```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
 2                   COLUMBIA DIVISION

 3
      RICHARD M. KENNEDY, III,   )
 4                               )
              PLAINTIFF,         )
 5                               )
            -VERSUS-            )       3:15-CV-01844
 6                               )       AUGUST 1, 2018
      ROBERT WILKIE, SECRETARY   )       COLUMBIA, SC
 7    OF THE US DEPARTMENT OF     )       VOLUME I OF II
      VETERANS AFFAIRS,          )
 8                               )
              DEFENDANTS.        )
 9    _____)

10

11         BEFORE THE HONORABLE MARGARET B. SEYMOUR
            UNITED STATES DISTRICT JUDGE, PRESIDING
12                     BENCH TRIAL
            ******** REDACTED TRANSCRIPT *********
13
      A P P E A R A N C E S :
14

15    FOR THE PLAINTIFF:        WILMOT B. IRVIN, ESQ.
                                REBECCA G. FULMER, ESQ.
16                              WILMOT B. IRVIN LAW OFFICE
                                PO BOX 7816
17                              COLUMBIA, SC  29202

18    FOR THE DEFENDANT:        TERRI H. BAILEY, AUSA
                                BROOK B. ANDREWS, AUSA
19                              US ATTORNEY'S OFFICE (COLUMBIA)
                                1441 MAIN STREET, SUITE 500
20                              COLUMBIA, SC  29201

21
      COURT REPORTER:           KATHLEEN RICHARDSON, RMR, CRR
22                              UNITED STATES COURT REPORTER
                                901 RICHLAND STREET
23                              COLUMBIA, SC 29201

24         STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

25                  *** *** *** ***
```

```
 1        OPENING STATEMENT BY MR. IRVIN  . . . . . . .  12

 2        OPENING STATEMENT BY MR. ANDREWS  . . . . . .  24

 3                   INDEX OF WITNESSES

 4   DR. ROBERT MILLER

 5        DIRECT BY MR. IRVIN . . . . . . . . . . .  43

 6        CROSS BY MRS. BAILEY  . . . . . . . . . .  73

 7        REDIRECT BY MR. IRVIN . . . . . . . . . .  81

 8        RECROSS BY MRS. BAILEY  . . . . . . . . .  83

 9   DR. BERNARD DEKONING

10        DIRECT BY MR. IRVIN . . . . . . . . . . .  84

11        CROSS BY MRS. BAILEY  . . . . . . . . . . 104

12   TAMARA NICHOLS

13        DIRECT BY MR. IRVIN . . . . . . . . . . . 116

14        CROSS BY MRS. BAILEY  . . . . . . . . . . 134

15        REDIRECT BY MR. IRVIN . . . . . . . . . . 161

16   DR. WILLIAM GROH

17        DIRECT BY MR. IRVIN . . . . . . . . . . . 183

18        CROSS BY MR. ANDREWS  . . . . . . . . . . 189

19        REDIRECT BY MR. IRVIN . . . . . . . . . . 197
```

```
20

21

22

23

24

25
```

**E X H I B I T S**

NO.                                      ID    EV

D-6                                           170


** EXHIBITS WERE PREMARKED **

1          THE COURT: ALL RIGHT.  THIS MORNING WE ARE HERE

2     FOR THE TRIAL OF THE CASE OF RICHARD M KENNEDY, THE THIRD,

3     VERSUS DAVID J SHULKIN IN HIS OFFICIAL CAPACITY AS SECRETARY

4     OF THE UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, CIVIL

5     ACTION NUMBER 3:14-3821.

6        THERE'S BEEN A MOTION TO SUBSTITUTE THE DEFENDANT FOR

7     THE NEWLY-APPOINTED SECRETARY OF THE DEPARTMENT OF VETERAN

8     AFFAIRS, ROBERT WILKIE.

9        IS THERE ANY OBJECTION TO THAT MOTION?

10          MR. IRVIN: NO OBJECTION, YOUR HONOR.

11          THE COURT: OKAY.  THE MOTION THEN IS GRANTED.  ARE

12    THERE ANY OTHER MOTIONS THAT NEED TO BE HEARD AT THIS TIME?

13          MRS. BAILEY: NOT FROM THE UNITED STATES, YOUR

14    HONOR.

15          MR. IRVIN: NONE FROM THE PLAINTIFF, YOUR HONOR.

16    THERE ARE JUST A FEW LITTLE HOUSEKEEPING MATTERS THAT WE

17    MIGHT WANT TO TALK ABOUT BEFOREHAND, BUT --

18          THE COURT: OKAY.

19          MR. IRVIN: -- NO MOTIONS.

20          THE COURT: ALL RIGHT.  AND THOSE HOUSEKEEPING

21    MATTERS ARE WHAT?

22          MR. IRVIN: THANK YOU, YOUR HONOR.  JUST WANTED TO

23    LET THE COURT KNOW THAT WE HAVE MADE SOME PROGRESS IN TERMS

24    OF BEING ABLE TO AGREE ON THINGS AND WE HAVE STIPULATED THE

25    EXHIBITS ON BOTH SIDES COME IN WITHOUT OBJECTION.  I JUST

1    WANTED TO APPRIZE THE COURT OF THAT.

2         AND ALSO I JUST WANTED TO REMIND THE COURT THAT WE DID

3    REQUEST IN OUR TRIAL BRIEF THAT THE WITNESSES BE EXCLUDED

4    UNDER THE RULE.  AND YOUR HONOR, I DO -- I GAVE TO

5    MRS. BAILEY A LIST THAT IS OUR -- OUR LIST OF -- NOW I CAN'T

6    PUT MY HANDS ON IT.  THERE IT IS.  THANK YOU.

7         AND JUST FOR THE COURT'S CONVENIENCE, THIS -- AS YOUR

8    HONOR WILL REMEMBER A FEW WEEKS AGO WHEN WE HAD A PRETRIAL

9    CONFERENCE WE DISCUSSED WHETHER THESE WITNESSES THAT WE PLAN

10   TO CALL THAT ARE VA EMPLOYEES --

11        *COURT REPORTER:*  CAN YOU GET NEAR YOUR MICROPHONE?

12        *MR. IRVIN:*  -- I'M SORRY.  WHETHER THE WITNESSES

13   WHO ARE VA EMPLOYEES WOULD COME IN BY DEPOSITION OR BY LIVE

14   TESTIMONY.  AND THEY ARE GOING TO COME IN BY LIVE TESTIMONY

15   WITH THE EXCEPTION OF DR. FICHTNER -- I BELIEVE IS HOW HE

16   PRONOUNCES THAT.  AND WE UNDERSTAND THAT DR. FICHTNER HAS A

17   SERIOUS MEDICAL CONDITION AND IS AWAY, AND SO WE ARE GOING TO

18   BE READING HIS; HIS DEPOSITION TESTIMONY.  I JUST WANTED TO

19   MAKE THE COURT AWARE OF THAT.

20        AND FOR THE COURT'S CONVENIENCE I WOULD JUST SIMPLY HAND

21   UP TO YOU -- WE HAVE ALREADY PROVIDED TO MRS. BAILEY -- THE

22   SEQUENCE OF THOSE VA WITNESSES IN THE ORDER THAT WE PLAN TO

23   CALL THEM.

24        *THE COURT:*  THAT'S FINE.

25        *MR. IRVIN:*  AND SO I JUST HAND THOSE TO THE CLERK.

```
 1    YOUR HONOR, JUST A COUPLE OF OTHER -- JUST A COUPLE OF OTHER
 2    HOUSEKEEPING MATTERS.  MRS. WOODS, WHO IS THE PARALEGAL FOR
 3    MRS. BAILEY AND MR. ANDREWS, WAS KIND ENOUGH YESTERDAY TO
 4    SEND ME A MUCH MORE LEGIBLE COPY OF OUR EXHIBIT 9,
 5    PLAINTIFF'S TRIAL EXHIBIT NUMBER 9.  AND UNFORTUNATELY I HAD
 6    ALREADY DELIVERED TO THE COURT OUR TRIAL NOTEBOOK THAT
 7    CONTAINED YOUR HONOR'S COPIES OF THE EXHIBITS.
 8         AND SO, WITH COUNSEL'S PERMISSION I SIMPLY WANTED TO
 9    HAND UP A MORE LEGIBLE COPY OF OUR TRIAL EXHIBIT NUMBER 9
10    WHICH MRS. BAILEY OBVIOUSLY ALREADY HAS A COPY OF.  AND THANK
11    YOU AGAIN, MRS. WOODS, FOR DOING THAT.  SO, THERE IS THAT.
12         AND ONE LAST HOUSEKEEPING MATTER.  YESTERDAY AS DR.
13    KENNEDY WAS PREPARING FOR THE TRIAL, HE NOTICED A TYPO IN HIS
14    CALCULATIONS, EXHIBIT 20, AND HE CORRECTED THAT AND SENT IT
15    TO ME AND I IMMEDIATELY SENT IT OVER TO MRS. BAILEY, AND I
16    HAVE -- UNFORTUNATELY IT WAS AFTER I DELIVERED THE TRIAL
17    NOTEBOOK, AND SO I WANTED TO JUST HAND UP TO YOUR HONOR, THE
18    HOLES PUNCHED IN IT, THAT CORRECTED SHEET THAT HAS -- YES.
19    THAT'S THE SAME ONE THAT I GAVE YOU.
20         AND YOUR HONOR, I THINK IN TERMS OF ANY HOUSEKEEPING
21    KINDS OF ISSUES, THAT WOULD BE ALL FOR THE PLAINTIFF.  AND I
22    SHOULD HAVE -- I APOLOGIZE.  I SHOULD HAVE INTRODUCED MYSELF.
23    I'M WILMOT IRVIN.  AND ALONG WITH REBECCA FULMER, MY
24    CO-COUNSEL, WE REPRESENT DR. RICK KENNEDY WHO IS SEATED WITH
25    US AT COUNSEL TABLE.
```

1            *THE COURT:*  THANK YOU VERY MUCH.  MRS. BAILEY?

2            *MRS. BAILEY:*  YOUR HONOR, AT COUNSEL TABLE WE HAVE

3    GOT BROOK ANDREWS, AN AUSA, AND SAUNDRA WOODS, OUR PARALEGAL

4    WHO WILL BE HELPING WITH THE EXHIBITS TODAY.

5            *THE COURT:*  OKAY.

6            *MRS. BAILEY:*  WE ALSO HAVE SOME SUMMER LAW CLERKS

7    AT THE US ATTORNEY'S OFFICE; CHRIS SEARS AND KEVIN DELONA

8    [PH].

9            *THE COURT:*  OKAY.

10           *MRS. BAILEY:*  AND THE NEWEST LAWYER IN THE BAILEY

11   FAMILY, MISS SARA BAILEY, WHO GRADUATED THIS PAST SPRING AND

12   TOOK THE BAR EXAM LAST WEEK.

13           *THE COURT:*  WELCOME.

14           *MRS. BAILEY:*  SHE WILL BE WATCHING THE TRIAL ALSO.

15           *THE COURT:*  OKAY.  THANK YOU.

16           *MR. IRVIN:*  YOUR HONOR, COULD WE BORROW ONE OF

17   THOSE LAW CLERKS OR PERHAPS SARA DURING THE TRIAL?  WE ARE A

18   LITTLE SHORT ON LAW CLERKS.

19           *MRS. BAILEY:*  OH, AND ONE MORE THING, YOUR HONOR.

20   WE -- DR. MILLER IS THE FIRST WITNESS ON THE PLAINTIFF'S

21   LIST.  HE RETIRED FROM THE VA SEVERAL MONTHS AGO AND MOVED TO

22   OHIO.  WE SUBPOENAED HIM TO COME TO THE TRIAL AND HE WAS

23   COMING LAST NIGHT BUT HIS PLANE GOT DELAYED BECAUSE THE

24   ATLANTA AIRPORT SHUT DOWN BECAUSE OF WEATHER.  HE IS ON THE

25   PLANE THIS MORNING AND SHOULD BE HERE SOON.

1          *THE COURT:*  OKAY.  SO THEN YOU WILL START WITH A

2    DIFFERENT WITNESS THEN IF HE'S NOT HERE?

3          *MRS. BAILEY:*  IF HE'S NOT HERE.

4          *THE COURT:*  OKAY.

5          *MR. IRVIN:*  YES, MA'AM.  WE CAN PUT HIM UP IF HE

6    ARRIVES IN TIME AFTER -- I'M ASSUMING THE COURT WOULD LIKE

7    SOME OPENING STATEMENTS.  BUT WE CAN PUT HIM UP WHEN HE GETS

8    HERE OR WE CAN TAKE HIM OUT OF SEQUENCE IF WE NEED TO.

9          *THE COURT:*  OKAY.  SO WILL YOU BE USING ANY SPECIAL

10   EQUIPMENT?  DO YOU KNOW HOW TO USE ALL OF THE EQUIPMENT HERE?

11         *MR. IRVIN:*  MAY IT PLEASE THE COURT.  WE INQUIRED A

12   WHILE BACK ABOUT WHAT YOUR HONOR'S PREFERENCE WAS IN TERMS OF

13   TRIAL EXHIBITS AND WE SUBMITTED THE PAPER COPIES VIA A TRIAL

14   NOTEBOOK.  MRS. BAILEY HAS BEEN GRACIOUS ENOUGH TO SAY THAT

15   THEY HAVE LOADED IN OUR EXHIBITS AS WELL AS THE DEFENDANT'S

16   EXHIBITS AND WE HAVE NO PROBLEM WITH THEM USING -- USING THE

17   EXHIBITS IN THAT WAY.

18      WE DID NOT DO THAT BECAUSE WE MAY HAVE MISUNDERSTOOD,

19   BUT WE -- WHAT WE UNDERSTOOD WAS PAPER COPIES IN A NOTEBOOK,

20   WE HAVE DONE THAT.  AND I HAVE GIVEN THE CLERK THE

21   PLAINTIFF'S ORIGINAL EXHIBITS.  AND YOUR HONOR MAY RECALL

22   THAT THERE WERE TWO OF OUR EXHIBITS THAT WERE ON DAMAGES

23   EXHIBITS AND THERE WAS SOME OBJECTION.  AND AS I MENTIONED

24   JUST A FEW MOMENTS AGO, WE HAVE RESOLVED THOSE OBJECTIONS AND

25   SO ALL OF THE EXHIBITS ON BOTH SIDES OF THE CASE ARE -- WOULD

```
 1    COME IN WITHOUT OBJECTION.

 2              THE COURT:  OKAY.  MR. ANDREWS?

 3              MR. ANDREWS:  AND YOUR HONOR, IN MY OPENING I WILL

 4    BE USING THE POWERPOINT.  EVERYTHING WE WILL BE USING WILL BE

 5    ELECTRONIC AND WE HAVE DONE A WALK-THROUGH HERE IN THE

 6    COURTROOM AND EVERYTHING IS WORKING.

 7              THE COURT:  OKAY.  ALL RIGHT.

 8              MR. IRVIN:  AND YOUR HONOR, IF THIS ISN'T THE

 9    APPROPRIATE TIME, I WOULD -- AND YOU MAY BE -- I DON'T KNOW

10    IF COUNSEL WILL BE REFERRING TO EXHIBITS, BUT I WOULD JUST

11    MOVE IN THE -- MOVE THE INTRODUCTION OF THE PLAINTIFF'S

12    EXHIBITS WITHOUT OBJECTION AND SAME WITH THE DEFENDANT IF

13    THAT'S...

14              THE COURT:  ALL RIGHT.  THAT'S FINE.

15              MR. IRVIN:  THANK YOU.

16              MRS. BAILEY:  AND I WILL HAND THE DEFENDANT'S

17    EXHIBITS UP.

18              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  SO, WE

19    ARE HERE IN THE MATTER OF RICHARD KENNEDY, THE THIRD, VERSUS

20    ROBERT WILKIE IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE

21    UNITED STATES DEPARTMENT OF VETERAN AFFAIRS.  THE PLAINTIFF'S

22    REMAINING CLAIM AGAINST THE DEFENDANT IS A DISPARATE IMPACT

23    CLAIM UNDER THE AGE DISCRIMINATION ACT, THE ADEA, 29 UNITED

24    STATES CODE, SECTION 623, AND THE PLAINTIFF IS BRINGING THIS

25    ACTION UNDER THE FEDERAL SECTOR PROVISION OF THE ADEA WHICH
```

1    IS 29, UNITED STATES CODE, SECTION 633A WHICH EXTENDS THE

2    ADEA TO FEDERAL EMPLOYEES OVER THE AGE OF 40.

3        PLAINTIFF ALLEGES THAT WILLIAM JENNINGS BRYAN DORN

4    VETERAN AFFAIRS MEDICAL CENTER, WHICH IS KNOWN AS THE DORN

5    MEDICAL CENTER, HAS ENGAGED IN A PRACTICE OF AGE

6    DISCRIMINATION IN DETERMINING THE MARKET PAY FOR

7    ANESTHESIOLOGISTS.

8        THE PLAINTIFF CLAIMS THAT ALTHOUGH THE DORN MEDICAL

9    CENTER'S PRACTICES AND POLICIES ARE FACIALLY NEUTRAL IN THE

10   TREATMENT OF STAFF ANESTHESIOLOGISTS, THE IMPACT OF THESE

11   PRACTICES FALLS MORE HARSHLY ON OLDER STAFF ANESTHESIOLOGISTS

12   INCLUDING THE PLAINTIFF.  AND THE PLAINTIFF IS SEEKING

13   DAMAGES AGAINST DEFENDANT IN THE FORM OF BACK-PAY, FUTURE

14   PAY, LOST RETIREMENT BENEFITS, AND OTHER BENEFITS,

15   CONSEQUENTIAL DAMAGES, ATTORNEYS FEES AND COSTS.

16       IN THE COURT'S JULY 30TH, 2018 ORDER THE COURT SET OUT

17   THE BURDEN OF PROOF IN THIS CASE AND SPECIFICALLY THE

18   PLAINTIFF HAS TO DEMONSTRATE WITH STATISTICAL EVIDENCE THAT

19   THE CHALLENGED PRACTICE HAS AN ADVERSE AFFECT ON THE

20   PROTECTED GROUP.

21       IF THE PLAINTIFF MEETS THIS BURDEN, THEN THE BURDEN

22   SHIFTS TO THE DEFENDANT TO DEMONSTRATE THAT THE CHALLENGED

23   PRACTICE IS JOB-RELATED FOR THE POSITION IN QUESTION AND

24   CONSISTENT WITH BUSINESS NECESSITY.  AND IF THE DEFENDANT

25   MEETS THIS BURDEN, THEN THE PLAINTIFF MUST THEN DEMONSTRATE

1   THAT AN ALTERNATIVE EMPLOYMENT PRACTICE COULD MEET THE

2   EMPLOYER'S LEGITIMATE NEEDS WITHOUT A SIMILAR DISCRIMINATORY

3   EFFECT.

4        AT THE HEART OF PLAINTIFF'S ISSUE WITH HOW MARKET PAY IS

5   SET IS HIS ALLEGATION THAT THE DEFENDANT DOES NOT FOLLOW THE

6   STATUTORY MANDATE TO CONSIDER THE FACTORS SET OUT IN SECTION

7   FIVE OF SECTION C OF THE ACT AND THE PLAINTIFF HAS LISTED THE

8   DETERMINATION OF THE AMOUNT OF MARKET PAY OF A PHYSICIAN OR

9   DENTIST SHOULD TAKE INTO CONSIDERATION CERTAIN FACTORS SUCH

10  AS THE LEVEL OF EXPERIENCE OF THE PHYSICIAN OR DENTIST AND

11  THE SPECIALTY OR THE ASSIGNMENT OF THE PHYSICIAN OR DENTIST,

12  THE NEED FOR THE SPECIALTY OR ASSIGNMENT OF THE PHYSICIAN OR

13  DENTIST AT THE MEDICAL FACILITY OF THE DEPARTMENT CONCERNED

14  AND THE HEALTHCARE LABOR MARKET FOR SPECIALTY FOR THE

15  SPECIALTY ASSIGNMENT OF THE PHYSICIAN OR DENTIST WHICH MAY

16  COVER ANY OF THE -- ANY OF THE GEOGRAPHIC AREA THE SECRETARY

17  CONSIDERS APPROPRIATE FOR THE SPECIALTY OR ASSIGNMENT, THE

18  BOARD CERTIFICATIONS, IF ANY, OF THE PHYSICIAN OR THE

19  DENTIST, AND THE PRIOR EXPERIENCE OF ANY OF THE PHYSICIANS OR

20  DENTISTS AS AN EMPLOYEE OF THE VETERANS HEALTH ADMINISTRATION

21  AND SUCH AS THE CONSIDERATIONS AS APPROPRIATE.  AND PLAINTIFF

22  IS CLAIMING THE DEFENDANT'S IMPROPER CONSIDERATION OF THESE

23  FACTORS HAS A SIGNIFICANT DISPARATE IMPACT ON HIM AND OLDER

24  ANESTHESIOLOGISTS.

25       AT THIS TIME I WILL HEAR FROM THE PLAINTIFF WITH REGARD

1    TO AN OPENING, ANY OPENING STATEMENT YOU MAY MAKE WITH REGARD

2    TO YOUR CASE.

3         *MR. IRVIN:*  THANK YOU VERY MUCH, YOUR HONOR.  I'M

4    NOT SURE, YOUR HONOR, ABOUT THE MICROPHONES AND THE SOUND

5    SYSTEM.  I WAS GOING TO USE THE PODIUM IF THAT...

6         *THE COURT:*  YOU MAY USE THE PODIUM, BUT JUST SPEAK

7    INTO THE MICROPHONE.

8                         OPENING STATEMENT

9         *MR. IRVIN:*  MAY IT PLEASE THE COURT.  THIS CASE,

10    YOUR HONOR, IS ABOUT ANESTHESIOLOGISTS AT DORN VA MEDICAL

11    CENTER AND THE AMOUNTS OF MARKET PAY THESE ANESTHESIOLOGISTS

12    RECEIVE.  AND AT BOTTOM, THE CASE PRESENTS, AS YOUR HONOR HAS

13    ALREADY ALLUDED TO, A CONFLICT BETWEEN THE FEDERAL STATUTE

14    GOVERNING PAY FOR VA PHYSICIANS AND, FIRST, A HANDBOOK THAT

15    WAS PUBLISHED BY THE VA AS INTERPRETED AND APPLIED BY THE

16    DORN VA AND, SECOND, THE FLAWED MARKET PAY METHODOLOGY THAT

17    IS ACTUALLY EMPLOYED BY DORN VA WHEREBY AT BEST, YOUR HONOR,

18    LIP SERVICE IS PAID TO THE STATUTORY FACTORS THAT ARE

19    MANDATED BY THE STATUTE.  THE LANGUAGE IN THE STATUTE IS,

20    SHALL TAKE INTO ACCOUNT THOSE FACTORS.  SO AT BEST THEY GIVE

21    LIP SERVICE TO THOSE FACTORS AND AT WORST THOSE MANDATED

22    FACTORS ARE SIMPLY IGNORED IN DETERMINING MARKET PAY.

23        THE RESULT?  THE DETERMINATION OF AN ANESTHESIOLOGIST'S

24    MARKET PAY, YOUR HONOR, BECOMES A SIMPLE MATHEMATICAL

25    CALCULATION AND THAT CALCULATION IS ANNUAL PAY MINUS BASE PAY

```
 1    EQUALS MARKET PAY.  THERE IS NO ATTEMPT TO ARRIVE AT AN AWARD

 2    OF MARKET PAY STANDING ALONE BY APPLYING THE MANDATED

 3    FACTORS.  AND KEY TO OUR CASE, YOUR HONOR, IS THAT THE

 4    STATUTE REQUIRES THAT.  AND AS THE TESTIMONY UNFOLDS, I

 5    BELIEVE THAT THE COURT WILL SEE THAT THAT AIN'T HOW IT

 6    HAPPENS AT DORN VA.

 7         NOW, ALSO LET ME JUST SAY THAT IN DOING SO, THAT IS THE

 8    METHODOLOGY THAT WE BELIEVE IS FLAWED AND IN VIOLATION OF THE

 9    STATUTE, THERE ALSO IS NO ATTEMPT MADE TO COMPARE THE

10    PROPOSED MARKET PAY OF A PARTICULAR ANESTHESIOLOGIST TO THE

11    MARKET PAY OF OTHER ANESTHESIOLOGISTS TO ENSURE THAT THE

12    FACTORS ARE APPLIED FAIRLY IN ARRIVING AT A DETERMINATION OF

13    MARKET PAY.

14         NOW, HERE IS HOW IT'S DONE AT DORN; THAT IS THIS PROCESS

15    OF ARRIVING AT AN ANESTHESIOLOGIST'S SALARY OR COMPENSATION.

16    THE ANESTHESIA DEPARTMENT OR SERVICE LINE SHEET -- DR.

17    MILLER, WHO IS ON HIS WAY FROM ATLANTA -- DR. MILLER, AS THE

18    SERVICE LINE CHIEF, WOULD IN WORKING WITH ONE OF DORN'S HR

19    PERSONS, WOULD COME UP WITH A NUMBER FOR ANNUAL PAY.  NOT

20    MARKET PAY BUT ANNUAL PAY.  AND ANNUAL PAY, AS THE COURT

21    KNOWS, IS THE SUM OF BASE PAY PLUS MARKET PAY.

22         AND SO DR. MILLER COMES IN TO WHAT IS CALLED A

23    COMPENSATION PANEL OR A PAY PANEL.  THEY ARE CALLED BOTH

24    THINGS IN THE TESTIMONY AND IN THE DOCUMENTS.  AND THE

25    STATUTE, YOUR HONOR, PRESCRIBES THAT THE SECRETARY OF THE VA
```

1    IS TO UTILIZE APPROPRIATE PANELS OF PHYSICIANS TO DETERMINE

2    MARKET PAY.  BUT DR. MILLER CONVENES A COMPENSATION PANEL AND

3    BRINGS WITH HIM A RECOMMENDATION FOR ANNUAL PAY AND HE PUTS

4    FORTH THAT RECOMMENDATION TO THE PANEL.

5         NOW, THE PANELS CONSIST OF THREE PHYSICIANS.  THEY ARE

6    NOT NECESSARILY ANESTHESIOLOGISTS.  THEY ARE SIMPLY

7    PHYSICIANS EMPLOYED AT THE DORN VA.  AND THOSE THREE

8    PHYSICIANS SERVE AS THE PANEL.  DR. MILLER, WHO IS THE

9    SERVICE LINE CHIEF FOR ANESTHESIOLOGY, PRESENTS.  THEY CALL

10   HIM THE PRESENTER OF THE RECOMMENDATION FOR ANNUAL PAY.

11        NOW, I THINK THAT THE TESTIMONY WILL DEMONSTRATE THAT

12   USUALLY, NOT ALWAYS, BUT USUALLY THAT RECOMMENDATION OF

13   ANNUAL PAY IS ACCEPTED BY THE PANEL AND THAT ESSENTIALLY

14   CONCLUDES THE PANEL'S ACTION.  THE MEMBERS OF THE PANEL SIGN

15   THE COMP FORM, THE COMP REVIEW FORM, AND THE PAPER TRAIL

16   PROGRESSES ON THROUGH HR AND GOES TO THE DIRECTOR OF THE DORN

17   VA WHO IS THE APPROVING OFFICIAL, AND THAT PERSON APPROVES

18   THE RECOMMENDATION THAT IS PASSED ON BY THE COMP PANEL.  THAT

19   IS IN GENERAL TERMS HOW THINGS WORK AT THE DORN VA.

20        AND THE IMPORTANT THING, YOUR HONOR, IS THAT IN THAT

21   PROCESS THERE IS NO FOCUS SPECIFICALLY ON MARKET PAY.  THE

22   FOCUS -- AND I BELIEVE WE WILL HEAR VIRTUALLY EVERY WITNESS

23   FROM THE VA CONFIRM THAT THE PANEL'S JOB, DR. MILLER'S JOB,

24   IS TO FOCUS ON ANNUAL PAY AND NOT MARKET PAY.  AND SO THAT,

25   YOUR HONOR, IS AT THE HEART OF THE CASE AND VIOLATES THE

1    STATUTORY MANDATE THAT THOSE FACTORS SHALL -- THEY SHALL TAKE

2    INTO ACCOUNT THOSE FACTORS IN DETERMINING MARKET PAY.

3         NOW, YOUR HONOR, I'VE ALREADY TALKED ABOUT ANNUAL PAY

4    AND THE TWO ELEMENTS OF ANNUAL PAY.  THOSE ARE BASE PAY AND

5    MARKET PAY.  VERY BRIEFLY YOU'LL HEAR ABOUT BASE PAY,

6    PROBABLY ALREADY READ ABOUT IT.  BASE PAY IS A -- IS A TABLE

7    OF LONGEVITY, AND THE NUMBERS FOR BASE PAY FOR A PARTICULAR

8    ANESTHESIOLOGIST COMES OFF OF THAT TABLE.

9         THERE'S NO DISCRETION.  THE PANEL DOESN'T NEED TO WORRY

10   ABOUT DID SHE MAKE ALL A'S IN MEDICAL SCHOOL OR DOES HE HAVE

11   BOARD CERTIFICATION OR HOW LONG -- IT'S PURELY A FUNCTION OF

12   THE LONGEVITY TABLE.  DR. KENNEDY'S BEEN THERE FOR 14 YEARS.

13   HE FALLS ON THE TABLE FOR BASE PAY, IT'S STEP SO-AND-SO OR

14   TIER SO-AND-SO AND BINGO, THERE'S HIS NUMBER.  THAT'S IT.  HR

15   DOES THAT ESSENTIALLY.

16        SO, ANNUAL PAY THEN IS BASE PAY PLUS THE MARKET PAY.

17   AND YOU HAVE A RECOMMENDATION FOR ANNUAL PAY AND YOU HAVE A

18   BASE PAY PORTION OF THAT THAT IS NONDISCRETIONARY, COMES

19   RIGHT OFF THE TABLE, IT IS WHAT IT IS, AND THAT'S WHAT YOU

20   APPLY.

21        AND SO WHAT HAPPENS IS WHEN THE PANEL HAS DONE ITS JOB

22   AND IT HAS RECOMMENDED THE ANNUAL PAY FIGURE, THEN YOU HAVE

23   GOT THE ANNUAL PAY FIGURE THEN.  LET'S SAY IT'S $275,000.

24   AND THEN YOU HAVE GOT A BASE PAY THAT COMES OFF THE TABLE,

25   THE LONGEVITY TABLE.  YOU KNOW WHAT THAT IS OR AT LEAST HR

1    KNOWS WHAT THAT IS.  AND THEY SIMPLY TAKE THE ANNUAL PAY

2    RECOMMENDATION AND THEY SUBTRACT THAT BASE PAY NUMBER THAT

3    COMES RIGHT OFF THE TABLE AND THAT'S HOW THEY ARRIVE AT THE

4    MARKET PAY.

5         THERE IS NO EVIDENCE, NO DOCUMENTATION ANYWHERE THAT I

6    HAVE SEEN IN THIS CASE WHEREBY THE DORN VA EVER TAKES THOSE

7    FACTORS AND APPLIES THEM IN A DETERMINATION DISCREETLY OF

8    MARKET PAY.  IT SIMPLY DOESN'T HAPPEN.  AND SO THAT SIMPLE

9    ARITHMETIC FORMULA, THAT CALCULATION THAT I MENTIONED A

10   MOMENT AGO IS HOW MARKET PAY IS DERIVED.  HEY, WE GOT AN

11   ANNUAL PAY RECOMMENDATION, WE KNOW WHAT THE BASE PAY NUMBER

12   IS, AND SO HR SUBTRACTS THAT FROM ANNUAL PAY AND THAT'S THE

13   MARKET PAY NUMBER.

14        NOW, LET ME TRY TO SAY WHY THIS MATTERS.  THE DATA THAT

15   DR. KENNEDY WILL TESTIFY THAT HE COLLECTED AFTER HE LEARNED

16   ABOUT HOW THINGS WORKED AT DORN VA AND THAT SAME DATA THAT

17   WAS LATER COLLECTED BY MRS. FULMER AND ME IN THE DISCOVERY IN

18   THIS CASE CLEARLY DEMONSTRATES AN INVERSE CORRELATION BETWEEN

19   THE AGE OF THE ANESTHESIOLOGISTS AND THE AMOUNT OF MARKET

20   PAY.

21        YOUR HONOR HAS ALREADY BEEN THERE AND DONE THIS.  AND IN

22   YOUR ORDER ON SUMMARY JUDGMENT YOU HAD A TABLE THAT THE

23   DEFENDANT HAD SUBMITTED, YOU HAD INFORMATION FROM US, AND YOU

24   SAW, THE COURT SAW, YOUR HONOR SAW THAT INVERSE CORRELATION.

25        AND SO, WHEN DR. KENNEDY LEARNED ABOUT HOW THINGS REALLY

1   WORKED IN DETERMINING MARKET PAY, HE MADE A FOIA REQUEST

2   BEFORE I HAD EVER SPOKEN TO HIM AND HE GATHERED THE

3   INFORMATION RELATIVE TO THE OTHER ANESTHESIOLOGISTS THAT WERE

4   MARKET PAY INFORMATION AND EVENTUALLY AGE INFORMATION AND HE

5   WAS ABLE TO SEE WHAT WAS HAPPENING TO HIM, AND HE IS THE

6   OLDEST ANESTHESIOLOGIST AT DORN.

7       HE HAS BEEN THERE FOR LONGER THAN ANY OF THE OTHER

8   ANESTHESIOLOGISTS AT DORN AND HE SEES THAT RATHER THAN BEING

9   GIVEN CREDIT FOR OR WE WOULD SAY REWARDED FOR THAT TIME THAT

10  HE HAS SPENT AT THE DORN VA -- AND THAT'S ONE OF THE FACTORS

11  THAT'S MANDATED IN THE STATUTE IN DETERMINING THE AMOUNT OF

12  MARKET PAY -- HE WAS ACTUALLY BEING PUNISHED, IF YOU WILL,

13  BECAUSE HE WAS RECEIVING THE LOWEST MARKET PAY OF ANY OF THE

14  ANESTHESIOLOGISTS.  AND SO, THE OLDER YOU ARE, THE LESS

15  MARKET PAY YOU RECEIVE IF YOU'RE AN ANESTHESIOLOGIST AT THE

16  DORN VA.

17      NOW, THAT RESULT NOT ONLY EVIDENCES A DISPARATE IMPACT

18  UPON OLDER ANESTHESIOLOGISTS SUCH AS DR. KENNEDY BUT IT ALSO

19  DIRECTLY CONTRAVENES THOSE MANDATED STATUTORY FACTORS THAT

20  REWARD LONGEVITY; LEVEL OF EXPERIENCE IN THE SPECIALTY, PRIOR

21  EXPERIENCE AS AN EMPLOYEE IN THE VA.  AND SO, LONGEVITY THEN

22  IS RECOGNIZED AS A FACTOR DESERVING OF REWARD IN THE FORM OF

23  MARKET PAY.

24      AND SO, YOUR HONOR, WHEN A YOUNGER ANESTHESIOLOGIST WITH

25  SUBSTANTIALLY LESS LONGEVITY RECEIVES $20,000 MORE IN MARKET

1    PAY THAN AN OLDER ANESTHESIOLOGIST WITH SUBSTANTIALLY MORE

2    LONGEVITY, THEN THE SYSTEM THAT WAS ESTABLISHED BY THE

3    CONGRESS HAS BEEN VIOLATED AND THE TRUST THAT WAS PLACED BY

4    ANESTHESIOLOGISTS, THOSE OLDER ANESTHESIOLOGISTS LIKE DR.

5    KENNEDY IN THE SYSTEM ESTABLISHED BY CONGRESS, THAT TRUST HAS

6    BEEN BROKEN, AND THAT'S WHAT THIS CASE IS ALL ABOUT.

7         AND AS YOUR HONOR KNOWS, WHENEVER THERE IS A CONFLICT

8    BETWEEN A FEDERAL STATUTE AND AN AGENCY REGULATION OR

9    IMPLEMENTATION, THEN THE STATUTE CONTROLS.  YOUR HONOR KNOWS

10   THAT LAW, HAS THAT LAW, WE HAVE SUBMITTED THAT LAW, AND THAT

11   IS REALLY THE NUB OF WHERE WE ARE BECAUSE HERE THE VA HAS

12   CREATED A SYSTEM AND THE DORN VA HAS IMPLEMENTED ITS OWN

13   SYSTEM THAT, YOU KNOW, IT'S ALL WELL AND GOOD AND IF THEY

14   WERE A BUSINESS AND THEY WANTED TO DO IT THAT WAY, THEN FINE,

15   BUT THEY ARE NOT.  AND THE CONGRESS OF THE UNITED STATES

16   CREATED A SYSTEM THAT WILL WORK JUST FINE AND THAT'S WHAT

17   THEY ARE NOT FOLLOWING.

18        NOW, AS FAR AS ANY BUSINESS NECESSITY JUSTIFYING WHAT

19   DORN HAS DONE HERE BY ESSENTIALLY VIOLATING THE STATUTORY

20   MANDATES AND HOW MARKET PAY IS TO BE DETERMINED, THERE REALLY

21   IS NO SUCH NECESSITY THAT CAN JUSTIFY VIOLATING THE FEDERAL

22   STATUTE.  AND NOT ONLY ARE THEY -- IN DOING THAT NOT ONLY ARE

23   THEY WORKING A DISPARATE IMPACT UPON OLDER ANESTHESIOLOGISTS

24   BUT THEY ARE IN VIOLATION OF THE STATUTE AND THEY CANNOT COME

25   FORWARD AND SAY WE HAVE GOT A BUSINESS NECESSITY HERE EVEN

```
1   THOUGH IT MEANS WE ARE VIOLATING THE STATUTE.

2        SO ON THE BUSINESS NECESSITY ISSUE I THINK THAT'S NUMBER

3   ONE.  AND NUMBER TWO IS, YOUR HONOR, THE ALTERNATIVE TO WHAT

4   THEY'RE DOING AND THE -- THAT ALTERNATIVE THAT WOULD ACHIEVE

5   THE GOALS OF RECRUITMENT AND RETENTION OF QUALIFIED

6   PHYSICIANS AND SPECIALTY, THAT -- THAT ALTERNATIVE IS THE

7   VERY PLAN THAT CONGRESS INTENDED IN THE STATUTE.  THAT IS

8   WHAT THEY CAN DO TO ENSURE FAIRNESS AND TO ACHIEVE THE GOALS

9   THAT ARE SET FORTH IN THE STATUTE.

10       AND SO, YOUR HONOR, WE JUST THINK THAT THERE IS NO

11  BUSINESS NECESSITY HERE THAT WOULD JUSTIFY VIOLATING A

12  STATUTE PARTICULARLY WHEN THAT STATUTE IS NOT BEING

13  IMPLEMENTED.  AND IF IT WERE, THERE WOULD BE NO -- NONE OF

14  THESE PROBLEMS.

15       NOW, VERY BRIEFLY -- AND I'M GOING TO SIT DOWN AND LET

16  MR. ANDREWS GO -- BUT I WANT TO JUST MENTION ON DAMAGES, YOUR

17  HONOR, A COUPLE OF THINGS.  AND YOUR HONOR HAS ALREADY

18  TOUCHED ON THIS AND I'LL TRY TO BE BRIEF.

19       WE HAVE -- DR. KENNEDY HAS DONE CALCULATIONS HERE AND

20  THOSE ARE IN THE EVIDENCE NOW AND WE WILL TALK ABOUT THAT

21  WHEN DR. KENNEDY GETS ON THE WITNESS STAND.  BUT WHAT HE HAS

22  DONE, YOUR HONOR, IS HE HAS LOOKED AT THE MARKET PAY AWARDS

23  FOR THE FIVE ANESTHESIOLOGISTS IN THE DEPARTMENT.  AND AS

24  YOUR HONOR WILL SEE, AND I BELIEVE IT'S ALREADY BEEN

25  DEMONSTRATED, DR. KENNEDY'S MARKET PAY COMES OUT AS THE
```

1    LOWEST EVERY PERIOD OF TIME THAT IS IN QUESTION HERE.

2         AND WHAT WE SAY, YOUR HONOR, IS THAT THE EVIDENCE WILL

3    DEMONSTRATE THAT DR. KENNEDY IN EVERY RESPECT IS EQUALLY

4    QUALIFIED AS AN ANESTHESIOLOGIST AND FOR THE FACTORS THAT

5    MATTER UNDER THE STATUTE HERE -- AND THERE ARE -- SOME OF

6    THEM DON'T REALLY EVEN APPLY AND I DON'T THINK ANYBODY

7    CONTESTS THAT THEY ARE THE SAME FOR EVERYBODY, THERE'S NO

8    DIFFERENCE BETWEEN THEM.

9         BUT THE ONE DIFFERENCE THAT MATTERS, YOUR HONOR, IS DR.

10   KENNEDY'S EXPERIENCE AT THE VA IS ABOVE ANY OF THE OTHER

11   ANESTHESIOLOGISTS.  AND SO WHEN YOU ACTUALLY APPLY THE

12   FACTORS, THEN DR. KENNEDY IS AT LEAST EQUAL IN THOSE FACTORS

13   THAT HAVE TO DO WITH COMPETENCY OR CLINICAL PRACTICE OR

14   EXPERIENCE IN THE SPECIALTY, BOARD CERTIFICATION.  THEY ARE

15   ALL BOARD CERTIFIED.

16        BUT THE ONE DIFFERENCE AND ONE OF THE FACTORS IS HE'S

17   BEEN THERE LONGER.  CONGRESS INTENDED THAT LONGEVITY AT THE

18   VA -- DR. KENNEDY'S GOT IT, HE'S THE OLDEST, BUT HE'S ALSO

19   THE ONE WITH THE MOST LONGEVITY AT THE VA IN ANESTHESIA --

20   SHOULD BE GIVEN SOME CREDIT.

21        AND SO, HERE'S WHERE I HAVE BEEN TRYING TO GO WITH THIS.

22   THE WAY WE MEASURE DAMAGES, AND WE THINK THIS IS AN

23   ABSOLUTELY REASONABLE APPROACH, THIS IS PLAINTIFF'S

24   EXHIBIT 18.  THE WAY DR. KENNEDY HAS MEASURED DAMAGES IS HE

25   SAID OKAY, YOU KNOW, THEY HAVE ESTABLISHED THIS RANGE OF

1    MARKET PAY AWARDS AND THEY DO THAT BY THE MARKET PAY THAT

2    THEY GIVE TO THE VARIOUS ANESTHESIOLOGISTS YEAR OVER YEAR

3    OVER YEAR.  BECAUSE I AM AT LEAST EQUAL ON ALL THE OTHER

4    FACTORS AND SUPERIOR ON THE FACTOR OF EXPERIENCE AT THE VA, I

5    SHOULD HAVE BEEN RATHER THAN AT THE BOTTOM OF THAT RANGE OF

6    MARKET PAY AWARDS FOR THE ANESTHESIOLOGISTS, I SHOULD HAVE

7    BEEN AT THE TOP OF THAT RANGE.  THEY HAVE GIVEN MARKET PAY IN

8    VARIOUS AMOUNTS.  THEY PUT ME AT THE BOTTOM.

9        AND SO WHAT WE SAY IN OUR DAMAGES IS IT IS A REASONABLE

10   APPROACH TO SAY, OKAY, SO LET'S JUST PUT DR. KENNEDY AT THE

11   TOP AND LET'S USE WHOEVER IT IS, DR. ALGHOTHANI OR DR. NGUYEN

12   OR WHOEVER HAD THE MOST MARKET PAY AND LET'S SAY DR. KENNEDY

13   SHOULD HAVE GOTTEN THAT.  IN FAIRNESS HE SHOULD HAVE GOTTEN

14   THE HIGHEST AWARD.

15       AND SO, WHAT WE HAVE DONE IS, WHAT DR. KENNEDY HAS DONE

16   IS HE HAS TAKEN HIS ACTUAL MARKET PAY AWARDS AND HE'S -- HE'S

17   THEN TAKEN THE HIGHEST AWARD FOR EACH PERIOD AND HE'S JUST

18   SUBTRACTED AND GOTTEN THE DIFFERENCE AND HE'S SAYING, I

19   SHOULD HAVE RECEIVED THE HIGHEST, AND IF I HAD I WOULD HAVE

20   GOTTEN THIS MUCH MORE IN MARKET PAY OVER THE PERIOD OF TIME

21   THAT WE'RE TALKING ABOUT AND THAT ESSENTIALLY HE'S DONE A

22   CALCULATION AND THAT'S HOW HE COMES UP WITH HIS BACK-PAY

23   NUMBER THAT IS SET FORTH IN EXHIBIT 18.

24       AND AS YOUR HONOR KNOWS, WE ARE SEEKING NOT ONLY THE

25   BACK-PAY AWARD BUT WE ARE SEEKING INTEREST ON THAT BACK-PAY.

1    AND YOUR HONOR, THOSE SAME CALCULATIONS THAT I JUST DESCRIBED

2    FOR THE BACK-PAY ARE UTILIZED -- AND DR. KENNEDY HAS DONE

3    THIS IN HIS EXHIBIT 20 TO FIGURE OUT HOW HAS THIS IMPACTED MY

4    PENSION.

5        HE'S -- THAT IS A VERY IMPORTANT THING TO DR. KENNEDY.

6    HE HAS NOW RETIRED FROM THE VA.  THAT RETIREMENT DATE IS

7    SEPTEMBER THE 30TH OF 2017, SO HE'S 10 MONTHS OUT FROM

8    RETIREMENT.  HE'S HAD SOME MEDICAL ISSUES THAT PROMPTED HIM

9    TO RETIRE EARLIER THAN HE HAD INTENDED TO DO, BUT HE HAS

10   RETIRED.  AND HIS PENSION -- ONE OF THE REASONS FOR DR.

11   KENNEDY'S LONGEVITY IS BECAUSE OF THE PENSION BENEFITS THAT

12   ARE AVAILABLE THROUGH THE VA SYSTEM, AND SO IT'S VERY

13   IMPORTANT TO HIM.

14       AND AS YOUR HONOR MAY BE AWARE, THAT PENSION SYSTEM ALSO

15   PROVIDES THAT IN HIS UNTIMELY DEATH THAT HIS WIFE COULD

16   RECEIVE A PORTION OF THOSE PENSION BENEFITS, TOO, AND SO

17   THAT'S KEY TO HIM.

18       AND WHAT HE'S DONE IS HE HAS FIGURED OUT FROM THE

19   INFORMATION THAT'S PUBLICLY AVAILABLE ABOUT HOW THE VA

20   CALCULATES PENSIONS, HE HAS TAKEN HIS MARKET PAY NUMBERS AND

21   CALCULATIONS AND HE'S FIGURED OUT THAT IF HE HAD GOTTEN THE

22   HIGHER AWARD OVER THESE YEARS, THE WAY THE VA, THE WAY THE

23   GOVERNMENT FIGURES HIS PENSION, HE WOULD HAVE GOTTEN MORE PER

24   MONTH.  HE'S DONE THOSE CALCULATIONS AND WE HAVE BEEN ABLE TO

25   SUBMIT, AGREE TO IT, NO OBJECTION, THEY ARE IN EVIDENCE.  DR.

1    KENNEDY WILL EXPLAIN THAT.  AND SO THAT'S -- THAT'S

2    ESSENTIALLY OUR DAMAGES.

3         THERE IS, YOUR HONOR, A LITTLE BIT OF BACK-PAY SORT OF

4    AN ISSUE WITH PENSION AND THAT IS BETWEEN SEPTEMBER THE 30TH

5    OF LAST YEAR WHEN DR. KENNEDY MEDICALLY RETIRED UP TO A POINT

6    WHERE THE COURT ISSUES A JUDGMENT, IF THE COURT DOES, AND

7    WHATEVER THAT PERIOD IS, 11 MONTHS OR SOMETHING, THEN HE IS

8    SEEKING ESSENTIALLY A BACK-PAY AWARD, IF YOU WILL, FOR THE

9    PENSION BENEFITS THAT HE SHOULD HAVE RECEIVED TO DATE OF YOUR

10   HONOR'S JUDGMENT.  IT'S RELATIVELY MODEST AMOUNT, BUT THERE'S

11   THAT, TOO.

12        ONE LAST THING AND I THINK I'M READY TO SIT DOWN.

13   MRS. FULMER WILL BE ABLE TO -- PERHAPS A LOT MORE ELOQUENTLY

14   THAN I CAN -- ABOUT THE PROVISIONS IN THE BACK-PAY ACT AND SO

15   FORTH.  YOUR HONOR, THE POINT IS THAT THE COURT HAS THE

16   AUTHORITY TO DIRECT THAT THE VA, THAT THE GOVERNMENT

17   RECALCULATE DR. KENNEDY'S MARKET PAY ALONG THE LINES THAT WE

18   HAVE DESCRIBED IF YOUR HONOR BELIEVES THAT WHAT WE ARE

19   PUTTING FORTH IS A REASONABLE APPROXIMATION OF THE DAMAGES

20   THAT HE HAS INCURRED AND SO FORTH.

21        UNDER THE BACK-PAY ACT IN ADDITION TO DR. KENNEDY'S

22   CALCULATIONS, WHICH WE BELIEVE ARE REASONABLE AND GOOD AND SO

23   FORTH, YOUR HONOR CAN DIRECT THE VA TO DO ITS OWN

24   CALCULATIONS UNDER THE BACK-PAY ACT AND TO CALCULATE INTEREST

25   UNDER THE BACK-PAY ACT ON THOSE BACK-PAY AWARDS.  AND SO I

1    JUST WANTED TO MENTION THAT.

2        AND YOUR HONOR CAN ALSO DIRECT THEM, HAS THE STATUTORY

3    AUTHORITY UNDER THE BACK-PAY ACT, TO DIRECT THE VA TO

4    RECALCULATE HIS PENSION BENEFITS SO THAT GOING FORWARD HE

5    WILL RECEIVE AN ENHANCED PENSION BENEFIT DUE TO THE LOSS OF

6    THE MARKET PAY THAT WE HAVE DESCRIBED.

7        AND AS YOUR HONOR POINTED OUT, FINALLY WE SEEK AN AWARD

8    OF ATTORNEYS FEES, AND AT THE APPROPRIATE TIME WE CAN ADDRESS

9    THAT IF THERE IS AN APPROPRIATE TIME.

10            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

11            MR. IRVIN:  THANK YOU VERY MUCH.

12            THE COURT:  MR. ANDREWS?

13            MR. ANDREWS:  MORNING, YOUR HONOR.

14            THE COURT:  GOOD MORNING.

15            MR. ANDREWS:  MAY IT PLEASE THE COURT.

16            THE COURT:  YES.

17                    OPENING STATEMENT

18            MR. ANDREWS:  PLAINTIFF WAS THE BEST PAID

19    ANESTHESIOLOGIST IN A NONSUPERVISORY POSITION AT DORN MEDICAL

20    CENTER.  OVER THE COURSE OF HIS CAREER HE RECEIVED CONSISTENT

21    PAY INCREASES, HIS PAY NEVER WENT DOWN, AND HE WAS NOT

22    TERMINATED.  I HAVE SEARCHED FOR AND CANNOT FIND A PAY

23    DISCRIMINATION CASE BROUGHT UNDER ANY CIVIL RIGHTS STATUTE

24    WHERE THE PLAINTIFF WAS PAID MORE THAN HIS PEERS AND THE

25    COURT NEVERTHELESS DECIDED THAT A CIVIL RIGHTS STATUTE

1    ENTITLED HIM TO MORE MONEY.  THIS CASE SHOULD NOT BE THE

2    FIRST.

3         NOW YOUR HONOR, WE HAVE ARTICULATED OVER THE COURSE OF

4    THIS CASE, AS I KNOW YOU ARE WELL AWARE, OUR ARGUMENTS ABOUT

5    JURISDICTION AND I AM NOT GOING TO RE-ARGUE THOSE HERE.  BUT

6    IN MANY WAYS WE ARE GLAD TO BE HERE NOW IN ORDER TO DEVELOP A

7    FULL TRIAL RECORD THAT WILL ESTABLISH THAT THIS IS NOT IN ANY

8    WAY A CASE OF DISCRIMINATION.

9         OUR ANALYSIS STARTS WITH THE PLAINTIFF'S PRIMA FACIE

10   CASE.  AND YOUR HONOR, THE STANDARD IS TAKEN FROM YOUR

11   SUMMARY JUDGMENT OPINION OF MARCH 2017, AND AS YOUR HONOR

12   REPEATED THIS MORNING, IT INVOLVES A SERIES OF ELEMENTS THAT

13   THE PLAINTIFF IS REQUIRED TO DEMONSTRATE IN THE PRIMA FACIE

14   CASE.

15        NOW, I HAVE BROKEN THOSE OUT INTO THREE DIFFERENT

16   FACTORS.  AND THE PLAINTIFF, IN ORDER TO MAKE ITS PRIMA FACIE

17   CASE, NEEDS TO DEMONSTRATE ALL THREE BY A PREPONDERANCE OF

18   THE EVIDENCE.  NOW, THE FIRST IS A SPECIFIC EMPLOYMENT

19   PRACTICE.  TWO, THAT HAD A DISPROPORTIONATE ADVERSE IMPACT ON

20   PEOPLE IN THE PROTECTED CLASS -- IN THIS CASE PEOPLE OVER THE

21   AGE OF 40.  AND THIRD, A DEMONSTRATION OF CAUSATION THROUGH

22   STATISTICAL EVIDENCE OF A KIND AND DEGREE SUFFICIENT TO SHOW

23   THAT THE PRACTICE IN QUESTION HARMED THOSE INDIVIDUALS

24   BECAUSE OF THEIR AGE.

25        NOW, AS WE GO THROUGH THESE FACTORS, I BELIEVE THE

1    EVIDENCE AND THE TESTIMONY IS GOING TO DEMONSTRATE THAT

2    PLAINTIFF IS GOING TO FAIL THE PRIMA FACIE ANALYSIS AT EVERY

3    STEP.  BUT EVEN IF THIS PLAINTIFF IS ABLE TO DEMONSTRATE ALL

4    THOSE FACTORS, AS YOUR HONOR HAS POINTED OUT IN THE ORDER OF

5    THIS WEEK, THE UNITED STATES THEN HAS THE OPPORTUNITY TO

6    PRESENT A REBUTTAL CASE SHOWING BUSINESS NECESSITY.  AND YOUR

7    HONOR, WE BELIEVE THE FACTS WILL SUPPORT THAT AS WELL.

8        SO AS WE GO THROUGH THIS PRESENTATION, I'M GOING TO WALK

9    THROUGH EACH STEP OF THE PRIMA FACIE ANALYSIS AND TALK ABOUT

10   THE EVIDENCE THAT'S GOING TO BE PRESENTED AT THIS TRIAL, SOME

11   QUESTIONS THAT I THINK WILL BE KEY FOR THE COURT IN

12   EVALUATING THAT EVIDENCE.

13       THE FIRST IS A SPECIFIC EMPLOYMENT PRACTICE.  NOW, THE

14   SUPREME COURT IN MEACHAM HAS INSTRUCTED THAT SPECIFIC

15   EMPLOYMENT PRACTICE NEEDS TO BE SOMETHING MORE THAN A

16   GENERALIZED POLICY OR A GENERALIZED GRIEVANCE, IT HAS TO

17   ISOLATE AND IDENTITY VERY SPECIFIC EMPLOYMENT PRACTICES.

18       NOW, IN THIS CASE THE PLAINTIFF HAS ALLEGED THAT DORN

19   FAILED TO CALCULATE HIS MARKET PAY PURSUANT TO STATUTORY

20   PROCEDURE.  WE WOULD SUGGEST THAT THIS IS ABOUT AS GENERAL AS

21   IT GETS.  AND WHEN WE REALLY GET INTO THE DETAILS, THE

22   EVIDENCE WILL NOT SUPPORT ANYTHING MORE SPECIFIC THAN THAT

23   BECAUSE THE KEY QUESTIONS I WOULD URGE ON THE COURT AT THIS

24   PARTICULAR STEP OF THE ANALYSIS IS IN WHAT SPECIFIC WAY DID

25   THE VA FAIL TO CALCULATE THE PLAINTIFF'S PAY AND A SECONDARY

```
1    AND EVEN MORE IMPORTANT QUESTION, WERE ALL OLDER EMPLOYEES

2    AFFECTED IN THE SAME WAY.  WE BELIEVE THE EVIDENCE WON'T

3    SUPPORT THAT.

4         NOW, THE SECOND STEP OF THE INQUIRY -- AND I'M GOING TO

5    SPEND SOME TIME HERE BECAUSE I THINK THIS IS PROBABLY THE

6    MOST CRITICAL PIECE OF THE INQUIRY -- IS THAT A PLAINTIFF

7    MUST ALLEGE A TANGIBLE ADVERSE EMPLOYMENT ACTION.  AND IT IS

8    OBVIOUS IN A DISCRIMINATION CASE THAT THE PLAINTIFF, IN A

9    DISPARATE IMPACT CASE, THAT THE PLAINTIFF'S PROTECTED CLASS

10   MUST BE HARMED IN SOME WAY.

11        AND YOUR HONOR, THE EVIDENCE IS GOING TO SHOW THE

12   PLAINTIFF HAD NOT BEEN HARMED IN ANY TANGIBLE WAY OR IN ANY

13   WAY AT ALL, MUCH LESS OLDER EMPLOYEES AT THE VA.  AS I HAVE

14   SAID, THE PLAINTIFF WAS THE HIGHEST PAID ANESTHESIOLOGIST.

15   HIS PAY WAS FAIRLY CLOSE TO THAT OF HIS PEERS, BUT IT WAS

16   NEVERTHELESS HIGHER.  HE RECEIVED CONSISTENT PAY RAISES OVER

17   TIME.  HE RECEIVED MORE IN FACT THAN A YOUNGER COLLEAGUE WHO

18   HAD MORE EXPERIENCE IN THE FIELD OF ANESTHESIOLOGY AND HE WAS

19   RELATIVELY CLOSE IN AGE AND OVERALL EXPERIENCE TO HIS PEERS.

20   THERE'S BEEN SOME CONFUSION I THINK ABOUT THAT IN HIS RECORD,

21   BUT WE ARE GOING TO TALK ABOUT THAT, AND THE EVIDENCE AND THE

22   TESTIMONY IS GOING TO MAKE THAT CLEAR.

23        I WOULD SUGGEST THAT THIS COURT WILL NOT FIND A

24   SUCCESSFUL PAY DISCRIMINATION CASE WITH FACTS LIKE THESE

25   BECAUSE THESE ARE NOT HARMFUL FACTS.  SO AS YOUR HONOR
```

1    EVALUATES THE EVIDENCE IN THIS CASE, IT'S IMPORTANT TO ASK

2    THE QUESTION, DID THE PLAINTIFF REALLY SUFFER ANY HARM HERE?

3    AND EVEN MORE IMPORTANTLY, DID OLDER EMPLOYEES AT THE CLASS

4    SUFFER ANY HARM?

5        SO HOW DOES THE PLAINTIFF ALLEGE HE'S BEEN HARMED?  AND

6    YOUR HONOR ACKNOWLEDGED THIS AT THE BEGINNING OF THIS -- OF

7    TODAY'S TRIAL, AND MR. IRVIN REFERENCES THIS AS WELL.  THE

8    PLAINTIFF ALLEGES THAT HE WAS ALLOCATED LESS MARKET PAY THAN

9    YOUNGER COLLEAGUES WHOSE COMBINED EXPERIENCE IN THE SPECIALTY

10   OF ANESTHESIOLOGY AND THAT VA DOCTORS WERE SUBSTANTIALLY

11   FEWER THAN KENNEDY.

12       NOW, WE ARE GOING TO NEED TO CLEAR UP I THINK A COUPLE

13   OF ISSUES HERE.  THE FIRST IS DR -- OR RATHER AS THE

14   PLAINTIFF SUGGESTED, MARKET PAY IS ONLY A COMPONENT OF

15   OVERALL SALARY, SO WE ARE GOING TO TALK ABOUT THAT.

16       AND I ALSO WANT TO TALK ABOUT COMBINED YEARS BECAUSE

17   THIS IS CONFUSING.  WHEN THE PLAINTIFF IS TALKING ABOUT

18   COMBINED YEARS, WHAT HE MEANS IS HE'S TAKING HIS ENTIRE

19   EXPERIENCE AS A DOCTOR AND THEN HE'S TAKING HIS ENTIRE

20   EXPERIENCE AS A DOCTOR AT THE VA AND HE'S ADDING THOSE YEARS

21   ON TOP OF ONE ANOTHER.

22       SO WHEN IN THE PLEADINGS AND IN THE COMPLAINT WHEN YOU

23   SEE 35 YEARS OF EXPERIENCE, HE WAS ACTUALLY A DOCTOR FOR 19

24   YEARS, AND 17 OF THOSE YEARS WERE SPENT AT THE VA HOSPITAL.

25   HE'S ADDED THOSE TWO TOGETHER AND THEN COMPARED THEM TO HIS

1    COLLEAGUES TO SUGGEST THAT HE HAD SUFFICIENTLY MORE TOTAL

2    EXPERIENCE, WHICH IS TRUE, BUT I DON'T THINK REASONABLE

3    PEOPLE VIEW EXPERIENCE IN THAT WAY.  AND WE ARE GOING TO TALK

4    MORE ABOUT THAT AND YOU'RE GOING TO HEAR MORE ABOUT THAT IN

5    THE COURSE OF THE EVIDENCE.

6        SO LET'S START WITH THE DEFINITION OF MARKET PAY BECAUSE

7    THAT'S WHAT PLAINTIFF'S CASE HIS ENTIRELY ABOUT.  AS YOU

8    HEARD, AND YOUR HONOR, AS I KNOW YOU KNOW, MARKET PAY IS A

9    COMPONENT OF ANNUAL PAY.  BASE PAY PLUS MARKET PAY EQUALS

10   ANNUAL PAY.  NOW, BASE PAY IS A RELATIVELY OLD CIVIL SERVICE

11   SYSTEM.  IT IS SCHEDULED.  IT IS NONDISCRETIONARY.  IT MOVES

12   UP EVERY TWO YEARS AND IT IS BASED ENTIRELY ON TENURE AT THE

13   VA.

14       THE MARKET PAY COMPONENT IS THE VARIABLE DISCRETIONARY

15   COMPONENT THAT'S ADDED ON TOP OF BASE PAY TO GET THE ANNUAL

16   PAY.  NEITHER EVER GO DOWN.  IT'S A ONE-WAY RATCHET UNLESS

17   THERE'S EXTRAORDINARY CIRCUMSTANCES THAT FRANKLY AREN'T AT

18   ISSUE IN THIS CASE.  ANNUAL PAY IS WHAT MOST OF US KNOW AS

19   SALARY.

20       SO WHEN WE TALK ABOUT ANNUAL PAY, THAT'S EFFECTIVELY THE

21   SALARY.  THERE'S ANOTHER THING CALLED PERFORMANCE PAY.  I

22   DON'T KNOW THAT WE ARE GOING TO SPEND A LOT OF TIME ON THAT.

23   THAT'S LIKE BONUS PAY.  BUT REALLY WE ARE TALKING ABOUT

24   ANNUAL PAY.

25       SO, WHAT DOES THE PAY ACT HAVE TO DO WITH ALL THIS?

1    YOUR HONOR, IN ORDER TO VIEW, TO REALLY UNDERSTAND HOW

2    PLAINTIFF ALLEGES HE WAS HARMED WE NEED TO PUT ON BLINDERS

3    AND LOOK JUST AT MARKET PAY AND COMPARE THAT TO HIM AND JUST

4    HIS PEERS IN THE ANESTHESIOLOGY PRACTICE.

5         BUT THE PAY ACT REQUIRES US TO DO MORE.  WE REALLY NEED

6    TO BE LOOKING AND -- AT ANNUAL PAY AND ASKING ONE QUESTION.

7    WAS THE ANNUAL PAY FAIR?  WAS IT JUSTIFIED?  WAS IT

8    REASONABLY COMPARABLE TO SALARIES THAT ONE MIGHT FIND IN

9    PRIVATE PRACTICE?  AND I WOULD SUGGEST TO THE COURT THAT IF

10   WE CAN'T FIND THAT, IF WE CAN'T FIND THAT THE PLAINTIFF HAS

11   BEEN HARMED IN HIS OVERALL PAY, WE CAN'T FIND THAT OLDER

12   EMPLOYEES ARE HARMED IN THEIR OVERALL PAY, THEN THERE'S

13   NOTHING THAT'S CONTRARY TO THE PAY ACT AND THERE'S CERTAINLY

14   NO DISCRIMINATION UNDER THE ADEA.

15        WHAT YOU WILL HEAR IN THE TESTIMONY IS THAT MARKET PAY

16   ENHANCES BASE PAY TO BRING DOCTORS TO A FAIR, JUSTIFIABLE

17   LEVEL OF ANNUAL PAY.  IT IS NOT A SEPARATE ENTITLEMENT

18   INDEPENDENT OF A FAIR ANNUAL PAY.

19        SO THE KEY QUESTION HERE THAT I WOULD URGE UPON THE

20   COURT AS WE GO THROUGH THE TESTIMONY AND THE EVIDENCE IS WHAT

21   EVIDENCE IS THERE THAT PLAINTIFF WAS ENTITLED TO ANYTHING

22   MORE THAN A FAIR RATE OF ANNUAL PAY THAT WAS REASONABLY

23   COMPARABLE TO THE PRIVATE MARKET.

24        SO, I'D LIKE TO WALK THROUGH THIS CHART.  I THINK THIS

25   IS HELPFUL.  I HAVE A FEW CHARTS THIS MORNING THAT ARE BASED

1    ON EXHIBITS THAT HAVE NOW BEEN ENTERED INTO THE RECORD, AND I

2    THINK THEY ARE HELPFUL TO ILLUSTRATE SOME OF THE DYNAMICS

3    GOING ON IN THIS CASE.

4        SO HERE YOU HAVE DR. KENNEDY AND EACH OF HIS

5    ANESTHESIOLOGIST PEERS.  NOW, AS I SAID, DR. KENNEDY WAS PAID

6    THE MOST OF THESE.  THEY'RE ALL WITHIN ABOUT $2,000, THOUGH.

7    SO THEY'RE FAIRLY -- THEY ARE FAIRLY COMPARABLE.  AND YOU

8    WILL SEE IN GREEN, THAT IS THE AMOUNT OF BASE PAY THAT EACH

9    DOCTOR RECEIVED.  AND YOU'LL SEE IN BLUE THE AMOUNT OF MARKET

10   PAY THAT EACH DOCTOR RECEIVED.

11       NOW, THE PLAINTIFF HAS POINTED TO THE EFFECT WHICH WE

12   CAN SEE BECAUSE WE HAVE THESE DOCTORS IN LINE FROM THE OLDEST

13   DOCTOR ON THE LEFT TO THE YOUNGEST DOCTOR ON THE RIGHT.  AND

14   WHAT THE PLAINTIFF HAS POINTED TO IS THAT THE PROPORTION OF

15   HIS OVERALL SALARY THAT IS MADE UP BY MARKET PAY IS LESS THAN

16   THAT OF SOME OF HIS YOUNGER COLLEAGUES.

17       SO I REMIND THE COURT THAT WHAT YOU'RE GOING TO HEAR IS

18   THAT MARKET PAY IS AN ENHANCEMENT TO BASE PAY TO BRING THE

19   DOCTOR TO AN ANNUAL, A FAIR ANNUAL PAY LEVEL.  SO LET'S

20   EXPLORE SOME OF THE FACTS BEHIND THESE RELATIONSHIPS AND

21   WHETHER IT'S FAIR TO PAY THESE DOCTORS ROUGHLY SIMILAR.

22   YOU'RE GOING TO HEAR TESTIMONY ABOUT THIS.

23       NOW, PLAINTIFF HAS CLAIMED THAT IN ORDER TO MAKE THIS

24   RIGHT, IN ORDER TO MAKE THIS FAIR, HE SHOULD BE GIVEN AT

25   LEAST AS MUCH MARKET PAY AS DR. NGUYEN AND DR. ALGHOTHANI;

1    OKAY?  THAT WOULD BE $22,000 MORE THAN DR. NGUYEN.  SO

2    LET'S -- I'M NOT SURE IF THAT'S GOING TO WORK HERE.  BUT

3    LET'S TAKE A LOOK AT DR. NGUYEN AND DR. KENNEDY.

4        SO, HE CLAIMS -- DR. KENNEDY CLAIMS HE'S MUCH OLDER THAN

5    DR. NGUYEN, HE SHOULD BE PAID $22,000 MORE THAN DR. NGUYEN.

6    WHAT EVIDENCE IS THERE GOING TO BE IN THE RECORD THAT WOULD

7    SUPPORT THE IDEA THAT DR. KENNEDY SHOULD BE PAID $22,000

8    MORE?  NOW, IN 2014 DR. NGUYEN HAD 22 YEARS EXPERIENCE AS AN

9    ANESTHESIOLOGIST.  DR. KENNEDY HAD 19 YEARS EXPERIENCE AS AN

10   ANESTHESIOLOGIST.

11       IT IS TRUE THAT KENNEDY WAS OLDER.  BUT IN THE TESTIMONY

12   YOU'RE GOING TO HEAR THAT MEDICINE WAS ACTUALLY A SECOND

13   CAREER FOR DR. KENNEDY.  HE WAS NOT SIGNIFICANTLY MORE

14   EXPERIENCED THAN HIS PEERS IN THE ANESTHESIOLOGY PRACTICE.

15   AND WHILE WE ARE AT IT, DR. PRYOR HAD 18 YEARS, DR. PENDER

16   HAD 17 YEARS, DR. ALGHOTHANI HAD 13 YEARS.  IF WE LOOK AT

17   THIS A DIFFERENT WAY, YOU CAN SEE EACH OF THE

18   ANESTHESIOLOGISTS, THEIR AGES AND THEIR YEARS OF EXPERIENCE

19   IN THE PRACTICE OF ANESTHESIOLOGY.

20       NOW, I WOULD SUGGEST TO THE COURT TO ASK THIS QUESTION.

21   DOES IT SEEM RIGHT OR FAIR OR EQUITABLE THAT DR. KENNEDY

22   SHOULD BE PAID $22,000 MORE THAN A YOUNGER COLLEAGUE WITH

23   THREE YEARS MORE EXPERIENCE IN THE FIELD OF ANESTHESIOLOGY?

24   DOES THAT SOUND RIGHT?  I DON'T BELIEVE THE EVIDENCE WILL

25   SUPPORT THAT CONCLUSION.  I BELIEVE THE EVIDENCE WILL SUPPORT

1    THE CONCLUSION THAT THE RATES OF ANNUAL PAY SET FOR THESE

2    DOCTORS WAS FAIR AND WAS JUSTIFIED, WAS CONSISTENT WITH THE

3    PAY ACT.

4        NOW, YOU'RE GOING TO HEAR A LOT ABOUT COMPENSATION

5    PANELS AND ABOUT THE FACTORS THAT COMPENSATION PANELS USED TO

6    RECOMMEND PAY.  YOU'RE GOING TO HEAR A LOT ABOUT WHAT IT WAS

7    THEIR JOB TO DO AND WHAT IT WAS NOT THEIR JOB TO DO.  BUT THE

8    MOST IMPORTANT -- THERE'S THREE IMPORTANT TAKE-AWAYS.

9        THE MOST IMPORTANT IS THAT COMPENSATION PANELS DID IN

10   FACT EXIST TO RECOMMEND ANNUAL PAY.  THE HANDBOOK SAYS THAT

11   BUT IT'S ALSO TRUE.  ONE OF THE JOBS OF THE COMPENSATION

12   PANELS WAS TO LOOK AT MARKET SURVEY DATA.  IN OTHER WORDS, TO

13   MATCH SALARIES TO THOSE IN THE PRIVATE MARKET.  THEY CAN'T DO

14   THAT BY LOOKING AT ONLY A COMPONENT OF OVERALL PAY.

15       WHEN THEY ARE SETTING A SALARY LEVEL AT A LEVEL THAT'S

16   FAIR AND EQUITABLE AND REASONABLY COMPARABLE TO PRIVATE

17   SALARIES THEY HAVE TO LOOK AT THE OVERALL NUMBER.  AND SO

18   WHEN THEY SET THAT NUMBER, IT'S WHAT THEY WERE INSTRUCTED TO

19   DO, IT'S WHAT THEY DID.

20       NOW, WHAT THE PLAINTIFF HAS ARGUED IS THEY DIDN'T RELY

21   ON THE FACTORS THAT ARE SET OUT IN THE STATUTE.  AND I DON'T

22   THINK THE TESTIMONY IS GOING TO BEAR THAT OUT.  I THINK THEY

23   DID LOOK AT THOSE -- ALL OF THAT INFORMATION AND TAKE IT INTO

24   CONSIDERATION.

25       WHAT THE PLAINTIFF ALSO WANTS IS HE WANTS THEM TO WEIGH

1    ONE OF THOSE FACTORS MORE THAN ANY OF THE OTHERS.  BUT

2    THERE'S NO OBLIGATION UNDER THE STATUTE OR UNDER REGULATION

3    THAT THEY GIVE ANY PARTICULAR FACTOR ANY MORE WEIGHT THAN

4    ANOTHER.

5         THE SECOND BIG TAKE-AWAY IS THAT THE PAY PANELS WERE

6    JUST THERE AS A PEER-REVIEW RECOMMENDATION.  THEY WERE NOT

7    THE FINAL AUTHORITY.  THEY MADE RECOMMENDATIONS TO THE

8    APPROVING OFFICIAL WHO HAD THE ULTIMATE AUTHORITY TO SET PAY.

9    AND THE THIRD IS THE MEMBERS OF THESE PANELS WORKED IN GOOD

10   FAITH.  THEY CONSIDERED THE INFORMATION THAT WAS PRESENTED TO

11   THEM TO RECOMMEND FAIR PAY FOR EVERY DOCTOR THEY CONSIDERED.

12        SO WHEN YOU HEAR THE TESTIMONY ABOUT WHETHER THERE HAS

13   BEEN AN ADVERSE IMPACT ON THE PLAINTIFF AND ON OLDER PEOPLE

14   OF THE CLASS, I WOULD URGE YOU TO ASK THESE QUESTIONS.  WHAT

15   EVIDENCE IS THERE THAT THE PLAINTIFF HAS BEEN HARMED; THAT HE

16   SHOULD HAVE MADE MORE ANNUAL PAY?  WHAT EVIDENCE IS THERE

17   THAT PLAINTIFF DESERVED MORE PAY THAN HIS PEERS EVEN MORE-SO

18   THAN WHAT HE ALREADY RECEIVED?

19        AND FINALLY, WHAT EVIDENCE IS THERE -- AND REALLY THIS

20   IS THE MOST CRITICAL QUESTION BECAUSE THIS IS A DISPARATE

21   IMPACT CASE, NOT A DISPARATE TREATMENT CASE -- THAT OLDER

22   EMPLOYEES AT THE VA WERE HARMED IN THE SAME WAY PLAINTIFF

23   ALLEGES HE WAS HARMED.

24        SO YOUR HONOR, WE MOVE TO THE THIRD PRONG OF THE PRIMA

25   FACIE CASE.  AS YOUR HONOR REPEATED THIS MORNING, THIS

1    DISPARATE IMPACT, THIS ADVERSE IMPACT, THIS HARM MUST BE

2    DEMONSTRATED THROUGH STATISTICAL EVIDENCE OF A KIND AND

3    DEGREE SUFFICIENT TO SHOW THAT THE HARM WAS BECAUSE OF THEIR

4    AGE.

5        YOUR HONOR, THIS QUOTE IS TAKEN FROM YOUR SUMMARY

6    JUDGMENT OPINION, IT HAS BEEN REPEATED IN YOUR OPINION OF

7    THIS WEEK ABOUT BUSINESS NECESSITY DEFENSE.  WE BELIEVE THIS

8    IS A CRITICAL PIECE OF THIS CASE.  AS I HAVE SAID, WE BELIEVE

9    THE EVIDENCE IS GOING TO DEMONSTRATE THAT PLAINTIFF FAILS THE

10   PRIOR TWO STEPS.  BUT EVEN ASSUMING THEY DON'T, YOUR HONOR,

11   THIS IS ENOUGH TO DEFEAT THE CASE.

12       BUT LET'S EVEN ASSUME THAT WE CAN LOOK PAST THE ABSENCE

13   OF STATISTICAL EVIDENCE.  WELL, LET'S TALK ABOUT STATISTICAL

14   EVIDENCE.  FIRST OF ALL, THE PLAINTIFF IS NOT GOING TO

15   PRESENT ANY STATISTICAL EVIDENCE.  HE'S NOT GOING TO CALL AN

16   EXPERT.  HIS EVIDENCE WILL BE ENTIRELY -- THERE ARE 200

17   DOCTORS AT THE DORN MEDICAL FACILITY AND THERE ARE 25,000

18   DOCTORS IN THE VA SYSTEM NATIONWIDE.  ALL OF THEM ARE SUBJECT

19   TO THE PAY ACT.

20       IF PLAINTIFF'S THEORY WERE TRUE, THEN THAT WOULD BE

21   EVIDENCE IN A STATISTICALLY SIGNIFICANT SAMPLE OF EITHER THE

22   DOCTORS AT DORN OR THE DOCTORS NATIONWIDE.  BUT YOUR HONOR,

23   PLAINTIFF HAS PUT FORWARD ONLY FOUR COMPARATORS.  AND WE

24   BELIEVE THE CASE LAW IS CLEAR THAT THAT IS NOT STATISTICALLY

25   SUFFICIENT EVIDENCE TO DEMONSTRATE CAUSATION.

1      SO EVEN IF WE LOOK PAST THAT, EVEN IF WE LOOK PAST THE

2    FACT THAT THERE'S NOT ANY STATISTICAL EVIDENCE OF HARM HERE,

3    WE STILL HAVE TO ASK, WHAT IS THE PRACTICE IN QUESTION?  HAS

4    IT HARMED HIM BECAUSE OF HIS AGE?

5      NOW, I'M ABOUT TO GET INTO AN ISSUE THAT I THINK IS

6    REALLY CRITICAL TO THE MISUNDERSTANDING AT THE BOTTOM OF THIS

7    CASE.  WHEN ANNUAL PAY IS OTHERWISE EQUAL FOR TWO

8    SIMILARLY-QUALIFIED DOCTORS, THE DIFFERENCE IN THE BASE PAY

9    AND MARKET PAY RATIOS THAT MAKE UP THEIR ANNUAL PAY IS GOING

10   TO SWING ENTIRELY ON ONE FACTOR, AND IT'S YEARS OF SERVICE IN

11   THE VA; NOT AGE.  THE AFFECT THAT PLAINTIFF HAS POINTED TO

12   HAS NOTHING TO DO WITH AGE.  IT IS ONLY BECAUSE OF TIME IN

13   THE VA.

14      LET'S TALK ABOUT THIS.  SO, PLAINTIFF'S EXHIBIT 15 WAS

15   PRESENTED AS PART OF SUMMARY JUDGMENT FILINGS.  IT'S BEEN A

16   COMPONENT OF HIS THEORY OF HARM THROUGHOUT THIS CASE.  AND

17   WHAT I HAVE DONE IS YOU CAN SEE THE OLDEST DOCTOR ON THE

18   LEFT, AND THAT WOULD BE DR. KENNEDY, AND WE CAN SEE THE

19   DOCTORS GETTING YOUNGER; RIGHT?

20      AND AS WE CAN SEE THAT, WE SEE THE AFFECT THAT PLAINTIFF

21   HAS POINTED US TO.  WE SEE THAT AS THE DOCTORS GET YOUNGER,

22   THEIR SHARE OF MARKET -- MARKET PAY SHARE SEEMS TO GROW.

23   NOW, WHAT THIS IS ALSO RELATED IS TO HOW MUCH BASE PAY THEY

24   HAVE.

25      NOW, WHAT IF WE LOOK AT A DIFFERENT SET OF DOCTORS.

1    THESE DOCTORS ARE ALSO LISTED FROM OLDEST TO YOUNGEST.  AND

2    DR. KENNEDY IS ON THIS LIST BUT HE'S THE YOUNGEST.  THESE ARE

3    OLDER DOCTORS AT THE VA.  WE HAVE A 73-YEAR-OLD DOCTOR IN

4    HERE AND HIS PROPORTION OF MARKET PAY IS AT 70 PERCENT.

5        SO WHAT EXPLAINS THIS?  WELL, WHAT EXPLAINS IT IS

6    OBVIOUSLY NOT AGE.  IF THIS WERE AGE DISCRIMINATION, THESE

7    OLDER DOCTORS WOULD BE DISADVANTAGED AS WELL.  WHAT IS

8    DIFFERENT IS THAT IN BOTH SETS, BOTH OF THESE COHORTS,

9    KENNEDY IS THE ONE WITH THE MOST VA EXPERIENCE.  THESE OTHER

10   OLDER DOCTORS WERE RECENTLY HIRED BY THE VA.  THEIR BASE PAY

11   IS LOWER, AND SO THE OVERALL SHARE OF THEIR ANNUAL PAY IS A

12   LARGER SHARE OF MARKET PAY.

13       THERE'S ONE CRITICAL THING THAT DIFFERENTIATES PLAINTIFF

14   FROM HIS PEERS IN ANESTHESIOLOGY PRACTICES, AND IT'S NOT AGE

15   AND IT'S NOT REALLY YEARS OF SERVICE IN ANESTHESIOLOGY.

16   THAT'S PRETTY COMPARABLE.  WHAT IT IS IS VA EXPERIENCE.  AND

17   YOU SEE THAT ON THAT CHART RIGHT HERE.

18       THESE ARE THE DOCTORS LISTED FROM OLDEST TO YOUNGEST.

19   AND AS WE SEE, THOSE YEARS OF VA EXPERIENCE GO DOWN.  THIS IS

20   THE ONLY CAUSE OF THE EFFECT THE PLAINTIFF HAS IDENTIFIED.

21   IT HAS NOTHING TO DO WITH AGE.  AND THE EVIDENCE IN THIS CASE

22   IS GOING TO DEMONSTRATE THAT.

23       SO YOUR HONOR, WHEN EVALUATING EVIDENCE AND CAUSATION,

24   PAY ATTENTION TO THE RELATIONSHIP BETWEEN BASE PAY AND ANNUAL

25   PAY.  LOOK AT THE YEARS OF VA SERVICE.  ASK THESE QUESTIONS,

```
 1    WHERE IS THE STATISTICAL EVIDENCE THAT OLDER EMPLOYEES HAVE
 2    SUFFERED THE SAME HARM PLAINTIFF ALLEGES BECAUSE OF THEIR
 3    AGE?  AND ALSO ASK THIS QUESTION:  IF YOU NEWLY-HIRED OLDER
 4    DOCTORS AREN'T SUFFERING A DISCRIMINATORY IMPACT, IS THIS
 5    REALLY A CASE OF AGE DISCRIMINATION?  YOUR HONOR, I DON'T
 6    BELIEVE THAT THE EVIDENCE WILL SUPPORT IT IS.
 7        SO YOUR HONOR, THE EVIDENCE WILL SHOW THAT PLAINTIFF
 8    CANNOT SATISFY ANY OF THE THREE STEPS OF THE PRIMA FACIE
 9    ANALYSIS.  BUT FAILURE ON EVEN ONE OF THOSE IS ENOUGH TO
10    DEFEAT PLAINTIFF'S CLAIM.
11        NOW BECAUSE OF THAT, YOUR HONOR NEED NOT EVEN GET TO THE
12    BUSINESS NECESSITY DEFENSE.  BUT I WOULDN'T BE DOING MY JOB
13    IF I DIDN'T TALK ABOUT IT, SO LET'S GET INTO IT.  YOUR HONOR
14    ISSUED AN ORDER THIS WEEK, WHICH WE HAVE REVIEWED AND
15    REVIEWED THE CASES THAT SUPPORT IT, SAYING THAT THE UNITED
16    STATES IS ENTITLED -- THAT IF PLAINTIFF CAN DEMONSTRATE A
17    PRIMA FACIE CASE, THE UNITED STATES IS ENTITLED TO A DEFENSE
18    TO SAY THAT THE ALLEGEDLY DISCRIMINATORY PRACTICE WAS
19    SUPPORTED BY A BUSINESS NECESSITY.  WE BELIEVE THAT THE FACTS
20    ARE GOING TO DEMONSTRATE AND SUPPORT THAT DEFENSE.
21        SO LET'S TALK ABOUT BUSINESS NECESSITY FOR A MINUTE.
22    THE VA IS REQUIRED BOTH BY THE PAY ACT BUT ALSO BY BUSINESS
23    NECESSITY TO SET LEVELS OF ANNUAL PAY; SET LEVELS OF ANNUAL
24    PAY THAT ARE BOTH REASONABLY COMPARABLE TO THE MARKET BUT
25    ALSO INTERNALLY FAIR AND CONSISTENT.
```

```
 1        NOW, IF THE PLAINTIFF WERE TO PREVAIL AND THE VA HAD TO
 2   ADOPT THE PLAINTIFF'S POINT OF VIEW, IT WOULD ENTIRELY
 3   DISRUPT THE PAYMENT SYSTEM WITHIN THE VA AND ITS ABILITY TO
 4   RETAIN AND RECRUIT COMPARABLE, GOOD, COMPETENT DOCTORS.  THE
 5   REASON FOR THAT IS THAT IF WE WERE TO AWARD EVERY OLDER
 6   PERSON IN THE VA THE SAME RATE OF MARKET PAY AS ONE OF THEIR
 7   YOUNGER PEERS, IT WOULD DISRUPT THE ENTIRE SETTING OF
 8   REASONABLY COMPARABLE MARKET RATES.
 9        THE ENTIRE WAY THAT THE VA ESTABLISHES RATES OF ANNUAL
10   PAY IS BASED ON LOOKING AT THE MARKET, LOOKING AT A
11   REASONABLY COMPARABLE RANGE, AND TRYING TO IDENTIFY WHAT'S
12   FAIR AND WHAT'S JUSTIFIED BY MARKET COMPETITORS.  THIS WOULD
13   BE EFFECTIVELY AN ENTITLEMENT THAT WOULD BE KEYED UPON PEOPLE
14   WITH MORE VA TENURE -- ACTUALLY NOT EVEN OLDER DOCTORS, I
15   SAID OLDER DOCTORS A MINUTE AGO.  THAT'S NOT ACTUALLY THE
16   CASE.
17        IN A CASE LIKE THIS YOU HAVE MAYBE TWO 50-YEAR-OLDS.
18   ONE OF THEM WAS BRAND NEW TO THE VA, ONE OF THEM HAD BEEN IN
19   THE VA A LONG TIME, BUT THEY HAD THE SAME AMOUNT OF MEDICAL
20   EXPERIENCE.  WELL THEN, WOULD THE 50-YEAR-OLD WITH THE HIGHER
21   BASE PAY AND THE LOWER MARKET SHARE REQUIREMENT BE ENTITLED
22   TO MORE MONEY THAN HIS REASONABLY-EQUALLY-QUALIFIED PEER?  WE
23   DON'T BELIEVE SO.
24        BUT IF THERE ARE BUSINESS REASONS WHY THE VA SETS PAY IN
25   THE WAY THAT IT DOES, AND WE BELIEVE THAT EVEN IF THE
```

1    PLAINTIFF IS SOMEHOW ABLE TO ESTABLISH A PRIMA FACIE CASE,

2    THAT BEING ABLE TO SET RATES OF PAY THAT ARE BOTH FAIR TO THE

3    MARKET AND INTERNALLY FAIR AND CONSISTENT IS A NECESSITY FOR

4    THE VA.

5         YOUR HONOR, JUST A WORD ABOUT DAMAGES.  I HAVE ALREADY

6    POINTED OUT I BELIEVE IN THE SLIDE LOOKING AT OVERALL ANNUAL

7    PAY THAT PLAINTIFF'S IDEA OF FAIRNESS AND EQUITY IS A VERY

8    WEIRD IDEA.  HIS IDEA OF FAIRNESS IS THAT HE SHOULD BE PAID

9    $22,000 MORE THAN A COLLEAGUE WITH MORE EXPERIENCE.  WE DON'T

10   BELIEVE THERE'S ANY EVIDENCE TO SUPPORT THAT FINDING, BUT

11   THAT'S WHAT HIS DAMAGES ARE BASED ON.  THEY'RE BASED ON HIS

12   OWN CALCULATIONS.  THERE'S NO EXPERT TESTIMONY OF DAMAGES.

13   WE DON'T BELIEVE THEY'RE SUPPORTED BY THE LAW.

14        IN CONCLUSION, YOUR HONOR, I THINK THERE'S TWO DIFFERENT

15   VIEWS IN THIS CASE.  WE WOULD URGE UPON THE COURT TO LOOK AT

16   ALL THE AVAILABLE EVIDENCE, TO LOOK AT THE ENTIRE RECORD.

17   MEANWHILE THE PLAINTIFF WANTS US TO FOCUS AND DISREGARD A LOT

18   OF AVAILABLE EVIDENCE.

19        PLAINTIFF WANTS US NOT TO LOOK AT ANNUAL PAY.  PLAINTIFF

20   WANTS US TO BREAK OUT MARKET PAY AND COMPARE MARKET PAY

21   ACROSS DOCTORS.  PLAINTIFF WANTS US NOT TO LOOK AT THE

22   COMPARATIVE EXPERIENCE OF THESE DOCTORS, THE COMPARATIVE

23   QUALIFICATIONS WHICH WOULD JUSTIFY SIMILAR PAYMENT FOR HIM

24   AND HIS ANESTHESIOLOGY COLLEAGUES.  PLAINTIFF DOESN'T WANT US

25   TO LOOK AT A STATISTICALLY SIGNIFICANT SET OF DOCTORS.

1        YOUR HONOR, THERE IS REASON WHY THE PLAINTIFF HAS ONLY

2   POINTED US TO THE ANESTHESIOLOGY PRACTICES BECAUSE THERE'S

3   ONLY FOUR DOCTORS THERE.  AS I HAVE SHOWN IN THIS

4   PRESENTATION, ONCE YOU STEP OUT OF THAT AND YOU LOOK AT ANY

5   OLDER DOCTORS AT THE VA, PARTICULARLY THOSE WHO ARE

6   NEWLY-ARRIVED, PLAINTIFF'S CASE COLLAPSES IN ON ITSELF AND

7   THAT IS EXACTLY WHY THE CASE LAW IS CLEAR THAT STATISTICALLY

8   SIGNIFICANT EVIDENCE IS REQUIRED TO DEMONSTRATE A DISPARATE

9   IMPACT CASE.

10       YOUR HONOR, THE PLAINTIFF HAS PRESENTED NO STATISTICAL

11  EVIDENCE OF CAUSATION, NO STATISTICAL EVIDENCE OF DAMAGES,

12  AND ALSO WE ARE IGNORING THE BECAUSE-OF FACTOR HERE; NOT

13  LOOKING AT THE QUESTION OF WHETHER THIS IS ABOUT VA TENURE,

14  WHICH IS NOT ACTIONABLE, BUT WHETHER THIS IS ABOUT AGE, WHICH

15  IS.

16       SO YOUR HONOR, PLEASE, WE URGE YOU, AS I KNOW YOU WILL,

17  TO LOOK AT THE TOTAL RECORD HERE BECAUSE WHEN YOU LOOK AT THE

18  TOTAL RECORD, I HAVE SEEN SUCCESSFUL PAY DISCRIMINATION

19  CASES, I'VE READ ABOUT THEM, I KNOW YOU HAVE, TOO.  THIS IS

20  NOT A SUCCESSFUL PAY DISCRIMINATION CASE.  THANK YOU.

21          *THE COURT:*  ALL RIGHT.  THANK YOU.  ALL RIGHT.  WE

22  ARE NOW READY TO TAKE THE TESTIMONY OF THE WITNESSES, AND I

23  DON'T KNOW WHETHER THE FIRST WITNESS IS HERE OR NOT.  IS HE

24  HERE?

25          *MRS. BAILEY:*  I GOT A NOTE THAT DR. MILLER WAS

1  HERE.  YOUR HONOR, IF WE COULD JUST TAKE A ONE OR TWO-MINUTE

2  BREAK.

3          THE COURT:  OKAY.  ALL RIGHT.  THAT'S FINE.  I'VE

4  BEEN ADVISED THAT THE GOVERNMENT HAS SUBMITTED FIVE EXHIBITS

5  BUT THERE ARE ONLY FOUR ON THE LIST.  IS THERE A FIFTH ONE

6  THAT'S -- IS THERE ONE THAT'S BEEN -- YOU'RE NOT GOING TO USE

7  OR...

8          MRS. BAILEY:  THERE WAS A LATE-AGREED-TO WITNESS

9  EXHIBIT YESTERDAY, EXHIBIT NUMBER 5.  MAYBE IF WE COULD LOOK

10  AT THAT WHILE WE BREAK.

11          THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL BE AT

12  EASE FOR ABOUT 10 MINUTES.

13          MR. IRVIN:  THANK YOU, YOUR HONOR.

14          MR. ANDREWS:  THANK YOU, YOUR HONOR.

15      (WHEREUPON, A BRIEF RECESS WAS HAD.)

16          THE COURT:  MR. IRVIN, YOU MAY CALL YOUR FIRST

17  WITNESS.

18          MR. IRVIN:  THANK YOU, YOUR HONOR.  WE CALL DR.

19  ROBERT MILLER.

20          THE COURT:  DR. MILLER, YOU MAY COME FORWARD AND BE

21  SWORN IN.  AND COME UP TO THE MICROPHONE IN FRONT OF THE

22  COURT REPORTER.

23          DR. ROBERT MILLER, AFTER BEING DULY SWORN,

24  TESTIFIED AS FOLLOWS:

25                  DIRECT EXAMINATION

MILLER - DIRECT

43

1    BY MR. IRVIN:

2    Q    DR. MILLER, GOOD MORNING.  WE HAD A CHANCE TO AT LEAST

3    SAY HELLO A MOMENT AGO, BUT I'M WILMOT IRVIN AS YOU KNOW.

4    YOU AND I HAVE SPENT SOME TIME ALREADY TOGETHER IN THIS CASE

5    AND YOU HAVE BEEN DEPOSED ON TWO SEPARATE OCCASIONS.  I

6    UNDERSTAND YOU HAD TO COME THROUGH SOME BAD WEATHER TO GET

7    HERE TODAY AND WE APPRECIATE YOUR BEING HERE.

8         YOU ARE A DOCTOR OF OSTEOPATHY; IS THAT CORRECT?

9    A    YES, SIR.

10   Q    ALL RIGHT.  AND YOU HAVE BEEN EMPLOYED IN THE

11   ANESTHESIOLOGY SERVICE AT THE VETERAN ADMINISTRATION, DORN

12   MEDICAL CENTER, IN YOUR PRIOR LIFE?

13   A    YES, SIR, TILL JANUARY OF 2018.

14   Q    ALL RIGHT.  AND WHAT CAUSED YOU TO SEPARATE FROM YOUR

15   EMPLOYMENT WITH THE DORN VA AT THAT TIME?

16   A    I HAD OTHER INTERESTS I WANT TO PURSUE.

17   Q    OKAY.  NOW, AS I RECALL FROM YOUR DEPOSITION TESTIMONY,

18   YOU CAME TO DORN VA IN 2005.  DOES THAT SOUND ABOUT RIGHT?

19   A    YES, SIR.

20   Q    OKAY.  AND AT THAT TIME THE DORN VA HIRED YOU AS A STAFF

21   ANESTHESIOLOGIST; IS THAT CORRECT?

22   A    YES, SIR.

23   Q    AND AT THAT TIME DR. KENNEDY, MY CLIENT WHO IS SEATED

24   HERE IN THE COURTROOM WITH US, WAS SERVING AS THE CHIEF OF

25   WHAT WAS THEN THE ANESTHESIOLOGY SECTION AT DORN VA?

1    A    YES, SIR.

2    Q    OKAY.  YOU I BELIEVE BECAME THE CHIEF OF THE

3    ANESTHESIOLOGY SERVICE AS IT BECAME AT DORN IN 2012; IS THAT

4    CORRECT, SIR?

5    A    YES, SIR.

6    Q    OKAY.  AND I BELIEVE THAT YOU HELD THAT POSITION, THAT

7    IS THE CHIEF OF ANESTHESIOLOGY AT DORN, AT LEAST UNTIL THE

8    LAST TIME I SAW YOU WHEN WE TOOK YOUR DEPOSITION IN 2017.

9    BUT LET ME ASK IT THIS WAY.  DID YOU SERVE AS CHIEF

10   CONTINUOUSLY UNTIL YOU LEFT DORN IN JANUARY OF 2018?

11   A    YES, SIR.

12   Q    OKAY.  WE ARE HERE TODAY TO TALK IN PART ABOUT

13   COMPENSATION PANELS AT THE DORN VA AND ITS ROLE OR THE ROLE

14   OF COMPENSATION PANELS AND SO FORTH.  GOING TO ASK YOU A FEW

15   QUESTIONS ABOUT THAT.

16        NOW, AS I UNDERSTAND IT FROM I THINK MOST OF THE

17   UNDISPUTED TESTIMONY, COMPENSATION PANELS AT THE DORN VA

18   CONSIST OF THREE PHYSICIANS WHO SERVE ON A PANEL THERE TO

19   REVIEW COMPENSATION OF A PHYSICIAN AT DORN.  IS THAT A FAIR

20   STATEMENT?

21   A    YES, SIR.

22   Q    OKAY.  NOW, IN YOUR ROLE, THOUGH, AS A SERVICE LINE

23   CHIEF, ARE YOU CALLED UPON TO PARTICIPATE IN THOSE COMP

24   PANELS OR PAY PANELS NOT AS A MEMBER OF THE PANEL BUT AS THE

25   PRESENTER WHEN AN ANESTHESIOLOGIST IS BEING REVIEWED?

1    A    YES, SIR.

2    Q    OKAY.  NOW, AND OVER THE COURSE OF TIME AT THE VA YOU

3    DID THAT ON A GOOD NUMBER OF OCCASIONS; THAT IS, SERVE AS A

4    PRESENTER FOR PAY PANELS?

5    A    FOR RECRUITMENT FOR THE ANESTHESIOLOGISTS AND RETENTION

6    OF ANESTHESIOLOGISTS.

7    Q    YES, SIR.  I UNDERSTAND AND THANK YOU FOR THAT.  BUT YOU

8    DID THAT SEVERAL TIMES; THAT IS, SERVE AS A PRESENTER TO A

9    PAY PANEL.  IS THAT CORRECT?

10   A    YES, SIR.

11   Q    OKAY.  AND GENERALLY THE PROCESS AS I UNDERSTAND IT FROM

12   THE TESTIMONY IS THAT HR HAS A PART TO PLAY IN THAT PROCESS.

13   IS THAT A FAIR STATEMENT?

14   A    YES, SIR.

15   Q    OKAY.  AND BEFORE THE PAY PANEL IS ACTUALLY CONVENED ON

16   A PARTICULAR DAY, YOU CONSULT WITH THE HR REPRESENTATIVE,

17   WHOEVER THAT MIGHT BE, FOR PURPOSES OF TRYING TO ESTABLISH A

18   RECOMMENDATION TO GIVE TO THE PANEL FOR ANNUAL PAY?

19   A    YES, SIR.

20   Q    OKAY.  AND ANNUAL PAY, AS I UNDERSTAND IT, IS THE SUM OF

21   TWO ELEMENTS OF A PHYSICIAN'S PAY.  THOSE ARE BASE PAY AND

22   MARKET PAY.  AM I CORRECT?

23   A    YES, SIR.

24   Q    ALL RIGHT.  AND WOULD YOU AGREE WITH ME THAT BASE PAY

25   IS -- COMES OFF OF A LONGEVITY TABLE THAT'S PUBLISHED BY THE

1    VA AND IT IS BASED ON TENURE OR LONGEVITY OF A PHYSICIAN AT

2    THE VA.  AM I RIGHT SO FAR?

3    A    I'D HAVE TO REVIEW THAT TO BE HONEST WITH YOU, SIR.

4    Q    YOU'D HAVE TO REVIEW WHAT?

5    A    THE LONGEVITY TABLES AND BASE PAY TABLES.

6    Q    OKAY.  BUT JUST CONCEPTUALLY AM I CORRECT, THOUGH, THAT

7    THE BASE PAY COMPONENT OF ANNUAL PAY IS A NONDISCRETIONARY

8    NUMBER THAT COMES OFF OF ONE OF THOSE TABLES?

9    A    YES, SIR.

10   Q    OKAY.  ALL RIGHT.  NOW, THE OTHER ASPECT OF ANNUAL PAY

11   OR THE OTHER ELEMENT IN THAT, THAT LITTLE ARITHMETIC

12   COMPUTATION, ANNUAL PAY -- I'M SORRY -- BASE PAY PLUS MARKET

13   PAY EQUALS ANNUAL PAY IS MARKET PAY; IS THAT CORRECT?

14   A    YES, SIR.

15   Q    OKAY.  AND FOR MARKET PAY, THAT'S MORE DISCRETIONARY, IF

16   YOU WILL, THAN COMING OFF OF A TABLE -- A TABLE LIKE BASE

17   PAY.  IS THAT A FAIR STATEMENT?

18   A    IT HAS TO BE JUSTIFIED.  I MEAN, YOU HAVE TO HAVE --

19   USUALLY IT'S THE HAY RESEARCH GROUP THAT YOU'RE USING OR THE

20   AMERICAN ASSOCIATION OF MEDICAL COLLEGES RANKING OF

21   PROFESSOR, FULL PROFESSOR, ASSOCIATE ASSISTANT INSTRUCTOR FOR

22   THAT.  I MEAN, YOU CAN'T BE RANDOM NUMBER.

23   Q    ABSOLUTELY.  AND I UNDERSTAND.  AND SO YOU HAVE TO APPLY

24   THINGS LIKE THE HAY STUDY AND THE AAMC INFORMATION AND THOSE

25   KIND OF THINGS THAT ARE GATHERED BY HR FOR YOU FOR ONE OF

MILLER - DIRECT

1    THESE PANELS.  IS THAT A FAIR STATEMENT?

2    A     YES, SIR.

3    Q     OKAY.  SO MARKET PAY THEN HAS SOME DISCRETIONARY ASPECT

4    TO IT IN THAT YOU HAVE TO -- YOU HAVE TO APPLY INFORMATION

5    AND FACTORS TO A PARTICULAR PHYSICIAN TO -- IN ORDER TO

6    DETERMINE MARKET PAY; IS THAT CORRECT?

7    A     YES, SIR.

8    Q     OKAY.  ALL RIGHT.  NOW, THERE IS A FEDERAL STATUTE THAT

9    APPLIES TO PHYSICIANS AND DENTISTS AT THE DORN VA -- I'M

10   SORRY -- AT THE VA INCLUDING THE DORN VA, AND I BELIEVE THAT

11   AT LEAST AS OF WHEN I TOOK YOUR DEPOSITION YOU HAD NOT SEEN

12   THAT STATUTE BEFORE.  I SHOWED IT TO YOU AND YOU INDICATED

13   YOU HAD NOT SEEN IT BEFORE.  IS THAT CORRECT?

14   A     YES, SIR.

15   Q     OKAY.  AND YOU HAD NEVER REVIEWED IT OR TAKEN A LOOK AT

16   THE SPECIFICS IN THE STATUTE THAT RELATE TO MARKET PAY; IS

17   THAT CORRECT?

18   A     YES, SIR.

19   Q     OKAY.  AND IS THAT TRUE RIGHT ON UP TO TODAY?

20   A     SIR, WHEN I CLEANED OUT MY DESK TO LEAVE FOR THE VA,

21   EVERYTHING THAT WAS THERE WENT INTO THAT SHREDDER, SO...

22   Q     OKAY.  I TAKE IT THEN THAT THE ANSWER IS YOU HAVEN'T

23   LOOKED AT IT, THE STATUTE THAT IS, SINCE YOUR DEPOSITION

24   EITHER; IS THAT CORRECT?

25   A     THAT WOULD BE CORRECT, SIR.

1    Q    OKAY.  I UNDERSTAND.  THANK YOU.  NOW LET ME MENTION THE

2    VA HANDBOOK AND THAT IS A DOCUMENT THAT WE HAVE IN EVIDENCE

3    AND I'M HAPPY TO SHOW YOU THAT IF YOU'D LIKE.  WOULD YOU LIKE

4    ME TO SHOW IT TO YOU?

5    A    WELL, THERE'S SEVERAL VA HANDBOOKS.

6    Q    OKAY.  WELL, LET ME JUST KIND OF CUT TO THE CHASE AND WE

7    CAN PROBABLY JUST MOVE ON.  BUT AGAIN, I BELIEVE THAT AT

8    LEAST AT -- WHEN I TOOK YOUR DEPOSITION, AND THAT WAS BEFORE

9    YOU CLEANED YOUR DESK OUT AND THINGS WENT TO THE SHREDDER,

10   BUT WHEN I TOOK YOUR DEPOSITION THAT YOU INDICATED THAT YOU

11   WERE NOT FAMILIAR WITH THE HANDBOOK AT THAT TIME.  IS THAT --

12   IS THAT CORRECT?

13   A    I PROBABLY DID SAY THAT, SIR.

14   Q    OKAY.  ALL RIGHT.  AND THAT WOULD HAVE BEEN A TRUE

15   STATEMENT; THAT YOU WEREN'T FAMILIAR WITH THE VA HANDBOOK?

16   A    LIKE I SAID, THERE WERE MULTIPLE VA HANDBOOKS.

17   Q    I UNDERSTAND.  BUT YOU WEREN'T FAMILIAR WITH ANY VERSION

18   OF THOSE HANDBOOKS AS OF THE TIME I TOOK YOUR DEPOSITION.

19   A    NO, SIR.

20   Q    OKAY.  AND AGAIN, JUST SO WE ARE CLEAR, SINCE THE

21   DEPOSITION AND UP TO WHEN YOU SENT THINGS TO THE SHREDDER,

22   DID YOU BECOME FAMILIAR WITH IT?  DID YOU -- DO YOU HAVE A

23   SPEAKING FAMILIARITY TODAY WITH IT?

24   A    NO, SIR, I WAS SINGING JOY AND GLEE--

25          COURT REPORTER:  I'M SORRY.  CAN YOU MOVE THE

```
 1    MICROPHONE?

 2    A    I WAS SINGING JOY AND GLEE ONCE I THREW PAPERWORK INTO

 3    THE SHREDDER.

 4    Q    AND I BELIEVE IT'S CORRECT THAT YOU COULDN'T TELL ME

 5    WHAT THE REQUIREMENTS WERE IN THE VA HANDBOOK FOR DETERMINING

 6    A PHYSICIAN'S MARKET PAY WITHOUT LOOKING AT IT.  IS THAT A

 7    FAIR STATEMENT?

 8    A    THAT WOULD BE A FAIR STATEMENT, SIR.

 9    Q    OKAY.  ALL RIGHT.  NOW, I BELIEVE IT'S ESTABLISHED, BUT

10    IS ONE OF THE PURPOSES OF MARKET PAY THE RECRUITMENT OF

11    PHYSICIANS AT THE VA?

12    A    RECRUITMENT AND RETENTION, YES.

13    Q    OKAY.  AND RECRUITMENT OBVIOUSLY MEANS YOU GOT SOMEBODY

14    NEW THAT YOU'RE GOING TO RECRUIT INTO A SERVICE LINE.  IS

15    THAT WHAT RECRUITMENT MEANS?

16    A    YES, SIR.

17    Q    ALL RIGHT.  AND THEN THE OTHER PURPOSE IS YOU MENTIONED

18    RETENTION; IS THAT CORRECT?

19    A    YES, SIR.

20    Q    AND RETENTION MEANS ONCE -- ONCE YOU HAVE THE FISH IN

21    THE BOAT SO-TO-SPEAK AND THE ANESTHESIOLOGIST IS EMPLOYED

22    THERE, THEN EVERY TWO YEARS HE OR SHE COMES UP FOR WHAT'S

23    CALLED A BIENNIAL REVIEW; IS THAT CORRECT?

24    A    YES, SIR.

25    Q    AND THOUGH -- SO THIS OTHER PURPOSE OF MARKET PAY THEN
```

1    IS RETAINING, KEEPING IN THE BOAT, THAT ANESTHESIOLOGIST THAT

2    WAS HIRED TWO YEARS AGO OR HOWEVER LONG BACK IT WAS WHEN THAT

3    PERSON WAS RECRUITED, SO YOU GOT THEM, YOU GOT THEM

4    RECRUITED, NOW YOU WANT TO RETAIN THEM.  IS THAT WHAT WE ARE

5    TALKING ABOUT?

6    A    YES, SIR.

7    Q    OKAY.  ALL RIGHT.  IN YOUR EXPERIENCE, THOUGH, RETENTION

8    OF QUALIFIED PHYSICIANS RELATIVE TO MARKET PAY IS NOT

9    SOMETHING THAT IS DISCUSSED AT COMP PANELS OR PAY PANELS; IS

10   THAT CORRECT?

11   A    I'M NOT SO SURE I UNDERSTAND YOUR QUESTION.

12   Q    OKAY.  WHEN I TOOK YOUR DEPOSITION AND WE DISCUSSED THE

13   SUBJECT OF MARKET PAY, YOU INDICATED TO ME THAT IN YOUR

14   EXPERIENCE THE RETENTION -- THAT IS KEEPING -- KEEPING THEM

15   IN THE BOAT -- THE RETENTION OF QUALIFIED PHYSICIANS RELATIVE

16   TO MARKET PAY WAS SOMETHING THAT IN YOUR EXPERIENCE WAS NOT

17   DISCUSSED AT PAY PANELS.

18   A    THE MARKET PAY WENT WITH THE AAMC AND WITH THE HAY

19   GROUP.

20   Q    OKAY.

21   A    SO I -- I'M CONFUSED ON WHAT YOU'RE -- YOU'RE ASKING

22   HERE.

23   Q    THAT'S FINE.  AND WE'LL TAKE A LOOK IN A MOMENT AT

24   EXACTLY WHAT YOU TESTIFIED TO WHEN YOU GAVE YOUR DEPOSITION

25   TESTIMONY ON IT.  BUT I THINK THE DISTINCTION I'M DRAWING,

1    THOUGH, IS I UNDERSTAND THAT HAY GROUP INFORMATION AND SO

2    FORTH IS AVAILABLE.  BUT THE ISSUE THAT WE WERE TALKING ABOUT

3    AND THAT I'M ASKING YOU TO CONFIRM NOW IS WHETHER AT THE COMP

4    PANEL MEETING WHEN THE COMP PANEL CONVENES, IN YOUR

5    EXPERIENCE MARKET PAY WAS NOT ONE OF THE FACTORS THAT WAS

6    GIVEN CONSIDERATION OR DISCUSSED -- LET ME PUT IT THAT WAY --

7    AT THESE COMP PANELS RELATIVE TO MARKET PAY.  NOT ANNUAL PAY

8    BUT MARKET PAY.  IS THAT A FAIR STATEMENT?

9    A    BE HONEST WITH YOU, I DON'T REMEMBER.

10   Q    ALL RIGHT, SIR.  FAIR ENOUGH.  LET ME DO THIS.  I'D LIKE

11   JUST TO SEE IF WE CAN TAKE A LOOK AT YOUR DEPOSITION

12   TESTIMONY ON THAT AND SO I WILL ASK THE CLERK, WITH THE

13   COURT'S PERMISSION, TO UNSEAL YOUR DEPOSITION OF DECEMBER THE

14   10TH, 2015.

15        DR. MILLER, THIS IS YOUR DEPOSITION --

16        *MR. IRVIN:*  COULD I APPROACH THE WITNESS, YOUR

17   HONOR, GIVE HIM THE -- THANK YOU.

18   Q    THIS IS YOUR DEPOSITION THAT WE TOOK BACK ON DECEMBER

19   THE 10TH OF 2015.  AND AT THAT TIME YOU RECALL THAT YOU WERE

20   UNDER OATH; IS THAT RIGHT?

21   A    YES, SIR.

22   Q    JUST LIKE YOU ARE TODAY.

23   A    YES, SIR.

24   Q    AND THE TESTIMONY THAT YOU GAVE WAS IN ACCORDANCE WITH

25   THAT OATH AND -- IS THAT RIGHT?

1    A    YES, SIR.

2    Q    TO THE BEST OF YOUR ABILITY IT WAS THE TRUTH?

3    A    YES, SIR.

4    Q    OKAY.  I'M SHOWING YOU NOW THAT DEPOSITION AND I HAVE IT

5    TURNED TO PAGE 86.

6    A    OKAY.

7    Q    AND I WILL DIRECT YOUR ATTENTION TO THE SPECIFIC THAT WE

8    WERE TALKING ABOUT A MOMENT AGO.  BUT CERTAINLY IF YOU WANT

9    TO LOOK AT ANY OF YOUR OTHER TESTIMONY, I'M HAPPY FOR YOU TO

10    DO SO.  BUT ON THE QUESTION THAT I ASKED YOU ABOUT WHETHER

11    RETENTION OF QUALIFIED PHYSICIANS RELATIVE TO MARKET PAY WAS

12    DISCUSSED.  AND SO I DIRECT YOUR ATTENTION TO THE QUESTION I

13    ASKED YOU ON PAGE 86 AT LINE 15.

14    A    YES, SIR.

15    Q    QUESTION.  BUT IS RETENTION OF QUALIFIED PHYSICIANS

16    RELATIVE TO MARKET PAY DISCUSSED?  AND WHAT WAS YOUR ANSWER?

17    A    I ANSWERED, NO, SIR.

18    Q    OKAY.  AND DO YOU BELIEVE THAT IS A TRUE STATEMENT?

19    A    TO THE BEST OF MY KNOWLEDGE, YES, SIR.

20    Q    ALL RIGHT, SIR.  NOW, LET ME HAND YOU TRIAL EXHIBIT 6

21    FOR THE PLAINTIFF.  AND THIS I BELIEVE WAS A -- YOU -- YOU

22    LIKE YOU CAN -- WOULD YOU LIKE ME TO SET--

23    A    THAT'S HERE.

24    Q    I'M HANDING YOU A DOCUMENT THAT I BELIEVE WE SHOWED YOU

25    AT YOUR DEPOSITION.  AND YOU TAKE -- TAKE A MOMENT TO LOOK AT

1    IT.  I JUST HAVE A QUESTION OR TWO ABOUT IT.  DO YOU RECALL

2    THIS PARTICULAR DOCUMENT, DR. MILLER?

3    A    TO BE HONEST WITH YOU, NO, SIR, I DON'T.

4    Q    OKAY.  WELL, THIS WAS A DOCUMENT THAT WE USED AT YOUR

5    EXHIBIT -- I MEAN AT YOUR DEPOSITION.  AND I ASKED YOU SOME

6    QUESTIONS ABOUT THE FIRST PAGE OF THAT EXHIBIT WHICH -- WHICH

7    I'D LIKE YOU TO FOCUS ON.  DO YOU SEE THAT FIRST PAGE WHICH

8    IS ESSENTIALLY A TABLE THAT WAS PREPARED BY TAMARA NICHOLS?

9    A    YES, SIR.

10   Q    OKAY.  NOW, YOU TAKE A MOMENT TO LOOK AT IT AND YOU SEE

11   THAT IT HAS THE NAMES OF THE ANESTHESIOLOGISTS, AND THIS

12   PARTICULAR ONE ACTUALLY INCLUDES YOU, ALTHOUGH YOU ARE THE

13   SERVICE LINE CHIEF.  BUT THE OTHER DOCTORS THAT APPEAR THERE

14   ON EXHIBIT 6 WOULD BE THE STAFF ANESTHESIOLOGISTS AT DORN AT

15   THAT TIME?

16   A    YES, SIR.

17   Q    ALL RIGHT.  AND I BELIEVE YOU SEE THAT THE DATES OF

18   BIRTH FOR THOSE VARIOUS PHYSICIANS INCLUDING YOURSELF ARE

19   SHOWN THERE ON THIS DOCUMENT PREPARED BY TAMARA NICHOLS WITH

20   THE HR DEPARTMENT AT VA?

21   A    YES, SIR.

22   Q    ALL RIGHT.  AND THEN GOING ON ACROSS THE PAGE THERE ARE

23   COLUMNS TO INDICATE BASE PAY FOR EACH PHYSICIAN.  YOU SEE

24   THAT?

25   A    YES, SIR.

MILLER - DIRECT

54

1    Q     AND MARKET PAY?  YOU SEE THAT ONE?

2    A     YES, SIR.

3    Q     AND THEN ANNUAL SALARY, WHICH IS THE COMBINATION OF THE

4    BASE PAY PLUS THE MARKET PAY.  YOU SEE THAT?

5    A     YES, SIR.

6    Q     ALL RIGHT.  NOW, THE YOUNGER ANESTHESIOLOGISTS THAT ARE

7    ON THAT CHART, THEY ARE RECEIVING MORE MARKET PAY THAN THE

8    OLDER ANESTHESIOLOGISTS.  WOULD YOU AGREE WITH ME?

9    A     YES, SIR.

10   Q     AND YOU CAN'T REALLY EXPLAIN WHY; CAN YOU, DR. MILLER?

11   A     NO, SIR.

12   Q     ALL RIGHT.  AND YOU CAN'T EXPLAIN WHY DR. ALGHOTHANI,

13   WHO WAS BORN IN 1966, WOULD RECEIVE ALMOST $22,000 MORE IN

14   MARKET PAY THAN DR. KENNEDY WHO WAS BORN IN 1951.  THAT IS 15

15   YEARS EARLIER.  YOU CAN'T EXPLAIN THAT; CAN YOU?

16   A     THE ONLY THING I CAN THINK OF IS WITH DR. ALGHOTHANI, WE

17   WERE RECRUITING -- AND I DON'T REMEMBER IF AT THE TIME IF HE

18   GOT A INCENTIVE OR A RELOCATION OR SIGN-ON BONUS OR ONE OF

19   THOSE.

20   Q     OKAY.

21   A     TO BE HONEST WITH YOU.

22   Q     DON'T RECALL ONE WAY--

23   A     I DON'T RECALL ONE WAY OR THE OTHER, YES, THAT WOULD BE

24   TRUE.

25   Q     OKAY.  AND OTHERWISE YOU WOULDN'T BE ABLE TO EXPLAIN

MILLER - DIRECT

55

1   THAT $22,000 DIFFERENCE BETWEEN DR. ALGHOTHANI AND DR.

2   KENNEDY?

3   A    ONLY THING I CAN THINK OF IS WHAT I SAID.

4   Q    YES, SIR.  I UNDERSTAND.  AND WITH RESPECT TO DR.

5   NGUYEN -- AND YOU SEE DR. NGUYEN THERE, HE'S THE NEXT TO THE

6   LAST ON THE LIST -- AND YOU SEE WHERE DR. NGUYEN WAS BORN IN

7   1962?

8   A    YES, SIR.

9   Q    DR. KENNEDY IN 1951.  AND YOU'RE NOT ABLE TO EXPLAIN WHY

10  DR. NGUYEN WOULD RECEIVE ALMOST $23,000 MORE IN MARKET PAY

11  THAN DR. KENNEDY?

12  A    IT WOULD BE THE SAME EXPLANATION AS DR. ALGHOTHANI.  IF

13  THERE WAS A RETENTION OR A -- OR A SIGN-ON BONUS OR SOMETHING

14  ALONG THAT LINE.

15  Q    OKAY.  AND YOU DON'T KNOW OF THAT.  YOU'RE JUST SAYING

16  THAT COULD BE AN EXPLANATION IF IT WERE A FACT; IS THAT

17  CORRECT?

18  A    THAT IS CORRECT.

19  Q    ALL RIGHT.  NOW, WITH RESPECT TO DR. PENDER, YOU SEE HE

20  WAS BORN IN 1957; IS THAT CORRECT?

21  A    YES, SIR.

22  Q    AND HE RECEIVED, ACCORDING TO MRS. NICHOLS' DOCUMENT,

23  PLAINTIFF'S EXHIBIT 6, DR. PENDER RECEIVED 19 --

24  APPROXIMATELY $19,500 MORE IN MARKET PAY THAN DR. KENNEDY.

25  DO YOU SEE THAT THERE, SIR?

MILLER - DIRECT

56

1    A    YES, SIR.

2    Q    OKAY.  AND THEN WITH RESPECT TO DR. PRYOR, WHO WAS BORN

3    IN 1954, DR. PRYOR RECEIVED ABOUT $9,000 MORE IN MARKET PAY

4    THAN DR. KENNEDY.  DO YOU SEE THAT?

5    A    YES, SIR.

6    Q    OKAY.  NOW, YOU DON'T HAVE ANY REASON TO CONTEST THE

7    ACCURACY OF THOSE FIGURES; DO YOU, SIR?

8    A    THE ONLY THING I CAN SAY IS DR. PRYOR AND I WERE HIRED

9    ABOUT THE SAME TIME, SO AT THE TIME OF HIS BASE PAY, MARKET

10   PAY, AND INITIALIZATION OF IT, I HAD NO INPUT.  AND DR.

11   PENDER WAS HIRED BY DR. CHAPEL WHEN SHE WAS THE CHIEF OF PAIN

12   MANAGEMENT AND ANESTHESIOLOGY.

13   Q    OKAY.  SO YOU DIDN'T HAVE ANYTHING TO DO WITH THOSE

14   HIRES?

15   A    NO.

16   Q    OKAY.  THAT'S -- THAT'S FINE.  NOW, YOU'RE SHOWN ON

17   THERE, TOO, DR. MILLER.  AND UNDERSTANDING THAT YOU ARE A

18   SERVICE LINE CHIEF, YOU ARE THE CHIEF OF THE ANESTHESIOLOGY

19   SERVICE.  BUT IF WE ELIMINATE THE ELEMENT OF YOU BEING THE

20   CHIEF OF THE SERVICE, DO YOU KNOW OF ANY REASON WHY YOUR

21   MARKET PAY WOULD BE $37,000 MORE THAN DR. KENNEDY'S?

22   A    NO, SIR.

23   Q    AND YOU ARE HOW MUCH YOUNGER THAN DR. KENNEDY WHO WAS

24   BORN IN 1951?

25   A    BE SIX YEARS OR FIVE YEARS.

1    Q    ALL RIGHT, SIR.  NOW, ALL OF YOUR STAFF

2    ANESTHESIOLOGISTS ON THIS EXHIBIT 6 ARE -- ALL OF THEM ARE

3    BOARD CERTIFIED; IS THAT CORRECT?

4    A    YES, SIR.

5    Q    OKAY.  ALL RIGHT.  NOW DR. MILLER, YOU RECALL THAT THERE

6    WERE SOME COMPENSATION PANELS OR A COMPENSATION PANEL THAT

7    WAS FORMED TO CONDUCT SOME REVIEWS IN NOVEMBER OF 2016 OF ALL

8    OF THE ANESTHESIOLOGISTS THAT ARE SHOWN THERE ON PLAINTIFF'S

9    EXHIBIT 6 WHO ARE THE STAFF ANESTHESIOLOGISTS, NOT YOU AS THE

10   CHIEF, BUT THE OTHER ANESTHESIOLOGISTS WERE REVIEWED IN

11   NOVEMBER OF 2016.  DO YOU RECALL THAT?

12   A    YES, SIR.

13   Q    OKAY.  AND LET ME JUST SHOW YOU SO YOU WILL HAVE IT IN

14   FRONT OF YOU PLAINTIFF'S EXHIBIT 12.  AND I AM HANDING YOU

15   NOW, DR. MILLER, PLAINTIFF'S EXHIBIT NUMBER 12, WHICH IS

16   ALREADY IN EVIDENCE.  AND I WILL REPRESENT TO YOU THAT THOSE

17   ARE THE FIVE PHYSICIAN, ANESTHESIOLOGISTS WHO WERE ALL

18   REVIEWED I GUESS SEQUENTIALLY; IS THAT CORRECT?

19   A    YES, SIR.

20   Q    OKAY.  AND I MEANT BY THAT THAT YOU -- THEY WERE

21   REVIEWED ONE AT A TIME; IS THAT RIGHT?

22   A    YES, SIR.

23   Q    OKAY.  AND THAT WAS DONE BY A PAY PANEL IN NOVEMBER OF

24   2016; IS THAT CORRECT?

25   A    YES, SIR.

1    Q    NOW, DID YOU SERVE AS THE PRESENTER ON THOSE PAY PANELS

2    THAT WERE CONVENED IN NOVEMBER OF 2016?

3    A    YES, SIR.

4    Q    OKAY.  AND YOU CONDUCTED A REVIEW OF ALL OF THE STAFF

5    ANESTHESIOLOGISTS IN NOVEMBER OF 2016 BECAUSE DR. NGUYEN HAD

6    COME TO YOU AT OR ABOUT THAT TIME AND INFORMED YOU OF HIS

7    INTENTION TO LEAVE DORN VA IF HE DIDN'T GET MORE MONEY; IS

8    THAT CORRECT?

9    A    YES, SIR.

10   Q    ALL RIGHT.  AND SO, YOU -- HE WOULD -- YOU REQUESTED HIS

11   PERMISSION TO SEE WHAT YOU COULD DO; IS THAT CORRECT?

12   A    YES, SIR.

13   Q    AND YOU DECIDED TO CONDUCT THESE REVIEWS IN

14   NOVEMBER 2016 OF ALL OF THE STAFF ANESTHESIOLOGISTS AT DORN

15   TO ENSURE THAT THERE WAS NO PAY DISPARITY BETWEEN NGUYEN AND

16   THE REMAINING STAFF ANESTHESIOLOGISTS; IS THAT CORRECT?

17   A    I CONDUCTED THE REVIEWS TO SEE IF WE COULD GET THE

18   SALARIES UP TO MAINTAIN OUR DEPARTMENT.  WE HAD A GOOD

19   DEPARTMENT THAT WORKED WELL TOGETHER WITH THE

20   ANESTHESIOLOGISTS.  SO, THAT WAS THE GOAL WAS TO KEEP OUR --

21   OUR DEPARTMENT INTACT.

22   Q    AND THE VEHICLE THAT YOU USED TO ACCOMPLISH THAT WAS TO

23   SET ALL OF THE STAFF ANESTHESIOLOGISTS' SALARIES EQUAL AT

24   $300,000 EACH; IS THAT CORRECT?

25   A    THAT WAS THE SALARY THAT DR. NGUYEN HAD PRESENTED ME

1    WITH FROM A COMPETITOR ACROSS TOWN.

2    Q    AND SO YOU WERE TRYING TO KEEP DR. NGUYEN.

3    A    YES.

4    Q    IS THAT RIGHT?

5    A    YES, SIR.

6    Q    OKAY.  AND SO, YOU DECIDED THAT YOU WOULD DO THESE

7    REVIEWS OF ALL THE STAFF ANESTHESIOLOGISTS AND SET

8    EVERYBODY'S SALARY THE SAME; IS THAT RIGHT?

9    A    NO, SIR.  WE DID AN INDEPENDENT REVIEW OF EVERY

10   ANESTHESIOLOGIST.  THEY WERE ACROSS TOWN -- I THINK IT WAS

11   RICHLAND OR BAPTIST, I DON'T REMEMBER WHICH HOSPITAL HE GAVE

12   ME THE PAPERWORK FROM -- THE SALARY WAS $300,000, AND THAT'S

13   WHAT HE SAID HE NEEDED TO HAVE IN ORDER TO STAY AT THE VA.

14   Q    WELL, BUT INSTEAD OF CONDUCTING A REVIEW ONLY OF DR.

15   NGUYEN AND ADJUSTING HIS SALARY AS MAY BE APPROPRIATE, YOU

16   DETERMINED TO CONDUCT A REVIEW OF EVERY STAFF

17   ANESTHESIOLOGIST; CORRECT?

18   A    THAT WOULD BE CORRECT.

19   Q    AND AS SHOWN ON PLAINTIFF'S EXHIBIT 12 IN THE LANGUAGE

20   THAT IS TYPED IN THERE, THE PURPOSE WAS TO ENSURE THERE'S NO

21   PAY DISPARITY AMONG THOSE STAFF ANESTHESIOLOGISTS; IS THAT

22   CORRECT?

23   A    YES, SIR.

24   Q    IS THAT WHAT IT SAYS?

25   A    THAT'S WHAT -- THAT'S WHAT THE PAPERWORK IN FRONT OF ME

1    SAID.

2    Q    WELL, ISN'T THAT WHAT YOU CONDUCTED THESE REVIEWS TO DO;

3    TO ENSURE THERE WAS NO PAY DISPARITY?

4    A    AT THE TIME THAT I CONDUCTED THIS REVIEW, SIR, THAT

5    STATEMENT WAS ADDED BY HR.

6    Q    OKAY.

7    A    AND AT THE TIME OF MY RETIREMENT, THERE WAS PAPERWORK

8    THAT I DISCARDED THAT HAD HR AS THE ONES ADDING THAT

9    STATEMENT TO THIS FORM.

10    Q    OH.  DID YOU DISAGREE WITH HR THAT ALL OF THE

11    ANESTHESIOLOGISTS' SALARIES AND ANNUAL PAY SHOULD BE SET AT

12    300,000?

13    A    I'M NOT SURE I'M UNDERSTANDING WHAT YOU'RE SAYING.  WHAT

14    I'M SAYING IS THAT STATEMENT THAT YOU READ TO ME WAS PLACED

15    BY HR.

16    Q    DID YOU AGREE WITH IT OR DISAGREE WITH IT, DR. MILLER?

17    A    I DON'T KNOW HOW TO ANSWER THAT QUESTION, YOUR HONOR,

18    SIR.

19    Q    OKAY.  LET'S DO THIS.  LET'S TAKE A LOOK AT YOUR

20    DEPOSITION, AND I'LL ASK THE COURT REPORTER -- BEG YOUR

21    PARDON -- THE CLERK OF COURT TO UNSEAL THE SECOND DEPOSITION

22    TRANSCRIPT OF DR. MILLER DATED NOVEMBER 13, 2017.  NOW, THIS

23    IS YOUR SECOND DEPOSITION.

24    A    YES, SIR.

25    Q    AND AGAIN, JUST TO GO THROUGH PAGES, YOU WERE SWORN TO

1    TELL THE TRUTH IN THIS DEPOSITION; CORRECT?

2    A    CORRECT.

3    Q    AND YOU TOLD THE TRUTH IN YOUR TESTIMONY TO THE BEST OF

4    YOUR ABILITY?

5    A    CORRECT.

6    Q    ALL RIGHT.  LET ME SHOW YOU THEN THIS ORIGINAL

7    TRANSCRIPT OF YOUR DEPOSITION TAKEN ON NOVEMBER THE 13TH,

8    2017.  AND I WILL ASK YOU TO TURN TO PAGE EIGHT IN THE

9    TRANSCRIPT OF THAT DEPOSITION.

10    A    I'M SORRY.  I DIDN'T HEAR THE PAGE YOU SAID.

11    Q    SORRY.  PAGE EIGHT.  AND LET'S DO THIS IF WE CAN, DR.

12    MILLER.  FLIP BACK A PAGE TO PAGE SEVEN AND LOOK DOWN AT LINE

13    23.  DO YOU HAVE THAT IN FRONT OF YOU?

14    A    YES, SIR.

15    Q    ALL RIGHT.  AND YOU AND I WERE DISCUSSING AT THIS POINT

16    IN YOUR DEPOSITION THESE PAY PANEL REVIEWS THAT ARE MARKED AS

17    EXHIBIT 12 AND DATED NOVEMBER THE 10TH OF 2016 WHERE THE

18    TYPED LANGUAGE THAT WE JUST DISCUSSED IS HERE THAT SAYS, TO

19    ENSURE THERE IS NO PAY DISPARITY.

20        AND MY QUESTION TO YOU ON THE BOTTOM OF PAGE SEVEN

21    BEGINNING AT LINE 23 WAS, I UNDERSTAND THAT ARE YOU THE ONE

22    THAT INSTRUCTED OR DIRECTED THAT IT BE SET FORTH ON THIS

23    DOCUMENT?

24        AND WHAT WAS YOUR ANSWER AT THE TOP OF PAGE EIGHT?

25    A    THE ANSWER IS, YES, SIR.

1    Q    ALL RIGHT.  AND THAT WAS A TRUE AND CORRECT STATEMENT?

2    A    I SAID IT THEN, IT WAS A TRUE AND CORRECT STATEMENT,

3    SIR.

4    Q    AND THEN THE NEXT LINE, LINE TWO OF PAGE EIGHT, I ASKED

5    YOU, AND WHY DID YOU DECIDE TO DO THAT?  AND WHAT WAS YOUR

6    RESPONSE?

7    A    TO MAKE SURE THERE WAS NO PAY...

8              COURT REPORTER:  I'M SORRY?

9    A    TO MAKE SURE THAT THERE WAS NO PAY DISPARITY BETWEEN THE

10   ANESTHESIOLOGISTS THAT WAS GOING TO LEAVE AND THE REMAINING

11   ANESTHESIOLOGISTS.

12   Q    OKAY.  AND THE ONE WHO WAS GOING TO LEAVE IS DR. NGUYEN.

13   A    CORRECT.

14   Q    AND THE ONES WHO WERE TO REMAIN WOULD HAVE BEEN DR.

15   KENNEDY AND DR. PRYOR AND DR. PENDER AND DR. ALGHOTHANI; IS

16   THAT CORRECT?

17   A    CORRECT.

18   Q    THOSE ARE THE ONES THAT WERE ON THAT CHART, THAT TABLE

19   THAT WE JUST WENT OVER A FEW MINUTES AGO THAT WAS PREPARED BY

20   TAMARA NICHOLS WHO WAS THE HR DIRECTOR AT DORN; IS THAT

21   CORRECT?

22   A    I GUESS, SIR.  YES, SHE WAS THE HR DIRECTOR.  AND IF SHE

23   PREPARED THOSE PANELS AND I SAID SHE PREPARED THOSE PANELS,

24   THEN SHE MUST HAVE PREPARED THOSE PANELS, BUT...

25   Q    OKAY.  NOW DR. MILLER, YOU DECIDED -- WELL, LET ME MOVE

MILLER - DIRECT

63

1    ON.  I BELIEVE THAT YOU WILL AGREE WITH ME THAT ALL OF THOSE

2    STAFF ANESTHESIOLOGISTS HAVE VERY SIMILAR QUALIFICATIONS; IS

3    THAT CORRECT?

4    A    YES, SIR.

5    Q    OKAY.  ALL RIGHT.  AND YOU REALLY VIEWED ALL FIVE OF

6    THEM AS HAVING ESSENTIALLY THE SAME QUALIFICATIONS; IS THAT

7    CORRECT?

8    A    YES, SIR.

9    Q    OKAY.  AND SO, HAVING HAD AN OPPORTUNITY TO REFRESH YOUR

10   RECOLLECTION BY LOOKING AT THIS TESTIMONY THAT YOU GAVE IN

11   THE DEPOSITION WHICH WAS NEARER IN TIME TO THE EVENTS, YOU

12   RECOMMENDED TO THE PANEL ON THIS DAY THAT ALL, EACH AND EVERY

13   ONE OF THE STAFF ANESTHESIOLOGISTS' ANNUAL SALARY BE SET AT

14   $300,000; IS THAT CORRECT?

15   A    THAT WOULD BE CORRECT, SIR.

16   Q    OKAY.  YOU DIDN'T COMPARE THE MARKET PAY AWARDS AS AMONG

17   THOSE FIVE; CORRECT?

18   A    CORRECT.

19   Q    YOU SIMPLY MADE A RECOMMENDATION IN CONSULTATION WITH HR

20   FOR THE RECOMMENDATION BY YOU AS THE PRESENTER IN NOVEMBER OF

21   2016 TO SET EACH AND EVERY ONE OF THE STAFF

22   ANESTHESIOLOGISTS' ANNUAL PAY AT $300,000.

23   A    YES, SIR.

24   Q    NOW, EACH OF THOSE STAFF ANESTHESIOLOGISTS HAVE A

25   DIFFERENT START DATE AT THE VA; IS THAT CORRECT?

1    A    ACCORDING TO THE PAPER THAT YOU GAVE ME, I THINK -- OH,

2    THAT WAS BIRTHDAYS.  SORRY.  YES, EVERY ONE OF THEM WOULD

3    HAVE A DIFFERENT START DATE.

4    Q    AND SO, THESE BASE PAY TABLES WOULD GIVE A DIFFERENT

5    AMOUNT OF BASE PAY -- AND WE CAN LOOK AT THEM IF YOU WANT TO

6    LOOK AT THE COLLECTION OF THOSE COMPENSATION PAY REVIEW

7    FORMS.  EACH ONE OF THOSE PHYSICIANS WOULD HAVE A DIFFERENT

8    AMOUNT OF BASE PAY; IS THAT CORRECT?  TAKE A MOMENT TO LOOK

9    AT IT IF YOU...

10   A    YES, SIR.  EACH PHYSICIAN HAS A DIFFERENT AMOUNT OF BASE

11   PAY.

12   Q    ALL RIGHT.  AND SO WHAT WE HAVE HERE IN NOVEMBER OF 2016

13   IS YOU DECIDED THAT YOU WANTED TO EQUALIZE ALL OF THE STAFF

14   ANESTHESIOLOGISTS' ANNUAL SALARY; CORRECT?

15   A    I WANTED TO MAKE IT COMPETITIVE SO WE DIDN'T LOSE THE

16   ANESTHESIOLOGISTS.

17   Q    AND THE VEHICLE YOU USED TO MAKE IT COMPETITIVE SO YOU

18   DIDN'T LOSE A STAFF ANESTHESIOLOGIST WAS TO RAISE DR. NGUYEN

19   AND EQUALIZE EVERYBODY ELSE AT THAT SAME PAY LEVEL; IS THAT

20   CORRECT?

21   A    YES, SIR.

22   Q    ALL RIGHT.  AND SO, WHAT WE HAVE THEN IS A DECISION BY

23   YOU TO SET EVERYONE'S ANNUAL PAY AT 300,000; CORRECT?

24   A    CORRECT.

25   Q    AND THEN EVERYBODY'S GOING TO HAVE A DIFFERENT BASE PAY,

1    BUT THAT NUMBER COMES OFF THE TABLE; RIGHT?

2    A    YES, SIR.

3    Q    AND SO, THE WAY MARKET PAY WOULD BE CALCULATED WOULD BE

4    SIMPLY BY TAKING YOUR $300,000 ANNUAL PAY NUMBER WHICH WAS

5    APPROVED; CORRECT?

6    A    YES, SIR.

7    Q    AND SUBTRACTING THE BASE PAY AMOUNT THAT COMES OFF THE

8    TABLE; CORRECT?

9    A    YES, SIR.

10   Q    WHICH IS DIFFERENT FOR EACH OF THE FIVE

11   ANESTHESIOLOGISTS; CORRECT?

12   A    CORRECT.

13   Q    AND THEN YOU COME UP WITH WHAT WAS THE MARKET PAY FOR

14   EACH ONE OF THOSE ANESTHESIOLOGISTS AT THE TIME OF THESE

15   REVIEWS.  IS THAT HOW YOU HAD COME UP WITH THE MARKET PAY

16   AMOUNT?

17   A    YES, SIR.

18   Q    LET ME ASK YOU TO TAKE A LOOK AT PLAINTIFF'S EXHIBIT 14.

19   DR. MILLER, THIS IS A DOCUMENT THAT WAS MARKED IN YOUR

20   DEPOSITION AS DEPOSITION EXHIBIT 2 TO YOUR NOVEMBER OF 2017

21   DEPOSITION THAT WE TOOK ON THE SUBJECT OF THESE NOVEMBER 2016

22   COMP PANELS.  DO YOU REMEMBER ME SHOWING YOU THAT DOCUMENT?

23   A    NO, SIR, I DON'T REMEMBER YOU SHOWING ME THIS DOCUMENT.

24   Q    OKAY.  I UNDERSTAND.  TAKE A MOMENT TO LOOK AT IT.

25   WOULD YOU DO THAT FOR ME?

MILLER - DIRECT

1    A    YES, SIR.

2    Q    OKAY.  ARE YOU FAMILIAR --

3    A    YES, SIR.

4    Q    -- WITH THAT?  OKAY.  NOW, WOULD IT BE CORRECT THAT

5    BASED ON THIS EXHIBIT THAT IS IN EVIDENCE, THAT IS

6    PLAINTIFF'S EXHIBIT NUMBER 14, THE MARKET PAY IN THAT FIRST

7    COLUMN FOR NOVEMBER THE 16TH -- DO YOU SEE THAT FIRST COLUMN?

8    A    YES, SIR.

9    Q    ALL RIGHT.  WOULD REFLECT THAT DR. KENNEDY RECEIVED THE

10   LOWEST AWARD OF MARKET PAY OF ANY OF THE OTHER STAFF

11   ANESTHESIOLOGISTS ALL OF WHOM GOT 300,000 ANNUAL?

12   A    I -- YES, SIR.  DR. KENNEDY GOT THE LOWEST MARKET

13   INCREASE, CORRECT.

14   Q    OKAY.  AND THEN THE NEXT COLUMN SAYS PRE-NOVEMBER 16

15   MARKET PAY.  AND YOU SEE THAT COLUMN?

16   A    YES, SIR.

17   Q    AND THAT WOULD BE THE AMOUNT OF MARKET PAY THAT EACH OF

18   THE STAFF PHYSICIANS WAS RECEIVING BEFORE YOU DID THESE

19   REVIEWS.  AND I'LL ASK YOU, SIR, WHO HAD THE LOWEST MARKET

20   PAY OF THE PHYSICIANS, THE ANESTHESIOLOGISTS, PRIOR TO THE

21   NOVEMBER 16 REVIEWS?

22   A    ACCORDING TO THE DOCUMENT THAT YOU PRESENTED TO ME WOULD

23   BE DR. KENNEDY.

24   Q    ALL RIGHT.  AND THE NEXT COLUMN SHOWS THE AMOUNT OF THE

25   MARKET PAY INCREASE BASED ON THE $300,000 EQUALIZING PAY

1    REVIEWS.  DO YOU SEE THAT COLUMN, THAT THIRD COLUMN?

2    A     OKAY.  THE MARKET INCREASE?

3    Q     YES, SIR.

4    A     OKAY.

5    Q     AND WHO -- WHO RECEIVED THE LOWEST AMOUNT OF MARKET PAY

6    INCREASE BASED ON YOUR NO PAY DISPARITY, EQUALIZING EVERYBODY

7    AT 300,000?

8    A     THAT WOULD HAVE BEEN DR. KENNEDY.

9    Q     ALL RIGHT, SIR.  ARE YOU FAMILIAR WITH THE MINIMUM

10   MAXIMUM AMOUNTS THAT ARE ESTABLISHED BY THE VA FOR VARIOUS

11   SPECIALTIES OF PHYSICIANS?

12   A     I REMEMBER SOMETHING ABOUT TIERED TABLES AND STUFF OF

13   THAT NATURE, BUT I HAVEN'T LOOKED AT THIS STUFF IN OVER EIGHT

14   MONTHS.

15   Q     BUT THAT'S GOOD ENOUGH.  AND I'M NOT GOING TO TRY TO

16   TEST YOUR MEMORY TO SEE IF YOU CAN TELL US ABOUT NUMBERS AND

17   THAT KIND OF THING.  WE HAVE DOCUMENTS IN THE RECORD.  BUT

18   CONCEPTUALLY YOU WERE AWARE, AS THE SERVICE LINE CHIEF FOR

19   ANESTHESIOLOGY, THAT THE VA ESTABLISHED THROUGH THESE VARIOUS

20   TABLES AND SO FORTH A MAXIMUM AMOUNT OF ANNUAL SALARY AND

21   MINIMUM AMOUNT OF ANNUAL SALARY FOR -- FOR EXAMPLE,

22   ANESTHESIOLOGISTS AT DORN; IS THAT RIGHT?

23   A     YES, SIR.

24   Q     AND SO THE SALARIES THAT WOULD BE SET OR ESTABLISHED IN

25   THIS PAY PANEL REVIEW THEN WOULD -- WOULD TRY TO BE WITHIN

MILLER - DIRECT

1    THE MAXIMUM AND THE MINIMUMS; IS THAT CORRECT?

2    A    YES, SIR.

3    Q    BUT THERE IS SOMETHING CALLED AN EXCEPTION TO THE

4    MAXIMUM; RIGHT?  YOU KNOW ABOUT THAT?

5    A    I VAGUELY REMEMBER ABOUT THAT.

6    Q    OKAY.  AND DO YOU REMEMBER THAT THE DIRECTOR OF THE DORN

7    VA HAS AUTHORITY TO INCREASE AN ANESTHESIOLOGIST, FOR

8    EXAMPLE, SALARY ABOVE THE MAXIMUM TO A CERTAIN LEVEL; DO YOU

9    REMEMBER THAT?

10   A    I REMEMBER ABOUT AN INCREASE IN MAXIMUM SALARY, BUT I

11   DON'T THINK IT WAS THE MEDICAL DIRECTOR.  I THINK IT WAS THE

12   VISN DIRECTOR.

13   Q    OKAY.  AND THE VISN DIRECTOR MEANS THE REGIONAL

14   DIRECTOR; IS THAT CORRECT?

15   A    YES, SIR.

16   Q    ALL RIGHT.  AND THE REGIONAL DIRECTOR IS IN ATLANTA?

17   A    YES, SIR.

18   Q    OKAY.  AND SO THAT VISN OR REGIONAL DIRECTOR HAS

19   AUTHORITY THEN TO APPROVE, IF YOU WILL, AN ANESTHESIOLOGIST'S

20   SALARY THAT IS ABOVE THE MAXIMUM THAT'S SET BY THE TABLES UP

21   TO A CEILING THAT THAT PERSON IN ATLANTA HAS AUTHORITY TO

22   APPROVE.  IS THAT A FAIR STATEMENT?

23   A    YES, SIR.

24   Q    OKAY.  AND AS A MATTER OF FACT -- WELL, I DON'T WANT TO

25   SAY ROUTINE, IT MIGHT HAVE BEEN -- BUT REGULARLY THE ANNUAL

1    SALARIES OF THE ANESTHESIOLOGISTS WOULD HAVE EXCEEDED IN SOME

2    AMOUNT THE MAXIMUM THAT'S SET BY THE TABLE AND THERE WOULD BE

3    A NEED TO SUBMIT TO THIS VISN OR REGIONAL PERSON A REQUEST

4    THAT HE OR SHE APPROVE THAT SALARY THAT GOES ABOVE THE TABLE.

5    IS THAT A FAIR STATEMENT?

6    A    IT WOULD HAVE TO HAVE SUPPLEMENTAL DOCUMENTATION ALONG

7    WITH IT, AND I DON'T REMEMBER ALL OF THE FORMS THAT WOULD GO

8    ALONG WITH IT, BUT IT'S NOT -- CONCEPTUALLY AND SIMPLIFIED

9    WAY YOU PRESENTED IT, THAT WOULD BE YES.

10   Q    FAIR, FAIR ENOUGH.  BUT THAT DID HAPPEN WHILE YOU WERE

11   SERVICE LINE CHIEF FOR ANESTHESIOLOGY; CORRECT?

12   A    I'M ASSUMING IT DID, SIR, IF YOU SAY IT DID.  I DON'T

13   REMEMBER.

14   Q    YOU RECALL DR. KENNEDY COMING TO YOU IN 2014 CONCERNED

15   ABOUT THE STAGNATION OF HIS SALARY?

16   A    YOU'RE ASKING ME?

17   Q    DO YOU RECALL THAT?

18   A    NO, SIR, I DON'T.  I'M SORRY.

19   Q    OKAY.  DO YOU RECALL HIM COMING TO YOU AND EXPLAINING TO

20   YOU THAT HE WAS CONCERNED ABOUT HIS PENSION BENEFITS AND IN

21   PARTICULAR INDICATING THAT HE WAS WANTING HIS LAST THREE OR

22   FOUR YEARS AT THE VA TO HAVE A HIGHER SALARY THAN WHERE HE

23   HAD BEEN FOR SEVERAL YEARS SO THAT HIS PENSION BENEFITS WOULD

24   BE CALCULATED ON AN ANNUAL SALARY THAT WAS HIGHER THAN WHAT

25   HIS WAS.  DO YOU REMEMBER A DISCUSSION ABOUT THAT?

MILLER - DIRECT

1    A     NO, SIR, I'M AFRAID I DON'T.

2    Q     OKAY.  DO YOU REMEMBER THAT YOU RECOMMENDED THAT THERE

3    BE A PAY PANEL REVIEW OF DR. KENNEDY IN 2014?

4    A     NO, SIR, I DON'T.  I DON'T REMEMBER A LOT FROM 2014.

5    Q     ALL RIGHT.  I UNDERSTAND.  DO YOU REMEMBER ASKING DR.

6    KENNEDY TO GATHER UP DOCUMENTATION AND INFORMATION RELATIVE

7    TO HIS ACCOMPLISHMENTS AND ACHIEVEMENTS AND THAT KIND OF

8    THING AND PUT IT INTO A PACKAGE THAT COULD BE SUBMITTED FOR A

9    REVIEW BY A COMP PANEL?

10   A     I -- WE ROUTINELY WOULD DO THAT FOR THE COMP PANELS FROM

11   WHAT I REMEMBER.

12   Q     BUT YOU DON'T REMEMBER RELATIVE TO A CONVERSATION WITH

13   HIM ABOUT HIS CONCERN OVER THE STAGNATION OF HIS SALARY AND--

14   A     NO, SIR, I DO NOT.

15   Q     OKAY.  SO, DID -- LET ME JUST ASK YOU TO LOOK AT ANOTHER

16   EXHIBIT, AND I THINK WE'RE PRETTY CLOSE TO BEING DONE.  AND

17   THIS IS EXHIBIT NUMBER 8.  I'M GOING -- YOU TAKE AS MUCH TIME

18   AS YOU WOULD LIKE TO TO LOOK THROUGH THE WHOLE THING.  I WILL

19   REPRESENT TO YOU -- MAYBE IT WILL HELP -- THAT THIS IS A

20   COLLECTION OF ALL DR. KENNEDY'S PAY PANEL REVIEW FORMS.

21        THE ONE I WANT YOU TO TAKE A LOOK AT IN SPECIFIC IS THE

22   SECOND ONE DATED FEBRUARY 26TH OF 2014.  AND I BELIEVE THAT

23   BEARS YOUR SIGNATURE AS THE RECOMMENDING PRESENTER.  IS THAT

24   A FAIR STATEMENT?

25   A     YES, SIR.  2014, THAT'S MY SIGNATURE.

MILLER - DIRECT

1    Q    OKAY.  AND YOU RECOMMENDED NO INCREASE FOR DR. KENNEDY

2    AT THAT TIME; IS THAT CORRECT?

3    A    ACCORDING TO THE PAPERWORK HE GAVE ME, THAT IS CORRECT.

4    Q    OKAY.  NOW, DO YOU REMEMBER IN 2015 OR THEREABOUTS THERE

5    CAME AN ISSUE THAT RESULTED IN A TYPEWRITTEN SHEET OF

6    INFORMATION TYPED UP BY PERHAPS YOUR ADMINISTRATIVE ASSISTANT

7    OR SOMEONE ELSE IN THE ANESTHESIOLOGY SERVICE LINE OF A

8    DESCRIPTION OF THAT PARTICULAR DOCTOR'S RESUME AND

9    INFORMATION AND BOARD CERTIFICATION AND ALL OF THOSE KINDS OF

10   THINGS?  DO YOU REMEMBER THAT COMING ABOUT?

11   A    ARE YOU TALKING ABOUT THE PAGE THAT YOU HAVE HERE THAT'S

12   VA 263 KENNEDY?  THIS ONE?

13   Q    YES, SIR.  THAT'S EXACTLY RIGHT.  AND --

14   A    OKAY.

15   Q    -- TELL ME WHAT IS THE DATE OF THE PANEL REVIEW THAT

16   YOU'RE LOOKING AT THAT CONTAINS THAT TYPED-UP SHEET THAT YOU

17   JUST IDENTIFIED AS KENNEDY VA 263.  WHAT'S THE DATE OF THAT

18   REVIEW?

19   A    OKAY.  IT SAYS MAY THE 1ST, 2015.

20   Q    RIGHT.  AND THE EARLIER REVIEW SHEET THAT YOU AND I WERE

21   TALKING ABOUT JUST A MOMENT AGO, THAT'S IN FEBRUARY OF 2014?

22   A    FEBRUARY 26TH, 2014.

23   Q    YEAH.  DOES THAT ONE HAVE THAT TYPED-UP SHEET OF

24   INFORMATION ATTACHED TO IT?

25   A    NO, SIR, IT DOES NOT.

MILLER - DIRECT

72

1    Q    WELL, DOES THAT REFRESH YOUR RECOLLECTION AT ALL ABOUT

2    HOW THESE SHEETS CAME ABOUT?

3    A    WHEN WE DID THE REVIEWS, IT WAS SUPPOSED TO BE SHEETS

4    LIKE YOU HAVE FOR VA KENNEDY 263 ATTACHED TO THE PANEL ACTION

5    SHEETS.  AND THEY WERE USUALLY PREPARED BY THE ADMINISTRATIVE

6    OFFICES.

7    Q    OKAY.  AND WHEN YOU SAY ADMINISTRATIVE OFFICES, WHAT DO

8    YOU MEAN?

9    A    THAT WOULD EITHER BE ALFRED BROWN OR -- HE WAS THE ONE

10   THAT I HAD AT THE TIME, BUT LIKE THE ONES FOR JEFFREY BROWN,

11   I DON'T KNOW WHO JEFFREY BROWN OR WHO THE ADMINISTRATIVE

12   OFFICER WAS AT THE TIME FOR JEFFREY BROWN ON THE DATES.

13   Q    OKAY.  SO YOU DIDN'T PREPARE THESE SHEETS?

14   A    THEY WERE PREPARED BY EITHER THE ADMINISTRATIVE OFFICE

15   AND MOST LIKELY IN COLLABORATION WITH THE HR REPRESENTATIVE.

16   Q    DID YOU PROVIDE INFORMATION THAT WOULD HAVE BEEN USED BY

17   THE ADMINISTRATIVE OFFICERS WHO PREPARED THESE SHEETS?

18   A    I GAVE THEM THE -- TOLD THEM TO GET THE THING -- CHART

19   FILE FOLDERS TO GET THE DATES.  I MEAN, I DON'T HAVE

20   EVERYBODY'S DATE AND BOARD CERTIFICATION, YEARS OF SERVICE.

21   I WOULDN'T HAVE HAD THAT MEMORIZED OR ANYTHING.

22   Q    OKAY.  AND YOU DON'T REMEMBER EXACTLY WHY THESE SHEETS

23   CAME INTO EXISTENCE IN 2015?

24   A    YOU MEAN WHY WE HAD...

25   Q    WHY YOU STARTED USING THEM WHEREAS YOU HADN'T BEEN USING

1    THEM IN THE PAST.

2    A    WHAT I'M TELLING YOU IS THEY SHOULD HAVE BEEN THERE IN

3    THE PAST.

4    Q    OKAY.  BUT THEY WEREN'T.

5    A    BUT THEY ARE NOT.  I DON'T KNOW WHERE THEY'RE AT.

6    Q    OKAY.  OH, ARE YOU SAYING YOU THINK THAT THEY DO EXIST

7    BUT THEY ARE JUST NOT ON THESE FORMS?

8    A    WHAT I'M SAYING IS IS USUALLY WE HAVE A WAY THAT YOU

9    HAVE IT PRESENTED HERE IN 2015, THERE SHOULD HAVE BEEN SHEETS

10   ATTACHED TO THOSE REVIEW FORMS.

11   Q    OKAY.  BUT THERE AREN'T.

12   A    BUT THEY ARE NOT HERE AND I DON'T KNOW WHERE THEY ARE

13   AT.

14   Q    THANK YOU VERY MUCH, DR. MILLER.  THAT'S ALL THE

15   QUESTIONS THAT I HAVE FOR YOU.

16          *THE COURT:*  YOU MAY CROSS-EXAMINE.

17                    CROSS-EXAMINATION

18   BY MRS. BAILEY:

19   Q    DR. MILLER, CAN YOU HEAR ME?

20   A    YES, MA'AM.

21   Q    I KNOW YOU'VE JUST GOTTEN IN FROM AN AIRPLANE AND WE

22   APPRECIATE YOUR COMING TO THE COURT TODAY.  I WANT TO GO OVER

23   A LITTLE BIT OF THE TERRITORY THAT MR. IRVIN WENT OVER JUST

24   TO SORT OF PUT THINGS MORE IN CONTEXT.  ONE OF THE REALLY

25   IMPORTANT THINGS ABOUT THIS CASE IS YOUR AGE, SO CAN I JUST

1    ASK YOU, DR. MILLER, HOW OLD YOU ARE?

2    A    SIXTY.

3    Q    AND YOUR BIRTH DATE.

4    A    ******1957.

5    Q    AND I KNOW YOU'VE WORKED FOR THE VA FOR A WHILE.  WHAT

6    WERE YOUR YEARS OF WORKING AT THE VA?

7    A    TWELVE YEARS, 10 MONTHS AND 27 DAYS.

8    Q    THAT SOUNDS LIKE A RETIREE TO ME.  THE WHOLE TIME YOU

9    WERE AT THE VA YOU WERE IN THE ANESTHESIOLOGY DEPARTMENT?

10    A    YES, MA'AM.

11    Q    AND ALSO I WANTED TO ASK YOU HOW MANY YEARS WERE YOU A

12    BOARD CERTIFIED ANESTHESIOLOGIST?

13    A    I DON'T KNOW.  I'D HAVE TO GO BACK AND LOOK WHEN THE

14    BOARD CERTIFICATION, WHEN I ACHIEVED THAT.  I DON'T REMEMBER

15    THAT OFF THE TOP OF MY HEAD.  IT'S LISTED ON MY CV.

16    Q    BUT IT WAS -- IT WAS LONG BEFORE YOU CAME TO THE VA?

17    A    YES, MA'AM.

18    Q    AND THEN HOW LONG WERE YOU AT THE VA?

19    A    TWELVE YEARS, 10 MONTHS AND 27 DAYS.

20    Q    OKAY.  SO YOU HAD 12 YEARS OF -- AT THE VA AND ALSO SOME

21    AMOUNT OF TIME AS AN ANESTHESIOLOGIST IN ADDITION TO THE 12

22    YEARS YOU WERE AT THE VA?

23    A    YES, MA'AM.

24    Q    DURING THE TIME THAT YOU'RE WITH THE ANESTHESIOLOGY

25    SERVICE AT THE VA, HOW MANY DOCTORS WERE THERE?  HOW MANY

1    ANESTHESIOLOGISTS WERE ON STAFF?

2    A    WHEN I STARTED AT THE VA THERE WAS ONLY TWO

3    ANESTHESIOLOGISTS AT THE TIME.  IT WAS DR. KENNEDY AND I

4    THINK HIS NAME WAS ALMA WHITESER [SIC].

5    Q    AND DID THAT CHANGE OVER TIME?

6    A    YEAH.  I WAS THE THIRD ONE WHEN I STARTED THERE AND

7    THEN, YES, IT CHANGED OVER TIME.  WE GOT -- OUR DEPARTMENT

8    GOT BIGGER.

9    Q    AND HOW MANY ANESTHESIOLOGISTS WERE THERE AT THE TIME

10   YOU LEFT?

11   A    INCLUDING MYSELF THERE WERE SIX.  IT WAS FIVE STAFF

12   ANESTHESIOLOGISTS AND THEN MYSELF.

13   Q    WHAT KIND OF WORK DID THE ANESTHESIOLOGISTS DO AT THE

14   VA?

15   A    THEY DO THEIR OWN CASES.  THEY DO SUPERVISION.  BUT ARE

16   YOU ASKING WHAT SPECIALTIES?

17   Q    YES.

18   A    OKAY.  SO WE HAVE GASTROENTEROLOGY THEY WOULD DO, THEY

19   WOULD DO CARDIAC UP IN THE CATH LAB, EMERGENCY INTUBATIONS,

20   NIGHT CALL AND WEEKEND CALL AND HOLIDAY CALL.  THERE WAS

21   GENERAL SURGERY.  THERE'S PLASTIC SURGERY.  THERE WAS

22   GYNECOLOGY.  THERE WAS THORACIC SURGERY.  THERE WAS UROLOGY,

23   EAR NOSE AND THROAT, OPHTHALMOLOGY, PODIATRY.  THAT'S ALL I

24   CAN THINK OF RIGHT NOW.

25   Q    WELL, HOW MANY OPERATING ROOMS WERE THERE?

```
 1   A    PHYSICALLY THERE WAS EIGHT OPERATING ROOMS.  BUT

 2   OPERATING ROOM EIGHT WAS USED MORE AS A OUTPATIENT OPERATING

 3   ROOM.  AND THEN OPERATING ROOM SEVEN WAS ONLY DESIGNATED FOR

 4   UROLOGICAL PROCEDURES BECAUSE IT HAD A DRAIN IN IT.  SO OPEN

 5   PROCEDURES YOU COULD NOT DO IN THERE BECAUSE STERILITY

 6   FACTORS, BUT YOU DIDN'T WANT SOMEBODY FALL, FALLING DOWN OR

 7   SLIPPING, SO YOU WOULD HAVE -- THEY HAD THE DRAIN.  SO WHEN

 8   THEY WOULD USE THE IRRIGATION TO FLUSH OUT ANY CLOTS OR

 9   STONES, THAT IT WOULD BE -- GO INTO THE DRAIN.  IT WAS MORE

10   OF A SAFETY FACTOR FOR PEOPLE.

11       SO TAKING THOSE TWO OUT AND TAKING OUT OR NUMBER FOUR,

12   BECAUSE THAT WAS PRIMARILY FOR OPHTHALMOLOGY, BECAUSE WE HAVE

13   LIKE A HUNDRED-THOUSAND-DOLLAR OPHTHALMOLOGY OPERATING SCOPE

14   IN THERE, SO WE DIDN'T WANT ANY DAMAGE, SO YOU HAD THREE

15   MAJOR SPECIALTY ROOMS AND THEN YOU WOULD HAVE FIVE GENERAL OR

16   ROOMS PLUS YOU HAD GASTROENTEROLOGY OVER IN THE GI SUITE AND

17   CARDIOLOGY.  AND WE WOULD ALSO GO TO RADIOLOGY FOR

18   CONSCIOUS -- OR FOR MAC ANESTHETICS, SO THAT'S ALL OF THEM.

19   Q    HOW MANY ANESTHESIOLOGISTS WOULD YOU NEED TO BE FULLY

20   STAFFED?

21   A    AT THE TIME WE WERE -- WE WERE FULLY STAFFED WHEN I

22   LEFT.  NO, WE'RE -- NO, WE WEREN'T.  I TAKE THAT BACK BECAUSE

23   RICK HAD ALREADY LEFT.  PRIOR TO RICK'S DEPARTURE WE WERE

24   FULLY STAFFED BUT WE DIDN'T HAVE A FULL COMPLEMENT --

25   COMPLEMENT OF CRNA'S ON BOARD AT THE TIME, BUT WE DID HAVE A
```

1    FULL COMPLEMENT OF ANESTHESIOLOGISTS.

2    Q    SO WHEN YOU WERE FULLY STAFFED LIKE THAT, HOW MANY

3    OPERATING ROOMS DID Y'ALL USE?

4    A    WE DID EVERYTHING WE COULD TO NOT CANCEL CASES, OKAY?

5    WE SUPERVISED AND WE DID OUR OWN CASES.  SO ONE GUY, RATHER

6    THAN TYPICALLY SUPERVISING TWO ROOMS, MAY HAVE TO PICK UP

7    THREE ROOMS OF SUPERVISION SO ANOTHER GUY COULD DO ANOTHER

8    OPERATING ROOM TO TRY AND MAKE SURE WE GOT ALL THE CASES

9    COMPLETED AND NO VETERAN WENT WITHOUT THE SURGICAL PROCEDURE.

10   Q    SO WHAT WOULD HAPPEN WHEN A -- WHEN ONE OF YOUR

11   ANESTHESIOLOGISTS LEFT?

12   A    THAT WENT TO A REDUCTION IN SERVICE OR THE OTHER OPTION

13   THAT OCCURRED IS IT RESULTED IN LONGER HOURS TO GET THE

14   SCHEDULED CASES DONE.

15   Q    SO WAS THAT IMPORTANT TO KEEP YOUR TEAM TOGETHER?

16   A    YES, MA'AM.

17   Q    NOW, I KNOW YOU SAID THAT DR. NGUYEN BROUGHT IN A OFFER

18   FROM A FIRM, FROM ANOTHER FIRM?

19   A    YES.  I DON'T REMEMBER.  IT WAS ONE OF THE ONES HERE IN

20   TOWN AND I THINK IT WAS RICHLAND OR BAPTIST HOSPITAL, BUT IT

21   WAS AN OFFER FOR $300,000.

22   Q    AND WHY DID HE COME TO YOU WITH THAT OFFER?

23   A    BECAUSE I WAS THE CHIEF OF THE DEPARTMENT AND IF HE

24   DIDN'T GET HIS MONEY, HE WAS GOING TO LEAVE AND THEN THAT

25   WOULD HAVE INCREASED THE WORKLOAD ON ALL THE REMAINING

MILLER - CROSS

1    ANESTHESIOLOGISTS.  AND IT'S VERY TOUGH TO RECRUIT

2    ANESTHESIOLOGISTS FOR THE VA.

3        WHEN I LEFT THE VA IN JANUARY, WE STILL HAD NOT FILLED

4    DR. KENNEDY'S POSITION AND WE HAD BEEN RECRUITING FOR IT FOR

5    MONTHS PRIOR TO WHEN HE LEFT.  HE HAD GIVEN US NOTIFICATION

6    OF WHEN HE WAS GOING TO LEAVE AND WE TRIED TO RECRUIT FOR

7    THAT POSITION AND WE WERE -- STILL HADN'T FILLED HIS POSITION

8    WHEN I LEFT.  I DON'T KNOW IF HIS POSITION HAS BEEN FILLED

9    OR -- AND IF MY POSITION HAS BEEN FILLED.

10   Q    SO WHEN AN ANESTHESIOLOGIST LIKE DR. NGUYEN BROUGHT YOU

11   AN OFFER FROM ONE OF THE LOCAL HOSPITALS, WHAT WAS YOUR NEXT

12   STEP OF THAT?

13   A    TO SEE IF WE COULD GET THE PAY UP TO RETAIN THE STAFF WE

14   HAD THERE.

15   Q    HOW DID YOU GO ABOUT DOING THAT?

16   A    I HAD TO GO TO HR AND TO THE CHIEF OF STAFF TO GET

17   APPROVAL FOR THAT.

18   Q    AND DID YOU HAVE TO HAVE A COMPENSATION PANEL?

19   A    YES, MA'AM.

20   Q    HOW DID THAT COME ABOUT?

21   A    WELL, HR WOULD COMPOSE THE -- OR HR WOULD PUT THE

22   INFORMATION TOGETHER FOR THE COMPENSATION PANEL AND THE

23   ADMINISTRATIVE OFFICER WOULD GET THE PAPERWORK IN CONJUNCTION

24   WITH THE HR REPRESENTATIVE TOGETHER SO I COULD TAKE IT TO THE

25   COMPENSATION PANEL, PRESENT THE ANESTHESIOLOGISTS.

1    Q    IF YOU HAD JUST DONE DR. NGUYEN'S COMPENSATION PANEL,

2    NOT THE OTHER DOCTORS, WHAT DO YOU THINK WOULD HAVE HAPPENED?

3    A    I PROBABLY WOULD HAVE HAD A MUTINY.

4    Q    AND WHY IS THAT?

5    A    BECAUSE THERE ARE NO SECRETS--

6         MR. IRVIN:  YOUR HONOR, I OBJECT.  THIS IS PURE

7    SPECULATION.

8         THE COURT:  SUSTAINED.

9    BY MRS. BAILEY:

10   Q    WHY DID YOU EXPAND THE COMPENSATION PANEL BEYOND DR.

11   NGUYEN?

12   A    BECAUSE I NEEDED TO RETAIN MY STAFF IN ORDER TO KEEP THE

13   OPERATING ROOMS FUNCTIONING AT THE LEVEL THAT THEY WERE

14   FUNCTIONING.

15   Q    SO WOULD YOU CALL THAT A BUSINESS NECESSITY?

16   A    YES, MA'AM.

17   Q    I'D LIKE FOR YOU TO LOOK AT EXHIBIT 12.  SAUNDRA, IF YOU

18   CAN PUT IT UP FOR HIM TO LOOK AT IT.

19   A    I HAVE SIX, EIGHT AND 14 IN FRONT OF ME.  OKAY.

20   Q    EXHIBIT 12 IS THE COMPENSATION PANEL ACTIONS FROM

21   NOVEMBER 10TH, 2016.

22   A    OKAY.

23   Q    I BELIEVE THIS IS ONE OF THE ONES THAT MR. IRVIN WAS

24   ASKING YOU ABOUT.

25   A    I -- OKAY.  YES, I HAVE IT.

1    Q    ACTUALLY, DOCTOR, YOU CAN LOOK ON THE SCREEN --

2    A    OKAY.

3    Q    -- AT THIS ONE.  NOW THAT -- YOU SEE THE DATE ON THAT?

4    A    NOVEMBER THE 10TH, 2016.

5    Q    AND AS YOU SAY, THAT'S THE ONE YOU CALLED FOR AFTER YOU

6    GOT DR. NGUYEN'S OFFER FROM DOWNTOWN?

7    A    I MEAN, I -- IF THAT'S DATED ON THAT DATE, THEN I HAD TO

8    HAVE CALLED FOR IT AROUND THAT TIME.  I MEAN, I DON'T

9    REMEMBER THE DATES.

10   Q    I WANT YOU TO GO DOWN HERE AND IT SAYS IN THE -- IN THE

11   NARRATIVE SECTION IT SAYS YOU'RE CONDUCTING YOUR REVIEW TO

12   ENSURE THERE IS NO PAY DISPARITY.

13        NOW, WHERE DID THAT LONG, NO PAY DISPARITY, COME FROM?

14   A    OKAY.  FROM MY PREVIOUS TESTIMONY I STATED THAT THAT WAS

15   PUT IN THERE BY MY DIRECTION ACCORDING TO WHAT I STATED

16   BEFORE MY TESTIMONY.  BUT AS I STATED, WHEN I DISCOVERED A

17   PIECE OF PAPER CLEANING OUT MY OFFICE WHERE HR HAD ADDED THAT

18   TO THAT.

19   Q    BUT THE POINT IS, THOUGH, THIS WAS YOUR RECOMMENDATION

20   THAT THE ANESTHESIOLOGISTS INDIVIDUALLY BE GIVEN $300,000.

21   A    YES, MA'AM.

22   Q    AND WHAT WAS YOUR REASON FOR THAT?

23   A    SO I DIDN'T LOSE ANESTHESIOLOGISTS SO I CAN MAINTAIN THE

24   SAME LEVEL OF SERVICE THAT WE WERE PROVIDING TO THE VETERANS.

25   Q    HAVE YOU PERSONALLY SERVED ON ANY COMP PANELS?

1    A    YES, MA'AM.

2    Q    HAVE YOU SERVED ON COMP PANELS FOR OTHER SERVICES OTHER

3    THAN THE ANESTHESIOLOGY SERVICE?

4    A    YES, MA'AM.

5    Q    IN YOUR EXPERIENCE OF OTHER COMP PANELS AT THE VA HERE

6    AT DORN, WERE THE COMP PANELS CONDUCTED PRETTY MUCH THE SAME

7    WAY?

8    A    YES, MA'AM.

9    Q    THAT'S ALL.  JUST ONE MOMENT.

10          *THE COURT:*  OKAY.

11        (WHEREUPON, THERE WAS A PAUSE.)

12          *MRS. BAILEY:*  THAT'S ALL I HAVE, DR. MILLER.  MR.

13    IRVIN MIGHT HAVE A QUESTION.

14          *MR. IRVIN:*  MAY IT PLEASE THE COURT, VERY BRIEFLY.

15          *THE COURT:*  REDIRECT.

16          *MR. IRVIN:*  THANK YOU.

17                    REDIRECT EXAMINATION

18    BY MR. IRVIN:

19    Q    YOU TESTIFIED THAT HR -- YOU DISCOVERED WHEN YOU WERE

20    CLEANING OUT YOUR OFFICE THAT HR HAD ADDED THIS LANGUAGE TO

21    ENSURE THERE IS NO PAY DISPARITY.  IS THAT WHAT YOU SAID?

22    A    YES, SIR.  FOUND A FORM IN THERE THAT HAD THAT ON THERE.

23    Q    AND ARE YOU SAYING THAT THE FORM THAT YOU USED WHEN YOU

24    WENT TO THE COMP PANEL TO RECOMMEND THESE $300,000 SALARIES

25    DID NOT HAVE THAT LANGUAGE ON IT?

1    A    NO, SIR, THAT'S NOT WHAT I'M SAYING.  I'M SAYING THAT I

2    FOUND A FORM THAT HAD AN OLDER FORM OR ANOTHER FORM WITH IT

3    THAT JUST HAD ANESTHESIOLOGIST SERVICE IS RECOMMENDING A PAY

4    OF 300,000 AND IT WAS A BLANK FORM.  IT DIDN'T HAVE ANYBODY'S

5    NAME ON IT -- IN MY FILE.  AND WHEN THIS IS ON HERE, LED ME

6    TO THINK ABOUT THAT STATEMENT.

7    Q    HAVE YOU EVER KNOWN OF A SITUATION IN YOUR EXPERIENCE

8    WHERE A PAY PANEL HAS BEEN CONVENED TO -- FOR PURPOSES OF

9    RECOMMENDING THAT THE SALARIES OF ANY SERVICE LINE AT DORN BE

10   EQUALIZED?

11   A    NO, SIR.

12   Q    YOU SAID THAT YOU HAD TO GO TO HR OR SOMEBODY ELSE,

13   AUTHORIZING OFFICIAL, TO GET APPROVAL TO DO WHAT YOU DID,

14   WHICH IS THE $300,000 NO PAY DISPARITY, EQUALIZED SALARIES.

15   IS THAT WHAT YOU SAID?

16   A    YES, SIR.

17   Q    OKAY.  AND SO WHAT YOU WERE TAKING WAS THE ANNUAL PAY,

18   300,000, NOT ANY MARKET PAY.

19   A    I MADE THE RECOMMENDATION EVERYBODY GET PAID $300,000.

20   Q    HAD YOU EVER DONE THAT BEFORE, THAT IS RECOMMEND THAT

21   THERE BE EQUALITY, NO PAY DISPARITY, EVERYBODY GETS THE SAME

22   AMOUNT BEFORE THIS?

23   A    AT THE VA?  NO.  AT OHIO STATE, YES.

24   Q    OKAY.  THANK YOU, DR. MILLER.

25        *MRS. BAILEY:*  ONE MORE QUESTION, YOUR HONOR.

MILLER - RECROSS

83

```
 1                    RECROSS-EXAMINATION

 2  BY MRS. BAILEY:

 3  Q    DR. MILLER, IN YOUR LAST RESPONSE YOU MENTIONED OHIO

 4  STATE.  AND I HADN'T -- REALLY TO PUT YOUR CV INTO EVIDENCE.

 5  CAN YOU TELL US A LITTLE BIT ABOUT YOUR EXPERIENCE AT OHIO

 6  STATE AND HOW YOU CAME TO ASK THAT PAY BE EQUALIZED?

 7  A    YES, MA'AM.  THE PAY THERE WAS BROKEN DOWN INTO

 8  INSTRUCTOR ASSISTANT, ASSOCIATE PROFESSOR, FULL PROFESSOR,

 9  TENURED.  YOU ACTUALLY GOT THREE DIFFERENT PAYCHECKS.  YOU

10  GOT ONE FROM THE STATE OF OHIO, YOU GOT ONE FROM OHIO STATE

11  UNIVERSITY MEDICAL SCHOOL, AND THEN YOU GOT ANOTHER ONE FROM

12  OHIO STATE ANESTHESIA CORPORATION.

13  Q    AND HOW DID YOU COME TO ASK THAT THE PAY BE EQUALIZED?

14  A    FOR THE OB ANESTHESIOLOGISTS THERE.  AT THE TIME I WAS

15  THE ONLY OB ANESTHESIOLOGIST THAT HAD COMPLETED A FELLOWSHIP

16  AND WE HAD RECRUITED TWO OTHER ANESTHESIOLOGISTS.  ONE OF

17  THEM HAD COMPLETED A FELLOWSHIP AND ONE OF THEM WAS IN THE

18  PROCESS OF COMPLETING THEIR FELLOWSHIP.

19  Q    AND WHAT WAS THAT ABOUT THE EQUALIZING OF PAY?

20  A    SO THAT SINCE EVERYBODY WAS GOING TO BE ON THE SAME

21  SCALE, THAT WE HAVE ALL EQUAL PAY FOR OUR FELLOWSHIP IN OB

22  ANESTHESIA.

23  Q    THANK YOU.

24          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

25  CAN STEP DOWN AND YOU ARE EXCUSED.
```

1              *THE WITNESS:*  WHAT DO YOU WANT ME TO DO WITH THESE?

2              *THE COURT:*  YOU CAN JUST LEAVE THEM THERE.

3          (WITNESS LEFT THE STAND.)

4          *MR. IRVIN:*  THANK YOU, DR. MILLER.

5              *THE WITNESS:*  YES, SIR.

6              *THE COURT:*  ALL RIGHT.  I THINK WE WILL TAKE A

7    BREAK FOR LUNCH AT THIS TIME AND WE WILL COME BACK AND I --

8    WE WILL COME BACK AT QUARTER TO 2.

9          *MR. IRVIN:*  THANK YOU, YOUR HONOR.

10             *MRS. BAILEY:*  THANK YOU.

11         *MR. ANDREWS:*  THANK YOU, YOUR HONOR.

12         (LUNCH RECESS WAS HAD.)

13             *THE COURT:*  ALL RIGHT.  MRS. BAILEY, YOU MAY CALL

14   YOUR NEXT WITNESS.  I'M SORRY.  MR. IRVIN, YOU MAY CALL YOUR

15   NEXT WITNESS.

16         *MR. IRVIN:*  THANK YOU, YOUR HONOR.  WE'D CALL DR.

17   BERNARD DEKONING.

18             *THE COURT:*  OKAY.

19             DR. BERNARD DEKONING, AFTER BEING DULY SWORN,

20   TESTIFIED AS FOLLOWS:

21                    DIRECT EXAMINATION

22   BY MR. IRVIN:

23   Q    MR. DEKONING, GOOD AFTERNOON.

24   A    GOOD AFTERNOON.

25   Q    YOU AND I HAVE MET BEFORE YOU MAY REMEMBER ON THE

DEKONING - DIRECT

85

1    OCCASION OF YOUR DEPOSITION THAT WE TOOK IN THIS CASE ON

2    DECEMBER THE 11TH, 2015.  AND I'M GOING TO BE ASKING YOU SOME

3    QUESTIONS THIS AFTERNOON, PRIMARILY THINGS THAT WE WENT OVER

4    IN YOUR DEPOSITION.  BUT IF YOU HAVE ANY QUESTIONS ABOUT A

5    QUESTION I ASK YOU, PLEASE FEEL FREE TO ASK ME TO TRY TO ASK

6    IT AGAIN.  ALL RIGHT.

7         YOU'RE A MEDICAL DOCTOR BY EDUCATION AND TRAINING; IS

8    THAT CORRECT?

9    A    THAT'S CORRECT.

10   Q    OKAY.  AND I BELIEVE THAT YOU TESTIFIED, TOLD ME IN YOUR

11   DEPOSITION THAT YOU COMPLETED A RESIDENCY IN FAMILY MEDICINE

12   IN 1985; IS THAT RIGHT?

13   A    THAT'S CORRECT.

14   Q    OKAY.  AND THEN YOU WENT INTO ACTIVE DUTY IN THE

15   MILITARY.  YOU WERE IN THE ARMY FOR 28 YEARS?

16   A    THAT'S CORRECT.

17   Q    OKAY.  YOU RETIRED FROM ACTIVE DUTY AND FROM THE ARMED

18   FORCES IN DECEMBER OF 2013; IS THAT CORRECT?

19   A    CORRECT.

20   Q    OKAY.  AND YOU DIDN'T TAKE TOO MUCH TIME OFF.  IN

21   JANUARY OF 2014 THEN YOU BECAME THE CHIEF OF STAFF AT DORN VA

22   MEDICAL CENTER HERE IN COLUMBIA; IS THAT RIGHT?

23   A    CORRECT.

24   Q    OKAY.  AND HAVE YOU HELD THAT POSITION OF CHIEF OF STAFF

25   AT DORN CONTINUOUSLY FROM JANUARY 2014 UP TO TODAY?

1    A    CORRECT.

2    Q    OKAY.  AND YOUR DUTIES AND RESPONSIBILITIES ARE

3    BASICALLY THE SAME AS THEY WERE WHEN WE TOOK YOUR DEPOSITION

4    A FEW YEARS AGO?

5    A    CORRECT.

6    Q    OKAY.  ALL RIGHT.  NOW, I BELIEVE THAT YOU TOLD ME THAT

7    YOU WERE NOT FAMILIAR WITH THE FEDERAL STATUTE GOVERNING VA

8    PHYSICIAN COMPENSATION; IS THAT CORRECT?

9    A    THAT'S CORRECT AT THE TIME.

10   Q    OKAY.  SINCE THE DEPOSITION THEN IN -- YOU'VE TRIED TO

11   FAMILIARIZE YOURSELF WITH IT?

12   A    WELL, I HAVE GROWN TO -- I HAVE GROWN TO LEARN MORE

13   ABOUT IT.

14   Q    OKAY.

15   A    THAT'S CORRECT.

16   Q    ALL RIGHT.  AND YOU -- DO YOU UNDERSTAND THAT THERE IS

17   ALSO A HANDBOOK THAT THE VA -- AT THE DORN VA UTILIZES AND

18   THAT THE VA ITSELF PUBLISHED THAT RELATES TO COMPENSATION FOR

19   VA PHYSICIANS; IS THAT RIGHT?

20   A    THAT'S CORRECT.

21   Q    AND I BELIEVE YOU TOLD ME THAT YOU REALLY WEREN'T

22   FAMILIAR WITH THE PROVISIONS OF THE VA HANDBOOK GOVERNING VA

23   PHYSICIAN COMPENSATION ISSUES AT LEAST AS OF THE TIME YOU

24   WERE GIVING YOUR DEPOSITION; IS THAT CORRECT?

25   A    AT THE TIME I GAVE THE DEPOSITION I WASN'T FAMILIAR WITH

1    IT, CORRECT.

2    Q    WELL, TODAY ARE YOU IN A -- ON SPEAKING TERMS WITH IT?

3    IN OTHER WORDS, DO YOU PULL IT OUT AND USE IT TO WORK FROM

4    TIME TO TIME IN THE COURSE OF YOUR DUTIES AND

5    RESPONSIBILITIES?

6    A    I STILL REFER TO HR FOR A LOT OF THE ISSUES DEALING WITH

7    PHYSICIAN COMPENSATION.

8    Q    OKAY.  SO, THAT IS AN ENTITY WITHIN DORN VA THAT YOU

9    RELY ON WHEN YOU GET -- WHEN YOU HAVE TO GET INVOLVED IN A

10   COMPENSATION ISSUE; IS THAT--

11   A    CORRECT.

12   Q    ALL RIGHT.  YOU UNDERSTAND THAT THERE ARE BIENNIAL

13   REVIEWS DONE OF VA, DORN VA PHYSICIANS BY PAY PANELS; IS THAT

14   CORRECT?

15   A    THAT'S CORRECT.

16   Q    AND AT LEAST AS OF THE TIME THAT ALL THESE EVENTS WERE

17   TRANSPIRING THAT RELATE TO DR. KENNEDY; IS THAT CORRECT?

18   A    CORRECT.

19   Q    OKAY.  AND I BELIEVE YOU HELD THE VIEW THAT THE PAY

20   PANEL'S JOB WAS TO RECOMMEND TOTAL OR ANNUAL COMPENSATION AND

21   NOT MARKET PAY; IS THAT CORRECT?

22   A    THAT'S CORRECT, ANNUAL COMPENSATION.

23   Q    OKAY.  YOU YOURSELF WOULD LOOK AT ANNUAL SALARY AND NOT

24   MARKET PAY SEPARATELY OR DISCREETLY IN DETERMINING WHETHER

25   YOU THINK A PHYSICIAN'S PAY IS APPROPRIATE; IS THAT ACCURATE?

1    A    THAT'S ACCURATE.

2    Q    OKAY.  ALL RIGHT.  NOW DR. DEKONING, DO YOU RECALL DR.

3    KENNEDY COMING TO SEE YOU IN EARLY 2015 EXPRESSING CONCERNS

4    ABOUT THE AMOUNT OF MARKET PAY HE WAS RECEIVING?

5    A    YES.  HE CAME TO ME IN FEBRUARY OF 2015.

6    Q    YES, SIR.  OKAY.  AND I BELIEVE THAT IN ADVANCE OF HIM

7    COMING TO TALK WITH YOU ABOUT HIS COMPENSATION CONCERNS, YOU

8    INVITED TAMARA NICHOLS TO COME AND JOIN YOU IN THAT MEETING.

9    IS THAT CORRECT, SIR?

10    A    THAT'S CORRECT.

11    Q    ALL RIGHT.  AND TAMARA NICHOLS IS OR WAS THE -- MAYBE I

12    SHOULD SAY WAS AT THAT TIME THE HR DIRECTOR FOR DORN VA?

13    A    THAT'S CORRECT.

14    Q    AND THAT -- IS THAT THE POSITION SHE CONTINUES TO HOLD

15    TODAY?

16    A    SHE'S NO LONGER IN THAT POSITION, BUT SHE WAS AT THE

17    TIME.

18    Q    OKAY. ALL RIGHT.  SO YOU INVITED TAMARA NICHOLS TO COME

19    BECAUSE SHE HAD THE HR EXPERTISE THAT YOU WANTED THERE AT THE

20    MEETING?

21    A    THAT'S CORRECT.

22    Q    AND HR HANDLES WOULD -- IS IT FAIR TO SAY THAT HR SORT

23    OF HANDLES THE NUTS AND BOLTS OF THAT COMPENSATION PROCESS

24    WITH THE SELECTION OF A PAY PANEL AND THE CONVENING OF THE

25    PANEL AND FILLING OUT OF THE DOCUMENTS AND SO FORTH?

DEKONING - DIRECT

1    A    THAT'S CORRECT.

2    Q    YOU DON'T DO THAT YOURSELF.

3    A    I DON'T DO THAT MYSELF.

4    Q    YOU ON OCCASION WILL HAVE PASS ACROSS YOUR DESK FOR

5    REVIEW SOME OF THOSE PAY PANEL FORMS, BUT --

6    A    CORRECT.

7    Q    -- YOU'RE NOT FILLING THEM OUT; IS THAT RIGHT?

8    A    THAT'S CORRECT.  I'M NOT FILLING THEM OUT ALTHOUGH THEY

9    DO COME ACROSS MY DESK.

10   Q    OKAY.  AND YOU HAVE NEVER SERVED AS A PAY PANEL MEMBER;

11   HAVE YOU?

12   A    NO.

13   Q    OKAY.  OR AS A PRESENTER TO A PAY PANEL?

14   A    I HAVE SERVED AS A PRESENTER TO THE PAY PANEL BUT NOT A

15   VOTING MEMBER.

16   Q    BUT I AM SORRY.  I DIDN'T HEAR THAT LAST--

17   A    I HAVE SERVED AS A PRESENTER TO THE PAY PANEL BUT NOT A

18   VOTING MEMBER.

19   Q    I SEE.  ALL RIGHT.  THE VOTING MEMBERS BEING THE PANEL

20   MEMBERS, THE PHYSICIANS THAT ARE CHOSEN TO BE PANEL MEMBERS

21   AND NOT A PRESENTER.

22   A    CORRECT.

23   Q    OKAY.  ALL RIGHT.  WHEN YOU AND MRS. NICHOLS MET WITH

24   DR. KENNEDY, DO YOU RECALL THAT HE BROUGHT UP THE AGE ISSUE

25   RELATIVE TO HIS MARKET PAY?

DEKONING - DIRECT

90

1    A    I DON'T RECALL THE AGE ISSUE BEING BROUGHT UP, BUT IT

2    COULD HAVE BEEN BROUGHT UP.

3    Q    OKAY.  DR. DEKONING, WE MENTIONED YOUR DEPOSITION.  YOU

4    RECALL WHEN YOU GAVE YOUR DEPOSITION IN THIS CASE?

5    A    YES.

6    Q    IN MY OFFICE AND A COURT REPORTER WAS THERE?

7    A    CORRECT.  UH-HUH.

8    Q    AND YOU WERE SWORN TO GIVE YOUR TESTIMONY --

9    A    CORRECT.

10   Q    -- UNDER OATH --

11   A    UH-HUH.

12   Q    -- AND TO TELL THE TRUTH AND SO FORTH.  YOU REMEMBER

13   THAT?

14   A    CORRECT.  UH-HUH.

15   Q    AND DID YOU CARRY OUT THAT OATH AND TELL THE TRUTH?

16   A    YES, I DID.

17   Q    OKAY.  ALL RIGHT.  HERE IS THE ORIGINAL OF YOUR

18   DEPOSITION THAT YOU GAVE IN THE CASE.  AND I'D LIKE FOR YOU,

19   PLEASE, TO TURN TO PAGE 44.  AND WHAT I -- ARE YOU THERE?

20   A    YES, SIR.

21   Q    OKAY.  TAKE A LOOK AT MY QUESTION THAT BEGINS ON LINE

22   13.  I'LL READ THAT QUESTION NOW AND THEN YOU CAN READ YOUR

23   ANSWER THAT YOU GAVE IN YOUR DEPOSITION ON DECEMBER THE 11TH

24   OF 2015.

25        AND THE QUESTION WAS:  DO YOU RECALL DR. KENNEDY

DEKONING - DIRECT

91

1    BRINGING UP THE ISSUE OF HIS AGE RELATIVE TO HIS MARKET PAY

2    OR THE AGE OF OTHER PHYSICIANS RELATIVE TO THEIR MARKET PAY?

3        AND WHAT WAS YOUR RESPONSE?

4    A    SAID I DO RECALL HIM BRINGING UP THE AGE ISSUE.  I DO

5    NOT RECALL HIM CITING THE AGES OF THE OTHER

6    ANESTHESIOLOGISTS.

7    Q    OKAY.  DOES THAT REFRESH YOUR RECOLLECTION THAT HE DID

8    BRING UP THE AGE ISSUE WHEN HE--

9    A    YES, IT DOES.

10   Q    OKAY.  ALL RIGHT.  NOW, AT THAT TIME YOU UNDERSTOOD THAT

11   DR. KENNEDY HAD GONE THROUGH SOME KIND OF AN INFORMAL

12   MEDIATION PROCESS AT THE VA TO TRY TO RESOLVE HIS CONCERNS

13   ABOUT THE AGE ISSUE RELATIVE TO HIS COMPENSATION?

14   A    CORRECT.

15   Q    OKAY.  ALL RIGHT.  NOW, AS I UNDERSTAND YOUR EARLIER

16   TESTIMONY, ESSENTIALLY YOU LISTENED TO DR. KENNEDY'S CONCERNS

17   AS --

18   A    CORRECT.

19   Q    -- WOULD BE APPROPRIATE.  AND TAMARA NICHOLS WAS THERE

20   WITH YOU AND ESSENTIALLY THE MEETING ENDED AND MAYBE YOU

21   INDICATED YOU'D GET BACK TO HIM OR SOMETHING TO THAT EFFECT.

22   IS THAT A FAIR STATEMENT?

23   A    I DID LISTEN AND TAMARA WAS PRESENT AND DR. KENNEDY DID

24   GIVE ME A FILE AND -- AND THEN I INDICATED TO DR. KENNEDY

25   THAT I WOULD REVIEW IT AND THEN WE WOULD GET BACK WITH HIM.

1    Q    OKAY.  NOW, AFTER THE MEETING WITH DR. KENNEDY YOU

2    RECOMMENDED THAT MRS. NICHOLS CONVENE A COMP PANEL, ONE OF

3    THESE COMPENSATION PAY PANELS, TO REVIEW DR. KENNEDY'S

4    SALARY; DIDN'T YOU, SIR?

5    A    THAT'S CORRECT.

6    Q    OKAY.  AND YOU ALSO WANTED TO RETRIEVE MORE INFORMATION

7    FROM MRS. NICHOLS; IS THAT CORRECT?

8    A    THAT'S CORRECT.

9    Q    YOU HAD SOME QUESTIONS IN YOUR MIND BASED ON THE MEETING

10   THAT YOU AND SHE HAD HAD WITH DR. KENNEDY.  SO TWO THINGS

11   WERE GOING TO HAPPEN.  NUMBER ONE IS THERE WAS GOING TO BE

12   ONE OF THESE COMP PANELS THAT WOULD BE CONVENED TO REVIEW DR.

13   KENNEDY'S COMPENSATION.  AND THEN --

14   A    CORRECT.

15   Q    -- IS THAT RIGHT?

16   A    CORRECT.

17   Q    OKAY.  AND THEN NUMBER TWO IS THAT YOU WERE GOING TO TRY

18   TO GET SOME FURTHER INFORMATION THAT TAMARA NICHOLS IN HR

19   MIGHT BE ABLE TO GET FOR YOU; IS THAT RIGHT?

20   A    THAT'S CORRECT.

21   Q    OKAY.  ALL RIGHT.  NOW, I BELIEVE THAT COMP PANELS WERE

22   CONVENED FOLLOWING THIS MEETING AND THAT YOUR INSTRUCTION OR

23   RECOMMENDATION ON MAY THE 1ST OF 2015; IS THAT YOUR

24   RECOLLECTION?

25   A    RIGHT, THAT'S CORRECT.

1    Q    OKAY.  AND THOSE COMP PANELS WERE CONVENED FOR PURPOSES

2    OF REVIEWING NOT ONLY DR. KENNEDY BUT ALL OF THE STAFF

3    ANESTHESIOLOGISTS.  IS THAT A FAIR STATEMENT?

4    A    YES, THAT'S CORRECT.

5    Q    OKAY.  AND AS I UNDERSTAND IT, AND I CAN CERTAINLY SHOW

6    YOU, BE GLAD TO SHOW YOU IF YOU'D LIKE FOR ME TO, THOSE --

7    THOSE REVIEW FORMS AS -- THAT WE HAVE IN EVIDENCE.  BUT AS A

8    BOTTOM LINE AS I UNDERSTAND IT, NO CHANGE IN COMPENSATION WAS

9    RECOMMENDED BY THE PAY PANEL FOR ANY OF THOSE STAFF

10   ANESTHESIOLOGISTS.  IS THAT A CORRECT STATEMENT?

11   A    RIGHT.  THAT'S CORRECT.

12   Q    OKAY.  ALL RIGHT.  NOW, SO WE HAVE THAT.  AND THEN THE

13   OTHER THING WAS THE INFORMATION THAT YOU WANTED TO GET FROM

14   MRS. NICHOLS.  AND SO YOU HAD E-MAIL EXCHANGES WITH

15   MRS. NICHOLS; IS THAT CORRECT?

16   A    THAT'S CORRECT.

17   Q    OKAY.  NOW, DR. DEKONING, THANKS TO MRS. WOODS I HAVE A

18   LEGIBLE COPY OF THIS.  I'M GOING TO SHOW YOU WHAT HAS BEEN

19   MARKED AND PLACED INTO EVIDENCE AS PLAINTIFF'S TRIAL EXHIBIT

20   NUMBER 9.  AND -- YOU TAKE A LOOK AT IT --

21   A    OKAY.

22   Q    -- AND THEN WE'LL TALK A LITTLE BIT ABOUT IT.

23   A    OKAY.  I'VE READ IT.

24   Q    OKAY.  VERY GOOD.  NOW, LET ME SEE IF I'M CORRECT IN MY

25   UNDERSTANDING OF THE TIME SEQUENCE HERE.  YOU MET WITH DR.

DEKONING - DIRECT

94

1    KENNEDY IN EARLY 2015, FEBRUARY OR SOMETHING LIKE THAT.  AM I

2    RIGHT SO FAR?

3    A    CORRECT.

4    Q    ALL RIGHT.  AND EVENTUALLY, BASED ON YOUR

5    RECOMMENDATION, PANEL REVIEWS WERE CONDUCTED ON MAY THE 1ST

6    OF 2015 FOR ALL THE STAFF ANESTHESIOLOGISTS; CORRECT?

7    A    CORRECT.

8    Q    IS THAT -- YOU HAVE TO VERBALLY ANSWER.  IS THAT

9    CORRECT?  I DIDN'T--

10    A    THAT'S CORRECT.

11    Q    OKAY.  ALL RIGHT.  NOW, AS I READ THIS E-MAIL THREAD

12    THAT IS PLAINTIFF'S EXHIBIT NUMBER 9 THAT YOU HAVE JUST

13    REVIEWED -- AND FIRST OFF, IS THIS AN E-MAIL THREAD BETWEEN

14    YOU AND TAMARA NICHOLS DISCUSSING DR. KENNEDY'S ISSUES AND

15    YOU SEEKING OUT THE INFORMATION THAT YOU WANTED TAMARA

16    NICHOLS TO GATHER?

17    A    YES.

18    Q    OKAY.  ALL RIGHT.  AND SO THIS WOULD HAVE BEEN -- THIS

19    E-MAIL THREAD WOULD HAVE TAKEN PLACE -- IT'S IN FEBRUARY,

20    SHORTLY AFTER THE MEETING WITH DR. KENNEDY, OF 2015 -- SO IT

21    WOULD HAVE OCCURRED BEFORE THE PAY PANEL REVIEWS IN MAY OF

22    2015.

23    A    THAT'S CORRECT.

24    Q    ALL RIGHT.  AND WE HAVE ALREADY SAID THAT THOSE PAY

25    PANEL REVIEWS IN MAY OF 2015 WERE OF ALL THE STAFF

1    ANESTHESIOLOGISTS.  BUT LET ME -- LET ME DIRECT YOUR

2    ATTENTION TO THE BATES NUMBER AT THE BOTTOM OF THE PAGES AND

3    ARE AT THE BOTTOM OF THE PAGES OF EXHIBIT 9.  AND THE BATES

4    NUMBER THAT I WANT TO START WITH IS KENNEDY VA 1327, AND THAT

5    WOULD BE THE THIRD PAGE OF EXHIBIT 9.

6         AND I APOLOGIZE, IT'S -- SOME OF THIS EVEN NOW IS A

7    LITTLE HARD TO READ, BUT I THINK WE HAVE GOT IT AS REAL WE

8    CAN GET IT AND MAY -- OH, IT'S EVEN BETTER ON THE SCREEN.

9    BUT I'M LOOKING AT KENNEDY VA 1327.  AND DO YOU SEE AT THE

10   BOTTOM OF THAT PAGE, DR. DEKONING, WHERE YOU SENT THIS E-MAIL

11   TO TAMARA NICHOLS AND YOU SAID IN THAT SECOND PARAGRAPH ON

12   ATTACHMENT THREE, WHAT REASONS DID THE PAY PANEL GIVE FOR

13   DENYING DR. KENNEDY AN INCREASE IN PAY?

14        DO YOU SEE THAT QUESTION OF YOUR'S THERE?

15   A    RIGHT.  THAT'S CORRECT.

16   Q    AND YOU WOULD HAVE -- HERE IN FEBRUARY OF 2015, YOU

17   WOULD HAVE BEEN REFERRING BACK TO THE PRIOR REVIEW THAT DR.

18   KENNEDY HAD GOTTEN IN 2014.

19   A    THAT'S CORRECT.

20   Q    IS THAT CORRECT?  AND THAT REVIEW IS IN A COLLECTIVE

21   EXHIBIT 8 THAT YOUR HONOR HAS ALL OF DR. KENNEDY'S REVIEWS.

22   AND IF YOU WOULD LIKE TO SEE THE FEBRUARY 2014 ONE, I WILL BE

23   GLAD -- WE CAN SHOW IT TO YOU.  I DON'T THINK I NEED TO GO

24   INTO IT, BUT IF YOU DO, BY ALL MEANS YOU LET ME KNOW.  ALL

25   RIGHT.

DEKONING - DIRECT

96

1      SO, BACK TO YOUR E-MAIL THEN. YOU ARE ASKING TAMARA

2  NICHOLS WHAT REASONS DID THE PAY PANEL GIVE FOR DENYING DR.

3  KENNEDY AN INCREASE IN PAY. AND THERE YOU'RE REFERRING TO

4  THAT FEBRUARY 2014 --

5  A    THAT'S CORRECT.

6  Q    -- PANEL REVIEW WHICH WAS PART OF THE CONCERN DR.

7  KENNEDY HAD WHEN HE CAME TO SIT DOWN AND TALK TO YOU THAT HE

8  WASN'T GETTING INCREASES AND HIS PAY WAS STAGNATING. IS THAT

9  A FAIR STATEMENT?

10  A    CORRECT.

11  Q    OKAY. ALL RIGHT. NOW, LOOK UP AT THE TOP OF PAGE -- OF

12  THAT SAME PAGE OF THE E-MAIL, KENNEDY VA 1327, AND THERE YOU

13  ARE E-MAILING MRS. NICHOLS AGAIN AND ESSENTIALLY REMINDING

14  HER THAT YOU NEEDED THAT QUESTION ANSWERED. AM I READING

15  THIS CORRECTLY? IT SAYS, STILL NEED THE FOLLOWING TWO

16  QUESTIONS ANSWERED.

17      AND THEN NUMBER ONE YOU SAY TO HER, ON ATTACHMENT THREE,

18  WHAT REASONS DID THE PAY PANEL GIVE FOR DENYING DR. KENNEDY

19  AN INCREASE IN PAY? DID I READ THAT CORRECTLY?

20  A    THAT'S CORRECT.

21  Q    ALL RIGHT. AND YOU SAY, I THOUGHT FOR A PAY INCREASE

22  DENIAL, THE SERVICE LINE CHIEF -- THAT'D BE DR. MILLER?

23  A    THAT'S CORRECT.

24  Q    ALL RIGHT. HAD TO GIVE A REASON WHY HE RECOMMENDED THE

25  DENIAL. THAT'S YOUR QUESTION TO TAMARA NICHOLS.

1    A    RIGHT.  THAT'S CORRECT.

2    Q    OKAY.  NOW, FLIP BACK A PAGE TO KENNEDY VA 1326 IN THAT

3    E-MAIL THREAD, EXHIBIT 9.  AND DO YOU HAVE THAT PAGE?  I'LL

4    DIRECT YOUR ATTENTION DOWN ABOUT TWO-THIRDS OF THE WAY.  AND

5    YOU HAVE A -- AN EMAIL THERE FROM TAMARA NICHOLS TO YOU.  AND

6    SHE SAYS, DR. DEKONING, QUESTION ONE.  THAT WOULD BE YOUR

7    QUESTION ONE IN THE --

8    A    CORRECT.

9    Q    -- E-MAILS, THE TWO E-MAILS THAT WE JUST READ.  THERE IS

10   NO WRITTEN REQUIREMENT TO GIVE AN EXPLANATION AS TO WHY NO

11   INCREASE WAS RECOMMENDED.

12        YOU SEE THAT?

13   A    YES, SIR.

14   Q    OKAY.  HOWEVER, SHE GOES ON TO SAY, THE PANEL ACTED ON

15   DR. MILLER'S RECOMMENDATION.

16        NOW, AT THE TOP OF THE PAGE, SAME PAGE, 1326, YOU

17   RESPONDED; DID YOU NOT?  DO YOU SEE THAT?

18   A    YES, SIR.

19   Q    AND YOU SAID, TAMARA, SO IF WE DO NOT HAVE A WRITTEN

20   REQUIREMENT TO GIVE AN EXPLANATION ON WHY NO SALARY INCREASE

21   WAS REQUESTED, HOW DO WE RECONCILE THIS WITH THE LEVEL OF

22   EXPERIENCE AND PRIOR EXPERIENCE ISSUES THAT DR. KENNEDY

23   POINTED OUT IN THE VA DIRECTIVE?

24        DO YOU SEE THAT THERE, SIR?

25   A    RIGHT.

1   Q     AND THAT WAS YOUR STATEMENT ON THAT DATE TO TAMARA; IS

2   THAT CORRECT?

3   A     THAT'S CORRECT.

4   Q     AND THAT WAS A CONCERN OF YOURS; IS THAT --

5   A     THAT'S CORRECT.

6   Q     -- FAIR TO SAY?  ALL RIGHT, SIR.  NOW, FLIP BACKWARDS TO

7   THE PREVIOUS PAGE OF THIS SAME EXHIBIT, THE E-MAIL THREAD,

8   EXHIBIT 9, AND THIS COULD BE KENNEDY VA 1325.  AND YOU SHOULD

9   SEE AT THE BOTTOM AN EMAIL IN THIS THREAD FROM TAMARA NICHOLS

10  TO YOU THAT RESPONDS TO THAT CONCERN OF YOURS AS FOLLOWS:

11       DR. DEKONING, THE COMP PANEL ON DR. KENNEDY SHOULD HAVE

12  HAD MORE INFORMATION THAN WHAT WAS PROVIDED.

13       SEE THAT?

14  A     THAT'S CORRECT.

15  Q     DR. MILLER SHOULD HAVE CLEARLY ADDRESSED THE SEVEN

16  FACTORS IN PART B.

17       AND THERE YOU'RE REFERRING TO THE COMP PANEL REVIEW

18  FORM; IS THAT CORRECT?

19  A     CORRECT.

20  Q     HOWEVER, PRIOR TO ME TAKING THE RESPONSIBILITY FOR COMP

21  PANELS BACK OVER, THE FORMS WERE NOT BEING FILLED OUT

22  PROPERLY.

23       YOU SEE THAT THERE, SIR?

24  A     THAT'S CORRECT.

25  Q     OKAY.  AND AS YOU SIT HERE TODAY, WAS THAT A TRUE AND

1    CORRECT STATEMENT THAT YOU MADE?

2    A    YES.  YES, SIR.

3    Q    OKAY.  ALL RIGHT.  NOW, ISN'T IT CORRECT THAT NONE OF

4    THE PAY PANEL REVIEW FORMS PRIOR TO MAY 1ST OF 2015 CONTAINED

5    DOCUMENTATION OF A REVIEW OF THOSE SEVEN FACTORS?

6    A    I DON'T KNOW ABOUT ALL THE PAY PANELS.  I ONLY KNOW OF

7    THAT PARTICULAR PAY PANEL THAT MET IN 2014 TO LOOK AT THE

8    ANESTHESIOLOGISTS.

9    Q    OKAY.  TAKE A LOOK AT PAGE 93 OF YOUR DEPOSITION.  AND

10   OH, IN FAIRNESS, TOO, I SHOULD SAY, DR. DEKONING, THAT YOU

11   SHOULD LOOK AT -- I SHOULD PUT IN FRONT OF YOU ALL OF DR.

12   KENNEDY'S PAY PANEL REVIEW FORMS SO THAT YOU WILL HAVE THOSE,

13   AND SO LET ME HAND YOU PLAINTIFF'S EXHIBIT 8.  OKAY.

14   PLAINTIFF'S EXHIBIT 8 IS JUST A COLLECTION OF DR. KENNEDY'S

15   REVIEW FORMS AND IT GOES BACKWARDS IN TIME FROM THE FRONT

16   PAGE GOING BACK.  AND SO THE FIRST ONE IS THE MAY 1ST, 2015

17   REVIEW.  AND THEN THE SECOND ONE IS THE FEBRUARY 26, 2014

18   REVIEW.

19   A    CORRECT.

20   Q    JUST SO THAT YOU CAN HAVE THAT THERE IF YOU'D LIKE TO

21   REFER TO IT.  NOW, I HAD ASKED YOU TO TAKE A LOOK AT PAGE 93

22   OF YOUR DEPOSITION TESTIMONY.  AND WHEN YOU FIND THAT, YOU

23   LET ME KNOW.

24   A    OKAY.  I HAVE IT.

25   Q    YOU READY?  OKAY.  NOW, I AM REFERRING IN YOUR -- IN

1    HERE IN THE DEPOSITION AND I'M SAYING, NOW SOMEWHERE IN THIS

2    MIASMA OF PAPERS WE HAVE DR. KENNEDY'S -- A COMPILATION OF

3    DR. KENNEDY'S COMPENSATION PANEL REVIEWS.  AND HERE IT IS.

4    THIS IS EXHIBIT 3.  THAT'S TO THE DEPOSITION.

5         AND WOULD YOU WALK THROUGH THAT AGAIN FOR ME AND TELL ME

6    ON ANY OF THE COMPENSATION PANEL REVIEW FORMS PRIOR TO MAY 1,

7    2015, BEGINNING WITH THE FEBRUARY 2014 REVIEW, DO YOU FIND

8    ANY DOCUMENTATION OF THE INFORMATION THAT WAS NEEDED FOR THE

9    SEVEN FACTORS FOR CONSIDERATION DOCUMENTED OF EACH OF THE

10   SEVEN FACTORS AS IS DONE ON MAY 1, 2015.

11        AND YOUR ANSWER AT LINE FOUR, WOULD -- WOULD YOU READ

12   THAT ANSWER, PLEASE, ON LINE FOUR.

13   A    NO, I DON'T.

14   Q    OKAY.  NOW, TAKE YOUR TIME.  LOOK THROUGH THE KENNEDY

15   REVIEWS IF YOU LIKE AND TELL ME IS THAT A TRUE STATEMENT

16   THAT, NO, YOU DON'T FIND ANY DOCUMENTATION ON ANY OF THE

17   REVIEWS PRIOR TO MAY 1, 2015.

18   A    THAT'S CORRECT.  ALL THE ONES PRIOR TO MAY 1ST, 2015 DID

19   NOT HAVE ALL OF THE SEVEN FACTORS LISTED.

20   Q    YES.  OKAY.  OR REALLY ANY DISCUSSION OF THEM; IS THAT

21   CORRECT?  LIKE--

22   A    WELL, THERE APPEARED TO BE A LITTLE BIT OF DISCUSSION ON

23   THE ONES PRIOR TO 2014, BUT NOT ALL THE SEVEN FACTORS WERE

24   LISTED.

25   Q    OKAY.  NOW, YOU REMEMBER ASKING DR. MILLER ABOUT WHY A

1    CONSIDERATION OF THE SEVEN FACTORS WASN'T DOCUMENTED ON ANY

2    OF THOSE REVIEW FORMS PRIOR TO MAY 1, 2015?

3    A    CAN YOU REPEAT THE QUESTION?

4    Q    YES.  DO YOU REMEMBER WHEN YOU DISCOVERED THIS, ASKING

5    DR. MILLER WHY A CONSIDERATION OF THOSE SEVEN FACTORS WASN'T

6    DOCUMENTED ON ANY OF THE REVIEW FORMS PRIOR TO MAY 1, 2015?

7    DO YOU REMEMBER ASKING HIM THAT?

8    A    I DON'T RECALL ASKING HIM THAT, BUT I DID POINT THAT OUT

9    TO HIM.  AND AT THAT TIME I FELT IT PRUDENT TO CONVENE A PAY

10   PANEL, AN OUT-OF-CYCLE PAY PANEL, FOR DR. KENNEDY.

11   Q    OKAY.  LOOK AT PAGE 94 OF YOUR DEPOSITION TRANSCRIPT,

12   AND I'M GOING DOWN TO LINE 22.  AND THIS WOULD BE YOUR

13   TESTIMONY.  DO YOU SEE THAT?

14   A    OKAY.  IT'S PAGE 94?

15   Q    YES, SIR.  LINE 22.

16   A    UH-HUH.

17   Q    AND IF YOU WOULD JUST READ FOR US YOUR ANSWER THERE

18   BEGINNING ON LINE 22.

19   A    SO I DID ASK DR. MILLER WHAT WAS THE JUSTIFICATION AND

20   WHERE WAS THE DOCUMENTATION OF THOSE SEVEN FACTORS IN THE

21   PREVIOUS PAY PANEL, FEBRUARY 14.

22   Q    ALL RIGHT.  AND SO DOES THAT REFRESH YOUR RECOLLECTION

23   THAT YOU DID ASK DR. MILLER ABOUT THAT?

24   A    YES, IT DOES.

25   Q    OKAY.  NOW FLIP OVER TO 95 AND COMPLETE YOUR -- YOUR

DEKONING - DIRECT

102

1    STATEMENT UNDER OATH AT YOUR DEPOSITION.

2    A    AND WHAT HE STATED WAS ESSENTIALLY WHAT TAMARA STATED

3    WAS -- HE SAID THERE WAS NO REQUIREMENT AND HE ALSO STATED

4    THAT BASED ON WHAT HE KNEW, THAT HIS PAY WOULD NOT CHANGE.

5    Q    OKAY.  SO TAMARA CONFIRMED WHAT DR. MILLER WAS TELLING

6    YOU WHICH WAS THERE WASN'T ANY REQUIREMENT TO DOCUMENT ANY

7    CONSIDERATION OF THOSE SEVEN -- SEVEN FACTORS ON THE REVIEW

8    FORMS PRIOR TO MAY 1, 2015.

9    A    THAT'S CORRECT.

10   Q    AND DID YOU, AFTER SPEAKING TO TAMARA AND HAVING THAT

11   CONFIRMED, DID THAT SATISFY THE QUESTION THAT YOU WERE

12   ASKING?

13   A    YES, IT DID.

14   Q    OKAY.  ALL RIGHT.  WOULD YOU AGREE WITH ME THAT DR.

15   KENNEDY'S ACCOMPLISHMENTS IN ANESTHESIA ARE SUBSTANTIALLY

16   EQUIVALENT IN VALUE TO THE OTHER STAFF ANESTHESIOLOGISTS?

17   A    YES.

18   Q    OKAY.  AND WOULD YOU ALSO AGREE WITH ME THAT THE PURPOSE

19   OF MARKET PAY UNDER THIS VA PHYSICIAN COMPENSATION SYSTEM IS

20   NOT ONLY THE RECRUITMENT OF THE BEST-QUALIFIED CANDIDATES BUT

21   ALSO THE RETENTION OF THOSE CANDIDATES AFTER THEY HAVE BEEN

22   ON BOARD?

23   A    I CONSIDER THE ANNUAL PAY AS THE RECRUITING AND

24   RETENTION INCENTIVE.

25   Q    OKAY.  SO YOU FOCUS ON ANNUAL PAY.  YOU DON'T

DEKONING - DIRECT

1    DISTINGUISH AND SEPARATE OUT MARKET PAY AND USE THAT AS A

2    FACTOR IN YOUR RECRUITMENT OR RETENTION EFFORTS.  IS THAT A

3    FAIR STATEMENT?

4    A    THAT'S A FAIR STATEMENT.

5    Q    OKAY.  WHEN WE HAD THIS CONVERSATION AT YOUR DEPOSITION,

6    I BELIEVE THAT YOU WERE OF THE VIEW -- OR I'M SORRY.  LET ME

7    START THAT ONE OVER.  YOU DID NOT KNOW THAT THOSE SEVEN

8    FACTORS WERE MANDATED FOR DETERMINATION OF MARKET PAY; DID

9    YOU?

10   A    IT'S -- I ALWAYS LOOK AT THE ANNUAL -- AT THE ANNUAL PAY

11   AND IT'S -- I'M UNFAMILIAR WITH ANY SPECIFIC REQUIREMENT FOR

12   MARKET PAY, BUT I ALWAYS CONSIDERED THE ANNUAL PAY AS THE

13   PRIMARY COMPENSATION AMOUNT TO BE USED FOR RECRUITING AND

14   RETENTION OF THE BEST-QUALIFIED PHYSICIANS.

15   Q    OKAY.  SO YOU WEREN'T AWARE OF ANY MANDATE OR DIRECTION

16   EITHER IN THE STATUTE OR THE HANDBOOK THAT WOULD SAY THAT

17   THOSE FACTORS ARE TO BE APPLIED IN THE DETERMINATION OF

18   MARKET PAY, NOT ANNUAL PAY.

19   A    THAT'S CORRECT.

20   Q    THANK YOU SO MUCH, DR. DEKONING.  I APPRECIATE YOUR TIME

21   THIS AFTERNOON.

22   A    THANK YOU.

23           *THE COURT:*  ONE SECOND, SIR.

24           *THE WITNESS:*  OH, I'M SORRY.

25                   CROSS-EXAMINATION

1    BY MRS. BAILEY:

2    Q    WELL DR. DEKONING, I'D LIKE TO SAY IT WAS JUST A FEW

3    MORE QUESTIONS, BUT THEN YOU'D SAY SHE'S JUST A LAWYER.  I DO

4    WANT TO TAKE THIS TIME TO SORT OF FILL IN SOME OF THE AREAS.

5    CAN YOU HEAR ME?  FILL IN SOME OF THE QUESTIONS OR SOME OF

6    THE AREAS THAT MR. IRVIN MAY NOT HAVE HIT UPON OR ASKED YOU

7    ABOUT, SO THIS IS A LITTLE BIT HIT-AND-MISS HERE.

8         BUT NOW AS I UNDERSTAND IT, YOU WERE ON ACTIVE DUTY FOR

9    SOME TIME?

10   A    YES, MA'AM.

11   Q    AND WHAT AREA OF THE SERVICE WERE YOU IN?

12   A    I WAS IN THE ARMY, IN THE ARMY MEDICAL CORPS.

13   Q    AND HOW LONG WAS THAT?

14   A    THAT'S TWENTY-EIGHT YEARS.

15   Q    AND WHAT DID YOU -- YOU RETIRED FROM THE ARMY?

16   A    YES, MA'AM.

17   Q    AND WHAT WAS YOUR FINAL RANK?

18   A    COLONEL 06.

19   Q    OKAY.  AND FOR US WHO DON'T KNOW ANYTHING ABOUT THE

20   ARMY...

21   A    THAT WAS THE FINAL RANK THAT I RETIRED AT.

22   Q    UH-HUH.

23   A    AND THAT IS ONE RANK BELOW THE GENERAL OFFICER.  SO I

24   WAS WHAT THEY CALL A FULL-BIRD COLONEL.  THE NEXT RANK UP

25   WOULD BE A ONE-STAR GENERAL.

1   Q    AND WHAT DID YOU DO AFTER YOU RETIRED?

2   A    I WENT TO WORK FOR THE VA.

3   Q    AND WHAT DID YOU -- WHAT WERE YOU HIRED AT THE VA --

4   WHAT POSITION WERE YOU IN?

5   A    I WAS HIRED AS A CHIEF OF STAFF.

6   Q    AND YOU'RE STILL THERE?

7   A    YES, MA'AM.

8   Q    NOW, DID -- THEY HAVE THESE COMPENSATION PANELS AT THE

9   VA.  DID THEY HAVE THAT BACK WHEN YOU WERE IN THE ARMY?

10  A    I'M SORRY.  REPEAT THE QUESTION.

11  Q    DID THEY HAVE COMPENSATION PANELS BACK WHEN YOU WERE IN

12  THE MILITARY?  DID YOU WORK ON THEM?

13  A    OH, DOES THE MILITARY HAVE COMPENSATION PANELS?

14  Q    YEAH.

15  A    NO, THEY DON'T.

16  Q    SO THIS IS ALL STUFF YOU HAVE LEARNED SINCE YOU HAVE

17  COME TO THE VA.

18  A    YES, THAT'S CORRECT.

19  Q    NOW YOU'RE -- YOU'RE AT DORN NOW.  HOW MANY PHYSICIANS

20  ARE THERE?

21  A    HOW MANY PHYSICIANS ARE THERE IN TOTAL IN -- AT DORN?

22  Q    UH-HUH.

23  A    WE HAVE -- CURRENTLY WE HAVE 206 MEDICAL STAFF.  THAT

24  INCLUDES PHYSICIANS, DENTISTS, PODIATRISTS AND OPTOMETRISTS.

25  OF THAT THERE ARE ROUGHLY A HUNDRED AND 80, 190 PHYSICIANS.

1    Q      AND WHAT IS YOUR ROLE REGARD TO ALL THESE PHYSICIANS?

2    A      I'M SORRY.  WHAT IS MY ROLE REGARDING...

3    Q      YEAH.  WHAT ARE YOUR DUTIES?  I'M TRYING TO GET THIS

4    CLOSER SO YOU CAN HEAR ME BETTER.

5    A      SO MY DUTIES ARE PRIMARILY TO ENSURE THAT QUALITY AND

6    PATIENT SAFETY IS MAINTAINED AND THAT WE MITIGATE RISK FOR

7    ANY TYPE OF UNWELCOMED OUTCOME AND THAT WE MAINTAIN ACCESS TO

8    CARE WHICH IS AVAILABILITY, AVAILABILITY APPOINTMENTS AND

9    AVAILABILITY OF CARE THROUGH OTHER VENTURES, AND THEN ALSO

10   THAT WE MAKE -- OR THAT WE ENSURE THAT WE GIVE THE PATIENT

11   THE BEST EXPERIENCE THAT THEY CAN GET AT ANY HEALTHCARE

12   FACILITY.

13   Q      DO YOUR RESPONSIBILITY -- DO YOU HAVE ANY

14   RESPONSIBILITIES FOR RECRUITMENT?

15   A      RECRUITING IS ESSENTIALLY AN HR RESPONSIBILITY.

16   ALTHOUGH I DO HAVE A LOT OF INTERFACE AND INTERACTION WITH HR

17   TO -- IN TERMS OF RECRUITING AND RETENTION.

18   Q      WHEN A YOUNG PHYSICIAN IS CONSIDERING THE VA, WHAT IS HE

19   LOOKING FOR?  HE OR SHE.

20   A      WELL, WE LOOK AT SEVERAL THINGS.  WE LOOK AT WHERE

21   THE -- WHAT RESIDENCY THEY DID, IN OTHER WORDS, WHAT TYPE OF

22   POST-GRADUATE EDUCATION THEY HAD, AND WE LOOK AT SOMETHING

23   CALLED THE CV, AND THAT'S A CURRICULUM VITAE.  IT'S -- IT'S A

24   RESUME BUT FOR PHYSICIANS.  AND THEN IN THAT CV WE LOOK FOR

25   CERTAIN THINGS.  WE LOOKED AT WHERE THEY WERE, BUT NOT ONLY

1    WHERE THEY WERE AND WHAT THEY DID, BUT HOW LONG THEY WERE

2    THERE FOR.

3         AND WE THEN LOOK TO SEE WHAT EXPERIENCE THEY HAD IN

4    TERMS OF HOW WELL PREPARED ARE THEY TO ASSUME THE POSITION

5    THAT THEY ARE BEING CONSIDERED FOR.  AND THEN WE WOULD

6    INTERVIEW THE CANDIDATE AND -- AND THEN WE WOULD -- IF A

7    CANDIDATE LOOKS FAVORABLE, THEN THE CANDIDATE COMPLETES

8    SOMETHING CALLED VET-PRO, WHICH IS FOR PRIVILEGING AND

9    CREDENTIALING, AND A PAY PANEL WOULD CONVENE.  AND THIS WAS

10   AS OF -- THIS IS DURING 2016 THAT A PAY PANEL WOULD CONVENE

11   TO DETERMINE ANNUAL COMPENSATION, WHAT WOULD BE OFFERED TO

12   THAT CANDIDATE TO ENSURE THAT WE HAD THE BEST CHANCE OF

13   RECRUITING THE CANDIDATE.

14   Q    NOW, WHEN YOU'RE -- A CANDIDATE'S THINKING ABOUT COMING

15   TO DORN, WHAT ARE THE THINGS THAT THEY ARE PRIMARILY

16   INTERESTED IN?

17   A    A CANDIDATE CAN APPLY TO DORN FOR ANY NUMBER OF REASONS.

18   AND THERE ARE SOME THAT WANT TO COME TO DORN FOR FAMILY

19   REASONS.  THERE ARE SOME THAT WANT TO COME TO DORN TO GET THE

20   OPPORTUNITY TO DO RESEARCH.  THERE ARE SOME THAT COME TO DORN

21   BECAUSE THEY WANT TO TEACH AND THEY LIKE THE ACADEMIC

22   AFFILIATION.

23        OTHERS COME TO DORN FOR WHAT THEY CALL A BETTER BALANCE,

24   WHICH MEANS IN TERMS OF YOUR -- HOW MUCH YOU WORK AND HOW

25   MUCH YOU CAN RELAX SO THAT -- SO THAT WORK RELAX BALANCE IS

1    WHAT THEY CALL BETTER BALANCE.  OTHERS COME TO DORN FOR

2    LEADERSHIP OPPORTUNITIES, AND THOSE ARE PRIMARILY THE

3    CANDIDATES THAT I REVIEW ARE THE ONES THAT COME OR THAT APPLY

4    FOR SERVICE LINE POSITIONS OR SERVICE LINE CHIEF POSITIONS

5    RATHER.

6        AND SO YOU HAVE -- YOU HAVE PRIMARILY THOSE REASONS WHY

7    PHYSICIANS WOULD APPLY TO DORN AND THAT PROBABLY CAPTURES

8    MOST -- THE MOST COMMON REASONS.

9    Q    SINCE YOU HAVE BEEN CHIEF, HAVE ANY OLDER PHYSICIANS,

10   MORE EXPERIENCED PHYSICIANS, BEEN HIRED?

11   A    WELL, I HAVE BEEN THE CHIEF OF STAFF FOR FOUR AND A HALF

12   YEARS.  AND SINCE THEN WE HAVE HIRED SEVEN PHYSICIANS OVER

13   THE AGE OF 65.  AND THEY'RE IN VARIOUS SPECIALTIES.  MOST OF

14   THEM HAVE BEEN IN PRIMARY CARE, BUT THERE ARE THOSE THAT WERE

15   IN CARD -- THAT ARE IN CARDIOLOGY.  AND WE ALSO HAVE A

16   PHYSICIAN IN ONE OF THE OTHER SPECIALTIES I CAN'T RECALL.

17   BUT THERE ARE SEVEN OF THEM.

18   Q    DO THESE PHYSICIANS HAVE PRIOR VA EXPERIENCE OF THE

19   SEVEN THAT--

20   A    NONE OF THE PHYSICIANS THAT WE HIRED HAD PRIOR VA

21   EXPERIENCE.  OF THOSE SEVEN, I'M SORRY.

22   Q    OF THOSE SEVEN?

23   A    RIGHT.

24   Q    AND--

25        MR. IRVIN:  YOUR HONOR, IF I COULD, AND I APOLOGIZE

1    TO MRS. BAILEY FOR INTERRUPTING, BUT I DO HAVE AN OBJECTION

2    THAT I JUST NEED TO MAKE SURE THAT I MAKE AND SO THAT IT IS

3    ON THE RECORD, AND IT IS THIS.  WE DON'T THINK IT'S RELEVANT

4    WHAT OTHER SPECIALTIES AT DORN OR IN THE VA MAY OR MAY NOT DO

5    IN TERMS OF THESE PAY PANELS OR WHAT THE INFORMATION AND DATA

6    IS WITH RESPECT TO THEM.

7        THE POOL IN THIS CASE IS THE ANESTHESIOLOGISTS.  SO I

8    JUST OBJECT ON RELEVANCE.  AND I DIDN'T WANT MY SITTING HERE

9    SILENT TO BE MISUNDERSTOOD AS WE THINK THAT'S RELEVANT.

10         THE COURT:  LET ME JUST MAKE SURE THAT IN THIS CASE

11   THE PROTECTED CLASS THAT WE ARE TALKING ABOUT IS THE

12   ANESTHESIOLOGISTS AT DORN; IS THAT CORRECT?

13         MR. IRVIN:  THAT'S OUR POSITION.  YOUR HONOR.

14         THE COURT:  MRS. BAILEY?

15         MRS. BAILEY:  OUR POSITION, YOUR HONOR, IS THAT

16   THAT IS TOO NARROW A COHORT FOR THIS PATTERN OR PRACTICE

17   LAWSUIT.  WE ARE TALKING ABOUT DISPARATE IMPACT OF VA POLICY

18   ON AT LEAST THE VA PHYSICIANS AT DORN BECAUSE THEY ARE ALL

19   PAID THE SAME WAY AND ALSO NATIONALLY.  IF YOU CHANGE THE WAY

20   JUST THIS ONE LITTLE GROUP IS PAID WHEN THEY ARE ALL PAID THE

21   SAME WAY, IT'S -- IT'S TOO SMALL A COHORT TO LOOK AT.  YES,

22   MA'AM.

23       WE FEEL LIKE YOU HAVE GOT TO LOOK AT -- ACTUALLY WE FEEL

24   LIKE YOU'VE GOT TO LOOK AT VA PHYSICIANS NATION-WIDE.  THE VA

25   PHYSICIANS AT DORN ARE A GOOD EXAMPLE AS TO WHY THIS COHORT

1    IS TOO SMALL.  THE ONES IN ANESTHESIOLOGY ARE NOT TREATED ANY

2    DIFFERENTLY THAN THE ONES IN SURGERY.

3              *THE COURT:*  ALL RIGHT.  MR. IRVIN?

4              *MR. IRVIN:*  YES, MA'AM.  I KNOW THAT MUCH HAS BEEN

5    MADE ABOUT OUR SO-CALLED STATISTICS.  WE ARE TRYING THIS CASE

6    AND HANDLING THIS CASE ON THE BASIC OF -- BASIS OF SPECIFIC

7    DOCTORS AND THE DATA AS TO THEM.  AND HOWEVER MANY IT IS,

8    IT'S FIVE.  AND SO, WE ARE NOT -- WE DO NOT BELIEVE THE LAW

9    REQUIRES THAT WE GO AND DO SOME FURTHER STATISTICAL STUDY AND

10   ENLARGE THE POOL.

11       THE LAW SAYS THAT SPECIFIC INSTANCES CAN TAKE THE PLACE

12   OF STATISTICAL DATA IN THESE DISPARATE IMPACT CASES, AND

13   THAT'S WHAT WE ARE ABOUT.  NO, WE DON'T HAVE -- WE DON'T HAVE

14   STATISTICS EXCEPT AS THAT TERM MIGHT APPLY TO THE SPECIFIC

15   INFORMATION ABOUT THE SPECIFIC DOCTORS AND THE ANESTHESIA

16   SERVICE AT THE DORN VA.  THAT'S OUR PROOF.  AND WE DON'T --

17   WE DON'T BELIEVE THE LAW REQUIRES US TO GO BEYOND THAT.

18              *THE COURT:*  ALL RIGHT.  MRS. BAILEY, I'M GOING TO

19   ALLOW YOU TO CONTINUE YOUR QUESTIONS AND I WILL MAKE MY

20   DECISION ABOUT THE POOL LATER.  OKAY.

21   BY MRS. BAILEY:

22   Q    SO NOW, YOU SAID THERE WERE SEVEN OLDER PHYSICIANS THAT

23   HAD BEEN HIRED AT DORN SINCE YOU CAME?

24   A    CORRECT.  SINCE I'VE BEEN THE CHIEF OF STAFF.

25   Q    SINCE YOU'VE BEEN THE CHIEF OF STAFF.

```
1    A     CORRECT.

2    Q     AND CAN YOU NAME THOSE SEVEN DOCTORS?

3    A     YES, I KNOW THE NAMES.

4    Q     WOULD YOU NAME THEM FOR US?

5    A     WE HAVE DR. THOMAS MALONE WHO IS 68.  HE WORKS AT OUR

6    ANDERSON CBOC AS A PRIMARY CARE PHYSICIAN.  WE HAVE DR.

7    RASHID KAHN WHO IS 79 AND HE WORKS AT OUR PRIMARY CARE

8    SERVICE LINE AT DORN.  DR. BILL ROBINSON, WILLIAM ROBINSON.

9    HE'S 69.  HE ALSO WORKS AT DORN PRIMARY CARE.  DR. IRVING

10   WILLIAMS WHO IS 72.  HE ALSO WORKS AT DORN PRIMARY CARE.  DR.

11   CARL HUFF WHO IS 72.  HE WORKS IN OUR ORTHOPEDICS SECTION.

12   DR. BEVERLY SIMONS.  SHE IS 70 YEARS OLD, WORKS IN OUR DORN

13   PRIMARY CARE.  AND DR. VICTOR SEGHERS.  HE IS 74 AND HE IS

14   OUR CARDIO -- HE'S ONE OF OUR CARDIOLOGISTS.

15   Q     ON LOOKING AT DEFENDANT'S EXHIBIT NUMBER 6 -- EXCUSE

16   ME -- NUMBER 5 -- MAYBE WE CAN GET IT FLASHED UP THERE ON THE

17   SCREEN.  HAVE YOU SEEN THIS EXHIBIT BEFORE?  LOOKING AT THE

18   SCREEN BEFORE YOU?

19   A     YES, UH-HUH.

20   Q     ARE ALL THESE DOCTORS LISTED ON THIS EXHIBIT THE ONES

21   YOU JUST NAMED?

22   A     LET ME LOOK.  LET'S SEE.  WE HAVE... TRYING TO FIND

23   MALONE.  IS THERE ANOTHER SHEET?  I DON'T SEE...

24   Q     OH, THAT'S JUST THE FIRST SHEET.  I'M SORRY --

25   A     THIS IS FIRST SHEET.
```

1    Q    --SHEET...

2    A    YOU WANT TO GO TO THE NEXT SHEET?

3    Q    YES.

4         *MRS. BAILEY:* YOUR HONOR, MAY I APPROACH THE

5    WITNESS?

6         *THE COURT:* YES.

7    A    OKAY.  THANKS.  SO I'M LOOKING AT COMMUNITY-BASED CARE

8    SERVICE AND I DON'T SEE DR. MALONE'S NAME HERE.  AND I SEE

9    DR. SIMONS.  AND MAY I MARK THIS?  OKAY.  I SEE DR. SIMONS.

10   AND LET'S SEE...

11   Q    BUT DOCTOR, NOT TO TAKE TOO LONG OR TO CUT YOU SHORT.

12   THERE HAVE BEEN SEVEN DOCTORS WHO ARE HIRED, OLDER DOCTORS

13   WHO WERE HIRED SINCE YOU CAME TO DORN?

14   A    I'M SORRY.  CAN YOU REPEAT THE QUESTION?

15   Q    THERE HAVE BEEN SEVEN OLDER DOCTORS HIRED SINCE YOU CAME

16   TO DORN?

17   A    THAT'S CORRECT.

18   Q    AND THEY CAME--

19   A    AND I WILL PROBABLY FIND THEM ON THIS LIST IF GIVEN

20   ENOUGH TIME, BUT I KNOW THEY ARE BURIED IN HERE.

21   Q    AND THEY ALL CAME IN AT THE LOWER STEP?

22   A    THAT'S CORRECT.

23   Q    ON THE BASE AND LONGEVITY TABLE?

24   A    I'M SORRY.  REPEAT THE QUESTION.

25   Q    THEY CAME DOWN AS -- THEY ALL CAME IN AT THE FIRST STEP

1    ON THE BASE AND LONGEVITY TABLE?

2    A    RIGHT.  THAT'S CORRECT.

3    Q    DO YOU HAVE A -- SO DO YOU HAVE A PROBLEM WITH TURNOVER

4    AT DORN WITH THE DOCTORS?

5    A    NOT PARTICULARLY, BUT IT DEPENDS ON WHAT SPECIALTY YOU

6    CONSIDER.  AS FAR AS ANESTHESIOLOGISTS IS CONCERNED WE HAVE

7    NOT HAD -- WE HAVEN'T BEEN CHALLENGED WITH A HIGH TURNOVER IN

8    ANESTHESIA.  WE WERE -- PROBABLY ABOUT A YEAR AND A HALF AGO

9    WE HAD A TURNOVER IN PRIMARY CARE AT THE COLUMBIA CAMPUS AT

10   DORN AND THEY LEFT FOR VARIOUS REASONS AND -- BUT WE HAVE

11   SINCE BEEN ABLE TO REPLACE THEM.

12        BUT OTHERWISE, AND IN OUR CBOC'S -- CBOC'S ARE

13   COMMUNITY-BASED OUTPATIENT CLINICS.  THOSE ARE THE SEVEN

14   OUTLYING PRIMARY CARE CLINICS.  WE HAVE HAD A LITTLE BIT OF

15   TURNOVER IN THAT AREA.  BUT OTHERWISE, OUTSIDE OF THOSE WE

16   HAVE NOT HAD THAT MUCH OF A PHYSICIAN TURNOVER.

17   Q    AND WHAT DO YOU CREDIT THAT TO?

18   A    MOST OF THE TIME PHYSICIANS LEAVE BECAUSE OF FAMILY

19   ISSUES AND THEY LEAVE BECAUSE THEY HAVE A SON OR A DAUGHTER

20   WHO IS ATTENDING COLLEGE OUT OF STATE AND THEY GET A POSITION

21   AT ANOTHER VA WHICH IS CLOSER.  THAT'S -- THAT'S THE MOST

22   COMMON REASON.

23        A SECOND REASON WOULD BE THE OPPORTUNITY TO HAVE A MORE

24   FULFILLING ACADEMIC PARTNERSHIP, AND SO THAT'S WHY SOME

25   PHYSICIANS LEAVE.  BUT BY FAR AND AWAY THE MOST COMMON REASON

1    WHY THE PHYSICIANS LEAVE IS BECAUSE OF FAMILY ISSUES; EITHER

2    BECAUSE THEY HAVE A -- AN ELDERLY PARENT THEY NEED TO TAKE

3    CARE OF, THEY HAVE A CHILD THAT LIVES OUT OF STATE THEY WANT

4    TO BE CLOSER TO, THEY HAVE GRANDCHILDREN THAT THEY WANT TO BE

5    CLOSER TO, AND SO IT'S -- I CALL IT THE FAMILY FACTOR.

6    Q    YEAH.  BUT WHAT HAPPENS WHEN A DOCTOR GETS AN OFFER FROM

7    AN OUTSIDE PRACTICE, A HIGHER OFFER?

8    A    WELL, FIRST WE NEED TO DETERMINE WHY IS THAT PHYSICIAN

9    LOOKING TO LEAVE AND COULD IT BE THAT THEY ARE GIVEN THE

10   OPPORTUNITY TO DO RESEARCH, COULD IT BE THAT THEY DON'T HAVE

11   THE OPPORTUNITY TO DO ENOUGH TEACHING, COULD IT BE THAT THEY

12   FEEL BURNED OUT?  AND SO WE HAVE TO LOOK AT THAT WORK LIFE

13   BALANCE.

14        AND YES, SOMETIMES IT COULD BE BECAUSE OF PAY.  AND IF

15   THAT'S THE CASE, THEN WE'D HAVE TO LOOK TO DETERMINE WHAT

16   THEIR PAY IS AND WE LOOK AT SOMETHING CALLED THE HAY MARKET

17   SURVEY, AND THEN WE MAKE A DETERMINATION WHETHER OR NOT A PAY

18   PANEL NEEDS TO CONVENE -- NOW, THIS IS BACK IN 2016 -- A PAY

19   PANEL NEEDS TO CONVENE TO LOOK AT ALL PHYSICIANS IN THAT

20   SPECIALTY.

21   Q    SO YOU CONVENED THE PAY PANELS FOR EVERYBODY?

22   A    FOR THAT SPECIALTY.

23   Q    AND WHY IS THAT?

24   A    BECAUSE WE NEED TO MAKE SURE THAT THERE IS EQUITY.

25   Q    AND WHY IS THAT?

1    A    AND WELL, PARTLY BECAUSE OF MORALE AND ALSO BECAUSE YOU

2    NEED TO MAKE SURE THAT WE FAIRLY COMPENSATE OUR PHYSICIANS IN

3    ORDER TO RETAIN THE BEST AND THE BRIGHTEST, AND SO WE HAVE TO

4    MAKE SURE THAT WE HAVE EQUITY IN ANNUAL PAY FOR ALL

5    PHYSICIANS IN THAT SPECIALTY.

6    Q    SO FROM YOUR PERSPECTIVE IT'S NECESSARY TO HAVE THE PAY

7    PANELS CONVENED?

8    A    I'M SORRY.  CAN YOU REPEAT THE QUESTION?

9    Q    FROM WHERE YOU STAND YOU FEEL LIKE IT'S NECESSARY TO

10   RECONVENE THE PAY PANELS WHEN ONE PERSON GETS AN OFFER

11   OUTSIDE?

12   A    YES, IT NEEDS TO -- IF YOU CONVEY A PAY PANEL FOR ONE

13   INDIVIDUAL, YOU NEED TO LOOK AT THE ENTIRE SPECIALTY IN YOUR

14   FACILITY.

15   Q    DOES THE DORN MANAGEMENT TREAT OLDER PHYSICIANS FAIRLY?

16   A    YES.

17   Q    WOULD YOU ANSWER ANY QUESTIONS THAT WILBUR MIGHT HAVE?

18           MR. IRVIN:  I DON'T HAVE ANY FURTHER QUESTIONS,

19   YOUR HONOR.

20           THE COURT:  ALL RIGHT.  THANK YOU.  YOU CAN STEP

21   DOWN.  YOU'RE EXCUSED NOW.

22           THE WITNESS:  OKAY.  NOW I CAN STEP DOWN?

23           THE COURT:  NOW IS THE TIME.

24       (WITNESS LEFT THE STAND.)

25           THE COURT:  YOU MAY CALL YOUR NEXT WITNESS.

1          *MR. IRVIN:* THANK YOU, YOUR HONOR. WE CALL TAMARA

2     NICHOLS.

3          (WITNESS ENTERED THE COURTROOM.)

4              TAMARA NICHOLS, AFTER BEING DULY SWORN,

5     TESTIFIED AS FOLLOWS:

6                      DIRECT EXAMINATION

7     BY MR. IRVIN:

8     Q    GOOD AFTERNOON, MRS. NICHOLS.

9     A    GOOD AFTERNOON.

10    Q    I'M WILMOT IRVIN AND WE HAVE MET BEFORE. YOU RECALL

11    GIVING YOUR DEPOSITION IN THE CASE EARLIER?

12    A    YES, SIR.

13    Q    OKAY. AND I HAVE SOME QUESTIONS TO ASK YOU TODAY THAT

14    WILL KIND OF TRACK ALONG WHAT WE DID IN THE DEPOSITIONS. AND

15    IF I ASK ONE THAT DOESN'T MAKE SENSE OR YOU DON'T UNDERSTAND,

16    PLEASE ASK ME TO REPEAT IT OR REPHRASE IT FOR YOU.

17    A    I WILL.

18    Q    ALL RIGHT. NOW AS I UNDERSTAND FROM YOUR DEPOSITION

19    TESTIMONY, YOU FIRST WENT TO WORK FOR THE VA HERE AT DORN IN

20    COLUMBIA IN FEBRUARY OF 2006; IS THAT CORRECT?

21    A    YES, IT IS.

22    Q    OKAY. AND YOU HELD VARIOUS POSITIONS PROGRESSING UP

23    THROUGH HR INCLUDING THE POSITION OF ASSISTANT CHIEF OF HR

24    AND YOU ARE NOW OR AT LEAST YOU WERE WHEN WE SPOKE AT YOUR

25    DEPOSITION CHIEF OF HR AT DORN VA. ARE YOU STILL -- IS THAT

1    RIGHT?  AT LEAST AS OF YOUR DEPOSITION YOU WERE CHIEF OF HR

2    AT DORN VA?

3    A    AS OF MY DEPOSITION I WAS.  I AM NOT ANY LONGER.

4    Q    ALL RIGHT.  AND YOUR DEPOSITION WAS TAKEN ON DECEMBER

5    THE 10TH OF 2015.  AND JUST TAKE US FROM THERE.  TELL US YOUR

6    POSITIONS THAT YOU HAVE HELD AT DORN VA SINCE DECEMBER OF

7    2015.

8    A    I STAYED WITH DORN VA FROM THAT POINT UNTIL FEBRUARY OF

9    2017 WHEN I WENT TO WORK FOR VHA CENTRAL OFFICE.

10   Q    OKAY.  AND IS VHA CENTRAL OFFICE A PART OF THE VETERANS

11   ADMINISTRATION?

12   A    IT IS.

13   Q    OKAY.  WHERE IS IT LOCATED?

14   A    WELL, THE HEADQUARTERS IS IN WASHINGTON DC BUT I'M A

15   VIRTUAL EMPLOYEE HERE IN SOUTH CAROLINA.

16   Q    I SEE.  ALL RIGHT.  SO YOU ARE THE REPRESENTATIVE OF

17   THAT OFFICE HERE IN SOUTH CAROLINA; IS THAT CORRECT?

18   A    ONE OF THEM, YES.

19   Q    ONE OF THEM.  AND IS YOUR OFFICE CURRENTLY AT DORN?

20   A    NO, IT'S NOT.

21   Q    OKAY.  ALL RIGHT.  SO, I APOLOGIZE.  DID YOU SAY 2017 IS

22   WHEN YOU LEFT YOUR POSITION AS CHIEF OF HR AT DORN?

23   A    I WAS SELECTED FOR A NEW POSITION IN FEBRUARY OF 2017

24   AND I WAS DETAILED TO THE DORN VA FOR 90 DAYS AFTER THAT.  I

25   ASSUMED MY NEW RESPONSIBILITIES IN APPROXIMATELY MAY OF 2017.

1    Q    OKAY. NOW, WE HAVE BEEN TALKING ABOUT -- OCCASIONALLY

2    ABOUT THE VA HANDBOOK. I KNOW YOU'RE FAMILIAR WITH THE VA

3    HANDBOOK AS IT PERTAINS TO COMPENSATION OF PHYSICIANS AND

4    DENTISTS AT THE VA. ARE YOU FAMILIAR WITH THAT?

5    A    YES, SIR.

6    Q    OKAY. AND IF WE NEED TO -- IF YOU FOR ANY REASON WANT

7    TO LOOK AT IT, WE -- BOTH SIDES IN THE CASE HAVE MARKED IT AS

8    AN EXHIBIT, PLAINTIFF'S EXHIBIT NUMBER 1, AND DEFENDANTS HAVE

9    MARKED IT AS THEIR EXHIBIT NUMBER 2. SO I DON'T KNOW THAT WE

10   ARE GOING TO -- YOU NEED IT, BUT IF YOU DO, YOU LET ME KNOW.

11        AND WHEN YOU WERE IN HR AT DORN, THAT'S WHAT YOU -- THAT

12   HANDBOOK WOULD BE WHAT YOU WOULD USE IN YOUR WORK RELATING TO

13   PHYSICIAN COMPENSATION PANELS. IS THAT AN ACCURATE

14   STATEMENT?

15   A    YES.

16   Q    OKAY. AND I BELIEVE YOU ARE ALSO FAMILIAR WITH THE

17   STATUTE, THAT IS THE 38 USC SECTION 7431. I CAN SHOW IT TO

18   YOU IF YOU LIKE. BUT YOU'RE FAMILIAR WITH THE STATUTE THAT

19   GOVERNS PHYSICIAN AND DENTISTS' COMPENSATION AT THE VA?

20   A    I'M FAMILIAR WITH IT. I WOULDN'T SAY THAT I COULD

21   RECITE IT TO YOU, BUT I'M AWARE THAT IT'S OUT THERE AND I'M

22   NOT AWARE OF THE SPECIFIC NUMBERS THAT ARE ASSOCIATED WITH

23   THAT.

24   Q    YOU'RE AWARE THERE IS SUCH A STATUTE BUT YOU DON'T HAVE

25   A DAILY OR YOU DIDN'T HAVE A DAILY SORT OF FAMILIARITY WITH

1    IT?  IS THAT ACCURATE?

2    A    THAT'S ACCURATE.

3    Q    OKAY.  AND I THINK YOU SAID THAT REALLY THE ONLY REASON

4    THAT -- OR THE REASON THAT YOU WOULD GO TO THE STATUTE IF YOU

5    HAD TO WOULD BE IF YOU DETERMINED THAT THERE WAS SOMETHING

6    MISSING FROM THE HANDBOOK AND THAT YOU WOULD NEED TO TRY TO

7    CHECK TO SEE IF THERE WAS SOMETHING IN THE STATUTE.  IS THAT

8    A FAIR STATEMENT?

9    A    YES.

10   Q    OKAY.  ALL RIGHT.  AND I DON'T THINK YOU RECALLED HAVING

11   A SITUATION WHERE YOU DETERMINED THAT THERE WAS SOMETHING

12   MISSING THAT REQUIRED YOU TO GO TO THE STATUTE.  DO YOU

13   RECALL EVER HAVING THAT CIRCUMSTANCE COME UP?

14   A    NO, I DON'T.

15   Q    OKAY.  ALL RIGHT.  NOW, THE COMP PANEL MEMBERS ARE THE

16   DOCTORS, THE PHYSICIANS THAT -- THREE OF THEM THAT SIT DOWN

17   ON ANY GIVEN COMP PANEL.  AND AS I UNDERSTAND WHAT YOU HAVE

18   TOLD US IN YOUR DEPOSITION, THOSE COMP PANEL MEMBERS DON'T

19   RECEIVE A COPY OF THE STATUTE.

20   A    NO, THEY DON'T.

21   Q    OKAY.  ALL RIGHT.  NOW, ARE YOU FAMILIAR WITH THE RANGES

22   FOR PHYSICIAN ANNUAL PAY AT THE VA; MINIMUMS AND MAXIMUMS FOR

23   VARIOUS SPECIALTIES?

24   A    YEAH.  IT VARIES FROM SPECIALTY TO SPECIALTY AND IT

25   CHANGES FROM YEAR TO YEAR, SO I CAN'T -- AGAIN, I CAN'T

1    RECITE IT.  I WOULD HAVE TO REFER TO THE CURRENT YEAR'S

2    INFORMATION.

3    Q    I UNDERSTAND.  AND I THINK WE HAVE GOT SOME OF THOSE

4    DOCUMENTS ALREADY IN THE RECORD AND I DON'T KNOW THAT I'LL

5    EVEN NEED TO BOTHER YOU ABOUT IT.  BUT YOU'RE FAMILIAR WITH

6    THE CONCEPT THAT IN THE PHYSICIAN COMPENSATION AT THE VA, THE

7    VA ESTABLISHES MINIMUM AND MAXIMUM FOR PARTICULAR SPECIALTIES

8    AND SO FORTH.

9    A    YES, SIR.

10   Q    OKAY.  ALL RIGHT.  AND AS I UNDERSTAND IT NOW, THERE CAN

11   BE EXCEPTIONS TO THE MAXIMUM.  LET'S JUST SAY THAT THERE IS A

12   MAXIMUM AT A PARTICULAR TIME FOR ANESTHESIOLOGISTS OF

13   $275,000 FOR ANNUAL PAY NOW.  OKAY?

14   A    OKAY.

15   Q    ALL RIGHT.  THERE WOULD BE AVAILABLE AN EXCEPTION THAT

16   WOULD ALLOW, IF THE APPROPRIATE PERSON APPROVED, AN

17   ANESTHESIOLOGIST'S SALARY TO GO UP ABOVE 275,000 AND UP TO

18   WHATEVER THE TOP OF THAT EXCEPTION WAS FOR THAT PARTICULAR

19   OFFICIAL.  IS THAT AN ACCURATE STATEMENT?

20   A    YES.

21   Q    OKAY.  AND I BELIEVE THAT THE DORN MEDICAL CENTER

22   DIRECTOR IS THE -- IS ONE PERSON WHO HAS THE FIRST LEVEL OR

23   LAYER OF AUTHORITY TO GRANT AN EXCEPTION.  IS THAT CORRECT?

24   A    THE EXCEPTIONS THAT CAN BE GRANTED VARY BASED ON THE

25   SPECIALTY AND THE -- AND THE TABLE AND TIER THAT THE

1    PHYSICIAN IS IN.  SO IN SOME INSTANCES EVEN THE DIRECTOR

2    DOESN'T HAVE AUTHORITY TO GRANT AN EXCEPTION.  DEPENDS ON THE

3    DOLLAR AMOUNT.

4    Q    OKAY.  SOMETIMES THE DIRECTOR DOES, SOMETIMES THE

5    DIRECTOR DOESN'T.  IS THAT--

6    A    THAT'S CORRECT.

7    Q    DEPENDING ON AS YOU JUST DESCRIBED.  BUT THAT DIRECTOR,

8    THAT DORN MEDICAL CENTER DIRECTOR, WOULD NOT BE DR. DEKONING.

9    THAT WOULD BE -- IS IT MR. OMURA OR SOMEONE IN A DIFFERENT

10   CAPACITY; IS THAT RIGHT?

11   A    IT'S CURRENTLY MR. OMURA.

12   Q    OMURA.  AND HE IS SORT OF THE EQUIVALENT OF THE CEO OF

13   DORN AS OPPOSED TO THE MEDICAL DIRECTOR, WHICH IS DR.

14   DEKONING.  IS THAT A FAIR STATEMENT?

15   A    DR. DEKONING IS THE CHIEF OF STAFF, SO HE'S OVER THE

16   PHYSICIANS' SIDE OF THE FACILITY AND MR. OMURA IS THE

17   DIRECTOR.  HE'S OVER THE ENTIRE FACILITY.

18   Q    OKAY.  SO IN ADDITION TO WHATEVER AUTHORITY, IF ANY,

19   THAT THE DORN MEDICAL CENTER DIRECTOR WOULD HAVE TO GRANT AN

20   EXCEPTION ABOVE THE MAXIMUM IN THE TABLE SAY FOR

21   ANESTHESIOLOGISTS, THERE'S ALSO A HIGHER LEVEL ABOVE THE DORN

22   MEDICAL CENTER DIRECTOR AND THAT IS THE NETWORK OR VISN

23   DIRECTOR IN ATLANTA WHO HAS AUTHORITY TO ALLOW A SALARY, AN

24   ANNUAL SALARY, AN ANNUAL PAY, OF A PHYSICIAN EVEN ABOVE WHAT

25   THE MEDICAL CENTER DIRECTOR COULD DO.  IS THAT A FAIR

1    STATEMENT?

2    A    VISN DIRECTORS HAVE THEIR OWN EXCEPTION APPROVAL

3    AUTHORITY.  BUT AGAIN IT'S BASED ON THE TABLES AND TIERS AND

4    WHETHER OR NOT THE PHYSICIAN'S SALARY THAT'S BEING

5    RECOMMENDED IS WITHIN A RANGE THAT THEY ARE ALLOWED TO

6    APPROVE.

7    Q    OKAY.  AND IN YOUR EXPERIENCE AS THE HR DIRECTOR AT DORN

8    DID YOU OBSERVE THAT EXCEPTIONS WERE GRANTED BY THE NETWORK

9    DIRECTOR IN ATLANTA ON OCCASION?

10    A    ON OCCASION.

11    Q    AND THAT WOULD HOLD TRUE ALSO FOR THE ANESTHESIOLOGY --

12    ANESTHESIOLOGISTS ON OCCASION?

13    A    ON OCCASION.

14    Q    YES.  OKAY.  ALL RIGHT.  NOW, LET ME SHOW YOU WHAT WE

15    HAVE PUT INTO EVIDENCE AS PLAINTIFF'S EXHIBIT 6.  TAKE A

16    MOMENT TO TAKE A LOOK AT THAT.  AND REALLY MY QUESTION IS

17    GOING TO BE DIRECTED TO THE FIRST PAGE, BUT YOU TAKE ALL THE

18    TIME YOU WANT TO LOOK THROUGH THE WHOLE EXHIBIT.

19    A    OKAY.

20    Q    OKAY.  YOU PREPARED THIS FIRST PAGE OF EXHIBIT 6 WHICH

21    IS THIS -- I'M GOING TO CALL IT A TABLE OR A CHART.

22    A    YES.

23    Q    THAT WAS YOUR WORK.

24    A    YES.

25    Q    OKAY.  AND AS FAR AS YOU CAN TELL US, IS THE INFORMATION

1    CONTAINED ON THAT DOCUMENT ACCURATE AND TRUE?

2    A    YES.

3    Q    OKAY.  ALL RIGHT.  AND DID YOU PREPARE THIS IN RESPONSE

4    TO HAVING BEEN IN THE MEETING WITH DR. KENNEDY AND DR.

5    DEKONING IN ORDER TO PROVIDE SOME INFORMATION TO DR.

6    DEKONING?

7    A    I HONESTLY DON'T KNOW WHEN THIS INFORMATION WAS

8    PREPARED.  I HAVE PULLED INFORMATION SIMILAR TO THIS ON A

9    NUMBER -- ON A NUMBER OF OCCASIONS.  THE FIRST TIME WAS FOR A

10   FOIA REQUEST THAT WAS SUBMITTED AND THEN FOR A SUBSEQUENT

11   COMPLAINT WHERE WE WENT TO MEDIATION.  SO I'M NOT SURE WHEN

12   THIS EXACT DOCUMENT WAS PRODUCED.

13   Q    OKAY.  AND THAT MEDIATION AND SO FORTH WOULD HAVE BEEN

14   DR. KENNEDY'S MEDIATION; IS THAT RIGHT?

15   A    THAT'S CORRECT.

16   Q    SO IT MIGHT HAVE BEEN THAT IT WAS PREPARED FOR USE AT

17   THAT TIME, BUT -- BUT THIS IS YOUR DOCUMENT.

18   A    TO THE BEST OF MY KNOWLEDGE IT IS.

19   Q    OKAY.  ALL RIGHT.  NOW, YOU'RE -- YOU ARE FAMILIAR, I

20   BELIEVE, THAT AFTER 2014 VISN -- AND I KEEP -- I'M USING THAT

21   VISN AND TOOK ME A WHILE TO REALIZE THAT IS -- VISN MEANS THE

22   REGIONAL OFFICE IN ATLANTA, IS THAT RIGHT, OF THE VA?

23   A    IT'S THE INTEGRATED SERVICE NETWORK FOR THE VA

24   HOSPITALS.  WHEN WE SAY REGIONAL, WE CONSIDER LIKE VBA'S OR

25   HAS A REGIONAL -- THEY'RE BENEFITS ADMINISTRATION.  WE ARE

1    HEALTH ADMINISTRATION. SO IT IS -- IT IS A HEADQUARTERS

2    OPERATION THAT'S IN BETWEEN VA CENTRAL OFFICE AND THE

3    FACILITIES.

4    Q    OKAY. ARE YOU FAMILIAR WITH THE FACT THAT VISN ISSUED A

5    POLICY AFTER 2014 -- I GUESS IT WAS SOMETIME IN 2015 -- THAT

6    REQUIRED DORN VA MEDICAL CENTER, MAYBE OTHER VA MEDICAL

7    CENTERS, TO DOCUMENT THE SEVEN FACTORS THAT APPEAR ON THE

8    COMPENSATION REVIEW FORMS?

9    A    THE VISN ISSUED A STANDARD OPERATING PROCEDURE ON HOW TO

10   SUBMIT EXCEPTION REQUESTS TO THE VISN AND TO THE

11   UNDER-SECRETARY'S OFFICE. IS THAT WHAT YOU'RE REFERRING TO?

12   Q    NO. I APOLOGIZE. I CONFUSED YOU. I'M NOT TALKING ANY

13   LONGER ABOUT THOSE EXCEPTIONS TO THE MAXIMUM. I'M TALKING

14   ABOUT SOMETHING DIFFERENT AND I SHOULD HAVE DONE A BETTER JOB

15   OF EXPLAINING THAT.

16       YOU RECALL THAT THE COMPENSATION PANEL REVIEW FORMS AT A

17   POINT IN TIME BEGAN TO INCLUDE A PAGE THAT WAS TYPED UP AND

18   INCLUDED AS AN ATTACHMENT TO THE COMPENSATION PANEL REVIEW

19   FORMS THAT ATTEMPTS TO SET FORTH INFORMATION RELEVANT TO THE

20   SEVEN FACTORS IN THE VA HANDBOOK THAT RELATE TO A PHYSICIAN'S

21   MARKET PAY?

22   A    I KNOW IN COLUMBIA WE STARTED USING THAT ABOUT THAT

23   SAME -- ABOUT THAT TIMEFRAME, BUT IT WASN'T AS A RESULT OF A

24   POLICY THAT THE VISN ISSUED. IT WAS A RESULT OF THAT

25   EXCEPTION PROCESS THAT WE DISCUSSED PREVIOUSLY; THAT THEY

1    GAVE US A STANDARD OPERATING PROCEDURE FOR HOW TO SUBMIT

2    EXCEPTION REQUESTS.  AND WE USE THAT AS A BEST PRACTICE IN

3    COLUMBIA TO MIRROR THAT PROCESS FOR OUR INTERNAL COMPENSATION

4    PANELS.

5    Q    OKAY.  BUT THAT SHEET -- LET ME JUST SHOW YOU THAT SHEET

6    AND THEN WE THEN CAN TRY TO MOVE ON.  BEAR WITH ME JUST A

7    MOMENT.  I'M GOING TO SHOW YOU PLAINTIFF'S EXHIBIT 8.  SO

8    THAT WE'LL -- WE'LL MAKE SURE WE ARE TALKING APPLES TO

9    APPLES.  THIS IS PLAINTIFF'S EXHIBIT 8.

10            *MR. IRVIN:*  YOUR HONOR, CAN I APPROACH THE WITNESS?

11            *THE COURT:*  YOU MAY.

12            *MR. IRVIN:*  THANK YOU.

13    BY MR. IRVIN:

14    Q    THIS IS PLAINTIFF'S EXHIBIT 8, MRS. NICHOLS, AND IT IS A

15    COMPILATION OR COLLECTION OF ALL OF DR. KENNEDY'S

16    COMPENSATION PANEL REVIEW FORMS GOING BACK IN TIME.  THE

17    FIRST ONE IS THE MAY 1ST, 2015 REVIEW.  AND I'M TURNING TO

18    THE THIRD PAGE OF THAT REVIEW AND SHOWING YOU KENNEDY VA 263,

19    AND THAT IS A TYPED-UP SHEET THAT I WAS REFERRING TO THAT'S

20    NUMBERED ONE THROUGH SEVEN AND THEN HAS AN EIGHT THAT'S NOT

21    APPLICABLE.  BUT DO YOU SEE WHAT I'M TALKING ABOUT?

22    A    YES, I DO.

23    Q    OKAY.  AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT PAGE

24    IS DOING?

25    A    WELL, THIS PAGE IS DONE IN A WORD DOCUMENT, BUT IT

1    ADDRESSES THE SAME FACTORS THAT ARE ADDRESSED ON THE FIRST

2    PAGE OF THIS ON KENNEDY VA 261.  UNDER PART B, PANEL

3    FINDINGS, IT SAYS, CONSIDERATION OF THE PANELS SHALL TAKE

4    INTO ACCOUNT, AND IT LISTS THOSE EIGHT FACTORS.

5         THESE FACTORS THAT ARE LISTED ON THIS WORD DOCUMENT ARE

6    THE SAME THING, IT'S JUST IT'S DONE ON ONE SHEET OF PAPER IN

7    A WORD DOCUMENT RATHER THAN THROUGH AN ADOBE FORM, BUT IT'S

8    THE SAME INFORMATION.

9    Q    OKAY.  AND ITS PURPOSE IN LIFE IS TO ADDRESS THOSE SEVEN

10   FACTORS THAT APPEAR ON THE FIRST PAGE OF THE COMP PANEL

11   REVIEW FORMS THAT ARE PULLED FROM THE VA HANDBOOK.  IS THAT A

12   FAIR STATEMENT?

13   A    CAN YOU SAY THAT AGAIN?

14   Q    YES.  THE -- THAT TYPEWRITTEN SHEET, PARAGRAPHS ONE

15   THROUGH SEVEN ATTEMPTS TO COLLECT INFORMATION ABOUT ITEM

16   NUMBERS OR FACTORS ONE THROUGH SEVEN AND PLACE THEM ON A

17   PARTICULAR PHYSICIAN'S -- IN THIS CASE AN ANESTHESIOLOGIST --

18   REVIEW PACKAGE.

19   A    THAT'S CORRECT.

20   Q    AND THOSE ARE THE SAME SEVEN FACTORS, AND I THINK YOU

21   HAVE SAID THIS, THAT APPEAR ON THE FIRST PAGE OF THE COMP

22   PANEL REVIEW FORM -- AT LEAST IDENTIFIED ON THE FIRST PAGE;

23   RIGHT?

24   A    THAT'S CORRECT.

25   Q    WITHOUT ANY DISCUSSION.  AND SO THAT THIRD PAGE THAT'S

1    TYPED UP HAS A PURPOSE IN LIFE TO DISCUSS THOSE SEVEN

2    FACTORS; IS THAT RIGHT?

3    A    THAT'S CORRECT.

4    Q    OKAY.  ALL RIGHT.  AND SOMEHOW OR ANOTHER THAT'S TIED TO

5    A VISN DIRECTIVE THAT CAME THROUGH OR NOT?

6    A    NO, SIR.  THE SOP THAT THE VISN PUT OUT, WE CONSIDERED

7    THAT TO BE A STRONG PRACTICE AND WE MIRRORED IT, BUT IT WAS

8    NOT A DIRECTION FROM THE VISN THAT WE HAVE THAT FOR ALL OF

9    OUR COMPENSATION PANELS, JUST FOR THOSE THAT WERE SENT TO THE

10   VISN FOR APPROVAL OF AN EXCEPTION REQUEST.

11   Q    OKAY.  AND AS I READ YOUR PRIOR TESTIMONY, I SEE THAT

12   YOU ARE CORRECT AND I HAVE MISINTERPRETED WHAT YOU SAID, AND

13   SO THANK YOU FOR THAT.  ALL RIGHT.

14        NOW, YOU AGREE WITH ME THAT FAIRNESS OR I BELIEVE IT

15   ALSO HAS BEEN SAID EQUITY OR FAIRNESS IS AN IMPORTANT ISSUE

16   IN ARRIVING AT COMPENSATION FOR VA PHYSICIANS LIKE DR.

17   KENNEDY; CORRECT?

18   A    YES.

19   Q    OKAY.  NOW, BASED ON YOUR EXPERIENCE IN PARTICIPATING IN

20   THESE COMPENSATION PANEL REVIEWS -- YOU HAVE EXPERIENCE

21   THERE?

22   A    YES.

23   Q    OKAY.  AND YOU WERE -- YOUR ROLE IN THAT WOULD BE AS THE

24   HR REPRESENTATIVE TO ASSIST THE PRESENTER OR THE SERVICE LINE

25   CHIEF LIKE DR. MILLER; IS THAT CORRECT?

1    A    MY ROLE IS AS A TECHNICAL ADVISER TO THE COMPENSATION

2    PANEL, SO MY ROLE WASN'T SPECIFICALLY IN SUPPORT OF THE

3    PRESENTER.  IT WAS IN SUPPORT OF THE PROCESS.

4    Q    OKAY.  AND YOU BRING INFORMATION TO THE PRESENTER SO

5    THAT HE CAN FORMULATE A RECOMMENDATION TO THE PANEL?  IS THAT

6    AN ACCURATE WAY TO PUT IT?

7    A    YES.  HR PROVIDES DOCUMENTATION AND INFORMATION TO

8    THE -- TO THE RECOMMENDING SUPERVISOR.  WE ALSO TAKE

9    INFORMATION TO THE COMPENSATION PANEL FOR THE BOARD MEMBERS

10   TO LOOK AT.

11   Q    OKAY.  AND WHEN IT GOES TO THE COMPENSATION PANEL, THE

12   THREE PHYSICIANS THAT ARE CONVENED THERE, THE RECOMMENDATION

13   THAT GOES TO THEM IS FOR ANNUAL PAY; IS THAT CORRECT?

14   A    THAT'S CORRECT.

15   Q    ALL RIGHT.  THAT'S WHAT THE PROCESS AT DORN FOCUSED ON

16   WAS ANNUAL PAY; IS THAT CORRECT?

17   A    YES.

18   Q    AND REALLY YOU KNOW -- WHEN YOU HAVE AN ANNUAL PAY

19   RECOMMENDATION THAT IS ADOPTED BY THE PANEL, THEN YOU KNOW

20   WHAT THAT NUMBER IS OBVIOUSLY -- LET'S MAKE ONE UP,

21   $275,000 -- AND THEN YOU CORRECT ME IF I'M WRONG, BUT THE

22   BASE PAY YOU EXTRACT RIGHT OFF OF THE LONGEVITY TABLE THAT

23   CORRELATES WITH THE PARTICULAR PHYSICIAN; IS THAT RIGHT?

24   A    WELL, IF IT'S A -- IF IT'S A NEW PHYSICIAN, THEN WE

25   KNOW -- WE MAY KNOW WHAT IT IS.  BUT IF I CAN HAVE THE

1    EXHIBIT THAT IS THE VA HANDBOOK, 5007 --

2    Q    YES, MA'AM.

3    A    -- I'D LIKE TO REFER TO THAT.

4    Q    ALL RIGHT.  I AM GOING TO SHOW YOU DEFENDANT'S EXHIBIT

5    NUMBER 2, WHICH IS THE VA HANDBOOK, AND I'LL TELL YOU -- I

6    BELIEVE THAT'S IDENTICAL TO THE PLAINTIFF'S EXHIBIT NUMBER 1

7    VA HANDBOOK.  SO IF YOU TAKE A MOMENT TO LOOK AT THAT AND

8    THEN YOU CAN ANSWER MY QUESTION.

9    A    OKAY.  SO, WHAT I'D LIKE TO START WITH IS THAT ON THIS

10   WHERE IT SAYS, KENNEDY VA 826, UNDER COMPENSATION PANELS,

11   UNDER FUNCTIONS OF THE PANEL IT SAYS THAT COMPENSATION PANELS

12   ARE NOT REQUIRED FOR PAY TABLE SIX, COMPENSATION PANELS

13   RECOMMEND THE APPROPRIATE PAY TABLE, TIER LEVEL, AND MARKET

14   PAY AMOUNT CONSIDERING THE COMBINED SUM OF THE BASE PAY AND

15   MARKET PAY FOR INDIVIDUAL PHYSICIANS AND DENTISTS.

16   Q    OKAY.

17   A    DOES THAT ANSWER YOUR QUESTION?

18   Q    WELL, IT DOES AND IT DOESN'T, AND SO LET ME TRY IT

19   AGAIN.  AND I'M FAMILIAR WITH WHAT YOU JUST READ.  IT IS IN

20   THE HANDBOOK.  BUT HERE'S WHAT I WANT TO ASK YOU.  BASE PAY,

21   AS I UNDERSTAND IT, IS A -- IS AN AMOUNT THAT COMES FROM THE

22   VA LONGEVITY TABLE APPLICABLE TO THE SPECIALTY AND BASED ON

23   THE TENURE OR LONGEVITY OF THE PARTICULAR PHYSICIAN UNDER

24   REVIEW.  IS THAT A FAIR STATEMENT?

25   A    BASE PAY IS SOLELY A PRODUCT OF LONGEVITY AS A

1    PHYSICIAN.  IT HAS NOTHING TO DO WITH THEIR SPECIALTY OR

2    THEIR PAY TABLE.

3    Q    OKAY.  THANK YOU.  SO IT JUST -- IT'S JUST BASED ON THAT

4    LONGEVITY.  AND IF DR. A HAS 16 YEARS, YOU LOOK AT THAT TABLE

5    AND HE FALLS ON WHATEVER THAT TIER OR STEP IS AND IT TELLS

6    YOU WHAT HIS BASE PAY IS --

7    A    THAT'S CORRECT.

8    Q    -- OR HER BASE PAY IS.  THAT'S WHAT I HAVE BEEN TRYING

9    TO GET AT.  AND SO IF YOU GOT IN ONE OF THESE PAY PANELS THE

10   SERVICE LINE CHIEF HAS A RECOMMENDATION OF $275,000 AND HE

11   MAKES THAT RECOMMENDATION TO THE PANEL AND THE PANEL ADOPTS

12   THAT RECOMMENDATION, THEN YOU KNOW WHAT THE ANNUAL PAY IS;

13   RIGHT?

14   A    THAT'S CORRECT.

15   Q    AND THEN YOU, AS AN HR PERSON, CAN LOOK AT THE LONGEVITY

16   TABLE APPLICABLE AND YOU WILL SEE WHAT THE BASE PAY IS.  IS

17   THAT CORRECT?

18   A    THAT'S CORRECT.

19   Q    AND SO THE MARKET PAY THEN BECOMES AN ARITHMETIC

20   CALCULATION OF SIMPLY TAKING THE ANNUAL PAY, SUBTRACTING THAT

21   FIXED BASE PAY, AND THAT GIVES YOU THE MARKET PAY; IS THAT

22   CORRECT?

23   A    THAT IS CORRECT.

24   Q    NOW, LET ME ASK YOU TO LOOK AT PLAINTIFF'S EXHIBIT

25   NUMBER 9.  YOU TAKE AS LONG AS YOU WANT TO FAMILIARIZE

1    YOURSELF ABOUT -- WITH THAT, AND I HAVE A FEW QUESTIONS FOR

2    YOU.

3    A    OKAY.

4    Q    ALL RIGHT.  AND IS THIS AN E-MAIL THREAD OR CHAIN OR

5    WHATEVER YOU WANT TO CALL IT BETWEEN YOU AND DR. DEKONING

6    FOLLOWING THE MEETING THAT YOU -- YOU AND HE HAD WITH DR.

7    KENNEDY IN EARLY 2015?

8    A    YES, IT IS.

9    Q    OKAY.  AND WOULD IT BE A FAIR CHARACTERIZATION OF THIS

10   E-MAIL THREAD TO SAY THAT THIS WAS COMMUNICATIONS BETWEEN YOU

11   AND DR. DEKONING ON SOME INFORMATION THAT HE WAS REQUESTING

12   THAT YOU GATHER THAT PERTAINED TO THE MEETING WITH DR.

13   KENNEDY?

14   A    YES.

15   Q    OKAY.  AND IF YOU LOOK WITH ME ON THE THIRD PAGE OF

16   EXHIBIT 9 YOU WILL SEE DOWN TOWARDS THE BOTTOM OF THAT,

17   KENNEDY VA 1327.  AND CAN YOU -- CAN YOU READ THAT ALL RIGHT?

18   I THINK WE CAN --

19   A    YES.

20   Q    -- GET IT UP ON YOUR--

21   A    IT'S ON MY SCREEN.

22   Q    OKAY.  AND YOU SEE THIS IS AN E-MAIL FROM DR. DEKONING

23   TO YOU DATED MONDAY, FEBRUARY THE 23RD OF 2015 ON THE SUBJECT

24   OF FOLLOW-UP TO MEETING WITH DR. KENNEDY.  DO YOU SEE THAT

25   THERE?

1    A     YES.

2    Q     AND YOU ATTENDED THAT MEETING?

3    A     YES.

4    Q     AND YOU HEARD DR. KENNEDY THERE EXPRESS HIS CONCERNS

5    ABOUT HIS MARKET PAY AND THE AGE FACTOR.  IS THAT FAIR TO

6    SAY?

7    A     YES.

8    Q     OKAY.  ALL RIGHT.  AND SO HERE IS DR. DEKONING AFTER THE

9    MEETING, THIS IS A FOLLOW-UP, AND HE'S SAYING ON ATTACHMENT

10   THREE, WHAT REASONS DID THE PAY PANEL GIVE FOR DENYING DR.

11   KENNEDY AN INCREASE IN PAY?  I THOUGHT FOR A PAY INCREASE

12   DENIAL, THE SERVICE LINE CHIEF HAD TO GIVE A REASON WHY HE

13   RECOMMENDED THE DENIAL.

14        DO YOU SEE THAT THERE?

15   A     YES, I DO.

16   Q     OKAY.  AND THEN ON UP AT THE TOP OF THAT SAME PAGE IT

17   LOOKS LIKE DR. DEKONING ASKED YOU ESSENTIALLY THAT QUESTION

18   AGAIN AND ASKED YOU -- APPARENTLY HE NEEDED AN ANSWER TO

19   THAT.  DO YOU SEE THAT?

20   A     YES.

21   Q     OKAY.  NOW, TURN BACK A PAGE TO 1326.  AND YOU'LL SEE

22   THE BOTTOM HALF OF THAT PAGE THERE'S AN E-MAIL FROM YOU BACK

23   TO DR. DEKONING ON THAT SAME SUBJECT, THE FOLLOW-UP TO

24   MEETING WITH DR. KENNEDY.

25        AND YOU SAY, DR. DEKONING, QUESTION ONE, THERE IS NO

```
1    WRITTEN REQUIREMENT TO GIVE AN EXPLANATION AS TO WHY NO

2    INCREASE WAS RECOMMENDED.  HOWEVER, THE PANEL ACTED ON DR.

3    MILLER'S RECOMMENDATION.  ON THE FRONT, IN PART A, DR. MILLER

4    ANNOTATED HIS CURRENT SALARY AS OF FEBRUARY 2014 AND

5    REQUESTED NO INCREASE IN PAY.

6         DO YOU SEE THAT?

7    A    YES.

8    Q    AND WAS THAT A TRUE AND CORRECT STATEMENT WHEN YOU MADE

9    IT?

10   A    YES.

11   Q    ALL RIGHT.  SO AT LEAST AS OF THAT TIME THERE WAS NO

12   WRITTEN REQUIREMENT TO GIVE AN EXPLANATION AS TO WHY NO

13   INCREASE WAS RECOMMENDED TO DR. KENNEDY IN THIS INSTANCE.

14   A    THAT'S CORRECT.

15   Q    OKAY.  OR ON ANY OTHER PANEL REVIEW AT THAT TIME.  IS

16   THAT -- THAT CORRECT?

17   A    THAT'S CORRECT.

18   Q    OKAY.  AND SO LOOK UP AT THE TOP OF THAT PAGE.  HERE IS

19   DR. DEKONING COMING BACK TO YOU AND SAYING, TAMARA, SO IF WE

20   DO NOT HAVE A WRITTEN REQUIREMENT TO GIVE AN EXPLANATION ON

21   WHY NO SALARY INCREASE WAS REQUESTED, HOW DO WE RECONCILE

22   THIS WITH THE LEVEL OF EXPERIENCE AND PRIOR EXPERIENCE ISSUES

23   THAT DR. KENNEDY POINTED OUT IN THE VA DIRECTIVE?

24        DO YOU SEE THAT?

25   A    YES.
```

1    Q    ALL RIGHT.  NOW FLIP TO THE FIRST PAGE AND READ TO US

2    YOUR RESPONSE THAT IS DOWN TOWARDS THE BOTTOM OF THE FIRST

3    PAGE IN THE FIRST PARAGRAPH OF YOUR E-MAIL BACK TO DR.

4    DEKONING, RE: FOLLOW-UP TO MEETING WITH DR. KENNEDY.  AND

5    WHAT DID YOU SAY IN THAT FIRST PARAGRAPH?

6    A    THE COMP PANEL ON DR. KENNEDY SHOULD HAVE HAD MORE

7    INFORMATION THAN WHAT WAS PROVIDED.  DR. MILLER SHOULD HAVE

8    CLEARLY ADDRESSED THE SEVEN FACTORS IN PART B.  HOWEVER,

9    PRIOR TO ME TAKING THE RESPONSIBILITY OF COMP PANELS BACK

10   OVER, THE FORMS WERE NOT BEING FILLED OUT PROPERLY.

11   Q    OKAY.  WAS THAT A TRUE AND CORRECT STATEMENT?

12   A    YES.

13   Q    OKAY.  AND STILL IS TODAY.  I MEAN, THAT ISN'T NOW --

14   I'M SORRY.  FORGET THAT QUESTION.  IT WAS A TRUE AND CORRECT

15   STATEMENT WHEN YOU MADE IT.

16   A    YES.

17   Q    OKAY.  THANK YOU, MRS. NICHOLS.  I APPRECIATE YOUR TIME.

18   THAT'S ALL THE QUESTIONS THAT I HAVE FOR YOU.

19         THE COURT:  ALL RIGHT.  MRS. BAILEY, YOU MAY

20   CROSS-EXAMINE.

21                    CROSS-EXAMINATION

22   BY MRS. BAILEY:

23   Q    NOW MRS. NICHOLS, HOW LONG HAVE YOU BEEN IN HUMAN

24   RESOURCES WITH THE VA?

25   A    SINCE 2006.

1    Q    AND HAVE YOU BEEN AT DORN I GUESS UP UNTIL 2016?

2    A    UNTIL 2017.

3    Q    2017?  DURING THAT TIME DID YOU WORK VERY MUCH WITH THE

4    COMPENSATION PANELS?

5    A    I WORKED WITH THE COMPENSATION PANELS QUITE A BIT.  I

6    STARTED IN 2006 WHEN THEY FIRST ROLLED OUT THIS NEW PAY LAW

7    THAT WAS PASSED IN 2004 AND I ASSISTED WITH PREPARING

8    COMPENSATION PANEL PACKETS AT THAT TIME.  I LATER BECAME A

9    PHYSICIAN RECRUITER AND I DID ALL OF THE COMPENSATION PANELS

10   AND THE BIENNIAL REVIEWS UP UNTIL ABOUT 2012 AND THAT

11   RESPONSIBILITY SHIFTED TO SOMEONE ELSE.

12        IN ABOUT 2014, 2013, 2014 I RECEIVED THAT -- THAT WORK

13   BACK BECAUSE IT WASN'T BEING HANDLED TO THE SATISFACTION OF

14   THE CURRENT DIRECTOR OF HUMAN RESOURCES.

15   Q    AND YOU HAD IT UNTIL YOU MOVED ON?

16   A    YES, I DID.

17   Q    IN 2017?

18   A    I OVERSAW IT -- WHEN I BECAME AN ASSISTANT CHIEF I

19   OVERSAW OTHER INDIVIDUALS DOING IT, BUT I HAD OVERSIGHT OF IT

20   UNTIL I LEFT IN 2017.

21   Q    WELL, ARE YOU FAMILIAR WITH THE VA HANDBOOK WHICH HAS

22   BEEN MARKED AS PLAINTIFF'S EXHIBIT NUMBER 1?

23   A    YES, MA'AM.

24   Q    HOW DID YOU BECOME FAMILIAR WITH IT?

25   A    WE USE THAT HANDBOOK EXCLUSIVELY FOR OUR PAY-SETTING

1    GUIDANCE AND I ALSO USED THAT HANDBOOK TO DRAFT A LOCAL

2    POLICY THAT KIND OF TAKES JUST A SNIPPET FROM THE POLICY AS

3    IT PERTAINS TO COMPENSATION PANELS SO INDIVIDUALS AT THE

4    FACILITY DON'T HAVE TO READ THE ENTIRE POLICY TO GET THE

5    INFORMATION THAT THEY NEED.

6    Q    WELL, WHAT IS THE PURPOSE OF A COMPENSATION PANEL

7    ACCORDING TO THIS HANDBOOK?

8    A    THE PURPOSE OF THE COMPENSATION PANEL IS IT GIVES US THE

9    FLEXIBILITY WITH THIS PAY ACT TO SET PAY FOR PHYSICIANS BASED

10   ON THE LABOR MARKET FOR OUR PARTICULAR AREA.  SO IT GIVES US

11   FLEXIBILITY.  RATHER THAN HAVING A SET PAY AMOUNT FOR A SET

12   TYPE OF PHYSICIAN OR DENTIST, IT GIVES US THE ABILITY TO LOOK

13   AT WHAT THE LOCAL LABOR MARKET BEARS AND SET THE PAY AT A

14   REASONABLY COMPARABLE RATE.

15        NOW, WE CAN NEVER ACTUALLY MATCH THE LOCAL LABOR MARKET

16   BECAUSE OF STATUTORY LIMITS THAT WE HAVE, BUT IT GIVES US A

17   RANGE AND IT MAKES IT EASIER FOR US TO SEE WHAT THAT IS BASED

18   ON THE LOCAL SURVEY DATA THAT WE USE FOR SETTING PAY.  AND

19   THE COMPENSATION PANELS CONSIDER THAT SURVEY DATA AND WHAT IT

20   WOULD COST THE FACILITY TO HIRE A PARTICULAR TYPE OF

21   PHYSICIAN OR DENTIST AND TO RETAIN THEM IF THERE'S AN ISSUE

22   WITH RECRUITMENT OR RETENTION OF THAT SPECIALTY.

23   Q    NOW, YOU MENTIONED THAT THERE -- IS THERE A VARIATION IN

24   THE PAY OF AN ANESTHESIOLOGIST IN COLUMBIA AND MAYBE ONE IN

25   SAN FRANCISCO?

1    A    CERTAINLY.  YOU GET TO TAKE INTO CONSIDERATION THE LOCAL

2    LABOR MARKET.  FOR EXAMPLE, YOU KNOW, WE HAVE 153 MEDICAL

3    CENTERS ACROSS THE UNITED STATES AND WE HAVE THE SAME PAY

4    RANGES FOR PHYSICIANS IN ALL OF THOSE.  SO IF YOU'RE LOOKING

5    AT ANESTHESIOLOGISTS, ANESTHESIOLOGISTS HAVE THE SAME RANGE

6    OF PAY REGARDLESS OF WHETHER THEY ARE IN COLUMBIA, SOUTH

7    CAROLINA OR SAN FRANCISCO WHICH HAS A MUCH HIGHER COST OF

8    LIVING.

9         HOWEVER, THINGS THAT WE HAVE TO TAKE INTO CONSIDERATION,

10   FOR EXAMPLE, THE VA MEDICAL CENTER IN BOSTON, MASSACHUSETTS

11   HAS A LOT OF AFFILIATIONS WITH VERY WELL AND HIGHLY-REGARDED

12   MEDICAL SCHOOLS, AND BECAUSE OF THAT IT'S A MORE ATTRACTIVE

13   PLACE FOR PHYSICIANS TO WORK.  AND EVEN THOUGH THEIR COST OF

14   LIVING IS SIGNIFICANTLY HIGHER THAN IN COLUMBIA, SOUTH

15   CAROLINA, THEIR PHYSICIANS' SALARIES AT THE VA ARE NOT AS

16   HIGH AS THEY ARE IN COLUMBIA, SOUTH CAROLINA FOR A LOT OF

17   SPECIALTIES.

18   Q    SO YOU MEAN IT'S MORE -- YOU GET PAID MORE IN COLUMBIA

19   THAN IN BOSTON?

20   A    IN SOME INSTANCES, YES.  IT'S BASED ON YOUR LOCAL LABOR

21   MARKET AND WHAT IT COSTS YOU TO HIRE THAT SPECIFIC SPECIALTY

22   THAT YOU'RE TRYING TO RECRUIT OR RETAIN.

23   Q    HOW DO THE COMPENSATION PANELS CONSIDER THIS -- THESE

24   SURVEY RESULTS?

25   A    THE SURVEY RESULTS -- WE USED TO JUST GET THE SURVEY

1    RESULTS HERE IN SOUTH CAROLINA FROM SOUTH CAROLINA HOSPITAL

2    ASSOCIATION WHEN WE PARTICIPATED IN THEIR SURVEYS.  BUT IN

3    RECENT YEARS I THINK STARTING IN ABOUT 2011 OR 2012 CENTRAL

4    OFFICE STARTED TAKING THAT INFORMATION AND THEY HAD A

5    CONTRACTOR THAT PUT THE INFORMATION TOGETHER AND PROVIDED AN

6    ANALYSIS OF IT THAT ALLOWS US TO GO IN AND FIND A SPECIALTY

7    FOR OUR SPECIFIC LABOR MARKET.

8        SO IF I'M DOING IT FOR COLUMBIA, I CAN PICK COLUMBIA

9    ITSELF AND THEN I CAN SEE A VARIETY OF DIFFERENT SALARY

10   INFORMATION FOR THAT SPECIALTY IN THIS AREA.  AND WE CAN SEE

11   THINGS -- WE CAN LOOK AT ANESTHESIOLOGISTS, WE CAN LOOK AT

12   EMERGENCY ROOM PHYSICIANS, WE CAN LOOK AT HOSPITAL DIRECTORS

13   IF WE WANTED TO, BUT IT'S ALL PREPARED AND PACKAGED BY

14   CENTRAL OFFICE FOR OUR USE.

15   Q    WOULD IT BE THE SAME FOR THE HOSPITALS, THE VA IN

16   COLUMBIA, AS THE VA DOWN IN CHARLESTON?

17   A    IT WOULDN'T.  THEY HAVE THEIR OWN LABOR MARKET AREA.

18   DEPARTMENT OF LABOR DESIGNATES WHAT METROPOLITAN STATISTICAL

19   AREA FACILITIES ARE IN AND WE USE THOSE AND SO WE'LL USE THE

20   LABOR MARKET AREA THAT'S AFFILIATED WITH THE METROPOLITAN

21   STATISTICAL AREA.  SO CHARLESTON IS IN A VERY DIFFERENT

22   STATISTICAL AREA THAN COLUMBIA.

23   Q    HOW ABOUT THE COMPENSATION PANELS?  HOW DO THEY USE THIS

24   MARKET INFORMATION?

25   A    THEY USE THE MARKET INFORMATION TO ENSURE THAT THEY HAVE

1    AN IDEA OF WHAT IT WOULD COST IN THE LOCAL LABOR MARKET TO

2    HIRE OR RETAIN A PHYSICIAN.  SO THE INFORMATION -- WE

3    TYPICALLY USE TWO TYPES OF DATA.  WE USE AAMC DATA WHICH

4    IS -- COMPARES OUR PHYSICIAN SALARIES TO MEDICAL SCHOOL

5    SALARIES FOR ASSISTANT PROFESSOR, ASSOCIATE PROFESSOR, OR

6    CHAIR OR A DEAN OF A PARTICULAR SPECIALTY.

7         AND WE USE ONE COMMONLY REFERRED TO AS HAY DATA, AND

8    THAT VARIES DEPENDING ON WHO THE CONTRACTOR IS.  THAT'S JUST

9    HOW WE REFERENCE IT IS -- HAY WAS THE FIRST CONTRACTOR THAT

10   PROVIDED THAT ANALYSIS FOR US, SO WE CONTINUED TO REFER TO IT

11   AS THAT.

12        WE -- THE COMPENSATION PANELS LOOK AT THAT HAY DATA AND

13   THAT AAMC DATA FOR OUR LOCAL AREA SO THAT WHEN THEY'RE MAKING

14   A RECOMMENDATION ON ANNUAL PAY, WHICH IS MARKET PAY PLUS BASE

15   PAY, THAT THEY KNOW THAT THE TOTAL COMPENSATION PACKAGE THAT

16   WE ARE GOING TO BE OFFERING TO A PHYSICIAN IN A PARTICULAR

17   SPECIALTY IS REASONABLY COMPARABLE TO THE LABOR MARKET AND

18   IT'S FAIR AND IT GIVES US A GOOD INDICATION OF WHAT IT COSTS

19   TO HIRE A PARTICULAR PHYSICIAN IN OUR MARKET.

20   Q    SO NOW, THE SALARY THAT'S OFFERED TO A PHYSICIAN IS

21   BASED ON ANNUAL PAY?

22   A    IT IS.

23   Q    WELL, WHAT IS ANNUAL PAY ACCORDING TO THE VA HANDBOOK?

24   A    IT'S MARKET PAY PLUS BASE PAY.  TOTAL COMPENSATION ALSO

25   WOULD INCLUDE OTHER THINGS LIKE THERE'S PAY FOR PERFORMANCE,

1    BUT THAT'S NOT PART OF WHAT'S CONSIDERED BY THE COMPENSATION

2    PANEL.

3    Q    AND THE ANNUAL PAY THAT THE COMPENSATION PANEL

4    RECOMMENDS, WHAT IS THAT USED FOR WITHIN THE VA?

5    A    THAT'S -- THAT'S THE SALARY NUMBER.  WHEN WE SAY SALARY,

6    THIS IS TYPICALLY WHAT WE'RE REFERRING TO.  AND ALL THEIR

7    BENEFITS ARE BASED ON IT.  THEIR RETIREMENT IS BASED ON IT.

8    SO IF -- SO THEIR ANNUAL PAY IS THE AMOUNT THAT IF THEY ARE

9    MAKING TSP CONTRIBUTIONS AND THE FEDERAL GOVERNMENT IS

10   MATCHING, THEN THE 3 PERCENT THAT THEY GET IS BASED ON THEIR

11   ANNUAL PAY.  AND IF THEY HAVE LIFE INSURANCE, THEIR LIFE

12   INSURANCE COVERAGE IS BASED ON THEIR ANNUAL PAY.

13   Q    I'D LIKE TO BE REFERRED TO EXHIBIT 1, WHICH IS THE VA

14   HANDBOOK, PAGE 813, AND IT'S GOT A DEFINITION OF ANNUAL PAY.

15   JUST WANT TO SAY, IS THAT PRETTY MUCH WHAT YOU JUST TOLD US?

16   A    IT IS.  IT SAYS, THE SUM OF THE BASE PAY RATE AND MARKET

17   PAY.  ANNUAL PAY IS BASED -- BASIC PAY ONLY FOR PURPOSES OF

18   COMPUTING CIVIL SERVICE RETIREMENT BENEFITS, LUMP SUM

19   ANNUALLY PAYMENTS, LIFE INSURANCE, THRIFT SAVINGS PLAN,

20   WORKERS COMPENSATION, SEVERANCE, RECRUITMENT AND RELOCATION,

21   RETENTION INCENTIVE, CONTINUATION PAY AND ADVANCES IN PAY.

22   SO I DIDN'T COVER ALL OF THOSE, BUT I COVERED THOSE FIRST

23   FEW.

24   Q    AND THEN IF YOU GO OVER TO THE NEXT PAGE, WHICH IS THE

25   DEFINITIONS, IT'S GOT DEFINITION OF A COMPENSATION PANEL.

1  A    YES.  SAYS, A COMPENSATION PANEL IS A GROUP OF

2  PHYSICIANS OR DENTISTS RESPONSIBLE FOR EVALUATION OF

3  PHYSICIANS OR DENTISTS AND MAKING RECOMMENDATIONS TO THE

4  APPROVING OFFICIAL FOR ANNUAL PAY.

5  Q    SO IS THAT WHAT THE COMPENSATION PANEL DOES?

6  A    THAT'S CORRECT.  THE COMPENSATION PANEL MAKES A

7  RECOMMENDATION ON ANNUAL PAY TO THE MEDICAL CENTER DIRECTOR

8  OR THE APPROVING OFFICIAL DEPENDING UPON THE LEVEL OF PAY

9  THAT'S BEING RECOMMENDED.

10  Q    WELL, IT DOESN'T SAY ANYTHING HERE ABOUT MAKING A

11  RECOMMENDATION OF MARKET PAY.

12  A    NO, MA'AM.  IT -- MARKET PAY IS A COMPONENT OF ANNUAL

13  PAY AND IT TAKES INTO CONSIDERATION THE BASE PAY WHICH IS

14  BASED ON LONGEVITY AND IS A STATIC NUMBER BASED ON THE NUMBER

15  OF YEARS OF SERVICE YOU HAVE AND THE MARKET PAY WHICH IS THE

16  PORTION OF THE PAY THAT ALLOWS US TO MOVE UP TO THE ANNUAL

17  PAY AMOUNT THAT GIVES US THE ABILITY TO RECRUIT AND RETAIN BY

18  OFFERING A COMPETITIVE SALARY WITHIN OUR LOCAL LABOR MARKET

19  FOR THAT SPECIALTY.

20  Q    BUT NOW, THE COMPENSATION PANEL MAKES THE RECOMMENDATION

21  FOR ANNUAL PAY?

22  A    THAT'S CORRECT.

23  Q    AND THEN COMING OVER HERE TO KENNEDY PAGE 826 IT TALKS

24  ABOUT THE BIENNIAL REVIEWS -- BOTTOM PARAGRAPH OF THAT

25  PAGE -- WHERE IT SAYS, THE FUNCTION OF THE PANELS.

```
1   A    YES.

2   Q    AND THE MIDDLE OF THAT PARAGRAPH START -- SENTENCE

3   STARTS WITH, THE COMPENSATION PANEL.  SAYS IT...

4   A    THE COMPENSATION PANEL IS ALSO RESPONSIBLE FOR

5   EVALUATING THE ANNUAL PAY, BASE PAY, AND MARKET PAY TO

6   INCLUDE TABLE AND TIER ASSIGNMENT OF EACH PHYSICIAN AND

7   DENTIST UNDER ITS JURISDICTION AT LEAST ONCE EVERY 24

8   MONTHS -- THEN IT SAYS BIENNIAL REVIEWS -- AND AT SUCH OTHER

9   TIMES AS DEEMED NECESSARY BY THE APPROPRIATE MANAGEMENT

10  OFFICIAL.

11  Q    SO NOW, THE BIENNIAL REVIEWS, DID MR. KENT -- DID DR.

12  KENNEDY HAVE ANY OF THOSE BIENNIAL REVIEWS?

13  A    HE DID.  BIENNIAL REVIEWS ARE DONE EVERY TWO YEARS, 24

14  MONTHS.  AND IN SOME INSTANCES NO INCREASE IN SALARY WAS

15  RECOMMENDED AND IN SOME INSTANCES HE DID RECEIVE AN INCREASE

16  TO HIS MARKET PAY, BUT HE RECEIVES INCREASES TO HIS BASE PAY

17  WHEN WE RECEIVE COST OF LIVING ADJUSTMENTS GENERALLY IN

18  JANUARY AS A RESULT OF EXECUTIVE ORDER AND EVERY TWO YEARS

19  TYPICALLY ON THEIR ANNIVERSARY DATE WHEN THEY MOVE UP TO THE

20  NEXT STEP.

21  Q    WELL, LET ME SEPARATE THIS OUT THEN BECAUSE YOU HAVE GOT

22  TWO DIFFERENT TYPES, TWO COMPONENTS TO THIS ANNUAL PAY THAT

23  THE COMPENSATION PANEL RECOMMENDS.  YOU HAVE GOT THE BASE AND

24  LONGEVITY PAY?

25  A    YEAH.
```

NICHOLS - CROSS

1    Q    AND TELL US BRIEFLY ABOUT THAT, AND I'M SURE THE JUDGE

2    HAS -- KNOWS ABOUT IT, BUT JUST AS -- IT'S OFF THE CHART?

3    A    THE BASE AND LONGEVITY IS OFF OF THE CHART AND IT'S

4    BASED ON YEARS OF SERVICE.  SO IN ZERO TO TWO YEARS YOU'RE AT

5    ONE STEP AND THEN FROM TWO TO FOUR YOU'RE AT THE NEXT STEP

6    AND IT MOVES UP EVERY TWO YEARS INCREMENTALLY AND IT GIVES

7    YOU A GUARANTEED PROGRESSION IN YOUR SALARY.

8         AND THEN IN ADDITION TO THAT STEP PROGRESSION THAT YOU

9    GET FOR LONGEVITY, YOU GET A COST OF LIVING INCREASE.  IF THE

10   FEDERAL GOVERNMENT IS GIVEN A COST OF LIVING INCREASE, THEN

11   YOU GET THAT AS WELL, BUT THAT ONLY HAPPENS ON YOUR BASE PAY.

12   SO WHEN WE GET A 1 PERCENT OR A ONE-AND-A-HALF PERCENT

13   INCREASE BY EXECUTIVE ORDER, PHYSICIANS GET THAT AS WELL, BUT

14   IT ONLY HAPPENS ON THEIR BASE PAY.

15   Q    AND THEN THE MARKET PAY COMPONENT, IS THAT USED FOR

16   ANYTHING WITHIN THE VA LIKE THE BASE PAY IS?

17   A    MARKET PAY IS OUR WAY OF MAKING SURE THAT OUR PAY

18   REMAINS COMPETITIVE TO THE EXTENT POSSIBLE, AND SO WE USE

19   THAT FOR RECRUITMENT AND RETENTION PURPOSES AND THAT'S WHY

20   IT'S DONE EVERY TWO YEARS OR EVERY 24 MONTHS AS REQUIRED BY

21   LAW AND IT GIVES US THE ABILITY TO ADJUST THE MARKET PAY UP

22   IF THE LABOR -- LOCAL LABOR MARKET REQUIRES THAT.

23        AND THERE'S ONLY VERY FEW INSTANCES WHEN IT WOULD GO

24   DOWN, AND THAT WOULD NOT BE BASED ON THE LOCAL LABOR MARKET.

25   THAT WOULD BE BASED ON A CHANGE IN ASSIGNMENT BY THE

1  PHYSICIAN.

2  Q    BUT IF THE LABOR MARKET DID GO DOWN, WOULD THE MARKET

3  PAY BE ACCEPTED -- BE AFFECTED?

4  A    NO.  THE MARKET PAY WOULD NOT CHANGE UNLESS THE

5  PHYSICIAN CHANGED ASSIGNMENTS OR MOVED TO ANOTHER FACILITY

6  AND THEN THEY WOULD HAVE A NEW COMPENSATION PANEL THAT WOULD

7  SET THEIR MARKET PAY FOR THAT LOCAL LABOR MARKET.

8  Q    NOW, I KNOW GOING BACK TO OUR DISCUSSION OF THE BASE AND

9  LONGEVITY PAY, THAT'S BEEN A PART OF THE PHYSICIAN PAY SYSTEM

10  EVER SINCE IT WAS CIVIL SERVICE IN GENERAL SCHEDULE?

11  A    THEY HAD A DIFFERENT PAY SYSTEM PRIOR TO 2006, AND SO I

12  DON'T FEEL COMFORTABLE SAYING THAT IT WAS EXACTLY THE SAME,

13  BUT IT -- IT IS A THROW-BACK TO THE CIVIL SERVICE PAY SYSTEM

14  THAT, FOR INSTANCE, I'M ON WHERE I GET A WITHIN-GRADE

15  INCREASE ON A SET SCHEDULE, A NUMBER OF YEARS.  THEIRS

16  HAPPENS TO BE STATIC TWO YEARS WHEREAS TITLE FIVE EMPLOYEES,

17  THEIR'S VARIES BASED ON THE NUMBER OF YEARS OF SERVICE.

18  Q    I WANT TO ASK YOU -- THANK YOU.

19  A    YOU'RE WELCOME.

20  Q    THAT WAS VERY COMPLICATED.  I'D LIKE TO, YOU KNOW, TAKE

21  A LOOK NOW AT WHAT'S BEEN MARKED AS PLAINTIFF'S EXHIBIT

22  NUMBER 4.  DO YOU RECOGNIZE THIS DOCUMENT?

23  A    YES, MA'AM.

24  Q    WHAT IS IT?

25  A    THIS IS A LOCAL POLICY FOR THE DORN VA MEDICAL CENTER

1    WHICH IS WHAT I WAS TALKING ABOUT EARLIER WHERE WE TAKE THE

2    VA HANDBOOK AND WE PUT IT INTO SMALLER CHUNKS THAT ARE MORE

3    EASILY DIGESTIBLE FOR THE LOCAL FACILITY -- AT THE LOCAL

4    FACILITY LEVEL.  SO THIS IS -- THIS IS A POLICY THAT I

5    DRAFTED FOR COMPENSATION PANELS FOR PHYSICIANS AND DENTISTS

6    AND IT MIRRORS VERY CLOSELY WHAT'S IN THE VA HANDBOOK, BUT

7    IT'S JUST SET SEPARATELY SO THAT IT'S EASIER TO READ AND

8    DIGEST NOT JUST FOR THE HR PERSONNEL BUT ALSO FOR ANYBODY WHO

9    DEALS WITH COMPENSATION PANELS AT THE VA HOSPITAL.

10   Q    NOW, HOW DO THE COMPENSATION PANELS USE THIS OR HOW WAS

11   IT -- HOW WAS -- HOW ARE THEY STRUCTURED ACCORDING TO THIS?

12   A    WELL, THE WAY THAT THEY ARE STRUCTURED IS THAT THE

13   FACILITY DIRECTOR HAS THE RIGHT TO APPOINT INDIVIDUALS TO THE

14   COMPENSATION PANEL AND THEN THE COMPENSATION PANEL REVIEWS

15   THEIR PEERS AND THEY -- AND THEY REVIEW THEM AND I THINK IF

16   WE GO MAYBE TO ONE OF THE NEXT PAGES IT STATES IN HERE THAT

17   THEY USE THE SAME SEVEN FACTORS.

18        IT GIVES THE FUNCTIONS, MAKING PAY RECOMMENDATIONS FOR

19   APPOINTMENTS, CONDUCTING PAY REVIEWS EVERY 24 MONTHS AND

20   CONDUCTING PAY REVIEWS WHEN A CHANGE IN DUTY BASIS -- OR WHAT

21   I REFERRED TO EARLIER AS A CHANGE IN ASSIGNMENT HAPPENS --

22   AND THEN EXECUTING THE FORM, WHICH IS THE COMPENSATION PANEL

23   ACTION FORM THAT WE HAVE SEEN EARLIER TODAY.  AND THEN IT

24   ALSO GOES ON -- MAYBE THE NEXT PAGE HAS THE SEVEN OR THE --

25   CAN YOU GO ONE MORE PAGE?  I THOUGHT IT HAD THE SEVEN -- I

1    THOUGHT IT HAD THE SEVEN FACTORS IN HERE.  PERHAPS IT

2    DOESN'T.

3        BUT IT'S JUST A SMALL SNAPSHOT OUT OF A HANDBOOK THAT

4    LETS ANYONE WHO GOES OUT AND READS IT KNOW WHAT THE FUNCTIONS

5    OF THE PANEL ARE AND HOW THEY -- AND HOW THEY FUNCTION AND

6    WHAT THEIR PURPOSE IS.

7    Q    WELL, GOING TO RFP18, MRS. WOODS, YOU CAN PULL UP THE

8    SECTION SIX ON THE PANEL FUNCTIONS.

9    A    YES.  MAKING RECOMMENDATIONS INCLUDING EVALUATING THE

10   ANNUAL PAY, BASE AND MARKET, TO INCLUDE PAY TABLE AND TIER

11   ASSIGNMENTS.

12   Q    SO HERE AGAIN THE RECOMMENDATION IS THE ANNUAL PAY?

13   A    YES, MA'AM.  IT WOULDN'T BE POSSIBLE TO MAKE JUST A

14   RECOMMENDATION ON MARKET PAY IN A VACUUM WITHOUT KNOWING WHAT

15   THE BASE PAY COMPONENT OF THAT WOULD BE BECAUSE IF YOU MADE A

16   RECOMMENDATION JUST FOR MARKET PAY, THEN YOU MAY NOT BE

17   ACCURATELY COMPENSATING BASED ON YOUR LOCAL LABOR MARKET.

18   Q    OKAY.  AND THAT'S BECAUSE OF -- AND WHY IS THAT?

19   A    WELL, LET'S SAY FOR INSTANCE THAT THE LOCAL SURVEY DATA

20   THAT WE'RE LOOKING AT SAYS THAT A PARTICULAR TYPE OF

21   PHYSICIAN'S MEDIAN SALARY IS $300,000.  IF WE WERE LOOKING AT

22   MARKET PAY ONLY AND WE SET THE MARKET PAY AT $300,000 OR

23   LET'S SAY WE SET IT AT -- KNOWING THAT THERE IS A BASE PAY

24   COMPONENT BUT WE ARE NOT TAKING INTO CONSIDERATION WHAT THAT

25   BASE PAY COMPONENT IS, WE SET IT AT $200,000 BECAUSE WE KNOW

1    THAT A BRAND NEW PHYSICIAN COMES IN WITH A BASE PAY OF

2    APPROXIMATELY $100,000.

3         SO IF WE SET IT AT $200,000 AND THEN WE WENT BACK AND

4    SAW THAT THE NEW PHYSICIAN THAT WE WERE HIRING HAD BEEN IN

5    THE VA FOR 20 YEARS OR EVEN 30 YEARS, THEN THEIR BASE PAY

6    COMPONENT WOULD BE SIGNIFICANTLY HIGHER THAN THE HUNDRED

7    THOUSAND THAT WE HAD IN THE BACK OF OUR MIND OR THE PANEL HAD

8    IN THE BACK OF THEIR MIND WHEN THEY MADE THAT RECOMMENDATION

9    AND NOW YOU'RE OFFERING A PHYSICIAN INSTEAD OF 300,000, WHICH

10   IS WHAT THE LOCAL LABOR MARKET BEARS, WE ARE OFFERING THEM

11   325 OR $350,000, WHICH WOULD BE SIGNIFICANTLY MORE THAN WHAT

12   THE MARKET BEARS, AND THAT WOULDN'T BE FAIR OR EQUITABLE AND

13   IT WOULDN'T BE -- WE WOULDN'T BE GOOD STORERS OF OUR TAXPAYER

14   DOLLARS IF WE WERE PAYING PHYSICIANS MORE THAN WHAT THE LOCAL

15   LABOR MARKET BEARS.

16   Q    SO THAT WOULD BE A BUSINESS NECESSITY?

17   A    YES, MA'AM.

18   Q    THE -- LOOKING BACK TO YOUR EXHIBIT 4, THIS IS JUST WHAT

19   WE'VE GOT ON THE SCREEN -- THIS WAS USED TO HELP THE

20   COMPENSATION PANELS DURING YOUR TIME AT DORN?

21   A    IT WAS AVAILABLE FOR THEM.  I CAN'T SAY THAT I

22   SPECIFICALLY GAVE IT TO THEM THEN TOLD THEM THEY NEEDED TO

23   READ IT, BUT IT WAS AVAILABLE ON THE FACILITY INTERNET PAGE

24   FOR ANY OF THE VA EMPLOYEES TO READ.

25   Q    AS FAR AS YOU KNOW DID ALL THE DORN COMPENSATION PANELS,

```
 1   NOT JUST THE ONES FOR THE ANESTHESIOLOGISTS, BUT ALL OF THEM,

 2   WERE THEY CONDUCTED PRETTY MUCH THE SAME WAY?

 3   A    YES, MA'AM.

 4   Q    AND HOW DO YOU KNOW THAT?

 5   A    I ATTENDED A NUMBER OF THOSE OVER THE YEARS AND THE

 6   PROCESS THAT WAS USED WAS VERY SIMILAR IN ALMOST EVERY

 7   CIRCUMSTANCE.  WHETHER IT WAS A NEW PHYSICIAN OR IF IT WAS A

 8   BIENNIAL REVIEW OR IF IT WAS AN INSTANCE WHERE WE FELT THAT

 9   WE WERE HAVING RECRUITMENT OR RETENTION ISSUES WITH A

10   PARTICULAR SPECIALTY, THE PROCESS WAS THE SAME.

11   Q    HOW DID THE COMPENSATION PANELS -- WHAT INTERFACE OR

12   INTERACTIONS DID THEY HAVE WITH THE HUMAN RESOURCES OFFICE

13   WHILE YOU WERE THERE?

14   A    THE COMPENSATION PANELS THEMSELVES, USUALLY THEIR

15   INTERACTION WAS JUST WITH THE TECHNICAL ADVISER, WHETHER THAT

16   WAS MYSELF OR ANOTHER HR SPECIALIST.  THE PANELS WOULD BE

17   CONVENED AND THE HR SPECIALIST WOULD BE THERE TO ENSURE THAT

18   WHEN THEY WERE MAKING RECOMMENDATIONS AND DISCUSSING THE

19   INFORMATION THAT THEY WERE CONSIDERING, THAT THEY WERE

20   STAYING WITHIN THE RULES AS THEY WERE LAID OUT BY THE VA

21   HANDBOOK.

22        SO THEY MADE SURE THAT THEY WERE LOOKING AT THE

23   APPROPRIATE SURVEY DATA, THAT THEY WERE TAKING INTO

24   CONSIDERATION THE SEVEN FACTORS AND THAT THEY WERE MAKING AN

25   APPROPRIATE RECOMMENDATION WITHIN THE TABLE AND TIER OF THIS
```

1    SPECIALTY FOR THE PHYSICIAN.

2    Q    I WANT YOU TO TAKE A LOOK AT THE PLAINTIFF'S EXHIBIT 11

3    WHICH WE HAVE TALKED ABOUT EARLIER TODAY WITH OTHER

4    WITNESSES.  IT'S THE MAY 1ST COMPENSATION PANEL.  THE TOP ONE

5    IS FOR NAEL ALGHOTHANI, DR. ALGHOTHANI.

6    A    ALGHOTHANI, YES.

7    Q    I WANT TO ASK YOU WHERE IT SAYS THE REASON FOR THE PAY

8    PANEL COMPENSATION REVIEW.  IT SAYS, OTHER.

9    A    YES.

10    Q    AND WHAT DOES THAT MEAN?

11    A    WELL THAT'S -- THAT'S WHAT I WAS TALKING ABOUT EARLIER.

12    YOU COULD DO AN INITIAL PAY DETERMINATION, WHICH IS FOR

13    APPOINTMENT, BIENNIAL REVIEW, WHICH IS THE EVERY TWO-YEAR OR

14    EVERY 24-MONTH REQUIRED REVIEW, AND THEN OTHER IS IF WE HAVE

15    RECRUITMENT OR RETENTION ISSUES THAT WE NEED TO ADDRESS

16    THROUGH COMPENSATION FOR OUR PHYSICIANS.

17        AND IN THIS INSTANCE IT IS CHECKED AS OTHER, EXPLAINED

18    BELOW.  AND IT SAYS, REQUEST PANEL TO REVIEW ANNUAL SALARY,

19    MARKET AND BASE.  THE PHYSICIAN COMPENSATION PANEL HAS

20    REVIEWED DR. ALGHOTHANI'S EXPERIENCE, SKILLS, AND THE SALARY

21    SURVEY DATA AND RECOMMENDS NO PAY INCREASE IN PAY PER REVIEW

22    OF 5-1-2015.

23    Q    AND SO WHY WAS THIS DONE?

24    A    I CAN'T SAY SPECIFICALLY WHY IT WAS DONE, BUT I SUSPECT

25    THAT THEY WERE LOOKING TO MAKE SURE THAT THERE WAS -- THAT

1    THE PAY WAS SET APPROPRIATELY FOR THE INDIVIDUALS WHO WERE

2    REVIEWED.  AT THIS POINT I DON'T THINK DR. ALGHOTHANI HAD

3    BEEN HERE FOR TWO YEARS, SO AT THIS POINT THEY MAY NOT HAVE

4    MADE A RECOMMENDATION FOR PAY INCREASE BECAUSE THEY FELT THAT

5    HIS SALARY WAS ALREADY CLOSE TO WHAT THE LABOR MARKET WOULD

6    BEAR FOR COLUMBIA.

7    Q    AND THEN WOULD YOU -- WOULDN'T MIND, GO ON TO

8    PLAINTIFF'S EXHIBIT 8.  AGAIN, WE'VE ALREADY HAD TESTIMONY

9    ABOUT THIS ONE.  THIS IS DR. KENNEDY'S MAY 1ST REVIEW.  DO

10   YOU SEE THAT?

11   A    YES, MA'AM.

12   Q    AND YOU SEE OVER HERE IT SAYS, OTHER?

13   A    YES, MA'AM.  AND IT HAS THE SAME VERBIAGE UNDERNEATH AS

14   DR. ALGHOTHANI'S AND RECOMMENDED NO PAY INCREASE AS OF

15   5-1-2015.

16   Q    SO BOTH OF THEM WERE REVIEWED AT THE SAME TIME AND THERE

17   WAS NO CHANGE IN PAY?

18   A    THAT'S CORRECT.

19   Q    TAMARA, ONE OF THE EXHIBITS WE GOT IN THIS CASE IS

20   PLAINTIFF'S EXHIBIT NUMBER 15.  I'D LIKE FOR YOU TO TAKE A

21   LOOK AT THAT.

22   A    OKAY.

23   Q    AND DO YOU RECOGNIZE, YOU KNOW, THESE DOCTORS?

24   A    YES, I DO.  THESE ARE THE ANESTHESIOLOGISTS THAT WERE

25   EMPLOYED IN 2014.

1    Q     AND THEN THE, YOU KNOW, THE FIRST COLUMN IS THEIR AGES,

2    AND I GUESS THAT'S HOW OLD WERE THEY IN DECEMBER 2014.

3    A     OKAY.

4    Q     AND WE SAW THAT CHART EARLIER ON DIRECT EXAMINATION

5    WHERE YOU HAD PULLED ALL THE DATA ABOUT THE PHYSICIANS AT THE

6    VA ON -- FOR 2014.

7    A     YES.

8    Q     NOW THE NEXT COLUMN SAYS, LENGTH OF SERVICE IN SPECIALTY

9    AND VHA.  WHAT DOES THAT MEAN?

10   A     WELL, I'M NOT SURE.  BUT BASED ON THE YEARS OF

11   EXPERIENCE, DR. ALGHOTHANI IS SHOWING AS 13 YEARS OF

12   EXPERIENCE AND I BELIEVE THAT'S HOW LONG -- I THINK HE HAD 12

13   YEARS OF EXPERIENCE OUTSIDE OF THE VA BEFORE HE CAME TO US,

14   SO I'M GOING TO GUESS THAT THIS IS ADDING TOGETHER HIS TOTAL

15   EXPERIENCE AS A PHYSICIAN PLUS HIS YEAR OF EXPERIENCE WITH

16   THE VA.

17   Q     SO LENGTH OF SERVICE IN SPECIALTY WOULD BE HOW LONG THEY

18   WERE ANESTHESIOLOGISTS AND THEN ALSO HOW LONG THEY'D BEEN AT

19   THE VA?

20   A     YEAH.  IT LOOKS LIKE -- IT'S LOOKS -- LOOKS LIKE THEY

21   ARE COUNTING THAT NUMBER, THEN THE AMOUNT OF TIME THAT THEY

22   HAVE BEEN IN VHA TWICE IF THEY HAVE BEEN IN THE VA FOR MORE

23   THAN A YEAR.

24   Q     BECAUSE IT WOULD BE A SAME TIME THAT WOULD OVERLAP.

25   A     RIGHT.  IT WOULD -- IT WOULD BE DOUBLE-COUNTING THAT

1    INFORMATION.

2    Q    SO A DOCTOR THAT'S SPENT HIS WHOLE CAREER AS AN

3    ANESTHESIOLOGIST AT THE VA WOULD HAVE X NUMBER OF YEARS AS AN

4    ANESTHESIOLOGIST AND X NUMBER OF YEARS AT THE VA AND THEY'D

5    BE THE SAME YEARS?

6    A    WELL, THEY SHOULD BE THE SAME YEARS.  BUT IT LOOKS LIKE

7    IN THIS CASE THEY ARE COUNTING THEM TWICE, AND SO THEY ARE

8    GIVING DOUBLE CREDIT FOR WORKING AT THE VA VERSUS WORKING IN

9    THE SPECIALTY.

10   Q    NOW, THE NEXT COLUMN IS THE BASE PAY, AND THAT WOULD BE

11   THAT LONGEVITY.

12   A    YES, BASED ON LONGEVITY.  SO YOU CAN SEE DR. ALGHOTHANI

13   AND DR. NGUYEN WERE NEW TO THE VA.  BASED ON THIS THEY HAD

14   LESS THAN TWO YEARS OF EXPERIENCE OR TWO YEARS OF TENURE AT

15   THE VA.

16   Q    SO THAT WOULD BE LIKE A STEP ONE?

17   A    STEP ONE, THAT'S CORRECT.

18   Q    AND THEN THE DOCTORS HAD BEEN THERE OLDER -- PENDER AND

19   PRYOR AND KENNEDY?

20   A    RIGHT.  THEIR STEPS WOULD HAVE GONE UP INCREMENTALLY

21   FROM THERE.  AND THERE'S TABLES FOR EACH YEAR THAT SHOWS WHAT

22   STEPS THOSE WOULD BE.  I DON'T RECOGNIZE THEM OFF THE TOP OF

23   MY HEAD OTHER THAN TO SAY THAT I'M SURE THAT THE 98,967 IS

24   STEP ONE.

25   Q    AND THEN ON THE ANNUAL PAY, YOU'RE JUST GOING TO ASSUME

1    THAT THAT'S FROM THAT INFORMATION YOU GAVE THEM?

2    A    YEAH.   THIS PROBABLY SHOWS UP AS A BASE OR AS THE ANNUAL

3    SALARY AMOUNT ON THAT OTHER SHEET THAT WAS PROVIDED EARLIER.

4    Q    NOW, THIS PERSON HAS DONE A -- OR SOMEBODY HAS DONE A

5    COMPUTATION TO SEE WHAT THE PERCENTAGE OF MARKET PAY -- WHAT

6    PERCENTAGE OF MARKET PAY MAKES UP ANNUAL PAY.   IS THAT A

7    FIGURE THAT YOU USE AT THE VA?

8    A    NO, WE DON'T.   WHAT WE ARE CONCERNED WITH IS WHAT THE

9    TOTAL COMPENSATION IS THAT WE'RE GOING TO OFFER TO THE

10   PHYSICIAN BECAUSE WE NEED TO MAKE SURE THAT THE SALARY, THE

11   ANNUAL PAY THAT WE ARE OFFERING TO THE PHYSICIAN, IS

12   REASONABLY COMPARABLE TO WHAT IS REQUIRED BY THE LOCAL LABOR

13   MARKET IN ORDER TO HIRE THAT SPECIALTY IN TO OR RETAIN THEM

14   IN THE VA IN COLUMBIA.

15        SO WE ARE -- WE ARE NOT -- WE ARE NOT CONCERNED WITH

16   WHETHER THE COMPENSATION FALLS UNDER THE ANNUAL PAY AMOUNT OR

17   UNDER THE MARKET PAY AMOUNT OR UNDER THE BASE PAY AMOUNT

18   WHICH IS STAGNANT.   WE ARE CONCERNED WITH WHETHER OR NOT WE

19   ARE OFFERING A COMPETITIVE ANNUAL PAY AMOUNT IN ORDER TO

20   RECRUIT OR RETAIN THAT SPECIALTY.

21   Q    DO YOU KNOW WHETHER OR NOT THESE PERCENTAGES ARE

22   CORRECT?

23   A    I DON'T KNOW FOR CERTAIN THAT THEY ARE CORRECT.   A QUICK

24   LOOK AT THEM MAKES ME BELIEVE THAT THEY ARE -- THEY ARE

25   FAIRLY CLOSE.   167,000 WOULD BE A LITTLE MORE THAN HALF OF

1    293.

2    Q    WELL, ARE YOU SURPRISED THAT THE PERCENTAGE OF ANNUAL

3    PAY OR PERCENTAGE OF MARKET PAY GOES UP FOR THE YOUNGER

4    DOCTORS?

5    A    NO, BECAUSE IF -- BUT IT'S NOT A PRODUCT OF AGE.  IT'S A

6    PRODUCT OF THE VA EXPERIENCE.  AND I CAN SEE BASED ON THE

7    BASE PAY THAT THOSE YOUNGER PHYSICIANS HAVE NOT BEEN WITH THE

8    VA AS LONG, SO THEREFORE IN ORDER FOR US TO OFFER THEM A

9    COMPETITIVE SALARY, WE HAVE TO PUT MORE OF THAT SALARY IN

10    THAT SECOND BUCKET WHICH IS MARKET PAY.

11    Q    AND AGAIN, THAT'S SOMETHING YOU HAVE TO DO TO BE

12    COMPETITIVE?

13    A    YES, THAT'S -- THAT'S WHAT IT COSTS FOR US TO HIRE AN

14    ANESTHESIOLOGIST AT THE DORN VA MEDICAL CENTER IN COLUMBIA,

15    SOUTH CAROLINA.

16    Q    WELL, I'D LIKE TO ASK YOU TO LOOK AT -- BACK AT

17    EXHIBIT 5.  THIS WILL BE THE UNITED STATES EXHIBIT 5,

18    GOVERNMENT EXHIBIT 5.

19    A    I'M FAMILIAR WITH THIS.

20    Q    DO YOU RECOGNIZE IT?

21    A    I DO.  THIS IS A LIST OF PHYSICIANS BASED ON THE

22    SERVICES THAT THEY WORK IN AND IT HAS THEIR DATE OF BIRTH.

23    IT ALSO HAS THEIR SALARY, WHICH IN THIS INSTANCE SALARY MEANS

24    BASE PAY.  THIS IS A PRINTOUT FROM A COMPUTER, A HUMAN

25    RESOURCES COMPUTER SYSTEM, WHICH TAKES THAT BASE AND

1    LONGEVITY AND CALLS IT SALARY.

2         THE MARKET PAY, WHICH WE'VE DISCUSSED, AND THE TOTAL

3    PAY, WHICH IS ACTUALLY WHAT WE THINK OF AS -- WE HAVE BEEN

4    DISCUSSING AS ANNUAL PAY.

5    Q    SO NOW, IS THIS INFORMATION THAT YOU GATHERED?

6    A    IT IS.

7    Q    AND TELL ME AGAIN, WHY DID YOU CALL THE BASE PAY COLUMN

8    SALARY?

9    A    THAT'S -- THAT'S JUST THE FILLED HEADING THAT THE

10   COMPUTER SYSTEM THAT WE USE CALLS IT.  BUT I CAN TELL BY

11   LOOKING AT IT, SEVERAL OF THEM HAVE 99,957 AS THEIR SALARY,

12   AND THAT'S -- THAT'S THEIR BASE SALARY.  THAT'S THE BASE AND

13   LONGEVITY PAY THAT'S -- THAT'S BASED SOLELY ON THEIR VA

14   TENURE.

15   Q    AND THEN THE TOTAL PAY...

16   A    THAT'S THE ANNUAL PAY.  THAT'S THE BASE PLUS THE MARKET.

17   Q    NOW, I WONDER IS THERE ANY WAY THAT SHE CAN MARK ON THIS

18   EXHIBIT?  CAN SHE WRITE ON IT?  CAN -- HOW DOES SHE DO THAT?

19   CAN YOU TOUCH THE SCREEN?

20   A    YES.

21   Q    AND WRITE THE CORRECT HEADINGS?

22   A    OH, SURE.  CAN I JUST WRITE WITH MY FINGER?

23        *THE CLERK:*  YES.

24   A    IT'S GIVING ME A...

25        *THE COURT:*  SHE CAN TELL US WHAT IT IS.

1    A    IF YOU CHANGE SALARY TO BASE PAY AND MARKET PAY REMAINS

2    THE SAME AND THEN TOTAL PAY IS ANNUAL PAY.

3    BY MRS. BAILEY:

4    Q    NOW LOOKING AT THIS, I SEE THE ANESTHESIOLOGISTS ARE IN

5    THE TOP COLUMN.

6    A    YES.

7    Q    I'D LIKE YOU TO LOOK OVER HERE TO THE SURGICAL SURGEONS

8    OVER AT DORN.

9    A    OKAY.

10    Q    WHICH IS THE LAST PAGE OF RFP6.

11    A    YES.

12    Q    ARE THERE -- LOOKING DOWN HERE AT THE SURGICAL CARE, ARE

13    THERE ANY SURGEONS WHO WERE BORN BEFORE DR. KENNEDY, WHO WAS

14    BORN IN 1951?

15    A    YES, THERE'S A NUMBER OF THEM.  DR. EADY WAS BORN IN

16    1941, BUT -- WELL, THERE'S A NUMBER OF THEM, BUT THE ONES

17    THAT JUMP OUT ARE DR. EADY.  DR. LEWIS WAS BORN IN 1944.  DR.

18    FERLANE [PH] WAS BORN IN 1953.  DR. PALEPU WAS BORN IN 1944.

19    Q    WELL, LOOKING AT DR. EADY.  NOW, WHAT WAS HIS BASE PAY?

20    A    HIS BASE PAY WAS 113,285.

21    Q    OKAY.

22    A    THAT'S A --

23    Q    AND --

24    A    -- 113,285.

25    Q    AND HIS MARKET PAY.

1    A    251,136.

2    Q    AND THEN SO GATHER THOSE TWO TOGETHER, WHAT WAS HIS

3    TOTAL PAY?  NOT HIS TOTAL PAY.  HIS ANNUAL PAY.

4    A    HIS ANNUAL PAY IS $364,421.

5    Q    OKAY.  WELL NOW, CAN YOU DO THIS MATH?

6    A    IF I HAD A CALCULATOR I COULD DO THE MATH.  BUT JUST

7    LOOKING AT IT, I CAN SEE THAT HIS -- HIS MARKET PAY IS WELL

8    IN EXCESS OF 50 PERCENT OF HIS ANNUAL PAY.  IT'S MORE THAN

9    TWICE WHAT HIS BASE PAY IS.

10   Q    MORE THAN TWICE?

11        MRS. BAILEY:  YOUR HONOR, CAN WE JUST TAKE BREAK

12   AND LET ME GET HER A CALCULATOR?

13        THE COURT:  SO, WHAT IS SHE TRYING TO DO?  WHAT DO

14   YOU WANT HER TO DO?

15        MRS. BAILEY:  I WANT HER TO SAY WHAT PERCENTAGE --

16   RUN THESE PERCENTAGES ON PAGE -- THAT ARE ON THE PLAINTIFF'S

17   EXHIBIT NUMBER 15 ON THESE FIVE...

18        MR. IRVIN:  YOUR HONOR, JUST TO RENEW MY OBJECTION

19   ABOUT RELEVANCE ON SURGEONS, ET CETERA.

20        THE COURT:  THE OBJECTION IS NOTED FOR THE RECORD

21   AND OVERRULED.

22        MR. IRVIN:  THANK YOU, YOUR HONOR.

23   BY MRS. BAILEY:

24   Q    SO MRS. NICHOLS, WERE YOU ABLE TO FIGURE OUT FOR DR.

25   EADY, HIS PERCENTAGE?

1    A    WELL, YES.  HIS MARKET PAY IS 68.9 PERCENT OF HIS ANNUAL

2    PAY.

3    Q    AND THEN HOW ABOUT DR. JACKSON?

4    A    DR. JACKSON IS -- IT'S 62.3 PERCENT OF HIS ANNUAL PAY.

5    Q    OKAY.  AND THEN LOOKING OVER HERE.  I DIDN'T ASK YOU

6    FIRST ABOUT DR. JACKSON.  WHAT WAS HIS DATE OF BIRTH?

7    A    DR. JACKSON WAS BORN IN 1945.

8    Q    SO HE'S ABOUT SIX YEARS OLDER THAN DR. KENNEDY?

9    A    THAT'S CORRECT.

10   Q    AND HIS -- CAN YOU TELL US WHAT HIS SALARY OR HIS BASE

11   PAY...

12   A    HIS BASE PAY IS $109,953.  HIS MARKET PAY IS 182,000,

13   $182,013, AND HIS ANNUAL PAY IS THE $291 -- $291,966.

14   Q    OKAY.  LOOKING DOWN ON THE FORM TO DR. LAWSON LEWIS.

15   A    YES.

16   Q    CAN YOU GIVE US HIS DATE OF BIRTH?  OR ARE YOU DOING THE

17   CALCULATION?

18   A    HIS DATE OF BIRTH IS 1944.  AND HIS MARKET PAY IS

19   59.5 PERCENT OF HIS ANNUAL PAY.

20   Q    AND THEN MICHAEL MACFARLANE, WHAT WAS HIS DATE OF BIRTH?

21   A    HIS DATE OF BIRTH IS 1953.

22   Q    AND WHAT WAS -- WHAT'S HIS PERCENTAGE?

23   A    HIS IS 67.2 PERCENT OF HIS ANNUAL PAY.

24   Q    AND FINALLY DR. PALEPU.

25   A    DR. PALEPU'S MARKET PAY IS 66.2 PERCENT OF HIS ANNUAL

1    PAY.

2    Q    OKAY.

3         *MRS. BAILEY:*  YOUR HONOR, CAN I APPROACH THE

4    WITNESS?

5    Q    I'M GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

6    IDENTIFICATION ONLY AS DEFENDANT'S EXHIBIT NUMBER 6.  DO THE

7    NUMBERS IN THAT CHART REPRESENT WHAT YOU JUST TESTIFIED TO?

8    A    YES, THEY DO.  THE ONLY ONE I DIDN'T CALCULATE WAS DR.

9    KENNEDY'S WHICH IS SHOWING UP AS 57.2 PERCENT OF HIS ANNUAL

10   SALARY.

11   Q    WE TALKED ABOUT THIS EXHIBIT THAT THE PLAINTIFF HAD A

12   SECOND AGO, PLAINTIFF'S EXHIBIT NUMBER 15.  IT, YOU KNOW,

13   TALKS ABOUT THE EXPERIENCE IN TERMS OF YEARS AS AN

14   ANESTHESIOLOGIST OR AT THE VA.  FOR Y'ALL IN HUMAN RESOURCES,

15   DO YOU LOOK AT EXPERIENCE IN TERMS JUST OF YEARS?

16   A    NO.  WHEN THE -- IF YOU LOOK AT THE FACTORS THAT ARE --

17   THAT ARE REQUIRED TO BE ADDRESSED BY THE COMPENSATION PANEL,

18   THE FIRST ONE ACTUALLY SAYS LEVEL OF EXPERIENCE AND NOT YEARS

19   OF EXPERIENCE, AND THAT WOULD TAKE INTO ACCOUNT MANY THINGS

20   ABOVE AND BEYOND JUST THE NUMBER OF YEARS.  SO IT WOULD TAKE

21   INTO ACCOUNT ANYTHING THAT THE APPLICANT OR THE EMPLOYEE HAS

22   IN THEIR RECORD THAT SHOWS THAT THEY ARE -- WHAT THEIR ACTUAL

23   EXPERIENCE IS.

24         SO THEY MAY TAKE INTO CONSIDERATION IN THE COMPENSATION

25   PANEL PARTICULAR TYPES OF STUDIES OR EXAMS OR PROCEDURES THAT

1    THE PHYSICIAN DOES.  MIGHT TAKE INTO ACCOUNT WHETHER OR NOT

2    THEY HAD SPENT ANY TIME AS -- TEACHING RESIDENTS OR THINGS OF

3    THAT NATURE.  SO, IT'S ABOVE AND BEYOND JUST YEARS.  IT'S

4    LEVEL OF EXPERIENCE.

5        LEVEL OF EXPERIENCE, IF YOU ARE A ANESTHESIOLOGIST, FOR

6    EXAMPLE, AT THE RICHLAND MEDICAL CENTER, WHICH IS THE LEVEL

7    ONE TRAUMA CENTER IN THIS AREA, THEN THE LEVEL OF EXPERIENCE

8    THAT YOU HAVE AS AN ANESTHESIOLOGIST FROM THERE MAY BE

9    GREATER THAN WHAT YOU HAVE AT A SMALLER HOSPITAL HERE IN

10   SOUTH CAROLINA SUCH AS TUOMEY HOSPITAL IN SUMTER OR

11   ORANGEBURG REGIONAL.

12       YOU MAY NOT SEE THE SAME LEVEL OF TRAUMA COME INTO THOSE

13   FACILITIES.  YOU MAY NOT SEE THE SAME ACUITY OF PATIENTS OR

14   THE SAME COMPLEXITY OF PATIENTS.  SO LEVEL OF EXPERIENCE MAY

15   TAKE INTO CONSIDERATION THOSE TYPES OF THINGS THAT YOU DID AS

16   A PHYSICIAN DEPENDING UPON WHERE YOU WORKED.

17   Q    WELL, I'M JUST LOOKING AT THESE OLDER DOCTORS FROM

18   THE -- THAT WE WERE JUST LOOKING AT WHO WERE IN THE SURGICAL

19   CARE LINE.  IT LOOKS TO ME LIKE MOST OF THEM WERE OVER 60

20   WHEN THEY WERE HIRED.

21   A    THAT'S FAIRLY COMMON IN THE VA.  WE HIRE A LOT OF

22   PHYSICIANS TOWARDS THE LATTER PART OF THEIR CAREER.  ONCE

23   THEY ARE -- THEY HAVE COME OUT OF PRIVATE PRACTICE OR WORKING

24   WITH LARGE GROUPS, THEY WANT SOMETHING THAT'S NOT AS

25   DEMANDING, THEY DON'T HAVE THE OVERHEAD AND PAYING EMPLOYEES

1    AND DEALING WITH MEDICARE REIMBURSEMENTS AND THINGS OF THAT

2    NATURE.

3        THEY WANT TO COME TO THE FACILITY, THEY WANT TO TAKE

4    CARE OF THE PATIENTS, AND THEY WANT TO CONTINUE TO PRACTICE

5    MEDICINE BUT MAYBE NOT HAVE THE BURDEN OF BEING THE SOLE

6    PROVIDER OR WORKING IN AN AREA WHERE THEY'RE PAID

7    SPECIFICALLY BY THE EXAMS THAT THEY DO.

8    Q    SO HOW VALUED ARE THESE DOCTORS BY THE VA?

9    A    THEY ARE VERY VALUED.  WE -- WE RECRUIT AND RETAIN

10   PHYSICIANS BASED ON THEIR -- THEIR EXPERIENCE AND WHAT THEY

11   CAN BRING TO US, AND AGE IS NOT A FACTOR.  WE ARE MORE

12   CONCERNED WITH WHAT TYPE OF CARE THEY CAN PROVIDE TO OUR

13   VETERAN POPULATION.

14   Q    AND THEN FINALLY, AS FAR AS YOU KNOW, THESE OLDER

15   SURGEONS THAT WE WERE JUST LOOKING AT WENT THROUGH THE SAME

16   COMPENSATION PANELS AS THE ANESTHESIOLOGISTS?

17   A    ABSOLUTELY.

18        *MRS. BAILEY:*  THAT'S ALL, YOUR HONOR.

19   Q    PLEASE ANSWER ANY QUESTIONS THAT MR. IRVIN MAY HAVE.

20        *MR. IRVIN:*  YOUR HONOR?  THANK YOU, YOUR HONOR.

21                    REDIRECT EXAMINATION

22   BY MR. IRVIN:

23   Q    MRS. NICHOLS, YOU MENTIONED THE HAY SURVEYS AND THE

24   AAMC -- I BELIEVE THEY ARE SURVEYS; IS THAT CORRECT?

25   A    THEY'RE SALARY DATA, THAT'S CORRECT.

1    Q     AND THAT WOULD BE INFORMATION THAT YOU WOULD OBTAIN IN

2    ORDER TO CONSIDER RETENTION ISSUES FOR A PHYSICIAN, WHAT --

3    WHAT IS THAT PHYSICIAN LIKELY TO EARN OUT IN THE PRIVATE

4    MARKET.  IS THAT A FAIR WAY OF PUTTING THAT?

5    A     YES, BUT IT'S FOR BOTH RECRUITMENT AND RETENTION

6    PURPOSE.

7    Q     RECRUITMENT -- AND THANK YOU.  BUT FOR BOTH OF THOSE

8    THINGS.  BUT THOSE -- THOSE HAY SURVEYS AND THAT AAMC WOULD

9    REALLY GO TO -- LET'S LOOK AT YOUR HANDBOOK.  I KNOW THAT'S

10   THE ONE Y'ALL LIKE TO LOOK AT.  AND THAT'S EXHIBIT NUMBER 1.

11   AND IF YOU LOOK AT THE LIST OF THE SEVEN FACTORS THAT'S IN

12   THE HANDBOOK, AND THAT'S ON KENNEDY VA 821.  DO YOU SEE THAT?

13   A     YES.

14   Q     OKAY.  AND THIS IS THE LIST OF THE SEVEN FACTORS THAT

15   YOU WERE TALKING ABOUT RELATING TO ANNUAL PAY; IS THAT RIGHT?

16   A     YES.  THESE ARE THE SAME FACTORS THAT ARE LISTED ON THE

17   FRONT OF THE FORM UNDER THE PANEL'S FINDINGS.

18   Q     OKAY.  AND THE HAY DATA -- THE HAY GROUP DATA GIVES YOU

19   INFORMATION ABOUT TOTAL SALARY OR WHAT THE VA CALLS ANNUAL

20   PAY FOR PHYSICIANS OUT THERE IN THE MARKETPLACE; IS THAT

21   RIGHT?

22   A     YES.

23   Q     IT DOESN'T BREAK DOWN INTO BASE PAY AND MARKET PAY.

24   THAT DOESN'T--

25   A     YEARS OF EXPERIENCE.  NONE OF THAT IS SHOWN.

NICHOLS - REDIRECT

163

1  Q    IT'S JUST TOTAL TAKE-HOME PAY OUT THERE IN THE MARKET IS

2  WHAT HAY DATA IS GOING TO GIVE YOU; IS THAT RIGHT?

3  A    IT -- IT WILL GIVE YOU TOTAL CASH COMPENSATION, BUT IT

4  GIVES YOU OTHER DATA AS WELL, BUT WE -- WE TYPICALLY -- WE

5  TYPICALLY LOOK AT THE PORTION OF THE SALARY THAT IS THEIR

6  ANNUAL SALARY.

7  Q    RIGHT.  OKAY.  AND THAT INFORMATION WOULD FIT INTO THE

8  FACTOR THAT'S LISTED AS NUMBER THREE OF THE SEVEN FACTORS IN

9  THE HANDBOOK; WOULD IT NOT?

10  A    IT WOULD.  THE APPROPRIATE HEALTHCARE LABOR MARKET FOR

11  THE SPECIALTY OR ASSIGNMENT OF THE PHYSICIAN OR DENTIST.

12  Q    AND ESSENTIALLY THAT INFORMATION IS NOT GOING TO BE HAY

13  INFORMATION.  AAMC ISN'T GOING TO BE SPECIFIC TO A PARTICULAR

14  INDIVIDUAL PHYSICIAN.  IT WOULD APPLY TO THE

15  ANESTHESIOLOGISTS OUT THERE IN THE MARKET THAT HAVE VARIOUS

16  QUALIFICATIONS OR WHATEVER IT IS; IS THAT RIGHT?

17  A    YES.  WE USE THAT TO SHOW WHAT THE REASONABLE COST IS TO

18  HIRE A PHYSICIAN OF A SPECIFIC SPECIALTY.

19  Q    OKAY.  AND SO THAT INFORMATION IS RELEVANT TO FACTOR

20  NUMBER THREE OF THE SEVEN FACTORS.

21  A    THAT'S CORRECT.

22  Q    AND IN YOUR HANDBOOK YOU USE THOSE FACTORS TO MAKE A

23  DETERMINATION OF THE AMOUNT OF MARKET PAY.  DO YOU SEE THAT?

24  A    YES.  BUT IF YOU SEE, MARKET PAY IS JUST ONE COMPONENT

25  OF PAY.  AND YOU'LL ALSO SEE UNDER THE RESPONSIBILITIES OF

1    THE COMPENSATION PANEL TO MAKE A RECOMMENDATION ON ANNUAL

2    PAY, WHICH IS BASE PAY PLUS MARKET PAY.

3    Q    WELL, LET'S STICK TO THE SEVEN FACTORS IN THE HANDBOOK,

4    AND THAT'S KENNEDY VA 821 IN EXHIBIT 1.  ARE YOU WITH ME?

5    A    I AM.

6    Q    AND THAT'S PARAGRAPH E OF -- OR SUB-E OF PARAGRAPH FIVE.

7    A    YES.

8    Q    AND THOSE FACTORS THERE, ONE THROUGH SEVEN, ARE UNDER

9    THE PARAGRAPH THAT SAYS, THE DETERMINATION OF THE AMOUNT OF

10   THE MARKET PAY THERE.  IT DOESN'T SAY ANNUAL PAY; DOES IT?

11   A    YOU'RE CORRECT.

12   Q    ALL RIGHT.  NOW, I KNOW THAT YOU DON'T USE THE STATUTE,

13   BUT I WANT TO HAND YOU A COPY, A COPY OF THE STATUTE AND --

14   SO THAT YOU TAKE A LOOK AT IT WITH ME.

15            MRS. BAILEY:  IS THIS AN EXHIBIT?

16            MR. IRVIN:  NO, THIS IS A STATUTE.  THIS IS THE

17   STATUTE THAT WAS APPLICABLE, AND SO THAT'S TITLE 38, SECTION

18   7431.

19            THE COURT:  SO WHAT IS THE PURPOSE OF HER -- I

20   MEAN, I'M NOT SURE HOW YOU ARE INTRODUCING THAT.

21            MR. IRVIN:  WELL, I DON'T KNOW THAT I NEED TO SINCE

22   IT IS A STATUTE.

23            THE COURT:  SO YOU'RE SHOWING IT TO HER FOR WHAT

24   PURPOSE?

25            MR. IRVIN:  FOR THE FACTORS THAT THE STATUTE HAS

1    FOR THE DETERMINATION -- HOW THE FACTORS -- THE STATUTE SAYS

2    MARKET PAY IS TO BE DETERMINED.

3              THE COURT:  SO, IS SHE FAMILIAR WITH THE STATUTE?

4         MR. IRVIN:  SHE TESTIFY -- SHE TESTIFIED THAT SHE

5    WAS FAMILIAR WITH IT BUT THAT SHE USES THE VA HANDBOOK AS HER

6    GUIDE, BUT SHE'S FAMILIAR WITH THE STATUTE AS WELL.

7              THE COURT:  I'M STILL NOT SURE WHAT -- HOW YOU ARE

8    GOING TO GET HER TO READ THE STATUTE.

9         MR. IRVIN:  WELL, WHAT I WANTED TO DO WAS SHE HAS

10   TESTIFIED AT LENGTH ABOUT HOW THE FACTORS AND THE

11   DETERMINATIONS ARE TO BE MADE WITH REFERENCE TO ANNUAL PAY,

12   AND I WANT HER TO SHOW ME IN THE STATUTE WHERE IT SAYS THAT.

13             THE COURT:  SO YOU'RE -- I DON'T THINK YOU CAN DO

14   THAT UNLESS SHE CAN TELL YOU THAT -- TELL YOU THAT.  AND

15   THAT'S NOT AN EXHIBIT; CORRECT?

16        MR. IRVIN:  IT'S NOT.  AND FRANKLY, YOUR HONOR, I

17   THOUGHT IT WAS KIND OF ODD TO MAKE A STATUTE AN EXHIBIT SINCE

18   IT'S A STATUTE, BUT I MOVE ITS INTRODUCTION--

19             THE COURT:  BUT SHE DOESN'T USE THAT; CORRECT?

20        MR. IRVIN:  SHE SAYS THAT SHE'S FAMILIAR WITH IT

21   BUT SHE USES PREDOMINANTLY THE HANDBOOK.

22             THE COURT:  OKAY.  SO, I MEAN, YOU CAN ASK HER IF

23   SHE'S FAMILIAR WITH THE PROVISION OF THE STATUTE THAT

24   REQUIRES THAT AND DOES SHE USE IT.

25        MR. IRVIN:  OKAY.

NICHOLS - REDIRECT
166

1    BY MR. IRVIN:

2    Q    LET ME START OVER WITH THOSE INSTRUCTIONS AND WE'LL SEE

3    IF WE CAN GET THROUGH THIS.  YOU'RE AWARE OF THIS STATUTE

4    THAT GOVERNS THE PHYSICIAN AND DENTIST PAY FOR VA PHYSICIANS

5    AND DENTISTS; CORRECT?

6    A    I'M AWARE THAT THE STATUTE EXISTS, YES.  AS I STATED

7    EARLIER, I CAN'T TELL YOU EXACTLY WHAT IT SAYS.

8    Q    OKAY.  ALL RIGHT.  DO YOU KNOW THAT IT CONTAINS -- THE

9    STATUTE CONTAINS FACTORS FOR DETERMINATION THAT INCLUDE THE

10   LEVEL OF EXPERIENCE OF THE PHYSICIAN OR DENTIST IN THE

11   SPECIALTY?

12   A    I'M AWARE THAT THE -- THAT IT HAS THE SAME SEVEN FACTORS

13   THAT WE DISCUSSED EARLIER THAT ARE IN THE POLICY AND ARE ON

14   THE FRONT PAGE OF THE COMPENSATION PANEL ACTION FORM.

15   Q    OKAY.  AND DO YOU UNDERSTAND THAT THE STATUTE SAYS THE

16   DETERMINATION OF THE AMOUNT OF MARKET PAY OF A PHYSICIAN

17   SHALL TAKE INTO ACCOUNT THOSE FACTORS?  WERE YOU AWARE THE

18   STATUTE--

19   A    I WASN'T AWARE THAT THAT WAS THE EXACT VERBIAGE, NO.

20   Q    OKAY.  AND WERE YOU AWARE THAT THE STATUTE -- AND I'M

21   LOOKING NOW AT 7431, THE SECTION WHICH IS PARAGRAPH C ON

22   MARKET PAY.  AND SUB-PARAGRAPH THREE READS THAT THE ANNUAL

23   AMOUNT OF THE MARKET PAY PAYABLE TO A PHYSICIAN OR DENTIST

24   SHALL BE DETERMINED ON A CASE-BY-CASE BASIS AND MARKET PAY

25   FOR PHYSICIANS -- IN DETERMINING MARKET PAY FOR PHYSICIANS,

1    THE SECRETARY SHALL CONSULT TWO OR MORE NATIONAL SURVEYS OF

2    PAY FOR PHYSICIANS OR DENTISTS.

3         WOULD THAT BE LIKE THE HAY SURVEY AND THE AAMC?

4    A    THAT WOULD.

5    Q    THAT'S WHAT VA USES.

6    A    THAT'S CORRECT.

7    Q    AND THIS -- WERE YOU AWARE THAT THE STATUTE SAYS THAT

8    THOSE ARE TO BE USED IN DETERMINING THE AMOUNT OF MARKET PAY

9    FOR PHYSICIANS, NOT ANNUAL PAY, BUT MARKET PAY.  WERE YOU

10   AWARE OF -- THE STATUTE REQUIRED THAT?

11   A    I WASN'T AWARE OF THAT SPECIFICALLY, BUT YOU CAN'T MAKE

12   A DETERMINATION ON MARKET PAY IN A VACUUM AS I DISCUSSED

13   EARLIER.  THAT IF YOU DID THAT, THEN YOU WOULD RISK

14   OVERCOMPENSATING A PARTICULAR PHYSICIAN BASED ON WHAT THE

15   LOCAL LABOR MARKET WILL BEAR.

16   Q    WELL, I THINK I AGREE WITH YOU IN PART.  AND LET ME SAY

17   THAT.  WHAT I JUST READ TO YOU TALKS ABOUT IN MAKING THE

18   DETERMINATION FOR MARKET PAY, THAT THE VA IS TO CONSULT TWO

19   OR MORE NATIONAL SURVEYS.

20   A    I WOULD AGREE WITH THAT.

21   Q    OKAY.  ALL RIGHT.  AND THAT IN DETERMINING THE AMOUNT OF

22   MARKET PAY OF A PARTICULAR PHYSICIAN, THE SECRETARY SHALL

23   CONSULT WITH AND CONSIDER THE RECOMMENDATIONS OF AN

24   APPROPRIATE PANEL.  WERE YOU AWARE THAT THE STATUTE REQUIRED

25   THE MARKET PAY DETERMINATION TO CONSIDER THE RECOMMENDATIONS

1    OF THE PAY PANEL?

2    A    I CAN'T SAY THAT I WAS AWARE THAT THAT VERBIAGE WAS IN

3    THE -- IN THE...

4    Q    OKAY.  AND THEN WERE YOU AWARE THAT THE STATUTE SAYS

5    THAT THE DETERMINATION OF THE MARKET PAY SHALL TAKE INTO

6    ACCOUNT THE FACTORS?  NOT THE DETERMINATION OF ANNUAL PAY BUT

7    THE DETERMINATION OF MARKET PAY.

8    A    AGAIN, I WASN'T AWARE THAT THAT WAS A SPECIFIC VERBIAGE

9    IN THE DOCUMENT.

10    Q    OKAY.  AND THAT THE STATUTE REQUIRES THAT THE AMOUNT OF

11    MARKET PAY OF A PHYSICIAN SHALL BE EVALUATED NOT LESS OFTEN

12    THAN EVERY 24 MONTHS.  THAT'S THE MARKET PAY, NOT THE ANNUAL

13    PAY.

14    A    WELL, THAT'S THE BIENNIAL REVIEW.  AND SINCE YOU CAN'T

15    CHANGE THE BASE PAY BECAUSE IT'S STATIC BASED ON -- BASED ON

16    LONGEVITY FOR THE PHYSICIAN, WHEN YOU'RE DOING A BIENNIAL

17    REVIEW, THE ONLY THING THAT CAN BE CHANGED IS THE MARKET PAY.

18    Q    OKAY.  NOW, THE EXHIBIT 4 THAT -- PLAINTIFF'S EXHIBIT

19    NUMBER 4, WHICH IS THIS MEDICAL CENTER MEMORANDUM DATED

20    MARCH 20TH OF 2014?

21    A    YES.

22    Q    IS THAT THE ONE THAT YOU SAID THAT YOU WROTE?

23    A    YES.

24    Q    OKAY.  AND SO, AND YOU WROTE THAT BASED ON YOUR

25    UNDERSTANDING OF THE VA HANDBOOK; IS THAT CORRECT?

1    A    THAT'S CORRECT.

2    Q    ALL RIGHT.  SO THESE DOCUMENTS THAT ARE IN EXHIBIT

3    NUMBER 4 THEN THAT WERE WRITTEN BY YOU WERE BASED ON WHAT THE

4    HANDBOOK SAYS, NOT WHAT THE STATUTE SAYS.

5    A    THAT'S CORRECT.  THE UNDERSECRETARY IS -- GIVES THE VA

6    POLICY THROUGH HANDBOOKS, AND THAT'S WHAT WE FOLLOW UNLESS

7    THE -- IF THE POLICY IS SILENT, THEN WE GO TO THE STATUTE.

8    Q    OKAY.  BUT WHAT YOU WROTE AS AN EMPLOYEE OF THE VA, AS

9    AN HR DIRECTOR AT DORN, WAS BASED ON THE VA HANDBOOK.

10   A    THAT'S CORRECT.

11   Q    OKAY.  NOT THE STATUTE.

12   A    THAT'S CORRECT.

13   Q    THANK YOU.  THAT'S ALL THE QUESTIONS I HAVE.

14          *MRS. BAILEY:*  YOUR HONOR, I JUST WANTED TO SEE IF I

15   CAN MOVE THIS EXHIBIT THAT I HAD MARKED FOR IDENTIFICATION

16   INTO EVIDENCE BASED ON HER TESTIMONY.

17          *THE COURT:*  ANY OBJECTION TO THAT?

18          *MR. IRVIN:*  I HAVE -- JUST I HAVEN'T SEEN IT.  IS

19   THIS SOMETHING THAT WAS USED--

20          *THE COURT:*  THIS IS A NEW EXHIBIT AND SHE'S MARKED

21   IT FOR IDENTIFICATION EARLIER AND ASKED THE WITNESS IF THOSE

22   PERCENTAGES WERE CONSISTENT WITH HER TESTIMONY.

23          *MR. IRVIN:*  YOUR HONOR, IF THIS IS THE ONE THAT

24   COMPARES DR. KENNEDY TO PHYSICIANS IN THE OTHER SERVICES, WE

25   OBJECT TO IT ON RELEVANCE GROUNDS.  WE DON'T THINK THAT'S A

```
1   PROPER COMPARISON IN THIS CASE.
2          THE COURT:  ALL RIGHT.  I'M GOING TO ADMIT IT.  I'M
3   GOING TO ADMIT IT.
4          (WHEREUPON, DEFENSE EXHIBIT NO. 6 WAS ADMITTED INTO
5      EVIDENCE.)
6          THE COURT:  DO YOU HAVE ANY OTHER QUESTIONS?
7          MRS. BAILEY:  NO, MA'AM.
8          THE COURT:  I HAVE -- I JUST WANTED SOME
9   CLARIFICATION WITH REGARD TO ANNUAL PAY.  THE ANNUAL PAY
10  EQUALS THE BASE PLUS THE MARKET; IS THAT CORRECT?
11         THE WITNESS:  YES, MA'AM.
12         THE COURT:  WHAT DO YOU DETERMINE FIRST, THE ANNUAL
13  PAY OR THE MARKET PAY?
14         THE WITNESS:  YOU HAVE TO DETERMINE THE ANNUAL PAY
15  FIRST BECAUSE WE NEED TO DETERMINE THE ANNUAL PAY BASED ON
16  THE LOCAL MARKET AND THAT'S BASED ON THE SURVEY DATA FOR OUR
17  PARTICULAR FACILITY AND CITY THAT WE LIVE IN.
18         THE COURT:  SO YOU DETERMINE THE ANNUAL PAY AND
19  THEN THE MARKET PAY FLUCTUATES BASED ON WHAT THE ANNUAL PAY
20  IS BECAUSE THE BASE PAY IS -- HAS THE--
21         THE WITNESS:  YES, MA'AM.  JUST FOR EXAMPLE, IF WE
22  HIRED A PHYSICIAN, WE DID A COMPENSATION PANEL FOR A
23  PHYSICIAN, AND WHEN WE TAKE THEM TO A COMPENSATION PANEL,
24  THEY REVIEW THEM AND SAY THAT THEY SHOULD BE MAKING $300,000,
25  THEY MAY BE AWARE THAT THAT APPLICANT WAS EITHER A PRIOR VA
```

1    EMPLOYEE OR NOT A PRIOR VA EMPLOYEE, SO THEY WOULDN'T KNOW

2    SPECIFICALLY WHAT THEIR BASE PAY WAS.

3        SO HR WOULD FIND THAT INFORMATION OUT AND THEN WE WOULD

4    ADJUST THE TOTAL COMPENSATION, THE ANNUAL PAY, BASED ON THEIR

5    BASE AND LONGEVITY TO ENSURE THAT THEIR MARKET PAY WAS

6    APPROPRIATE TO ENSURE THAT WE WERE PAYING THEM A REASONABLY

7    COMPARABLE AMOUNT TO THE LABOR MARKET FOR OUR AREA.

8        *THE COURT:*  SO THEN REGARDLESS OF EXPERIENCE, THEN

9    ALL OF THE ANESTHESIOLOGISTS OR ALL THE SURGEONS WOULD MAKE

10   THE SAME AMOUNT OF MONEY BASED ON THE MARKET PAY?

11       *THE WITNESS:*  IT MAY NOT BE EXACTLY THE SAME AMOUNT

12   BECAUSE THEIR LEVEL OF EXPERIENCE OR THEIR OTHER FACTORS MAY

13   BE SLIGHTLY DIFFERENT.  IN SOME -- IN SOME SERVICES THEY

14   PAY -- IF THEY'RE BOARD CERTIFIED IN MULTIPLE SPECIALTIES,

15   THEY MAY GET ADDITIONAL MONEY FOR THAT OR, FOR EXAMPLE, IF WE

16   WERE HIRING RADIOLOGISTS AND WE HIRED TWO RADIOLOGISTS BUT

17   ONE ONLY READ ONE OR TWO TYPES OF EXAMS BUT THE OTHER READ

18   X-RAYS, CAT SCANS, MRI'S AND THINGS OF THAT NATURE, THEN EVEN

19   THOUGH THEY HAD APPROXIMATELY EQUAL EXPERIENCES AS FAR AS

20   YEARS GO, THE ONE THAT READ MORE TYPES OF EXAMS MAY HAVE A

21   HIGHER LEVEL OF EXPERIENCE AND MAY BE PAID MORE.

22       *THE COURT:*  AND UNDER WHAT CATEGORY IS THAT

23   CALCULATION MADE?  UNDER THE MARKET PAY OR THE ANNUAL PAY?

24       *THE WITNESS:*  IT WOULD BE MADE UNDER THE MARKET PAY

25   BECAUSE ANNUAL -- THE -- IT WOULD AFFECT THE MARKET PAY -- IT

1    WOULD AFFECT THE ANNUAL PAY BUT IT WOULD FALL UNDER MARKET

2    PAY BECAUSE WE CAN'T ADJUST BASE PAY.  BASE PAY IS STAGNANT

3    AND IT'S ONLY -- ONLY FACTOR THAT INFLUENCES BASE PAY IS YOUR

4    LONGEVITY IN VA.

5           THE COURT:  SO FOR EXAMPLE, IF DR. KENNEDY'S BASE

6    PAY IS 125,359 AND THEN YOU MADE A DETERMINATION THAT THE

7    MARKET PAY WAS...

8           THE WITNESS:  WELL, WE WOULD MAKE A DETERMINATION,

9    FOR INSTANCE, FOR ANESTHESIOLOGISTS IT PROBABLY -- IN THE

10   CURRENT MARKET IT PROBABLY COSTS SOMEWHERE AROUND $300,000 TO

11   RECRUIT AN ANESTHESIOLOGIST IN THE COLUMBIA, SOUTH CAROLINA

12   AREA.  SO BASED ON THAT, IF THEY WERE BRAND NEW TO VA, THEIR

13   BASE PAY WOULD BE ABOUT A HUNDRED THOUSAND DOLLARS AND WE

14   WOULD HAVE TO MAKE UP THE REMAINDER OF THAT 300,000 IN

15   MARKET.

16          THE COURT:  AND SO THEN IF YOU DO THAT, HOW DO YOU

17   TAKE INTO CONSIDERATION THE DIFFERENT SPECIALTIES OR BOARD

18   CERTIFICATIONS AND ALL OF THAT?  HOW DO YOU ADD THAT IN?

19          THE WITNESS:  THAT WOULD BE CONSIDERED WHEN THEY

20   MADE THE DETERMINATION THAT THAT $300,000 WAS AN APPROPRIATE

21   ANNUAL PAY.  THEY WOULD LOOK AT LEVEL OF EXPERIENCE, BOARD

22   CERTIFICATIONS, ANY TIME THAT THEY SPENT IN THE VA, AND OTHER

23   FACTORS INCLUDING THE LOCAL LABOR MARKET, WHETHER OR NOT THEY

24   HAD AFFILIATIONS WITH MEDICAL CENTERS, THEY'VE TAUGHT

25   RESIDENTS, THEY'VE WRITTEN PAPERS, THEY WERE PUBLISHED, THEY

1    WENT ON SPEAKING TOURS.

2        ALL OF THOSE THINGS ARE CONSIDERED TOGETHER BEFORE THEY

3    ARRIVE AT THAT $300,000 ANNUAL PAY AMOUNT.  AND THEN THE

4    MARKET PAY IS DERIVED FROM -- FROM THAT ONCE WE CONSIDER HOW

5    MUCH TIME THEY SPENT IN VA AND WE KNOW WHAT THEIR BASE PAY

6    IS.

7            THE COURT:  THEN FOR EXAMPLE, IF THERE WAS A DOCTOR

8    WHO WANTED TO LEAVE BUT YOU WANTED TO RETAIN HIM AND SO YOU

9    FIGURED OUT THAT IN ORDER TO KEEP HIM, YOU'D HAVE TO PAY HIM

10   $300,000, SO YOU WOULD ADJUST HIS MARKET PAY TO GET HIM UP TO

11   THE $300,000.  BUT THEN THE OTHER DOCTORS IN THAT SERVICE,

12   HOW WOULD YOU ADJUST THEIR PAY?

13           THE WITNESS:  SO--

14           THE COURT:  SO THEY WOULD MAKE -- IF THEY HAD MORE

15   EXPERIENCE OR MORE BOARD CERTIFICATIONS THAN THAT DOCTOR,

16   WOULD THEN THEY MAKE MORE THAN THE $300,000?

17           THE WITNESS:  THEY MAY DEPENDING -- IT DEPENDS ON

18   WHAT THE LABOR MARKET WILL CURRENTLY BEAR.  AND BECAUSE I'M

19   NOT A PHYSICIAN, I CAN'T SPEAK TO THIS SPECIFICALLY.  BUT

20   WHAT I HAVE SEEN IN COMPENSATION PANELS IS THAT THEY TAKE

21   INTO CONSIDERATION THE LEVEL OF EXPERIENCE AND THEY TAKE

22   THOSE THINGS INTO CONSIDERATION.

23       BUT NOT EVERY ONE OF THOSE SEVEN FACTORS IS WEIGHTED

24   EQUALLY.  SO IN SOME INSTANCES -- AND I HAVE SEEN THIS FROM

25   EARLIER IN MY CAREER -- WE HAVE HIRED NEW GRADUATE

1    PHYSICIANS, PEOPLE WHO JUST COMPLETED THEIR RESIDENCY, AT THE

2    TOP OF THE TABLE IN TIER BECAUSE THAT'S WHAT IT COST TO

3    RECRUIT AT THAT PARTICULAR TIME.

4        NOW, A YEAR OR TWO YEARS LATER IF WE'RE RECRUITING FOR

5    THE SAME SPECIALTY POSITION BUT THERE'S MORE PHYSICIANS OF

6    THAT SPECIALTY AVAILABLE, THE NEW PHYSICIAN BEING HIRED MAY

7    HAVE MORE YEARS -- A HIGHER LEVEL OF EXPERIENCE THAN THE ONE

8    THAT WE ALREADY HAVE ON STAFF, THEIR PAY MAY NOT BE SET AS

9    HIGH BECAUSE THE LOCAL LABOR MARKET DOESN'T CURRENTLY BEAR

10   THAT HIGHER SALARY.

11       *THE COURT:*  ALL RIGHT.  SO FOR EXAMPLE, IN THE

12   CHARTS, ONE OF THE CHARTS OR ONE OF THE EXHIBITS HAS ONE OF

13   THE REVIEWS THAT WAS DONE, I GUESS THE BIENNIAL REVIEWS.  YOU

14   MAKE A DETERMINATION AS TO WHAT SALARY ADJUSTMENTS ARE GOING

15   TO BE MADE.  SO WHEN YOU -- FOR EXAMPLE, IF YOU TOOK THE

16   ANESTHESIOLOGY DEPARTMENT AND YOU LISTED ALL OF THE

17   PHYSICIANS THERE, HOW DO YOU MAKE A DECISION AS TO HOW MUCH

18   INCREASE EACH ONE IS GOING TO BE, HOW THE MARKET PAY IS GOING

19   TO BE INCREASED?

20       *THE WITNESS:*  WELL, THE PANEL MAKES A

21   RECOMMENDATION ON WHAT THE ANNUAL SALARY SHOULD BE FOR EACH

22   OF THOSE PHYSICIANS.

23       *THE COURT:*  SO THEY TAKE EACH PHYSICIAN SEPARATELY

24   AND SAY FOR -- WHAT IS THE CHART THAT HAS ALL OF THE

25   PHYSICIANS LISTED IN THE ANESTHESIOLOGY DEPARTMENT?  IS THERE

1    AN EXHIBIT -- IS EXHIBIT 14 IN?

2          *MR. IRVIN:*  YOUR HONOR, I DON'T KNOW.  EXHIBIT 6 IS

3    SOMETHING THAT THE WITNESS ACTUALLY PREPARED.  IT'S GOT SOME

4    INFORMATION ON IT, BUT...

5          *THE COURT:*  BUT THAT'S NOT JUST ANESTHESIOLOGY.

6    THAT'S OTHER...

7          *MR. IRVIN:*  WELL, THAT FOR ANESTHESIOLOGY IS

8    EXHIBIT NUMBER 6.

9          *THE COURT:*  NO.  GO BACK TO THE ONE YOU JUST HAD.

10          *THE WITNESS:*  FOURTEEN?

11          *THE COURT:*  YEAH, FOURTEEN.  IS THAT THE ONE YOU

12    JUST HAD?

13          *THE WITNESS:*  NO, THE ONE I JUST HAD WAS...

14          *THE COURT:*  TWELVE?

15          *THE WITNESS:*  IS THAT THE ONE?

16          *THE COURT:*  NO.  GO TO -- YEAH, THAT'S FINE.

17    THAT'S FINE.  THE ONE YOU HAD BEFORE, THAT'S FINE.  WAS THAT

18    12?

19          *THE WITNESS:*  SIX.

20          *THE COURT:*  OKAY.

21          *MR. IRVIN:*  THIS ONE WAS PREPARED BY THIS WITNESS.

22          *THE COURT:*  OKAY.  SO THE BASE PAY FOR DR. KENNEDY

23    IS 125,359 AND THEN HIS ANNUAL SALARY ENDS UP BEING 293,097.

24    SO, WHAT DID YOU TAKE INTO CONSIDERATION WHEN YOU CAME UP

25    WITH THE DIFFERENT MARKET PAYS FOR EACH ONE OF THOSE?

1          *THE WITNESS:* SO, I DIDN'T TAKE INTO

2     CONSIDERATION--

3          *THE COURT:* OR WHAT--

4          *THE WITNESS:* THE COMPENSATION PANEL?

5          *THE COURT:* YES.

6          *THE WITNESS:* THE COMPENSATION PANEL WOULD HAVE

7     LOOKED AT THOSE SEVEN FACTORS. WHETHER THEY WERE DOCUMENTED

8     ON THE FORM OR NOT, THEY WOULD HAVE BEEN DISCUSSED DURING THE

9     COMPENSATION PANEL. AND THEY ALSO WOULD HAVE TAKEN INTO

10    CONSIDERATION THOSE SURVEY DATA THAT WE DISCUSSED EARLIER,

11    THE AAMC DATA AND THE HAY DATA, AND THEY WOULD HAVE LOOKED UP

12    WHAT THE -- WHAT THE SALARY FOR THE COLUMBIA, SOUTH CAROLINA

13    AREA BEARS FOR ANESTHESIOLOGISTS AND THEY WOULD HAVE MADE A

14    RECOMMENDATION THEN BASED ON THAT INFORMATION AS TO WHETHER

15    OR NOT TO INCREASE THE SALARY OR TO LEAVE IT THE SAME.

16    TYPICALLY--

17         *THE COURT:* SO, LET ME JUST STOP YOU FOR A MINUTE

18    BECAUSE I JUST WANT -- SO YOU TOLD ME THAT YOU DETERMINED

19    WHAT THE ANNUAL SALARY SHOULD BE FIRST. BUT DR. KENNEDY --

20    IN 2014 YOU DETERMINED OR SOMEONE DETERMINED THAT HIS ANNUAL

21    SALARY SHOULD BE 293,000. AND WHAT WAS THAT BASED ON THAT?

22         *THE WITNESS:* THAT WAS BASED ON THOSE SEVEN

23    FACTORS, A DISCUSSION OF THE SEVEN FACTORS THAT ARE ON THE

24    FRONT PAGE OF THE COMPENSATION PANEL AND THE SURVEY DATA THAT

25    WAS REVIEWED, TYPICALLY WHICH IS AAMC AND HAY. AND SO THEY

1    LOOKED AT THOSE AND THEY SAID LIKELY, YOU KNOW, WAS SOMEWHERE

2    AROUND 300 TO $321,000.

3              THE COURT: WAS HIS MARKET--

4              THE WITNESS: THAT WOULD BE WHAT THE MARKET SAYS.

5              THE COURT: OKAY.

6              THE WITNESS: NOW, ALSO THINGS THAT THEY MAY HAVE

7    TAKEN INTO CONSIDERATION WHEN THEY LOOKED AT THIS, IN 2014

8    THE PAY TABLE IN TIER FOR ANESTHESIOLOGY ARE -- MAY HAVE

9    TOPPED OUT AT 295. AND WHILE THERE IS AN ABILITY TO GET AN

10   EXCEPTION GRANTED EITHER THROUGH THE FACILITY DIRECTOR, THE

11   NETWORK DIRECTOR OR THE UNDERSECRETARY OF HEALTH, IF WE DON'T

12   HAVE A STRONG BUSINESS NEED TO PAY THEM MORE, EVEN IF IT'S

13   ONLY, YOU KNOW, LESS THAN $2,000 MORE THAN WHAT THEY'RE

14   CURRENTLY MAKING, WE WOULDN'T PUT THAT PACKAGE TOGETHER AND

15   SEND IT TO THE VISN BECAUSE WE NEED TO BE AWARE OF WHAT OUR

16   FACILITY BUDGET IS AND WHAT THE COST OF OUR SALARY DOLLARS

17   ARE AND WHERE WE SPEND THAT MONEY.

18        SO IF THEY'RE CLOSE TO THIS -- THE TABLE IN TIER LIMITS

19   AND THEY ARE CLOSE TO WHAT THE LABOR MARKET IS, WE ARE NOT

20   GOING TO -- WE DON'T -- WE DON'T TYPICALLY PAY EXACTLY WHAT

21   THE LABOR MARKET DATA SAYS IS THE AMOUNT THAT'S FOR OUR AREA.

22   WE PAY SOMETHING THAT'S REASONABLY COMPARABLE TO THE LOCAL

23   LABOR MARKET.

24              THE COURT: OKAY. SO, THE MARKET PAY IS NOT THE

25   SAME FOR ALL PHYSICIANS REGARDLESS OF EXPERIENCE.

1          *THE WITNESS:* NO, IT'S NOT BECAUSE WHAT WE ARE

2    CONCERNED ABOUT IS -- IS THAT THEIR ANNUAL SALARY IS

3    REASONABLY COMPARABLE TO THE LOCAL LABOR MARKET -- AND IF

4    THEIR MARKET PAY MAY HAVE TO BE HIGHER IN ORDER TO GET THEM

5    TO THAT REASONABLY COMPARABLE RATE IF THEIR BASE PAY IS LOW.

6          *THE COURT:* OKAY. SO IS THIS A PROCESS THAT'S DONE

7    NATION-WIDE, SPECIALTY-WIDE, OR STATE-WIDE?

8          *THE WITNESS:* IT'S -- THIS IS A -- THIS IS A

9    NATION-WIDE PROCESS. I CAN'T SPEAK TO SPECIFICALLY HOW IT'S

10   IMPLEMENTED IN OTHER FACILITIES EXCEPT FOR THOSE THAT I

11   VISITED IN MY NEW -- MY NEW ROLE, BUT IT'S REASONABLY THE

12   SAME AT ALL FACILITIES.

13         *THE COURT:* SO IS THE PAY ADJUSTMENT PROCESS

14   DIFFERENT FOR DIFFERENT SPECIALTIES OR DIFFERENT LOCATIONS?

15         *THE WITNESS:* I'M NOT SURE I'M...

16         *THE COURT:* THE PAY ADJUSTMENT PROCESS, THE PROCESS

17   YOU USE TO I GUESS EVALUATE PAY.

18         *THE WITNESS:* NO, THE HANDBOOK SPEAKS TO HOW THE

19   PROCESS IS DONE, AND THAT'S -- AT THE TIME THAT THESE WERE

20   DONE, THE COMPENSATION PANELS WOULD MAKE A RECOMMENDATION ON

21   ANNUAL PAY, WHICH IS BASE PLUS MARKET FOR THE PHYSICIANS.

22         *THE COURT:* SO THAT WOULD BE THE SAME NATION-WIDE?

23         *THE WITNESS:* YEAH.

24         *THE COURT:* OKAY. ALL RIGHT. THANK YOU. I

25   APPRECIATE IT. ANY OTHER QUESTIONS?

1          *MRS. BAILEY:* YOUR HONOR, I JUST POINT OUT WE HAVE

2     DEBORAH DOTY HERE AS A WITNESS AND SHE CAN SPEAK TO THE

3     NATION-WIDE REGULATIONS.

4          *THE COURT:* OKAY.

5          *MR. IRVIN:* AND YOUR HONOR, LISTENING TO ALL OF

6     THAT, I THINK YOUR HONOR HAD IT RIGHT AT THE END OF THAT,

7     THAT REALLY THE STARTING POINT IN THAT PROCESS WITH THE

8     COMPENSATION PANEL AND ALL THAT IS THE ANNUAL SALARY. AND

9     THAT'S BEEN THE CONSISTENT TESTIMONY OF DR. MILLER AND DR.

10    DEKONING AND NOW MRS. NICHOLS IS THAT MARKET PAY IS JUST THE

11    END OF -- THE DETERMINATION MARKET PAY IS JUST THE END OF THE

12    PROCESS FOR THEM.

13         THEY COME IN WITH A RECOMMENDATION FOR ANNUAL PAY. AND

14    THEY KNOW THAT BASED ON THE LONGEVITY WHAT THE BASE PAY WILL

15    BE. AND SO WHAT THEY DO IS THEY SUBTRACT THE BASE PAY FROM

16    THE ANNUAL PAY RECOMMENDATION. AND MATHEMATICALLY IT ENDS UP

17    BEING THE MARKET PAY.

18         *THE COURT:* IS THAT YOUR QUESTION?

19         *MR. IRVIN:* NO, MA'AM.

20         *THE COURT:* OKAY.

21         *MR. IRVIN:* IT WAS JUST A COMMENT ON...

22         *THE COURT:* OKAY. OKAY. ALL RIGHT. THANK YOU.

23    ANYTHING ELSE? ANY OTHER QUESTIONS?

24         *MR. IRVIN:* NO QUESTIONS, YOUR HONOR.

25         *THE COURT:* OKAY. ALL RIGHT. THANK YOU VERY MUCH.

```
1    YOU CAN STEP DOWN.

2         (WITNESS LEFT THE STAND.)

3              THE COURT:  ALL RIGHT.  WE ARE GOING TO TAKE A

4    LITTLE SHORT BREAK AND THEN WE ARE GOING TO HAVE ONE MORE

5    WITNESS.

6         (WHEREUPON, A BRIEF RECESS WAS HAD.)

7              THE COURT:  MR. IRVIN, YOU MAY CALL YOUR NEXT

8    WITNESS.

9              MR. IRVIN:  THANK YOU, YOUR HONOR.  COUNSEL FOR THE

10   VA HAS INFORMED ME THAT ONE OF THE WITNESSES, THE VA

11   WITNESSES ON OUR LIST ABOUT FIVE WITNESSES DOWN, IS ACTUALLY

12   HERE FROM CHARLESTON AND THEY WERE HOPING THAT WE COULD GET

13   HIM DONE AND LET HIM GET BACK TO CHARLESTON RATHER THAN

14   COMING BACK TOMORROW.

15        I DON'T MIND TRYING TO DO THAT.  YOUR HONOR INDICATED

16   THAT YOU WANTED TO HAVE ONE MORE WITNESS, AND I WASN'T

17   NECESSARILY PREPARED TO DO DR. GROH TODAY, BUT I'M READY TO

18   DO THAT IF THAT WOULD CONVENIENCE HIM AND GET HIM BACK TO

19   CHARLESTON, BUT WE WOULD BE TAKING HIM OUT OF SEQUENCE.  IT'S

20   NO BIG DEAL, BUT I'LL DO THAT IF -- YOUR HONOR WANTED ONE

21   MORE WITNESS.  IS THAT WHAT--

22             THE COURT:  YES, I WOULD LIKE TO DO ONE MORE

23   WITNESS TODAY AND I WOULD APPRECIATE IT IF YOU COULD DO THAT

24   IF HE'S...

25             MR. IRVIN:  I WILL.  I WILL DO DR. GROH AND THEN
```

1    WE'LL STOP FOR THE NIGHT.

2            *MR. ANDREWS:* OKAY. I WAS GOING TO -- YOUR HONOR,

3    I WAS GOING TO POINT OUT -- AND I'M NOT TRYING TO BOX THE

4    PLAINTIFF IN. I DO THINK WE HAVE WITNESSES AHEAD OF US THAT

5    WILL MOVE FASTER THAN THE WITNESSES WE HAVE ALREADY HEARD

6    TODAY. I DON'T WANT TO, YOU KNOW, BIND YOU IN ANY WAY. I'LL

7    LET YOU CALL YOUR WITNESS, BUT WE DO APPRECIATE THAT.

8            *MR. IRVIN:* SURE. LET'S JUST GO AHEAD AND DO DR.

9    GROH. AND I DON'T KNOW HOW LONG HE WILL BE, BUT WE'LL GET

10   HIM DONE AND GO HOME AND COME BACK TOMORROW. AND I DO AGREE

11   THAT THESE PANEL MEMBERS -- AND THAT'S WHO WE ARE GETTING

12   READY TO GO THROUGH -- THEY SHOULD BE SHORTER. I CAN'T SPEAK

13   FOR MRS. BAILEY AND HER PART OF IT, BUT THEY SHOULD BE

14   SHORTER TOMORROW. SO HOPEFULLY WE CAN GET ON THROUGH A

15   LOT -- ALL OF THOSE PANEL MEMBERS I WOULD EXPECT TOMORROW.

16       BUT WE WILL DO DR. GROH FOR HIS CONVENIENCE, GET HIM

17   BACK TO CHARLESTON TONIGHT. AND EXCUSE ME IF I STUMBLE A

18   LITTLE BIT IN DOING THAT.

19           *THE COURT:* I APPRECIATE YOU DOING THAT. THANK

20   YOU.

21           *MR. IRVIN:* THANK YOU, MA'AM. OKAY.

22           *MR. ANDREWS:* ONE OTHER MATTER OR TWO WHILE WE ARE

23   WAITING ON THE WITNESS IF I COULD. ONE OF THE WITNESSES WHO

24   IS ON BOTH OF OUR LISTS I BELIEVE IT WAS MENTIONED EARLIER

25   HAS A MEDICAL CONDITION THAT IS GOING TO MAKE HIM UNABLE TO

1    ATTEND, AND SO WE AGREED TO READ IN THE DEPOSITION TESTIMONY.

2         I DON'T KNOW WHAT YOUR HONOR'S PREFERENCE IS IN TERMS OF

3    ACTUALLY READING THAT IN OR WHETHER YOU WOULD PREFER JUST TO

4    HAVE THE ACTUAL DEPOSITION TRANSCRIPT ADMITTED INTO THE

5    EVIDENCE.

6              MR. IRVIN:  YOUR HONOR...

7              THE COURT:  GO AHEAD.

8              MR. IRVIN:  YOUR HONOR, WHAT WE HAVE DONE IS WE

9    DESIGNATED -- LET ME BACK UP.  WHAT I HAVE DONE IS I HAVE

10   TAKEN THE PORTIONS AND NOT THE WHOLE DEPOSITIONS THAT I

11   WANTED TO PUBLISH AND I HAVE INCLUDED THEIR

12   COUNTER-DESIGNATIONS FOR WHAT THEY WANTED TO DO AND I MADE

13   COPIES OF THAT WHEN MRS. BAILEY INFORMED ME THAT DR. FICHTNER

14   HAD THE MEDICAL CONDITION AND COULDN'T TESTIFY, THEN I SORT

15   OF CHANGED GEARS AND I'VE GOT THAT READY.

16        SO WHAT I CAN DO TOMORROW IS SIMPLY GIVE YOU A COPY AND

17   GIVE THE COURT A COPY.  BUT I WOULD LIKE TO READ IT BECAUSE I

18   THINK OTHERWISE IT GETS LOST A LITTLE BIT WHEN YOU'RE HEARING

19   ALL OF THESE OTHER WITNESSES.  AND IT SHOULD BE RELATIVELY

20   BRIEF.  BUT WHAT I HAD HOPED TO DO IS PUT MRS. FULMER ON THE

21   STAND AND HAVE HER BE DR. FICHTNER -- OR I CAN DO -- DO THE

22   SAME IF YOU'D LIKE TO BE DR. FICHTNER -- BUT DO THE Q AND A

23   AND HAVE YOUR HONOR HEAR IT, BUT I WILL DO WHATEVER YOU WANT

24   ME TO.

25              THE COURT:  I MEAN, I'M PERFECTLY HAPPY JUST TO

1   READ IT.  BUT IF YOU WOULD PREFER TO HAVE IT READ IN THE

2   RECORD, THAT'S FINE WITH ME, TOO.  SO I'LL LET YOU DECIDE.

3           MR. IRVIN:  THANK YOU FOR THAT.  LET ME THINK ABOUT

4   IT OVERNIGHT.

5           MR. ANDREWS:  YOUR HONOR, WE DON'T HAVE ANY

6   PREFERENCE.  WE'D DEFER TO YOUR JUDGMENT ON THAT.

7           THE COURT:  ALL RIGHT.  THANK YOU.

8           MR. IRVIN:  READY WITH DR. GROH?  DR. GROH IS HERE.

9   CALL DR. GROH.

10          DR. WILLIAM GROH, AFTER BEING DULY SWORN,

11  TESTIFIED AS FOLLOWS:

12                      DIRECT EXAMINATION

13  BY MR. IRVIN:

14  Q    GOOD AFTERNOON, DR. GROH.  I UNDERSTAND THAT YOU NEED TO

15  GET BACK TO OR WANT TO GET BACK TO CHARLESTON, AND SO WE WANT

16  TO GO AHEAD AND TRY TO GET YOU DONE AND I'M GOING TO ASK YOU

17  SOME QUESTIONS.  YOU WILL RECALL, I'M SURE, THAT WE TOOK YOUR

18  DEPOSITION IN THIS CASE EARLIER.  DO YOU REMEMBER THAT?

19  A    YES.

20  Q    OKAY.  AND SO I'M GOING TO TRY TO GO THROUGH THIS, HIT

21  SORT OF THE HIGHLIGHTS OF WHAT MAYBE I ALREADY UNDERSTAND

22  YOUR TESTIMONY TO BE.  AND LET ME START WITH THIS.  YOU ARE A

23  CARDIOLOGIST; IS THAT CORRECT?

24  A    YES.

25  Q    OKAY.  AND YOU, AT LEAST AS OF THE TIME OF MY TAKING OF

GROH - DIRECT

1    YOUR DEPOSITION IN FEBRUARY OF 2016, YOU WERE THE SERVICE

2    LINE CHIEF OF MEDICINE OR INTERNAL MEDICINE.  ARE YOU STILL

3    AT THAT POSITION?

4    A    YES.

5    Q    OKAY.  AND THAT IS AT THE DORN VA; IS THAT CORRECT?

6    A    AT THE TIME I WAS AT DORN AND NOW I'M AT RALPH H JOHNSON

7    VA MEDICAL CENTER IN CHARLESTON, SOUTH CAROLINA.

8    Q    THAT'S WHY YOU NEED TO GET BACK TO CHARLESTON.

9    A    YEAH.

10   Q    OKAY.  I BELIEVE YOU SAID THAT YOUR WORK AT DORN WHEN

11   YOU WERE CHIEF OF MEDICINE, SERVICE LINE CHIEF OF MEDICINE,

12   WAS HIGHLY ADMINISTRATIVE.  IS THAT AN APT DESCRIPTION OF

13   YOUR ROLE AS CHIEF OF MEDICINE?

14   A    YES.

15   Q    OKAY.  NOW, AND YOU HAVE SERVED ON A NUMBER OF THESE

16   WHAT WE CALL COMP PANELS OR PAY PANELS WHERE THERE ARE THREE

17   PHYSICIANS CHOSEN TO SERVE AS MEMBERS OF A PANEL REVIEWING

18   ANOTHER PHYSICIAN'S COMPENSATION RECOMMENDATIONS.  IS THAT A

19   FAIR STATEMENT?

20   A    YES.

21   Q    YOU HAVE GOT EXPERIENCE IN SERVING ON THOSE KINDS OF

22   PANELS WHILE YOU WERE AT DORN.

23   A    YES.

24   Q    OKAY.  ALL RIGHT.  NOW AS I UNDERSTAND IT, WHEN YOU

25   SERVED ON THESE COMP PANELS, IN YOUR EXPERIENCE THE PANEL

1    DOESN'T SEPARATE OUT MARKET PAY AND BASE PAY BUT RATHER IT

2    LOOKS AT WHAT IS CALLED ANNUAL PAY OR TOTAL PAY.  IS THAT A

3    FAIR STATEMENT?

4    A    YES.

5    Q    OKAY.  ALL RIGHT.  AND YOUR UNDERSTANDING ABOUT WHY THE

6    PANEL WOULD LOOK AT ANNUAL PAY AS OPPOSED TO LOOKING

7    DISCREETLY AT MARKET PAY OR BASE PAY COMES FROM YOUR

8    DISCUSSION WITH OTHER CHIEFS OF SERVICE AND WITH TAMARA

9    NICHOLS AND YOUR EXPERIENCE SERVING ON THESE PAY PANELS; IS

10   THAT CORRECT?

11   A    YES.

12   Q    OKAY.  AND THE PROCESS AS I UNDERSTAND IT IS NORMALLY

13   THE SERVICE LINE CHIEF -- AND I GUESS WHEN YOU WERE THE

14   MEDICINE CHIEF YOU WOULD DO THIS -- AND THE HR REP PRESENT A

15   RECOMMENDATION TO THE PANEL FOR ANNUAL PAY; IS THAT CORRECT?

16   A    AS THE SERVICE CHIEF I WOULD PREPARE THAT DOCUMENT THAT

17   WE WOULD THEN -- AND I WOULD -- I WOULD PRESENT THAT DOCUMENT

18   FOR PHYSICIANS THAT WERE GOING TO WORK IN MY SERVICE LINE TO

19   THE PAY PANEL.

20   Q    OKAY.  AND THE STARTING POINT THERE WOULD BE THE

21   RECOMMENDATION TO THE PAY PANEL FOR ANNUAL PAY AS OPPOSED TO

22   DISCREETLY MARKET PAY OR BASE PAY.

23   A    YES.

24   Q    OKAY.  ALL RIGHT.  YOU UNDERSTAND THAT BASE PAY COMES

25   OUT OF A LONGEVITY TABLE, NO DISCRETION, NO NEED TO WORRY TOO

1    MUCH ABOUT THAT; IT IS WHAT IT IS.  IS THAT A FAIR STATEMENT?

2    A    YES.

3    Q    OKAY.  AND SO REALLY, IN TERMS OF WHAT THE PANEL DOES,

4    THE MARKET PAY SIMPLY BECOMES A FUNCTION OF TAKING THE ANNUAL

5    PAY, THAT TOTAL AMOUNT, AND SUBTRACTING WHATEVER THE BASE PAY

6    NUMBER IS OFF THE LONGEVITY TABLE AND THAT GIVES YOU THE

7    MARKET PAY.  IS THAT FAIR TO SAY?

8    A    YES.

9    Q    NOW, YOU AND DOCTORS AL-ASSAAD AND DOWNIE SERVED ON THE

10   PANEL THAT REVIEWED ALL FIVE OF THE ANESTHESIOLOGISTS'

11   REVIEWS ON MAY 1ST OF 2015.  DO YOU RECALL SERVING ON THAT

12   PANEL?

13   A    I SERVED ON ALMOST EVERY PANEL.  I DON'T NECESSARILY

14   RECALL SERVING JUST ON THAT ONE PANEL, BUT I DO REMEMBER -- I

15   RECALL THE TIME THAT ALL THE ANESTHESIOLOGISTS WERE REVIEWED.

16   I DON'T REMEMBER THE DATE.

17   Q    OKAY.  LET ME JUST TAKE A MOMENT TO SEE IF I CAN'T PUT

18   MY HANDS ON THOSE.  AND WE HAVE AN EXHIBIT THAT INCLUDES

19   THOSE AND THEN WE CAN AT LEAST GET THAT QUESTION ANSWERED FOR

20   YOU AND MAKE SURE WE ARE ALL ON THE SAME PAGE.

21       I'M SHOWING YOU NOW PLAINTIFF'S EXHIBIT 8 WHICH

22   CONTAINS -- SORRY.  YES.  I'M SHOWING YOU NOW PLAINTIFF'S

23   EXHIBIT NUMBER 8.  AND THIS IS A COMPILATION OF THE PANEL

24   REVIEWS THAT WERE DONE ON MAY 1ST, 2015 TO INCLUDE DR.

25   KENNEDY.  AND IS THAT YOUR SIGNATURE THERE AND YOUR NAME

1    PRINTED, WILLIAM J GROH, AND YOUR SIGNATURE FOR THOSE

2    REVIEWS?

3    A    YES.

4    Q    OKAY.  ALL RIGHT.  AND SO THAT WOULD BE THE REVIEWS THAT

5    YOU RECALL DOING OF ALL THE ANESTHESIOLOGISTS; CORRECT?

6    A    YES.

7    Q    ALL RIGHT.  NOW, YOU WERE ASKED TO APPROVE A RECOMMENDED

8    ANNUAL PAY FOR EACH ONE OF THOSE PHYSICIANS; IS THAT CORRECT?

9    IN OTHER WORDS, TAKING EACH ONE OF THEM AND RECOMMENDING AN

10   AMOUNT OF ANNUAL PAY FOR EACH ONE.

11   A    YES.

12   Q    OKAY.  AND AGAIN, THE PANEL DID NOT MAKE A DISCRETE

13   DETERMINATION OF WHAT PORTION OF THAT ANNUAL PAY WAS MARKET

14   PAY.

15   A    YES, CORRECT.

16   Q    CORRECT, IT DID NOT MAKE THAT DISCRETE DETERMINATION ON

17   MARKET PAY?

18   A    THAT'S CORRECT.

19   Q    OKAY.  ALL RIGHT.  AND ACTUALLY, YOU WERE NOT EVEN TOLD

20   WHAT THE BASE PAY WAS FOR ANY OF THESE ANESTHESIOLOGISTS;

21   WERE YOU?

22   A    NO.

23   Q    OKAY.  AND YOU DIDN'T KNOW WHAT THE MARKET PAY COMPONENT

24   WAS DURING THE PANEL REVIEW OR EVEN AFTERWARDS; IS THAT

25   CORRECT?

1    A    THAT WAS TRUE FOR ALL THE PANELS THAT WE DID.  WE LOOKED

2    AT ANNUAL PAY AND NOT NECESSARILY MARKET OR BASE PAY.

3    Q    OKAY.  ALL RIGHT.  NOW, AT YOUR DEPOSITION I HAD ASKED

4    YOU TO REVIEW THESE TYPED-UP SHEETS THAT ARE ATTACHED TO THE

5    REVIEWS THEMSELVES.  DO YOU REMEMBER THAT, THAT DOCUMENT?

6    NOT THE SPECIFICS, OF COURSE, BUT DO YOU REMEMBER THIS

7    DOCUMENT BEING A PART OF THESE PANEL REVIEWS?

8    A    YES.

9    Q    OKAY.  AND AS I UNDERSTAND IT FROM THE TESTIMONY, THAT

10   THAT SHEET, THE TYPED-UP SHEET WITH NUMBERED PARAGRAPHS ONE

11   THROUGH SEVEN IS AN ATTEMPT TO PROVIDE THE PANEL WITH

12   INFORMATION ABOUT THE PHYSICIAN UNDER REVIEW SUCH AS BOARD

13   CERTIFICATION, QUALIFICATIONS, THAT TYPE THING.

14        DO YOU -- DO YOU AGREE WITH THAT?

15   A    YES.

16   Q    ALL RIGHT, SIR.  NOW, I BELIEVE THAT WHEN I ASKED YOU TO

17   COMPARE THOSE SHEETS AT YOUR DEPOSITION AND GAVE YOU TIME TO

18   DO THAT, YOU CONCLUDED THAT ALL OF THE ANESTHESIOLOGISTS,

19   INCLUDING DR. KENNEDY WHO IS MY CLIENT HERE TODAY, WERE ALL

20   INCREDIBLY VALUABLE TO THE VA.  DO YOU AGREE WITH THAT?

21   A    YES.

22   Q    ALL RIGHT, SIR.  AND IF YOU LEAVE ASIDE FACTORS SUCH AS

23   LENGTH OF SERVICE IN THE SPECIALTY OR LENGTH OF SERVICE AT

24   THE VA, YOU WOULD BELIEVE THAT THE RELATIVE VALUE OF THESE

25   FIVE ANESTHESIOLOGISTS, DR. KENNEDY AND DR. PRYOR AND DR.

1    PENDER AND DR. NGUYEN AND DR. ALGHOTHANI, WHO WERE REVIEWED,

2    IN TERMS OF THE WORK THEY DO AND THEIR BACKGROUND AND WHAT

3    THEY BRING TO THE TABLE, THEY ARE ALL REASONABLY COMPARABLE.

4    IS THAT A FAIR STATEMENT?

5    A    I WOULD SAY YES, REASONABLY COMPARABLE.  EXACTLY

6    COMPARABLE WOULD BE HARD TO SAY.

7    Q    OKAY.  THANK YOU VERY MUCH, DR. GROH.  I HOPE YOU HAVE A

8    SAFE TRIP BACK TO CHARLESTON AND PLEASE ANSWER ANY QUESTIONS

9    THAT COUNSEL FOR THE VA MIGHT HAVE FOR YOU.

10                        CROSS-EXAMINATION

11   BY MR. ANDREWS:

12   Q    DR. GROH, GOOD TO SEE YOU AGAIN.  THANK YOU FOR BEING

13   HERE AND THANK YOU FOR BEING PATIENT WITH US.  I BELIEVE YOU

14   JUST TESTIFIED THAT YOUR RECOLLECTION OF YOUR SERVICE ON THE

15   COMPENSATION PANEL AND THE PURPOSE OF IT WAS TO REVIEW AND

16   RECOMMEND ANNUAL PAY FOR DOCTORS; IS THAT CORRECT?

17   A    YES.

18   Q    OKAY.  AND YOU DID THIS ON COMPENSATION PANELS FOR DR.

19   KENNEDY; IS THAT CORRECT?

20   A    YES.

21   Q    AND FOR OTHER ANESTHESIOLOGISTS; IS THAT CORRECT?

22   A    CORRECT.

23   Q    AS WELL AS FOR DOCTORS OF OTHER SPECIALTIES; IS THAT

24   CORRECT?

25   A    DURING MY APPROXIMATE 20 MONTHS AT CHARLESTON, I -- I

1    MEAN IN COLUMBIA -- I SERVED ON MOST OF THE PAY PANELS --

2    Q    YEAH.

3    A    -- AND WE -- WE DID THAT AND REVIEWED TYPICALLY ANNUAL

4    PAY.

5    Q    YEAH.  AND SO WHAT TYPE OF SPECIALTIES, WHAT OTHER TYPES

6    OF DOCTORS DID YOU SEE OUTSIDE OF ANESTHESIOLOGY?

7    A    GASTROENTEROLOGISTS, CARDIOLOGISTS, GENERAL INTERNAL

8    MEDICINE PHYSICIANS, EMERGENCY DEPARTMENT PHYSICIANS,

9    INTENSIVISTS--

10   Q    DID THE PROCESS -- I'M SORRY.  I DIDN'T MEAN TO CUT YOU

11   OFF.

12   A    YEAH.

13   Q    DID THE PROCESS THAT YOU FOLLOWED ON THE COMPENSATION

14   PANEL CHANGE DEPENDING UPON THE SPECIALTY OF THE DOCTOR?

15   A    NO.  WE -- IT WAS CONSISTENT OVER THAT PERIOD OF TIME I

16   WAS IN COLUMBIA.

17   Q    OKAY.  THANK YOU.  WOULD YOU AGREE THAT BASE PAY PLUS

18   MARKET PAY EQUALS ANNUAL PAY?

19   A    YES.

20   Q    OKAY.  WE HAVE BEEN SAYING THAT A LOT IN THIS CASE.  SO

21   BASE PAY, THOUGH, IS SCHEDULED.  YOU DIDN'T HAVE ANYTHING TO

22   DO WITH THAT; CORRECT?

23   A    CORRECT.

24   Q    OKAY.  SO WHEN YOU'RE IN THE COMPENSATION PANEL

25   DETERMINING ANNUAL PAY, MARKET PAY IS THE ONLY VARIABLE THAT

1    CAN CHANGE BASED ON THE DETERMINATIONS YOU MAKE; IS THAT

2    RIGHT?

3    A    CORRECT.

4    Q    OKAY.  SO WOULD IT BE FAIR TO SAY THAT IN DETERMINING

5    ANNUAL PAY, YOU WERE IN FACT DETERMINING MARKET PAY?  IS THAT

6    CORRECT?

7            MR. IRVIN:  YOUR HONOR, THESE ARE THEIR WITNESSES

8    AND HE'S LEADING.

9            MR. ANDREWS:  YOUR HONOR, THIS IS

10   CROSS-EXAMINATION.  IT'S ENTIRELY WITHIN THE SCOPE OF THE

11   DIRECT EXAMINATION.

12           THE COURT:  I'M GOING TO LET HIM CONTINUE.

13           MR. ANDREWS:  THANK YOU, YOUR HONOR.

14           THE COURT:  YOU CAN ANSWER THE QUESTION.

15           THE WITNESS:  YES.

16           MR. ANDREWS:  THANK YOU.

17   BY MR. ANDREWS:

18   Q    PLEASE PULL UP PLAINTIFF'S EXHIBIT 8, PAGE ONE.  OKAY.

19   NOW DR. GROH, YOU WERE JUST ASKED SOME QUESTIONS ABOUT THIS

20   DOCUMENT.  LET'S LOOK AT AGAIN.  I'D LIKE TO LOOK AT THE

21   FIRST PAGE HERE.  IF YOU CAN GO DOWN JUST A LITTLE BIT MORE.

22   THANK YOU.

23           DO YOU RECOGNIZE THESE SEVEN FACTORS OR THESE EIGHT

24   FACTORS RIGHT HERE ON THE FRONT OF THIS COMPENSATION PANEL

25   FORM?

1    A    YES.

2    Q    AND WERE THOSE FACTORS THAT YOU CONSIDERED IN THE COURSE

3    OF RECOMMENDING ANNUAL PAY?

4    A    YES, WE CONSIDERED ALL OF THOSE SEVEN FACTORS.

5    Q    OKAY.  AND COULD YOU GO FORWARD ONE MORE PAGE, PLEASE?

6    HOW ABOUT ONE MORE?  WANT TO GET TO THE -- THERE WE GO.  SO

7    LET'S TAKE A LOOK AT THESE.  I BELIEVE YOU JUST TESTIFIED

8    ABOUT THIS PAGE.  YOU'RE FAMILIAR WITH THIS PAGE?

9    A    YES.

10   Q    OKAY.  NOW COULD WE ZOOM OUT, PLEASE, ON THIS PARTICULAR

11   PAGE OR IS THIS THE BEST WE CAN SEE?  THE -- SO WE CAN SEE

12   THE ENTIRE PAGE?  DO YOU SEE HOW MANY NUMBERS THERE ARE ON

13   THIS PAGE?

14   A    EIGHT.

15   Q    THERE'S EIGHT.  RIGHT.  AND THEN THE EIGHTH IS NOT

16   APPLICABLE.  BUT FOR THE OTHER SEVEN, DO THOSE CORRESPOND BY

17   ANY CHANCE WITH THE SEVEN FACTORS ON THE FIRST PAGE OF THIS

18   FORM?

19   A    IT LOOKED LIKE THEY DO CORRESPOND TO THE--

20   Q    WELL, LET -- WHY DON'T WE WALK THROUGH THEM.

21   A    OKAY.

22   Q    SO NUMBER ONE, IN YOUR VIEW DOES THAT RELATE TO THE

23   LEVEL OF EXPERIENCE DR. KENNEDY HAS?

24   A    YES.

25   Q    OKAY.  NUMBER TWO, WOULD THAT RELATE TO THE PARTICULAR

1    NEED FOR HIS SPECIALTY AT THE FACILITY?

2    A    YES.

3    Q    OKAY.  NUMBER THREE, WOULD THAT RELATE TO RELEVANT

4    MARKET SALARY DATA SUCH AS THE HAY SURVEY?

5    A    YES.

6    Q    OKAY.  NUMBER FOUR, WOULD THAT RELATE TO ANY PARTICULAR

7    BOARD CERTIFICATIONS IN THE FIELD?

8    A    YES.

9    Q    OKAY.  NUMBER FIVE, WOULD THAT RELATE TO WHETHER THE

10   DOCTOR HAS ANY PARTICULAR EXPERIENCE AT THE VA?

11   A    YES.

12   Q    OKAY.  AND NUMBER SIX, ANY OTHER -- OH, SORRY.  THINK I

13   MIGHT -- MIGHT HAVE GOTTEN A LITTLE BIT OFF.  I SKIPPED

14   PARTICULAR ACCOMPLISHMENTS IN SPECIALTY.  THAT WOULD BE FIVE?

15   A    FIVE IS THE -- YES.

16   Q    CORRECT?  AND SIX WOULD BE EXPERIENCE AT THE VA;

17   CORRECT?

18   A    CORRECT.

19   Q    AND SEVEN WOULD BE ANY OTHER UNIQUE CONSIDERATIONS

20   RELEVANT TO CONSIDERATIONS.  IS THAT FAIR?

21   A    YEAH, I DON'T HAVE THAT.  LET ME LOOK BACK AT THE LIST

22   HERE ONE MORE TIME.  OTHER CONSIDERATIONS, RIGHT.  AND THEN

23   THE EIGHTH IS -- YES, OKAY.  YES.

24   Q    OKAY.  ALL RIGHT.  THANK YOU.  SO, IN YOUR COURSE OF

25   SERVICE ON THESE COMPENSATION PANELS, EVALUATING THESE

1    FACTORS, WERE YOU AWARE OF ANY GUIDANCE BY LAW OR BY POLICY

2    TO GIVE ANY ONE OF THESE FACTORS ANY PARTICULAR WEIGHT?

3    A    NO.

4    Q    IN FACT, IT COULD VARY ON A CASE-BY-CASE BASIS; DIDN'T

5    IT?

6    A    ABSOLUTELY.

7    Q    OKAY.  NOW, LET'S TALK ABOUT ONE OF THE FACTORS WHICH WE

8    HAVE TALKED ABOUT ALREADY; MARKET DATA.  NOW, WHEN YOU LOOK

9    AT THESE MARKET SURVEYS, ARE THESE SALARIES THAT YOU'RE

10   LOOKING AT?

11   A    TYPICALLY YOU WERE GOING TO -- YES, WE ARE GOING TO BE

12   LOOKING AT THE SALARIES, THE AAMC, AMERICAN ASSOCIATION OF

13   MEDICAL COLLEGES, THE HAY GROUP AGAIN IS A SALARY FOR LIKE

14   PHYSICIANS --

15   Q    OKAY.

16   A    -- AND IT TELLS US A LITTLE BIT WHAT A PHYSICIAN OF THAT

17   TYPE WOULD BE COMPENSATED IN THE COMMUNITY OR IN A MEDICAL

18   SCHOOL THAT WOULD BE APPLICABLE THEN TO WHERE -- WHERE WE

19   MIGHT NEED TO GO WITH -- WITH COMPENSATION FOR THAT

20   PHYSICIAN.

21   Q    OKAY.  AND SO WHEN YOU EVALUATE ALL THE CRITERIA THAT

22   YOU'VE IDENTIFIED AND YOU'RE TRYING TO ARRIVE AT A LEVEL OF

23   ANNUAL PAY TO RECOMMEND, IT'S FAIR TO SAY THAT WHEN YOU'RE

24   LOOKING AT WHAT'S COMPARABLE WITH THE SALARY, YOU NEED TO BE

25   LOOKING AT THE SALARY FOR THE DOCTOR AT THE VA; CORRECT?

GROH - CROSS

1    A    YES.

2    Q    SO THE ANNUAL PAY.

3    A    THE ANNUAL PAY.

4    Q    RIGHT.  LET ME ASK YOU THIS.  IN THE COURSE OF

5    EVALUATING THIS MARKET DATA, DO YOU BELIEVE THERE'S ANY

6    GUARANTEE IN THE PRIVATE MARKET THAT A 60-YEAR-OLD DOCTOR

7    MIGHT MAKE MORE THAN A 50-YEAR-OLD DOCTOR?

8    A    NO.

9    Q    DO YOU BELIEVE THERE'S ANY GUARANTEE THAT A DOCTOR WITH

10   25 YEARS EXPERIENCE IN THE PRIVATE MARKET MIGHT MAKE MORE

11   THAN A DOCTOR WITH 15 YEARS EXPERIENCE IN THE PRIVATE MARKET?

12   A    NO.

13   Q    DO YOU BELIEVE THERE'S ANY GUARANTEE THAT TWO DOCTORS

14   WITH THE SAME EXPERIENCE, THAT THE OLDER DOCTOR WOULD BE PAID

15   MORE?  THEY HAVE THE SAME EXPERIENCE BUT ARE DIFFERENT AGES.

16   A    NO.

17   Q    OKAY.  THE PRIVATE MARKET DOESN'T GUARANTEE THAT PAY

18   WILL ALWAYS INCREASE WITH AGE; DOES IT?

19   A    NO.

20   Q    OKAY.  SO WHEN YOU SERVED ON THE COMPENSATION PANELS,

21   YOUR JOB WAS TO ONLY ISSUE A RECOMMENDATION; CORRECT?

22   A    THAT IS CORRECT.

23   Q    TO THE APPROVING OFFICIAL.

24   A    THAT IS CORRECT.

25   Q    WHO HAVE FINAL AUTHORITY TO SET PAY.

1    A    CORRECT.

2    Q    OKAY.  DID YOU TAKE YOUR ROLE ON THE PANEL SERIOUSLY?

3    A    ABSOLUTELY.

4    Q    YOU CONSIDERED THE INFORMATION THAT WAS PRESENTED TO

5    YOU?

6    A    YES.

7    Q    IF YOU DISAGREED WITH THE RECOMMENDATION OF THE SERVICE

8    CHIEF, YOU WOULDN'T HAVE AGREED WITH IT; WOULD YOU?  OR YOU

9    WOULDN'T HAVE APPROVED IT; WOULD YOU?

10   A    NO, WE WOULD NOT.  WE WOULD HAVE VOICED OUR CONCERNS AT

11   THAT TIME.

12   Q    OKAY.  AND WITH THE PAY PANEL REVIEWS FOR DR. KENNEDY

13   AND HIS PEERS, YOU SIGNED YOUR NAME TO THOSE; CORRECT?

14   A    CORRECT.

15   Q    DO YOU TYPICALLY SIGN YOUR NAMES TO DOCUMENTS AND

16   DECISIONS YOU DON'T ENDORSE?

17   A    NO.

18   Q    OKAY.  AND WOULD YOU HAVE ENDORSED THE RECOMMENDATION

19   FOR ANY DOCTOR YOU DID NOT BELIEVE WAS FAIR AND JUSTIFIED?

20   A    I WOULD NOT HAVE.

21   Q    OKAY.  WOULD YOU HAVE ENDORSED A RECOMMENDATION FOR AN

22   OLDER DOCTOR YOU FELT MIGHT BE UNFAIR BECAUSE OF THEIR AGE?

23   A    NO.

24   Q    DID YOU ENDORSE A RECOMMENDATION FOR DR. KENNEDY THAT

25   YOU DID NOT BELIEVE IS FAIR?

1    A    NO.

2    Q    DO YOU STAND BY THAT RECOMMENDATION TODAY?

3    A    I DO.

4         *MR. ANDREWS:* I DON'T HAVE ANY FURTHER QUESTIONS,

5    YOUR HONOR.

6         *THE COURT:* ALL RIGHT.  THANK YOU.

7         *MR. IRVIN:* JUST ONE, YOUR HONOR.

8                      REDIRECT EXAMINATION

9    BY MR. IRVIN:

10   Q    YOU WERE ASKED ABOUT PRIVATE MARKET AND HIRING AND

11   PRIVATE MARKET AND SO FORTH.  IS IT FAIR TO SAY THAT IN THE

12   PRIVATE MARKET -- THAT IS PRIVATE GROUPS OF DOCTORS WHO

13   PRACTICE IN THE SPECIALTY -- TYPICALLY THOSE PRIVATE GROUPS

14   ARE LOOKING TO HIRE RELATIVELY YOUNG PHYSICIANS THAT ARE

15   FRESH OUT OF THEIR RESIDENCIES AND COMING INTO THE PRACTICE

16   WITH THEIR BOARD CERTIFICATIONS IN THE VARIOUS SPECIALTY?

17   THEY ARE NOT LOOKING FOR MORE EXPERIENCED OR PERHAPS THE

18   OLDER, THEY ARE LOOKING FOR THE YOUNG GUYS COMING FROM

19   COLLEGE.  IS THAT A FAIR STATEMENT IN YOUR EXPERIENCE?

20   A    NO, I DON'T THINK SO.

21   Q    OKAY.  THAT'S ALL I HAVE.

22        *THE COURT:* ANYTHING ELSE?

23        *MR. ANDREWS:* NO, YOUR HONOR.

24        *THE COURT:* ALL RIGHT.  THANK YOU.  YOU CAN STEP

25   DOWN AND YOU'RE EXCUSED.

1        (WITNESS LEFT THE STAND.)

2            *THE COURT:*  ALL RIGHT.  WE'RE GOING TO ADJOURN FOR

3    THE DAY AND WE WILL START BACK TOMORROW MORNING AT 9:30.

4        *MR. IRVIN:*  AT 9:30?

5        *THE COURT:*  YES.

6        *MR. IRVIN:*  THANK YOU.

7        (COURT IN RECESS FOR THE EVENING.)

8                                    * * *

9        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

10   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

11       S/KATHLEEN RICHARDSON

12       _____        AUGUST 28, 2018

13       KATHLEEN RICHARDSON, RMR, CRR

14

15

16

17

18

19

20

21

22

23

24

25