```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF SOUTH CAROLINA
2                          COLUMBIA DIVISION

3
     RICHARD M. KENNEDY, III,   )
4                               )
                PLAINTIFF,      )
5                               )
                -VERSUS-        )    3:15-CV-01844
6                               )    AUGUST 2, 2018
     ROBERT WILKIE, SECRETARY   )    COLUMBIA, SC
7    OF THE US DEPARTMENT OF    )    VOLUME II OF II
     VETERANS AFFAIRS,          )
8                               )
                DEFENDANTS.     )
9    ---------------------------)

10

11        BEFORE THE HONORABLE MARGARET B. SEYMOUR
             UNITED STATES DISTRICT JUDGE, PRESIDING
12                       BENCH TRIAL
          ******** REDACTED TRANSCRIPT ********
13
     A P P E A R A N C E S :
14

15   FOR THE PLAINTIFF:        WILMOT B. IRVIN, ESQ.
                               REBECCA G. FULMER, ESQ.
16                             WILMOT B. IRVIN LAW OFFICE
                               PO BOX 7816
17                             COLUMBIA, SC  29202

18   FOR THE DEFENDANT:        TERRI H. BAILEY, AUSA
                               BROOK B. ANDREWS, AUSA
19                             US ATTORNEY'S OFFICE (COLUMBIA)
                               1441 MAIN STREET, SUITE 500
20                             COLUMBIA, SC  29201

21
     COURT REPORTER:           KATHLEEN RICHARDSON, RMR, CRR
22                             UNITED STATES COURT REPORTER
                               901 RICHLAND STREET
23                             COLUMBIA, SC 29201

24            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

25                   *** *** *** ***
```

**INDEX OF WITNESSES**

DR. JAMES MCCALLUM

    DIRECT BY MR. IRVIN . . . . . . . . . . . . . .203

    CROSS BY MR. ANDREWS  . . . . . . . . . . . .209

    REDIRECT BY MR. IRVIN . . . . . . . . . . . .217

DR. ZIAD AL-ASSAAD

    DIRECT BY MR. IRVIN . . . . . . . . . . . . .218

    CROSS BY MR. ANDREWS  . . . . . . . . . . . .224

    REDIRECT BY MR. IRVIN . . . . . . . . . . . .231

DR. NOAH DOWNIE

    DIRECT BY MR. IRVIN . . . . . . . . . . . . .234

    CROSS BY MR. ANDREWS  . . . . . . . . . . . .239

DR. ALAN CARR

    DIRECT BY MR. IRVIN . . . . . . . . . . . . .249

    CROSS BY MR. ANDREWS  . . . . . . . . . . . .254

DR. RAMOTH COX

    DIRECT BY MR. IRVIN . . . . . . . . . . . . .256

    CROSS BY MR. ANDREWS  . . . . . . . . . . . .264

    REDIRECT BY MR. IRVIN . . . . . . . . . . . .266

    RECROSS BY MR. ANDREWS  . . . . . . . . . . .268

DR. STUART SMITH

    DIRECT BY MR. IRVIN . . . . . . . . . . . . . 270

    CROSS BY MR. ANDREWS  . . . . . . . . . . . .273

DEBORAH DOTY

    DIRECT BY MR. IRVIN . . . . . . . . . . . . .286

CROSS BY MRS. BAILEY . . . . . . . . . . .316

REDIRECT BY MR. IRVIN . . . . . . . . . . .338

RECROSS BY MRS. BAILEY . . . . . . . . . .346

REDIRECT BY MR. IRVIN . . . . . . . . . . .349

RECROSS BY MRS. BAILEY . . . . . . . . . .351

REDIRECT BY MR. IRVIN . . . . . . . . . . .355

RECROSS BY MRS. BAILEY . . . . . . . . . .357

RICHARD KENNEDY

DIRECT BY MR. IRVIN . . . . . . . . . . . .358

CROSS BY MRS. BAILEY . . . . . . . . . . .419

1            MR. IRVIN:  GOOD MORNING, YOUR HONOR.

2            THE COURT:  YOU MAY CALL YOUR NEXT WITNESS.

3            MR. IRVIN:  THANK YOU, YOUR HONOR.  WHEN WE WERE

4   CONCLUDING YESTERDAY, WE TALKED ABOUT DR. KURT FICHTNER -- IS

5   HOW HE PRONOUNCES IT -- HE'S ON THE WITNESS LIST, AND HE'S

6   THE ONE, YOUR HONOR, THAT HAS A SERIOUS MEDICAL CONDITION AND

7   HAS BEEN OUT FOR TREATMENTS, AND WE'VE JUST DECIDED THAT

8   RATHER THAN ME PUT MRS. FULMER UP AND US GOING THROUGH THE

9   READING HIS DEPOSITION TESTIMONY, THAT WE ARE SIMPLY GOING TO

10  SUBMIT YOUR HONOR THE PORTIONS OF THE TESTIMONY THAT WE PUT

11  INTO EVIDENCE.

12          AND MR. ANDREWS, I WILL TELL YOU, THAT I -- I UNDERSTAND

13  THAT MY LONG-TIME ASSISTANT ACTUALLY PUT MORE

14  COUNTER-DESIGNATIONS INTO THIS AND SO YOUR

15  COUNTER-DESIGNATIONS WOULD BE PUT -- BY ALL MEANS CHECK ME,

16  AND IF WE LEFT SOMETHING OUT...

17          MR. ANDREWS:  I WILL DO THAT.  AND I WILL JUST SAY,

18  YOUR HONOR, WE HAVEN'T REVIEWED THOSE YET.  I TAKE MR. IRVIN

19  AT HIS WORD.  WE WILL REVIEW IT, BUT IF FOR WHATEVER REASON

20  WE SEE THERE'S SOMETHING WRONG, WE WILL RAISE THAT OBJECTION.

21          MR. IRVIN:  WE WOULDN'T HAVE ANY PROBLEM WITH -- I

22  DID INCORPORATE TO THE BEST OF MY REPRESENTATION TO THE COURT

23  THIS MORNING THE COUNTER-DESIGNATIONS THAT I UNDERSTOOD THEY

24  WANTED.  BUT IF THEY WANT SOME MORE, WE WOULDN'T HAVE ANY

25  OBJECTION.

1            *THE COURT:*  OKAY.  THAT'S FINE.  AND COULD YOU GIVE

2    THE COURT, THE CLERK OF COURT, THE ORIGINAL?

3            *THE CLERK:*  I NEED THE ORIGINAL DEPOSITION.

4            *MR. IRVIN:*  OKAY.  THIS IS THE PORTION THAT WE ARE

5    SUBMITTING, AND I JUST WANTED THE COURT TO HAVE THAT.

6            *THE CLERK:*  I NEED THE ORIGINAL.

7            *MR. IRVIN:*  OH, I UNDERSTAND.  SO THAT WILL

8    HOPEFULLY, YOUR HONOR, SAVE US A LITTLE BIT OF TIME.

9            *THE COURT:*  IT WILL.  THANK YOU VERY MUCH.  WE

10   APPRECIATE IT.  ALL RIGHT.

11           *MR. IRVIN:*  MAY IT PLEASE THE COURT.  THE WITNESS

12   THAT COMES NEXT ON THE LIST ACTUALLY WAS BEFORE DR. FICHTNER,

13   BUT IS DR. MCCALLUM, SO WE WOULD CALL DR. MCCALLUM AT THIS

14   TIME.

15           *THE COURT:*  ALL RIGHT.  THANK YOU.

16       (WITNESS ENTERED THE COURTROOM.)

17           *THE COURT:*  ALL RIGHT.  DR. MCCALLUM, YOU MAY COME

18   FORWARD.

19            DR. JAMES MCCALLUM, AFTER BEING DULY SWORN,

20   TESTIFIED AS FOLLOWS:

21                   DIRECT EXAMINATION

22   BY MR. IRVIN:

23   Q    GOOD MORNING, DR. MCCALLUM.

24   A    GOOD MORNING.

25   Q    I BELIEVE WE HAVE MET BEFORE.  YOUR DEPOSITION WAS TAKEN

MCCALLUM - DIRECT

1    IN THE CASE AND I TOOK THAT DEPOSITION.  DO YOU RECALL US

2    DOING THAT --

3    A    I DO.

4    Q    -- IN THE CASE?  ALL RIGHT.  AND YOUR DEPOSITION WAS

5    TAKEN ON FEBRUARY THE 29TH OF 2016.  DO YOU RECALL GIVING

6    YOUR TESTIMONY?

7    A    I DO RECALL GIVING MY TESTIMONY AND I BELIEVE IT WAS

8    ABOUT THEN.

9    Q    OKAY.  ALL RIGHT.  NOW, YOU HAVE BEEN A PHYSICIAN AT THE

10   VA MEDICAL CENTER AT DORN FOR HOW LONG, SIR?

11   A    ABOUT 14 YEARS.

12   Q    DID YOU SAY 14?

13   A    FOURTEEN, YES, SIR.

14   Q    OKAY.  AND WHAT IS YOUR SPECIALTY?

15   A    INTERNAL MEDICINE.

16   Q    I SEE.  ALL RIGHT.  AND HAVE YOU HAD THE OPPORTUNITY TO

17   SERVE AS A PANEL MEMBER ON WHAT WE HAVE BEEN REFERRING TO AS

18   THESE COMP PANELS OR --

19   A    YES, SIR.

20   Q    -- PAY PANELS?

21   A    I HAVE.

22   Q    AND THE PURPOSE OF THOSE PANELS IS TO REVIEW A STAFF

23   PHYSICIAN'S COMPENSATION EVERY SO OFTEN?  WOULD THAT BE A

24   FAIR STATEMENT?

25   A    THAT'S ONE OF THEM, CERTAINLY.

1    Q    OKAY.

2    A    IT WOULD ALSO BE TO RECOMMEND PAY FOR A NEW INCOMING

3    PHYSICIAN AS WELL.

4    Q    YES.  THANK YOU VERY MUCH.  AND SO IT IS REALLY IN PART

5    A RECRUITMENT SORT OF ASPECT TO IT AND THEN A RETENTION

6    ASPECT TO THE REVIEWS AS WELL?

7    A    I DON'T -- IT'S TO MAKE A RECOMMENDATION FOR PAY.  AS

8    FAR AS WHETHER SERVES AS RECRUITMENT OR RETENTION, THAT WOULD

9    BE I GUESS IN THE EYES OF THE BEHOLDER, SO...

10   Q    OKAY.  I JUST SAID THAT BECAUSE YOU MENTIONED IT APPLIED

11   TO INCOMING NEW PHYSICIANS THAT ARE BEING RECRUITED INTO DORN

12   AS WELL AS TO THOSE WHO ARE ALREADY THERE --

13   A    CORRECT.

14   Q    -- WHO COME UP FOR REVIEW PERIODICALLY.

15   A    CORRECT.

16   Q    OKAY.  AND SO YOU'VE SERVED ON A BUNCH OF THESE PANELS

17   OVER YOUR 14 YEARS AT DORN?

18   A    I HAVE.

19   Q    OKAY.  YOU'RE STILL AT DORN?

20   A    I AM.

21   Q    OKAY.  AND IN THE SAME CAPACITY AS A STAFF PHYSICIAN IN

22   INTERNAL MEDICINE?

23   A    AMONG OTHER CAPACITIES.

24   Q    OKAY.  ALL RIGHT.  NOW, AS I UNDERSTAND IT FROM YOUR

25   TESTIMONY THAT YOU GAVE IN THE DEPOSITION, YOU BELIEVE THAT

1    IT IS THE COMP PANEL'S JOB TO LOOK AT THE ANNUAL PAY OF THE

2    PHYSICIAN UNDER REVIEW.  IS THAT A FAIR STATEMENT?

3    A    THAT'S A FAIR STATEMENT.

4    Q    ALL RIGHT.  AND BASE PAY -- YOU KNOW GENERALLY WHAT BASE

5    PAY IS; THAT ELEMENT OF THE PHYSICIAN'S PAY?

6    A    YES, SIR.

7    Q    THAT'S A LONGEVITY TABLE NUMBER?

8    A    UH-HUH.  IT IS, YES.

9    Q    OKAY.  SO THE TWO COMPONENTS THAT MAKE UP ANNUAL PAY

10   BEING BASE PAY AND MARKET PAY.

11   A    CORRECT.

12   Q    YOU AGREE WITH ME THERE?  ALL RIGHT.  THOSE TWO

13   COMPONENTS ARE, AS I UNDERSTAND YOUR PRIOR TESTIMONY, ARE NOT

14   CONSIDERED SEPARATELY BY THE PANEL; IS THAT A FAIR STATEMENT?

15   A    THAT'S CORRECT.

16   Q    THE PANEL AT LEAST IN YOUR EXPERIENCE OVER 14 YEARS

17   CONSIDERS THE OVERALL ANNUAL PAY NUMBER.

18   A    THAT'S CORRECT.

19   Q    OKAY.  ALL RIGHT.  NOW, WOULD IT BE FAIR TO SAY THAT IN

20   THE PANELS -- AT LEAST THAT YOU HAVE EXPERIENCE IN -- WHEN

21   THAT ANNUAL PAY NUMBER IS CONSIDERED AND EVENTUALLY ARRIVED

22   AT EITHER BY RECOMMENDATION FROM THE SERVICE LINE CHIEF OR IF

23   THERE IS SOME CHANGE THAT'S MADE, BUT ONCE THAT NUMBER IS

24   ARRIVED AT AND THE PANEL RECOMMENDS WHATEVER IT IS -- LET'S

25   JUST SAY $275,000 FOR ANNUAL PAY -- THEN THAT'S PRETTY MUCH

1    THE PANEL'S -- THE END OF THE PANEL'S JOB.  WOULD THAT BE

2    FAIR TO SAY?  I KNOW YOU GOT TO SIGN THE FORMS, BUT YOU DON'T

3    GET INTO...

4        I APOLOGIZE.  MY QUESTIONS ARE GETTING TOO LONG.  YOU

5    DON'T GET INTO LOOKING UP THE LONGEVITY TABLES TO TRY TO

6    FIGURE OUT WHAT BASE PAY IS.

7    A    THAT'S CORRECT.

8    Q    OKAY.  AND YOU DON'T TRY REALLY TO DO ANYTHING

9    SPECIFICALLY WITH RESPECT TO MARKET PAY?

10   A    YOU'RE GOING TO HAVE TO EXPLAIN WHAT YOU MEAN A LITTLE

11   MORE THAN THAT --

12   Q    OKAY.

13   A    -- IN ORDER TO ANSWER THAT.

14   Q    YOU JUST TESTIFIED THAT THE PANEL DOESN'T FOCUS ON BASE

15   PAY OR MARKET PAY, THE PANEL FOCUSES ON ANNUAL PAY.

16   A    THAT'S CORRECT.

17   Q    AND WHAT I'M TRYING TO GET AT IS ONCE YOU DO YOUR JOB

18   AND FOCUS ON ANNUAL PAY AND MAKE A DECISION ABOUT THAT AND

19   YOU ALL SIGN OFF ON THAT, IS THAT PRETTY WELL THE END OF YOUR

20   RESPONSIBILITIES OF THE PANEL MEMBER, MEMBERS WITH RESPECT TO

21   THAT PARTICULAR PHYSICIAN REVIEW?

22   A    AS I UNDERSTAND YOUR QUESTION, YES.

23   Q    OKAY.  IS THERE SOMETHING ABOUT MY QUESTION THAT YOU

24   DON'T UNDERSTAND?  I'LL BE GLAD TO TRY TO--

25   A    NO, I THINK SO.  I THINK, YES, SIR, THAT'S MY

1   UNDERSTANDING, YES.

2   Q    OKAY.  NOW, I BELIEVE THAT YOU HAVE TOLD ME THAT AT THE

3   FEBRUARY 2014 COMP PANEL REVIEW THAT YOU SERVED ON FOR DR.

4   KENNEDY -- DO YOU RECALL THAT?

5   A    I DON'T RECALL THE SPECIFIC PANEL TO BE HONEST WITH YOU.

6   I DO RECALL THAT I CERTAINLY WAS ON THAT ONE BASED ON THE

7   DOCUMENTATION.

8   Q    OKAY.  YOU'VE REVIEWED THE DOCUMENTATION?

9   A    CORRECT.

10   Q    AND YOU CAN CONFIRM THAT YOU --

11   A    I WAS ON IT.

12   Q    -- YOU SIGNED -- YEAH.

13   A    I DON'T RECALL THE ACTUAL EVENT, SO, YES, SIR.

14   Q    YOU SIGNED OFF ON --

15   A    CORRECT.

16   Q    -- THAT COMP PANEL REVIEW.  AND I BELIEVE THAT AT THAT

17   COMP PANEL REVIEW YOU WEREN'T GIVEN ANY OF THE MARKET PAY

18   INFORMATION ABOUT ANY OF THE OTHER ANESTHESIOLOGISTS IN THE

19   DEPARTMENT; WERE YOU?

20   A    WE WOULD NOT HAVE BEEN.

21   Q    OKAY.  AND SO, YOU DIDN'T HAVE ANY OF THAT INFORMATION

22   FOR COMPARISON PURPOSES.

23   A    NO.

24   Q    OKAY.  ALL RIGHT.  AND AS I UNDERSTAND IT, WHAT YOU HAVE

25   JUST DESCRIBED ABOUT HOW THAT PANEL PROCESS WORKS WITH

1    RESPECT TO DR. KENNEDY WOULD BE CONSISTENT BY AND LARGE WITH

2    ALL OF THE PANELS THAT YOU HAVE SERVED ON.  WOULD THAT BE A

3    FAIR STATEMENT?

4    A    THAT WOULD BE A FAIR STATEMENT.

5    Q    OKAY.  THANK YOU VERY MUCH, DR. MCCALLUM.  PLEASE ANSWER

6    ANY QUESTIONS THAT COUNSEL FOR THE VA MAY HAVE FOR YOU.

7                         CROSS-EXAMINATION

8    BY MR. ANDREWS:

9    Q    GOOD MORNING, DR. MCCALLUM.

10   A    GOOD MORNING.

11   Q    I APPRECIATE YOU BEING WITH US THIS MORNING.  I KNOW WE

12   DIDN'T GIVE YOU MUCH OF A CHOICE, BUT WE APPRECIATE IT ANY

13   WAY.  I BELIEVE YOU JUST TESTIFIED THAT YOUR ROLE ON THE

14   COMPENSATION PANEL AS YOU VIEWED IT WAS TO RECOMMEND ANNUAL

15   PAY.

16   A    THAT'S CORRECT.

17   Q    IS THAT CORRECT?

18   A    THAT IS CORRECT.

19   Q    OKAY.  AND I BELIEVE YOU ALSO TESTIFIED THAT THE BASE

20   PAY COMPONENT OF ANNUAL PAY IS NOT SOMETHING THAT YOU WOULD

21   CALCULATE; IS THAT RIGHT?

22   A    THAT'S CORRECT.

23   Q    WOULD HR TAKE CARE OF THAT?

24   A    HR WOULD TAKE CARE OF THAT.

25   Q    OKAY.  AND THE OTHER VARIABLE OF ANNUAL PAY IS MARKET

1    PAY; IS THAT CORRECT?

2    A    THAT IS CORRECT.

3    Q    SO WHEN YOU'RE RECOMMENDING ANNUAL PAY, IS IT FAIR TO

4    SAY THAT YOU'RE ALSO RECOMMENDING MARKET PAY?

5    A    WELL, THE ONLY VARIABLE PART OF THE PAY IS IN FACT THE

6    MARKET PAY.  THE OTHER IS SET.  SO YES, WE ARE EFFECTIVELY

7    RECOMMENDING ANNUAL PAY TAKING MARKET PAY INTO CONSIDERATION.

8    Q    OKAY.  NOW IN THE COURSE OF YOUR REVIEW AND

9    RECOMMENDATION OF ANNUAL PAY, WERE THERE CERTAIN FACTORS THAT

10   YOU CONSIDERED AS PART OF THAT PROCESS?

11   A    THERE ARE.

12   Q    YOU'VE HEARD OF THE SEVEN FACTORS?

13   A    THERE ARE SEVEN FACTORS AND WE ALSO HAVE A

14   REPRESENTATIVE FROM HR THERE WITH US TO MAKE SURE THAT WE ARE

15   TAKING INTO CONSIDERATION THOSE SEVEN FACTORS.

16   Q    OKAY.  AND LET'S TALK ABOUT THOSE SPECIFICALLY.

17   A    OKAY.

18   Q    I WANT TO WALK YOU THROUGH THEM.  SO IN CONSIDERING A

19   PAY RECOMMENDATION, DID YOU CONSIDER THE DOCTOR'S EXPERIENCE

20   IN THAT PARTICULAR SPECIALTY?

21   A    THAT'S ONE OF THEM, CERTAINLY.

22   Q    AND WHEN WE TALK ABOUT EXPERIENCE, I SHOULD ALSO ADD

23   WOULD THAT INCLUDE BOTH QUANTITATIVE EXPERIENCES IN YEARS OF

24   SERVICE AND ALSO QUALITATIVE EXPERIENCE AS IN THE RICHNESS OF

25   THAT EXPERIENCE?

1    A    CORRECT.

2    Q    OKAY.  HOW ABOUT THE PARTICULAR NEED FOR THAT SPECIALTY

3    AT THE HOSPITAL?

4    A    ABSOLUTELY.

5    Q    OKAY.  HOW ABOUT RELEVANT MARKET SALARY DATA LIKE THE

6    HAY SURVEY OR OTHER SURVEY--

7    A    HAY SURVEY AND THE DOUBLE A MC SURVEY AND WHATEVER

8    THAT -- IN ALL HONESTY, THOSE HAVE EVOLVED OVER TIME, SO MOST

9    RECENT ARE THE HAY AND THE DOUBLE A MC.  WE'VE USED OTHERS AT

10   OTHER TIMES AS WELL, BUT THE BEST DATA WE CAN GET.

11   Q    OKAY.  THE BEST -- WHATEVER DATA YOU CAN GET ABOUT THE

12   RELEVANT LABOR MARKET.  WOULD THAT BE FAIR TO SAY?

13   A    YES, IT WOULD.

14   Q    OKAY.  HOW ABOUT BOARD CERTIFICATION IN THEIR SPECIALTY?

15   A    YES.

16   Q    OKAY.  ANY PARTICULAR ACCOMPLISHMENTS IN THEIR

17   SPECIALTY?

18   A    YES.

19   Q    OKAY.  WHETHER THEY HAVE EXPERIENCE, IF ANY, AT THE VA?

20   A    THAT... IT WOULD DEPEND ON THE NATURE OF THE PARTICULAR

21   PHYSICIAN.

22   Q    SURE.  WOULD YOU TYPICALLY SEE A CV OR HAVE --

23   A    YES.

24   Q    -- SOME UNDERSTANDING OF WHAT THEIR BACKGROUND IS?

25   A    YES.

1    Q    SO YOU WOULD KNOW IF THEY HAD VA EXPERIENCE OR NOT.  IS

2    THAT FAIR TO SAY?

3    A    YES, CORRECT.

4    Q    OKAY.  AND HOW ABOUT ANY OTHER CONSIDERATIONS THAT MIGHT

5    BE DEEMED RELEVANT OR--

6    A    YES.

7    Q    OKAY.  NOW, I WANT TO ASK YOU THIS BECAUSE I THINK IT'S

8    IMPORTANT.  WHEN YOU CONSIDER THESE FACTORS, WERE YOU UNDER

9    ANY -- AS FAR AS YOU'RE AWARE WAS THERE ANY GUIDANCE OR ANY

10   INSTRUCTIONS THAT WERE GIVEN TO YOU ON HOW MUCH WEIGHT NEEDED

11   TO BE ASSIGNED TO ANY ONE OF THOSE FACTORS?

12   A    NO.

13   Q    AND IN FACT, IT COULD VARY ON A CASE-BY-CASE BASIS?

14   A    IT DOES VARY ON A CASE-BY-CASE BASIS.

15   Q    NOW, I BELIEVE YOU WERE ASKED A QUESTION ABOUT YOUR

16   SERVICE ON COMPENSATION PANELS AND I BELIEVE YOU ANSWERED IT

17   AFFIRMATIVELY TO A QUESTION THAT YOU HAD SERVED ON A BUNCH OF

18   COMPENSATION PANELS; IS THAT RIGHT?

19   A    THAT'S CORRECT.

20   Q    OKAY.  YOU DON'T HAVE TO GIVE US ANY SPECIFICITY, BUT DO

21   YOU HAVE ANY IDEA HOW MANY COMPENSATION PANELS?

22   A    A LOT.  IT'S ONE OF THOSE THINGS WHERE I COULDN'T GIVE

23   YOU AN EXACT NUMBER.  IF IT'S IN THE HUNDREDS, I WOULD NOT BE

24   SURPRISED.

25   Q    IN THE HUNDREDS YOU WOULD NOT BE SURPRISED?

```
1    A    CORRECT.

2    Q    OKAY.  I WOULD CONSIDER THAT A LOT.  BUT THE -- LET ME

3    ASK YOU THIS.  HAVE YOU SERVED -- WELL, YOU SERVED ON DR.

4    KENNEDY'S COMPENSATION PANEL; CORRECT?

5    A    I DID.

6    Q    AND HE'S AN ANESTHESIOLOGIST.

7    A    CORRECT.

8    Q    HAVE YOU SERVED ON COMPENSATION PANELS FOR DOCTORS IN

9    OTHER SPECIALTIES?

10   A    MANY TIMES.

11   Q    OKAY.  COULD YOU NAME FOR US SOME OF THOSE SPECIALTIES?

12   A    INTERNAL MEDICINE, SURGERY, WE ALSO DO DENTISTS,

13   PSYCHIATRY, PHYSICAL MEDICINE REHABILITATION, PRIMARY CARE.

14   I THINK I'VE PROBABLY SERVED ON JUST ABOUT EVERY SPECIALTY WE

15   HIRE.

16   Q    OKAY.

17   A    I COULD NOT GUARANTEE THAT, BUT IT WOULD -- IT WOULDN'T

18   SURPRISE ME THERE AGAIN.

19   Q    OKAY.  NOW, IN YOUR EXPERIENCE SERVING ON THOSE

20   COMPENSATION PANELS, WERE THEY CONDUCTED ANY DIFFERENTLY THAN

21   THE COMPENSATION PANEL FOR DR. KENNEDY?

22   A    NO.  THEY ARE ALL CONDUCTED THE -- EXACTLY THE SAME WAY.

23   Q    OKAY.

24   A    LET ME REPHRASE THAT.  THEY ARE ALL INDIVIDUALLY DONE,

25   BUT THE FORMAT IS SIMILAR, EXACTLY THE SAME.  SO EACH ONE IS
```

1    CONSIDERED INDIVIDUALLY.

2    Q    I UNDERSTAND.  YOU'RE GOING TO CONSIDER EACH DOCTOR --

3    A    CORRECT.

4    Q    -- ON THEIR OWN MERIT.

5    A    CORRECT.

6    Q    IS THAT FAIR TO SAY?

7    A    THAT'S FAIR TO SAY.

8    Q    OKAY.  THANK YOU.  LET'S GO BACK A LITTLE BIT TO THE

9    MARKET DATA.  I WANT TO MAKE SOMETHING CLEAR.  NOW, WHEN

10   YOU'RE LOOKING AT MARKET DATA, IS THAT WHAT WE WOULD THINK OF

11   AS A SALARY?  ARE YOU LOOKING AT RANGE -- SALARY RANGES THAT

12   MIGHT BE IN THE PRIVATE MARKET?

13   A    EFFECTIVELY, YES.

14   Q    AND SO IS IT FAIR TO SAY THAT IN ORDER TO DETERMINE

15   WHETHER YOU'RE GOING TO PAY A DOCTOR AT A RATE OF PAY THAT'S

16   FAIR AND REASONABLY COMPARABLE THAT YOU WOULD HAVE TO LOOK AT

17   WHAT THEIR EFFECTIVE SALARY WOULD BE, RIGHT, THE OVERALL

18   NUMBER.  IS THAT FAIR TO SAY?

19   A    THAT'S CORRECT.

20   Q    AND WE WOULD LOOK AT THAT AS ANNUAL PAY; IS THAT

21   CORRECT?

22   A    THAT'S CORRECT.

23   Q    OKAY.  NOW IN THE COURSE OF YOUR REVIEW OF THIS PRIVATE

24   MARKET DATA AND THE COURSE OF YOUR EXPERIENCES AS A DOCTOR,

25   WOULD THERE BE ANY GUARANTEE THAT A 60-YEAR-OLD DOCTOR IN

MCCALLUM - CROSS

1     PRIVATE PRACTICE WOULD BE PAID MORE THAN A 50-YEAR-OLD

2     DOCTOR?

3     A     NO.

4     Q     WOULD THERE BE ANY GUARANTEE THAT A DOCTOR WITH 25 YEARS

5     EXPERIENCE WOULD BE PAID MORE THAN A DOCTOR WITH 15 YEARS

6     EXPERIENCE?

7     A     NO.

8     Q     IF THERE WERE TWO DOCTORS IN PRIVATE PRACTICE OF

9     REASONABLY-COMPARABLE EXPERIENCE, IS THERE ANY GUARANTEE THAT

10    THE OLDER DOCTOR WOULD BE PAID MORE?

11    A     NONE THAT I'M AWARE OF.

12    Q     OKAY.  THE PRIVATE MARKET DOESN'T GUARANTEE THAT PAY IS

13    GOING TO GO UP WITH AGE; DOES IT?

14    A     NO.

15    Q     NOW, THE COMPENSATION PANELS DON'T HAVE FINAL PAY

16    AUTHORITY; DO THEY?

17    A     THAT'S CORRECT.

18    Q     THEY ONLY ISSUE A RECOMMENDATION TO THE APPROVING

19    OFFICIAL?

20    A     THAT'S CORRECT.

21    Q     NOW, THROUGHOUT YOUR SERVICE ON ALL THESE PANELS, WHICH

22    YOU'VE ESTIMATED COULD BE IN THE HUNDREDS, DID YOU TAKE YOUR

23    ROLE SERIOUSLY?

24    A     YES, ABSOLUTELY.

25    Q     DID YOU CONSIDER THE INFORMATION THAT WAS BROUGHT TO

1    YOU?

2    A    WE DO JUST AS I'M -- GET RECOMMENDATIONS THE SAME WAY, I

3    WOULD HOPE THAT PEOPLE WHO ARE ON MINE WOULD TAKE THINGS INTO

4    CONSIDERATION AS WELL, SO IT'S...

5    Q    BECAUSE WE HAVEN'T TALKED ABOUT THIS.  SO YOU SERVED ON

6    COMPENSATION PANELS, BUT IS IT ALSO TRUE THAT YOUR ANNUAL PAY

7    IS UNDER CONSIDERATION BY OTHER PANELS OF DOCTORS, TOO?

8    A    CORRECT.

9    Q    OKAY.  AND SO IF YOU DISAGREE WITH A RECOMMENDATION THAT

10   THE SERVICE LINE CHIEF BROUGHT FOR A DOCTOR'S ANNUAL PAY,

11   WOULD YOU HAVE APPROVED IT?

12   A    NO.

13   Q    OKAY.  NOW, IN THE COURSE OF YOUR REVIEW OF DR.

14   KENNEDY'S PAY RECOMMENDATION, DO YOU RECALL ANYTHING THAT

15   FELT UNFAIR TO YOU OR UNJUSTIFIED?

16   A    NO.

17   Q    AND YOU SIGNED YOUR NAME TO THAT RECOMMENDATION --

18   A    I DID.

19   Q    -- DID YOU NOT?  AND DO YOU STAND BY IT TODAY?

20   A    I DO.

21   Q    IF YOU HAD SEEN ANYTHING IN YOUR EXPERIENCE SERVING ON A

22   COMPENSATION PANEL THAT SUGGESTED TO YOU THAT OLDER DOCTORS

23   AT DORN WERE BEING UNFAIRLY TREATED BY THESE PAY PRACTICES

24   WOULD YOU HAVE APPROVED THEM?

25   A    NO.

1    Q    OKAY.  I DON'T HAVE ANY FURTHER QUESTIONS.  THANK YOU

2    VERY MUCH.

3                         REDIRECT EXAMINATION

4    BY MR. IRVIN:

5    Q    DR. MCCALLUM, JUST SO THAT WE CAN BE CLEAR THAT YOU'RE

6    NOT -- THAT YOUR TESTIMONY THAT YOU JUST GAVE TO MR. ANDREWS

7    IS IN LINE WITH WHAT YOU GAVE TO ME, I WANT TO MAKE SURE

8    ABOUT WHAT YOU SAID ON THOSE FACTORS AND SO FORTH.  BUT WITH

9    RESPECT TO MARKET PAY, WOULDN'T IT BE THE CASE THAT ONCE YOU

10   AS A PANEL MAKE THE DETERMINATION OF ANNUAL PAY, THEN THE

11   MARKET PAY IS DICTATED SIMPLY BY TAKING THE ANNUAL PAY NUMBER

12   THAT YOU'RE MAKING A RECOMMENDATION ON AND SUBTRACTING FROM

13   IT THE BASE PAY NUMBER THAT COMES OFF OF SOME TABLE AND

14   THAT'S HOW YOU GET THE MARKET PAY?

15   A    THAT'S CORRECT.  IT'S THE ONLY VARIABLE PORTION.

16   Q    AND IT'S CORRECT THAT THAT'S HOW IT'S DONE.

17   A    TO MY UNDERSTANDING, YES.

18   Q    THANK YOU VERY MUCH, DR. MCCALLUM.

19        MR. ANDREWS:  I DON'T HAVE ANY FURTHER QUESTIONS,

20   YOUR HONOR.

21        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

22   CAN STEP DOWN.  YOU'RE EXCUSED.

23        (WITNESS LEFT THE STAND.)

24        THE COURT:  MAY CALL YOUR NEXT WITNESS.

25        MR. IRVIN:  THANK YOU, YOUR HONOR.  THE NEXT

```
1    WITNESS IS DR. AL-ASSAAD.

2                    DR. ZIAD AL-ASSAAD, AFTER BEING DULY SWORN,

3    TESTIFIED AS FOLLOWS:

4                         DIRECT EXAMINATION

5    BY MR. IRVIN:

6    Q    GOOD MORNING, DR. AL-ASSAAD.

7    A    GOOD MORNING.

8    Q    MY NAME IS WILMOT IRVIN, AND YOU AND I HAVE MET BEFORE,

9    I BELIEVE.  DO YOU RECALL GIVING YOUR DEPOSITION EARLIER IN

10   THE CASE?

11   A    I THINK SO, YEAH, I REMEMBER.

12   Q    YES, SIR.

13   A    YES.

14   Q    AND I REPRESENT -- I'M A LAWYER AND I REPRESENT DR. RICK

15   KENNEDY WHO IS SEATED HERE AT COUNSEL TABLE WITH ME.

16   A    YES.

17   Q    AND I JUST WANT TO ASK YOU A FEW QUESTIONS.  AND WE --

18   LET ME FIRST JUST GET A LITTLE BIT OF INFORMATION ABOUT YOU.

19   AS I UNDERSTAND IT, YOU WERE CHIEF OF PATHOLOGY AND

20   LABORATORY AT DORN VA FOR 28 YEARS; IS THAT CORRECT?

21   A    YES, SIR.

22   Q    ARE YOU STILL EMPLOYED IN THAT POSITION TODAY?

23   A    NO, SIR.

24   Q    YOU -- I'M SORRY.  I DIDN'T HEAR YOU.

25   A    NO, SIR.
```

AL-ASSAAD - DIRECT

219

1    Q    OKAY. YOU ARE RETIRED?

2    A    I'M RETIRED.

3    Q    WAY TO GO. BUT YOU SERVED -- DID YOU SERVE AS THE CHIEF

4    OF PATHOLOGY FOR 28 YEARS?

5    A    YES, SIR.

6    Q    WOW. OKAY. ALL RIGHT. AND OVER THAT PERIOD OF TIME

7    I'M GUESSING THAT YOU SERVED ON A GOOD MANY OF THESE

8    COMPENSATION PANELS THAT REVIEW PHYSICIAN PAY AT DORN?

9    A    YES, SIR.

10   Q    AND DR. AL-ASSAAD, AS I UNDERSTAND THE PROCESS, AS THE

11   CHIEF OF A SERVICE LINE, WHICH YOU WERE, PATHOLOGY AND

12   LABORATORY, SOMETIMES YOU WOULD BE CALLED UPON TO BE THE

13   PRESENTER OF A RECOMMENDATION FOR ANNUAL PAY TO ONE OF THESE

14   PANELS? DID YOU DO THAT WHEN SOME PHYSICIAN IN YOUR SERVICE

15   LINE CAME UP FOR REVIEW?

16   A    ONLY I PRESENT MY STAFF.

17   Q    YOUR STAFF. YES, SIR. THAT'S WHAT I INTENDED. SO, YOU

18   PRESENTED ON OCCASIONS WHEN YOUR PHYSICIANS' STAFF MEMBER OR

19   MEMBERS COME UP FOR REVIEW?

20   A    YES, SIR.

21   Q    OKAY. AND YOU HAVE ALSO, SIR -- HAVE YOU ALSO SERVED AS

22   AN ACTUAL PANEL MEMBER ON PANELS REVIEWING PHYSICIANS IN

23   OTHER SPECIALTIES?

24   A    YES, SIR.

25   Q    OKAY. ALL RIGHT. NOW, I'M GOING TO SHOW YOU A COUPLE

1   OF THE EXHIBITS THAT WE HAVE ALREADY PUT IN EVIDENCE IN THE

2   CASE. AND I'LL TELL YOU THAT IT'S -- IT'S MY UNDERSTANDING,

3   I THINK WE ALL AGREE -- THAT THESE DOCUMENTS SHOW YOU AS A

4   PANEL MEMBER FOR A SERIES OF REVIEWS. I'M --

5          MR. IRVIN: BEG YOUR PARDON. YOUR HONOR, CAN I

6   APPROACH THE WITNESS?

7          THE COURT: YOU MAY.

8          MR. IRVIN: THANK YOU.

9   BY MR. IRVIN:

10  Q    A SERIES OF REVIEWS THAT OCCURRED ON MAY THE 1ST OF 2015

11  AND THESE WOULD BE REVIEWS OF ALL OF THE STAFF

12  ANESTHESIOLOGISTS AT DORN. DR. KENNEDY'S ONE OF THEM. DR.

13  ALGHOTHANI IS ONE OF THEM. AND I BELIEVE THAT SHOWS YOUR

14  NAME AND SIGNATURE AS A PANEL MEMBER THERE; IS THAT RIGHT?

15  A    OKAY. YES.

16  Q    OKAY. AND THEN HERE'S DR. NGUYEN WHO WAS ALSO AN

17  ANESTHESIOLOGIST AT DORN, AND THERE WAS A PANEL REVIEW DONE

18  ON MAY 1ST OF 2015. AND THAT BEARS YOUR SIGNATURE AS WELL;

19  DOES IT NOT?

20  A    YES. YES, SIR.

21  Q    OKAY. AND SO YOU WOULD HAVE SAT AS A PANEL MEMBER FOR

22  THESE VARIOUS ANESTHESIOLOGISTS. HERE'S DR. PENDER, MAY THE

23  1ST, 2015, AND THEN AGAIN THERE'S YOUR NAME AND SIGNATURE; IS

24  THAT CORRECT?

25  A    YES, SIR.

AL-ASSAAD - DIRECT

221

1   Q    AS A PART OF EXHIBIT NUMBER 11.  AND THEN HERE IS DR.

2   PRYOR ON MAY THE 1ST.  HE'S ALSO AN ANESTHESIOLOGIST.  AND

3   THIS IS FOR REVIEW OF HIM.  AND AGAIN, THAT'S YOUR NAME

4   PRINTED AND YOUR SIGNATURE?

5   A    YES.

6   Q    OKAY.  ALL RIGHT.  AND THEN DR. KENNEDY ON THAT SAME

7   DATE, MAY THE 1ST OF 2015 -- AND I'M LOOKING NOW AT

8   PLAINTIFF'S EXHIBIT 8 WITH YOU.  AND HERE'S DR. KENNEDY ON

9   THAT SAME DATE AND THERE AGAIN YOUR NAME PRINTED.  AND IS

10  THAT YOUR SIGNATURE?

11  A    YES.  YES.

12  Q    OKAY.  DOES THAT -- DO YOU GENERALLY RECALL DOING THE

13  STAFF ANESTHESIOLOGISTS' REVIEWS ON THE -- ON THAT DATE?

14  A    I REALLY DON'T RECALL, BUT I WILL -- IT'S THERE

15  DOCUMENTED, I'M THERE.

16  Q    OKAY.  THAT'S ACTUALLY A GENERAL RECOLLECTION AND ALL

17  THAT TOOK PLACE.

18  A    YES.

19  Q    OKAY.  SO I THINK WE CAN PROBABLY MOVE ON ALONG.  DR.

20  AL-ASSAAD, WHEN YOU CONDUCT, WHEN YOU SIT AS A PANEL MEMBER

21  ON ONE OF THESE PAY PANELS OR AS YOU COME AS THE PRESENTER, A

22  SERVICE LINE CHIEF, CHIEF OF PATHOLOGY, IS IT FAIR TO SAY

23  THAT THE PANELS ARE ASKED TO LOOK ONLY AT THE TOTAL PAY OR

24  WHAT IS CALLED THE ANNUAL PAY AND NOT THE SEPARATE COMPONENTS

25  OF BASE PAY AND MARKET PAY?

1    A    YES, SIR.  WHY WE REALLY -- THAT'S THE ANNUAL PAY TOTAL.

2    Q    OKAY.  AND IS THAT ALSO THE WAY IN YOUR EXPERIENCE THAT

3    YOU AND OTHER SERVICE LINE CHIEFS PRESENT IT TO THE PANEL?

4    THAT IS, YOU PRESENT AN ANNUAL PAY RECOMMENDATION AND NOT A

5    SEPARATE MARKET PAY OR BASE PAY?

6    A    YES, SIR.

7    Q    OKAY.  NOW, LET ME JUST ASK YOU TO LOOK ONE LAST TIME AT

8    THESE DOCUMENTS THAT I SHOWED YOU THAT YOU SIGNED AS A PANEL

9    MEMBER REVIEWING THE ANESTHESIOLOGISTS ON MAY THE 1ST OF

10   2015.  NOW, I'M GOING TO SHOW YOU ON THE SECOND PAGE OF

11   EXHIBIT 8 -- THIS IS THE SECOND PAGE OF THESE COMP PANEL

12   REVIEW FORMS -- AND THERE'S A SECTION ON THE SECOND PAGE AND

13   IT'S CALLED PART C, ACTION BY APPROVING OFFICIAL.

14        DO YOU SEE -- OOPS.  DO YOU SEE THAT THERE, DR.

15   AL-ASSAAD?  DO YOU SEE THIS SECTION HERE THAT SAYS,

16   COMPENSATION -- I'M SORRY.  PART C, ACTION BY APPROVING

17   OFFICIAL?

18   A    THAT'S NOT US.

19   Q    RIGHT.  AND ALL I WANTED TO DO WAS DIRECT YOUR ATTENTION

20   HERE TO WHERE SOMEONE ELSE BESIDES THE PANEL HAS TAKEN THE

21   ANNUAL PAY AND BROKEN IT DOWN INTO ITS COMPONENTS IN -- IN

22   AMOUNTS, BASE PAY AND MARKET PAY.  BUT AS YOU SAY, THAT WAS

23   NOT YOU OR--

24   A    NO, THAT WAS -- NO.  THIS IS AFTER WE DO RECOMMENDATION

25   AND THIS GOES UP AND WE DON'T KNOW WHAT HAPPEN TO IT.

AL-ASSAAD - DIRECT

223

1    Q    YES, SIR.  AND SO THIS, AS YOU WOULD UNDERSTAND IT,

2    WOULD BE DONE LATER BY WHOEVER THE APPROVING OFFICIAL IS

3    WHOSE SIGNATURE IS DOWN HERE ON THE BOTTOM?

4    A    YEAH.  YOU'RE DOING -- I THINK -- I'M NOT SURE.  YOU'RE

5    DOING ANYTHING -- FINAL DECISION IS THAT...

6    Q    OKAY.  AND SO WHERE THESE BASE PAY AND MARKET PAY

7    AMOUNTS ARE BROKEN OUT SEPARATELY, THAT'S NOT SOMETHING IN

8    YOUR EXPERIENCE THE PANEL DOES.

9    A    NO, WE DON'T.

10   Q    OKAY.  NOW, IF WE CAN ACCEPT THESE NUMBERS ON THESE

11   FORMS AS BEING TRUE, HOW MUCH IS -- IF YOU CAN READ IT, HOW

12   MUCH IS THE MARKET PAY AMOUNT FOR DR. KENNEDY ON THIS

13   PARTICULAR DATE?  CAN YOU READ THAT NUMBER FOR ME?

14   A    167,770.

15   Q    ALL RIGHT.  NOW, LET'S LOOK AT DR. ALGHOTHANI ON THAT

16   SAME DATE AND TELL ME IF YOU CAN READ THE NUMBER THAT'S

17   WRITTEN THERE FOR HIS AMOUNT OF MARKET PAY.

18   A    189,533.

19   Q    THANK YOU.  NOW, IF YOU WOULD TAKE A LOOK, PLEASE, AT

20   THE SECOND PAGE OF DR. NGUYEN'S REVIEW ON THAT SAME DATE.

21   WHAT IS THE AMOUNT OF MARKET PAY AWARDED TO DR. NGUYEN?

22   A    190,513.

23   Q    OKAY.  AND LOOK AT DR. BRADLEY'S REVIEW WITH ME ON THAT

24   SAME DATE AND TELL ME THE AMOUNT OF HIS MARKET PAY.

25   A    187,246.

1    Q    THANK YOU.  AND FINALLY, DR. PRYOR ON THAT DATE.  AND

2    HOW MUCH WAS THE AWARD OF MARKET PAY TO DR. PRYOR?

3    A    176,911.

4         *MR. IRVIN:*  YOUR HONOR'S INDULGENCE JUST FOR A

5    MOMENT.

6    Q    DR. AL-ASSAAD, THANK YOU VERY MUCH AND PLEASE ANSWER ANY

7    QUESTIONS THAT COUNSEL FOR THE VA MIGHT HAVE FOR YOU.

8    A    OKAY.

9                        CROSS-EXAMINATION

10   BY MR. ANDREWS:

11   Q    GOOD MORNING, MR. AL-ASSAAD.  HOW ARE YOU TODAY?

12   A    GOOD MORNING.

13   Q    THANK YOU FOR COMING BACK TO THE COURTHOUSE TODAY.  I

14   APPRECIATE YOU BEING HERE.  NOW, YOU WERE JUST ASKED AND I

15   BELIEVE YOU TESTIFIED THAT YOU HAVE SERVED ON COMPENSATION

16   PANELS MANY TIMES; IS THAT CORRECT?

17   A    YES, SEVERAL TIME.

18   Q    OKAY.  DO YOU HAVE ANY IDEA APPROXIMATELY HOW MANY

19   TIMES?

20   A    NOT TO--

21   Q    BE HARD TO PUT A NUMBER ON IT?

22   A    I DOUBT IF I CAN RECALL HOW MANY.

23   Q    I'M SORRY?

24   A    I DOUBT -- I CANNOT RECALL HOW MANY.

25   Q    OKAY.

AL-ASSAAD - CROSS

225

1    A    I HAVE BEEN.

2    Q    WELL, LET ME ASK YOU THIS.  YOU HAVE SERVED ON

3    COMPENSATION PANELS FOR ANESTHESIOLOGISTS; IS THAT CORRECT?

4    A    YES.

5    Q    HAVE YOU SERVED ON COMPENSATION PANELS FOR DOCTORS IN

6    OTHER SPECIALTIES?

7    A    YES.

8    Q    COULD YOU NAME SOME OF THOSE SPECIALTIES?

9    A    MEDICINE, PSYCHIATRY --

10         *COURT REPORTER:*  I'M SORRY?

11    A    -- PSYCHIATRY.  SURGERY.  THAT'S BASICALLY MOST OF THE

12    SPECIALTY IN THE HOSPITAL.

13    Q    IS THE -- IS THE PROCESS YOU FOLLOW IN THOSE PAY PANELS

14    GENERALLY THE SAME?

15    A    THE SAME.

16    Q    OKAY.  NOW, YOU HAVE TESTIFIED THAT ON THE PAY PANELS,

17    YOUR JOB IS TO RECOMMEND ANNUAL PAY; IS THAT CORRECT?

18    A    RECOMMEND THE PAY.

19    Q    TO RECOMMEND ANNUAL PAY.

20    A    ANNUAL PAY.

21    Q    RIGHT.  SAID THE BASE PLAY PLUS THE MARKET PAY, THE

22    ANNUAL PAY.

23    A    YES, SIR.

24    Q    BUT YOU DON'T DETERMINE THE BASE PAY; IS THAT CORRECT?

25    A    NO.

AL-ASSAAD - CROSS

1    Q    THAT'S DONE BY HR.

2    A    THAT'S NOT...

3    Q    SO IS IT FAIR TO SAY THAT THE MARKET PAY IS THE ONLY

4    VARIABLE COMPONENT OF THE ANNUAL PAY; CORRECT?

5    A    APPARENTLY.  WE DON'T KNOW.  I MEAN, WE ARE ONLY CONCERN

6    ABOUT THE ANNUAL PAY.

7    Q    RIGHT.  THAT'S RIGHT.

8    A    YEAH.

9    Q    BUT THE BASE PAY IS NON-DISCRETIONARY.  HR DETERMINES

10   THAT; CORRECT?

11   A    EXACTLY.  DEPENDS ON HOW LONG THE PERSON THAT'S -- WE

12   DON'T DECIDE THAT.

13   Q    YOU DON'T GET INVOLVED WITH THAT.

14   A    NO.

15   Q    OKAY.  BUT AS YOU SET ANNUAL PAY HIGHER OR LOWER, THAT

16   MARKET PAY NUMBER WILL GO UP OR DOWN; IS THAT CORRECT?

17   A    WE DON'T LOOK AT THE MARKET PAY, I MEAN, INDIVIDUALLY.

18   Q    RIGHT.

19   A    WE LOOK AT THE TOTAL ANNUAL PAY.

20   Q    YOU'RE LOOKING AT THE ANNUAL PAY ON A DOCTOR-BY-DOCTOR

21   BASIS.

22   A    YES.  AND THAT'S WHAT WE TRY TO MAKE SWITCHABLE TO

23   EVERYBODY ELSE--

24   Q    SURE.  RIGHT.  WELL, LET'S TALK ABOUT THE FACTORS THAT

25   YOU MIGHT CONSIDER IN THE COURSE OF THAT PROCESS.  CAN YOU

1    PULL UP PLAINTIFF'S EXHIBIT 8 ON THE FIRST PAGE?  RIGHT IN

2    THE MIDDLE.

3         SO DR. AL-ASSAAD, I BELIEVE YOU WERE PRESENTED WITH THIS

4    DOCUMENT BY MR. IRVIN.  DO YOU SEE RIGHT HERE THESE FACTORS

5    IN THE MIDDLE OF THE PAGE?

6    A    I DON'T SEE THE FACTOR REALLY.

7    Q    HOW ABOUT PANEL FINDINGS?

8    A    OKAY.  I SEE --

9    Q    RIGHT HERE.

10   A    -- I SEE.  OKAY.

11   Q    DO THOSE LOOK FAMILIAR TO YOU?

12   A    YEP.

13   Q    IS THAT THE TYPE OF INFORMATION YOU WOULD TAKE INTO

14   CONSIDERATION IN A COMPENSATION PANEL?

15   A    YES.

16   Q    OKAY.  LET'S LOOK AT -- IF WE COULD GO TO PAGE TWO OF

17   THIS DOCUMENT, PLEASE.  IF YOU COULD SCROLL DOWN TO THAT PART

18   C.  THANK YOU.  NOW DR. AL-ASSAAD, YOU WERE JUST ASKED ABOUT

19   THESE NUMBERS HERE AND THE ANNUAL PAY.  DO YOU SEE THAT?

20   A    YES, SIR.

21   Q    AND ABOUT THE BASE PAY PLUS MARKET PAY EQUALS ANNUAL

22   PAY?  AND YOU WERE ASKED I BELIEVE SPECIFICALLY ABOUT THE

23   MARKET PAY.

24   A    I BEEN ASKED TO READ THE MARKET PAY ONLY.

25   Q    THAT'S RIGHT.  YOU WERE ASKED TO READ THAT NUMBER.

AL-ASSAAD - CROSS

228

1    COULD YOU READ US THE FINAL ANNUAL PAY NUMBER?

2    A    294,351.

3    Q    OKAY.  NOW, IN -- AND YOU WERE ON THIS PARTICULAR PANEL;

4    IS THAT CORRECT?

5    A    MY SIGNATURE IS THERE.

6    Q    YOUR SIGNATURE IS THERE.  DO YOU THINK --

7    A    YES, SIR.

8    Q    -- THAT YOU SIGNED THIS DOCUMENT?

9    A    I SIGNED THIS.

10   Q    OKAY.  NOW, IF YOU SIGNED THIS DOCUMENT AND THAT IS THE

11   NUMBER OF ANNUAL PAY, THAT'S THE AMOUNT OF ANNUAL PAY, IS

12   THAT YOUR RECOMMENDATION OF ANNUAL PAY?

13   A    THAT'S -- THAT'S WHAT RECOMMEND.

14   Q    RIGHT.  IF YOU HAD BEEN PRESENTED WITH ANY EVIDENCE THAT

15   THE ANNUAL PAY NUMBER SHOULD BE HIGHER, WOULD YOU HAVE

16   SUGGESTED TO THE CHIEF THAT IT SHOULD BE HIGHER?

17   A    I -- USUALLY WE ARE FOLLOW THE GUIDE, GUIDELINE.

18   Q    YOU'RE FOLLOWING THE GUIDELINES.

19   A    RIGHT.

20   Q    RIGHT.  BUT IF THERE WERE EVIDENCE, MARKET-BASED

21   EVIDENCE OR EXPERIENCE-RELATED EVIDENCE THAT--

22   A    THAT WILL AFFECT LITTLE BIT HERE AND THERE, YEAH.

23   Q    I'M SORRY, SIR?  COULD YOU REPEAT--

24   A    NOT A MAJOR FACTOR AFFECT THE ANNUAL.

25   Q    UH-HUH.

1   A    IT WILL AFFECT LITTLE BIT, THOUGH, BUT NOT VERY.

2   Q    OKAY.  I GUESS WHAT I'M TRYING TO ASK IS IF THERE HAD --

3   IF THE CHIEF HAD BROUGHT EVIDENCE AND YOU HAD CONSIDERED

4   EVIDENCE THAT MAYBE A DOCTOR WAS ENTITLED TO MORE MONEY,

5   WOULD THAT HAVE COME UP IN THE COURSE OF YOUR DISCUSSION AT

6   THE COMPENSATION PANEL?

7   A    THAT WOULD COME UP LITTLE BIT, YES.

8   Q    ALL RIGHT.  CAN WE GO TO EXHIBIT 11, PLEASE, PAGE TWO.

9   OKAY.  NOW, THIS IS ANOTHER ONE OF THE RATES OF PAY I BELIEVE

10  YOU WERE ASKED TO READ.  THIS IS FOR DR. ALGHOTHANI AND THIS

11  IS PLAINTIFF'S EXHIBIT 11 PAGE TWO.  DO YOU SEE THOSE FIGURES

12  THERE?

13  A    YES, SIR.

14  Q    CAN YOU READ US THE ANNUAL PAY NUMBER?

15  A    289,490.

16  Q    AND DO YOU SEE YOUR SIGNATURE AGAIN ABOVE THAT NUMBER?

17  A    YES, SIR.

18  Q    AND IS THAT A NUMBER THAT YOU WOULD HAVE RECOMMENDED AS

19  ANNUAL PAY?

20  A    THAT WAS I THINK RECOMMENDED FOR ANNUAL PAY.

21  Q    AND WOULD YOU HAVE RECOMMENDED A NUMBER FOR ANNUAL PAY

22  YOU DID NOT THINK WAS FAIR?

23  A    I THINK -- I WOULD NOT RECOMMEND SOMETHING NOT FAIR.

24  Q    YOU WOULD NOT RECOMMEND SOMETHING THAT'S NOT FAIR.  IS

25  THAT -- IS THAT CORRECT?

AL-ASSAAD - CROSS

1   A    THAT'S CORRECT.

2   Q    OKAY.  THANK YOU.  CAN WE GO FORWARD I BELIEVE -- NOW,

3   THIS IS THE COMPENSATION PAY PANEL FOR DR. NGUYEN.  AND

4   AGAIN, IS THAT YOUR SIGNATURE HERE ON THIS DOCUMENT?

5   A    YES, SIR.

6   Q    AND COULD YOU READ US THE ANNUAL PAY RECOMMENDATION

7   HERE?

8   A    290,470.

9   Q    AND AGAIN, IS THAT THE ANNUAL PAY NUMBER THAT YOU

10  RECOMMENDED?

11  A    YES, SIR.

12  Q    AND WOULD YOU HAVE RECOMMENDED A ANNUAL PAY NUMBER YOU

13  DID NOT THINK WAS FAIR?

14  A    NO.

15  Q    OKAY.

16  A    NO, SIR.

17  Q    LET'S GO FORWARD TO DR. PENDER.  AND DR. AL-ASSAAD, I'M

18  GOING TO ASK YOU THE SAME QUESTION.  IS THAT YOUR SIGNATURE

19  ON THIS PAGE?

20  A    YES, SIR.

21  Q    AND COULD YOU READ US THE ANNUAL PAY NUMBER, PLEASE?

22  A    YES, SIR, 290,535.

23  Q    AND IS THAT THE ANNUAL PAY NUMBER YOU RECOMMENDED?

24  A    YES, SIR.

25  Q    AND YOU WOULD NOT HAVE RECOMMENDED A NUMBER YOU DID NOT

AL-ASSAAD - REDIRECT

1    THINK WAS FAIR; CORRECT?

2    A    NO, SIR.

3    Q    LET'S GO FORWARD TO DR. PRYOR.  AND AGAIN, DR.

4    AL-ASSAAD, IS THAT YOUR SIGNATURE?

5    A    YES, SIR.

6    Q    AND COULD YOU READ US THAT ANNUAL PAY NUMBER?

7    A    YES, SIR.  293,528.

8    Q    AND IS THAT YOUR RECOMMENDATION OF ANNUAL PAY?

9    A    YES, SIR.

10   Q    AND YOU WOULD NOT HAVE RECOMMENDED A NUMBER FOR ANNUAL

11   PAY YOU DID NOT AGREE WITH?

12   A    NO, SIR.

13   Q    AND YOU DID NOT THINK WAS FAIR?

14   A    THINK IS FAIR.

15   Q    OKAY.  THANK YOU.

16        MR. ANDREWS:  THAT'S ALL I HAVE, YOUR HONOR.

17        THE COURT:  ANY OTHER QUESTIONS?

18        MR. IRVIN:  YES, MA'AM, JUST A COUPLE.

19                    REDIRECT EXAMINATION

20   BY MR. IRVIN:

21   Q    DR. AL-ASSAAD, JUST WANTED TO MAKE SURE THAT I HEARD YOU

22   CORRECTLY.  DID YOU SAY THAT USUALLY THE PANEL WILL GO ALONG

23   WITH THE RECOMMENDATION THAT THE SERVICE LINE CHIEF IS MAKING

24   ON ANNUAL PAY?

25   A    MOST OF THE TIME IS VERY CLOSE AND THERE ARE SOME LITTLE

AL-ASSAAD - REDIRECT

1    ITEMS FROM -- MAYBE NEED LITTLE ADJUSTMENT AND USUALLY IT'S

2    NOT MAJOR.  IT DEPENDS SOMETIMES IF THERE IS LIKE ACADEMIC

3    TITLE OR A DIFFERENT ACADEMIC TITLE, MIGHT USE COUPLE OF

4    THOUSAND, FOR EXAMPLE.  BUT I MEAN, IT'S NOT A MAJOR

5    ADJUSTMENT.

6         BUT ARE -- WE TRY TO GO WITH ACADEMIC SORT OF NUMBER,

7    THE PROFESSOR SUCH BEEN PROFESSOR FOR SOME TIME AND ASSISTANT

8    PROFESSOR, AND SOMEBODY THAT SOMETHING UNUSUAL, BETTER OR --

9    OR OTHER WAY AROUND, NOT BETTER, AND THAT WILL AFFECT THE

10   ADJUSTMENT LITTLE BIT.  AND THERE WILL BE DISCUSSION AND

11   AGAIN THERE WILL BE VOTING AFTER THAT AND THEY'RE

12   RECOMMENDATION A HIGHER LEVEL.

13   Q    THANK YOU.  ONE LAST QUESTION.  ON EXHIBIT 8 -- AND

14   THESE ARE THE ONES THAT WE LOOKED AT THAT ARE DR. KENNEDY'S

15   REVIEWS.  AND HERE, HERE IS THIS ONE DATED MAY THE 1ST OF

16   2015 THAT HAS THE PANEL MEMBERS AND THEIR SIGNATURES AND THEN

17   THE AMOUNTS DOWN HERE ON THIS SECOND PAGE.

18        AND WHAT I WANTED TO ASK YOU ABOUT IS THE THIRD PAGE OF

19   THIS MAY 1, 2015 REVIEW.  AND IT'S A TYPED-UP PAGE AND IT'S

20   GOT NUMBERS ONE THROUGH SEVEN, INFORMATION ON ONE THROUGH

21   SEVEN, AND THEN IT LOOKS LIKE EIGHT IS NOT APPLICABLE.  BUT

22   MY QUESTION IS, ARE THESE SHEETS FAMILIAR TO YOU?

23   A    YEAH.  EVERYBODY HAS TO -- I MEAN, THAT'S REQUIREMENT TO

24   FILL OUT THOSE SEVEN ITEMS.

25   Q    ALL RIGHT, SIR.

1    A    YEAH.

2    Q    AND DO YOU RECALL WHEN THAT REQUIREMENT STARTED?

3    A    I REALLY DON'T RECALL WHEN IT STARTED.  I MEAN, IN THE

4    WHOLE, THE WHOLE...

5    Q    IF YOU'D LOOK WITH ME AT THE PRIOR YEAR FOR DR. KENNEDY

6    OR REVIEW ON FEBRUARY THE 26TH OF 2014, THAT SHEET IS NOT A

7    PART OF THAT REVIEW.  DO YOU SEE THAT?

8    A    YEAH.  OF COURSE, I -- I REALLY DON'T RECALL WHEN THEY

9    START REQUIRING THIS SEVEN ITEMS.  THAT'S THE -- THE RULES

10   AND WE FOLLOW THE RULES AND...

11   Q    YES.

12   A    OKAY.  AND THAT -- YEAH, SO EVERYBODY -- EVERY CHIEF HAS

13   TO SUBMIT THOSE THINGS AND...

14   Q    OKAY.

15   A    THAT...

16   Q    THANK YOU VERY MUCH, DR. AL-ASSAAD.

17   A    THANK YOU.

18        *MR. ANDREWS:*  I DON'T HAVE ANY FURTHER QUESTIONS,

19   YOUR HONOR.

20        *THE COURT:*  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

21   CAN STEP DOWN.  YOU'RE EXCUSED.

22        *THE WITNESS:*  THANK YOU.

23        (WITNESS LEFT THE STAND.)

24            DR. NOAH DOWNIE, AFTER BEING DULY SWORN,

25   TESTIFIED AS FOLLOWS:

DOWNIE - DIRECT

234

1                    DIRECT EXAMINATION

2    BY MR. IRVIN:

3    Q    GOOD MORNING, DR. DOWNIE.

4    A    GOOD MORNING.

5    Q    I'M WILMOT IRVIN AND WE MET AT YOUR DEPOSITION.  DO YOU

6    REMEMBER GIVING YOUR DEPOSITION IN THE CASE?

7    A    YES.

8    Q    OKAY.  JUST TO GIVE A LITTLE CONTEXT TO WHO YOU ARE AND

9    WHY YOU'RE HERE, AS I UNDERSTAND IT YOU ARE A PSYCHIATRIST

10   AND YOU PRACTICE AT THE DORN VA MEDICAL CENTER HERE IN

11   COLUMBIA; IS THAT CORRECT?

12   A    YES.

13   Q    OKAY.  AND YOU BEGAN YOUR WORK AT DORN ON JUNE 30TH OF

14   2013; IS THAT ACCURATE?

15   A    YES.

16   Q    OKAY.  AND SO, OVER THE PERIOD OF I GUESS ROUGHLY NOW

17   FIVE YEARS OR A LITTLE MORE, YOU HAVE HAD OCCASION TO SERVE

18   ON THESE PHYSICIAN COMPENSATION PANELS WHERE THE PHYSICIANS'

19   SALARIES ARE REVIEWED?

20   A    YES.

21   Q    YOU SERVED ON THOSE PANELS.

22   A    YES.

23   Q    OKAY.  ALL RIGHT.  AND AS I RECALL, YOU SERVED ON THE

24   PANEL THAT REVIEWED DR. KENNEDY AND THE OTHER FOUR STAFF

25   ANESTHESIOLOGISTS ON MAY THE 1ST OF 2015.  DO YOU -- DO YOU

DOWNIE - DIRECT

235

1    REMEMBER THAT?

2    A    YES.

3    Q    OKAY.  I HAVE GOT HERE IN FRONT OF YOU THOSE MAY 1ST,

4    2015 REVIEWS.  AND IF YOU EVER WANT TO LOOK AT THEM WHILE WE

5    ARE TALKING, FEEL FREE TO.  BUT THIS ONE, EXHIBIT 11, IS A

6    COLLECTION OF THE FOUR STAFF ANESTHESIOLOGISTS BESIDES DR.

7    KENNEDY.  AND THEN WE PUT DR. KENNEDY'S IN A SEPARATE

8    EXHIBIT, NUMBER 8, ALONG WITH HIS OTHER REVIEWS OVER THE

9    COURSE OF TIME.

10        SO, THERE'S DR. KENNEDY ON MAY 1ST.  HERE ARE THE OTHER

11   FOUR STAFF ANESTHESIOLOGISTS ON MAY THE 1ST OF 2015.  AND YOU

12   CAN -- IF YOU WANT, IF YOU WANT TO TAKE A MOMENT JUST TO

13   CONFIRM THAT YOU PRINTED YOUR NAME AND SIGNED YOUR NAME TO

14   THESE REVIEWS THAT WERE ON THAT DATE.  IS THAT YOUR

15   SIGNATURE?

16   A    YES.

17   Q    OKAY.  ALL RIGHT, SIR.  NOW ON THIS DATE, MAY 1ST OF

18   2013 -- OF 2015 WHEN YOU SERVED ON THESE PANEL -- THIS PANEL

19   THAT REVIEWED THE FIVE STAFF ANESTHESIOLOGISTS, I BELIEVE

20   THAT YOU TOLD ME THAT THOSE FIVE PHYSICIANS, THOSE

21   ANESTHESIOLOGISTS, WERE REVIEWED ONE BY ONE, THAT IS

22   SEQUENTIALLY, AND NOT THEY WERE ALL REVIEWED AT THE SAME

23   TIME.  IS THAT YOUR RECOLLECTION?

24   A    YES.

25   Q    ALL RIGHT.  AND YOU TOLD ME THAT THE -- THAT YOU

1    RECALLED THAT THOSE FIVE SEQUENTIAL REVIEWS TOOK SOMEWHERE IN

2    THE RANGE OF 45 MINUTES TO AN HOUR TO GET ALL OF THOSE DONE.

3    IS THAT A FAIR STATEMENT?

4    A    YES.

5    Q    OKAY.  ALL RIGHT.  SO YOU GOT THE FIVE DONE, YOU DID

6    THEM SEQUENTIALLY ONE AFTER THE OTHER AND IT TOOK ABOUT AN

7    HOUR, 45 MINUTES TO AN HOUR, TO ACCOMPLISH THOSE FIVE; IS

8    THAT CORRECT?

9    A    YES.

10   Q    ALL RIGHT.  NOW, BEFORE YOU BEGAN YOUR SERVICE ON THESE

11   PANELS, DID YOU RECEIVE ANY TRAINING FROM DORN VA ABOUT WHAT

12   YOU SHOULD DO AS A PANEL MEMBER?

13   A    NO.

14   Q    ALL RIGHT.  OR -- OR HOW YOU WERE TO GO ABOUT THIS PANEL

15   PROCESS OF ARRIVING AT THE ANNUAL PAY FOR A PHYSICIAN?

16   A    NOT THAT I RECALL.

17   Q    ALL RIGHT.  AND I BELIEVE YOU SAID THAT THE FIRST TIME

18   YOU EVER REVIEWED THE VA HANDBOOK, WHICH IS EXHIBIT NUMBER 1,

19   PLAINTIFF'S EXHIBIT NUMBER 1 -- AND I'M SHOWING YOU THAT

20   NOW -- THE FIRST TIME THAT YOU EVER REVIEWED THE HANDBOOK

21   WOULD HAVE BEEN ON THE DAY THAT I TOOK YOUR DEPOSITION.  IS

22   THAT A CORRECT STATEMENT?

23   A    YES.

24   Q    ALL RIGHT, SIR.  NOW, AS I UNDERSTAND IT FROM YOUR

25   EXPERIENCE, THE PANEL THAT IS CONSIDERING A PARTICULAR

1    PHYSICIAN IN YOUR EXPERIENCE IS LOOKING AT THE TOTAL ANNUAL

2    PAY NUMBER AND NOT FOCUSING ON THE DISCRETE BASE PAY OR

3    MARKET PAY COMPONENTS THAT MAKE UP THAT ANNUAL PAY.  IS THAT

4    YOUR UNDERSTANDING?

5    A    YES.

6    Q    OKAY.  WAS IT YOUR UNDERSTANDING FROM THE PRESENTATION

7    THAT WOULD HAVE BEEN MADE BY DR. MILLER ON THE DATE MAY 1,

8    2015, ON THE DATE OF THESE STAFF ANESTHESIOLOGISTS' REVIEWS,

9    THAT THE OBJECTIVE WAS TO TRY TO KEEP ALL OF THE

10   ANESTHESIOLOGISTS' TOTAL PAY PRETTY CLOSE?

11   A    I DON'T KNOW.

12   Q    YOU DON'T REMEMBER?

13   A    I MEAN, I DON'T KNOW WHAT HIS MOTIVATION WAS.

14   Q    OKAY.  LET ME SHOW YOU YOUR TRANSCRIPT FROM YOUR

15   DEPOSITION.  AND THE CLERK HAS NOW UNSEALED THE ORIGINAL AND

16   I'LL HAND THAT TO YOU NOW.  DO -- YOU RECALL GIVING THAT

17   TESTIMONY; CORRECT?

18   A    YES.

19   Q    OKAY.  AND YOU UNDERSTOOD WHEN YOU GAVE IT THAT YOU WERE

20   GIVING THAT TESTIMONY UNDER YOUR OATH TO TELL THE TRUTH?

21   A    YES.

22   Q    AND YOU ATTEMPTED TO DO THAT TO THE BEST OF YOUR

23   ABILITY, THAT IS, TELL THE TRUTH?

24   A    YES.

25   Q    OKAY.  ALL RIGHT, SIR.  AND LET ME DIRECT YOUR

DOWNIE - DIRECT

238

1   ATTENTION, IF I CAN, TO PAGE 23 OF YOUR DEPOSITION

2   TRANSCRIPT.  AND LET ME KNOW WHEN YOU HAVE FOUND THAT.

3   A    I HAVE FOUND IT.

4   Q    OKAY.  AND MY QUESTION TO YOU BEGINNING ON LINE 13 WAS,

5   WAS IT YOUR UNDERSTANDING IN SERVING ON THESE PANELS OR ON

6   THIS PARTICULAR PANEL THAT THE OBJECTIVE WAS TO KEEP THE

7   ANESTHESIOLOGISTS' PAY ESSENTIALLY PRETTY CLOSE, PRETTY

8   UNIFORMLY CLOSE IN AMOUNT?

9       AND READ YOUR ANSWER THAT YOU GAVE ON THAT DATE, SIR.

10  A    I MEAN, THAT WAS MY UNDERSTANDING AS TO WHAT THE CHIEF

11  OR CHAIRPERSON WAS ASKING FOR.

12       MR. ANDREWS:  YOUR HONOR, OBJECTION.  THIS QUESTION

13  CALLS FOR SPECULATION.  IT WAS -- I KNOW IT'S BEING READ FROM

14  HIS DEPOSITION TRANSCRIPT, IT WAS ENTERED INTO EVIDENCE.  IT

15  STILL HAS TO NOT BE SPECULATIVE.

16       MR. IRVIN:  YOUR HONOR--

17       THE COURT:  I THINK HE'S USING THE TRANSCRIPT TO

18  REFRESH HIS MEMORY OR EITHER TO IMPEACH, SO IF HE SAID

19  SOMETHING DIFFERENT DURING HIS DEPOSITION THAN HE'S

20  TESTIFYING TO AT TRIAL, THEN HE CAN USE IT.

21       MR. IRVIN:  THANK YOU VERY MUCH, YOUR HONOR.  AND

22  THOSE ARE ALL THE QUESTIONS THAT WE HAVE FOR DR. DOWNIE.

23  BY MR. IRVIN:

24  Q    PLEASE ANSWER ANY QUESTIONS THAT MR. ANDREWS MIGHT HAVE,

25  SIR.

1    A    OKAY.

2                        CROSS-EXAMINATION

3    BY MR. ANDREWS:

4    Q    GOOD MORNING, DR. DOWNIE.

5    A    GOOD MORNING.

6    Q    THANK YOU FOR BEING WITH US THIS MORNING.

7    A    YOU'RE WELCOME.

8    Q    DR. DOWNIE, YOU TESTIFIED THAT YOU HAVE SERVED ON

9    COMPENSATION PANELS DURING YOUR TIME AT THE VA; IS THAT

10   CORRECT?

11   A    YES.

12   Q    WE KNOW THAT YOU SERVED ON DR. KENNEDY'S PANEL, FOR

13   INSTANCE; IS THAT CORRECT?

14   A    YES.

15   Q    AND THE PANELS OF OTHER ANESTHESIOLOGISTS, I BELIEVE?

16   A    I BELIEVE THIS IS THE ONLY PANEL THAT WAS COMPRISED OF

17   ANESTHESIOLOGISTS.

18   Q    OKAY.  HAVE YOU SERVED ON A PANEL FOR DOCTORS IN OTHER

19   SPECIALTIES?

20   A    YES.

21   Q    COULD YOU NAME FOR US SOME OF THOSE SPECIALTIES?

22   A    PHYSICAL MEDICINE AND REHAB, I BELIEVE INTERNAL

23   MEDICINE.  THAT'S ALL THAT I RECALL.

24   Q    OKAY.

25   A    I HAVE ONLY DONE FOUR, MAYBE, PANELS.

1    Q    OKAY.  ALL RIGHT.  HAVE THERE BEEN ANY NOTICEABLE

2    DIFFERENCES IN THE WAY THESE COMPENSATION PANELS OPERATE

3    ACROSS SPECIALTIES?

4    A    NO.

5    Q    OKAY.  LET'S LOOK AT PLAINTIFF'S EXHIBIT 8.  IF WE CAN

6    GO TO PAGE TWO OF THIS DOCUMENT.  AND DR. DOWNIE, IS THAT

7    YOUR NAME AND SIGNATURE RIGHT THERE?

8    A    YES.

9    Q    AND THIS IS FOR DR. KENNEDY'S COMPENSATION PANEL.  DO

10   YOU REMEMBER SERVING ON THIS PANEL?

11   A    YES.

12   Q    DO YOU SEE THE ANNUAL PAY NUMBER DOWN THERE BELOW YOUR

13   SIGNATURE?

14   A    YES.

15   Q    COULD YOU READ THAT FOR US?

16   A    294,351.

17   Q    WOULD THAT HAVE BEEN THE ANNUAL PAY NUMBER THAT YOU

18   RECOMMENDED TO THE APPROVING OFFICIAL?

19   A    YES.

20   Q    DO YOU BELIEVE THAT'S A FAIR NUMBER?

21   A    YES.

22   Q    WOULD YOU HAVE APPROVED A NUMBER YOU DIDN'T THINK WAS

23   FAIR?

24   A    NO.

25   Q    CAN WE TURN TO THE NEXT PAGE, PLEASE.  AND IF YOU COULD

```
 1   ZOOM OUT A LITTLE BIT SO THAT WE CAN SEE THE WHOLE PAGE.

 2   JUST WANT TO... DOES THIS PAGE LOOK FAMILIAR TO YOU?  HAVE

 3   YOU SEEN THIS PAGE BEFORE?

 4   A    YES, I BELIEVE I HAVE.

 5   Q    OKAY.  AND WHAT DO YOU RECOGNIZE IT TO BE?

 6   A    I RECOGNIZE IT AS LISTING THE SPECIFIC INFORMATION

 7   PERTAINING TO THE PERSON THAT'S BEING REVIEWED BY THE PAY

 8   PANEL.

 9   Q    OKAY.

10   A    THE VARIOUS COMPONENTS THAT GO INTO PAY RECOMMENDATIONS.

11   Q    RIGHT.  AND SO THIS IS FOR DR. KENNEDY; CORRECT?

12   A    APPEARS TO BE, YES.

13   Q    AND ARE YOU FAMILIAR WITH -- IT'S SOMETIMES REFERRED TO

14   AS THE SEVEN FACTORS?

15   A    YES.

16   Q    SO, FOR INSTANCE, EXPERIENCE IN THE SPECIALTY?

17   A    YES.

18   Q    THE NEED FOR SPECIALTY ASSIGNMENT AT THE FACILITY?

19   A    YES.

20   Q    OKAY.  LET'S WALK THROUGH THESE PARAGRAPHS.  THIS FIRST

21   PARAGRAPH -- WE'LL DO IT ONE AT A TIME.  DOES THIS FIRST

22   PARAGRAPH LOOK TO YOU LIKE IT RELATES TO DR. KENNEDY'S LEVEL

23   OF EXPERIENCE IN THE FIELD OF ANESTHESIOLOGY?

24   A    YES.

25   Q    AND THE SECOND PARAGRAPH, DOES THAT APPEAR TO YOU THAT
```

1    IT'S DISCUSSING THE NEED FOR THE SPECIALTY OR ASSIGNMENT AT

2    THE FACILITY?

3    A    YES.

4    Q    AND THE THIRD, DOES THAT LOOK LIKE IT'S REFERRING TO THE

5    RELEVANT HEALTHCARE LABOR MARKET?

6    A    YES.

7    Q    AND THE FOURTH, DOES THAT REFER TO DR. KENNEDY'S BOARD

8    CERTIFICATIONS?

9    A    YES.

10   Q    AND THE FIFTH, DOES THAT REFER TO ACCOMPLISHMENTS IN THE

11   FIELD OF ANESTHESIOLOGY?

12   A    YES.

13   Q    OKAY.  AND THE SIXTH, DOES THAT REFER TO DR. KENNEDY'S

14   VA EXPERIENCE?

15   A    YES.

16   Q    OKAY.  AND THE SEVENTH IS A CATCH-ALL FOR OTHER

17   CONSIDERATIONS.  DOES THIS LOOK LIKE PERHAPS INDIVIDUAL,

18   UNIQUE INFORMATION YOU WOULD TAKE INTO ACCOUNT IN CONSIDERING

19   ANNUAL PAY?

20   A    YES.

21   Q    OKAY.  DR. DOWNIE, WHEN YOU SERVED ON THESE PANELS --

22   AND I KNOW YOU'VE SERVED ON FOUR -- BUT HAVE YOU TAKEN YOUR

23   ROLE SERIOUSLY?

24   A    YES.

25   Q    DO YOU CONSIDER THE INFORMATION THAT'S PUT BEFORE YOU?

1    A    YES.

2    Q    AND DO YOU TRY TO GET TO A FAIR RESULT FOR EVERY DOCTOR

3    YOU CONSIDER?

4    A    YES.

5         MR. ANDREWS:  I DON'T HAVE ANY FURTHER QUESTIONS,

6    YOUR HONOR.  THANK YOU.

7         THE COURT:  ANYTHING ELSE?

8         MR. IRVIN:  WE DON'T HAVE ANY FURTHER QUESTIONS FOR

9    DR. DOWNIE.

10        THE COURT:  I HAVE A COUPLE OF QUESTIONS.  IF YOU

11   COULD PUT THAT BACK UP ON THE SCREEN AGAIN, PLEASE.

12        MR. ANDREWS:  WHICH PARTICULAR PAGE?

13        THE COURT:  DR. KENNEDY'S SEVEN FACTORS.  ALL

14   RIGHT.

15      DR. DOWNIE, DID YOU PREPARE THESE SEVEN FACTORS?  DO YOU

16   KNOW HOW THEY CAME TO BE ARTICULATED THIS WAY?

17        THE WITNESS:  I DON'T.

18        THE COURT:  OKAY.

19        THE WITNESS:  I DIDN'T.

20        THE COURT:  DID YOUR GROUP, YOUR COMMITTEE, DISCUSS

21   THE SEVEN FACTORS AS TO WHAT WOULD BE PUT ON THIS FORM?  DID

22   YOUR GROUP SAY, FOR EXAMPLE, THE REASON WE ARE RECOMMENDING

23   THIS PAY IS BECAUSE DR. KENNEDY HAS OVER 20 YEARS OF

24   EXPERIENCE AND THERE'S A NEED TO RETAIN THE SPECIALTY?  DID

25   YOU ALL GO THROUGH THESE?

1              THE WITNESS:  WE WENT THROUGH THESE.  DR. MILLER

2    PRESENTED THESE VARIOUS FACTORS AS A BASIS FOR HIS

3    RECOMMENDATION FOR THE ANNUAL PAY TO THAT.

4              THE COURT:  SO YOU TOOK A LOOK AT THESE FACTORS --

5              THE WITNESS:  YES.

6              THE COURT:  -- AS HE PRESENTED?

7              THE WITNESS:  YES.

8              THE COURT:  AND THEN YOU CAME UP WITH YOUR

9    RECOMMENDATION?

10             THE WITNESS:  YES.

11             THE COURT:  SO AT THE TIME YOU CONSIDERED DR.

12   KENNEDY'S RECOMMENDATION FOR MARKET PAY AND ANNUAL PAY, DID

13   YOU ALSO LOOK AT THE OTHER DOCTORS AND COMPARE THEM TO HIM OR

14   DID YOU DO THEM ONE AT A TIME?

15             THE WITNESS:  ONE AT A TIME.

16             THE COURT:  SO YOU DIDN'T SAY, FOR EXAMPLE, IF YOU

17   LOOK AT DR. KENNEDY AND HE HAS 20 YEARS AND DR -- ANOTHER

18   DOCTOR ONLY HAS FIVE YEARS, THEN DR. KENNEDY SHOULD MAKE MORE

19   MONEY THAN THE PERSON?  YOU DIDN'T DO THAT?

20             THE WITNESS:  WE DIDN'T COMPARE BETWEEN -- BETWEEN

21   INDIVIDUALS.

22             THE COURT:  ALL RIGHT.  SO IF THIS WAS YOUR

23   RECOMMENDATION FOR DR. KENNEDY AND THIS IS THE REASON YOU

24   SUGGEST THAT DR. KENNEDY SHOULD RECEIVE THE SALARY THAT HE

25   RECEIVED, IF YOU GO TO EXHIBIT 11 AND PULL UP DR.

DOWNIE - CROSS

245

1   ALGHOTHANI'S REPORT, DID YOU ALSO DO HIS?

2          *THE WITNESS:* I BELIEVE SO, YES, MA'AM.

3          *THE COURT:* OKAY. AND IF YOU LOOK AT HIS SEVEN

4   FACTORS IT ALMOST LOOKS AS IF -- KEEP GOING DOWN -- NUMBER

5   TWO. IT ALMOST LOOKS LIKE IT WAS CUT AND PASTED BECAUSE YOU

6   STILL HAVE DR. KENNEDY'S NAME IN THERE WHEN IT'S REALLY DR.

7   ALGHOTHANI.

8          SO, I'M TRYING TO FIND OUT HOW MUCH CONSIDERATION WAS

9   GIVEN TO THESE FACTORS. AND IF YOU LOOK AT IT, DR.

10  ALGHOTHANI WAS RECOMMENDED APPROXIMATELY $21,795 MORE IN

11  MARKET PAY THAN DR. KENNEDY. AND I WANT TO FIND OUT FROM YOU

12  WHAT WOULD HAVE BEEN YOUR REASON FOR GIVING HIM A DIFFERENT

13  SALARY IF YOU COMPARE HIS EXPERIENCE WITH DR. KENNEDY.

14         SO IF YOU GO BACK TO THE SEVEN FACTORS FOR DR.

15  ALGHOTHANI, HE HAS OVER 17 YEARS OF EXPERIENCE WHEREAS DR.

16  KENNEDY HAD 20 YEARS OF EXPERIENCE. WHAT IS IT THAT MADE DR.

17  ALGHOTHANI MORE I GUESS ELIGIBLE FOR A HIGHER MARKET PAY

18  INCREASE THAN DR. KENNEDY?

19         *THE WITNESS:* I DON'T KNOW. THE ONLY THING THAT WE

20  REALLY CONSIDERED WAS THE ANNUAL PAY AND...

21         *THE COURT:* SO THEN WHAT WOULD MAKE HIS ANNUAL PAY

22  HIGHER? I GUESS, WAS HIS ANNUAL PAY HIGHER? IT WASN'T

23  HIGHER, BUT HE DID GET A HIGHER MARKET PAY. SO WHY WAS THAT?

24         *THE WITNESS:* I -- I DON'T KNOW.

25         *THE COURT:* OKAY. SO YOU REALLY DIDN'T LOOK AT

1    THOSE SEVEN FACTORS AND COMPARE EACH PERSON IN THE DEPARTMENT

2    TO SEE IF ONE HAD MORE EXPERIENCE OR DONE MORE THAN THE

3    OTHER.

4              THE WITNESS:  RIGHT.  WE DIDN'T COMPARE BETWEEN THE

5    PEOPLE.  WE WERE PRESENTED THE INFORMATION BY DR. MILLER AND

6    THEN EITHER AGREED THAT IT SOUNDED REASONABLE OR DIDN'T, AND

7    IN THIS CASE WE DID.

8              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  ANYTHING

9    ELSE?

10             MR. ANDREWS:  JUST A FEW MORE QUESTIONS, YOUR HONOR

11   IN LIGHT...

12   BY MR. ANDREWS:

13   Q    SO DR. DOWNIE, JUST SO I UNDERSTAND, DR. MILLER, THE

14   SERVICE LINE CHIEF, WOULD BE -- COME TO THE PAY PANEL WITH

15   RECOMMENDATION; IS THAT CORRECT?

16   A    YES.

17   Q    AND IS THAT HOW IT OPERATED ON EACH OF THE PANELS YOU

18   SERVED ON?

19   A    YES.

20   Q    SO THEY WOULD PRESENT YOU WITH THE INFORMATION TO BE

21   CONSIDERED?

22   A    YES.

23   Q    WOULD IT BE UNUSUAL THAT THE SERVICE LINE CHIEF WOULD

24   PREPARE THE INFORMATION FOR THE COMPENSATION PANEL REVIEW?

25   A    NO.

1    Q    THAT'S HOW IT WOULD OPERATE WITH EACH COMPENSATION

2    PANEL?

3    A    YES.

4    Q    AND YOU VIEWED YOUR ROLE TO -- AS A -- TO LOOK AT THE

5    ANNUAL PAY NUMBER AND DETERMINE WHETHER THE SALARY WAS GOING

6    TO BE FAIR FOR EACH DOCTOR; IS THAT CORRECT?

7    A    YES.

8    Q    NOW, YOU WOULD ALSO BE PRESENTED WITH MARKET -- I SHOULD

9    SAY REGIONAL, LOCAL MARKET PAY DATA; CORRECT?

10   A    YES.

11   Q    SO YOU COULD LOOK AND SEE WHERE EACH DOCTOR FELL IN

12   RELATION TO THOSE REGIONAL PAY NUMBERS; IS THAT CORRECT?

13   A    YES.

14   Q    AND YOU WOULD DO THAT INDIVIDUALLY FOR EACH DOCTOR?

15   A    YES.

16   Q    AND SO IF ONE DOCTOR WERE OUT OF LINE, A LITTLE BIT

17   HIGHER THAN THE RANGE OR LOWER IN THE RANGE, YOU WOULD

18   UNDERSTAND THAT; CORRECT?

19   A    YES.

20   Q    OKAY.

21        MR. ANDREWS:  I DON'T HAVE ANY OTHER QUESTIONS,

22   YOUR HONOR.

23        THE COURT:  ALL RIGHT.  ANYTHING ELSE, MR. IRVIN?

24        MR. IRVIN:  NO, MA'AM, YOUR HONOR.

25        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

```
1   CAN STEP DOWN.  YOU'RE EXCUSED.

2       (WITNESS LEFT THE STAND.)

3           MR. IRVIN:  YOUR HONOR, MIGHT THIS BE A GOOD TIME

4   TO TAKE A SHORT BREAK?  WE ARE GETTING READY TO SHIFT GEARS

5   TO THE NOVEMBER OF 2016 PANEL REVIEWS.  AND IF--

6           THE COURT:  THAT'S FINE.  WE CAN TAKE A BREAK.

7   THANK YOU.

8       (WHEREUPON, A BRIEF RECESS WAS HAD.)

9           MR. ANDREWS:  YOUR HONOR, IF I COULD JUST BRIEFLY

10  ADDRESS ONE ISSUE.  MRS. WOODS HERE HAS DILIGENTLY EXAMINED

11  DR. FICHTNER'S DEPOSITION TRANSCRIPT.  AS YOU MAY RECALL, DR.

12  FICHTNER WAS THE DOCTOR WHO CAN'T BE PRESENT.  WE JUST

13  IDENTIFIED THREE LINES THAT I THINK WERE INADVERTENTLY LEFT

14  OUT OF THE DESIGNATIONS, AND SO WE JUST WANT TO MAKE NOTE OF

15  THAT FOR THE RECORD.

16          MR. IRVIN:  NO OBJECTION TO INCLUDING IT, YOUR

17  HONOR.

18          MR. ANDREWS:  SO THAT WOULD BE -- THE PART THAT WAS

19  INADVERTENTLY STRUCK THAT WAS ON OUR COUNTER-DESIGNATIONS

20  WOULD BE ON PAGE 25 OF DR. FICHTNER'S DEPOSITION TRANSCRIPT

21  LINES 23 THROUGH 25.  THAT'S THE BEGINNING OF A QUESTION.

22  AND THEN ON THE NEXT PAGE THE ANSWER IS ACTUALLY ALREADY

23  INCLUDED, BUT THE ENTIRE QUESTION WAS NOT INCLUDED, SO WE

24  JUST WANTED TO MAKE A NOTE OF THAT.

25          THE COURT:  OKAY.
```

CARR - DIRECT

249

```
 1              MR. ANDREWS:  THANK YOU.

 2              THE COURT:  ALL RIGHT.  THANK YOU.  MAY CALL YOUR

 3    NEXT WITNESS.

 4              MR. IRVIN:  DR. ALAN CARR.

 5         (WITNESS ENTERED THE COURTROOM.)

 6                    DR. ALAN CARR, AFTER BEING DULY SWORN,

 7    TESTIFIED AS FOLLOWS:

 8                    DIRECT EXAMINATION

 9    BY MR. IRVIN:

10    Q    GOOD MORNING, DR. CARR.

11    A    GOOD MORNING.

12    Q    YOU HAVE BEEN PATIENT WAITING ON US THIS MORNING AND WE

13    ALL APPRECIATE THAT.  MY NAME IS WILMOT IRVIN AND I REPRESENT

14    DR. RICK KENNEDY WHO IS SEATED HERE WITH ME AT COUNSEL TABLE.

15    AND YOU AND I MET YOU MAY REMEMBER WHEN WE TOOK YOUR

16    DEPOSITION IN THIS CASE, AND THAT TOOK PLACE ON NOVEMBER THE

17    13TH OF 2017.

18         DO YOU RECALL GIVING YOUR TESTIMONY ON THAT DATE?

19    A    YES.

20    Q    ALL RIGHT, SIR.  AND I JUST HAVE SOME QUESTIONS TO ASK

21    YOU THAT WILL SORT OF TRACK ALONG WITH WHAT YOU HAVE ALREADY

22    GIVEN, BUT WE NEED TO GET IT INTO THE COURTROOM, SO HERE WE

23    ARE.  LET ME FIRST JUST GET YOUR -- BRIEFLY YOUR BACKGROUND

24    IN.  YOU ARE CURRENTLY EMPLOYED AT DORN VA?

25    A    YES.
```

1    Q    AND IN THE SAME CAPACITY, THAT IS SPECIALIZING IN

2    EMERGENCY MEDICINE AS A PHYSICIAN AT THE DORN VA?

3    A    YES.

4    Q    OKAY.  SO NOTHING HAS CHANGED IN TERMS OF YOUR JOB

5    STATUS OR MAJOR DUTIES OR RESPONSIBILITIES SINCE WE HAD YOUR

6    DEPOSITION?

7    A    CORRECT.

8    Q    OKAY.  AND SO YOU HAVE BEEN AT DORN IN THAT CAPACITY FOR

9    SIX YEARS OR SO?  DOES THAT SOUND ABOUT RIGHT?

10    A    YES.

11    Q    WHEN DID YOU START AT DORN VA?

12    A    DECEMBER 2011.

13    Q    OKAY.  SO LITTLE MORE THAN SIX YEARS NOW, BUT -- OKAY.

14    NOW, OVER THE COURSE OF THAT TIME PERIOD, HAVE YOU HAD

15    EXPERIENCE IN SERVING ON THESE COMPENSATION OR PAY PANELS

16    THAT ARE USED TO REVIEW PHYSICIANS AT DORN'S SALARY

17    INFORMATION?

18    A    YES.

19    Q    OKAY.  AND THE REASON THAT YOU'RE HERE TODAY IS BECAUSE

20    YOU WERE FORTUNATE ENOUGH TO BE ONE OF THE PANEL MEMBERS FOR

21    REVIEWS OF THE STAFF ANESTHESIOLOGISTS THAT OCCURRED ON

22    NOVEMBER THE 10TH OF 2016.  DO YOU RECALL THAT TAKING PLACE?

23    A    VAGUELY.

24    Q    OKAY.  I'M GOING TO JUST SHOW YOU, AND HOPEFULLY IT WILL

25    BE OF SOME ASSISTANCE, WHAT WE HAVE MARKED AS PLAINTIFF'S

1    EXHIBIT NUMBER 12.  THIS IS ALREADY IN EVIDENCE.

2    A    UH-HUH.

3              MR. IRVIN:  AND YOUR HONOR, CAN I APPROACH THE

4    WITNESS, PLEASE?

5              THE COURT:  YOU MAY.

6              MR. IRVIN:  THANK YOU.

7    BY MR. IRVIN:

8    Q    THIS IS ALL OF THE REVIEWS OF THE FIVE STAFF

9    ANESTHESIOLOGISTS INCLUDING DR. KENNEDY THAT WERE CONDUCTED

10   ON NOVEMBER 10TH OF 2016.  I THINK WE ARE ALL IN AGREEMENT

11   THERE.  AND AS I UNDERSTAND YOUR PRIOR TESTIMONY, YOU WERE

12   ONE OF THE PANEL MEMBERS AND ACTUALLY SERVED AS THE

13   CHAIRPERSON OF THE PANEL FOR THOSE STAFF REVIEWS.

14       DOES THAT APPEAR TO BE CORRECT?

15   A    YES.

16   Q    OKAY.  AND IS THAT YOUR SIGNATURE THAT APPEARS THERE ON

17   THIS FIRST DR. ALGHOTHANI REVIEW THAT TOOK PLACE ON NOVEMBER

18   THE 10TH OF 2016?

19   A    THAT'S MY SIGNATURE.

20   Q    YEAH.  OKAY.  AND YOU CERTAINLY TAKE AS MUCH TIME AS YOU

21   LIKE AT ANY POINT TO LOOK THROUGH THOSE REVIEWS.  BUT JUST

22   WHY DON'T YOU TAKE A MOMENT JUST TO LOOK THROUGH AND SEE THAT

23   YOUR SIGNATURE APPEARS ON EACH OF THE FIVE REVIEWS AS THE

24   CHAIRPERSON OF THE COMP PANEL ON NOVEMBER 10TH OF 2016.

25   THAT'S EXHIBIT 12.

1        ALL RIGHT, SIR.  HAVE YOU HAD A CHANCE TO LOOK AND SEE

2    THAT YOUR SIGNATURE APPEARS AS CHAIRPERSON ON EACH OF THOSE

3    FIVE STAFF ANESTHESIOLOGISTS' --

4    A    YES.

5    Q    -- REVIEWS?  THANK YOU, DR. CARR.  NOW, OVER THE YEARS

6    AT DORN I THINK YOU TOLD ME THAT YOU APPROXIMATE THAT YOU

7    PROBABLY PARTICIPATED IN MAYBE 50 OR SO OF THESE COMPENSATION

8    PANEL REVIEWS AT LEAST AS OF WHEN WE TOOK YOUR DEPOSITION A

9    YEAR OR SO AGO.  IS THAT ABOUT ACCURATE?

10   A    YES.

11   Q    AND MAYBE YOU HAVE DONE SOME ADDITIONAL TO THAT 50 OR SO

12   SINCE WE TOOK YOUR DEPOSITION?

13   A    YES.

14   Q    OKAY.  ALL RIGHT.  NOW, IN ALL YOUR TIME THERE AT DORN

15   AND THROUGHOUT THE COURSE OF THESE 50 OR MORE PHYSICIAN

16   COMPENSATION PANEL REVIEWS, HAVE YOU -- DO YOU REMEMBER EVER

17   PARTICIPATING IN ANY OTHER PANEL REVIEW BESIDES THIS ONE THAT

18   INVOLVES THESE FIVE STAFF ANESTHESIOLOGISTS WHERE THE PURPOSE

19   WAS TO ENSURE THAT THERE WAS NO PAY DISPARITY WITHIN A GROUP?

20   HAD THAT EVER COME UP BEFORE OR SINCE?

21   A    NO.

22   Q    OKAY.  NOW, BEFORE YOU STARTED SERVING ON THESE PANELS

23   AND BEING THE CHAIRPERSON AND SO FORTH, DID YOU RECEIVE ANY

24   FORMAL TRAINING ABOUT HOW TO DO THAT?

25   A    THERE'S A DOCUMENT THAT'S DISTRIBUTED TO EVERYONE THAT'S

1    ON THE PAPERWORK TO REVIEW, AND I REVIEWED THAT DOCUMENT.

2    Q    OKAY.  BUT ASIDE FROM GETTING A DOCUMENT AND REVIEWING

3    IT, DID ANYBODY EVER SIT YOU DOWN OR PUT YOU IN ANY KIND OF A

4    TRAINING CLASS AND SAY, HERE'S HOW IT'S GOING TO WORK AND

5    HERE'S WHAT YOUR JOB IS AND HERE'S WHAT YOU'RE TO DO AND

6    HERE'S THE HANDBOOK AND FOLLOW THIS, AND THAT KIND OF THING?

7    A    NO.

8    Q    OKAY.  YOU SEE THAT THE LANGUAGE ON EXHIBIT 12 -- IF YOU

9    WANT TO TAKE THAT AGAIN.  IF YOU LOOK AT THAT FIRST PAGE --

10   AND THIS IS DR. ALGHOTHANI'S REVIEW, BUT I'LL REPRESENT TO

11   YOU THAT THE SAME TYPED LANGUAGE APPEARS ON ALL FIVE OF THESE

12   FORMS.

13   A    UH-HUH.

14   Q    BUT YOU'LL SEE ABOUT A THIRD OF THE WAY DOWN ON THAT

15   FIRST PAGE SOMEONE HAS TYPED IN THERE, ANESTHESIOLOGY SERVICE

16   IS CONDUCTING A REVIEW OF PROVIDERS' PAY TO ENSURE THERE IS

17   NO PAY DISPARITY.

18        DO YOU SEE THAT THERE?

19   A    YES.

20   Q    THAT'S WHAT I WAS ASKING YOU ABOUT A MOMENT AGO ABOUT

21   WHETHER THAT HAD EVER BEEN THE GOAL OF ANY OTHER PANEL.  BUT

22   DID YOU -- DID ANYBODY EXPLAIN TO YOU WHAT THAT MEANT?

23   A    NO.

24   Q    DID YOU UNDERSTAND WHY THAT WAS BEING DONE?

25   A    I DIDN'T QUESTION WHY IT WAS BEING DONE.

1    Q    OKAY. AND NO ONE, AS BEST AS YOU CAN REMEMBER,

2    EXPLAINED WHY THAT WAS THE PURPOSE, TO ENSURE NO PAY

3    DISPARITY?

4    A    NO ONE.

5    Q    OKAY. THANK YOU VERY MUCH. THAT'S ALL THE QUESTIONS I

6    HAVE, DR. CARR. AND PLEASE ANSWER ANY QUESTIONS THAT THE VA

7    HAS FOR YOU.

8                        CROSS-EXAMINATION

9    BY MR. ANDREWS:

10   Q    GOOD MORNING, DR. CARR.

11   A    MORNING.

12   Q    THANK YOU FOR BEING WITH US THIS MORNING. I WILL BE

13   BRIEF. YOU HAVE BEEN ASKED ABOUT THIS PARTICULAR DOCUMENT,

14   PLAINTIFF'S EXHIBIT 12.

15   A    YES.

16   Q    IF WE COULD LOOK AT THAT. DO YOU SEE HERE -- LOOK IN

17   THE MIDDLE. IF WE COULD ZOOM IN. SAYS HERE, THE

18   CONSIDERATION OF THE PANEL SHALL TAKE INTO ACCOUNT. AND THEN

19   IT LISTS SEVERAL FACTORS. DO YOU SEE THAT?

20   A    SAY AGAIN.

21   Q    DO YOU SEE THE -- RIGHT HERE IN PART B, PANEL FINDINGS,

22   ON THE SCREEN?

23   A    OH, YES.

24   Q    DO YOU SEE WHERE IT SAYS, CONSIDERATION OF THE PANEL

25   SHALL TAKE INTO ACCOUNT, AND THEN IT LISTS CERTAIN FACTORS?

1    A    YES.

2    Q    NOW, WHEN YOU SERVED ON THE PAY PANEL FOR EACH OF THE

3    ANESTHESIOLOGISTS, DID YOU TAKE THOSE FACTORS INTO

4    CONSIDERATION?

5    A    YES.

6    Q    OKAY.  NOW, AND YOUR ULTIMATE RECOMMENDATION OF ANNUAL

7    PAY FOR EACH OF THESE DOCTORS WAS $300,000; IS THAT CORRECT?

8    A    CORRECT.

9    Q    AND YOU SIGNED YOUR NAME TO EACH OF THOSE PAY PANEL

10   ACTIONS; IS THAT CORRECT?

11   A    CORRECT.

12   Q    WOULD YOU HAVE RECOMMENDED ANNUAL PAY THAT YOU DID NOT

13   BELIEVE WAS FAIR?

14   A    NO.

15   Q    WOULD YOU HAVE RECOMMENDED ANNUAL PAY THAT YOU BELIEVED

16   DISCRIMINATED AGAINST OLDER DOCTORS?

17   A    NO.

18   Q    THANK YOU.

19          MR. IRVIN:  NOTHING FURTHER OF THIS WITNESS, YOUR

20   HONOR.

21          THE COURT:  OKAY.  THANK YOU VERY MUCH.  YOU CAN

22   STEP DOWN.  YOU'RE EXCUSED.

23        (WITNESS LEFT THE STAND.)

24        (WITNESS ENTERED THE COURTROOM.)

25             DR. RAMOTH COX, AFTER BEING DULY SWORN,

1    TESTIFIED AS FOLLOWS:

2                        DIRECT EXAMINATION

3    BY MR. IRVIN:

4    Q    GOOD MORNING, DR. COX.

5    A    GOOD MORNING.

6    Q    THANK YOU FOR BEING HERE TODAY.

7    A    THANK YOU.

8    Q    DO YOU RECALL THAT I HAD THE OPPORTUNITY TO TAKE YOUR

9    DEPOSITION TESTIMONY EARLIER IN THIS CASE BACK IN NOVEMBER OF

10   2017?

11   A    YES.

12   Q    ALL RIGHT.  AND THAT I'M A LAWYER WHO REPRESENTS RICK,

13   DR. RICK KENNEDY, WHO IS HERE TODAY.

14   A    UH-HUH.

15   Q    AND I WANT TO ASK YOU SOME QUESTIONS AND MOSTLY JUST

16   SORT OF TRACKING ALONG WHAT WE TALKED ABOUT AT THE TIME OF

17   YOUR DEPOSITION.  AND LET ME FIRST GET A LITTLE BIT OF

18   BACKGROUND FOR THE RECORD.  AS I UNDERSTAND IT, YOU ARE A

19   PHYSICIAN AND YOU ARE EMPLOYED AT THE DORN VA; IS THAT

20   CORRECT?

21   A    YES.

22   Q    AND YOUR SPECIALTY IS IN INTERNAL MEDICINE?

23   A    YES.

24   Q    ALL RIGHT.  AND YOU ARE ALSO THE CHIEF OF

25   COMMUNITY-BASED OUTPATIENT CARE SERVICE AND HAVE -- ARE YOU

1    STILL IN THAT CAPACITY?

2    A    YES.

3    Q    AND YOU HAVE HELD THAT, THAT POSITION, CONTINUOUSLY

4    SINCE 2009?

5    A    YES.

6    Q    AS I RECALL?  OKAY.  AND I GUESS THAT MEANS THAT YOU'RE

7    THE MEDICAL DIRECTOR OF THE -- OF DORN VA'S COMMUNITY-BASED

8    CLINICS THAT ARE LOCATED THROUGHOUT SOUTH CAROLINA?

9    A    YES.

10   Q    SORT OF THE OUTREACH, OUT -- IF DORN VA ON GARNERS FERRY

11   ROAD IS THE HUB, THEN THESE FOLKS GO OUT IN THE STATE TO

12   THESE VARIOUS COMMUNITY-BASED CENTERS; IS THAT RIGHT?

13   A    YES.

14   Q    AND THAT'S WHAT YOU DO?

15   A    YES.

16   Q    OKAY.  ALL RIGHT.  NOW, LET ME SHOW YOU WHAT WE HAVE

17   MARKED AS PLAINTIFF'S EXHIBIT NUMBER 12.  AND I'LL TELL YOU

18   THAT THIS IS A COLLECTION OF THE PAY PANEL, COMPENSATION PAY

19   PANEL, REVIEW FORMS FOR A SERIES OF REVIEWS THAT TOOK PLACE

20   ON NOVEMBER THE 10TH OF 2016.

21       AND WHAT I'D LIKE TO ASK YOU TO DO IS SIMPLY TO TAKE A

22   MOMENT TO LOOK THROUGH THOSE BECAUSE THERE ARE FIVE REVIEWS

23   OF THE FIVE STAFF ANESTHESIOLOGISTS AT DORN AND JUST CONFIRM

24   THAT YOUR SIGNATURE APPEARS AS A PANEL MEMBER ON THOSE

25   COMPENSATION PANEL ACTION FORMS FOR EACH OF THE FIVE STAFF

1    ANESTHESIOLOGISTS.

2    A    YES.

3    Q    OKAY.  NOW, OVER YOUR TIME AT DORN VA AS A PHYSICIAN,

4    YOU HAVE SERVED ON A BUNCH OF THESE PANELS OVER THE YEARS?

5    A    A NUMBER OF THEM, YES.

6    Q    OKAY.  AND I BELIEVE YOU SAID THAT THE -- AT LEAST MORE

7    RECENTLY YOU WERE CALLED UPON TO SERVE ON THESE PANELS MAYBE

8    ONCE OR TWICE A MONTH EVEN.  IS THAT A FAIR ASSESSMENT?

9    A    I MEAN, NOT NECESSARILY MORE RECENTLY.  THE SYSTEM HAS

10   CHANGED AS PREVIOUSLY THEY WEREN'T SCHEDULED AND IT WAS -- WE

11   WOULD DO THEM AS NEEDED WHEREAS NOW THEY ACTUALLY HAVE THEM

12   SCHEDULED EACH WEEK AND THEN WE DO THEM IF NEEDED.

13   Q    OKAY.

14   A    IT'S A LITTLE BIT MORE STANDARDIZED.

15   Q    ALL RIGHT.  NOW IF YOU WILL LOOK ON EXHIBIT 12, WE CAN

16   JUST USE THE TOP SHEET THAT YOU HAVE THERE.  YOU WILL SEE

17   ABOUT A THIRD OF THE WAY DOWN THERE IS SOME TYPEWRITTEN

18   LANGUAGE UNDER PART A.

19   A    UH-HUH.

20   Q    AND IT SAYS, ANESTHESIOLOGY SERVICE IS CONDUCTING A

21   REVIEW OF PROVIDERS' PAY TO ENSURE THERE IS NO PAY DISPARITY.

22   DO YOU SEE THAT LANGUAGE AS IT APPEARS THERE?

23   A    I DO.

24   Q    OKAY.  NOW, DID ANYONE ON THE PANEL INCLUDING YOURSELF

25   ASK ANY QUESTIONS ABOUT WHAT WAS MEANT BY THAT LANGUAGE,

1    REFERRING TO NO PAY DISPARITY?

2    A    NOT THAT I RECALL.

3    Q    OKAY.  SO NEITHER YOU NOR -- YOU DON'T RECALL IT -- THE

4    OTHER PANEL MEMBERS ASKING, WHAT DOES THAT MEAN?

5    A    NO, SIR.

6    Q    OKAY.  ALL RIGHT.  AND I BELIEVE YOU SAID THAT IN YOUR

7    EARLIER TESTIMONY THAT YOU DON'T RECALL DR. MILLER MAKING A

8    PRESENTATION TO THE PANEL ABOUT THE PURPOSE OF THE REVIEWS

9    BEING TO ENSURE THERE WAS NO PAY DISPARITY.  IS THAT CORRECT?

10   A    I DON'T REMEMBER THAT EXACT STATEMENT FROM HIM, NO.

11   Q    OKAY.  ALL RIGHT.  AND AS I UNDERSTAND IT, THE PANEL ON

12   THIS DATE FOCUSED ON THE ANNUAL PAY RECOMMENDATIONS MADE BY

13   DR. MILLER FOR THESE FIVE STAFF ANESTHESIOLOGISTS.  IS THAT A

14   FAIR STATEMENT?

15   A    YES.

16   Q    ALL RIGHT.  AND YOU TAKE A MOMENT TO LOOK, BUT AS I

17   BELIEVE IS THE CASE FOR EACH OF THESE FIVE STAFF

18   ANESTHESIOLOGISTS, DR. MILLER, AS THE SERVICE LINE CHIEF, PUT

19   FORWARD A RECOMMENDATION FOR THE EXACT SAME AMOUNT OF ANNUAL

20   PAY FOR EACH OF THESE STAFF ANESTHESIOLOGISTS BEING $300,000;

21   IS THAT CORRECT?

22   A    YES.

23   Q    ALL RIGHT.  NOW, IN YOUR EXPERIENCE SERVING ON PAY

24   PANELS, HAD YOU EVER -- DO YOU RECALL EVER HAVING A PAY PANEL

25   WHERE A SERVICE LINE CHIEF CAME IN AND -- FOR THE STATED

COX - DIRECT

260

1    PURPOSE OF ENSURING THERE WAS NO PAY DISPARITY AND WANTING TO

2    AWARD EACH AND EVERY MEMBER OF A SERVICE THE EXACT SAME

3    AMOUNT OF ANNUAL SALARY?

4    A    I MEAN, I DON'T -- I DON'T RECALL ANY SPECIFIC

5    INSTANCES.

6    Q    OKAY.  BUT THE PANEL THAT YOU SERVED ON ON THIS DATE

7    WOULD HAVE FOCUSED ON THAT 300,000 ANNUAL PAY RECOMMENDATION

8    AND NOT ON ANY DISCRETE MARKET PAY OR BASE PAY PORTION OF

9    THAT.  IS THAT A FAIR STATEMENT?

10   A    WOULD HAVE FOCUSED ON THE ANNUAL; THE ANNUAL PAY.

11   Q    OKAY.  AND IF YOU LOOK ON THE SECOND PAGE -- AND AGAIN

12   WE'LL JUST USE DR. ALGHOTHANI AS AN EXAMPLE -- YOU WILL SEE

13   ABOUT TWO-THIRDS OF THE WAY DOWN THERE IS A SECTION ENTITLED

14   PART C, ACTION BY APPROVING OFFICIAL.

15        DO YOU SEE THAT ON THE SECOND PAGE?  AND IT SHOULD BE UP

16   ON THE SCREEN NOW.

17   A    YES.

18   Q    AND SO, AS I UNDERSTAND IT, THIS SECTION IS DONE BY THE

19   APPROVING OFFICIAL, NOT THE PANEL, AND YOU CAN SEE DOWN BELOW

20   WHERE SOMEONE NAMED DAVID L OMURA APPEARS TO BE THE APPROVING

21   OFFICIAL WHO HAS SIGNED AND DATED THIS FORM.  DO YOU SEE THAT

22   THERE?

23   A    YES.

24   Q    SO MY QUESTION TO YOU IS, SOMEONE HAS HANDWRITTEN IN

25   THAT SECTION SOME NUMBERS.  IT SAYS ANNUAL RATE OF PAY, BASE

COX - DIRECT

261

1    PAY PLUS MARKET PAY, AND THEN SOMEONE HAS WRITTEN IN 104,322

2    FOR THE BASE PAY.  IS THAT SOMETHING THE PANEL DID OR WOULD

3    THAT HAVE BEEN--

4    A    THAT WASN'T DONE BY THE PANEL.

5    Q    OKAY.  AND THEN THE SECOND NUMBER, APPARENTLY THE MARKET

6    PAY, OF $195,678, THERE AGAIN, WHOEVER WROTE THOSE NUMBERS IN

7    WOULD HAVE BEEN AFTER THE PANEL DID ITS WORK?

8    A    YES.

9    Q    AND SO YOU DIDN'T FOCUS ON NOR DID YOU KNOW WHAT THOSE

10   NUMBERS WERE.

11   A    RIGHT.

12   Q    BUT YOU UNDERSTAND, DO YOU NOT, DR. COX, THAT BASE PAY,

13   WHICH IS ONE OF THE TWO ELEMENTS OF TOTAL ANNUAL PAY, IS A

14   LONGEVITY PAY NUMBER THAT COMES OFF OF A TABLE.  DO YOU

15   UNDERSTAND THAT?

16   A    I KNOW THERE'S A BASE PAY AND THEN THERE'S A MARKET

17   COMPONENT.

18   Q    OKAY.  AND DO YOU UNDERSTAND THAT THE BASE PAY, THOUGH,

19   IS JUST A FIXED NUMBER OFF OF A LONGEVITY TABLE?  THERE'S NO

20   DISCRETION ABOUT HOW MUCH --

21   A    I DO.

22   Q    -- THAT SHOULD BE?

23   A    THERE IS -- YES, THAT'S NOT SOMETHING THAT IS

24   CHANGEABLE.

25   Q    OKAY.  AND SO, THE ARITHMETIC CALCULATION THEN THAT'S ON

1    THIS PAGE -- AND WE JUST LOOKED AT IT THAT SOMEONE HAS

2    HANDWRITTEN IN -- IF YOU WANTED TO KNOW WHAT THE MARKET PAY

3    WAS, YOU COULD TAKE THE ANNUAL PAY RECOMMENDATIONS -- WHICH

4    WERE APPROVED BY THE PANEL, WERE THEY NOT, THE $300,000 --

5    A    YES.

6    Q    -- FOR EACH ONE OF THESE STAFF ANESTHESIOLOGISTS?

7    A    YES.

8    Q    YOU COULD TAKE THAT NUMBER AND THEN YOU COULD SUBTRACT

9    FROM IT THE BASE PAY FIXED AMOUNT OFF THE LONGEVITY TABLE AND

10   THAT WOULD GIVE YOU THE MARKET PAY.  IS THAT A FAIR

11   STATEMENT?

12   A    THAT I DON'T -- THAT I DON'T KNOW.  ALL WE DID WAS LOOK

13   AT THE ANNUAL PAY RECOMMENDATION BASED ON THE PRESENTATION BY

14   THE SERVICE CHIEF.

15   Q    OKAY.  AND AGAIN, YOU AND THE OTHER PANEL MEMBERS

16   ACCEPTED THE RECOMMENDATION OF DR. MILLER THAT EACH AND EVERY

17   ONE OF THEM SHOULD RECEIVE 300,000 IN ANNUAL PAY.

18   A    IT APPEARS THAT WAY BASED ON THE DOCUMENTS, YES.

19   Q    OKAY.  AND I ASKED YOU IN YOUR DEPOSITION ABOUT WHETHER

20   YOU SAW ANY REASON WHY ANY OF THESE FIVE ANESTHESIOLOGISTS

21   SHOULD RECEIVE MORE OR LESS THAN THE RECOMMENDATION FOR

22   300,000 FOR EACH ONE, AND I BELIEVE YOU SAID THAT YOU

23   REALLY -- YOU CAN'T SAY THAT YOU REALLY COMPARED THEM.  IS

24   THAT A FAIR STATEMENT?

25   A    THE PRESENTATIONS WERE MADE INDIVIDUAL ON THE -- ON THE

1   INDIVIDUAL PERSON PER, YOU KNOW, EMPLOYEE.  AND BASED ON WHAT

2   WAS PRESENTED BY THE CHIEF, THERE WAS A RECOMMENDATION AND WE

3   EITHER AGREED OR HAD DISCUSSION OR DIDN'T AGREE.  IN THIS

4   SENSE WE AGREED.  BUT YEAH, THAT -- THAT -- WE WEREN'T

5   LOOKING AT COMPARING.

6   Q    OKAY.  YOU DID THEM ONE AT A TIME?

7   A    WE DID THEM ONE AT A TIME.

8   Q    BUT YOU DIDN'T COMPARE ONE AGAINST THE OTHER.

9   A    WE DID ONE AT A TIME, AND THE CHIEF PRESENTED ALL -- THE

10  SEVEN ELEMENTS OF THE THINGS THAT WE TYPICALLY CONSIDER IN A

11  COMP PANEL.

12  Q    OKAY.  AND THEN YOU WENT TO THE SECOND ONE AND YOU DID

13  THAT ONE SEPARATELY AND YOU ACCEPTED THE RECOMMENDATION;

14  CORRECT?

15  A    YES.

16  Q    AND DIDN'T COMPARE HIM OR HER TO ANY OF THE OTHERS IN

17  DOING SO.

18  A    I MEAN, NOT THAT I RECALL.  THEY -- HE PRESENTED EACH

19  INDIVIDUAL AND WE, YOU KNOW, MADE THE RECOMMENDATION AND WE

20  CONCURRED WITH HIS RECOMMENDATION.

21  Q    THANK YOU VERY MUCH FOR YOUR TIME TODAY, AND PLEASE

22  ANSWER ANY QUESTIONS THAT COUNSEL FOR THE VA HAS FOR YOU,

23  PLEASE.

24  A    OKAY.

25                    CROSS-EXAMINATION

BY MR. ANDREWS:

Q    GOOD MORNING, DR. COX.

A    GOOD MORNING.

Q    THANK YOU FOR BEING WITH US THIS MORNING AND THANK YOU

FOR BEING PATIENT.  SO YOU HAVE BEEN ASKING QUESTIONS ABOUT

WHETHER YOU COMPARED THE DOCTORS, AND I'D LIKE TO EXPLORE

THAT A LITTLE BIT.  SO, IF WE COULD BRING THAT PLAINTIFF'S

EXHIBIT 12, PLEASE.

     FIRST LET'S START ON THIS FIRST PAGE HERE.  DO YOU SEE

THE -- RIGHT IN THE MIDDLE OF THE SCREEN UNDER PART B --

A    UH-HUH.

Q    -- SAYS, CONSIDERATION OF THE PANEL SHALL TAKE INTO

ACCOUNT, AND THEN IT LISTS SOME FACTORS.  DO YOU RECOGNIZE

THESE FACTORS?

A    YES.

Q    ARE THESE THE FACTORS THAT YOU WOULD HAVE CONSIDERED IN

A PANEL, PAY PANEL REVIEW FOR EACH OF THESE

ANESTHESIOLOGISTS?

A    RIGHT.

Q    OKAY.

A    THAT WOULD HAVE BEEN PRESENTED.

Q    NOW, YOU SAID YOU CONSIDERED THE DOCTORS ONE AT A TIME;

CORRECT?

A    UH-HUH.

Q    AND YOU'RE CONSIDERING EACH OF THEM IN REFERENCE TO

1    THESE STANDARDS; CORRECT?

2    A    YES.

3    Q    OKAY.  SO THAT THE STANDARDS YOU'RE CONSIDERING FOR THE

4    SETTING AND RECOMMENDATION OF ANNUAL PAY FOR EACH OF THESE

5    DOCTORS ARE THE SAME STANDARDS; CORRECT?

6    A    YES.

7    Q    YOU'RE HOLDING THEM TO THE SAME STANDARDS.

8    A    YES.

9    Q    SO IF YOU ARRIVE AT A RECOMMENDATION OF $300,000 FOR

10   EACH OF THESE DOCTORS IN LIGHT OF THESE STANDARDS, WOULD IT

11   BE YOUR BELIEF THAT THESE DOCTORS ARE SIMILARLY QUALIFIED?

12   A    YES.

13   Q    DO YOU BELIEVE THAT THERE'S ANYTHING WRONG WITH

14   ELIMINATING PAY DISPARITY FOR DOCTORS WHO ARE SIMILARLY

15   QUALIFIED?

16   A    I MEAN, IF THE QUALIFICATIONS ARE SIMILAR AND -- I DON'T

17   SEE ANYTHING WRONG WITH THAT.

18   Q    OKAY.  WOULD YOU HAVE APPROVED A SALARY THAT YOU DID NOT

19   THINK WAS FAIR?

20   A    NO.

21   Q    WOULD YOU HAVE APPROVED A SALARY THAT YOU BELIEVED WAS

22   DISCRIMINATORY TO OLDER DOCTORS?

23   A    NO.

24   Q    I DON'T HAVE ANY FURTHER QUESTIONS.  THANK YOU.

25                         REDIRECT EXAMINATION

1    BY MR. IRVIN:

2    Q    DR. COX, IF I MIGHT, JUST ANOTHER QUESTION OR TWO TO

3    FOLLOW UP THERE.  THE TOTAL SALARY WAS THE SAME; THAT IS

4    $300,000 FOR EACH OF THESE FIVE ANESTHESIOLOGISTS.  BUT IF

5    YOU LOOK AT THOSE SHEETS THAT YOU HAVE IN FRONT OF YOU THERE,

6    EXHIBIT 12, WOULD YOU JUST TURN TO THOSE SHEETS FOR ME IN

7    EXHIBIT 12 AND LOOK AT THE SECOND PAGE WHERE I ASKED YOU DOWN

8    TOWARDS THE BOTTOM ABOUT THE HANDWRITTEN AMOUNTS THAT ARE

9    ENTERED THERE FOR BASE PAY AND MARKET PAY AND ADD UP TO THE

10   $300,000.

11   A    UH-HUH.

12   Q    LOOK AT THAT WITH ME.  ON KENNEDY, SEE DOWN AT THE

13   BOTTOM THERE'S SOME PAGE NUMBERING THAT WE CALL BATES

14   NUMBERS, AND KENNEDY RFP100 IS DR. ALGHOTHANI'S SECOND SHEET.

15   A    OKAY.

16   Q    YOU SEE THERE THAT THE HANDWRITTEN MARKET PAY AMOUNT FOR

17   HIM IS 195,678.  DO YOU SEE THAT THERE?

18   A    YES.

19   Q    OKAY.  AND THEN IF YOU FLIP OVER TO KENNEDY RFP104, AND

20   THAT'S THE BEGINNING OF DR. KENNEDY'S COMP PANEL REVIEW FORM

21   FOR THIS SAME DAY, AND LOOK AT HIS SECOND SHEET, THAT'S

22   KENNEDY RFP105, THE HANDWRITTEN AMOUNT OF HIS MARKET PAY IS

23   168,758.

24       DO YOU SEE THAT THERE?

25   A    YES.

1   Q    SO THOSE NUMBERS SO FAR AREN'T THE SAME.  THOSE ARE

2   DIFFERENT; IS THAT CORRECT?

3   A    YES.

4   Q    AND DR. KENNEDY'S MARKET PAY AMOUNT IS SUBSTANTIALLY

5   LESS BY $25,000 OR SO THAN DR. ALGHOTHANI; IS THAT CORRECT?

6   A    IT APPEARS SO.

7   Q    OKAY.  AND THEN FLIPPING ON OVER AND YOU'LL SEE ON

8   KENNEDY RFP109, THAT IS THE COMP PANEL FORM FOR DR. NGUYEN ON

9   THIS SAME DATE WHEN THE PANEL APPROVED THE ANNUAL OF 300,000,

10  YOU'LL SEE THAT DR. NGUYEN THERE HAS A MARKET PAY HANDWRITTEN

11  AMOUNT THERE OF 195,678.  DO YOU SEE THAT THERE?

12  A    UH-HUH.

13  Q    OKAY.  AND THAT HAPPENS TO BE THE SAME AMOUNT AS DR.

14  ALGHOTHANI RECEIVED.  AND THEN IF YOU FLIP ON OVER YOU WILL

15  SEE ON PAGE 114, THIS IS THE REVIEW FOR DR. PENDER, AND ON

16  THE SECOND PAGE OF THIS SHEET YOU SEE THAT HIS MARKET PAY

17  AWARD WAS 192,313.  DO YOU SEE THAT?

18  A    YES.

19  Q    OKAY.  AND THEN IF YOU FLIP ON BEYOND YOU WILL SEE FOR

20  DR. PRYOR, BEGINNING AT 119 AND OVER ON 120, THAT HIS MARKET

21  PAY WAS 182,218.  DO YOU SEE THAT?

22  A    YES.

23  Q    AND SO ALL OF THOSE OTHER STAFF PHYSICIANS,

24  ANESTHESIOLOGISTS BESIDES DR. KENNEDY, RECEIVED SUBSTANTIALLY

25  MORE IN MARKET PAY THAN DID DR. KENNEDY; CORRECT?

1    A    IN MARKET PAY IT LOOKS FROM WHAT YOU'RE SHOWING HERE,

2    YES.

3    Q    OKAY.  AND SO, THERE IS -- THE PAY DISPARITY AS TO

4    MARKET PAY WAS NOT A RAISE; IS THAT CORRECT?

5    A    THE -- WHAT WE CONSIDERED HIS ANNUAL PAY.

6    Q    YES.  BUT THE MARKET PAY AMOUNTS WERE NOT EQUALIZED.

7    A    IT APPEARS THAT THE MARKET PAY AMOUNTS WEREN'T EQUAL

8    HERE, BUT WE CONSIDERED ANNUAL PAY.

9    Q    THANK YOU.  THAT'S ALL I HAVE.

10         *MR. ANDREWS:*  YOUR HONOR, I HAVE A FEW MORE

11   QUESTIONS WITHIN THE SCOPE.

12                          RECROSS-EXAMINATION

13   BY MR. ANDREWS:

14   Q    DR. COX, I TOLD YOU I WAS DONE AND I HAVE JUST A FEW

15   MORE.  BUT I'D LIKE TO FOCUS ON THESE NUMBERS AGAIN.  NOW, IF

16   YOU LOOK AT -- AND WE'LL START WITH THIS IS DR. ALGHOTHANI,

17   AND YOU WERE JUST ASKED ABOUT THESE NUMBERS -- YOU SEE HERE

18   THAT DR. ALGHOTHANI'S BASE PAY IS $104,322; CORRECT?

19   A    UH-HUH.

20   Q    AND HIS MARKET PAY WAS $195,678; CORRECT?  GO TO DR.

21   KENNEDY, PLEASE.  NOW WE SEE HERE WITH DR. KENNEDY, HIS BASE

22   PAY IS SUBSTANTIALLY MORE THAN DR. ALGHOTHANI'S; CORRECT?

23   A    YES.

24   Q    IT'S $131,242; CORRECT?

25   A    YES.

1    Q    AND THEN HIS MARKET PAY, AS HAS BEEN POINTED OUT, WAS

2    LESS.  IT WAS 168,758; CORRECT?

3    A    YES.

4    Q    DO YOU KNOW WHAT AFFECT IT WOULD HAVE -- IF WE COULD

5    STAY THERE, ACTUALLY.  DO YOU KNOW WHAT AFFECT IT WOULD HAVE

6    ON DR. KENNEDY'S ANNUAL PAY IF HE WAS GIVEN THE SAME MARKET

7    PAY AS DR. ALGHOTHANI?

8    A    I MEAN, I'M ASSUMING IT WOULD BE HIGHER.

9    Q    WOULD IT BE FAIR TO SAY THAT IT WOULD BE ALMOST $30,000

10   HIGHER?

11   A    I HAVE NOT DONE THE MATH, BUT I WILL TAKE YOUR WORD FOR

12   IT.

13   Q    DO YOU BELIEVE WHEN TWO DOCTORS HAVE SIMILAR

14   QUALIFICATIONS THAT IT WOULD BE FAIR TO PAY ONE OF THEM

15   $30,000 MORE THAN THE OTHER?

16   A    I DO NOT.

17   Q    I DON'T HAVE ANY FURTHER QUESTIONS.  THANK YOU.

18           THE COURT:  I JUST HAVE ONE QUESTION.  I WANT TO

19   ASK A QUESTION ABOUT THE SEVEN FACTORS THAT YOU TAKE INTO

20   CONSIDERATION WHEN YOU'RE DOING THE ANNUAL REVIEWS.

21           THE WITNESS:  YES.

22           THE COURT:  DO YOU TAKE THOSE SEVEN FACTORS INTO

23   CONSIDERATION WHEN YOU'RE DETERMINING THE ANNUAL SALARY OR DO

24   YOU TAKE THE SEVEN FACTORS INTO CONSIDERATION WHEN YOU ARE

25   DETERMINING MARKET PAY?

1              THE WITNESS:  WE -- WE ARE LOOKING AT ANNUAL

2    SALARIES.

3              THE COURT:  SO THE SEVEN FACTORS DON'T PLAY INTO

4    WHAT THE MARKET PAY IS?

5              THE WITNESS:  MARKET?  NO.

6              THE COURT:  OKAY.

7              THE WITNESS:  TOTAL SALARY.

8              THE COURT:  THANK YOU.

9              MR. IRVIN:  WE ARE DONE.

10             THE COURT:  THANK YOU.  YOU'RE EXCUSED.

11         (WITNESS LEFT THE STAND.)

12         (WITNESS ENTERED THE COURTROOM.)

13             THE COURT:  YOU MAY CALL YOUR NEXT WITNESS.

14             MR. IRVIN:  THANK YOU, YOUR HONOR.  WE CALL DR.

15    SMITH.

16             THE COURT:  DR. SMITH, YOU MAY COME FORWARD AND

17    STOP AT THIS MICROPHONE IN FRONT OF THE COURT REPORTER AND BE

18    SWORN IN, PLEASE.

19              DR. STUART SMITH, AFTER BEING DULY SWORN,

20    TESTIFIED AS FOLLOWS:

21                      DIRECT EXAMINATION

22    BY MR. IRVIN:

23    Q    GOOD AFTERNOON, DR. SMITH.  MY NAME IS WILMOT IRVIN AND

24    WE MET EARLIER IN THIS CASE.  I TOOK YOUR DEPOSITION.  DO YOU

25    RECALL THAT?

SMITH - DIRECT

271

1    A    YES, SIR.

2    Q    OKAY.  I JUST HAVE A VERY FEW QUESTIONS TO ASK YOU.  AND

3    YOU ARE HERE TODAY BECAUSE YOU SERVED ON THE COMP PANEL

4    REVIEWS THAT WERE DONE ON NOVEMBER THE 10TH OF 2016 OF THE

5    FIVE STAFF ANESTHESIOLOGISTS AT DORN VA MEDICAL CENTER.  DO

6    YOU RECALL SERVING ON THAT PANEL?

7    A    YES, SIR.

8    Q    OKAY.  I'M JUST GOING TO PUT IN FRONT OF YOU -- DON'T

9    KNOW THAT WE'LL NEED TO EVEN LOOK AT IT, BUT IF WE DECIDE TO,

10   IT'S HERE FOR YOU.  THOSE ARE THE COMP PANEL FORMS THAT YOU

11   LOOKED AT I THINK IN YOUR DEPOSITION.  AND YOU WOULD HAVE

12   SIGNED THOSE FORMS, IS THAT CORRECT, AS A MEMBER OF THE

13   PANEL?

14   A    MAY I LOOK AT THEM?

15   Q    CERTAINLY.  PLEASE DO.

16   A    YES, SIR.

17   Q    OKAY.  AND SO THAT'S YOUR SIGNATURE THAT APPEARS ON EACH

18   OF THOSE FIVE STAFF ANESTHESIOLOGISTS' REVIEWS?

19   A    YES, SIR.

20   Q    OKAY.  NOW, I THINK YOU SAID THAT -- IN YOUR DEPOSITION

21   TESTIMONY THAT YOU REMEMBER PORTIONS MAYBE BUT DON'T HAVE AN

22   INSTANT RECALL OF EVERYTHING THAT TOOK PLACE BUT THAT WHAT

23   YOU DO RECALL IS THAT THESE REVIEWS WERE NOT PARTICULARLY

24   NOTEWORTHY AND THEY WERE PRETTY STANDARD, THEY DIDN'T INVOLVE

25   ANY CONTROVERSY.  IS THAT A FAIR STATEMENT OF YOUR

1    RECOLLECTION OF THIS?

2    A    YES.

3    Q    OKAY.  ALL RIGHT.  AND YOU HAVE SAT ON A GOOD MANY OF

4    THESE PANELS.  I BELIEVE YOU HAVE BEEN AT DORN AS A

5    PHYSICIAN, A HOSPITALIST WHO SPECIALIZES IN INTERNAL MEDICINE

6    SINCE 2001.  DOES THAT SOUND RIGHT?

7    A    UH-HUH.

8    Q    ALL RIGHT.  AND SO COMING ON 17 YEARS OR SO YOU HAVE

9    SERVED ON A GOOD MANY OF THESE PANELS.

10    A    YES, SIR.

11    Q    ALL RIGHT.  NOW, AS FAR AS WHAT SUM IS BASE PAY AND WHAT

12    SUM IS MARKET PAY, YOU DON'T REALLY KNOW HOW THAT IS ARRIVED

13    AT.  YOU FOCUSED ON ANNUAL PAY AS A PANEL MEMBER.  IS THAT

14    FAIR TO SAY?

15    A    CORRECT.

16    Q    AND WOULD THAT ALSO BE THE CASE GENERALLY FOR THE PANELS

17    THAT YOU SAT ON NOT JUST FOR ANESTHESIOLOGISTS BUT THROUGHOUT

18    YOUR 15, 16, 17 YEARS THERE AT DORN?

19    A    CORRECT.

20    Q    OKAY.  ALL RIGHT.  AND YOU HAVE NEVER BEEN GIVEN A COPY

21    OF THE FEDERAL STATUTE THAT APPLIES TO THE DETERMINATION OF

22    PHYSICIAN SALARIES AT THE VA; HAVE YOU, DR. SMITH?

23    A    NOT THAT I RECALL.

24    Q    OKAY.  AND YOU NEVER RECEIVED ANY FORMAL TRAINING WHEN

25    YOU BEGAN DOING THESE PANELS WHERE YOU WERE BROUGHT IN AND

1    SORT OF TUTORED ABOUT WHAT ALL THE HANDBOOK SAYS AND THE

2    STATUTE SAYS AND HERE'S WHAT YOU'RE CALLED UPON TO DO AS A

3    PANEL MEMBER AND HERE'S HOW THE PROCESS WORKS.  YOU NEVER

4    RECEIVED ANYTHING LIKE THAT; DID YOU?

5    A    NOTHING THAT YOU DESCRIBED, SIR.

6    Q    OKAY.  THAT'S ALL THE QUESTIONS THAT I HAVE, DR. SMITH.

7    THANK YOU.

8    A    THANK YOU.

9                        CROSS-EXAMINATION

10   BY MR. ANDREWS:

11   Q    MORNING, DR. SMITH.

12   A    MORNING.

13   Q    THANK YOU FOR BEING WITH US TODAY AND THANK YOU FOR

14   BEING PATIENT WITH US.  NOW, I BELIEVE YOU JUST SAID THAT YOU

15   HAVE SERVED ON A NUMBER OF COMPENSATION PANELS IN THE COURSE

16   OF YOUR CAREER; IS THAT CORRECT?

17   A    YES, SIR.

18   Q    DO YOU HAVE ANY IDEA WHAT A ROUGH RANGE WOULD BE?

19   A    MORE THAN 10, CERTAINLY LESS THAN A HUNDRED PROBABLY.

20   Q    MORE THAN 10, LESS THAN A HUNDRED.

21   A    YES, SIR.

22   Q    BIG RANGE, BUT I WILL TAKE IT.  YOU HAVE SERVED ON

23   COMPENSATION PANELS FOR ANESTHESIOLOGISTS; CORRECT?

24   A    YES, SIR.

25   Q    HAVE YOU SERVED ON COMPENSATION PANELS FOR DOCTORS OF

SMITH - CROSS
274

1    ANY OTHER SPECIALTY?

2    A    I BELIEVE ALL OF THEM.

3    Q    COULD YOU--

4    A    I -- SURGERY, INTERNAL MEDICINE, GASTROENTEROLOGY,

5    ONCOLOGY, PAIN MEDICINE, I BELIEVE OPHTHALMOLOGY, PRIMARY

6    CARE, PSYCHIATRY.

7    Q    NOW, IN THE COURSE OF YOUR SERVICE ON THESE COMPENSATION

8    PANELS, YOU WERE MAKING RECOMMENDATIONS OF ANNUAL PAY; IS

9    THAT CORRECT?

10    A    CORRECT.

11    Q    NOW, DO YOU UNDERSTAND -- IS IT TRUE TO SAY THAT ANNUAL

12    PAY IS BASE PAY PLUS MARKET PAY?

13    A    YES.

14    Q    AND YOU DIDN'T HAVE ANYTHING TO DO WITH THE CALCULATION

15    OF BASE PAY; IS THAT RIGHT?

16    A    NO, SIR.

17    Q    THAT WAS A SCHEDULED PROCESS THAT WAS CALCULATED BY HR;

18    CORRECT?

19    A    I BELIEVE SO.

20    Q    SO, IS IT FAIR TO SAY THAT AS YOU EVALUATED ANNUAL PAY,

21    THE ONLY REAL VARIABLE THAT YOU HAD ANY CONTROL OVER WAS

22    MARKET PAY?  IS THAT FAIR?

23    A    CORRECT.

24    Q    OKAY.  COULD WE SEE PLAINTIFF'S EXHIBIT 12, PLEASE?  ALL

25    RIGHT.  SO, DO YOU RECOGNIZE THIS DOCUMENT?

SMITH - CROSS

1    A    MAY I?

2    Q    ABSOLUTELY.  YEAH.  IT SHOULD BE THE SAME AS WHAT MR.

3    IRVIN JUST PRESENTED TO YOU.

4    A    YES.

5    Q    OKAY.  NOW, LET'S SCROLL DOWN TO THE MIDDLE OF THE PAGE

6    WHERE WE SEE THE PANEL FINDINGS IN THIS -- YOU SEE THIS

7    LANGUAGE HERE THAT SAYS, CONSIDERATION OF THE PANEL SHALL

8    TAKE INTO ACCOUNT.  AND THEN IT LISTS SOME FACTORS?

9    A    YES.

10   Q    DO YOU RECOGNIZE THOSE FACTORS?

11   A    YES.

12   Q    ARE THOSE THE FACTORS THAT YOU CONSIDERED IN THE

13   RECOMMENDATION OF PAY ON THE COMPENSATION PANEL?

14   A    YES.

15   Q    CAN WE TURN TO THE NEXT PAGE, PLEASE?  SCROLL DOWN.  AND

16   SO, WOULD THIS BE YOUR SIGNATURE HERE?

17   A    YES.

18   Q    AND THIS WOULD BE YOUR RECOMMENDATION OF ANNUAL PAY FOR

19   DR. ALGHOTHANI; IS THAT CORRECT?

20   A    YES.

21   Q    OKAY.  COULD YOU GO TO -- ACTUALLY COULD YOU GO TO DR --

22   OR SEVERAL.  SO, WHAT WE ARE LOOKING AT HERE IS THE

23   COMPENSATION PANEL'S ACTION FOR DR. KENNEDY.  COULD YOU TURN

24   TO THE NEXT PAGE, PLEASE?  AND IF YOU SCROLL DOWN, DO YOU SEE

25   YOUR NAME THERE?

1    A    YES, SIR.

2    Q    AND THAT'S YOUR SIGNATURE AS WELL?

3    A    YES.

4    Q    AND YOU SEE THE RATE OF ANNUAL PAY RECOMMENDED IS

5    300,000; IS THAT CORRECT?

6    A    YES.

7    Q    OKAY.  COULD YOU GO TO THE NEXT PAGE, PLEASE.  NOW, WE

8    DISCUSSED JUST A MOMENT AGO THE CONSIDERATION OF THESE SEVEN

9    FACTORS IN THE COMPENSATION PANEL REVIEW, AND I WANT TO TALK

10   ABOUT THAT JUST A LITTLE BIT MORE.  DO YOU RECOGNIZE THIS

11   PAGE IN FRONT OF YOU?

12   A    YES, SIR.

13   Q    YOU'VE SEEN THIS PAGE BEFORE?

14   A    YES.

15   Q    OKAY.  NOW, COULD YOU ZOOM OUT, PLEASE, SO YOU CAN SEE

16   THE WHOLE PAGE?  NOW, YOU SEE HERE THERE'S SEVEN FACTORS

17   LISTED ON THIS OR SEVEN PARAGRAPHS LISTED ON THIS PAGE.  DO

18   YOU KNOW WHETHER THESE SEVEN PARAGRAPHS CORRESPOND WITH THE

19   SEVEN FACTORS?

20   A    I BELIEVE SO, YES.

21   Q    OKAY.  LET'S WALK THROUGH THEM ONE AT A TIME.  SO

22   PARAGRAPH ONE, DID THAT CORRESPOND WITH DR. KENNEDY'S

23   EXPERIENCE IN HIS SPECIALTY?

24   A    YES.

25   Q    LET'S LOOK AT PARAGRAPH TWO, AND I ACTUALLY WANT TO DRAW

1    ON THIS FOR A MINUTE.  DOES THIS APPEAR TO YOU TO RELATE TO

2    THE PARTICULAR NEED FOR THE ANESTHESIOLOGY SPECIALTY AT THE

3    DORN MEDICAL CENTER?

4    A    YES.

5    Q    OKAY.  CAN WE GO BACK TO DR. ALGHOTHANI'S, PLEASE, THE

6    CORRESPONDING PAGE WITH THE FACTORS.  SO, I'D LIKE YOU TO

7    TAKE A LOOK AT THIS, DR. SMITH.  YOU SEE IN PARAGRAPH ONE,

8    DOES THAT APPEAR TO YOU THAT -- TO RELATE TO DR. ALGHOTHANI'S

9    EXPERIENCE IN THE PRACTICE OF MEDICINE?

10   A    YES.

11   Q    OKAY.  NOW PARAGRAPH TWO.  COULD YOU READ THAT PARAGRAPH

12   FOR ME, PLEASE?

13   A    THE NEED TO RETAIN AND MAINTAIN THIS SPECIALTY IS

14   CRITICAL TO THE SUCCESS OF THE DORN VA MEDICAL CENTER,

15   ANESTHESIOLOGY AND SURGICAL SERVICES.  CURRENTLY

16   ANESTHESIOLOGY SERVICE HAS AGGRESSIVELY RECRUITED AND FAILED

17   TO FILE [SIC] ALL ANESTHESIOLOGY VACANCIES.  THE SERVICE

18   CANNOT MAINTAIN COMPARABLE PAY COMPENSATION AND ASSIGNED

19   PERSONNEL DEPART DUE TO PAY COMPENSATION WILL DIRECTLY AFFECT

20   PATIENT CARE AND SERVICES PROVIDED AT DORN VA MEDICAL CENTER.

21   DR. KENNEDY IS WELL-TRAINED AND WITH HIS EXPERIENCE AND

22   LEADERSHIP ABILITIES THAT HE POSSESSES, VALUABLE MEMBER OF

23   OUR DORN ANESTHESIA TEAM.

24   Q    NOW, IF YOU DON'T KNOW, SAY SO, BUT I WANT YOU TO TELL

25   ME, DO YOU KNOW IF THAT'S A TYPO?

SMITH - CROSS
278

1    A    I DO NOT KNOW.

2    Q    OKAY.  ANSWER ME THIS.  WOULD THIS PARAGRAPH BE RELEVANT

3    FOR EVERY ONE OF THE ANESTHESIOLOGISTS?

4    A    YES.

5    Q    BECAUSE IT'S ABOUT THE NEED FOR ANESTHESIOLOGY AT THE

6    DORN MEDICAL CENTER; CORRECT?

7    A    CORRECT.

8    Q    SO IT WOULD NOT BE INVOLVED INFORMATION THAT'S SPECIFIC

9    TO ANY ONE OF THESE DOCTORS; IS THAT FAIR?

10   A    YES, SIR.

11   Q    OKAY.  LET ME GO BACK TO DR. KENNEDY, PLEASE.  SO I

12   THINK WE WERE ON PARAGRAPH THREE.  DOES THIS APPEAR TO YOU TO

13   REFLECT RELEVANT LOCAL MARKET SALARY DATA SUCH AS HAY'S DATA?

14   A    YES.

15   Q    OKAY.  AND NUMBER FOUR, DOES THAT APPEAR TO YOU TO

16   RELATE TO DR. KENNEDY'S BOARD CERTIFICATIONS IN THE FIELD?

17   A    YES.

18   Q    OKAY.  NUMBER FIVE, ANY PARTICULAR ACCOMPLISHMENTS IN

19   HIS SPECIALTY?

20   A    YES, SIR.

21   Q    OKAY.  AND NUMBER SIX, ANY PRIOR VA EXPERIENCE?

22   A    YES.

23   Q    AND NUMBER SEVEN -- NUMBER SEVEN IS REALLY A CATCH-ALL,

24   ANYTHING ELSE THAT MIGHT BE RELEVANT TO THE PANEL'S

25   RECOMMENDATION.

1   A    YES, SIR.

2   Q    OKAY.  NOW I ASKED YOU PREVIOUSLY ABOUT YOUR SERVICE ON

3   PAY PANELS FOR DOCTORS IN OTHER SPECIALTIES.  AND I'M NOT

4   SURE THAT I CLOSED THE LOOP ON THIS, BUT I WANT TO MAKE

5   CLEAR, IN THE COURSE OF YOUR CONSIDERATION OF PAY FOR THESE

6   ANESTHESIOLOGISTS, DID THE PROCESS WORK ANY DIFFERENTLY THAN

7   WHAT IT MIGHT HAVE FOR A DOCTOR OF A DIFFERENT SPECIALTY?

8   A    NO, SIR.

9   Q    OKAY.  NOW, WHEN CONSIDERING THESE SEVEN FACTORS, WERE

10  YOU UNDER AN UNDERSTANDING BY ANY REQUIREMENT OR GUIDELINE OR

11  ANYTHING YOU WERE TOLD THAT YOU HAD TO GIVE ANY PARTICULAR

12  FACTOR MORE WEIGHT THAN ANOTHER?

13  A    NO, SIR.

14  Q    AND IT MIGHT VARY ON A CASE-BY-CASE; WOULDN'T IT?

15  A    YES.

16  Q    OKAY.  NOW, IN THE COURSE OF YOUR EXPERIENCE AS A DOCTOR

17  AND YOUR REVIEW OF RELEVANT MARKET DATA, WOULD YOU BELIEVE

18  THERE TO BE A GUARANTEE IN PRIVATE PRACTICE THAT A

19  60-YEAR-OLD DOCTOR WOULD MAKE MORE MONEY THAN A 50-YEAR-OLD

20  DOCTOR?

21  A    NO, SIR.

22  Q    HOW ABOUT A DOCTOR WITH 25 YEARS OF EXPERIENCE IN THE

23  FIELD, WOULD THEY BE GUARANTEED TO MAKE MORE MONEY THAN A

24  DOCTOR WITH 15 YEARS EXPERIENCE?

25  A    NO.

SMITH - CROSS

280

```
1    Q     HOW ABOUT FOR TWO DOCTORS WHO ARE SIMILARLY QUALIFIED,

2    WOULD IT -- WOULD THERE BE A GUARANTEE THAT THE OLDER DOCTOR

3    WOULD MAKE MORE MONEY?

4    A     NO.

5    Q     AND THERE'S NO GUARANTEE THAT IN PRIVATE PRACTICE YOUR

6    INCOME IS GUARANTEED TO GO UP AS YOU AGE; IS THAT RIGHT?

7    A     NO, SIR.

8    Q     OKAY.  OR I'M SORRY -- DID -- IS THAT -- IS THAT--

9    A     THERE'S NO GUARANTEE THAT WOULD GO UP.

10   Q     THERE WAS NO GUARANTEE.  JUST MAKE SURE WE HAVE A CLEAR

11   ANSWER ON THAT.  THANK YOU.  JUST GIVE ME ONE MOMENT, PLEASE.

12   NOW, IF WE COULD LOOK AT -- WE LOOKED AT DR. ALGHOTHANI'S

13   ANNUAL PAY AND THAT'S $300,000; IS THAT --

14   A     YES, SIR.

15   Q     -- CORRECT?  WE LOOKED AT DR. KENNEDY'S RECOMMENDED PAY

16   OF 2016, THAT WAS $300,000; CORRECT?

17   A     YES, SIR.

18   Q     COULD WE LOOK AT THE OTHERS AS WELL, THE ANNUAL PAY FOR

19   EACH OF THE DOCTORS HERE?  JUST WANT TO MAKE SURE THAT WE GET

20   THIS INTO THE RECORD.  SO THIS WOULD BE DR. NGUYEN.  DO YOU

21   SEE THE NUMBER OF RECOMMENDED ANNUAL PAY?

22   A     THE TOP IS CUT OFF, SIR.

23   Q     HOW ABOUT HERE IN THE PART C?

24   A     YES.

25   Q     DO YOU SEE THAT NUMBER $300,000?
```

1   A    YES.

2   Q    THAT WAS RECOMMENDED FOR DR. NGUYEN?

3   A    CORRECT.

4   Q    GO TO THE NEXT DOCUMENT, PLEASE.  THIS IS DR. PENDER.

5   AND AGAIN HERE IT SAYS A RECOMMENDED ANNUAL PAY OF $300,000.

6   A    YES.

7   Q    IS THAT CORRECT?  GO TO THE NEXT DOCTOR, PLEASE.  AND

8   THIS IS DR. PRYOR, AND THERE'S ANOTHER RECOMMENDED PAY OF

9   $300,000; IS THAT CORRECT?

10  A    YES.

11  Q    OKAY.  COULD YOU SCROLL UP TO THE TOP, THE TOP OF THAT

12  DOCUMENT, PLEASE.  THE FIRST PAGE OF THE PANEL ACTION.  AND

13  WE'LL LEAVE IT RIGHT THERE.  THANK YOU.  SO, IN THE COURSE OF

14  THIS PAY PANEL, YOU CONSIDERED EACH OF THE ANESTHESIOLOGISTS;

15  IS THAT CORRECT?

16  A    YES.

17  Q    DID YOU CONSIDER THEM ONE AT A TIME OR AS A GROUP?

18  A    INDIVIDUALLY.

19  Q    INDIVIDUALLY.  OKAY.  AND YOU CONSIDERED EACH ONE OF

20  THEM IN REFERENCE TO THESE SEVEN FACTORS; IS THAT CORRECT?

21  A    YES, SIR.

22  Q    AND YOU ARRIVED AT A RECOMMENDATION OF PAY OF $300,000.

23  A    YES.

24  Q    AND THIS IS A RECOMMENDATION THAT WAS BROUGHT TO YOU BY

25  THE SERVICE LINE CHIEF; CORRECT?

1  A    YES.

2  Q    IN FACT, THIS INFORMATION INVOLVING THE DIFFERENT

3  FACTORS, WHAT SUPPORTED THE RECOMMENDATION, THAT WOULD HAVE

4  BEEN PRESENTED TO YOU BY THE SERVICE LINE CHIEF; CORRECT?

5  A    CORRECT.

6  Q    IS THERE ANYTHING DIFFERENT ABOUT WHAT HAPPENED HERE

7  WITH THESE ANESTHESIOLOGISTS THAN WHAT YOU MIGHT HAVE SEEN IN

8  A PAY PANEL FOR A DOCTOR WITH A DIFFERENT SPECIALTY?

9  A    NO, SIR.

10 Q    OKAY.  IF IN EVALUATING THESE FACTORS AND APPLYING THEM

11 TO EACH ONE OF THESE DOCTORS YOU ARRIVED AT THE SAME ANNUAL

12 PAY, IS IT FAIR TO SAY THAT THEY WERE SIMILARLY QUALIFIED?

13 A    YES, SIR.

14 Q    DO YOU BELIEVE THAT IT'S FAIR TO PAY SIMILARLY-QUALIFIED

15 DOCTORS THE SAME AMOUNT OF ANNUAL PAY?

16 A    YES.

17 Q    DO YOU BELIEVE IT WOULD BE FAIR TO PAY ONE OF THESE

18 DOCTORS 20 TO $30,000 MORE THAN ANY ONE OF THE OTHERS IF THEY

19 ARE SIMILARLY QUALIFIED?

20 A    NO, SIR.

21 Q    OKAY.  I'D LIKE TO DRAW YOUR ATTENTION TO THIS SENTENCE

22 RIGHT HERE ON THE DOCUMENT WE ARE LOOKING AT.  AND BELIEVE

23 THIS IS COPIED ON EVERY ONE OF THE COMPENSATION PANEL ACTIONS

24 WE DISCUSSED.  IT SAYS, THE ANESTHESIOLOGY SERVICE IS

25 CONDUCTING A REVIEW OF PROVIDERS' PAY TO ENSURE THERE IS NO

1    PAY DISPARITY.  DO YOU SEE THAT?

2    A    I DO.

3    Q    DO YOU BELIEVE THERE IS ANYTHING WRONG WITH ELIMINATING

4    PAY DISPARITY FOR DOCTORS WHO ARE SIMILARLY QUALIFIED?

5    A    NO.

6    Q    IN YOUR TIME ON THESE PANELS, DID YOU TAKE YOUR ROLE

7    SERIOUSLY?

8    A    YES, SIR.

9    Q    DID YOU CONSIDER THE INFORMATION THAT WAS PRESENTED TO

10   YOU?

11   A    YES.

12   Q    IF YOU HAD DISAGREED WITH THE RECOMMENDATION OF THE

13   SERVICE LINE CHIEF, WOULD YOU HAVE APPROVED THE

14   RECOMMENDATION?

15   A    NO.

16   Q    DID YOU DISAGREE WITH THE RECOMMENDATION OF THE SERVICE

17   LINE CHIEF HERE?

18   A    NO, SIR.

19   Q    DO YOU AGREE WITH THE RECOMMENDATIONS YOU MADE FOR EACH

20   OF THESE DOCTORS?

21   A    YES.

22   Q    WOULD YOU HAVE APPROVED ANY COMPENSATION PANEL

23   RECOMMENDATION FOR ANNUAL PAY IF YOU THOUGHT IT WAS

24   DISCRIMINATORY TO OLDER DOCTORS AT THE VA HOSPITAL?

25   A    NO.

1    Q    IN ANY SPECIALTY?

2    A    NO.

3    Q    I DON'T HAVE ANY FURTHER QUESTIONS.  THANK YOU.  OH, I'M

4    SORRY.  JUST TO CLEAR THIS UP.  I THINK THERE'S STILL AN OPEN

5    QUESTION ABOUT THIS IN THE RECORD, SO I THINK IT WOULD BE

6    USEFUL FOR ALL OF US JUST TO GET AN ANSWER HERE.  IF YOU

7    COULD GO HERE.

8         WE HAVE TALKED A LOT ABOUT THESE PARAGRAPHS BOTH FOR DR.

9    KENNEDY AND FOR DR. ALGHOTHANI, BUT I BELIEVE THEY'RE IN THE

10   RECORD FOR EVERY ONE OF THE ANESTHESIOLOGISTS.  DO YOU KNOW

11   WHO PREPARED THESE PARTICULAR PARAGRAPHS?

12   A    I DO NOT.

13   Q    OKAY.  THANK YOU.

14        MR. IRVIN:  NOTHING FURTHER OF THIS WITNESS, YOUR

15   HONOR.

16        THE COURT:  THANK YOU.  YOU ARE EXCUSED.  YOU CAN

17   STEP DOWN.

18        (WITNESS LEFT THE STAND.)

19        THE COURT:  CALL YOUR NEXT WITNESS.

20        MR. IRVIN:  IF YOUR HONOR PLEASE, AND CERTAINLY WE

21   WILL JUST DO -- JUST TO INFORM THE COURT SORT OF WHERE WE

22   ARE.  WE ARE AT THE END OF THESE NOVEMBER 2016 PANEL MEMBERS.

23   WE HAVE TWO WITNESSES LEFT TO CALL.  THE FIRST IS GOING TO BE

24   MRS. DOTY WHO HAS BEEN A REPRESENTATIVE FOR THE VA THROUGHOUT

25   THE TRIAL.  AND WHILE I DON'T THINK I'M GOING TO BE AWFULLY

1    LONG WITH HER, DEPENDING ON WHAT SHE HAS TO SAY, I ANTICIPATE

2    THAT THE VA MAY SPEND SOME SUBSTANTIAL TIME WITH HER.  AND I

3    CAN CERTAINLY START IF YOU WANT ME TO.

4        THE ONLY OTHER WITNESS THAT WE WILL CALL WOULD BE DR.

5    KENNEDY.  AND SO WE'RE DOWN TO THOSE TWO.  AND I CERTAINLY

6    ANTICIPATE THAT WE CAN FINISH BOTH OF THOSE WITNESSES THIS

7    AFTERNOON, AND SO -- AND AS I UNDERSTAND IT FROM TALKING WITH

8    MR. ANDREWS, THEY DO NOT ANY LONGER INTEND TO USE THEIR

9    WITNESS DR. JORGENSON, AND SO AS FAR AS I KNOW THEY DON'T

10   HAVE ANY OTHER WITNESSES.

11            THE COURT:  ALL RIGHT.

12            MR. ANDREWS:  THAT'S CORRECT, YOUR HONOR.  THESE

13   ARE THE ONLY TWO WITNESSES LEFT.  WE ARE HAPPY TO PROCEED AND

14   DEFER TO YOUR HONOR IN TERMS OF...

15            THE COURT:  ALL RIGHT.  IT'S 12:00 NOW, SO WE CAN

16   BREAK FOR LUNCH NOW AND COME BACK AT 1:00 AND THEN START WITH

17   MRS. DOTY AT 1:00.

18            MR. IRVIN:  THANK YOU, YOUR HONOR.

19            MR. ANDREWS:  THANK YOU.

20        (COURT IN RECESS FOR LUNCH.)

21            THE COURT:  ALL RIGHT.  MR. IRVIN, YOU MAY CALL

22   YOUR NEXT WITNESS.

23            MR. IRVIN:  THANK YOU, YOUR HONOR.  WE CALL DEBORAH

24   DOTY.

25                DEBORAH DOTY, AFTER BEING DULY SWORN,

1    TESTIFIED AS FOLLOWS:

2                          DIRECT EXAMINATION

3    BY MR. IRVIN:

4    Q    GOOD AFTERNOON, MRS. DOTY.

5    A    HI.

6    Q    WE SPOKE EARLIER.  I'M WILMOT IRVIN AND I THINK YOU

7    REMEMBER THAT WE TOOK YOUR DEPOSITION BY VIDEO HOOK-UP

8    THROUGH THE VA OFFICES HERE IN COLUMBIA A COUPLE OF YEARS

9    AGO.  DO YOU RECALL THAT?

10   A    YES, I DO.

11   Q    OKAY.  AND YOU UNDERSTAND I REPRESENT DR. KENNEDY IN

12   THIS CASE?

13   A    YES.

14   Q    AND I BELIEVE YOU HAD THE OPPORTUNITY AS THE CLIENT

15   REPRESENTATIVE TO BE ABLE TO SIT IN THE COURTROOM AND HEAR

16   ALL THE TESTIMONY DURING THE TRIAL; IS THAT RIGHT?

17   A    YES.

18   Q    OKAY.  ALL RIGHT.  LET'S START AND JUST TALK A LITTLE

19   BIT ABOUT WHO YOU ARE AND WHAT YOUR POSITION IS AND YOUR

20   RESPONSIBILITIES.  ARE YOU CURRENTLY EMPLOYED WITH THE VA?

21   A    YES, I AM.

22   Q    OKAY.  AND WHEN I TOOK YOUR DEPOSITION I BELIEVE YOU

23   SAID THAT YOU WERE A SENIOR POLICY ADVISER FOR THE TITLE 38

24   PAY SYSTEM.  IS THAT STILL YOUR ROLE?

25   A    YES.

1   Q    OKAY.  AND YOU ARE WITH THE OFFICE OF HR MANAGEMENT IN

2   THE VA CENTRAL OFFICE IN WASHINGTON DC; IS THAT CORRECT?

3   A    I AM STILL IN CENTRAL OFFICE BUT I NOW WORK IN VHA WITH

4   WORK FORCE MANAGEMENT AND CONSULTING IN THE HR CENTER OF

5   EXPERTISE.

6   Q    OKAY.  HOW HAVE YOUR DUTIES AND RESPONSIBILITIES CHANGED

7   SINCE YOU MADE THAT CHANGE?

8   A    NOT VERY MUCH AT ALL.

9   Q    OKAY.  WHAT IS THE DIFFERENCE BETWEEN VA AND VHA?

10  A    VHA IS ONE OF THE THREE ADMINISTRATIONS IN THE MORE

11  GLOBAL VETERAN'S AFFAIRS.

12  Q    OKAY.  NOW, DO YOU STILL HAVE RESPONSIBILITIES AS A

13  SENIOR POLICY ADVISER FOR TITLE 38 PAY SYSTEMS?

14  A    YES, I DO.

15  Q    AND YOU UNDERSTAND THAT TITLE 38 REFERS TO THE UNITED

16  STATES CODE, TITLE 38; IS THAT RIGHT?

17  A    YES.

18  Q    OKAY.  AND I BELIEVE THAT YOU ARE FAMILIAR WITH THE

19  STATUTE THAT TITLE 38 CONTAINS THAT APPLIES TO PAY FOR

20  PHYSICIANS AND DENTISTS BEING TITLE 38, SECTION 7431.

21  A    YES.

22  Q    IS THAT A FAIR STATEMENT?

23  A    YES.

24  Q    OKAY.  AND I MAY -- MAY BE REFERRING TO THAT.  I MAY

25  NOT.  I HAVEN'T DECIDED YET.  BUT ANY WAY, JUST WE DID NOT

1    MARK IT AS AN EXHIBIT, BUT I WILL JUST GIVE YOU A COPY OF

2    WHAT I HAVE.  AND I'M GOING TO TELL YOU, SUBJECT TO BEING

3    CORRECTED, THAT I BELIEVE THAT IT IS THE VERSION OF THAT

4    SECTION OF THE STATUTE THAT IS APPLICABLE TO THE TIME PERIOD

5    IN QUESTION.  AND IF I'M WRONG ABOUT THAT, PLEASE CORRECT ME.

6    BUT, SO YOU HAVE AT LEAST SOME GENERAL FAMILIARITY WITH THE

7    STATUTE; IS THAT RIGHT?

8    A    YES.  I'M VERY FAMILIAR WITH THE STATUTE.

9    Q    BUT WOULD IT BE FAIR TO SAY THAT IN YOUR DAY TO DAY

10   DUTIES AND RESPONSIBILITIES YOU REFER MORE OFTEN TO THE VA

11   HANDBOOK?

12   A    I ACTUALLY WROTE A LOT OF THE VA HANDBOOK, BUT I STILL

13   USE THE STATUTE OFTEN.

14   Q    OKAY.  VERY GOOD.  ALL RIGHT.  SO YOU USE THEM BOTH.

15   A    YES.

16   Q    OKAY.  AND JUST TELL US, IF YOU WOULD, IN YOUR OWN WORDS

17   HOW YOU WOULD DESCRIBE YOUR RESPONSIBILITIES AS THEY RELATE

18   TO PAY FOR PHYSICIANS AT VA MEDICAL FACILITIES.

19   A    I, AS THE SENIOR -- AS ONE OF SEVERAL SENIOR HR

20   SPECIALISTS WHO SPECIALIZE IN TITLE 38 COMPENSATION, I WORK

21   INTRICATELY WITH VHA PHYSICIAN AND DENTIST PAY.  I HAVE

22   WRITTEN MOST OF THE POLICY REVISIONS THAT HAVE OCCURRED SINCE

23   WE IMPLEMENTED THIS NEW PAY SYSTEM IN 2006.  AND WHEN I SAY

24   POLICY REVISIONS I'M REFERRING TO VA HANDBOOK 5007 PART NINE.

25   Q    ALL RIGHT.  AND COULD I JUST INTERRUPT YOU THERE FOR A

1    MOMENT?  AND I'M GOING TO HAND YOU WHAT'S ALREADY IN EVIDENCE

2    --

3    A    OKAY.

4    Q    -- AS PLAINTIFF'S EXHIBIT 1.  AND I BELIEVE THIS WOULD

5    BE PART NINE.

6    A    YES.

7    Q    PLEASE TAKE A LOOK AND CONFIRM THAT THAT IS WHAT YOU

8    JUST MADE REFERENCE TO AS THE VA HANDBOOK AS IT RELATES IN

9    PART NINE --

10   A    YES.

11   Q    -- TO PAY FOR VA, VHA PHYSICIANS.

12   A    CORRECT.  SO, I -- I HAVE WRITTEN A LOT OF THE POLICY

13   REVISIONS NOT ONLY TO PART NINE, WHICH IS THE HANDBOOK

14   THAT -- OR THE POLICY -- THE CHAPTER THAT COVERS PHYSICIAN

15   AND DENTIST PAY, BUT I'VE ALSO DONE MANY REVISIONS TO THE

16   POLICY AND OTHER TITLE 38 CHAPTERS AS WELL COVERING NURSE

17   LOCALITY PAY, THINGS OF THAT NATURE.

18      I SERVE AS A MEMBER ON THE VHA PHYSICIAN AND DENTIST

19   STEERING COMMITTEE WHICH IS A COMMITTEE THAT IS REQUIRED TO

20   MEET ONCE EVERY TWO YEARS.  THAT COMMITTEE MAKES

21   RECOMMENDATIONS TO THE SECRETARY.  THE SECRETARY IN TITLE 38

22   STATUTE IS REQUIRED TO REVIEW SURVEY DATA -- I'M SORRY --

23   SALARY SURVEY DATA EVERY 24 MONTHS OR EVERY TWO YEARS AND

24   MAKE RECOMMENDATIONS AS FAR AS -- I'M SORRY.

25      THE SECRETARY HAS TO APPROVE MINIMUM AND MAXIMUM RATES

1    OF PAY FOR PHYSICIANS AND DENTISTS EVERY 24 MONTHS.  AND THE

2    WAY IN VA WE DO THAT, A VHA STEERING COMMITTEE MEETS,

3    CONVENES FOR THREE DAYS AND MAKES RECOMMENDATIONS TO THE

4    SECRETARY, SO I HAVE BEEN INCLUDED ON AT LEAST FOUR OF THE --

5    OVER THE PAST EIGHT YEARS FOUR DIFFERENT STEERING COMMITTEES

6    TO MAKE THOSE FORMAL RECOMMENDATIONS AS FAR AS ANNUAL PAY

7    RANGES TO THE SECRETARY.

8    Q    AND THOSE ARE THE ANNUAL PAY RANGES THAT YOU MENTIONED,

9    THE MAXIMUMS AND THE MINIMUMS, FOR VA PHYSICIANS.

10   A    YES, THE ONES THAT ARE PUBLISHED ON THOSE ANNUAL PAY

11   RANGE DOCUMENTS THAT SHOWS THE DIFFERENT CLINICAL ALIGNMENT

12   OF SPECIALTIES AND TIERS AND TABLES THAT -- THE PAY TABLES

13   AND THE TIERS.

14   Q    RIGHT.  AND SOME OF THOSE ARE IN THE RECORD AND IN THESE

15   DOCUMENTS THAT WE HAVE PUT INTO EVIDENCE ON BOTH SIDES, I

16   THINK.  BUT JUST WHILE WE'RE ON THAT SUBJECT OF THE MINIMUMS

17   AND MAXIMUMS, THOSE PAY RANGES, IT'S MY UNDERSTANDING THAT

18   THERE ARE OFFICIALS WITHIN THE VA SYSTEM WHO HAVE AUTHORITY

19   TO GRANT EXCEPTIONS TO THE MAXIMUMS.  IS THAT A CORRECT

20   STATEMENT?

21   A    YES.

22   Q    AND WOULD ONE OF THOSE PERSONS BE THE FACILITY -- FOR

23   EXAMPLE, HERE IN COLUMBIA, THE DORN VA FACILITY -- DIRECTOR

24   OR THE HEAD PERSON THERE AT THE LOCAL FACILITY?

25   A    THE DIRECTOR HAS SOME DISCRETION TO SET OR TO -- TO

1    AUTHORIZE A PAY EXCEPTION UP TO A CERTAIN AMOUNT.  THE

2    NETWORK DIRECTOR ALSO HAS -- CAN APPROVE HIGHER RATES AND

3    THEN THERE'S ALSO A CAVEAT THAT THE UNDERSECRETARY FOR HEALTH

4    CAN APPROVE PAY EXCEPTIONS.

5    Q    OKAY.  AND SO YOU HAVE GOT THE LOCAL DIRECTOR THAT HAS

6    SOME AUTHORITY UNDER SOME CIRCUMSTANCES TO GRANT EXCEPTIONS

7    TO THE MAXIMUM; CORRECT?

8    A    YES.

9    Q    AND THEN YOU HAVE WHAT YOU PROBABLY HAVE HEARD AT LEAST

10   ME REFER TO AS THE VISN DIRECTOR -- IN OUR CASE I BELIEVE

11   THAT PERSON'S LOCATED IN ATLANTA; IS THAT RIGHT?

12   A    THAT'S CORRECT.

13   Q    AND THAT IS ESSENTIALLY A REGIONAL DIRECTOR OVER THIS

14   PAY PROCESS; IS THAT RIGHT?

15   A    CORRECT.

16   Q    AND THAT INDIVIDUAL WOULD BE THE AUTHORIZING OFFICIAL OR

17   THE APPROVING OFFICIAL TO GRANT AN EXCEPTION ABOVE THE

18   LIMITATION THAT -- THE PAY RANGE MAXIMUM AND PERHAPS IN SOME

19   CASES EVEN ABOVE WHAT THE LOCAL DIRECTOR HIMSELF OR HERSELF

20   COULD GRANT.  IS THAT A FAIR STATEMENT?

21   A    THAT'S CORRECT.

22   Q    OKAY.  AND THEN ABOVE EVEN THE VISN OR REGIONAL DIRECTOR

23   THERE IS AUTHORITY UNDER THE STATUTE TO ENABLE THE

24   UNDERSECRETARY, AND I'M NOT SURE UNDERSECRETARY OF WHAT RIGHT

25   AT THE MOMENT, BUT THE UNDERSECRETARY THAT HAS RESPONSIBILITY

1    FOR VA PHYSICIAN PAY --

2    A    VHA, YES.

3    Q    -- COULD GRANT EVEN A HIGHER EXCEPTION; IS THAT CORRECT?

4    A    THAT'S CORRECT.

5    Q    DO YOU HAPPEN TO KNOW, COULD YOU TELL US FOR THE TIME

6    PERIOD IN QUESTION HERE WHAT THOSE MAXIMUMS ARE FOR

7    ANESTHESIOLOGISTS SUCH AS DR. KENNEDY AND THEN WHAT THE

8    EXCEPTION LIMITS OR LEVELS WOULD BE FOR AN ANESTHESIA, STAFF

9    ANESTHESIOLOGIST AT DORN VA, OVER THIS PERIOD.

10   A    WELL, JANUARY 10TH, 2016 THE APPROVED ANNUAL PAY RANGES

11   FOR PHYSICIANS AND DENTISTS, ANESTHESIOLOGY WAS ON PAY TABLE

12   FOUR, AND THE MAX FOR TIER ONE, WHICH COVERS STAFF

13   PHYSICIANS, WAS 325.

14   Q    OKAY.  AND THAT WOULD HAVE BEEN IN EFFECT UNTIL WHAT

15   DATE?

16   A    THAT WAS IN EFFECT UNTIL THE TABLE WAS INCREASED

17   PROBABLY THE NEXT YEAR.  I DON'T HAVE THE NEXT TABLE FOR SOME

18   REASON.

19   Q    I'M GOING TO...

20   A    ACTUALLY I KNOW BY MEMORY.  THAT WAS -- THAT

21   JANUARY 10TH, 2016 PAY TABLE WAS IN EFFECT UNTIL NOVEMBER OF

22   2016, AND THERE WAS A CHANGE TO THE PAY TABLE NOVEMBER 2016

23   BASED ON THE SECRETARY'S APPROVAL OF THE VHA PHYSICIAN AND

24   DENTIST STEERING COMMITTEE'S RECOMMENDATION.

25   Q    ALL RIGHT.  AND WHAT WAS IT CHANGED TO?

1  A    I DON'T HAVE THAT PAY CHART IN FRONT OF ME.

2  Q    LET ME SHOW YOU--

3  A    PAY TABLE.

4  Q    LET ME SHOW YOU WHAT WE'VE MARKED AS -- AND INTRODUCED

5  AS PLAINTIFF'S EXHIBIT 4.  I'M NOT SURE THAT WILL ANSWER YOUR

6  QUESTIONS, BUT TAKE A MOMENT TO LOOK THROUGH IT.  AND I

7  BELIEVE THE TESTIMONY OF MRS. NICHOLS WAS THAT SHE WROTE THAT

8  MEMORANDUM.  AND THEN THERE ARE SOME OTHER DOCUMENTS

9  ATTACHED.  BUT IF THAT DOESN'T HELP YOU, YOU CAN--

10  A    THIS DOESN'T HELP ME.  IT DOESN'T.  I... I'M -- THERE IS

11  A ANNUAL PAY RANGE PAY TABLE THAT PROVIDES ALL THE CLINICAL

12  SPECIALTIES, THE PAY TABLES AS WELL AS THE NEW APPROVED

13  MAXIMUM RATES THAT'S DATED I BELIEVE NOVEMBER 14TH, 2016.

14  Q    OKAY.  LET ME -- WELL, YOU FINISH UP LOOKING AT THAT TO

15  SEE IF ANY OF THAT IS ANY ASSISTANCE TO YOU.

16  A    THIS DOESN'T TELL ME THE MAXIMUMS.  THIS IS A --

17  ATTACHED IS A COPY OF THE INTERIM UNDERSECRETARY FOR HEALTH.

18  IT'S THE -- A PAY DELEGATION MEMO THAT WAS AUTHORIZED BY THE

19  ACTING UNDERSECRETARY FOR HEALTH AT THE TIME.  SO THIS

20  DOCUMENT OUTLINES THE NEW PAY RANGES THAT CAN BE APPROVED AT

21  WHAT LEVEL BUT IT DOESN'T SPECIFICALLY TELL ME WHAT THE

22  MAXIMUM RATES ON THOSE TABLE -- THAT NEW TABLE --

23  Q    OKAY.

24  A    -- WHAT THOSE RATES ARE.

25  Q    THAT'S FINE.  WELL, YOU TOLD US THAT THE MAXIMUM AS OF I

1    THINK YOU SAID JANUARY 2016 WAS 325,000; IS THAT RIGHT?

2    A    YES.  YES.

3    Q    AND THEN IN NOVEMBER OF 2016 IT INCREASED TO WHAT?

4    A    I DON'T HAVE THAT TABLE IN FRONT OF ME.

5    Q    THAT'S WHAT YOU DON'T RECALL.  BUT IT WOULD HAVE BEEN

6    SOME -- SOME LEVEL ABOVE 325,000.

7    A    THAT'S CORRECT.

8    Q    OKAY.  AND THEN THAT WOULD BE WHERE THE EXCEPTIONS WOULD

9    COME IN.  THAT IS, FOR EXAMPLE, IN MOST OF THE CALENDAR YEAR

10   2016 THESE EXCEPTIONS AND THE APPROPRIATE OFFICIALS THAT CAN

11   GRANT EXCEPTIONS WOULD BE ABLE TO APPROVE A PHYSICIAN'S

12   RECOMMENDED ANNUAL PAY OR ANNUAL SALARY ABOVE $325,000 AND UP

13   TO WHATEVER THE LIMIT IS THAT THAT OFFICIAL HAS; CORRECT?

14   A    CORRECT.

15   Q    AND AGAIN, THAT WOULD BE A LEVEL FOR THE LOCAL DIRECTOR

16   FIRST ABOVE 325 AND THEN A LEVEL FOR THE VISN DIRECTOR ABOVE

17   THE LOCAL DIRECTOR'S AUTHORITY, AND THEN THE UNDERSECRETARY

18   HAS A FURTHER CAPACITY, IF YOU WILL, TO APPROVE A SALARY EVEN

19   ABOVE THAT.

20   A    THAT'S CORRECT.

21   Q    THAT RIGHT?  OKAY.  PRIOR TO 2016 DO YOU JUST RECALL

22   FROM YOUR MEMORY FOR THE PARTICULAR -- FOR THE

23   ANESTHESIOLOGIST -- STAFF ANESTHESIOLOGISTS WHAT THE MAXIMUMS

24   WERE?

25   A    PRIOR TO THE PAY TABLE DATED JANUARY 10TH, 2016, THE ONE

DOTY - DIRECT

295

1    PRIOR TO THAT WAS DATED JANUARY 11TH, 2015, AND THE MAXIMUM

2    WAS STILL 325 FOR TIER ONE.

3    Q    OKAY.  AND HOW ABOUT PRIOR TO THAT DATE?

4    A    PRIOR TO THAT DATE THE PAY TABLE WAS EFFECTIVE

5    NOVEMBER 30TH, 2014, AND IT WAS 325.  THE MAXIMUM WAS 325 PER

6    PAY TABLE FOUR.

7    Q    OKAY.  AND DO YOU KNOW WHAT IT WAS PRIOR TO THAT?

8    A    PRIOR TO THAT WAS A TABLE THAT WAS EFFECTIVE

9    JANUARY 12TH, 2014 AND THAT WAS 295.

10    Q    ALL RIGHT.  AND PRIOR TO THAT DATE?

11    A    I DON'T HAVE THAT.

12    Q    OKAY.  ALL RIGHT.  THANK YOU.  I GOT US OFF TRACK

13    BECAUSE WE WERE TALKING ABOUT YOUR DUTIES AND

14    RESPONSIBILITIES RELATIVE TO VA PHYSICIAN PAY AND YOU

15    MENTIONED THOSE MAXIMUMS AND I THOUGHT IT OPPORTUNE MAYBE

16    JUST TO ASK YOU ABOUT THAT.

17        WHAT ARE YOUR OTHER DUTIES AND RESPONSIBILITIES WITH

18    RESPECT TO PHYSICIAN -- VA PHYSICIAN PAY?

19    A    I DO TRAINING ON IT AT THE BOTH FACILITY AND STATION

20    MEDICAL CENTER LEVELS.  I HAVE RECENTLY BEEN RESPONSIBLE FOR

21    WRITING NEW LEGISLATIVE PROPOSALS ON DESIRED CHANGES THAT VHA

22    WOULD LIKE TO MAKE TO ENHANCE THE PROGRAM, THAT PARTICULAR

23    PAY PROGRAM.

24    Q    OKAY.  AND--

25    A    I WAS GOING TO SAY I HAVE BEEN IN A -- RECENTLY I HAVE

1    BEEN IN A VERY LENGTHY REVIEW OF COMPENSATION PANEL REVIEW

2    FORM PAY ACTIONS INCLUDING PHYSICIANS.

3    Q    DOES THE VA CURRENTLY UTILIZE COMPENSATION PANELS?

4    A    AS OF JUNE 7TH, 2018, NO.

5    Q    OKAY.  WERE YOU RESPONSIBLE FOR WRITING SOME OR ALL OF

6    THE POLICY THAT HANDLED THAT CHANGE?

7    A    YES.  BASED ON THE STATUTORY CHANGE, YES.

8    Q    OKAY.  ALL RIGHT.  SO, YOU MENTIONED THAT YOU ALSO HAD

9    INVOLVEMENT IN TRAINING RELATIVE TO THE HANDBOOK AND ITS

10   PROVISIONS FOR PHYSICIAN PAY.  IS THAT A FAIR STATEMENT?

11   A    YES.

12   Q    ALL RIGHT.  AND YOU TRAINED HR PEOPLE?

13   A    YES.

14   Q    ALL RIGHT.  AND THAT WOULD INCLUDE ON OCCASION COMING TO

15   LOCALITIES AND TRAINING HR DIRECTORS AT VARIOUS MEDICAL

16   CENTERS?

17   A    YES.

18   Q    OKAY.  DO YOU EVER TRAIN PHYSICIANS?

19   A    NO.

20   Q    OKAY.  ALL RIGHT.  NOW, HAVE YOU TOLD US NOW PRETTY,

21   PRETTY MUCH WHAT YOUR JOB RESPONSIBILITIES ARE IN THE AREA OF

22   SENIOR POLICY ADVISER OR REALLY IN ANY CAPACITY THAT YOU

23   CURRENTLY HAVE AS IT RELATES TO VA PHYSICIAN COMPENSATION?

24   A    I THINK SO.

25   Q    OKAY.  ALL RIGHT.  NOW, YOU HAVE THE HANDBOOK THERE IN

1   FRONT OF YOU AND YOU INDICATED THAT YOU HAD ACTUALLY BEEN THE

2   AUTHOR OF SOME OF THE PROVISIONS OF PART NINE; IS THAT

3   CORRECT?

4   A    THAT'S CORRECT.

5   Q    WELL, COULD YOU JUST WALK US THROUGH AND TELL US WHAT

6   SECTIONS YOU AUTHORED THAT EVENTUALLY BECAME APPROVED AND A

7   PART OF THE VA HANDBOOK?

8   A    I DON'T KNOW IF -- I WOULD HAVE TO LOOK BASED ON THE

9   CHANGES.  LET ME SEE.  I WORKED ON AT THE TOP OF EACH PAGE

10  WHERE IT SAYS VA HANDBOOK 5007 AND THERE'S A DASH AND THEN A

11  NUMBER.

12  Q    OKAY.

13  A    FOR EXAMPLE, ON--

14  Q    YEAH.  MINE HAS A SLASH AND --

15  A    YES.

16  Q    -- THEN A NUMBER.

17  A    YES.  I'M SORRY.  SO ON PAGE 9-2, THAT REFERS TO CHANGE

18  47 AT THE TOP WHERE IT SAYS --

19  Q    OH.

20  A    -- VA HANDBOOK 5007/47.

21  Q    YEAH.

22  A    OKAY.  SO THAT INDICATES THAT'S A CHANGE NUMBER THAT --

23  WE USE A SEQUENTIAL CHANGE EVERY TIME WE'RE MAKING A CHANGE

24  TO VA HANDBOOK 5007.

25  Q    UH-HUH.

1    A    I -- I DEVELOPED AND PUBLISHED CHANGE 47.

2    Q    AND CHANGE 47 APPEARS WHERE ON THAT PAGE?

3    A    WHEN YOU SEE BRACKETS AROUND TEXT THAT IS THE IDENT --

4    WAY WE IDENTIFY WHAT WE ARE CHANGING IN A POLICY.  SO IF YOU

5    LOOK AT PARAGRAPH F, CHANGE IN ASSIGNMENT, THERE'S A BRACKET

6    THAT STARTS ON THE -- ABOUT THE MIDDLE OF THE SECOND

7    SENTENCE.

8    Q    OKAY.

9    A    THAT'S A CHANGE WE ADDED TO THAT PARAGRAPH.

10   Q    ALL RIGHT.  AND THAT WAS ONE OF YOUR -- YOU AUTHORED

11   THAT?

12   A    YES.

13   Q    OKAY.  NOW WHAT ABOUT THE -- ON THAT SAME PAGE,

14   PARAGRAPH G, COMPENSATION PANEL.  DID YOU AUTHOR THAT ONE?

15   A    NO.  THAT'S -- NO, THERE HASN'T BEEN A CHANGE TO THAT,

16   SO...

17   Q    OKAY.  AND I MEANT TO INCLUDE IF YOU -- YOU INDICATED

18   THAT YOU HAD WRITTEN A LOT OF THE HANDBOOK --

19   A    SURE.

20   Q    -- AND I DIDN'T KNOW IF MAYBE YOU HAD WRITTEN THAT ONE.

21   A    I THINK THAT'S BEEN THE SAME SINCE THE INCEPTION OF THIS

22   NEW PAY SYSTEM IN 2006.

23   Q    OKAY.  AND IS THAT A PROVISION THAT IS NO LONGER IN THE

24   HANDBOOK DUE TO THE CHANGE THAT HAS BEEN MADE REGARDING

25   COMPENSATION PANELS?

DOTY - DIRECT
299

1    A    THAT'S CORRECT.  IT'S BEEN TAKEN OUT.

2    Q    OKAY.  NOW -- ALL RIGHT.  AND DID YOU WANT TO -- LET ME

3    ASK IT THIS WAY.  CAN YOU DIRECT OUR ATTENTION TO ANY OTHER

4    CHANGES IN THE VA HANDBOOK OR ANY OTHER PROVISIONS THAT YOU

5    AUTHORED, ORIGINAL OR MODIFICATIONS, THAT YOU BELIEVE ARE

6    PERTINENT TO WHAT YOU HAVE BEEN LISTENING TO IN THE COURTROOM

7    HERE THE LAST TWO DAYS?

8    A    I'D HAVE TO GO PAGE BY PAGE.

9    Q    NOTHING COMES TO MIND?

10   A    I -- NOTHING COMES TO MIND, BUT I'D HAVE TO LOOK BACK TO

11   SEE.  I WRITE A LOT OF POLICY.

12   Q    WELL, THAT--

13   A    SO I...

14   Q    SORRY.  I DIDN'T MEAN TO INTERRUPT YOU.

15   A    NO, I SAID I'D HAVE TO GO THROUGH AND LOOK AT ALL THE

16   BRACKETS AND SEE IF I CAN REMEMBER IF IT WAS A PART OF THE

17   POLICY THAT I ACTUALLY DEVELOPED AND PUBLISHED.

18   Q    WHY DON'T WE DO IT THIS WAY.  WE WILL RUN THROUGH SOME

19   OF THE PROVISIONS IN THE HANDBOOK --

20   A    OKAY.

21   Q    -- AS I THINK WE MAY HAVE SOME PERTINENCE TO US.  AND IF

22   WE BUMP INTO SOME BRACKETS OR IF WE HIT A PROVISION AND YOU

23   RECALL THAT I WROTE THIS ONE OR THAT I MODIFIED THIS ONE, YOU

24   CAN LET US KNOW THAT.  HOW ABOUT THAT?

25   A    OKAY.

1    Q    OKAY.  NOW, WOULD YOU AGREE WITH ME THAT THE VA HANDBOOK

2    IS TO CONFORM TO THE STATUTE, THE FEDERAL STATUTE?

3    A    YES.

4    Q    ALL RIGHT.  AND IF THERE WAS ANY CONFLICT IN THE

5    HANDBOOK OR BETWEEN THE HANDBOOK AND THE STATUTE, DO YOU

6    BELIEVE THE HAND -- THE STATUTE SHOULD CONTROL?

7    A    YES.

8    Q    OKAY.  ALL RIGHT.  NOW, LOOK AT THE BOTTOM OF PAGE --

9    I'M GOING TO SAY KENNEDY VA 813, WHICH IS THE BATES LEGEND

10   DOWN AT THE BOTTOM OF THE PAGE.  ARE YOU FAMILIAR WITH THE

11   BATES LEGEND?

12   A    YES, I AM.

13   Q    ALL RIGHT.  AND IF YOU LOOK DOWN AT THE BOTTOM OF THAT

14   PAGE, THERE IS -- THAT'S THE DEFINITION SECTION THERE.  AND B

15   IS ANNUAL PAY.  DO YOU SEE THAT?

16   A    I DO.

17   Q    OKAY.  AND THIS SAYS THE SUM OF THE BASE PAY RATE AND

18   MARKET PAY.  AND SO, WE HAVE BEEN TALKING A LOT HERE IN THE

19   COURTROOM SAYING ANNUAL PAY IS THE SUM OF BASE PAY AND MARKET

20   PAY.  SO YOU AGREE WITH THAT.

21   A    I DO.

22   Q    ALL RIGHT.  AND THAT IS GENERALLY UNDERSTOOD WITHIN THE

23   VA'S HR DEPARTMENTS AND WITH RESPECT TO PHYSICIAN

24   COMPENSATION.

25   A    YES.

1    Q    AND YOU HAVE SEEN THE VARIOUS FORMS THAT WE HAVE BEEN

2    SHOWING ALL THESE PANEL -- DOCTOR PANEL MEMBERS, THOSE

3    COMPENSATION PAY ACTION REVIEW FORMS, AND YOU'RE FAMILIAR

4    WITH THOSE; IS THAT RIGHT?

5    A    YES.

6    Q    OKAY.  AND THOSE FORMS, WERE THEY CREATED IN WASHINGTON

7    AND SENT OUT TO ALL OF THE VARIOUS LOCALITIES OR WAS THAT

8    FORM SOMETHING SPECIFIC TO DORN?

9    A    THAT IS A -- THE FORM -- THE COMPENSATION PANEL FORMS

10   WERE -- ARE STANDARD -- WERE STANDARD VA FORMS THAT WERE

11   CREATED AT THE TIME THAT THIS POLICY WAS FIRST PUBLISHED.

12   Q    ALL RIGHT.

13   A    SO IT IS A STANDARD VA FORM THAT'S USED BY ALL OF THE VA

14   MEDICAL CENTERS ACROSS THE COUNTRY.

15   Q    OKAY.  AND AS FAR AS YOU KNOW OR CAN TELL, THE ONE, THE

16   SPECIFIC ONE THAT THE DORN VA IS USING CONFORMS WITH THAT

17   STANDARD FORM; IS THAT CORRECT?

18   A    YES.

19   Q    OKAY.  NOW, FLIP OVER TO KENNEDY VA 814.  AND IN THE

20   DEFINITION SECTION YOU WILL SEE WHERE COMPENSATION PANEL IS

21   DEFINED.  DO YOU SEE THAT?

22   A    I DO.

23   Q    ALL RIGHT.  AND IT SAYS A GROUP OF PHYSICIANS OR

24   DENTISTS RESPONSIBLE FOR THE EVALUATION OF PHYSICIANS OR

25   DENTISTS IN MAKING RECOMMENDATIONS TO THE APPROVING -- I'M

1    SORRY -- OFFICIAL FOR ANNUAL PAY.  DO YOU SEE THAT?

2    A    I DO.

3    Q    OKAY.  DO YOU KNOW WHETHER YOU HAD ANYTHING TO DO WITH

4    WRITING THAT LANGUAGE OR MODIFYING IT AT ANY TIME?

5    A    NO, I DON'T.  I THINK, AGAIN, THIS HAS BEEN IN THE

6    ORIGINAL -- THIS ORIGINAL CHAPTER NINE SINCE THE INCEPTION OF

7    THE NEWER PAY SYSTEM SINCE 2006.

8    Q    OKAY.  AND COULD YOU TELL US WHERE IN THE STATUTE IT

9    AUTHORIZES THAT THE COMPENSATION PANEL MAKES THE

10    RECOMMENDATION ON ANNUAL PAY?  WHERE DO YOU FIND THAT?  IF

11    YOU COULD JUST POINT THAT OUT TO THE COURT, PLEASE.

12    A    THE COMPENSATION PANEL, ALTHOUGH IT'S NOT REFERRED TO AS

13    A COMPENSATION PANEL IN THE STATUTE...

14    Q    AND WHAT PORTION ARE YOU--

15    A    THAT IS IN -- LET'S SEE.  THIS IS... C UNDER MARKET PAY,

16    C, ROMAN NUMERAL -- WHAT IS THAT?  SORRY.  C?  NO, IT'S III.

17    THE SECRETARY SHOULD TO THE EXTENT PRACTICABLE ENSURE THAT A

18    PANEL OR BOARD THAT INCLUDES PHYSICIANS OR DENTISTS WHO ARE

19    PRACTICING CLINICIANS AND DO NOT HOLD MANAGEMENT POSITIONS IN

20    THE MEDICAL FACILITY OF THE DEPARTMENT OF WHICH THE PHYSICIAN

21    OR DENTIST SUBJECT TO THE CONSULTATION IS EMPLOYED.

22    THE DETERMINATION OF THE AMOUNT OF MARKET PAY OF THE

23    PHYSICIAN SHALL TAKE INTO ACCOUNT.  AND THEN IT CONTINUES

24    WITH THE SEVEN FACTORS.

25    Q    OKAY.

DOTY - DIRECT

303

1          *MRS. BAILEY:* EXCUSE ME.  MR. IRVIN, DO YOU AN

2     EXTRA COPY OF THAT STATUTE?

3          *MR. IRVIN:* YES.  I CERTAINLY DO.  THANK YOU.

4     BY MR. IRVIN:

5     Q    OKAY.  NOW MRS. DOTY, WE GOT HERE -- BECAUSE I HAD ASKED

6     YOU TO POINT OUT IN THE STATUTE WHERE IT AUTHORIZES THE PAY

7     PANEL TO MAKE A RECOMMENDATION ON ANNUAL PAY AS OPPOSED TO

8     MARKET PAY.

9     A    OKAY. I'M SORRY.  YES.  IT REFERS TO IT -- THE PANEL TO

10    RECOMMEND MARKET PAY.

11    Q    RIGHT.  SO THAT'S WHAT THE STATUTE SAYS IS THAT THE

12    PANEL -- AND I'M NOW GOING TO READ FROM IT I BELIEVE IN THE

13    SECTION THAT -- WHERE YOU WERE.  AND THIS, YOUR HONOR, IS

14    UNDER THE SECTION C, MARKET PAY.

15         AND PARAGRAPH 4V WHERE IT SAYS, IN DETERMINING THE

16    AMOUNT OF THE MARKET PAY FOR A PARTICULAR PHYSICIAN OR

17    DENTIST UNDER THIS SUBSECTION -- AND THEN I'M GOING TO SKIP A

18    TIER BECAUSE I DON'T THINK THAT'S RELEVANT -- BUT THE

19    SECRETARY SHALL CONSULT WITH AND CONSIDER THE RECOMMENDATIONS

20    OF AN APPROPRIATE PANEL.  IS THAT WHAT YOU WERE SAYING A

21    MINUTE AGO?

22    A    YES.

23    Q    AND THAT WOULD BE IN THIS CASE, THESE COMPENSATION

24    PANELS.

25    A    CORRECT.

1    Q    AND SO, THE STATUTE AUTHORIZES THE PANEL TO MAKE A

2    RECOMMENDATION ON MARKET PAY; IS THAT CORRECT?

3    A    CORRECT.

4    Q    AND THEN YOU WENT ON DOWN FURTHER TO SUB-PARAGRAPH FIVE

5    AND YOU BEGAN TO READ WHAT I THINK IS WHAT WE ARE ALL -- WE

6    ALL SORT OF CALL THE FACTORS SUB-PARAGRAPH AND THAT IS WHERE

7    IT SAYS, THE DETERMINATION OF THE AMOUNT OF MARKET PAY --

8    A    CORRECT.

9    Q    -- OF A PHYSICIAN OR DENTIST.  AND THEN IT SAYS, SHALL

10   TAKE INTO ACCOUNT.  DO YOU SEE THAT THERE?

11   A    I DO.

12   Q    ALL RIGHT.  AND SO, THAT AGAIN IS REFERRING TO A

13   DETERMINATION OF MARKET PAY, NOT ANNUAL PAY; CORRECT?

14   A    CORRECT.

15   Q    OKAY.  AND THEN THERE ARE THE SEVERAL FACTORS THERE.

16   AND DO YOU BELIEVE THAT YOUR FORM THAT YOU USE -- I'M

17   SORRY -- THE HANDBOOK, THE VA HANDBOOK THAT YOU HAD A HAND IN

18   WRITING, GENERALLY CONFORMS WITH THOSE FACTORS?

19   A    YES.

20   Q    OKAY.  I THINK IF WE WERE TO TAKE THE TIME TO KIND OF GO

21   DOWN THEM, WE WOULD SEE ACTUALLY THAT THERE IS AN ADDITIONAL

22   ONE IN THE HANDBOOK THAT IS NOT NECESSARILY IN -- NOT IN THE

23   STATUTE, BUT NEVERTHELESS IT'S THERE AND IT'S CONSIDERED, AND

24   THAT ONE IS THE ACCOMPLISHMENTS OF THE PHYSICIAN IN THE

25   SPECIALTY, AND THAT IS PARAGRAPH NUMBER FIVE IN YOUR

1    HANDBOOK.

2        AND YOUR HONOR, I'M NOW LOOKING AT KENNEDY VA 821 AND

3    COMPARING THAT LIST OF FACTORS TO THE LIST THAT'S IN THE

4    STATUTE.

5        AND MRS. DOTY, YOU CORRECT ME IF I'M WRONG, BUT I DON'T

6    THINK THAT THE LIST IN THE STATUTE INCLUDES NUMBER FIVE IN

7    THE HANDBOOK, WHICH IS THE ACCOMPLISHMENTS OF THE PHYSICIAN

8    IN THE SPECIALTY.

9    A    YOU'RE CORRECT, BUT THE STATUTE ALLOWS OTHER SUCH

10   CONSIDERATIONS AS THE SECRETARY CONSIDERS APPROPRIATE.

11   Q    THANK YOU. AND I DON'T HAVE A BIT OF QUARREL OR QUIBBLE

12   ABOUT THAT. I JUST WAS POINTING OUT THAT THERE'S BEEN AT

13   LEAST THAT ONE FACTOR ADDED. AND THEN IF YOU LOOK ON DOWN AT

14   SEVEN IN THE HANDBOOK IT SAYS, CONSIDERATION OF UNIQUE

15   CIRCUMSTANCES, QUALIFICATIONS, OR CREDENTIALS, ET CETERA.

16       AND AGAIN, THERE'S NOT A SPECIFIC ITEM IN THE STATUTE.

17   WOULD YOU AGREE WITH ME THERE?

18   A    YES.

19   Q    BUT AGAIN, YOU WOULD SAY THAT THAT MIGHT BE ANOTHER

20   CONSIDERATION THAT THE SECRETARY MIGHT HAVE AND GETS

21   IN-DRAFTED INTO THE HANDBOOK.

22   A    YES.

23   Q    OKAY. ALL RIGHT. BUT OKAY. SO LET'S CONTINUE TO LOOK

24   AT -- AND LET ME SAY THIS. AM I CORRECT THAT BOTH THE

25   STATUTE, THE PROVISIONS THAT WE JUST LOOKED AT FOR THE

1    DETERMINATION OF MARKET PAY AND THEN IT LISTS THE FACTORS

2    THAT SHALL BE TAKEN INTO ACCOUNT, BOTH THE STATUTE AND THE

3    HANDBOOK CONSISTENTLY SAY THAT THOSE FACTORS SHALL BE TAKEN

4    INTO ACCOUNT FOR THE DETERMINATION OF MARKET PAY?

5    A    YES.

6    Q    OKAY.  ALL RIGHT.  NOW, FLIP OVER TO KENNEDY VA 823 IF

7    YOU WOULD, PLEASE MA'AM.  AND THIS IS THE PROVISION 10 ON

8    MARKET PAY ADJUSTMENTS FOR INDIVIDUAL PHYSICIANS.

9    A    OKAY.

10   Q    DID YOU WRITE ANY PART OF THIS OR MODIFY ANY PART OF

11   THIS ONE?

12   A    PARAGRAPH B ON PAGE 824 I DID.

13   Q    OKAY.  AND IF THAT IS SOMETHING THAT YOU WANTED TO MAKE

14   A REFERENCE TO, YOU CERTAINLY CAN.  I'M LOOKING AT A BECAUSE

15   MY QUESTION--

16   A    OH, OKAY.  I'M SORRY.

17   Q    THAT'S ALL RIGHT, AND YOU CAN REFER TO B IF YOU'D LIKE.

18   BUT MY QUESTION TO YOU, THOUGH, IS DOES A SET FORTH IN THE

19   HANDBOOK THAT AT LEAST ONCE EVERY 24 MONTHS THE MARKET PAY OF

20   EACH PHYSICIAN IS REVIEWED BY AN APPROPRIATE COMPENSATION

21   PANEL?

22   A    YES.

23   Q    AND DO YOU BELIEVE THAT THAT IS CONSISTENT WITH THE

24   PROVISIONS OF THE STATUTE?

25   A    YES.

DOTY - DIRECT

307

1    Q    OKAY. VERY GOOD. AND SO, THAT'S TALKING ABOUT THESE

2    REVIEWS THAT WE HAVE BEEN GOING OVER WHILE YOU HAVE BEEN IN

3    THE COURTROOM WITH US THAT RELATE TO PHYSICIANS THAT ARE NOT

4    BEING RECRUITED BUT WHO ARE ALREADY ON BOARD. AND SO EVERY

5    24 MONTHS AT LEAST THOSE PHYSICIANS ALREADY ON STAFF ARE TO

6    BE -- HAVE THEIR MARKET PAY REVIEWED. IS THAT A CORRECT --

7    A    CORRECT.

8    Q    -- STATEMENT? OKAY. AND THAT WOULD BE CONSISTENT WITH

9    THE STATUTE. IF YOU LOOK DOWN WHERE WE WERE IN THE STATUTE.

10   A    YES.

11   Q    IF YOU LOOK DOWN AT PARAGRAPH NUMBER SIX UNDER THE

12   MARKET PAY SECTION OF THE STATUTE IT SAYS, THE AMOUNT OF

13   MARKET PAY OF A PHYSICIAN SHALL BE EVALUATED BY THE SECRETARY

14   NOT LESS OFTEN THAN ONCE EVERY 24 MONTHS.

15   A    CORRECT.

16   Q    AND AGAIN, THAT IS A MARKET PAY DETERMINATION AND

17   EVALUATION, NOT AN ANNUAL PAY.

18   A    CORRECT.

19   Q    OKAY. ALL RIGHT. NOW, WHILE WE ARE ON PAGE KENNEDY VA

20   823, I NOTICED THAT THERE IS A NOTE UP TOWARDS THE TOP OF THE

21   PAGE THERE. AND DO YOU SEE WHERE I'M TALKING ABOUT? IT'S

22   SOME LANGUAGE IN ITALICS.

23   A    YES.

24   Q    AND THEN THERE'S A BRACKET THERE IN IT. BUT DID YOU

25   HAVE ANYTHING TO DO WITH THAT NOTE, WRITING IT, MODIFYING IT?

1    A    I MODIFIED PART OF THAT WHERE IT SHOWS THE BRACKETS.  I

2    DON'T KNOW THAT -- I DON'T THINK THAT I ORIGINALLY WROTE THIS

3    NOTE IN ITS ENTIRETY.

4    Q    OKAY.  AND THE NOTE, THE FIRST SENTENCE OF THE NOTE

5    SAYS, THE LAW -- AND THERE THAT'S REFERRING TO THE FEDERAL

6    STATUTE.

7    A    CORRECT.

8    Q    THE LAW REQUIRES THE COMPENSATION PANEL TO CONSIDER ALL

9    FACTORS.

10   A    CORRECT.

11   Q    AND THAT'S REFERRING AGAIN TO THE FACTORS THAT ARE IN

12   THE STATUTE WHICH THE VA HANDBOOK ATTEMPTS TO INCLUDE IN THE

13   HANDBOOK; IS THAT RIGHT?

14   A    THAT'S CORRECT.

15   Q    SO, IT'S FAIR TO SAY THEN THAT THE COMPENSATION PANEL IN

16   DOING ITS JOB OF REVIEWING EVERY 24 MONTHS, THE BIENNIAL

17   REVIEW, IS TO CONSIDER ALL THE FACTORS.

18   A    CORRECT.

19   Q    OKAY.  ALL RIGHT.  NOW, IN THE SECTION OF THE HANDBOOK

20   THAT YOU REFERRED TO JUST A LITTLE WHILE AGO IN TELLING US

21   ABOUT THAT, THOSE MAXIMUMS FOR STAFF ANESTHESIOLOGISTS OR

22   PHYSICIANS, IS THAT FOUND IN PART AT KENNEDY VA 831?  AND I

23   AM LOOKING THERE AT PARAGRAPH D SUB-PARAGRAPHS ONE AND TWO

24   AND THREE.

25   A    WE DON'T PUBLISH EACH YEAR WHEN THE PAY TABLES, THE

1    ANNUAL PAY RANGES FOR ALL OF THE CLINICAL -- FOR ALL OF THE

2    PHYSICIAN AND DENTIST PAY TABLES, AS THEY ARE INCREASED WE

3    DON'T PUBLISH THOSE ACTUAL PAY RANGES IN THE POLICY BECAUSE

4    IF WE DID, EVERY TIME THE PAY RANGES CHANGE, WE'D HAVE TO

5    REVISE POLICY, AND REVISING POLICY IS A -- IS A LONG PROCESS.

6         THE PARAGRAPH THAT YOU ARE REFERRING TO ON 831 IS THE

7    PARAGRAPH AS OF APRIL 2ND, 2013 THAT PROVIDES WHAT THE

8    MEDICAL CENTER DIRECTOR CAN APPROVE, WHAT THE NETWORK

9    DIRECTOR CAN APPROVE, AND WHAT THE UNDERSECRETARY FOR HEALTH

10   CAN APPROVE AS FAR AS ANNUAL PAY RANGES -- ANNUAL PAY RATES.

11   Q    OKAY.  NOW, LET ME DIRECT YOUR ATTENTION TO KENNEDY VA

12   826.  THIS IS PARAGRAPH 13 ON COMPENSATION PANELS.  AND YOU

13   AND I TALKED ABOUT THIS SECTION I THINK AT YOUR DEPOSITION

14   AND ABOUT THE PARENTHETICAL THAT IS INCLUDED IN THERE.  DO

15   YOU RECALL THAT?

16   A    NO.

17   Q    OKAY.

18   A    I MEAN, I JUST DON'T REMEMBER.

19   Q    YEAH.  ALL RIGHT.  I UNDERSTAND.  ALL RIGHT.  DO YOU

20   KNOW -- DO YOU SEE IT IN FRONT OF YOU NOW?

21   A    WHICH ONE ARE YOU...

22   Q    THIS IS ON PAGE KENNEDY VA 826.

23   A    AND WHICH PARENTHETICAL?

24   Q    I'M LOOKING AT 13A1 AND THE PARENTHETICAL IS CONSIDERING

25   THE COMBINED SUM OF THE BASE PAY AND MARKET PAY.

1    A    YES, I SEE THAT.

2    Q    ALL RIGHT.  AND I BELIEVE YOU TOLD ME THAT THAT CHANGE

3    CAME INTO EFFECT THROUGH A REVISION IN APRIL OF 2013.  IS

4    THAT YOUR UNDERSTANDING?

5    A    I DON'T REMEMBER.

6    Q    OKAY.  LET'S DO THIS.  LET ME ASK THE CLERK TO UNSEAL

7    YOUR DEPOSITION AND THEN WE CAN TAKE A LOOK AT SOME OF YOUR

8    TESTIMONY AND SEE IF THAT REFRESHES YOUR RECOLLECTION --

9    A    OKAY.

10   Q    -- ON THAT POINT.  ALL RIGHT.  MRS. DOTY, YOU KNOW THE

11   DRILL FROM LISTENING TO THE OTHERS.  YOU RECALL GIVING THIS

12   DEPOSITION ON MAY THE 11TH, 2016?

13   A    YES.

14   Q    ALL RIGHT.  AND WHEN YOU GAVE YOUR TESTIMONY, YOU GAVE

15   THAT TESTIMONY UNDER OATH TO TELL THE TRUTH; IS THAT CORRECT?

16   A    YES.

17   Q    AND TO THE BEST OF YOUR ABILITY YOU HAVE TOLD THE TRUTH

18   ON THAT DAY?

19   A    YES.

20   Q    ALL RIGHT.  AND SO LET ME ASK YOU TO TAKE A LOOK AT PAGE

21   43 OF YOUR TESTIMONY -- AND CERTAINLY DON'T INTEND TO LIMIT

22   YOU TO A FEW LINES.  IF YOU NEED TO LOOK BACK OR FORWARD, YOU

23   CAN DO THAT.  BUT YOU WILL SEE THAT WE ARE DISCUSSING PAGE

24   ROMAN NUMERAL 9-12 WHICH APPEARS IN THE HANDBOOK THAT WE HAVE

25   MARKED AS EXHIBIT 1 AS KENNEDY VA 826 AND WE WERE TALKING

1    ABOUT THE PARENTHETICAL CONSIDERING THE COMBINED SUM OF THE

2    BASE PAY AND MARKET PAY, CLOSED PARENTHESIS.

3        DO YOU SEE WHERE I AM NOW?

4    A    YES.

5    Q    OKAY.  AND SO, MY QUESTION TO YOU AT LINE 12 WAS, OKAY,

6    AND WERE WE CORRECT THAT THE BRACKETS ARE WHERE I SAID THEY

7    WERE, THAT IS AROUND THE PARENTHETICAL, CONSIDERING THE

8    COMBINED SUM OF THE BASE PAY AND MARKET PAY, CLOSED

9    PARENTHESIS, AND THAT TELLS YOU THAT THIS CHANGE WAS

10   IMPLEMENTED AS OF APRIL THE 2ND OF 2013.

11       AND WHAT WAS YOUR ANSWER?

12   A    YES, THAT IT WAS REVISED APRIL 2013.

13   Q    OKAY.  AND SO -- AND THEN MY NEXT QUESTION, SO PRIOR TO

14   THAT TIME THEN, THAT PARENTHETICAL WOULD NOT HAVE BEEN IN THE

15   HANDBOOK.  AND YOUR ANSWER?

16   A    YES, THAT'S CORRECT, IT WAS NOT IN THE HANDBOOK.

17   Q    ALL RIGHT.  OKAY.  AND WHERE IN THE STATUTE DO YOU FIND

18   AUTHORITY FOR THAT -- THAT BEING THIS PARENTHETICAL -- THAT

19   IS, THAT IN RECOMMENDING THE MARKET PAY THAT THERE SHOULD BE

20   A CONSIDERATION OF THE COMBINED SUM OF BASE AND MARKET?

21   A    WHAT WE CHANGED IN POLICY -- WELL, NOW TRYING TO FIND

22   OUT -- IS THAT WHEN THE COMPENSATION PANEL IS EVALUATING

23   THE -- NO, I'M SORRY.  LOOKING AT THE WRONG REFERENCE.  WERE

24   WE ON 13A?  IS THAT THE REFERENCE THAT WE WERE DISCUSSING?

25   Q    YES, THAT'S WHAT WE WERE--

1    A    OKAY.  WHAT WE WERE CLARIFYING IN POLICY WITH THAT

2    CHANGE WAS IN THE MIDDLE OF THAT PARAGRAPH IN 13A, THE

3    COMPENSATION PANEL IS ALSO RESPONSIBLE FOR EVALUATING THE

4    ANNUAL PAY PAREN BASE PAY AND MARKET PAY TO INCLUDE PAY TABLE

5    AND TIER ASSIGNMENT FOR EACH POSITION AND DENTIST UNDER ITS

6    JURISDICTION.

7    Q    AND AGAIN, YOU'RE READING FROM THE HANDBOOK --

8    A    YES, I AM.

9    Q    -- AND NOT THE STATUTE.

10   A    CORRECT.  YES.  WE ARE CLARIFYING IT IN VA POLICY THE

11   PROCESS FOR DOING THAT.

12   Q    FAIR ENOUGH.  I UNDERSTAND.  AND MY QUESTION HAD BEEN,

13   WHERE DOES IT SAY IN THE STATUTE THAT THAT IS AUTHORIZED?

14   THAT WAS MY ONLY QUESTION.

15   A    CORRECT.

16   Q    AND SO YOU--

17   A    IT IS NOT.  YES.

18   Q    OH, OKAY.

19   A    THAT'S IN OUR POLICY THAT'S BASED ON THE STATUTE,

20   CORRECT.

21   Q    ALL RIGHT.  THANK YOU VERY MUCH.  AND I BELIEVE THAT YOU

22   SAID -- YOU POINTED OUT THAT YOU THINK DR. KENNEDY'S

23   FUNDAMENTAL MISUNDERSTANDING IN THIS CASE IS THAT HE DOESN'T

24   UNDERSTAND THAT THE VA LOOKS AT ANNUAL PAY WHEN SETTING THE

25   PAY FOR PHYSICIANS AND THAT YOU DON'T LOOK AT MARKET PAY

1    DISCRETELY OR IN ISOLATION.  IS THAT YOUR VIEW?

2    A    THAT'S CORRECT.

3    Q    ALL RIGHT.  AND I BELIEVE YOU WOULD AGREE AND INDICATED

4    IN YOUR DEPOSITION THAT IT IS -- THAT TYPICALLY OR ROUTINELY

5    STAFF, SUCH AS DR. MILLER, WHO IS THE CHIEF OF THE

6    ANESTHESIOLOGY SERVICE --

7    A    UH-HUH.

8    Q    -- WOULD MAKE A RECOMMENDATION ON ANNUAL PAY AND THEN HR

9    COMPUTES THE BASE PAY USING THE LONGEVITY TABLE.  YOU WITH ME

10   ON THAT?

11   A    YES.

12   Q    ALL RIGHT.  AND THEN MARKET PAY BECOMES AN ARITHMETIC

13   FUNCTION OR CALCULATION OF ANNUAL PAY MINUS BASE PAY EQUALS

14   MARKET PAY.

15   A    CORRECT.

16   Q    WHERE IN THE STATUTE DOES IT AUTHORIZE THAT YOU CAN

17   ARRIVE AT MARKET PAY BY THIS ARITHMETIC FUNCTION OF

18   SUBTRACTING BASE PAY FROM ANNUAL PAY?

19   A    IT DOESN'T, BUT WHEN WE RECEIVE STATUTE, STATUTE IS --

20   IS -- DOES NOT CERTAINLY PROVIDE A PROCESS.  SO IN THIS CASE

21   AND IN MANY OTHER CASES WHEN WE HAVE A STATUTE THAT

22   IMPLEMENTS A NEW PAY SYSTEM, WE TAKE THE BONES OR THE

23   SKELETON OF, YOU KNOW, THAT STATUTE AND WE CREATE AN AGENCY

24   POLICY AND PROCESS.

25   Q    OKAY.  BUT YOU WOULD AGREE WITH ME, THOUGH, THAT IN THIS

1    CASE THE STATUTE SETS FORTH MORE THAN BONES WHEN IT LISTS THE

2    FACTORS THAT ARE TO BE DETERMINED BY THE COMPENSATION PANEL

3    --

4    A    CORRECT.

5    Q    -- IN OR -- OR TO BE TAKEN INTO ACCOUNT IN DETERMINING

6    MARKET PAY.

7    A    CORRECT.

8    Q    DO YOU HAVE RESPONSIBILITIES IN RELATION TO PENSION

9    BENEFITS?

10    A    NO.

11    Q    OKAY.  ALL RIGHT.  SAVED US SOME TIME.  ALL RIGHT.  DO

12    YOU KNOW OF ANY VA POLICY OR RULE OR DIRECTIVE AUTHORIZING

13    THE EQUALIZATION OF AWARDS OF ANNUAL PAY FOR VA PHYSICIANS

14    SUCH AS I THINK YOU'RE NOW FAMILIAR WITH IN THE NOVEMBER 2016

15    PANEL REVIEWS THAT WERE DONE FOR DR. KENNEDY AND THE OTHER

16    STAFF PHYSICIANS?  DO YOU KNOW OF ANY RULE OR DIRECTIVE THAT

17    AUTHORIZES THAT BE DONE?

18    A    WELL, OUR VHA PHYSICIAN AND DENTIST PAY POLICY IN PART

19    NINE ALLOWS -- THERE'S THREE TIMES THAT A COMPENSATION PANEL

20    MEETS.  IT MEETS IN TO RECOMMEND AN INITIAL RATE OF PAY FOR A

21    NEW HIRE.  IT MEETS -- THE POLICY STATES TO MEET THAT 24

22    MONTH BIENNIAL REVIEW THAT'S REQUIRED IN STATUTE.  AND THEN

23    THE POLICY ALLOWS THAT A POLICY CAN BE -- I'M SORRY -- A

24    COMPENSATION PANEL CAN BE CONVENED AS DEEMED NECESSARY BY AN

25    APPROPRIATE MANAGEMENT OFFICIAL.

1         SO WE HAVE THOSE THREE ITEMS AVAILABLE ON THE FORM TO

2    CHECK WHETHER THIS COMPENSATION PANEL IS FOR AN INITIAL

3    APPOINTMENT, FOR A BIENNIAL REVIEW, OR FOR SOME OTHER REASON.

4    SO, I THINK WHAT YOU'RE REFERRING TO FITS INTO THAT

5    FOR-OTHER-REASONS CATEGORY.

6    Q    DID THE -- TO YOUR KNOWLEDGE DID THE VA, WHEN IT

7    UNDERTOOK TO DESCRIBE THIS PARAGRAPH 13A AND HAS THE

8    PARENTHETICAL IN IT THAT DOESN'T CONFORM TO THE STATUTE ABOUT

9    CONSIDERING THE COMBINED SUM OF BASE PAY AND MARKET PAY, DO

10   YOU KNOW WHETHER THE VA TOOK INTO CONSIDERATION WHAT IMPACT

11   THAT PARENTHETICAL WOULD HAVE ON OLDER PHYSICIANS WHO WERE

12   ALREADY IN THE VA SYSTEM?

13   A    WELL, I DON'T BELIEVE THAT IT DOESN'T CONFORM TO

14   STATUTE, BUT -- WE DON'T -- I DON'T KNOW HOW TO ANSWER YOUR

15   QUESTION.  IT -- WE WERE TRYING TO CLARIFY THAT WHEN COMP

16   PANELS ARE MAKING RECOMMENDATIONS FOR ANNUAL PAY THAT ANNUAL

17   PAY IS A COMBINATION OF THE BASE PAY AND MARKET PAY.

18   Q    I UNDERSTAND.  AND WHAT MY QUESTION WAS -- IT WAS

19   INARTFULLY ASKED -- WAS DID YOU CONSIDER, DO YOU KNOW -- DID

20   THE VA CONSIDER THE IMPACT OF THAT PARENTHETICAL ON OLDER

21   PHYSICIANS?

22   A    I'M NOT AWARE THAT WE DID THAT.

23   Q    OKAY.  I BELIEVE THAT THAT IS ALL THAT I HAVE.  IF YOU'D

24   JUST GIVE ME A INDULGENCE OF JUST A MOMENT.  THANK YOU,

25   MRS. DOTY.  ANSWER ANY QUESTIONS, OF COURSE, THAT MRS. BAILEY

1    MAY HAVE FOR YOU.

2                         CROSS-EXAMINATION

3    BY MRS. BAILEY:

4    Q    NOW MRS. DOTY, YOU HAVE BEEN SITTING HERE THROUGHOUT

5    THIS TRIAL AS THE GOVERNMENT'S REPRESENTATIVE.  I APPRECIATE

6    THAT.  AND I WANT TO ASK YOU TO ANSWER A FEW QUESTIONS AND

7    THERE'S PROBABLY GOING TO BE SOME OVERLAP WITH WHAT MR. IRVIN

8    ASKED YOU.

9    A    OKAY.

10   Q    WILL JUST BEAR WITH ME.  WE TALKED ABOUT THE VA HANDBOOK

11   AS EXHIBIT 1.  AND WHAT IS THAT?

12   A    THE VA HANDBOOK?

13   Q    YES, MA'AM.

14   A    IT'S THE AGENCY GUIDANCE AND PROCESS AND PROCEDURES THAT

15   WE USE.  5007 COVERS -- THAT HANDBOOK COVERS ALL OF THE PAY

16   ADMINISTRATION COVERING BOTH TITLE FIVE AND TITLE 38.

17   Q    WHO ALL USES THAT HANDBOOK?

18   A    THE ENTIRE VA.  PRIMARILY HR OFFICES BUT IT'S VA -- IT

19   COVERS VA-WIDE.

20   Q    SO IS THAT JUST THE HOSPITALS, THE VA HOSPITALS?

21   A    NO, THE NETWORK OFFICES USE THEM, VBA USES...

22   Q    AND WHAT IS VBA?

23   A    I'M SORRY.  THE VETERAN'S BENEFITS ADMINISTRATION.  THE

24   NATIONAL CEMETERY ADMINISTRATION USES PARTS OF IT.  NOT ALL

25   THE PARTS APPLY BECAUSE THEY DON'T -- THEY ARE NOT COVERED

1    UNDER TITLE 38.  SO IT'S A COMPREHENSIVE PAY ADMINISTRATION

2    HANDBOOK FOR -- THAT OUTLINES ALL THE POLICIES AND PROCEDURES

3    AND PROCESSES AND FLEXIBILITIES THAT VA MAINTAINS.

4    Q    AND WHY DO YOU HAVE ONE HANDBOOK FOR ALL OF THOSE

5    DIFFERENT USES?

6    A    WE LUMP OUR HANDBOOKS INTO HR AREAS OF RESPONSIBILITY OR

7    DISCIPLINE.  SO WE HAVE ONE THAT COVERS RECRUITMENT AND

8    PLACEMENT, WE HAVE ONE THAT COVERS WORK LIFE BENEFITS, AND WE

9    HAVE ONE THAT COVERS HOURS OF DUTY, AND ONE THAT COVERS

10   RETIREMENTS AND TERMINATIONS AND CONDUCT ISSUES.  AND THIS

11   ONE, 5007, COVERS PAY ADMINISTRATION.

12   Q    IS THERE SOME BENEFIT TO HAVE -- HAVE UNIFORMITY IN THE

13   PAY ADMINISTRATION?

14   A    OH ABSOLUTELY.

15   Q    AND WHAT IS THAT?  WHAT'S THE BENEFIT?

16   A    THE -- WELL, AS A FEDERAL AGENCY, WHAT WE WANT TO ENSURE

17   CONFORMITY TO STATUTE, WE WANT TO ENSURE CONFORMITY

18   AMONGST -- WE HAVE AT LEAST 152 DIFFERENT OPERATING HR

19   OFFICES.  WE WANT TO MAKE SURE THAT THEY ARE ALL IN

20   COMPLIANCE WITH STATUTE AND, YOU KNOW, AND THEN POLICY.

21   Q    HAVE YOU HAD A CHANCE TO LOOK AT EXHIBIT NUMBER 4, THE

22   VA POLICIES, THE LOCAL VA POLICIES?  YOU CAN PULL THAT UP.

23   PLAINTIFF'S EXHIBIT 4.

24              *THE COURT:*  PLAINTIFF'S OR DEFENSE?

25              *MRS. BAILEY:*  PLAINTIFF'S.

1              *THE WITNESS:* YES, I HAD A CHANCE TO LOOK AT THAT.

2      BY MRS. BAILEY:

3      Q    YOU WERE HERE WHEN MRS. TAMARA NICHOLS TESTIFIED ABOUT

4      THIS FORM, HEARD HER CROSS-EXAMINATION ON IT ALSO.

5      A    YES.

6      Q    IS THIS POLICY, IS THIS MEMORANDUM FOR THE MEDICAL

7      CENTER HERE IN COLUMBIA, IS THAT CONSISTENT WITH WHAT'S DONE

8      NATIONALLY?

9      A    IT'S -- YES, IT'S A -- IT'S AN EXCERPT.  OFTEN TIMES

10     INSTEAD OF HANDING, YOU KNOW, A POLICY THAT'S LARGER THAN

11     THIS TO SOMEONE, MANY VA OFFICES WILL DO STANDARD OPERATING

12     PROCEDURES OR MEMORANDUMS AND THEY WILL TAKE OUT AND PROVIDE

13     GUIDANCE THAT'S IDENTICAL TO POLICY AND PROVIDE THAT GUIDANCE

14     TO INDIVIDUALS.  IN THIS CASE THIS IS TO DO WITH THE

15     COMPENSATION PANELS FOR PHYSICIANS AND DENTISTS.

16     Q    DOES THIS CONFORM WITH NATIONAL VA POLICY?

17     A    YES.

18     Q    WHEN I SAY THIS, I MEAN DOES PLAINTIFF'S EXHIBIT 4

19     CONFORM WITH NATIONAL VA POLICY?

20     A    YES.

21     Q    I'D LIKE FOR YOU NEXT TO LOOK AT THE -- GO TO EXHIBIT 1,

22     PLAINTIFF'S EXHIBIT NUMBER 1 AND TO PAGE VA UNDERSCORE 814.

23     AND I KNOW THAT YOU HAVE HAD SOME QUESTIONS ABOUT THIS PAY,

24     ABOUT THIS PAGE, BUT DOES THIS PAGE DEFINE WHAT A

25     COMPENSATION PANEL IS?

1    A    YES.  IT SAYS IT'S A GROUP OF PHYSICIANS OR DENTISTS

2    RESPONSIBLE FOR THE EVALUATION OF PHYSICIANS OR DENTISTS AND

3    FOR MAKING RECOMMENDATIONS TO THE APPROVING OFFICIAL FOR

4    ANNUAL PAY.

5    Q    NOW, FROM THE TESTIMONY YOU HAVE HEARD IN THIS CASE, IS

6    THAT WHAT THE COMPENSATION PANELS AT DORN HAVE DONE?

7    A    YES.

8    Q    AND THEN GO ON TO THE SAME EXHIBIT BUT TO VA PAGE 826.

9    AND IN THIS PARAGRAPH AT THE BOTTOM WHERE IT TALKS ABOUT THE

10   FUNCTION IN THE COMPENSATION PANELS --

11   A    YES.

12   Q    -- THINK ABOUT HALF-WAY DOWN IT TALKS ABOUT THE FUNCTION

13   OF COMPENSATION PANEL IS RESPONSIBLE FOR EVALUATING ANNUAL

14   PAY.

15   A    YES.

16   Q    DO YOU SEE THAT?

17   A    I DO.

18   Q    CAN YOU READ THAT SENTENCE TO US?

19   A    THE COMPENSATION PANEL IS ALSO RESPONSIBLE FOR

20   EVALUATING THE ANNUAL PAY, BASE PAY, AND MARKET PAY TO

21   INCLUDE PAY TABLE AND TIER ASSIGNMENT OF EACH PHYSICIAN AND

22   DENTIST UNDER ITS JURISDICTION AT LEAST ONCE EVERY 24 MONTHS,

23   BIENNIAL REVIEW, AND AT SUCH OTHER TIMES DEEMED NECESSARY BY

24   THE APPROPRIATE MANAGEMENT OFFICIAL.

25   Q    AND YOU LOOK AT WHERE IT SAYS, FOR EVALUATING THE ANNUAL

1    PAY?

2    A    YES.

3    Q    AND IN PARENTHESIS YOU'VE GOT BASE PAY AND MARKET PAY?

4    A    YES.

5    Q    WHY ARE THOSE NUMBERS IN PARENTHESIS?

6    A    AS INFORMATION TO -- OR A SPECIFIC GUIDANCE THAT IN VA

7    FOR VHA PHYSICIANS AND DENTISTS, THEIR ANNUAL PAY IS COMPOSED

8    OF TWO COMPONENTS; BASE PAY AND MARKET PAY.

9    Q    AND SO THE COMPENSATION PANEL COMES UP WITH ANNUAL PAY

10   --

11   A    CORRECT.

12   Q    -- WITH THOSE TWO COMPONENTS?

13   A    CORRECT.

14   Q    DOES IT SAY HERE THAT THE COMPENSATION PANEL HAS TO COME

15   UP WITH A DIFFERENT EVALUATION OF THE MARKET PAY AND THE BASE

16   PAY?

17   A    NO, IT DOES NOT.

18   Q    IT ALSO TALKS IN THIS PARAGRAPH ABOUT THE BIENNIAL

19   REVIEWS.

20   A    YES.

21   Q    NOW, WHAT ARE THOSE?

22   A    THAT'S THE REVIEWS THAT ARE REQUIRED FOR EVERY VHA

23   PHYSICIAN AND DENTIST THAT'S REQUIRED IN STATUTE TO BE

24   CONDUCTED EVERY 24 MONTHS.

25   Q    AND WHY ARE THEY CONDUCTED EVERY TWO YEARS OR 24 MONTHS?

1    A    I WASN'T INSTRUMENTAL IN WRITING THIS LAW OR THIS

2    LEGISLATIVE PROPOSAL, BUT I THINK IT'S TO ENSURE THAT ANNUAL

3    PAY IS REVIEWED ON A REGULAR, A FAIRLY REGULAR BASIS FOR

4    PHYSICIANS AND DENTISTS.

5    Q    WE HAVE HEARD SOME TESTIMONY ABOUT THE HAY SURVEY.

6    A    YES.

7    Q    WHAT ARE THESE SURVEYS?  WHAT ARE THE VARIOUS SURVEYS

8    AND WHAT'S THE HAY SURVEY?

9    A    WELL, HAY IS JUST A TERM THAT FOR SOME REASON IS USED

10   COMMONLY TO REFER TO THE SALARY SURVEY DATA PRODUCTS.  VHA

11   HAS A -- ACTUALLY A MULTI-MILLION-DOLLAR CONTRACT.  WE

12   PURCHASE ABOUT 65 DIFFERENT REGIONAL AND NATIONAL HEALTHCARE

13   SURVEY DATA PRODUCTS EVERY YEAR.

14        AND THOSE SURVEY DATA PRODUCTS ARE USED NOT ONLY TO HELP

15   DEFINE OR PROVIDE INFORMATION ON PHYSICIAN AND DENTIST PAY AT

16   EACH LOCAL LABOR MARKET, IT'S ALSO USED FOR OUR NURSES TO SET

17   THEIR SCHEDULES FOR -- TO SET PAY FOR HEALTHCARE, OTHER VA

18   HEALTHCARE OCCUPATIONS FOR JUSTIFYING DIFFERENT INCENTIVES

19   THAT WE MAY WANT TO JUSTIFY -- AUTHORIZE TO HEALTHCARE

20   EMPLOYEES -- EMPLOYEES IN HEALTHCARE OCCUPATIONS.

21        SO IT'S -- THESE ARE USED VERY EXTENSIVELY THROUGHOUT

22   THE VA.  HAY GROUP IS JUST ONE OF THE MANY NATIONAL SURVEY

23   DATA PRODUCTS THAT WE PURCHASE AND PROVIDE TO THE FIELDS SO

24   THAT THEY DON'T HAVE TO TRY TO GO OUT AND FIND THIS

25   THIRD-PARTY SURVEY DATA ON THEIR OWN.  AND THAT IS A VERY

1   COMMON COMPENSATION PRACTICE BOTH IN THE FEDERAL GOVERNMENT

2   AND THE PRIVATE SECTOR.  WE ARE ALL USING THIS SAME

3   THIRD-PARTY SURVEY DATA PRODUCTS.

4   Q    NOW, THE INFORMATION YOU GET ON THIS THIRD-PARTY SURVEY

5   PRODUCT -- WE'RE JUST GOING TO CALL IT THE HAY DATA.

6   A    OKAY.

7   Q    HOW DOES THAT HELP YOU WITH PHYSICIAN PAY?

8   A    THE VARIOUS PRODUCTS INCLUDING THE HAY GROUP SURVEY DATA

9   WILL PROVIDE ANNUAL RATES OF AVERAGE ANNUAL RATES OF PAY FOR

10  PHYSICIANS IN VARIOUS LABOR MARKETS, SO WE ARE ABLE TO USE

11  THAT TO SEE HOW COMPARABLE VA IS WITH PHYSICIANS IN THE

12  PRIVATE SECTOR.

13  Q    NOW, THIS SURVEY DATA, DOES IT TALK ABOUT THE COST OF

14  LIKE MEDICAL MALPRACTICE INSURANCE OR VACATION DAYS OR OTHER

15  BENEFITS THAT PHYSICIANS IN PRIVATE PRACTICE MIGHT HAVE?

16  A    TYPICALLY NOT.  THERE'S A FEW THAT MAY GIVE A LITTLE BIT

17  OF INFORMATION ON AN -- IF A -- IF PHYSICIANS RECEIVE AN

18  ON-CALL BENEFIT, BUT TYPICALLY THEY DON'T GO INTO THAT

19  DETAIL.

20  Q    SO IS THE HAY INFORMATION YOU GET THE TOTAL SALARY FOR

21  THE PHYSICIANS?

22  A    ANNUAL, YES.  IT LISTS -- I THINK IT REFERS TO IT AS

23  ANNUAL SALARY OR ANNUAL PAY.

24  Q    ANNUAL SALARY.

25  A    YES.

1    Q    SO THE COMPENSATION BOARDS AT THE VA HOSPITALS ARE

2    LOOKING AT ANNUAL SALARY?

3    A    YES.

4    Q    AND THE HAY INFORMATION IS ALSO ANNUAL SALARY?

5    A    CORRECT.  WE WOULD CERTAINLY WANT TO MAKE SURE WE'RE

6    USING COMPARABLE DATA THAT'S PROVIDING, YOU KNOW, THE

7    COMPARABLE DATA POINTS.

8    Q    AND WHY IS IT IMPORTANT TO HAVE COMPARABLE DATA POINTS?

9    A    BECAUSE WE NEED TO MAKE SURE THAT WHEN WE ARE LOOKING

10   AT -- WHEN WE ARE MAKING RECOMMENDATIONS -- WHEN THE

11   COMPENSATION PANEL IS MAKING RECOMMENDATIONS ON ANNUAL

12   SALARY, THAT THE SURVEY DATA THAT THEY ARE USING IS ALSO

13   REFLECTIVE OF THE ANNUAL SALARY THAT'S PAID FOR THAT

14   PARTICULAR CLINICAL SPECIALTY IN A PARTICULAR LOCAL LABOR

15   MARKET.

16   Q    I KNOW MR. IRVIN WAS ASKING YOU ABOUT THE FORMS THAT

17   WERE USED BY THE COMPENSATION REVIEW BOARDS.  THAT WAS VA

18   FORM 100432A?

19   A    YES.

20   Q    IS THAT DONE ALL ACROSS THE COUNTRY?

21   A    IT IS.

22   Q    AND IT'S A VERY SAME FORM NUMBER?

23   A    YES.

24   Q    SO HOW DO -- HOW DOES THE MARKET SURVEY PAY COME UP ON

25   THESE -- ON THE -- BEFORE THE PANEL?  HOW DOES THE PANEL KNOW

1    ABOUT THAT?

2    A    THE -- I'M SORRY.  THE...

3    Q    LIKE THE HAY SURVEY.  IF YOU'RE SETTING -- HOW DOES THE

4    COMPENSATION PANEL OR THE VA, LOCAL VA HOSPITAL, KNOW ABOUT

5    WHAT THE SURVEY RATES FOR PAYMENTS ARE?

6    A    WELL, HR HAS ACCESS TO ALL OF THE NATIONAL SURVEY DATA

7    PRODUCTS.

8    Q    AND THAT WOULD BE THE HUMAN RESOURCES OFFICE --

9    A    YES.

10    Q    -- AND HOSPITAL OR FACILITY?

11    A    CORRECT.  AND HUMAN RESOURCES IS RESPONSIBLE FOR

12    PROVIDING THAT SURVEY DATA AND, FOR EXAMPLE, IN THIS CASE TO

13    THE CHIEF OF ANESTHESIOLOGY AS TO BE USED, YOU KNOW, IN

14    DETERMINING COMPARABLE RATES OF PAY.

15    Q    THERE'S ONE MORE FORM I'D LIKE FOR YOU TO LOOK AT.  IT'S

16    DEFENDANT'S EXHIBIT NUMBER 4.  DO YOU RECOGNIZE THAT?

17    A    YES, I DO.  IT'S THE FEDERAL REGISTER NOTICE FOR A

18    CHANGE.  THE FEDERAL REGISTER NOTICES ARE REQUIRED ANY TIME

19    THE SECRETARY OF VA MAKES CHANGES TO THE ANNUAL PAY RANGES,

20    TIERS, OR PAY TABLES FOR VHA PHYSICIANS AND DENTISTS.

21        WE ARE REQUIRED BY STATUTE ONCE THOSE CHANGES, WHATEVER

22    CHANGES ARE APPROVED, WE ARE REQUIRED TO PROVIDE NOTICE TO

23    THE GENERAL PUBLIC IN THE FORM OF A FEDERAL REGISTER NOTICE.

24    IT'S PUBLISHED FOR 60 DAYS.  AND THE EFFECTIVE CHANGES ARE

25    THEN MADE -- MADE EFFECTIVE THE FIRST DAY OF THE FIRST PAY

1    PERIOD FOLLOWING THAT 60-DAY NOTIFICATION PERIOD.

2    Q    AND WHO IS RESPONSIBLE FOR THIS DOCUMENT?

3    A    I DID THIS DOCUMENT.

4    Q    SO YOU WROTE IT?

5    A    YES.

6    Q    AND YOU -- IT WAS PUBLISHED IN THE FEDERAL REGISTER?

7    A    YES.

8    Q    OKAY.  I'D LIKE FOR YOU TO LOOK DOWN TO THE SECOND

9    PARAGRAPH UNDER SUMMARY.

10   A    YES.

11   Q    IT STARTS WITH, THESE ANNUAL PAY RANGES.

12   A    YES.

13   Q    WOULD YOU READ THAT.

14   A    THESE ANNUAL PAY RANGES ARE INTENDED TO ENHANCE VA

15   FLEXIBILITY TO RECRUIT, DEVELOP, AND RETAIN THE MOST

16   HIGHLY-QUALIFIED PROVIDERS TO SERVE OUR NATION'S VETERANS AND

17   MAINTAIN A STANDARD FOR EXCELLENCE IN THE VA HEALTHCARE

18   SYSTEM.

19   Q    NOW, WHAT PART OF THE PHYSICIAN'S PAY DOES THIS ANNUAL

20   PAY RANGE DEAL WITH?

21   A    I'M SORRY.  I DON'T QUITE UNDERSTAND.

22   Q    WELL, HOW DOES THIS RELATE TO THE --

23   A    OH.

24   Q    -- THE -- OUR FORMULA HERE OF THE BASE PAY PLUS MARKET

25   PAY EQUALS ANNUAL PAY?

1    A    WELL, IN VA ANNUAL PAY IS MADE UP OF BASE PAY AND MARKET

2    PAY.

3    Q    AND SO THESE PAY RANGES ARE -- THAT THESE--

4    A    FINAL RANGE -- YES.  I'M SORRY.  THE PAY RANGES ARE

5    PUBLISHED, AND IT'S A PAY TABLE BASICALLY, AND IT HAS ALL THE

6    DIFFERENT CLINICAL SPECIALTIES.  IT HAS THE AMOUNTS, THE

7    MINIMUM AND MAXIMUM AMOUNTS THAT THE SECRETARY APPROVED, AND

8    IT IS -- IT'S A PUBLICATION THAT IS THEIR APPROVED PAY RANGES

9    FOR EACH CLINICAL SPECIALTY FOR EACH PAY TABLE FOR EACH TIER.

10    Q    AND THEN IF YOU COULD GO TO PAGE 3 OF THIS THERE'S A

11    SECTION THAT SAYS, PAY TABLE FOUR, CLINICAL SPECIALTY.

12    A    YES.

13    Q    CAN YOU EXPLAIN THIS TO US?

14    A    THE SECRETARY -- THE VHA PHYSICIAN AND DENTIST STEERING

15    COMMITTEE MAKES RECOMMENDATIONS BASED ON A VARIETY OF THINGS,

16    BUT BASED ON THIRD-PARTY SURVEY DATA, THE SALARY SURVEY DATA

17    PRODUCTS, THEY LOOK AT OUR STAFFING RETENTION TURNOVER RATES,

18    BUT PRIMARILY THEY LOOK AT SALARY, COMPARABLE SALARIES IN THE

19    PRIVATE SECTOR, AND WE LUMP TOGETHER VARIOUS PHYSICIAN AND

20    DENTIST CLINICAL SPECIALTIES INTO PAY TABLES.  AND THE PAY

21    TABLES DEFINE THE MINIMAL AND MAXIMUM RATES OF ANNUAL PAY

22    THAT CAN BE AUTHORIZED TO THESE VARIOUS CLINICAL SPECIALTIES.

23    Q    AND SO WHAT IS IT FOR ANESTHESIOLOGY?

24    A    AS OF THIS DATE FOR PAY TABLE FOUR, FOR TIER ONE, WHICH

25    IS FOR STAFF PHYSICIANS, THE MAXIMUM WAS 325.  SO THESE

1    MINIMUM AND MAXIMUM RATES ARE INTENDED IN THE VA TO REFLECT

2    FOR ALL OF OUR VARIOUS LABOR MARKETS A BROAD RANGE THAT

3    TYPICALLY OUR PHYSICIANS SHOULD BE ABLE TO FIT INTO.

4    Q    AND SO THE PHYSICIAN -- A PHYSICIAN LIKE DR. KENNEDY,

5    WHAT TIER WOULD HE BE IN?

6    A    IF DR. KENNEDY IS STAFFED, HE WOULD BE IN TIER ONE

7    MEANING NONSUPERVISORY.

8    Q    AND SO THE VERY MAXIMUM HE'D GET IN 2014 WHEN THIS WAS

9    PUBLISHED NO MATTER WHERE HE WAS LOCATED WOULD BE THIS FIGURE

10   OF $325,000?

11   A    THAT'S CORRECT.  THAT'S THE MAXIMUM RATE OF PAY TABLE.

12   Q    NOW, MR. IRVIN WAS ASKING YOU EARLIER ABOUT EXCEPTIONS.

13   A    CORRECT.

14   Q    WHAT IS AN EXCEPTION?

15   A    A PAY EXCEPTION IS AS WE SEE IN MOST PAY SYSTEMS IN THE

16   FEDERAL GOVERNMENT, THERE IS A WAY THAT IN -- I DON'T WANT TO

17   SAY EXTREME -- BUT IN UNIQUE CIRCUMSTANCES IN VARIOUS LOCAL

18   LABOR MARKETS WHERE THIS PAY TABLE MAY NOT BE SUFFICIENT TO

19   RECRUIT OR RETAIN A PHYSICIAN, THAT COMPENSATION PANEL CAN

20   RECOMMEND A HIGHER RATE, MAXIMUM RATE THAT GOES BEYOND THE

21   MAXIMUM OF THAT PAY TABLE.

22        AND DEPENDING ON THE AMOUNT THEY ARE RECOMMENDING, IT

23   EITHER GOES TO THE MEDICAL CENTER DIRECTOR, THE NETWORK OR

24   VISN DIRECTOR, OR TO THE UNDERSECRETARY FOR HEALTH.

25   Q    AND SO THAT WOULD BE -- IN COLUMBIA IT MAY NOT BE

1    325,000; IS THAT CORRECT?

2    A    I'M SORRY?

3    Q    THE MAXIMUM FOR THE PAY TABLE IN A PARTICULAR LOCATION

4    MAY NOT BE 325,000 FOR A ANESTHESIOLOGIST.

5    A    YOU MEAN THE PRIVATE SECTOR COMPARABLE RATES MAY NOT BE?

6    Q    YES.

7    A    IS THAT WHAT YOU'RE SAYING?

8    Q    YES.

9    A    CORRECT; THAT THOSE RATES WOULD VARY FROM LABOR MARKET

10    TO LABOR MARKET.

11    Q    AND SO THIS MAXIMUM, THAT WOULD BE THE MAXIMUM ANNUAL

12    PAY?

13    A    YES.

14    Q    AND THAT WOULD BE BASED ON -- FOR EACH COMMUNITY BASED

15    ON OTHER FACTORS, WHAT -- HOW IT WOULD RELATE TO DIFFERENT --

16    LET ME START THIS ALL OVER AGAIN.  WAS THE -- WOULD THE

17    MAXIMUM RATE OF 325,000 APPLY TO EVERY FACILITY ACROSS THE

18    COUNTRY?

19    A    EVERY VA FACILITY ACROSS THE COUNTRY.  AGAIN, THIS IS A

20    WIDE RANGE.  IT GOES FROM 98,967, WHICH IS VERY LOW, TO

21    325,000.  SO WHEN THE STEERING COMMITTEE IS LOOKING AT

22    RECOMMENDING TO THE SECRETARY -- AND IN THIS CASE THE

23    SECRETARY APPROVED THESE MAXIMUM -- MINIMUM AND MAXIMUM PAY

24    RANGES -- THIS WIDE RANGE IS INTENDED TO BE SUITABLE AND

25    ADEQUATE TO RECRUIT AND RETAIN PHYSICIANS IN ALL OF OUR LABOR

DOTY - CROSS

329

1    MARKETS ACROSS THE COUNTRY.

2    Q    SO WHAT WOULD BE A JUSTIFICATION FOR GOING BEYOND THIS

3    RANGE?

4    A    WELL, FOR EXAMPLE, WE HAVE SOME VERY HIGH-COST AREAS.

5    WEST LA IS ONE OF THEM.  IT'S NOT JUST THAT THE COST THAT

6    IS -- IT'S NOT JUST BASED ON THEIR COST OF LIVING, WHICH IS

7    MUCH HIGHER THAN OTHER PLACES IN THE COUNTRY, BUT ALSO THEY

8    HAVE HAD DIFFICULTY, FOR EXAMPLE, RECRUITING CERTAIN TYPES OF

9    PHYSICIANS, YOU KNOW, FOR SEVERAL YEARS, SO THEY MAY COME IN

10   WITH A REQUEST TO EXCEED IN THIS CASE PAY TABLE FOUR, TIER

11   ONE, THAT MAXIMUM OF 325.

12   Q    HOW ABOUT IF THEY WANTED TO EXCEED THE MAXIMUM FOR --

13   JUST ON AN ANNUAL PAY REVIEW BASIS WITHOUT ANY SPECIAL

14   FACTORS?

15   A    THEY HAVE TO PROVIDE FAIRLY EXTENSIVE JUSTIFICATION AND

16   DOCUMENTATION AS TO WHY THEY ARE REQUESTING TO EXCEED OR

17   SEEKING A PAY EXCEPTION, SO THEY NEED TO PROVIDE INFORMATION

18   ON PAST RECRUITMENT DIFFICULTY, MAYBE RETENTION ISSUES.  YOU

19   KNOW, IF A FACILITY CANNOT RECRUIT AND -- RECRUIT OR RETAIN

20   SURGEONS AND THEY ARE GOING TO HAVE TO CLOSE OR'S, THAT TYPE

21   OF THING, SO IT -- YOU KNOW, IT NEEDS TO BE BASED ON A

22   SIGNIFICANT REASON WHY WE ARE ASKING OR A PARTICULAR FACILITY

23   IS ASKING TO EXCEED THE MAXIMUM OF THE PAY TABLE.

24   Q    DO YOU HAVE ANY IDEA HOW MANY EXCEPTIONS ARE GRANTED A

25   YEAR?

DOTY - CROSS
330

1    A    I -- WE DON'T KEEP TRACK OF WHAT IS APPROVED BY THE

2    MEDICAL CENTER DIRECTOR OR THE NETWORK DIRECTOR AT THIS TIME,

3    BUT WE HAD LESS THAN 200 THAT CAME UP TO THE UNDERSECRETARY

4    FOR HEALTH THE LAST TIME I SAW A REPORT, AND THAT WAS EITHER

5    IN FOR 2017 OR 2016.

6    Q    SO THAT'S 200 THAT WERE APPROVED IN 2016?

7    A    NO, THAT WAS 200 THAT WERE SUBMITTED. I DON'T KNOW THE

8    AMOUNT THAT WERE APPROVED. THE UNDERSECRETARY APPROVED SOME

9    OF THEM AND THE -- THEY ARE NOT RUBBER-STAMPED. IT'S

10   SOMETHING THAT IS CAREFULLY CONSIDERED BY THE UNDERSECRETARY.

11   Q    NOW, YOU WERE IN THE COURTROOM WHEN PROBABLY EIGHT OR SO

12   DOCTORS IN THE CURRENT VA TALKED ABOUT HOW THEY DID THE PAY

13   PANELS THAT WERE AT ISSUE IN THIS CASE.

14   A    YES.

15   Q    WHILE YOU WERE LISTENING, DID YOU SEE ANYTHING THAT

16   DEVIATED FROM NATIONAL VA POLICY OR THE PROCESS FOR DOING

17   THESE?

18   A    NO.

19   Q    I WANTED TO ASK YOU SPECIFICALLY ABOUT EXHIBIT 11,

20   PLAINTIFF'S EXHIBIT NUMBER 11. THESE ARE THE COMPENSATION

21   PANEL ACTIONS FOR 2015. AND IF YOU LOOK UNDER PART A OF THE

22   VERY FIRST PAGE, 1246, IT SAYS, REASON FOR COMPENSATION PANEL

23   REVIEW. AND IT SAYS OTHER.

24   A    YES.

25   Q    NOW, IS THAT UNUSUAL FOR THE OTHER TO BE CHECKED?

1    A    NO.  IT'S A PROVISION IN POLICY, AGAIN, THAT SAYS

2    COMPENSATION PANELS WILL MEET EITHER BASED TO -- EITHER TO

3    DETERMINE INITIAL RATE OF PAY FOR NEW EMPLOYEES BASED ON --

4    OR TO DO A BIENNIAL REVIEW ON AN EXISTING EMPLOYEE OR THE

5    POLICY ALLOWS FOR A PAY PANEL TO BE CONVENED BASED ON AN

6    APPROPRIATE MANAGEMENT OFFICIAL'S RECOMMENDATION.

7    Q    WAS THERE ANY CHANGE MADE IN MR. ALGHOTHANI'S PAY AS A

8    RESULT OF THIS REVIEW?

9    A    NO.

10   Q    WE HAVE HAD TESTIMONY IN THIS CASE THAT DR. KENNEDY HAD

11   COMPLAINED ABOUT HIS PAY IN JANUARY OR FEBRUARY 2015 AND THAT

12   THE HR OFFICE RECONVENED THE PAY TABLES FOR EVERYONE.  DO YOU

13   SEE ANYTHING IRREGULAR IN THAT?

14   A    NO.  I THINK THAT'S APPROPRIATE.

15   Q    AND WHY WOULD IT BE APPROPRIATE?

16   A    IF THE SERVICE CHIEF, SERVICE LINE CHIEF, DECIDED THAT

17   HE WANTED TO CONVENE A PAY PANEL FOR ONE ANESTHESIOLOGIST

18   BECAUSE THERE WAS SOME QUESTION AS TO PERHAPS THAT

19   INDIVIDUAL'S RATE OF PAY, I DON'T THINK IT'S UNUSUAL THAT

20   THAT WOULD BE ALSO EXTENDED TO LOOK AT OR REVIEW OTHER

21   SIMILARLY-SITUATED OR EXPERIENCED PHYSICIANS IN THAT SAME

22   CLINICAL DISCIPLINE OR CLINICAL SPECIALTY.

23   Q    AND THEN IF YOU'D LOOK TO PLAINTIFF'S EXHIBIT NUMBER 8.

24   AND AGAIN, THAT'S FOR THAT SAME MAY 1ST, 2015.  DO YOU SEE

25   ANYTHING IRREGULAR IN HIM BEING -- HIS REVIEW -- HIS PAY

1    BEING REVIEWED ALONG WITH THE OTHER ANESTHESIOLOGISTS

2    TOGETHER?

3    A    NO.

4    Q    NOW I'D LIKE FOR YOU TO GO TO THE SECOND PAGE OF THIS

5    EXHIBIT WHERE IT SAYS, COMPENSATION PANEL RECOMMENDATION.

6    A    OKAY.

7    Q    AT THE TOP TO THE RIGHT IT SAYS PAY RANGE OR RATE AND

8    THOSE NUMBERS UNDERNEATH IT.  ARE THOSE THE SAME NUMBERS THAT

9    WE HAVE SEEN IN EXHIBIT 4 --

10    A    I HAVE TO SEE...

11    Q    -- THAT WE WERE JUST TALKING ABOUT?

12    A    SHOULD BE THE PAY RANGES FROM THE PAY TABLES.

13    Q    BASICALLY THE SAME AS ON PAGE THREE OF FOUR OF

14    EXHIBIT 4, DEFENDANT'S EXHIBIT 4.  ANY WAY, THAT'S THE PAY

15    RANGES OFF THE TABLE?

16    A    YES.  YES.

17    Q    NOW IT SHOWS THAT DR. KENNEDY'S BASE PAY WAS 126,613.

18    A    YES.

19    Q    AND THEN HIS MARKET PAY WAS 167.  BUT WE HAVE HAD SOME

20    TESTIMONY THAT THE MARKET PAY THIS TIME PERIOD WAS -- RANGED

21    UP FROM MAYBE AS HIGH AS 305 OR THREE -- 319.  IF YOU PUT IN

22    THE MARKET PAY HERE AS 300, WHICH WOULD BE ABOUT IN THE

23    MIDDLE OF THE PAY RANGE, 300,000, WHAT WOULD THAT MAKE HIS

24    TOTAL PAY, HIS ANNUAL PAY?

25    A    LIKE $426,000 IF I UNDERSTAND WHAT -- YOU'RE SAYING IF

1    WE ADD THE 300,000 IN MARKET PAY ONLY?

2    Q    YES.

3    A    AND THEN ADD THE BASE AND LONGEVITY TO THAT?

4    Q    YES.

5    A    IT WOULD SET ANNUAL SALARY AT LIKE 400 -- IN EXCESS OF

6    $426,000.

7    Q    SO DOING THE BASE PAY PLUS THE MARKET PAY WOULD LEAVE A

8    ANNUAL PAY OF ROUGHLY $426,000 FOR DR. KENNEDY?

9    A    YES.  IN THIS SCENARIO, YES.

10   Q    WELL, WHAT KIND OF AFFECT WOULD THAT HAVE ON -- IF YOU

11   DID -- YOU DID THAT FOR DR. KENNEDY -- IF THAT WAS THE WAY

12   YOU COMPUTED IT, HOW WOULD THAT AFFECT THE VA?

13   A    IF THAT'S THE WAY WE COMPUTED PAY, IT WOULD -- IT WOULD

14   CAUSE FIRST OF ALL A TREMENDOUS BUDGETARY DEFICIT IN VA.  YOU

15   KNOW, VA IS A FEDERAL AGENCY THAT HAS A FINITE BUDGET, SO

16   I -- WE HAVE 25,000 PLUS EMPLOYEES, SO THAT SIGNIFICANT OF AN

17   INCREASE THAT WOULD -- SOMEHOW THAT HAD TO BE APPLIED, THAT

18   PROCESS APPLIED ACROSS THE COUNTRY WOULD, YOU KNOW, HAVE A

19   TREMENDOUS NEGATIVE AFFECT ON VA'S BUDGET.

20        IT WOULD TAKE MONEY BASICALLY AWAY FROM MONEY THAT WE

21   USE TO TREAT PATIENTS AND PROVIDE HEALTHCARE.  AND NOT TO

22   MENTION, IT WOULD CAUSE OUR PHYSICIANS TO IN THIS CASE BE

23   PAID A CONSIDERABLE AMOUNT OF MONEY GREATER THAN THE

24   COMPARABLE RATES OF PAY IN THE LABOR MARKET.

25   Q    SO THE VA PHYSICIANS AT DORN WOULD BE PAID A LOT MORE

DOTY - CROSS

1    THAN THE ONES IN THE COMMUNITY?

2    A    YES, BASED ON THE CALCULATION THAT THAT -- YES, BASED ON

3    WHAT WE JUST TALKED ABOUT, THEY WOULD.

4    Q    WELL, HOW DOES THAT COMPORT WITH THE VA PHILOSOPHY?

5    A    IT'S COMPLETELY CONTRARY TO THE VA PHILOSOPHY.  IN ALL

6    OF OUR PAY SYSTEMS, WHILE WE WANT TO HAVE COMPETITIVE RATES,

7    WE DON'T ASPIRE TO AND IN MANY PAY SYSTEMS WE'RE REQUIRED BY

8    STATUTE NOT TO BE A PAY LEADER IN THE COMMUNITY.

9        SO WHILE WE WANT TO CREATE AS COMPETITIVE RATES AS WE

10   CAN BECAUSE OBVIOUSLY OUR GOAL IS TO BE ABLE TO ATTRACT AND

11   RETAIN THE HIGHEST-QUALITY PHYSICIANS AND DENTISTS AND

12   HEALTHCARE EMPLOYEES AS A WHOLE, YOU KNOW, WE ALSO HAVE TO BE

13   MINDFUL OF OUR BUDGETARY RESTRICTIONS AS WELL AND, YOU KNOW,

14   THAT'S WHERE THAT SALARY SURVEY DATA COMES INTO EFFECT.

15       IT'S IMPERATIVE AND THE STATUTE REQUIRES THAT WE

16   CONSIDER SALARY SURVEY DATA, WHICH IS BASICALLY COMPARING OUR

17   RATES OF PAY TO COMPARABLE RATES OF PAY IN THE LOCAL LABOR

18   MARKET AREA.

19   Q    AND I WAS JUST THINKING ABOUT ANOTHER QUESTION THAT MR.

20   IRVIN RAISED ABOUT THIS EQUALIZING PAY.  AND IN THE INCIDENCE

21   THAT HE WAS TALKING ABOUT -- LET'S SEE IF I'VE GOT THAT

22   EXHIBIT NUMBER UP HERE...

23       WOULD YOU LOOK AT PLAINTIFF'S EXHIBIT NUMBER 12?

24   A    YES, I SEE IT.

25   Q    IT SAYS HERE THAT THERE'S -- THESE ARE THE

```
 1   NOVEMBER 10TH, 2016 PAY RAISES.  YOU REMEMBER THE TESTIMONY

 2   ABOUT IS THAT ONE OF THE DOCTORS CAME IN WITH AN OFFER FROM A

 3   DOWNTOWN GROUP --

 4   A    YES.

 5   Q    -- THAT WANTED TO PAY HIM $300,000?

 6   A    YES.

 7   Q    AND DR. MILLER WAS -- WANTED TO KEEP HIS STAFF TOGETHER.

 8   A    CORRECT.

 9   Q    AND HE RECOMMENDED PAY FOR EACH OF HIS PHYSICIANS FOR

10   $300,000.

11   A    YES.

12   Q    AND HE SAYS HE WANTED TO BE SURE THERE WAS NO PAY

13   DISPARITY.  WHAT DO YOU THINK OF THAT?

14   A    WELL, I ACTUALLY THINK THAT IT IS A PROACTIVE MOVE.  I

15   THINK THAT IT WOULD HAVE BEEN -- HAD -- I'M SORRY, IS HIS

16   NAME DR. MILLER?  IS THAT -- IF DR. MILLER HAD ONLY ENSURED

17   AND REVIEWED THE PHYSICIAN THAT HAD THE COMPETING OFFER, THEN

18   OBVIOUSLY -- HE OBVIOUSLY, AS A SERVICE CHIEF I BELIEVE IT'S

19   IMPERATIVE THAT HE LOOK AT ALL OF HIS PHYSICIANS AND ENSURE

20   THAT THEY ALL HAVE COMPETITIVE AND COMPARABLE RATES OF PAY.

21       I MEAN, OBVIOUSLY IN THIS EXAMPLE DORN MEDICAL CENTER

22   HAS A PRIVATE SECTOR COMPETITOR THAT'S TRYING TO RECRUIT

23   THEIR ANESTHESIOLOGISTS.  SO IF IT WEREN'T THIS -- THIS

24   INDIVIDUAL PHYSICIAN, MY GUESS IS THEY WOULD HAVE TRIED TO

25   CONTACT ANOTHER ANESTHESIOLOGIST TO RECRUIT.
```

1          SO TO ME THIS IS A PROACTIVE APPROACH.  AND IF HE WAS

2      GOING TO REVIEW ONE, IT WOULD BE APPROPRIATE TO REVIEW THEM

3      ALL TO ENSURE THAT THE PAY IS FAIR AND EQUITABLE WITHIN THE

4      SERVICE.

5      Q    AND NOW IN -- DURING THIS TRIAL, WHICH HAS GONE ON FOR A

6      DAY AND A HALF NOW, HAVE YOU HEARD ANY SUGGESTION OF A BETTER

7      WAY TO DO THE PAY THAN THE WAY THE VA DOES?

8      A    NO.  I HAVE HEARD A LOT ABOUT THE PROCESS, THE WAY WE

9      COMPLETE THESE FORMS, AND I DON'T THINK ANY OF THAT IS IN

10     VIOLATION OF STATUTE, BUT I -- AT THIS POINT I'M SATISFIED

11     WITH THE WAY THAT WE ARE -- WE ARE REVIEWING ANNUAL SALARY.

12     WE ARE COMPARING IT TO ANNUAL SALARY IN THE PRIVATE SECTOR IN

13     THE SAME LABOR MARKET.

14         WE ARE PROVIDING THAT INFORMATION TO THE COMPENSATION --

15     WELL, WE WERE -- TO THE COMPENSATION PANELS BACK IN WHEN WE

16     HAD COMPENSATION PANELS.  THEY ARE LOOKING AT THAT

17     INFORMATION.  THEY ARE LOOKING AT THE CRITERIA FOR EACH OF

18     THE PHYSICIANS THAT'S REQUIRED IN STATUTE TO REVIEW AND THEY

19     MAKE AN OVERALL RECOMMENDATION ON THE ANNUAL PAY.

20         NOW, PERSONALLY I, YOU KNOW, SAT HERE AND I HAVE HEARD

21     THE DISCUSSION, DISAGREEMENT OR DISCUSSION, ABOUT THE WAY

22     THAT WE COMPLETE THESE FORMS.  BUT IN REALITY WHEN YOU LOOK

23     AT THE WAY OUR PAY SYSTEM IS OUTLINED IN STATUTE AND IN

24     POLICY, WE HAVE TWO COMPONENTS OF PAY.  ONE IS DISCRETIONARY.

25     ONE IS NON-DISCRETIONARY.  THE BASE AND LONGEVITY PAY IS NOT

DOTY - CROSS

337

1    GOING TO CHANGE BASED ON A RECOMMENDATION OF AN INCREASE OR

2    DECREASE BY A COMPENSATION PANEL.  IT CAN'T BY LAW.

3         SO WHEN OUR PAY PANELS ARE LOOKING AT RECOMMENDING PAY

4    FOR PHYSICIANS AND THEY ARE LOOKING -- WE ARE COMPARING

5    ANNUAL PAY TO ANNUAL PAY IN THE COMMUNITY, WE DON'T HAVE

6    SURVEY DATA IN THE COMMUNITY BECAUSE PRIVATE SECTOR

7    PHYSICIANS DON'T HAVE A MARKET PAY COMPONENT AND A BASE

8    COMPONENT, SO WE ARE UNABLE TO COMPARE SOLELY MARKET PAY TO

9    ANNUAL SALARY.

10        SO WE COMPARE ANNUAL SALARIES TO ANNUAL SALARIES.  THE

11   COMPENSATION PANEL MAKES ITS RECOMMENDATIONS AND THEN, YES,

12   IT IS -- BUT YOU KNOW, BY VIRTUE OF THAT ANNUAL PAY, THE ONLY

13   THING THAT WE CAN MAKE A RECOMMENDATION ON AND CHANGE IS THE

14   MARKET PAY.

15        SO, I DON'T BELIEVE THAT WE ARE VIOLATING THE STATUTE

16   JUST BECAUSE WE ASK OUR PHYSICIANS TO RECOMMEND ANNUAL PAY

17   BECAUSE WHAT THEY ARE DOING IN -- BASICALLY IS RECOMMENDING

18   EITHER AN -- IS RECOMMENDING AN INCREASE IN THEIR MARKET

19   PAY -- IN THE MARKET PAY COMPONENT BECAUSE THAT'S THE ONLY

20   COMPONENT WE CAN -- WE CAN CHANGE.

21   Q    THANK YOU.  PLEASE ANSWER ANY QUESTIONS MR. IRVIN MAY

22   HAVE.

23        *MR. IRVIN:*  JUST BRIEFLY, YOUR HONOR.

24                    REDIRECT EXAMINATION

25   BY MR. IRVIN:

1    Q    I THINK I HEARD YOU SAY, YOU AND MRS. BAILEY SAY

2    SOMETHING ABOUT AN ANNUAL PAY THAT YOU THOUGHT DR. KENNEDY

3    MIGHT BE SEEKING OR THAT SOMEHOW OR ANOTHER CAME ABOUT OF

4    $426,000.  WHERE DID THAT NUMBER COME FROM?

5    A    I THINK WHAT SHE WAS -- MRS. BAILEY WAS SAYING WAS IF WE

6    USED SURVEY DATA AND ONLY -- AND USED THAT DATA AND USED THAT

7    DATA TO CHANGE -- INSTEAD OF COMPARING IT TO THE ANNUAL PAY,

8    WE USED IT TO INCREASE JUST THE MARKET PAY ONLY WITHOUT, YOU

9    KNOW, WITHOUT REGARD TO HOW MUCH BASE AND LONGEVITY PAY A

10   PHYSICIAN IS MAKING, THAT THAT WOULD CREATE POTENTIALLY MUCH

11   HIGHER RATES FOR OUR PHYSICIANS.

12   Q    $426,000?  IS THAT WHAT YOU THINK DR. KENNEDY IS ASKING

13   THE COURT TO DETERMINE IS HIS ANNUAL--

14   A    NO, THAT WASN'T THE QUESTION SHE ASKED ME.  SHE WAS

15   ASKING ME ABOUT THIS PROCESS IF WE ONLY APPLIED THAT $300,000

16   THAT'S IN THE COMMUNITY TO THE MARKET PAY COMPONENT IN THAT

17   CALCULATION.

18   Q    OH, I SEE.  BUT THAT WOULDN'T BE--

19   A    AND THEN ADDING HIS BASE AND LONGEVITY PAY ON TOP OF

20   THAT.

21   Q    I SEE WHAT--

22   A    HOW THAT METHOD WOULD SKEW--

23   Q    YEAH.  IT WOULD SKEW BECAUSE YOU WOULDN'T BE COMPARING

24   APPLE TO APPLES; RIGHT?

25   A    WELL, AND THAT'S -- WE ARE NOT COMPARING APPLES TO

1    APPLES IF WE ARE TRYING TO COMPARE JUST OUR MARKET PAY TO

2    ANNUAL SALARIES IN THE COMMUNITY EITHER.

3    Q    RIGHT.  BUT WHEN YOU'RE TRYING TO COMPARE YOUR ANNUAL

4    PAY TO SALARIES IN THE COMMUNITY AND THE HAY DATA AND SO

5    FORTH, THAT'S WHERE IT'S APPLES TO APPLES.

6    A    WHEN WE ARE COMPARING ANNUAL PAY, YES, TO THE ANNUAL PAY

7    IN THE COMMUNITY.

8    Q    RIGHT, WHICH IS WHAT THE HAY DATA GIVES YOU.  IT GIVES

9    YOU --

10   A    CORRECT.

11   Q    -- ANNUAL PAY BECAUSE PRIVATE MARKET DOESN'T BREAK IT

12   OUT INTO BASE PAY AND MARKET PAY; DO THEY?

13   A    NO, THEY DON'T.

14   Q    OKAY.  THANK YOU.

15             THE COURT:  I HAD A COUPLE OF QUESTIONS.

16             THE WITNESS:  YES.

17             THE COURT:  THE SEVEN FACTORS THAT ARE LISTED ON

18   THE COMPENSATION PANEL REVIEW FORMS, WHO PREPARES THOSE, THAT

19   LIST?

20             THE WITNESS:  TYPICALLY THE SERVICE CHIEF WOULD DO

21   THAT.  THE SERVICE CHIEF IS THE ONE THAT HAS THE MOST

22   INFORMATION ON THEIR -- THE INDIVIDUAL PHYSICIANS THAT THEY

23   SUPERVISE, SO THEY WOULD HAVE INFORMATION ON THEIR

24   EXPERIENCE, THEIR QUALIFICATIONS, ANY TYPE OF -- WHERE THE

25   BOARD CERTIFICATIONS, THE NEED FOR THAT SPECIALTY AT THAT

1    FACILITY.

2            THE COURT:  SO THE SERVICE CHIEF TAKES INTO

3    CONSIDERATION THE SEVEN FACTORS AND INDICATES THAT HE'S

4    TAKING THOSE INTO CONSIDERATION WITH THAT ATTACHMENT.

5            THE WITNESS:  YES.

6            THE COURT:  THEN HE PRESENTS THAT TO THE PANEL.

7            THE WITNESS:  YES.

8            THE COURT:  AND THE PANEL DOESN'T INDEPENDENTLY

9    LOOK AT THOSE MARKET FACTORS; IS THAT CORRECT?

10           THE WITNESS:  THE PANEL LOOKS AT WHAT'S PROVIDED BY

11   THE SERVICE, SERVICE LINE CHIEF.

12           THE COURT:  BUT THEY DON'T DO AN INDEPENDENT

13   ANALYSIS OF THE MARKET OR ANYTHING LIKE THAT?

14           THE WITNESS:  THEY SHOULD BE PROVIDED MARKET DATA

15   TO REVIEW EITHER BY THE SERVICE CHIEF OR BY HUMAN RESOURCES.

16   THEY ARE REQUIRED TO LOOK AT COMPARABLE RATES OF PAY IN THE

17   COMMUNITY WHEN MAKING THEIR RECOMMENDATIONS.

18           THE COURT:  SO DOES THE SERVICE CHIEF PRESENT THEM

19   WHAT THE COMPARABLE RATES ARE OR DO THEY INDEPENDENTLY LOOK

20   AT THE COMPARABLE RATES OF PAY?

21           THE WITNESS:  EITHER THE SERVICE CHIEF WOULD GET

22   THAT INFORMATION FROM HR OR HR WOULD BE THERE TO PROVIDE THAT

23   INFORMATION.  AND AGAIN, THAT INFORMATION IS PROVIDED IN THE

24   FORM -- TYPICALLY WOULD BE PROVIDED THROUGH ONE OF THE MANY

25   DIFFERENT SURVEY DATA PRODUCTS THAT VA PURCHASES.

1          THE COURT: SO THE ANNUAL PAY IS THE BASE PAY PLUS

2    THE MARKET PAY. AND THE ONLY VARIABLE YOU HAVE IN THAT IS

3    MARKET. THE BASE PAY DOESN'T -- YOU CAN'T -- CAN'T VARY

4    THAT.

5          THE WITNESS: THAT'S CORRECT.

6          THE COURT: SO, WHY DO YOU -- WHY IS THERE A NEED

7    FOR THE BASE PAY IF THE MARKET PAY CAN BE MANIPULATED

8    REGARDLESS OF LONGEVITY OR TIME AT THE VA? SEEMS LIKE YOU

9    SHOULD JUST LOOK AT MARKET PAY AND SAY WE ARE GOING TO PAY

10   EVERYBODY $300,000.

11         THE WITNESS: WELL, THAT--

12         THE COURT: SO WHAT DOES THE BASE PAY MEAN?

13         THE WITNESS: THE BASE PAY IS -- THIS PAY SYSTEM

14   WAS IMPLEMENTED IN 2006, AND SO SIMILAR -- THE SAME THING WE

15   HAVE, FOR EXAMPLE, IN THE GENERAL SCHEDULE IN THE GENERAL --

16   AT LEAST WE HAVE IN THE GENERAL SCHEDULE, WE HAVE IT IN THE

17   FEDERAL WAGE SYSTEM, WE HAVE IT IN THE NURSE LOCALITY PAY

18   SYSTEM. IT'S IN STATUTE.

19      TYPICALLY AT THIS TIME FEDERAL WAGES HAVE A PAY SCALE

20   THAT'S ATTACHED, AND SO THAT BASE AND LONGEVITY SCHEDULE IS

21   ESSENTIALLY A BASE PAY STRUCTURE, A BASE CHART, AND ON THAT

22   WE ADD THE MARKET PAY.

23      THE BASE AND LONGEVITY PAY SCHEDULE WAS NEVER INTENDED I

24   BELIEVE TO BE, YOU KNOW, THE SOLE SOURCE OF COMPENSATION, BUT

25   IT DOES -- THE ONE -- THE ONE BENEFIT THAT THE BASE AND

1    LONGEVITY PAY SYSTEM DOES IS IT REWARDS EMPLOYEES EVERY TWO

2    YEARS FOR THEIR TIME THAT THEY SPEND IN VHA SERVICE; SO

3    SIMILAR TO HOW WE GO UP IN STEPS IN THE GENERAL SCHEDULE.

4            THE COURT:  OKAY.  BUT STILL, A PERSON WHO HAS BEEN

5    THERE FOR 20 YEARS COULD STILL END UP MAKING THE SAME AS

6    SOMEBODY WHO HAS BEEN THERE FOR FIVE YEARS IF THE MARKET WILL

7    SUPPORT IT.

8            THE WITNESS:  ABSOLUTELY.  BUT THAT'S ABSOLUTELY

9    ESSENTIAL FOR VA.  WE ARE FORTUNATE IN VA THAT WE'RE OFTEN

10   ABLE -- AND I THINK WE HAVE TALKED ABOUT THIS PREVIOUSLY --

11   WE ARE OFTEN ABLE TO ATTRACT PHYSICIANS THAT MAYBE HAVE

12   ALREADY LEFT PRIVATE PRACTICE.  AFTER 20, 25 YEARS, THEY

13   RETIRED AND THEY HAVE A DESIRE TO COME WORK FOR VA.

14       IF SO, WE HAVE TO HAVE A SYSTEM BY WHICH -- BECAUSE THAT

15   PHYSICIAN WILL HAVE TO START AT STEP ONE, WHICH IS ABOUT

16   $101,000.  WE HAVE TO HAVE A MECHANISM BY WHICH WE CAN STILL

17   RECRUIT AND RETAIN THAT VERY HIGHLY-PRIZED, PROFICIENT,

18   SPECIALIZED PHYSICIAN AND WE DO THAT BY THE MARKET PAY

19   COMPONENT.

20           THE COURT:  A NUMBER OF THE PEOPLE OR DOCTORS ON

21   THE COMPENSATION PANEL HAVE TESTIFIED THAT THEY WERE ONLY

22   LOOKING AT ANNUAL PAY; THAT'S WHAT THEY WERE GOING TO MAKE A

23   RECOMMENDATION ON.  HOW HAVE THEY COMPLIED WITH THE

24   REGULATIONS IN THE STATUTE IF THEY ONLY LOOK AT ANNUAL PAY?

25           THE WITNESS:  WELL, I BELIEVE THAT WE ARE STILL

1    MEETING THE STATUTE.  IN REALITY WHEN THEY'RE -- WHEN THEY

2    ARE REVIEWING AND MAKING A RECOMMENDATION FOR ANNUAL PAY,

3    THEY ARE IN ESSENCE ONLY ABLE TO INCREASE MARKET PAY AS A

4    COMPONENT OF THAT ANNUAL PAY.

5        SO FOR EXAMPLE -- AND I'LL BE VERY JUST DOWN-TO-EARTH

6    HERE.  WHEN PHYSICIANS COME IN AND THEY LEAVE THEIR CLINICAL

7    PRACTICE AND THEY COME IN AND DO THESE ADMINISTRATIVE ROLES

8    OF RECOMMENDING PAY, THEY DON'T NECESSARILY -- AS THEY HAVE

9    SAID, THEY DON'T NECESSARILY UNDERSTAND THE BASE AND

10   LONGEVITY PAY AND THAT, YOU KNOW, WHAT THE STEPS ARE AND WHEN

11   SOMEBODY IS GOING TO MOVE UP AND DOWN.

12       SO IN VA I BELIEVE THAT BECAUSE WE SAY WE DON'T EXPECT

13   THEM TO HAVE TO KEEP UP WITH THE BASE AND LONGEVITY AND

14   MARKET PAY, WE EXPECT THEM TO COMPARE, YOU KNOW, WHAT'S A

15   COMPARABLE ANNUAL SALARY FOR THIS PHYSICIAN BASED ON THE

16   MARKET DATA, THE COMPARABLE DATA THAT'S IN THE COMMUNITY, AND

17   YOU MAKE THAT RECOMMENDATION.

18       THAT RECOMMENDATION GOES TO HR AND HR THEN SITS DOWN

19   WITH THAT CALCULATION AND SAYS OKAY, THIS DOCTOR'S MAKING 140

20   IN BASE PAY, THEREFORE TO GET TO 300 THIS IS WHAT THE MARKET

21   PAY WILL BE.

22           THE COURT:  IT SEEMS TO ME THAT THE FORMULA MAY BE

23   FLAWED BECAUSE IT SEEMS TO ME THE ANNUAL PAY IS BASICALLY THE

24   MARKET PAY.

25           THE WITNESS:  NO.  THE ANNUAL PAY IS NOT JUST

1    MARKET PAY, IT'S ALSO BASE PAY.  ANNUAL PAY IS THE SUM OF

2    YOUR BASIC PAY THAT, AGAIN, WE HAVE NO CONTROL OVER HOW MUCH

3    MARKET -- I'M SORRY -- ANNUAL PAY.  BASE PAY YOU'RE GOING TO

4    RECEIVE, SO IT'S THE -- IT'S THE COMP -- THE BASE PLUS YOUR

5    MARKET EQUALS YOUR ANNUAL SALARY.

6        SO WHEN A COMPENSATION PANEL IS MAKING A RECOMMENDATION

7    TO INCREASE SOMEONE'S PAY BY $20,000, THEY ARE ACTUALLY

8    INCREASING THE MARKET PAY BY 20,000.

9        THE COURT:  SO THEN MAYBE IT'S NOT THE MARKET PAY,

10   IT'S -- BECAUSE IF THE MARKET PAY IS 300,000, IF THAT'S WHAT

11   THE MARKET PAY IS, THEN THE ANNUAL IS NOT THE BASE PLUS THE

12   MARKET PAY, THE ANNUAL IS THE BASE PLUS SOME OTHER FACTOR

13   THAT TAKES INTO CONSIDERATION THE MARKET.

14       THE WITNESS:  AND WHEN YOU SAY MARKET PAY, ARE YOU

15   REFERRING TO THAT AS THE RATES OF PAY PAID IN THE COMMUNITY?

16       THE COURT:  LIKE YOU HAVE ON TABLE FOUR, YEAH.

17   THAT'S WHAT I'M THINKING OF.

18       THE WITNESS:  NO, THE PAY TABLES --

19       THE COURT:  YES.

20       THE WITNESS:  -- ARE THE BASE PLUS THE MARKET

21   AMOUNTS.  SO WHEN YOU SEE 325 IS THE HIGHEST FOR PAY TABLE

22   FOUR, THAT'S THE HIGHEST ANNUAL PAY, SO THAT WOULD INCLUDE A

23   PHYSICIAN'S BASE AND ANY MARKET PAY THEY RECEIVED.

24       THE COURT:  BUT HOW DO YOU DETERMINE WHERE IN THAT

25   RANGE THE MARKET PAY SHOULD BE USING THOSE FACTORS?  IT SEEMS

1    IT'S VERY ARBITRARY.  IT'S JUST BASICALLY WHATEVER IT IS TO

2    GET YOU TO A CERTAIN NUMBER.  IT'S NOT BASED ON THE FACTORS.

3              THE WITNESS:  WELL, BUT THE -- BUT THOSE

4    COMPENSATION PANELS, THEY'RE STILL CONSIDERING ALL THOSE

5    FACTORS TO -- AND APPLYING THOSE FACTORS TO THOSE, TO THAT

6    INDIVIDUAL PHYSICIAN THAT THEY ARE REVIEWING.

7              THE COURT:  WELL, HOW CAN THEY DO THAT?  FOR

8    EXAMPLE, IF YOU HAD A DOCTOR THAT STARTED AT A BASE -- HAD A

9    BASE PAY OF $100,000 AND YOU HAD ANOTHER DOCTOR THAT HAD A

10   BASE PAY OF $200,000 BECAUSE HE HAD BEEN THERE FOR 20 YEARS

11   AND THE OTHER GUY HAD ONLY BEEN THERE FOR 10 YEARS, BUT THE

12   MARKET NOW IS $300,000.

13       SO YOU'RE GOING TO INCREASE THE 20-YEAR DOCTOR BY

14   $100,000 AND THE 10-YEAR DOCTOR BY $200,000.  SO, HOW IS THAT

15   TAKING INTO CONSIDERATION THE LENGTH OF TIME THEY HAVE BEEN

16   THERE AND ALL THOSE OTHER FACTORS?

17             THE WITNESS:  WELL, THE LENGTH OF TIME IS ALREADY

18   FACTORED INTO THAT BASED ON THEIR BASE AND LONGEVITY PAY.

19   SO...

20             THE COURT:  SO THE PERSON WHO HAS BEEN THERE FOR 20

21   YEARS GETS LESS MONEY THAN THE --

22             THE WITNESS:  WELL--

23             THE COURT:  -- IN THE MARKET INCREASE THAN THE

24   PERSON WHO HAS BEEN THERE FOR 10 YEARS.

25             THE WITNESS:  THE PERSON THAT'S BEEN THERE FOR 20

1    YEARS GETS MORE BASE AND LONGEVITY AND PROPORTIONATELY LESS

2    MARKET SO THAT THEY HAVE A 300,000.

3            THE COURT:  SO IT REALLY DOESN'T MATTER HOW LONG

4    YOU HAVE BEEN THERE.  YOU'RE GOING TO END UP MAKING THE SAME

5    THING ANY WAY.

6            THE WITNESS:  IF -- IF PHYSICIANS ARE PAID THE

7    SAME, THAT -- YES, THAT -- WHICH IS WHY THERE -- THE

8    FLUCTUATION IS IN THE BASE AND LONGEVITY AS THEY CONTINUE TO

9    INCREASE UP THROUGH THE SCHEDULE.

10           THE COURT:  OKAY.  ALL RIGHT.  ANYTHING ELSE?

11           MRS. BAILEY:  YOUR HONOR, I HAVE ONE FOLLOW-UP

12   QUESTION.

13                      RECROSS-EXAMINATION

14   BY MRS. BAILEY:

15   Q    MRS. DOTY, BEFORE THE PAY ACT WAS ADOPTED IN 2006, HOW

16   WERE PHYSICIANS PAID?

17   A    THERE WAS A PAY SYSTEM CALLED PHYSICIAN AND DENTIST

18   SPECIAL PAY.  SPECIAL PAY HAD SEVEN OR EIGHT COMPONENTS BUT

19   BASICALLY THE -- THERE WAS AN AMOUNT OF SPECIAL PAY THAT WAS

20   AUTHORIZED FOR A PHYSICIAN BASED ON HIS OR HER

21   RESPONSIBILITY, THE AMOUNT OF TIME THEY HAD BEEN IN THE VA,

22   IF THEY WERE IN A CARE SPECIALTY WHERE THEY WERE AT IN THE

23   COMMUNITY -- I'M SORRY -- IN THE LOCAL LABOR MARKET THAT SORT

24   OF THERE WAS A FACILITY-SPECIFIC COMPONENT AND THEN THAT

25   AMOUNT OF SPECIAL PAY WAS ADDED TO -- PHYSICIANS WERE PAID

1    OFF OF THE GS BASE PAY CHART, TYPICALLY AT A GS15, SO

2    WHATEVER RATE AND STEP THEY WERE ON, THAT SPECIAL PAY AMOUNT

3    WAS ADDED TO THEIR BASE PAY.

4    Q    SO HOW DID THE 2000 ACT CHANGE THAT?

5    A    IT CHANGED IT DRAMATICALLY IN THE FACT THAT IT REMOVED

6    ALL OF THE DIFFERENT VARIABLE SPECIAL RATE, SPECIAL PAY

7    COMPONENTS THAT ALL -- WE HAD SEVEN OR EIGHT COMPONENTS AND

8    EACH OF THOSE COMPONENTS HAD MINIMUM AND MAXIMUM, SO IT DID

9    AWAY WITH THAT.

10        IT KEPT THE CONCEPT OF HAVING THE BASE PAY SCHEDULE THAT

11   REWARDS A PHYSICIAN OR DENTIST AND ALLOWS THEM TO MOVE UP

12   INCREMENTALLY EVERY TWO YEARS, SO IT STILL ALLOWS FOR A

13   GUARANTEED, IF YOU WILL, STEP INCREASE AND INCREASE IN PAY,

14   AND THEN IT ADDED, YOU KNOW, THE MARKET PAY COMPONENT.

15   Q    YOU KNOW, I WONDER ABOUT THE AFFECT OF THAT ON JUST AN

16   INDIVIDUAL PHYSICIAN'S SALARY.  WE ARE GOING TO HAVE

17   TESTIMONY THAT WHEN DR. KENNEDY FIRST CAME WITH THE VA, HE

18   WAS MAKING WELL UNDER A HUNDRED THOUSAND DOLLARS YET WHEN THE

19   PAY ACT--

20        THE COURT:  WAIT A MINUTE.  WAIT A MINUTE.  YOU

21   SAID YOU'RE GOING TO HAVE TESTIMONY OR YOU ALREADY HAVE

22   TESTIMONY?

23        MRS. BAILEY:  GOING TO.

24        THE COURT:  WELL, YOU CAN'T TESTIFY ABOUT SOMETHING

25   THAT HASN'T HAPPENED YET.

1           *MRS. BAILEY:* OKAY. WELL, LET ME JUST ASK YOU.

2           *THE COURT:* OKAY.

3      BY MRS. BAILEY:

4      Q    IF THERE WERE TESTIMONY THAT DR. KENNEDY WAS MAKING

5      UNDER A HUNDRED THOUSAND DOLLARS--

6           *THE COURT:* I DON'T THINK YOU CAN ASK HER A

7      HYPOTHETICAL, EITHER. SHE'S NOT AN EXPERT, SO YOU...

8      BY MRS. BAILEY:

9      Q    HOW ABOUT WHAT AFFECT DID THE PAY ACT HAVE ON PHYSICIANS

10     WHO WERE CURRENTLY EMPLOYED WHEN IT WAS ENACTED OR BECAME

11     OPERATIONAL?

12     A    WHEN IT WAS FIRST ENACTED, PHYSICIANS WERE CONVERTED

13     FROM SPECIAL PAY TO THE NEW VH -- WELL, THE NEW THEN VHA

14     PHYSICIAN AND DENTIST PAY SYSTEM AT THEIR EXISTING RATE OF

15     PAY AND THEN THEY WERE ALL -- WITHIN A YEAR I BELIEVE THE

16     DATE WAS -- THEY WERE ALL REQUIRED TO GO TO AN INITIAL

17     COMPENSATION PANEL, HAVE THEIR PAY REVIEWED AND DETERMINE

18     WHETHER, YOU KNOW, ANY ADDITIONAL MARKET PAY SHOULD BE ADDED.

19     Q    SO THE MARKET PAY WAS ADDED TO THAT BASE PAY?

20     A    TO THE BASE AND LONGEVITY PAY, YES.

21     Q    I'D ALSO LIKE TO TAKE A LOOK AT WHAT'S BEEN IDENTIFIED

22     AS PLAINTIFF'S EXHIBIT NUMBER 12 AND GO BACK TO THE THIRD

23     PAGE OF -- FOURTH PAGE OF THAT, PAGE 102. AND WE HAVE HAD

24     TESTIMONY THAT EXHIBIT 12 IS THE COMPENSATION PANEL DATA FROM

25     NOVEMBER OF 2016.

1    A    IT'S THE HAY GROUP SURVEY DATA FROM 2015, YES.

2    Q    SO THIS WAS -- LOOKING AT EXHIBIT 12, WAS THIS ATTACHED

3    TO THE COMPENSATION PANEL'S MATERIAL?

4    A    I BELIEVE IT WAS.

5    Q    THANK YOU.

6         MR. IRVIN:  WE ARE GOING TO FINISH.

7                    REDIRECT EXAMINATION

8    BY MR. IRVIN:

9    Q    JUST -- YOU HAVE EXHIBIT 12 THERE IN FRONT OF YOU; DON'T

10   YOU?

11   A    YES.  THIS IS THE SURVEY, THE HAY SURVEY?

12   Q    YES.

13   A    YES.

14   Q    WELL, THE WHOLE PACKAGE OF THESE NOVEMBER--

15   A    YES.  I'M SORRY.  I DIDN'T REALIZE -- OKAY.  I DIDN'T

16   REALIZE THIS WAS A CONTINUAL PACKAGE.  YES.

17   Q    WELL, I JUST WANT TO MAKE SURE THAT WE ARE CLEAR ON THIS

18   POINT.  LONGEVITY AT THE VA OR TENURE -- I GUESS WE CALL IT

19   LONGEVITY -- BUT THE NUMBER OF YEARS THAT A PHYSICIAN HAS

20   BEEN AT THE VA AS A PHYSICIAN.

21   A    YES.

22   Q    THAT LONGEVITY IS THE SUBJECT OF THAT BASE PAY AND THE

23   LONGEVITY TABLE AND YOU ARE WHAT YOU ARE AND...

24   A    CORRECT.

25   Q    BASED ON THE NUMBER OF YEARS THAT YOU'RE -- BEEN THERE

1    20 YEARS, YOU GET MORE THAN YOU -- THAN IF YOU HAD BEEN THERE

2    ON -- SOMEBODY BEEN THERE ON 10 YEARS.

3    A    CORRECT.

4    Q    BUT THAT SAME LONGEVITY OR TENURE IS RECOGNIZED AND IS

5    TO BE GIVEN CREDIT IN THE MARKET PAY PORTION AS WELL UNDER

6    FACTOR SIX WHICH IS PRIOR VHA EXPERIENCE; IS THAT CORRECT?

7    A    I THINK NOT IN ADDITION TO, BUT IT SHOULD BE CONSIDERED.

8    Q    WELL NOW, IF YOU LOOK AT 12 WITH ME -- AND I'M LOOKING

9    HERE AT DR. ALGHOTHANI ON TOP.  AND THEN YOU FLIP OVER TO THE

10   THIRD PAGE AND THAT'S THE TYPED-UP SHEET THAT'S GOT

11   PARAGRAPHS ONE THROUGH SEVEN.  AND YOU SEE WHERE SIX FOR DR.

12   ALGHOTHANI IS -- THIS IS THE LANGUAGE THAT'S IN THIS THING

13   THAT DR. MILLER APPARENTLY DID AND BROUGHT TO THE PANEL

14   REVIEW FOR -- HERE'S THE INFO --

15   A    RIGHT.

16   Q    -- ON FACTOR NUMBER SIX WHICH IS PRIOR VHA EXPERIENCE.

17   AND THE INFO THAT HE GAVE THE PANEL WAS THAT DR. ALGHOTHANI

18   HAD BEEN THERE FOR A YEAR; RIGHT?

19   A    RIGHT.

20   Q    AND THEN IF YOU FLIP OVER TO KENNEDY RFP106 IN THAT

21   EXHIBIT, THE INFO THAT DR. MILLER GAVE THE PANEL FOR DR.

22   KENNEDY IS DR. KENNEDY HAS 20 YEARS EXPERIENCE AT THE VA.

23   SEE THAT?

24   A    NOT YET, BUT IT'S COMING UP.

25   Q    OKAY.  AND SO -- AND SO THAT IS -- THAT FACTOR, FACTOR

1    NUMBER SIX, IS BASED ON LONGEVITY AT THE VA; CORRECT?

2    A    CORRECT.

3                          RECROSS-EXAMINATION

4    BY MRS. BAILEY:

5    Q    ONE LAST QUESTION.  MRS. DOTY, IS THERE ANY REQUIREMENT

6    AS TO THE WAY THAT PANELS GIVE TO ANY OF THESE SEVEN FACTORS?

7    A    NO.

8    Q    ALL RIGHT.

9             THE COURT:  I'M GOING TO ASK ONE MORE QUESTION.  I

10   JUST WANT TO UNDERSTAND.  IF YOU LOOK AT PAGE 106 AND YOU GO

11   BACK AND YOU LOOK AT PAGE -- JUST WANT TO MAKE SURE I

12   UNDERSTAND -- 10 -- WHAT'S THE ONE FOR DR. KENNEDY?  THE 101

13   IS DR. ALGHOTHANI AND PAGE 106 IS DR. KENNEDY.

14        AND DR. KENNEDY GOT AN INCREASE OR GOT -- WAIT.  DR.

15   ALGHOTHANI GOT A $195,678 FIGURE FOR HIS MARKET AND DR.

16   KENNEDY GOT 168,000 --

17             THE WITNESS:  UH-HUH.

18             THE COURT:  -- 758 FOR HIS MARKET RATE.

19             THE WITNESS:  UH-HUH.

20             THE COURT:  IF WE GO THROUGH THE TWO OF THEM AND WE

21   LOOK AT -- COMPARE NUMBER ONE, DR. ALGHOTHANI HAS 17 YEARS

22   AND DR. KENNEDY HAS 20.  THE NEED TO RETAIN IS THE SAME

23   FOR -- ONE AND TWO IS THE SAME FOR BOTH.  THE MARKET PAY

24   DETERMINATION IS THE SAME FOR BOTH, BUT IT WAS BASED ON 331

25   AND 306.

1          DR. ALGHOTHANI IS A BOARD CERTIFIED ANESTHESIOLOGIST

2     WITH 17 YEARS EXPERIENCE.  AND NUMBER FOUR, DR. KENNEDY IS A

3     BOARD CERTIFIED ANESTHESIOLOGIST WITH 17 YEARS.  SO THAT'S

4     THE SAME.

5          NUMBER FIVE, DR. ALGHOTHANI IS WELL-QUALIFIED, HAS HAD

6     SEVERAL POSITIONS OF RESPONSIBILITY.  IS THE SAME FOR DR.

7     KENNEDY.  DR. ALGHOTHANI'S PROFICIENT WILL BE ANESTHESIOLOGY

8     AND ROBOTIC SURGERY, VASCULAR CASES AND ULTRASOUND.

9          DR. KENNEDY HAS BEEN THE CHIEF, ACTING CHIEF, HE'S

10    COMPLETED AN INTERNSHIP AND A RESIDENCY AT RICHLAND MEMORIAL

11    AND POSSESSES SOME OF THE MOST UNIQUE SKILLS AND COMPETENCIES

12    FOR THIS PROFESSION.  AND NUMBER SIX, KENNEDY HAS 20 YEARS,

13    ALGHOTHANI HAS ONE.  SEVEN, ALGHOTHANI HAS COMPLETED AN

14    INTERNSHIP.  AND THEN IT GOES ON FOR SEVEN FOR KENNEDY, HE'S

15    SIX MONTHS.

16          SO IT -- IF I WERE COMPARING THE TWO, I WOULD SAY DR.

17    KENNEDY'S FACTORS WERE HIGHER THAN DR. ALGHOTHANI YET DR.

18    ALGHOTHANI GOT A HIGHER MARKET RATE THAN DR. KENNEDY.  WHY --

19    HOW DOES THAT HAPPEN?

20          *THE WITNESS:*  THAT'S BECAUSE DR. KENNEDY HAS A MUCH

21    HIGHER BASE RATE.  SO IF WE ARBITRARILY ADDED THAT HIGHER

22    MARKET PAY RATE THAT DR -- I'M SORRY, I DON'T KNOW HOW --

23    ALGHOTHANI RECEIVED TO DR. KENNEDY'S MUCH HIGHER BASE AND

24    LONGEVITY RATE, THEN THAT WOULD PUT DR. KENNEDY UP TO LIKE

25    320 OR 330, SO THEN HE WOULD BE MAKING MUCH MORE.

1          *THE COURT:* SO MARKET RATE IS NOT BASED ON THESE

2    FACTORS BECAUSE IF YOU WERE JUST TO BASE MARKET RATE ON THE

3    THINGS THAT THEY HAVE DONE AND THE THINGS THAT THEY HAVE

4    ACCOMPLISHED, DR. KENNEDY'S MARKET RATE OR VALUE WOULD APPEAR

5    TO BE GREATER THAN DR. ALGHOTHANI'S BUT YOU HAVE TO TAKE INTO

6    CONSIDERATION THE BASE.

7          *THE WITNESS:* YES.  OUR POLICY--

8          *THE COURT:* AND SO MARKET ISN'T -- THAT FIGURE, 195

9    AND 168, ISN'T MARKET BECAUSE IF IT WAS MARKET, DR. KENNEDY'S

10   WOULD BE HIGHER BECAUSE HE WOULD BE MORE VALUED IN THE MARKET

11   BECAUSE HIS SKILL LEVEL AND HIS EXPERIENCE IS MUCH GREATER.

12   BUT YOU HAVE TO TAKE THE MARKET, AND IF YOU ADD IT TO THE

13   BASE -- I'M NOT SURE HOW IT ALL WORKS OUT.

14      I THINK THE TERMINOLOGY IS INCORRECT.  HOW YOU'RE

15   FIGURING IT ALL OUT IS NOT THE WAY YOU SAY IT IS BECAUSE -- I

16   MEAN, IT JUST DOESN'T MAKE SENSE TO ME.

17         *THE WITNESS:* AND I WISH I'M -- PERHAPS IT'S THAT

18   I'M NOT EXPLAINING IT CORRECTLY.  WE BUILD THE MARKET PAY.

19   THE MARKET PAY IS USED SOLELY TO GET A PHYSICIAN FROM THEIR

20   BASE AND LONGEVITY PAY UP TO THE AMOUNT OF ANNUAL PAY THAT WE

21   NEED TO PAY THEM TO HAVE COMPARABLE RATES.

22         *THE COURT:* OKAY.  THAT'S -- THAT'S WHAT I'M

23   HEARING MARKET PAY IS.  MARKET PAY IS NOT THESE SEVEN

24   FACTORS.

25         *THE WITNESS:* MARKET PAY -- BUT IN REALITY WHEN WE

1    ARE REVIEWING EVERY PHYSICIAN, LOOKING AT THEM IN THESE

2    COMPENSATION PANELS USING THESE SEVEN FACTORS, FIGURING OUT

3    AN ANNUAL -- WE NEED TO BE ABLE TO COMPARE THEIR ANNUAL, WHAT

4    THEIR -- WHAT THEIR END RESULT IS GOING TO BE FOR THEIR

5    ANNUAL RATE OF PAY BECAUSE WE ARE COMPARING OUR ANNUAL PAY TO

6    ANNUAL PAY IN THE DORN COMMUNITY.

7        SO WHEN WE DO THAT, THE WAY THAT WE DO THAT, BECAUSE OF

8    THAT STATUTORY REQUIREMENT TO PAY BASE AND LONGEVITY --

9    BECAUSE ALL OF OUR PHYSICIANS HAVE DIFFERENT BASE AND

10   LONGEVITY PAY AMOUNTS.  WE HAVE TO VARY THE AMOUNT OF MARKET

11   PAY THAT THEY ARE RECEIVING BASED ON THEIR BASE AND LONGEVITY

12   SO THEY END UP AT THE AMOUNT OF ANNUAL SALARY THAT WE BELIEVE

13   IS COMPETITIVE FOR THEM.

14       *THE COURT:*  NOW, I UNDERSTAND THE END RESULT.  I

15   UNDERSTAND WHAT THE GOAL IS.  I DON'T HAVE A PROBLEM WITH

16   THAT.  YOU KNOW, YOU'RE TRYING TO GET EVERYBODY UP TO WHAT

17   THE MARKET IS.  BUT I HAVE A PROBLEM WITH CALLING THAT FIGURE

18   MARKET PAY WHEN ACTUALLY IT'S NOT.  THAT FIGURE IS A VARIABLE

19   TO GET A PERSON TO THE MARKET PAY.

20       *THE WITNESS:*  WELL, I THINK THAT'S BECAUSE YOU'RE

21   CALLING MARK -- WE SOMETIMES CALL WHAT I'M REFERRING AS TO

22   ANNUAL SALARY IN THE COMMUNITY WE ALSO REFER TO THAT AS

23   MARKET PAY, AND SO THAT'S--

24       *THE COURT:*  THAT WOULD MAKE SENSE TO ME.  IF YOUR

25   ANNUAL SALARY IS YOUR MARKET PAY, THAT WOULD MAKE SENSE.  BUT

1    I DON'T SEE HOW ANNUAL PAY IS MARKET PAY PLUS BASE PAY

2    BECAUSE MARKET PAY IS WHAT THE MARKET PAY WILL BEAR FOR THAT

3    PROFESSION.

4          THE WITNESS:  WELL, WE--

5          THE COURT:  AND I'M NOT -- I'M JUST TRYING TO

6    CLARIFY IT IN MY MIND WHAT IS GOING ON.

7          THE WITNESS:  THE SURVEY DATA THAT WE COLLECT

8    DOESN'T SAY MARKET PAY, IT SAYS ANNUAL SALARIES IN THE

9    COMMUNITY.

10         THE COURT:  OKAY.

11         THE WITNESS:  WE REFER TO IT COMMONLY AS MARKET --

12   MARKET PAY OR MARKET-DRIVEN PAY.

13         MR. IRVIN:  YOUR HONOR, COULD I ASK ONE MORE

14   QUESTION?

15         THE COURT:  SURE.

16                    REDIRECT EXAMINATION

17   BY MR. IRVIN:

18   Q    MRS. DOTY, YOU INDICATED THAT IF YOU GAVE DR. KENNEDY

19   THE MARKET PAY DR. ALGHOTHANI HAD, IT WOULD PUT HIM UP TO

20   325.  DR. KENNEDY I MEAN --

21   A    SOMETHING.

22   Q    -- 325.  AND THAT WOULD BE WITHIN THE -- AT THE TOP OF

23   BUT WITHIN THE PAY RANGE THAT'S SHOWN ON THE ALGHOTHANI AND

24   KENNEDY'S COMP PANEL REVIEW FORMS.  IT SAYS THE PAY RANGE IS

25   UP TO $325,000; IS THAT CORRECT?

1    A    THAT'S CORRECT.

2    Q    OKAY.

3    A    BUT THAT WOULD ALSO PUT HIM ABOVE WHAT'S COMMANDED IN

4    THE -- THE COMPARABLE PAY RATES IN THE COMMUNITY.

5    Q    AND THAT WOULD TAKE INTO CONSIDERATION THE FACTOR OF

6    PRIOR VHA EXPERIENCE.

7    A    THE BASE AND LONGEVITY PAY, YES.

8    Q    WELL, THE PRIOR VHA EXPERIENCE THAT'S FACTOR NUMBER SIX

9    IN THE MANDATED FACTORS IN THE VA HANDBOOK FOR DETERMINATION

10   OF MARKET PAY; ISN'T THAT CORRECT?

11   A    IT SAYS THAT YOU SHOULD CONSIDER THEIR BASE, THEIR

12   MARKET PAY, THE AMOUNT OF VA SERVICE THEY HAD, YES.

13   Q    BUT IF YOU DON'T ADD SOMETHING IN, YOU'RE NOT

14   CONSIDERED?

15   A    I DON'T UNDERSTAND YOUR THOUGHT PROCESS THERE.

16   Q    THAT'S ALL.  YOU DON'T GIVE HIM CREDIT FOR IT.  YOU'RE

17   NOT--

18   A    GIVE HIM CREDIT FOR IT THROUGH THE BASE AND LONGEVITY

19   PAY.

20   Q    THANK YOU.

21   A    YES.

22          *MRS. BAILEY:*  ONE MORE?

23          *THE WITNESS:*  OKAY.  I DON'T BELIEVE Y'ALL ANY

24   MORE.

25                    RECROSS-EXAMINATION

1    BY MRS. BAILEY:

2    Q    EXHIBIT 12, WHICH WE HAVE BEEN TALKING ABOUT THE LAST

3    FEW MINUTES --

4    A    UH-HUH.

5    Q    -- PAGE 102.  THIS IS THE HAY DATA.

6    A    YES.

7    Q    CAN YOU TELL FROM HERE WHAT THE ANNUAL PAY IN THE

8    COMMUNITY AROUND COLUMBIA FOR SURGEONS WAS?

9    A    I THINK IT SAID MEDIAN WAS LIKE 304, TWO -- 304,200.

10   IT'S USUALLY A RANGE.

11   Q    AND THEN THE NEXT PAGE IS THE -- ONE OF THOSE OTHER

12   SURVEYS YOU TALKED ABOUT?

13   A    IT'S THE AAMC DATA.

14   Q    AND WHAT DOES IT SAY FOR THE COLUMBIA COMMUNITY?

15   A    YEAH.  WE TYPICALLY, I BELIEVE -- AND I'D HAVE TO GO

16   BACK AND LOOK AT MY GUIDANCE ON AAMC DATA -- THINK WE

17   TYPICALLY USE ASSISTANT PROFESSOR DATA AND IT RANGES FROM --

18   THE MEAN IS 320.5 FOR GENERAL ANESTHESIA.  THE 25TH

19   PERCENTILE IT'S 282.  THE MEDIAN IS 320.  THE 75TH PERCENTILE

20   IS 357.

21   Q    THANK YOU.

22          THE COURT:  THANK Y'ALL.  I APPRECIATE IT.

23          THE WITNESS:  I'M WAITING.

24          THE COURT:  YOU'RE FINISHED.

25       (WITNESS LEFT THE STAND.)

1              THE COURT:  ALL RIGHT.  WE WILL TAKE A BREAK.  YOUR

2     NEXT WITNESS WILL BE...

3              MR. IRVIN:  DR. KENNEDY.  AND I UNDERSTAND THAT'S

4     THE LAST WITNESS, YOUR HONOR, FOR EVERYBODY.

5         (BRIEF RECESS WAS TAKEN.)

6              THE COURT:  NEXT WITNESS.

7              MR. IRVIN:  THANK YOU, YOUR HONOR.  WE CALL DR.

8     KENNEDY.

9                   RICHARD KENNEDY, AFTER BEING DULY SWORN,

10    TESTIFIED AS FOLLOWS:

11                        DIRECT EXAMINATION

12    BY MR. IRVIN:

13    Q    HELLO, DR. KENNEDY.  YOU'VE HAD A LONG RIDE TO THIS SEAT

14    IN THE WITNESS CHAIR HERE IN THE COURTROOM.

15    A    THAT'S RIGHT.

16    Q    LET ME ASK YOU -- YOU HAVE ALREADY GIVEN THE CLERK YOUR

17    NAME, BUT GIVE US YOUR FULL NAME AGAIN PLEASE, DR. KENNEDY.

18    A    RICHARD MCKINNE KENNEDY, THE THIRD.

19    Q    OKAY.  HOW OLD ARE YOU, DR. KENNEDY?

20    A    SIXTY-SEVEN.

21    Q    OKAY.  WHAT'S YOUR DATE OF BIRTH?

22    A    MAY 29, 1951.

23    Q    ALL RIGHT, SIR.  AND DR. KENNEDY, I WANT TO FIND OUT A

24    LITTLE BIT ABOUT YOU AND SO THAT WE KNOW WHO YOU ARE.  WHERE

25    WERE YOU BORN?

1    A    BIRMINGHAM, ALABAMA.

2    Q    ALL RIGHT.  AND AT SOME POINT DID YOU MOVE TO SOUTH

3    CAROLINA?

4    A    MY FAMILY SETTLED IN COLUMBIA IN 1963.

5    Q    OKAY.  AND AT THAT POINT YOU WOULD HAVE BEEN A YOUNG

6    FELLOW ABOUT 12 YEARS OLD THEN?

7    A    YES.

8    Q    ALL RIGHT.  AND TELL US WHERE YOU RECEIVED YOUR

9    EDUCATION PRIOR TO GOING TO COLLEGE.

10   A    I WENT TO PUBLIC SCHOOLS IN COLUMBIA AND FINISHED AT AC

11   FLORA HIGH SCHOOL IN 1969.

12   Q    OKAY.  AND I WANT TO TALK A LITTLE BIT MORE ABOUT YOUR

13   EDUCATION IN JUST A MOMENT, BUT LET ME ASK YOU A FEW MORE

14   KIND OF BASIC QUESTIONS.  ARE YOU MARRIED?

15   A    YES.

16   Q    AND WHO ARE YOU MARRIED TO?

17   A    KATHERINE KENNEDY.

18   Q    ALL RIGHT.  AND SHE'S HERE IN THE COURTROOM?

19   A    YES.

20   Q    SHE CAME THIS AFTERNOON.  GOOD TIMING.  ALL RIGHT.  AND

21   DO YOU AND KATHY HAVE CHILDREN?

22   A    YES.

23   Q    ALL RIGHT.  HOW MANY CHILDREN DO YOU HAVE?

24   A    THREE.

25   Q    OKAY.  AND THEY ARE ALL GROWN AND GONE; IS THAT RIGHT?

1    A    YES.

2    Q    AND YOU GOT SOME GRANDCHILDREN?

3    A    YES.

4    Q    OKAY.  RICK, YOU ARE -- YOU GO BY RICK?

5    A    THAT'S TRUE.

6    Q    I KNOW YOU AS RICK.

7    A    YES.

8    Q    IS IT ALL RIGHT FOR ME TO CALL YOU--

9    A    ABSOLUTELY.

10   Q    OKAY.  YOU ARE CURRENTLY RETIRED; IS THAT CORRECT?

11   A    THAT IS CORRECT.

12   Q    AND YOU MEDICALLY RETIRED FROM THE DORN VA FAIRLY

13   RECENTLY?

14   A    I DON'T -- I -- TERM MEDICALLY RETIRED IS NOT VERY

15   PRECISE.  I -- I HAD INTENDED TO RETIRE IN SEPTEMBER OF 2018,

16   IN OTHER WORDS THIS YEAR, BUT FOR THE LAST FEW YEARS I HAVE

17   BEEN HAVING A LOT OF BACK PROBLEMS.  AND DURING MY -- DURING

18   2017 THOSE PROBLEMS WERE PROGRESSING TO THE POINT THAT I

19   REALIZED I WAS GOING TO PROBABLY HAVE TO MOVE MY RETIREMENT

20   DATE UP.

21        SO I ENDED UP -- ALTHOUGH I HAD PLANNED TO RETIRE IN

22   SEPTEMBER OF 2018, I MOVED MY PLANS UP DUE TO PHYSICAL

23   PROBLEMS WITH BEING ABLE TO REALLY PERFORM MY JOB IN

24   SEPTEMBER.  SO I RETIRED ON SEPTEMBER 30TH OF 2017.  IT WAS

25   JUST A PURE RETIREMENT A -- FROM THE VA STANDPOINT IT WAS NOT

1  A MEDICAL RETIREMENT, IT WAS JUST RETIREMENT.  BUT I WAS NOT

2  ABLE TO PERFORM MY -- FULLY PERFORM MY DUTIES, SO I DID

3  QUALIFY FOR DISABILITY BENEFITS UNDER A PRIVATE POLICY I

4  HAVE.

5  Q    ALL RIGHT, SIR.  AND SO, YOU RETIRED FROM THE POSITION

6  OF A STAFF ANESTHESIOLOGIST AT THE DORN VA MEDICAL CENTER ON

7  SEPTEMBER THE 30TH OF 2017.

8  A    THAT'S CORRECT.

9  Q    HOW LONG HAD YOU BEEN EMPLOYED AT THE DORN VA AT THE

10  TIME OF YOUR RETIREMENT?

11  A    NINETEEN YEARS.

12  Q    AND THROUGHOUT THAT 19 YEARS DID YOU SERVE CONTINUOUSLY

13  AS A STAFF ANESTHESIOLOGIST?

14  A    NO.

15  Q    ALL RIGHT.  TAKE US THROUGH YOUR EMPLOYMENT AT DORN VA

16  AND TELL US WHAT POSITIONS YOU HELD.

17  A    PRIOR TO -- WELL, I HAD WORKED AT THE DORN IN MEDICAL

18  SCHOOL AND I DID MY RESIDENCY AT RICHLAND MEMORIAL, SO I HAD

19  WORKED AT DORN AS A MEDICAL STUDENT AND I HAD WORKED AT DORN

20  AS A ANESTHESIA RESIDENT AND INTERNAL MEDICINE RESIDENT,

21  WHICH IS MY TRANSITION YEAR PRIOR TO ANESTHESIOLOGY.

22      AFTER I FINISHED RESIDENCY I TOOK A POSITION IN

23  ORANGEBURG, SOUTH CAROLINA, AND WAS LOOKING FOR OPPORTUNITIES

24  TO COME BACK TO COLUMBIA.  AND THE FIRST OPPORTUNITY THAT

25  PRESENTED ITSELF WAS THE VA HOSPITAL BECAUSE THEY HAD MADE

1    THE DECISION TO TRANSITION AWAY FROM HAVING ANESTHESIA

2    SERVICES PROVIDED UNDER A CONTRACT.

3        FOR MANY YEARS AND DURING THE TIME I WAS IN MEDICAL

4    TRAINING ANESTHESIA SERVICES AT THE DORN VA WERE PROVIDED BY

5    ANESTHESIOLOGY CONSULTANTS OF COLUMBIA UNDER A CONTRACT.

6    THIS IS THE SAME GROUP THAT I WORKED FOR AS A RESIDENT WHICH

7    PROVIDED ANESTHESIA SERVICES AT RICHLAND MEMORIAL WHICH WAS

8    HOW IT WAS KNOWN AT THE TIME.

9        DORN AND ACC, ANESTHESIOLOGY CONSULTANTS OF COLUMBIA

10   DURING THE LATTER PART OF THE 1990'S WERE BASICALLY FAILING

11   TO NEGOTIATE THEIR CONTINUED RELATIONSHIP AND ULTIMATELY THE

12   DORN VA DECIDED THAT IT WOULD NO LONGER HAVE ITS ANESTHESIA

13   SERVICES PROVIDED UNDER A CONTRACT BUT THAT IT WOULD HAVE --

14   IT WOULD HIRE EMPLOYEES, WHAT THEY REFER TO AS FTE'S OR

15   FULL-TIME EQUIVALENTS.

16       AND I MADE INQUIRY AFTER SEEING AN ADVERTISEMENT IN A

17   PROFESSIONAL JOURNAL AND FOUND OUT THAT ONE OF MY GOOD

18   FRIENDS WHO HAD BEEN MY ATTENDING OVER AT RICHLAND MEMORIAL,

19   A FELLOW NAMED CURTIS BASINGER, WAS ALSO INTERESTED IN

20   LEAVING THE PRIVATE GROUP AND -- BECAUSE IT WAS VERY HIGH

21   PRESSURE -- AND HE WAS INTERESTED IN GOING TO THE VA ALSO.

22   SO WE MADE CONTACT WITH EACH OTHER.  AND BASICALLY IN THE

23   SUMMER OF 1998 WE JOINTLY APPLIED TO BE THE TWO STAFF

24   ANESTHESIOLOGISTS AT DORN.

25   Q    ALL RIGHT.  AND YOU WERE HIRED AT THAT TIME?

1    A    I WAS.

2    Q    OKAY.  AND YOU MENTIONED THAT FOR SOME PERIOD PRIOR TO

3    THAT YOU WERE IN PRIVATE PRACTICE IN ANESTHESIOLOGY IN

4    ORANGEBURG; IS THAT RIGHT?

5    A    YES.

6    Q    HOW LONG DID YOU DO THAT BEFORE YOU CAME TO DORN AS A

7    STAFF ANESTHESIOLOGIST?

8    A    APPROXIMATELY THREE YEARS.

9    Q    OKAY.  ALL RIGHT.  NOW, AND SO YOU SAID THAT YOU RETIRED

10   IN -- ON SEPTEMBER 30, 2017 AND YOU CAME TO DORN IN THE

11   SUMMER OF 1998 AS A STAFF ANESTHESIOLOGIST, AND SO THAT WOULD

12   BE YOUR 19 YEARS OF --

13   A    YES.

14   Q    -- VHA EXPERIENCE AS AN ANESTHESIOLOGIST ON THE PAYROLL

15   AT DORN.

16   A    YES, SIR.

17   Q    OKAY.  LET ME GO BACK AND ASK YOU BRIEFLY TO TAKE US

18   THROUGH YOUR POST-HIGH SCHOOL EDUCATION.

19   A    YES.  AFTER I FINISHED HIGH SCHOOL I ENROLLED IN THE

20   UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL WITH THE INTENT

21   OF STUDYING MEDICINE.  AND WHEN I ARRIVED THERE AND STARTED

22   MY FRESHMAN CURRICULUM I DECIDED THAT THE BEST MAJOR FOR ME

23   FOR PRE-MED WAS CHEMISTRY, AND SO I BEGAN MY PURSUIT OF A

24   BACHELOR OF SCIENCE IN CHEMISTRY AND CONTINUED TO DO SO UP

25   UNTIL THE FALL OF MY JUNIOR YEAR WHEN I WAS VERY SEVERELY

1    INJURED IN A FIRE AND I SPENT ABOUT THREE MONTHS AT NORTH

2    CAROLINA MEMORIAL HOSPITAL IN CHAPEL HILL, MOST OF THE TIME

3    IN INTENSIVE CARE AND A CONVALESCENT HOME AND WAS ABLE TO

4    RETURN TO CHAPEL HILL IN THE SUMMER OF 1972.

5          AND AT THAT TIME I CONSULT -- I WAS REALLY NOT

6    PHYSICALLY ABLE OR MENTALLY ABLE TO CONTINUE TO PURSUE MY

7    PRE-MEDICAL PLANS, AND SO I DECIDED I WOULD RETHINK MY CAREER

8    PLANS.  AND I WANTED TO GRADUATE BASICALLY WITH MY CLASS AND

9    SO I FOUND A MAJOR THAT I WOULD BE ABLE TO DO ALL THE COURSE

10   REQUIREMENTS STARTING FROM SCRATCH IN ONE YEAR, AND THAT

11   MAJOR WAS POLITICAL SCIENCE.

12   Q    AND THAT ENABLED YOU TO CATCH UP WITH YOUR CLASS.

13   A    YES.

14   Q    OKAY.  AND SO DID YOU PURSUE THEN THAT MAJOR IN

15   POLITICAL SCIENCE RATHER THAN THE MAJOR IN CHEMISTRY AND

16   EVENTUALLY GRADUATE FROM UNC AT CHAPEL HILL?

17   A    YES.  I GRADUATED IN JULY AFTER THE FIRST SUMMER SESSION

18   AFTER THE NORMAL GRADUATION TIME.  I GRADUATED IN JULY OF

19   1973 PHI BETA KAPPA WITH A BACHELOR OF ARTS IN POLITICAL

20   SCIENCE.

21   Q    OKAY.  AND WHAT DID YOU DO NEXT IN TERMS OF YOUR

22   EDUCATION?

23   A    WELL, I GAVE A LOT OF THOUGHT TO WHAT I WAS GOING TO DO

24   CAREER-WISE BECAUSE I REALLY CHANGED GEARS SO MUCH.  AND MY

25   FATHER WAS AN ATTORNEY AND I THOUGHT, WELL, I DIDN'T REALLY

1    HAVE ANY IDEAS OF WHERE I MIGHT GO IN THE BUSINESS COMMUNITY.

2    I DIDN'T KNOW -- AS MANY COLLEGE STUDENTS -- KNOW WHAT THEY

3    ARE GOING TO DO WITH THEIR LIFE, AND SO I MADE A DECISION

4    THAT I WOULD GO TO LAW SCHOOL AND THAT THAT WOULD GIVE ME

5    FLEXIBILITY.

6        I COULD EITHER USE THE TRAINING FROM LAW IN SOME TYPE OF

7    BUSINESS PURSUIT OR I COULD PRACTICE LAW.  AND SO I DECIDED

8    TO GO TO LAW SCHOOL AND WAS ACCEPTED AT THE UNIVERSITY OF

9    SOUTH CAROLINA SCHOOL OF LAW AND STARTED THERE IN AUGUST,

10   SEPTEMBER OF 1973.

11   Q    OKAY.  AND DID YOU COMPLETE LAW SCHOOL AT USC?

12   A    YES.  I RECEIVED A JD MAGNA CUME LAUDE IN MAY OF '76.

13   Q    OKAY.  WHILE YOU WERE IN LAW SCHOOL DID YOU CLERK FOR

14   ANY FIRMS OR GROUPS OR GOVERNMENT AGENCIES?

15   A    AFTER MY FIRST YEAR OF LAW SCHOOL I CLERKED FOR MY

16   FATHER'S FIRM.  AND AFTER MY SECOND YEAR OF LAW SCHOOL I

17   CLERKED FOR THE UNITED STATES ATTORNEY IN SOUTH CAROLINA WHO

18   WAS THEN MARK BUYCK.

19   Q    OKAY.  ALL RIGHT.  AND YOU COMPLETED LAW SCHOOL AND YOUR

20   GRADUATION DATE AGAIN WAS WHAT?

21   A    MAY OF 1976.

22   Q    ALL RIGHT.  AND AT THAT TIME DID YOU KNOW WHAT YOU

23   WANTED TO DO IN THE LAW?

24   A    MY FATHER -- I HAD -- LAW SCHOOL PRETTY MUCH PUSHED ME

25   TOWARD PRACTICING LAW, AND SO I DECIDED TO DO THAT.

1    Q    OKAY.

2    A    AND MY FATHER HAD ADVISED ME EARLY ON THAT HE THOUGHT IT

3    WAS VERY GOOD EXPERIENCE TO BE A LAW CLERK FOR A FEDERAL

4    JUDGE.

5    Q    OKAY.  DID YOU PURSUE THAT?

6    A    I DID.

7    Q    ALL RIGHT.  AND DID YOU GO TO WORK FOR A JUDGE?

8    A    I DID.  JUDGE ROBERT CHAPMAN HAD -- HE WAS ENTITLED TO

9    HAVE ONE LAW CLERK AND A BAILIFF.  AND RATHER THAN HIRING A

10   BAILIFF, HE HIRED TWO LAW CLERKS.  AND ONE OF HIS LAW CLERKS

11   WOULD DRIVE HIM AS THE BAILIFF NORMALLY WOULD AND CRY COURT.

12   AND I WAS HIRED AS THE LAW CLERK WHO WOULD DRIVE THE JUDGE

13   AND CRY COURT FOR TWO-YEAR PERIOD FROM 19 -- TO BE FROM 1976

14   TO 1978, AND I WOULD LIVE IN CAMDEN WHERE HE LIVED SO I COULD

15   DRIVE HIM TO AND FROM THE COURTHOUSES IN EITHER FLORENCE OR

16   GREENVILLE OR COLUMBIA, WHEREVER HE WAS HOLDING COURT.

17   Q    NOW AS A RESULT OF THAT EXPERIENCE WITH JUDGE CHAPMAN,

18   HOW -- WHAT DID YOU DECIDE TO GO INTO LAW?

19   A    I DECIDED TO GO WORK FOR MY FATHER'S FIRM, KENNEDY AND

20   PRICE.

21   Q    AND THAT WAS HERE IN COLUMBIA?

22   A    YES.

23   Q    ALL RIGHT.  HOW LONG DID YOU PRACTICE LAW WITH KENNEDY

24   AND PRICE?

25   A    NINE YEARS.

1    Q    OKAY.  AND DURING THAT PERIOD OF NINE YEARS PRACTICING

2    LAW, DID YOU EVER THINK ABOUT YOUR ORIGINAL DESIRE TO PURSUE

3    MEDICINE AS A CAREER?

4    A    THE LONGER I PRACTICED, THE MORE UNHAPPY I BECAME

5    PRACTICING LAW AND IT -- DIDN'T REALLY KNOW WHAT TO DO ABOUT

6    IT.  AND I HAD -- I HAD THIS SORT OF NAGGING DOUBT OR I GUESS

7    REGRET, NAGGING REGRET THAT I HADN'T FOLLOWED THROUGH WITH MY

8    INITIAL CAREER GOALS.  AND BASICALLY ONE DAY ABOUT 19 -- I'D

9    SAY 1985 I BASICALLY HAD AN EPIPHANY THAT I COULD STILL DO

10   IT.  THERE WAS A MEDICAL SCHOOL IN COLUMBIA AND IT WAS

11   POSSIBLE AND I -- SO I STARTED LOOKING INTO IT.

12   Q    NOW, AT THAT TIME YOU WOULD HAVE BEEN IN YOUR 30'S; IS

13   THAT RIGHT?

14   A    YES.

15   Q    OKAY.  AND YOU WERE MARRIED?

16   A    YES.

17   Q    YOU AND KATHY WERE MARRIED?

18   A    YES.

19   Q    DID YOU HAVE ANY CHILDREN AT THAT TIME?

20   A    WE HAD TWO CHILDREN AND WE HAD A THIRD CHILD BORN ON MY

21   THIRD DAY OF MEDICAL SCHOOL.

22   Q    OKAY.  YOU WERE PRESENTED THEN WITH A SITUATION WHERE

23   YOU NEEDED TO EARN ENOUGH MONEY TO FEED YOUR CHILDREN AND

24   YOUR -- WAS YOUR WIFE WORKING AT THAT TIME?

25   A    YES.

1    Q    ALL RIGHT.  AND SO, WHAT DID -- JUST TELL US WHAT THAT

2    THOUGHT PROCESS WAS AND WHAT YOU ENDED UP DOING.

3    A    WELL, MY FAMILY WAS VERY IMPORTANT AND I DID NOT WANT TO

4    MOVE MY FAMILY OUT OF COLUMBIA.  HAD I NOT BEEN ACCEPTED AT

5    THE UNIVERSITY OF SOUTH CAROLINA SCHOOL OF MEDICINE, I WOULD

6    NOT HAVE PURSUED IT.  MY WIFE HAD RECENTLY BEEN ELECTED AS

7    RICHLAND COUNTY PROBATE JUDGE.  THAT HELPED US SOMEWHAT

8    FINANCIALLY.  AND I -- WE CRUNCHED THE NUMBERS AND IT WAS

9    POSSIBLE FOR ME TO PERCEIVE THIS GOAL.

10   Q    NOW HOW DID YOU DO THAT, RICK, WHEN YOU HAD A DEGREE IN

11   POLITICAL SCIENCE?

12   A    I HAD SOME OF THE COURSEWORK COMPLETED DURING THE FIRST

13   TWO YEARS OF COLLEGE.  I HAD COMPLETED ALL OF MY INORGANIC

14   CHEMISTRY REQUIREMENTS AND I HAD COMPLETED MY REQUIREMENTS IN

15   PHYSICS AND I COMPLETED SOME OF THE ORGANIC CHEMISTRY

16   REQUIREMENTS.

17        SO I WENT AND VISITED WITH ROBERT SABALIS WHO WAS THE

18   DEAN OF ADMISSION AT THE MEDICAL SCHOOL AND BASICALLY WORKED

19   OUT WHAT I WOULD NEED TO DO.  I NEEDED TO PICK UP THREE

20   SCIENCE COURSES, ONE ORGANIC CHEMISTRY COURSE AND TWO BIOLOGY

21   COURSES THAT I WOULD TAKE AT NIGHT AT THE UNDERGRADUATE

22   SCHOOL AT THE UNIVERSITY OF SOUTH CAROLINA.  THE OTHER THING

23   I NEEDED TO DO WAS TO MAKE A SATISFACTORY SHOWING ON THE

24   ADMISSION TEST FOR MEDICAL SCHOOL WHICH IS CALLED MCAT.

25   Q    OKAY.  WERE YOU ABLE TO ACCOMPLISH BOTH OF THOSE; THAT

1    ARE IS UNDERGRADUATE COURSES AND THE SCIENCES AND THEN THE

2    SUCCESSFUL MCAT SCORE?

3    A    YES, I WAS.

4    Q    ALL RIGHT.  AND AS A RESULT OF THAT, DID YOU GET INTO OR

5    WERE YOU ACCEPTED INTO USC SCHOOL OF MEDICINE?

6    A    I WAS ACCEPTED IN THE SCHOOL OF MEDICINE.

7    Q    AND WHAT YEAR WAS THAT, RICK?

8    A    1987.

9    Q    OKAY.  AND HOW LONG DID IT TAKE YOU TO COMPLETE MEDICAL

10   SCHOOL?

11   A    FOUR YEARS.

12   Q    ALL RIGHT.  AND SO YOU WOULD HAVE FINISHED MEDICAL

13   SCHOOL THEN ROUGHLY 1991?

14   A    THAT'S CORRECT.

15   Q    DOES THAT SOUND ABOUT RIGHT?  OKAY.  AND TAKE US FROM

16   THERE AND GO FORWARD AND TELL US WHAT YOU DID IN THE FIELD OF

17   MEDICINE.

18   A    I WAS REALLY MORE INTERESTED IN A SPECIALTY OTHER THAN

19   PRIMARY CARE.  I HAD -- AFTER PRACTICING LAW, I REALIZED THAT

20   THERE WAS SO MUCH OF MY TIME THAT WAS SPENT NOT PRACTICING

21   LAW BUT RUNNING THE LAW FIRM AS A BUSINESS, HIRING AND FIRING

22   EMPLOYEES, AND SUPPLIES, AND JUST THE NORMAL THINGS OF

23   RUNNING AN OFFICE.

24        AND I REALIZED THAT A LOT OF PRIMARY CARE MEDICAL

25   PRACTICE WAS -- HAD A LOT OF THAT KIND OF TIME THAT WAS SPENT

1    AWAY FROM ACTUAL PRACTICE OF MEDICINE, SO I STARTED LOOKING

2    INTO ANESTHESIOLOGY WHICH IS HOSPITAL-BASED SPECIALTY.

3    THERE'S NO OFFICE TO MAINTAIN, VERY MINIMAL OVERHEAD, AND AN

4    OVERWHELMING AMOUNT OF THE TIME IS SPENT ACTUALLY PURSUING

5    YOUR CAREER.

6        AND SO I DECIDED THAT I WOULD SEEK TO MATCH -- WHICH IS

7    THE WAY WE CALL IT -- THEY DO A MATCH.  YOU DON'T ACTUALLY

8    APPLY TO A RESIDENCY PROGRAM AND GET ACCEPTED.  YOU PUT YOUR

9    NAME IN A BOX AFTER -- AND YOU INTERVIEW WITH A NUMBER OF

10   DIFFERENT RESIDENCY PROGRAMS AND THEN THEY HAVE MATCH DAY

11   WHERE THEY OPEN UP THE ENVELOPES AND YOU FIND WHERE YOU'RE

12   GOING.

13   Q    AND DID YOU FIND WHERE YOU WERE GOING?

14   A    YES.  I WENT TO RICHLAND MEMORIAL.

15   Q    OKAY.  AND HOW LONG DID -- AND THAT WOULD HAVE BEEN FOR

16   AN ANESTHESIOLOGY RESIDENCY?

17   A    I MATCHED IN WHAT WAS CALLED SOME KIND OF -- IT WAS SORT

18   OF A COMPOSITE PROGRAM BECAUSE NO ONE RIGHT OUT OF MEDICAL

19   SCHOOL GOES DIRECTLY INTO ANESTHESIA TRAINING.  THE

20   ANESTHESIA PROGRAM REQUIRES THAT YOU COMPLETE ONE YEAR OF

21   SORT OF AN INTERNSHIP IN SOME OTHER SPECIALTY.  IT CAN BE ANY

22   NUMBER OF THINGS FROM INTERNAL MEDICINE TO PEDIATRICS,

23   SURGERY, FAMILY MEDICINE; A LOT OF DIFFERENT THINGS LIKE

24   THAT.

25        AND I MATCHED INTO A PROGRAM THAT PLACED ME AS AN

1  INTERNAL MEDICINE RESIDENT WITH RICHLAND MEMORIAL FOR THE ONE

2  YEAR AND THEN I ALREADY HAD MATCHED FOR THE ANESTHESIA

3  PROGRAM -- CALLED IT CLINICAL ANESTHESIA YEARS -- FOR THE

4  NEXT THREE YEARS AT RICHLAND MEMORIAL.

5  Q    OKAY.  AND DID YOU SUCCESSFULLY COMPLETE THAT TRAINING

6  BOTH IN THE INTERNAL MEDICINE YEAR AND THEN THE YEARS IN

7  ANESTHESIOLOGY RESIDENCY?

8  A    YES.

9  Q    ALL RIGHT.  AND I BELIEVE YOU HAVE INDICATE -- WELL, LET

10  ME BACK UP A STEP.  AND UNDERSTAND THERE'S SOMETHING CALLED

11  BOARD CERTIFICATION.  DOES THAT RING A BELL?

12  A    YES.

13  Q    OKAY.  AND WAS THAT SOMETHING THAT FOLLOWED AFTER YOU

14  COMPLETED YOUR RESIDENCY IN ANESTHESIOLOGY AT RICHLAND

15  MEMORIAL?

16  A    YES.  AFTER COMPLETION OF MY RESIDENCY, I TOOK THE

17  WRITTEN BOARDS AND PASSED THEM ON THE FIRST ATTEMPT.

18  Q    OKAY.

19  A    AND THEN THE FACT THAT I PASSED MY WRITTEN BOARDS MADE

20  ME ELIGIBLE TO TAKE THE ORAL BOARDS, AND SO THEN I WENT AND

21  TOOK MY ORAL BOARDS AND I PASSED THOSE ON FIRST ATTEMPT AND

22  RECEIVED BOARD CERTIFICATION IN I THINK IT WAS OCTOBER OF --

23  IT WAS OCTOBER OF THE FOLLOWING YEAR.  IT WAS OCTOBER OF '96

24  WHEN I GOT BOARD CERTIFICATION.

25  Q    OKAY.  NOW, AT THAT TIME HAD YOU ALREADY GONE TO WORK IN

1    ORANGEBURG?

2    A    YES, I WENT TO -- STARTED WORK IN ORANGEBURG I GUESS IT

3    WOULD HAVE BEEN IN THE SUMMER OF 1995 RIGHT AFTER I FINISHED

4    MY RESIDENCY.

5    Q    OKAY.  AND THAT WAS IN THE PRIVATE PRACTICE OF MEDICINE

6    SPECIFICALLY IN ANESTHESIOLOGY?

7    A    THAT'S CORRECT.

8    Q    AND YOU WORKED THERE AT THE HOSPITAL IN ORANGEBURG

9    DURING THAT TIME; IS THAT RIGHT?

10   A    YES.

11   Q    AND I BELIEVE YOU SAID THAT WAS ABOUT TWO YEARS THAT YOU

12   DID THAT?

13   A    THREE YEARS.

14   Q    THREE YEARS.  EXCUSE ME.  ALL RIGHT.  AND AT THE END OF

15   THAT THREE YEARS WHAT DID YOU DO?

16   A    DURING THE TIME I WAS IN ORANGEBURG, I WAS CONTINUALLY

17   WATCHING FOR OPENINGS IN THE COLUMBIA MARKET BECAUSE I DID

18   NOT MOVE MY FAMILY TO ORANGEBURG.  MY WIFE WAS STILL A

19   RICHLAND COUNTY PROBATE JUDGE.  MY CHILDREN WERE IN SCHOOL IN

20   COLUMBIA SCHOOLS.  AND I WAS ESSENTIALLY COMMUTING TO

21   ORANGEBURG TO PRACTICE AND I HAD A SMALL HOUSE IN ORANGEBURG

22   BECAUSE I NEEDED TO BE THERE WHEN I WAS ON CALL.

23   Q    YOU MEAN AT NIGHT?

24   A    YEAH, ON CERTAIN WEEKENDS.  SO WHENEVER I WAS ON CALL, I

25   HAD TO BE WITHIN A CLOSE DISTANCE TO THE HOSPITAL.  SO I

```
 1   WAS -- DURING THE ENTIRE TIME I WAS IN ORANGEBURG, I WAS

 2   ALWAYS KEEPING MY EYE OPEN FOR OPPORTUNITIES.  AND AS I

 3   MENTIONED TO YOU EARLIER, WHEN I SAW THE NOTICE IN THE

 4   PROFESSIONAL JOURNAL ABOUT THE VA LOOKING TO HIRE STAFF

 5   ANESTHESIOLOGISTS, I PURSUED THAT.

 6   Q    AND THAT WOULD HAVE BEEN -- THAT WOULD HAVE BROUGHT YOU

 7   BACK TO COLUMBIA WHERE KATHY WAS WORKING AND TRYING TO RAISE

 8   THREE CHILDREN.

 9   A    YES.

10   Q    ALL RIGHT.  AND SO YOU APPLIED AT THE VA AND YOU

11   INDICATED THAT YOU WITH DR. BASINGER MADE APPLICATION AND YOU

12   WERE ACCEPTED AND YOU WENT TO WORK THERE IN THE SUMMER OF

13   1998; IS THAT RIGHT?

14   A    YES.  DR. BASINGER AND I HAD A CONVERSATION AND HE SAID,

15   NOW, SOMEBODY HAS TO BE -- SIT THE QUOTE CHIEF.  AND HE SAID,

16   DO YOU HAVE ANY OBJECTION TO ME BEING THE CHIEF?  AND I SAID

17   ABSOLUTELY NOT.  HE WAS AN ANESTHESIOLOGIST WITH MANY YEARS

18   OF EXPERIENCE AND QUITE PROMINENT IN THE AREA AND WAS A GOOD

19   BUDDY OF MINE AND THAT -- I WAS VERY HAPPY FOR HIM TO HAVE

20   THE ROLE OF CHIEF.

21   Q    OKAY.  SO YOU WENT IN IN THE SUMMER OF '98 AND HE WAS

22   THE CHIEF OF THE SECTION OF ANESTHESIOLOGY.

23   A    YES.

24   Q    AND YOU WOULD HAVE BEEN A STAFF ANESTHESIOLOGIST; IS

25   THAT RIGHT?
```

1    A    YES.  WE WERE UNDER THE SURGERY SERVICE LINE AT THAT

2    TIME AND FOR MANY YEARS AFTER THAT.

3    Q    OKAY.  BUT IT WAS JUST THE TWO OF YOU THERE ON STAFF AS

4    ANESTHESIOLOGISTS WHEN YOU STARTED IN '98; IS THAT RIGHT?

5    A    YES.

6    Q    AND THAT LASTED FOR SOME PERIOD OF TIME.

7    A    JUST THE TWO OF US WERE THERE?

8    Q    YES, SIR.

9    A    YES, IT WAS ABOUT FIVE OR SIX YEARS LATER DR. BASINGER

10   LEFT THE VA TO GO TO NASHVILLE AND THAT LEFT ME AS THE ONLY

11   ANESTHESIOLOGIST AT THE VA.

12   Q    NOW, HOW WERE YOU GOING TO DO THAT; THAT IS BE THE ONLY

13   ANESTHESIOLOGIST IN A MEDICAL FACILITY THAT WE HAVE HEARD

14   BEING DESCRIBED WITH ALL THESE OPERATING ROOMS AND YOU'RE THE

15   ONLY ANESTHESIOLOGIST?

16   A    WELL, IT WASN'T EASY.  I STILL HAD A LOT OF CONTACTS AT

17   RICHLAND MEMORIAL.  THERE WERE A NUMBER OF ANESTHESIOLOGISTS

18   AT RICHLAND MEMORIAL WHO HAD ENJOYED WORKING AT THE VA WHEN

19   THEY WORKED THERE UNDER THE CONTRACT.  AND I WAS ABLE TO

20   RECRUIT SOME OF THESE PEOPLE TO COME DO SORT OF A MOONLIGHT

21   BASIS THAT WHEN THEY HAD A DAY OFF AT RICHLAND, THEY WOULD

22   COME WORK FOR THE VA AND THE VA WOULD PAY THEM A CERTAIN

23   AMOUNT PER DAY FOR A ONE-DAY CONTRACT BASIS AND THEY AGREED

24   TO HELP WITH CALL.

25        AND THERE WAS FORTUITOUSLY AN OLDER GENTLEMAN WHO WAS A

1    RETIRED VA PHYSICIAN FROM SOMEWHERE ELSE -- I THINK OHIO, I'M

2    NOT SURE -- HIS NAME WAS DON BENSON.  HE HAD JUST

3    FORTUITOUSLY GOTTEN IN CONTACT WITH ME BECAUSE BASICALLY I

4    WAS THE CHIEF BY DEFAULT.  I WAS THE ONLY ANESTHESIOLOGIST

5    THERE.

6         AND SO I DEALT WITH RECRUITING HELPERS AND I RECRUITED

7    THIS DR. BENSON TO COME HELP US.  AND HE WOULD FLY IN, STAY

8    ALL WEEK, HE WOULD TAKE CALL, AND HE CONTINUED TO DO THAT

9    ALMOST EVERY WEEK FOR SOME TIME.  AND SO BETWEEN USING DR.

10   BENSON AND THE FREELANCE PEOPLE I HAD FROM RICHLAND, I WAS

11   ABLE TO KEEP THE OR RUNNING.

12   Q    DID THERE COME A POINT IN TIME, RICK, WHEN THE VA, THE

13   DORN VA BEGAN TO HIRE OTHER FULL-TIME STAFF ANESTHESIOLOGISTS

14   TO REPLACE DR. BASINGER AND TO GROW?

15   A    YES.  EVEN BEFORE DR. BASINGER LEFT WE WERE RATHER

16   SHORT-STAFFED AND THERE WAS A CONTINUING DISCUSSION OF TRYING

17   TO GET THE ADMINISTRATION TO APPROVE US HIRING ADDITIONAL

18   PEOPLE.  AND THEN IT GOT QUITE CRITICAL WHEN DR. BASINGER

19   LEFT, AND SO I HAD CONTINUING DISCUSSIONS WITH ADMINISTRATION

20   TO GET APPROVAL FOR US TO ADVERTISE FOR AND HIRE ADDITIONAL

21   ANESTHESIOLOGISTS.

22   Q    OKAY.

23   A    AND I CAN START GOING THROUGH THAT PROCESS OF WHO I

24   HIRED IF...

25   Q    WELL, LET'S DO THIS.  YOU HEARD DR. MILLER TESTIFY THAT

1    WHEN HE CAME TO THE DORN VA THAT YOU WERE AT THAT TIME THE

2    ACTING CHIEF.  IS THAT CORRECT?  WERE YOU--

3    A    WELL, I WAS THE CHIEF.

4    Q    YOU WERE THE CHIEF.

5    A    I WAS -- IT WASN'T ACTING.  I -- I NEVER WAS OFFICIALLY

6    APPOINTED, BUT I WAS CONSIDERED BY EVERYONE IN THE

7    ADMINISTRATION THE SECTION CHIEF AND WENT TO THE MEETINGS AND

8    DID ALL THE FUNCTIONS OF A SECTION CHIEF.  I WAS INVOLVED

9    WITH ALL THE RECRUITMENT EFFORTS, SO I WAS -- I WAS CHIEF OF

10   THE SECTION DURING THAT PERIOD OF TIME.

11   Q    ALL RIGHT, SIR.  AND AT SOME POINT LATER YOU STEPPED

12   DOWN AS CHIEF AND YOU CONTINUED ON AS A STAFF

13   ANESTHESIOLOGIST; IS THAT CORRECT?

14   A    I WOULDN'T SAY I STEPPED DOWN.  I WAS REMOVED.

15   Q    ALL RIGHT.  AND WHAT WAS THAT ALL ABOUT, RICK?

16   A    DURING 2005 THERE WERE SOME SERIOUS MISCONDUCT FROM THE

17   DEPARTMENT OF GENERAL SURGERY.  I HAD FOUND THAT--

18            *MRS. BAILEY:*  YOUR HONOR, I OBJECT ON THE RELEVANCE

19   OF THIS.  THIS IS A PAY DISPARITY CASE.

20            *MR. IRVIN:*  YOUR HONOR, THAT'S FINE.  AND I

21   UNDERSTAND MRS. BAILEY'S OBJECTION.  AND AS LONG AS SHE'S NOT

22   GOING TO GO INTO THAT IN HER CROSS-EXAMINATION, WE CAN SKIP

23   ON BY THAT, RICK.

24            *THE COURT:*  THAT'S FINE.

25   BY MR. IRVIN:

1   Q    AND THEN JUST LET ME ASK YOU THAT AT SOME POINT THEN

2   YOU -- YOU TRANSFERRED OR TRANSITIONED FROM BEING THE CHIEF

3   OF THE ANESTHESIOLOGY SECTION TO A STAFF ANESTHESIOLOGIST; IS

4   THAT CORRECT?

5   A    JUST KIND OF MAKE IT CLEAR THAT I WAS REMOVED AS --

6   BECAUSE I WAS A WHISTLEBLOWER WITHOUT GETTING INTO DETAILS.

7   Q    OKAY.  AND YOU BECAME A STAFF ANESTHESIOLOGIST.

8   A    YES.

9   Q    ALL RIGHT.  AND YOU CONTINUED IN THAT CAPACITY AND IN

10  THAT POSITION UNTIL, AS YOU HAVE TOLD US, YOU RETIRED ON

11  SEPTEMBER THE 30TH OF 2017; IS THAT CORRECT?

12  A    THAT IS CORRECT.

13  Q    OKAY.  NOW DR. KENNEDY, YOU HAVE BEEN WITH US HERE THESE

14  LAST TWO DAYS AND YOU HAVE BEEN ABLE TO HEAR A LOT OF THE

15  TESTIMONY AND SO FORTH.  AND WE HAVE FOCUSED ON THESE

16  COMPENSATION PANEL REVIEWS THAT WERE DONE WITH THE

17  ANESTHESIOLOGY GROUP -- THAT IS THE STAFF ANESTHESIOLOGISTS

18  THAT CONSISTED OF YOURSELF, DR. ALGHOTHANI, DR. NGUYEN, DR.

19  PENDER AND DR. PRYOR; IS THAT CORRECT?

20  A    YES.

21  Q    OKAY.  NOW, HERE IS WHAT I'D LIKE FOR YOU TO DO NOW FOR

22  US.  I'M GOING TO -- I'M GOING TO SHOW YOU EXHIBIT NUMBER 10

23  THAT IS IN EVIDENCE.  AND WE CAN I BELIEVE JUST USE THIS TO

24  HELP US THROUGH A LITTLE OF YOUR TESTIMONY.  AND THESE ARE

25  THE TYPED-UP SHEETS FOR THE FIVE OF YOU WHO WERE STAFF

KENNEDY - DIRECT

378

1    ANESTHESIOLOGISTS AND THE TESTIMONY HAS BEEN THAT THOSE

2    SHEETS WOULD HAVE BEEN ATTACHED OR HAD BEEN A PART OF THIS

3    WHOLE COMPENSATION PANEL REVIEW PROCESS.  JUST WANT YOU TO

4    HAVE THOSE IN FRONT OF YOU IN CASE YOU NEED TO LOOK AT THEM

5    OR YOU WANT TO LOOK AT THEM.

6         BUT HERE'S WHAT I'M GOING TO DO.  I'M GOING TO TAKE THE

7    FACTORS THAT ARE SHOWN ON THE DEPARTMENT OF VETERAN'S AFFAIR

8    COMPENSATION PANEL FORMS ON PAGE ONE THAT THE TESTIMONY HAS

9    BEEN FROM MRS. DOTY AND OTHERS CORRELATES WITH THOSE TYPED-UP

10   SHEETS.

11   A    YES.

12   Q    YOU UNDERSTAND WHAT I'M TALKING ABOUT HERE?

13   A    YES.

14   Q    OKAY.  AND AS I UNDERSTAND THE TESTIMONY -- AND HERE I'M

15   LOOKING AT PLAINTIFF'S EXHIBIT 11, SO LET ME JUST HAND YOU

16   PLAINTIFF'S EXHIBIT 11 SO YOU'LL HAVE IN FRONT OF YOU WHAT I

17   HAVE GOT IN FRONT OF ME.  AND YOU WILL SEE, AS YOU KNOW, ON

18   PAGE ONE THERE ABOUT HALF-WAY DOWN THERE'S A BOX AND IT HAS

19   SEVEN FACTORS IN THE BOX.  DO YOU -- YOU SEE THAT THERE?

20   A    YES.

21   Q    AND THEN ON THOSE SHEETS THAT I HAVE JUST HANDED YOU,

22   YOU HAVE WHAT WE UNDERSTAND TO BE THE TYPED-UP DESCRIPTIONS

23   THAT CORRELATE WITH THOSE FACTORS.  YOU WITH ME?

24   A    YES.

25   Q    HERE'S WHAT I WANT YOU TO DO, DR. KENNEDY, FOR THE

1    COURT.  LET'S START WITH -- I WANT YOU TO COMPARE YOURSELF

2    WITH THE OTHER STAFF ANESTHESIOLOGISTS PURSUANT TO THESE

3    FACTORS.

4    A    OKAY.

5    Q    OKAY.

6         MRS. BAILEY:  OBJECTION, YOUR HONOR.  THERE'S NO

7    FOUNDATION FOR HIM HAVING THE EXPERTISE TO COMPARE HIMSELF

8    WITH THESE SEVEN FACTORS OF THE OTHER ANESTHESIOLOGISTS.  I

9    THINK SOMEBODY WHO IS AN HR REPRESENTATIVE COULD HAVE

10   COMPARED THESE FACTORS ON THE DIFFERENT PEOPLE, BUT HE HAS NO

11   EXPERTISE IN THAT AREA THAT I HEARD.

12        MR. IRVIN:  YOUR HONOR, I'M JUST ASKING HIM TO

13   COMPARE FACTUALLY HIS UNDERSTANDING OF THESE.  HE'S BEEN

14   THROUGH ALL THESE REVIEWS, HE'S SAT ON THE PANELS.  IT

15   DOESN'T--

16        THE COURT:  I AM NOT SURE WHAT YOU'RE ASKING.  ARE

17   YOU ASKING HIM TO LOOK AT LIKE NUMBER ONE, LEVEL EXPERIENCE,

18   HE HAS 17, DR. ALGHOTHANI HAS--

19        MR. IRVIN:  YES, MA'AM.

20        THE COURT:  SO, I MEAN, YOU CAN READ FROM THE FORMS

21   AND SAY WHAT THEY ARE BUT HE CAN'T MAKE HIS OWN OPINION AS TO

22   WHETHER OR NOT HE'S MORE QUALIFIED OR LESS QUALIFIED THAN ANY

23   OF THE OTHER INDIVIDUALS.

24   BY MR. IRVIN:

25   Q    OKAY.  WELL, LET ME DO THIS THEN IF I CAN, AND I BELIEVE

1   THIS HAS ALREADY BEEN ESTABLISHED, BUT I WANT YOU TO TELL US.

2   WITH RESPECT TO FACTOR NUMBER SIX, THAT IS PRIOR VHA

3   EXPERIENCE, WOULD YOU PLEASE TAKE A LOOK AT THOSE SHEETS THAT

4   ARE IN EVIDENCE AND TELL US WHAT YOUR NUMBER OF YEARS IN

5   PRIOR VH EXPERIENCE IS ON YOUR SHEET.

6   A    THIS SHEET SAYS NUMBER SIX, DR. KENNEDY HAS 20 YEARS VHA

7   EXPERIENCE.

8   Q    ALL RIGHT.  AND HOW DOES THAT COMPARE IN YEARS TO THE

9   OTHER DOCTORS?

10  A    IT'S MORE THAN ANY OF THE OTHER DOCTORS.

11  Q    ALL RIGHT, SIR.  YOU ARE, OF COURSE, BOARD CERTIFIED.

12  A    YES.

13  Q    DR. KENNEDY, WHAT DO YOU CONSIDER TO BE YOUR

14  ACCOMPLISHMENTS IN THE FIELD OF ANESTHESIOLOGY?

15  A    I HAVE BEEN QUITE ACTIVE IN ORGANIZED MEDICINE.

16       MRS. BAILEY:  OBJECTION, YOUR HONOR.  THAT'S GOING

17  BEYOND THE SCOPE OF THIS EXHIBIT.

18       MR. IRVIN:  YOUR HONOR, I'M NOT ON AN EXHIBIT.  I'M

19  JUST ASKING HIM WHAT HE CONSIDERS TO BE HIS ACCOMPLISHMENTS

20  IN THE FIELD OF ANESTHESIOLOGY.

21       THE COURT:  THAT'S FINE.  HE CAN SAY WHAT HE'S DONE

22  IN ANESTHESIOLOGY.  YOU CAN ANSWER THE QUESTION.

23       THE WITNESS:  I BEGAN ACTIVE IN THE STATE AND

24  NATIONAL ANESTHESIA SOCIETIES FROM THE TIME I WAS A RESIDENT.

25  I ATTENDED THE AMERICAN SOCIETY OF ANESTHESIOLOGISTS MEETING

1    AS A RESIDENT AND I ATTENDED MULTIPLE MEETINGS OF SOUTH

2    CAROLINA SOCIETY OF ANESTHESIOLOGY AS A RESIDENT.

3        I WAS INVOLVED BOTH IN ANESTHESIA AND IN THE LOCAL

4    MEDICAL SOCIETIES.  I WORKED MY WAY UP THROUGH THE STATE

5    SOCIETY OF ANESTHESIA HOLDING MULTIPLE POSITIONS CULMINATING

6    IN BEING PRESIDENT OF THE SOUTH CAROLINA SOCIETY OF

7    ANESTHESIOLOGY.  AND AROUND 2005 OR 2006, SUBSEQUENT TO THAT

8    TIME I HAVE SERVED AS A DELEGATE FROM SOUTH CAROLINA TO THE

9    CONVENTION OF THE AMERICAN SOCIETY OF ANESTHESIOLOGISTS ON A

10   NUMBER OF OCCASIONS.

11       I WAS ASKED TO SERVE TO REPRESENT ANESTHESIOLOGY ON A

12   TASK FORCE OF THE SOUTH CAROLINA MEDICAL ASSOCIATION LOOKING

13   AT OFFICE-BASED SURGERY PRACTICES.  AND THE TASK FORCE THAT I

14   WAS ON WAS INSTRUMENTAL IN COMING UP WITH RULES FOR

15   OFFICE-BASED SURGERY TO IMPROVE SAFETY BECAUSE THERE HAD BEEN

16   A LOT OF BAD OUTCOMES IN OFFICE-BASED SURGERY SITUATIONS.

17   AND OUR TASK FORCE'S POLICIES WERE ULTIMATELY ADOPTED INTO

18   LAW BY THE REGULATORY AGENCIES IN SOUTH CAROLINA.

19       I WAS ALSO APPOINTED TO BE THE ANESTHESIA REPRESENTATIVE

20   TO THE CARRIER ADVISORY COMMITTEE, WHICH WE ABBREVIATED AS

21   THE CAC, AND I AM -- THE CAC IS THE COMMITTEE OF DIFFERENT

22   SPECIALISTS WHO CONSULT WITH THE MEDICARE CONTRACTOR,

23   PALMETTO GBA, TO DISCUSS RULES ON COMPENSATION, RULES ON

24   REIMBURSEMENT PRINCIPLES SO THAT THERE IS GOOD COMMUNICATION

25   BETWEEN THE MEDICARE CONTRACTOR THAT IS COMING UP WITH THESE

1    RULES AND THE VARIOUS SPECIALTIES.  AND I HAVE SERVED AS A

2    MEMBER OF A CAC FROM THE ANESTHESIA SOCIETY UP UNTIL

3    RECENTLY.

4        I HAVE ALSO WRITTEN A NUMBER OF ARTICLES.  I HAVE

5    GIVEN -- GIVEN TALKS DOWN IN HILTON HEAD ON -- TO ANESTHESIA

6    PAIN SOCIETIES ON MALPRACTICE IMPLICATION -- IMPLICATIONS OF

7    THEIR PRACTICE.  I'VE GIVEN TALKS AT THE VA MOST RECENTLY ON

8    HOW TO HANDLE PERIOPERATIVE CARE OF PATIENTS WHO ARE ON

9    HIGH-DOSE NARCOTICS.

10       ON SEVERAL OCCASIONS I WAS ASKED TO BE A MODERATOR AT AN

11   ANESTHESIA CONFERENCE DOWN IN HILTON HEAD WHERE I WAS THE

12   MODERATOR OF NATION-WIDE SPEAKERS WHO CAME IN TO GIVE

13   LECTURES ON ANESTHESIA TOPICS.

14   Q    OKAY.  NOW, LET ME DIRECT YOUR ATTENTION TO EARLY 2014.

15   YOU HAVE HEARD DR. MILLER'S TESTIMONY.  AND LET ME ASK YOU,

16   DID YOU HAVE OCCASION IN EARLY 2014 TO GO TO DR. MILLER, WHO

17   AT THAT TIME WAS THE ANESTHESIOLOGY SERVICE LINE CHIEF, TO

18   TALK ABOUT CONCERNS THAT YOU HAD?

19   A    YES, I DID.  IN THE EARLY PART OF 2014 I WAS CONCERNED

20   THAT MY SALARY HAD BEEN SOMEWHAT STAGNANT FOR A NUMBER OF

21   YEARS UP TO THAT POINT.  I HAD BEEN DOING RETIREMENT PLANNING

22   AND SORT OF HAD THE REASONABLE EXPECTATIONS AS -- BY THE TIME

23   I GOT TO THE MAGIC THREE YEARS PRIOR TO RETIREMENT THAT MY

24   OVERALL SALARY SHOULD BE AROUND 300,000, AND I WAS SORT OF

25   RUNNING MY NUMBERS BASED UPON THAT, AND IT JUST DIDN'T SEEM

1    TO BE HAPPENING.

2    Q    WHEN YOU SAY, MAGIC THREE YEARS, TELL THE COURT WHAT YOU

3    MEAN.

4    A    THE RETIREMENT PENSION UNDER THE FEDERAL EMPLOYEE

5    RETIREMENT SYSTEM, FERS, CALCULATES YOUR PENSION BASED UPON

6    THE AVERAGE OF YOUR HIGH THREE YEARS.  AND SO TYPICALLY

7    THAT'S THE LAST THREE YEARS THAT YOU WORK.  AND SO I WAS VERY

8    INTERESTED IN MAKING SURE THAT MY LAST THREE YEARS AT THE

9    DORN VA I WAS GETTING THE MAXIMUM AMOUNT OF INCOME POSSIBLE

10   SO THAT -- BECAUSE THAT WOULD HAVE A SIGNIFICANT IMPACT ON MY

11   ULTIMATE PENSION AND MY FINANCIAL PLANNING FOR RETIREMENT.

12   Q    DID YOU EXPLAIN THOSE CONCERNS TO DR. MILLER?

13   A    YES.

14   Q    OKAY.  AND WHAT WAS DR. MILLER'S RESPONSE TO YOU?

15   A    I DON'T RECALL ANY RESPONSE THAT -- I GUESS IT WAS JUST

16   HE WOULD LOOK INTO IT OR SOMETHING LIKE THAT.  I DON'T -- I

17   DON'T RECALL WHAT HE SAID, QUITE HONESTLY.  I JUST RECALL

18   WHAT HAPPENED AFTER THAT.

19   Q    OKAY.  AND TELL US WHAT HAPPENED AFTER THAT.

20   A    WELL, SHORTLY AFTER MY CONVERSATION WITH DR. MILLER, HIS

21   ASSISTANT, ADMINISTRATIVE ASSISTANT WHO BASICALLY TOOK CARE

22   OF ADMINISTRATIVE THINGS AND SECRETARIAL DUTIES FOR DR.

23   MILLER APPROACHED ME AND SAID THEY'RE GOING TO BE HAVING A

24   PAY PANEL ON YOU AND WE WANT YOU TO SUBMIT A CURRENT CV AND

25   COPIES OF ANY ARTICLES THAT YOU HAVE WRITTEN AND ANY AWARDS

1    THAT YOU HAVE RECEIVED.

2         AND SO I WAS ENCOURAGED BY THAT THAT MY CONVERSATION

3    WITH DR. MILLER WAS SUCH THAT HE HAD ASKED FOR A PAY PANEL

4    AND THAT I WAS GOING TO PRESENT THIS INFORMATION, COPIES OF

5    PUBLICATIONS I HAD, AND THAT I WAS OPTIMISTIC THAT I WOULD

6    GET A RAISE BECAUSE THEY WERE LOOKING INTO THAT AND I WAS

7    GOING TO SHOW THEM A LOT OF MY ACCOMPLISHMENTS.

8         AND I HAD BEEN WORKING VERY, VERY HARD AT THE VA PRIOR

9    TO THAT TIME TAKING NOT ONLY CLINICAL DUTIES BUT

10   ADMINISTRATIVE DUTIES, SO I REALLY FELT I WAS DUE AND I WAS

11   HOPEFUL THAT THAT WAS GOING TO COME THROUGH FOR ME.

12   Q    NOW, DID YOU IN FACT UNDERGO A COMPENSATION PANEL

13   REVIEW?

14   A    I WAS NOT PRESENT.  I LEARNED OF IT AFTER THE FACT.

15   Q    OKAY.  AND LET ME SHOW YOU -- THIS IS EXHIBIT NUMBER 8.

16   THIS IS ALREADY IN EVIDENCE.  AND ASK YOU TO TAKE A LOOK AT

17   KENNEDY VA 12, WHICH IS A COMPENSATION PANEL ACTION FORM ON

18   YOU DATED FEBRUARY 26TH, 2014.

19        TAKE A LOOK AT THAT PLEASE, DR. KENNEDY, AND TELL US IF

20   THAT RELATES TO THE COMPENSATION PANEL REVIEW THAT WAS DONE

21   ON YOU AS A RESULT OF YOUR CONVERSATIONS AS YOU DESCRIBED.

22   A    YES.  I SAW THIS NOT TOO LONG AFTER IT HAD BEEN CREATED.

23   Q    ALL RIGHT.  AND WHAT WAS YOUR REACTION TO THAT?

24   A    RATHER SIGNIFICANT DISAPPOINTMENT.

25   Q    OKAY.  NOW THAT DOCUMENT, KENNEDY VA 12, A PART OF

1    EXHIBIT NUMBER 8 SHOWS ON THE FIRST PAGE, REQUEST NO INCREASE

2    IN PAY.  DO YOU SEE THAT THERE?

3    A    YES.

4    Q    AND WAS THAT IN FACT THE RESULT OF THAT PAY PANEL; THAT

5    YOU DID NOT RECEIVE ANY INCREASE IN PAY?

6    A    THAT IS CORRECT.

7    Q    OKAY.  AND SO YOUR -- WOULD IT BE FAIR TO SAY THEN THAT

8    YOUR -- YOUR SALARY CONTINUED TO STAGNATE?

9    A    YES.

10   Q    ALL RIGHT, SIR.  NOW, WHAT HAPPENED AFTER THAT FEBRUARY

11   OF 2014 COMPENSATION PANEL REVIEW AND YOUR CONTINUING TO MAKE

12   YOUR PLANS FOR RETIREMENT AND DOING YOUR FINANCIAL STUDIES

13   AND SO FORTH?  WHAT WAS THE NEXT SIGNIFICANT EVENT IN THAT

14   PROCESS AS YOU -- IT BEGAN TO UNFOLD?

15   A    WELL, I LOOKED AT THE PAY PANEL RESULTS OF FEBRUARY THE

16   26TH, 2014, AND I LOOKED AT THEM MORE CAREFULLY THAN I HAD IN

17   THE PAST AND I REALLY NOTICED THE TWO COMPONENTS, THE BASE

18   PAY AND MARKET PAY, AND I REALLY SORT OF -- THOSE WERE SORT

19   OF BURNED INTO MY MEMORY, AND THOSE NUMBERS WOULD PRETTY MUCH

20   SHOW UP ON EVERY PAYSTUB EVERY TWO WEEKS.  SO I WAS SORT OF

21   FOCUSED ON THAT AND WONDERING SORT OF WHERE ALL THIS WAS

22   GOING.

23   Q    DID YOU KNOW MUCH ABOUT THE BASE PAY AND MARKET PAY

24   ELEMENTS?

25   A    AT THAT TIME I DON'T THINK I HAD VERY DETAILED KNOWLEDGE

1    ABOUT ALL OF THE INTRICACIES OF THESE PAY PANELS AND THE

2    FACTORS OR ANYTHING LIKE THAT.

3    Q    SO YOU WERE BEGINNING TO THINK ABOUT THOSE THINGS; IS

4    THAT RIGHT?

5    A    YES.

6    Q    ALL RIGHT.  WELL, WHAT HAPPENED NEXT?

7    A    IN MAY DR. MILLER WAS AWAY FOR SOME REASON.  HE MAY HAVE

8    BEEN ON LEAVE OR WENT TO A MEETING, I DON'T KNOW.  BUT AS HE

9    OFTEN DID, HE ASKED ME TO SERVE AS ACTING CHIEF IN HIS

10   ABSENCE AND EXPLAINED THAT WHILE HE WAS ABSENT, THERE WAS

11   GOING TO BE A PAY PANEL ON A NEW HIRE, DR. ALGHOTHANI.  AND

12   HIS ADMINISTRATIVE ASSISTANT, AL BROWN, THEN CAME TO ME AND

13   SAID, HERE IS A PIECE OF PAPER THAT SAYS YOU'RE TO ASK THE

14   PAY PANEL TO SUPPORT A TOTAL PAY AWARD TO DR. ALGHOTHANI OF

15   SOME -- SOMETHING AROUND $288,500 OR SOMETHING LIKE THAT.

16        AND I REALLY DIDN'T GIVE IT MUCH THOUGHT.  I -- OKAY,

17   I'LL GO TO THE PAY PANEL, WE NEED ANOTHER DOCTOR, I WILL ACT

18   IN DR. MILLER'S STED AND I WILL ASK THE PANEL TO APPROVE THIS

19   SALARY.

20   Q    WELL NOW, YOU WENT IN DR. MILLER'S STED.

21   A    YES.

22   Q    SO YOU WERE NOT ONE OF THE THREE PANEL MEMBERS FOR DR.

23   ALGHOTHANI'S REVIEW.  YOU WOULD HAVE BEEN THE PRESENTER AT

24   THAT PANEL?

25   A    YES.

1    Q    INSTEAD OF DR. MILLER WHO WAS NOT ABLE TO DO IT?

2    A    YES.

3    Q    LET ME SHOW YOU EXHIBIT NUMBER 5 --

4    A    OKAY.

5    Q    -- ALREADY IN EVIDENCE.  AND THOSE ARE SOME DOCUMENTS

6    THAT I BELIEVE RELATE TO THAT REVIEW OF DR. ALGHOTHANI.  AND

7    COULD YOU SEE IF YOU COULD FIND THAT REVIEW, THAT COMP PANEL

8    REVIEW FORM IN THAT EXHIBIT FOR US, AND TELL US IF THAT IS IN

9    FACT THE ONE THAT YOU SERVED ON AS THE PRESENTER.

10   A    YES, THIS IS THE ONE I MADE THE PRESENTATION ON DR.

11   MILLER'S BEHALF.

12   Q    ALL RIGHT.  AND THIS ONE INDICATES ON THE SECOND PAGE --

13   THIS IS KENNEDY FIVE -- THAT DR. ALGHOTHANI WAS APPROVED FOR

14   AN AWARD OF ANNUAL PAY IN THE AMOUNT OF $288,500.  DO YOU SEE

15   THAT THERE?

16   A    YES, I DO.

17   Q    SOMEONE HAS HANDWRITTEN THAT IN?

18   A    YES.

19   Q    AND THAT WAS NOT YOU AS THE PRESENTER, BUT THAT WOULD

20   HAVE BEEN THE APPROVING OFFICIAL?

21   A    I DON'T KNOW WHO WROTE IT.  IT WAS AFTER THE MEETING.

22   Q    OKAY.  NOW, HOW LONG DID THAT PANEL REVIEW LAST?  HOW

23   LONG DID IT TAKE FROM THE TIME YOU CAME IN AND, AS THE

24   PRESENTER, YOU MADE YOUR PRESENTATION, THE PANEL DID ITS

25   THING, HOW LONG DID ALL THAT TAKE?

1    A    WELL, THERE WERE TWO PANELS AT THAT TIME.  THERE WAS THE

2    ONE FOR DR. ALGHOTHANI AND THERE WAS ONE FOR ANOTHER

3    PHYSICIAN -- I THINK WAS AN ER PHYSICIAN.  AND TO THE BEST OF

4    MY RECOLLECTION ON THE ER PHYSICIAN, I WAS A MEMBER OF THE

5    PANEL, AND THERE WERE TWO PHYSICIANS THAT WERE DETERMINED BY

6    THE SAME GROUP OF PEOPLE IN THAT ROOM.

7    Q    OKAY.  I'M FOCUSING ON DR. ALGHOTHANI'S --

8    A    YES.

9    Q    -- PANEL REVIEW WHERE YOU SERVED AS THE PRESENTER.

10   A    BASICALLY -- OKAY.

11   Q    WAS THAT ONE DONE SEPARATELY FROM THE OTHERS?

12   A    YES.  MY RECOLLECTION IS THAT IT WAS DONE FIRST, BUT I

13   COULDN'T SWEAR TO THAT, THAT'S JUST THE BEST -- THE BEST THAT

14   I COULD RECALL.  BASICALLY THE H -- THERE WAS A PERSON FROM

15   HR THAT WAS BASICALLY CHAIRING THIS GROUP OF PEOPLE.  AND

16   THEY SAID, WELL, I UNDERSTAND THAT THE ANESTHESIA DEPARTMENT

17   IS PROPOSING 288,500 FOR THIS NEW HIRE, AND I THINK I SAID,

18   YES, THAT'S CORRECT.

19        AND THERE WAS A VERY SHORT CONVERSATION WHERE THE HR

20   PERSON ASKED THE THREE PANEL MEMBERS DID ANYONE HAVE ANY

21   OBJECTION OR ANY PROBLEMS WITH PAYING DR. ALGHOTHANI

22   $288,500.  NOBODY SAID THEY HAD ANY OBJECTION, SO THE HR

23   REPRESENTATIVE SAID, WELL, I NEED YOU TO SIGN THE FORM, AND

24   SHE PASSED IT AROUND.

25   Q    OKAY.  AND WHAT WAS -- WHAT DID YOU NOTICE ABOUT THE

1    ANNUAL PAY, BASE PAY, MARKET PAY NUMBERS THAT ARE SHOWN ON

2    DR. ALGHOTHANI'S REVIEW?

3    A    THOSE NUMBERS DID NOT -- THOSE WERE HANDWRITTEN

4    NUMBERS -- DID NOT APPEAR ON THIS FORM WHEN IT WAS PASSED

5    AROUND FOR SIGNATURE.  I ONLY KNEW THAT A TOTAL PAY AMOUNT OF

6    $288,500 IN TOTAL PAY WAS BEING APPROVED.  AND AS I MENTIONED

7    TO YOU, I HAD SORT OF ETCHED IN MY MEMORY THE TWO COMPONENTS

8    OF PAY I HAD RECEIVED, AND I ASKED THE HR PERSON, I SAID,

9    WELL, OKAY, WE HAVE APPROVED THIS ANNUAL PAY FOR DR.

10   ALGHOTHANI, PLEASE TELL ME WHAT HIS MARKET PAY IS.

11        AND THE HR REPRESENTATIVE SAID, OKAY.  SHE PULLED OUT A

12   CALCULATOR AND SHE CONSULTED SOME DOCUMENTS AND SHE SAID,

13   WELL, LET'S SEE, DR. ALGHOTHANI'S BASE PAY AS A NEW HIRE IS

14   $98,967, AND LET'S SEE, I SUBTRACT THAT FROM $288,500, DR.

15   ALGHOTHANI'S MARKET PAY WAS -- IS TO BE $189,533.

16   Q    WHAT WAS YOUR REACTION TO THAT?

17   A    I WAS RATHER SURPRISED AND SOMEWHAT IRKED THAT A NEW

18   HIRE -- I KNEW THAT MINE WAS ABOUT 167,000 SOMETHING -- THAT

19   A NEW HIRE WITH NO YEARS OF ANESTHESIA EXPERIENCE WAS COMING

20   IN WITH A MARKET PAY $20,000 MORE THAN MINE AND I MADE A

21   COMMENT TO HER.  I SAID, I DON'T UNDERSTAND HOW IS THAT

22   APPROPRIATE THAT WE'RE PAYING ON $20,000 IN MARKET PAY TO

23   THIS INDIVIDUAL WHERE MINE IS AROUND $167,000?  AND THE HR

24   PERSON JUST SORT OF SHRUGGED.

25   Q    OKAY.  NOW, AT THAT -- I'M NOT SURE I GOT AN ANSWER FROM

1    YOU.  I WANT TO MAKE SURE OF HOW LONG DR. ALGHOTHANI'S PANEL

2    REVIEW TOOK.  YOU DESCRIBED SORT OF WHAT HAPPENED, BUT CAN

3    YOU GUESSTIMATE OR ESTIMATE?

4    A    I'D SAY FIVE, 10 MINUTES.

5    Q    OKAY.  NOW DURING THAT FIVE OR 10 MINUTES WAS THERE ANY

6    REVIEW OF MARKET PAY CRITERIA?

7    A    IT WAS NOT DISCUSSED.  THE FIRST TIME THE TERM MARKET

8    PAY CAME UP WAS WHEN I ASKED THE HR REPRESENTATIVE WHAT IS

9    THE MARKET PAY.  IT HAD BEEN NO DISCUSSION ABOUT THAT.  THERE

10   HAD BEEN NO DISCUSSION OF SURVEYS.  THERE HAD BEEN NO

11   DISCUSSION OF ANYTHING EXCEPT WHAT WE'RE PROPOSING TO PAY THE

12   NEW HIRE.

13   Q    ALL RIGHT.  NOW, ON THE FIRST PAGE OF THE COMPENSATION

14   PANEL ACTION FORM, AS WE'VE ALSO SAID, THEY ARE -- IN PART B

15   ARE THOSE SEVEN FACTORS.

16   A    YES.

17   Q    WERE THOSE SEVEN FACTORS DISCUSSED?

18   A    THEY WERE NOT.

19   Q    OKAY.  ALL RIGHT.  WAS THERE ANY ATTEMPT IN THE PANEL

20   MEETING ITSELF TO ARRIVE AT A SEPARATE DISCRETE MARKET PAY

21   AMOUNT?

22   A    THE ONLY MARKET PAY DETERMINATION WAS MADE BY THE HR

23   PERSON USING A CALCULATOR AS I HAVE DESCRIBED.

24   Q    OKAY.  NOW, WHAT DID YOU DO AFTER YOU ATTENDED THIS

25   PANEL AND DID THE PRESENTATION AND LEARNED ABOUT DR.

1    ALGHOTHANI'S MARKET PAY AMOUNT?

2    A    I STARTED RESEARCHING THE MARKET PAY ISSUE IN SOME

3    DETAIL, REVIEWING THE STATUTE, REVIEWING THE HANDBOOK,

4    REVIEWING ANY VA KIND OF DOCUMENTS THAT I COULD FIND.  I WAS

5    VERY CONCERNED BECAUSE DR. ALGHOTHANI WAS SIGNIFICANTLY

6    YOUNGER THAN I, AND I WAS VERY CONCERNED THAT THERE WAS A WAY

7    THAT YOUNGER PEOPLE WERE BEING GIVEN FAVORABLE TREATMENT.

8         AND AT SOME POINT DURING THIS PROCESS, AND I CAN'T

9    REMEMBER EXACTLY, I CONSULTED LEGAL COUNSEL AND I DECIDED

10   THAT SINCE THIS WAS SO SUSPICIOUS THAT I REALLY NEEDED TO SEE

11   HOW EVERYONE IN THE DEPARTMENT'S MARKET PAY WAS BEING HANDLED

12   AS -- BY THIS TIME I HAD SEEN WHAT THE FACTORS WERE AND I

13   COULDN'T SEE HOW LOOKING AT THE FACTORS WITH ALGHOTHANI

14   MARKET PAY OF 189 OR WHATEVER IT WAS COULD BE JUSTIFIED IN

15   COMPARISON TO WHAT I HAD BEEN AWARDED ONLY A FEW MONTHS

16   PREVIOUSLY.

17   Q    NOW, LET ME STOP YOU JUST A SECOND.

18   A    OKAY.

19   Q    YOU MENTIONED THAT YOU CONSULTED LEGAL COUNSEL.  THAT

20   WASN'T ME OR REBECCA.

21   A    NO, IT WASN'T.  NO.

22   Q    AND I BELIEVE WE HAVE GOT A DOCUMENT IN EVIDENCE.  THAT

23   WAS DR. LARRY KERR WHO IS ALSO--

24   A    NO.

25   Q    I'M SORRY.

1    A    THE ATTORNEY I CONSULTED WAS MELISSA BURNETT.

2    Q    OKAY.  ALL RIGHT.  BUT YOU CONSULTED LEGAL COUNSEL.  AND

3    I INTERRUPTED YOU.  SO AS A RESULT OF THAT AND GIVING

4    CONSIDERATION TO THESE THINGS, WHAT DID YOU DO NEXT?

5    A    SHORTLY AFTER THIS ALGHOTHANI PAY PANEL I DID TWO

6    THINGS.  I SENT AN E-MAIL TO THE EEO REPRESENTATIVE AT THE VA

7    EXPRESSING CONCERNS THAT MARKET PAY WAS BEING AWARDED IN A

8    DISCRIMINATORY MANNER BASED UPON AGE.  AND I DIDN'T HAVE A

9    LOT OF INFORMATION AT THAT TIME AND I REQUESTED THAT SHE

10   INVESTIGATE THE ISSUE.

11       AT THE SAME TIME -- ABOUT THE SAME TIME I DECIDED TO DO

12   MY OWN INVESTIGATION, AND SO I SUBMITTED A REQUEST FOR

13   DOCUMENTS UNDER THE FREEDOM OF INFORMATION ACT ASKING FOR

14   COMPENSATION DOCUMENTS ON ALL THE ANESTHESIOLOGISTS AT THE

15   DORN.

16   Q    ALL RIGHT.  AND DID YOU EVENTUALLY RECEIVE A RESPONSE TO

17   THAT FOIA REQUEST?

18   A    I RECEIVED THE DOCUMENTS -- SUBSTANTIAL COMPLIANCE WITH

19   THE REQUEST I THINK IN SEPTEMBER.

20   Q    OF 2014?

21   A    YES.

22   Q    ALL RIGHT.  AND WHAT DID YOU DO WITH THEM, THE

23   DOCUMENTS?

24   A    WELL, I SPENT HOURS GOING THROUGH THE DOCUMENTS

25   COMPARING THE DIFFERENT MARKET PAY AMOUNTS, LOOKING AT WHAT I

1    THOUGHT WERE THE APPROXIMATE AGES OF THE ANESTHESIOLOGISTS.

2    THE VA DID NOT PROVIDE ME ANY BIRTH DATE OR AGE INFORMATION.

3    ALL OF THAT WAS BLOCKED OUT AND REDACTED FROM THE MATERIALS

4    THAT I HAD RECEIVED.  AND SO I JUST ASKED MY COLLEAGUES THEIR

5    AGES, AND SO I -- I BASICALLY HAD THAT INFORMATION.

6         I HAD THE DOCUMENTATION, MUCH OF WHICH WE HAVE SEEN

7    TODAY, THESE COMPENSATION PANEL REPORTS.  AND IN ORDER TO

8    SORT OF MAKE SENSE OF IT, I STARTED COMPILING CHARTS THAT

9    MADE A NUMBER OF DIFFERENT COMPARISONS.  ONE OF THE CHARTS

10   LISTED THE ANESTHESIOLOGIST BY AGE AND THE MARKET PAY

11   DETERMINATIONS AND IT STRUCK ME JUST QUITE VIVIDLY AT THAT

12   TIME THAT THERE WAS A CLEAR INVERSE CORRELATION BETWEEN AGE

13   OF ANESTHESIOLOGISTS AND MARKET PAY AWARDS.

14   Q    TELL US WHAT YOU MEAN BY THAT.

15   A    WELL, I WAS THE OLDEST.  MY MARKET PAY WAS THE LOWEST.

16   AND AS I WENT DOWN TO DR. PRYOR, HE GOT A LITTLE MORE MARK --

17   HE WAS A LITTLE YOUNGER THAN ME.  HE GOT A LITTLE HIGHER

18   MARKET PAY.  AND I WENT DOWN TO THE NEXT YOUNGER PHYSICIAN.

19   HIS MARKET PAY WAS A LITTLE HIGHER.  AND THEN THE LAST TWO,

20   WHO WERE THE YOUNGEST, THEIR MARKET PAY WAS HIGHER STILL AND

21   PRETTY MUCH ALMOST EQUIVALENT TO EACH OTHER WITHIN LESS THAN

22   A THOUSAND DOLLARS.

23   Q    AND THOSE TWO WERE SUBSTANTIALLY YOUNGER THAN YOU ARE?

24   A    YES.

25   Q    AND YOUNGER THAN DR. PRYOR OR EVEN DR. PENDER.

1    A    YES.  AND I WAS CONCERNED THAT ONCE I REALLY LOOKED AT

2    THE DOCUMENTS, IT APPEARED THAT -- YOU KNOW, I KNEW WHAT -- I

3    KNEW ABOUT THE -- BY THIS -- BY THIS TIME I HAD RESEARCHED

4    AND UNDERSTOOD THE BASE PAY TABLES AND THE STEP INCREASES.

5    AND I SAW THAT BASICALLY THE CUMULATIVE STEP INCREASES THAT I

6    HAD RECEIVED SORT OF MATCHED THE DIFFERENCE BETWEEN MY MARKET

7    PAY AND DR. ALGHOTHANI'S.  AND SO WHAT IT APPEARED TO ME IS

8    THAT THE VA HAD BASICALLY SAID, OKAY, THE MARKET PAY WILL

9    BE--

10          MRS. BAILEY:  OBJECTION.  SPECULATIVE.

11          THE COURT:  HOW IS THAT SPECULATIVE?

12          MRS. BAILEY:  HE'S SAYING WHAT THE VA THOUGHT.

13          THE COURT:  I THINK HE SAID WHAT THE VA SAID.  DID

14   YOU SAY WHAT THE VA--

15          THE WITNESS:  I AM SAYING WHAT MY INTERPRETATION OF

16   THE DOCUMENTS ARE, YOUR HONOR.

17          MRS. BAILEY:  HE'S GOT NO -- THERE'S NO FOUNDATION

18   FOR HIS OPINION.

19          THE COURT:  ALL RIGHT.  SUSTAINED.

20          MR. IRVIN:  I WILL TRY TO GO AT IT ANOTHER WAY.

21   BY MR. IRVIN:

22   Q    YOU GOT THIS INFORMATION THAT DEMONSTRATED AN INVERSE

23   CORRELATION BETWEEN AGE AND MARKET PAY AS YOU HAVE DESCRIBED.

24   A    YES.

25   Q    ALL RIGHT.  AND YOU HAVE RECEIVED THIS INFORMATION UNDER

1    FOIA AND AT THAT TIME YOU HAD NOT RETAINED COUNSEL, AT LEAST

2    YOU HADN'T RETAINED US; IS THAT RIGHT?

3    A    THAT'S RIGHT.

4    Q    OKAY.  BUT DID YOU GET SOMEBODY TO TRY TO HELP YOU WITH

5    THAT, TRYING TO ANALYZE THAT AND FIGURE OUT HOW TO PURSUE IT?

6    YOU'VE -- YOU INDICATED THAT YOU WERE GETTING IN TOUCH WITH

7    PEOPLE AT THE VA ABOUT IT.

8    A    WELL, I -- AFTER I HAD OBTAINED ALL THE FOIA INFORMATION

9    I HAD CONSULTED WITH OTHER COUNSEL.  AND BASED UPON THAT

10   COUNSEL'S ADVICE, I SUBMITTED TO THE EEO REPRESENTATIVE --

11   WHO I ORIGINALLY JUST SENT A BRIEF E-MAIL -- I PRESENTED S

12   VERY DETAILED WRITTEN COMPLAINT IN WHICH I ATTACHED THE

13   VARIOUS CHARTS THAT I HAD PREPARED SHOWING THE PROBLEM

14   BETWEEN AGE AND MARKET PAY TO THAT EEO REPRESENTATIVE AS

15   BASICALLY MY FORMAL COMPLAINT TO THE LOCAL EEO OFFICER.

16   Q    OKAY.  AND WHAT HAPPENED NEXT IN THAT PROCESS, DR.

17   KENNEDY?

18   A    WELL, I DIDN'T HEAR ANYTHING FOR A LONG TIME.  AND

19   FINALLY I CONTACTED THE EEO OFFICER AND I SAID, WHAT'S THE

20   STORY ON MY COMPLAINT?  AND SHE SAID, I HAVE CONSULTED WITH

21   HR AND THEY SAID THAT SINCE YOUR TOTAL PAY WAS THE HIGHEST IN

22   THE DEPARTMENT, THAT YOU DIDN'T HAVE ANY LEGITIMATE

23   COMPLAINT.

24   Q    AND SO WHAT DID YOU DO NEXT?

25   A    FURTHER CONSULTED WITH MY COUNSEL AT THAT TIME.  AND

1    BASED UPON RECOMMENDATIONS I HAD RECEIVED AS FAR AS MY

2    OPTIONS FROM THE EEO OFFICER, IN CONSULTATION WITH MY COUNSEL

3    I REQUESTED TO HAVE A AGENCY MEDIATION.

4    Q    ALL RIGHT.  AND DID YOU IN FACT HAVE A MEDIATION?

5    A    I DID.

6    Q    ALL RIGHT. AND WHO WAS INVOLVED?  WHO WERE THE PLAYERS

7    IN THAT MEDIATION?

8    A    THERE WAS A MEDIATOR, BUT I DON'T RECALL HIS NAME.  HE

9    REALLY PLAYED A VERY -- VIRTUALLY NO ROLE AND SORT OF WATCHED

10   THE DISCUSSION.  FOR THE VA THERE WAS EDITH LEWIS WHO WAS

11   COUNSEL FOR THE VA AND TAMARA NICHOLS, AND I WAS PRESENT

12   ALONG WITH A FRIEND OF MINE NAMED LARRY KERR WHO LIKE ME IS

13   AN MDJD AND HAD DONE THE REVERSE OF I.  HE HAD GONE FROM

14   MEDICINE TO LAW, AND HE WAS A LICENSED ATTORNEY.

15       MY COUNSEL AT THAT TIME WAS UNABLE -- SHE WAS TIED UP

16   WITH A LOT OF OTHER CASES AND WAS NOT ABLE TO ATTEND THE

17   MEDIATION WITH ME, AND SO I ASKED DR. KERR TO ATTEND AS MY

18   REPRESENTATIVE.

19   Q    OKAY.  SO YOU HAD THE MEDIATION.  AND DID YOU AIR YOUR

20   CONCERNS AND YOUR COMPLAINT AT THE MEDIATION?

21   A    I DID.  AND THERE WAS -- I WAS SOMEWHAT DISAPPOINTED

22   BECAUSE I HAD THOUGHT AT A MEDIATION THAT THE REPRESENTATIVE

23   FOR THE VA WOULD COME WITH SOME TYPE OF COMPROMISE OFFER,

24   SOME KIND OF AUTHORITY--

25       *MRS. BAILEY:*  OBJECTION TO WHAT HAPPENED AT THE

1    MEDIATION.

2              *THE COURT:* SUSTAINED.

3    BY MR. IRVIN:

4    Q    OKAY.  WERE YOU ABLE TO RESOLVE THE MATTER AT MEDIATION?

5    A    IT WAS NOT.

6    Q    OKAY.  AND SO WHAT DID YOU DO NEXT IN TERMS OF YOUR

7    CONCERNS ABOUT THIS INVERSE CORRELATION BETWEEN AGE AND

8    MARKET PAY RELATIVE TO YOU AND THE OTHER STAFF

9    ANESTHESIOLOGISTS?

10   A    MY RECOLLECTION IS THAT I -- MY NEXT STEP WAS THAT I

11   ENGAGED YOUR SERVICES.

12   Q    WELL, LET'S DO THIS.  DID YOU IN 2015, EARLY 2015, HAVE

13   OCCASION TO MEET WITH OR TALK WITH DR. DEKONING?

14   A    YES.

15   Q    ALL RIGHT.  AND TELL US ABOUT THAT, PLEASE.

16   A    I BASICALLY WENT THROUGH THE ARGUMENTS THAT I HAD MADE

17   TO THE EEO OFFICER AND THAT I HAD MADE DURING MEDIATION.

18   Q    AND THIS WOULD HAVE BEEN IN A MEETING WITH DR. DEKONING?

19   A    YES, IN HIS OFFICE.  HE HAD ASKED TAMARA NICHOLS TO BE

20   THERE.

21   Q    ALL RIGHT.  NOW, DID YOU GIVE HIM ANY KIND OF HEADS-UP

22   ABOUT WHAT IT WAS YOU WANTED TO DISCUSS OR DID YOU SEND HIM

23   ANYTHING TO LOOK AT PRIOR TO MEETING?

24   A    I DON'T RECALL EXACTLY WHAT I TOLD HIM PRIOR TO OUR

25   MEETING.

1    Q    OKAY.  AND WHEN YOU CAME TO THE MEETING, DID YOU BRING

2    WITH YOU INFORMATION?

3    A    YES, I BROUGHT WITH HIM THE VARIOUS CHARTS THAT I HAD

4    PREPARED THAT SHOWED ALL OF THESE PROBLEMS WITH THE

5    COMPUTATION OF MY MARKET PAY COMPARED TO MY COLLEAGUES, AND

6    HE HAD TAMARA NICHOLS THERE WHO BASICALLY SAID THAT I WAS

7    MISTAKEN, THAT IT -- THE WAY THAT THEY DID THIS IS THE VA

8    CONSIDERED THE AMOUNT OF MY BASE PAY IN DETERMINING MY MARKET

9    PAY.

10        IT DIDN'T SAY AT THAT TIME THAT THE COMPENSATION PANELS

11   WERE TO DETERMINE TOTAL, TOTAL PAY AND THEN THEY DID THE

12   ARITHMETIC COMPUTATION.  THAT -- THAT REPRESENTATION WAS

13   BASICALLY MADE LATER ONCE WE WERE IN THIS LITIGATION.  BUT AT

14   THAT MEETING WITH DR. DEKONING, THEY WERE -- TAMARA WAS

15   TAKING THE POSITION THAT IT WAS PERFECTLY APPROPRIATE FOR

16   THEM TO CONSIDER MY BASE PAY IN DETERMINING MY MARKET PAY,

17   AND I WAS SOMEWHAT FLABBERGASTED BY THAT AND EXPRESSED THAT

18   TO DR. DEKONING AS THAT IT APPEARED THAT WHEN THEY CONSIDERED

19   MY BASE PAY, THEY WERE PENALIZING ME FOR MY CUMULATIVE STEP

20   INCREASES AND THAT THE NUMBER SIX OR WHATEVER IN THE FACTORS

21   WHERE THE LENGTH OF VA EXPERIENCE IS LISTED, I ALWAYS

22   INTERPRETED THAT TO BE A POSITIVE FACTOR.

23        BUT BY INTERPOSING THIS POSITION -- AND I USED SOME OF

24   THE LANGUAGE FROM THE HANDBOOK WHERE HAD THESE PARENT -- SORT

25   OF AMBIGUOUS PARENTHETICALS ABOUT LOOKING AT BASE PAY PLUS

1    MARKET PAY, TAMARA HAD SUGGESTED, WELL, THAT GIVES US

2    AUTHORITY TO CONSIDER YOUR BASE PAY IN DETERMINING YOUR

3    MARKET PAY.

4        I SAID, WELL, BASICALLY WHAT YOU'RE DOING IS RATHER THAN

5    GIVING ME A POSITIVE RESULT FROM MY VA EXPERIENCE, MY MARKET

6    PAY, THE -- MY PRIOR EXPERIENCES AT THE VA IS A NEGATIVE, AND

7    SO THAT'S BEING HELD AGAINST ME IN THE DETERMINATION OF MY

8    MARKET PAY.  DR. DEKONING SEEMED TO BE CONCERNED AND HE

9    INDICATED THAT HE WOULD LOOK INTO IT.

10   Q    OKAY.  AND YOU'VE HEARD DR. DEKONING'S TESTIMONY IN THE

11   CASE AND THE EXCHANGE OF E-MAILS THAT HE HAD WITH TAMARA

12   NICHOLS ABOUT GATHERING INFORMATION AND ABOUT HOW THE FORMS

13   WERE BEING COMPLETED; IS THAT CORRECT?

14   A    YES.

15   Q    ALL RIGHT.  WELL, WERE YOU EVER ABLE TO GET IT RESOLVED

16   SATISFACTORILY AS A RESULT OF MEETING WITH DR. DEKONING?

17   A    NO.

18   Q    OKAY.  NOW, LET ME MOVE NOW TO THE MAY 1ST, 2015 PANEL

19   REVIEWS THAT WERE DONE OF ALL OF THE STAFF ANESTHESIOLOGISTS.

20   WHAT WERE YOUR -- WHAT WAS YOUR UNDERSTANDING OF HOW THAT

21   CAME ABOUT?

22   A    HAD TO COME ABOUT EITHER BECAUSE I HAD BROUGHT THIS

23   ISSUE UP OR BECAUSE DR. DEKONING WAS CONCERNED ABOUT THE

24   APPARENT LACK OF MUCH DOCUMENTATION ON THE COMPENSATION

25   PANEL'S FORMS THAT I HAD OBTAINED THROUGH FOIA AND WAS VERY

1    CONCERNED ABOUT.

2    Q    OKAY.  AND THAT DOCUMENT IS IN EVIDENCE, THAT IS

3    EXHIBIT 8, AND I THINK YOU ALREADY HAVE IT THERE IN FRONT OF

4    YOU.  BUT THE RESULT OF THOSE MAY 1ST, 2015 REVIEWS WAS THAT

5    NOBODY GOT ANY INCREASE; IS THAT...

6    A    THAT IS CORRECT.

7    Q    ALL RIGHT.  AND IS THAT PART OF THE STAGNATION ISSUE

8    THAT YOU MENTIONED EARLIER THAT WAS OF A CONCERN TO YOU THAT

9    YOU SPOKE TO DR. MILLER ABOUT?

10   A    WELL, MY CONCERN HAD REALLY MOVED BEYOND STAGNATION TO

11   MY CONCERN WITH THE UNFAIR WAY THAT I WAS BEING TREATED WITH

12   REGARD TO MY MARKET PAY.

13   Q    RICK, BASED ON YOUR CONVERSATIONS WITH TAMARA NICHOLS

14   AND DR. DEKONING AND OTHERS AND THE INFORMATION THAT YOU

15   GATHERED AND YOUR PARTICIPATION AT THAT PAY PANEL FOR DR.

16   ALGHOTHANI, WHAT WAS YOUR UNDERSTANDING OF HOW MARKET PAY

17   AWARDS WERE ARRIVED AT?

18   A    IN THAT TIME, TIME PERIOD AROUND MAY OF 2015, IT WAS MY

19   UNDERSTANDING THAT THEY WERE DETERMINING MARKET PAY BY USING

20   THE FACTORS PLUS LOOKING AT BASE PAY AND USING THAT BASICALLY

21   AS A NEGATIVE FACTOR SO THAT, YOU KNOW, IF YOU WERE

22   OTHERWISE -- LIKE IF ALGHOTHANI WAS ENTITLED TO 189,000 THAT

23   I WOULD HAVE TO BE REDUCED BECAUSE I HAD CUMULATIVE STEP

24   INCREASES AS PART OF MY BASE PAY.  SO THEY WERE USING -- THAT

25   WAS MY IMPRESSION AROUND THAT TIME IN MAY OF 2015.

1    Q    HERE'S WHAT I'M DRIVING AT.  BASED ON ALL OF THAT THAT

2    YOU LEARNED AND THE PEOPLE THAT YOU SPOKE WITH INCLUDING

3    TAMARA NICHOLS AND SO FORTH, WHAT -- HOW DID YOU UNDERSTAND

4    THAT THEY CALCULATED THE MARKET PAY AMOUNT?

5    A    THEY -- AS I HAD SEEN THEM DO IT IN DR. ALGHOTHANI'S PAY

6    PANEL WAS THAT THEY DETERMINED WHATEVER TOTAL PAY THAT THEY

7    HAD COME UP WITH AND THEY LOOKED AT THE CHART AND DETERMINED

8    WHAT THE BASE PAY WAS, WHICH IS A COMBINATION OF INITIAL PLAY

9    PLUS THE STEP INCREASES, SUBTRACTED THAT FROM THE TOTAL PAY

10   AMOUNT AND, VOILA, THAT WAS THE MARKET PAY.

11   Q    OKAY.  WELL, WHAT'S THE PROBLEM WITH THAT?  WHAT'S THE

12   BEEF THERE WITH IT IF THEY DO IT THAT WAY?  WHY DOESN'T THAT

13   WORK OUT GOOD?

14   A    THE BEEF THAT I HAVE IS THAT I DIDN'T RECEIVE THE

15   RECOGNITION FINANCIALLY FOR THE YEARS OF SERVICE THAT I WOULD

16   HAVE RECEIVED HAD IT BEEN DONE PROPERLY AND I HAD BEEN

17   PROPERLY FINANCIALLY AWARDED, THAT I HAD RECEIVED MARKET PAY

18   COMMENSURATE WITH MY COMPARISON TO MY COLLEAGUES AND THAT MY

19   TOTAL PAY WAS MORE THAN THEM BECAUSE OF MY LONGEVITY AT THE

20   VA.  IN OTHER WORDS, THAT MY BASE PAY CUMULATIVE STEP

21   INCREASES WOULD BE ON TOP OF THAT.

22   Q    NOW DR. KENNEDY, THE NEXT PAY REVIEW THAT WAS DONE -- AS

23   IS IN EVIDENCE ALREADY AND AS YOU ARE FAMILIAR WITH -- WOULD

24   BE THE 2016 PAY REVIEWS WHERE THERE WAS TO BE NO PAY

25   DISPARITY.  YOU'RE FAMILIAR WITH THAT; ARE YOU NOT?

1    A    YES, I AM.

2    Q    AND YOU DID GET SOME INCREASE, DID YOU NOT, IN YOUR

3    ANNUAL SALARY?

4    A    I GOT LITTLE OVER A THOUSAND-DOLLAR INCREASE.

5    Q    OKAY.  HOW DID YOUR INCREASE COMPARE TO THE OTHERS?

6    A    MOST OF THE OTHER PEOPLE GOT INCREASES OF FIVE TO

7    $6,000.

8    Q    AND WAS THAT IN THEIR MARKET PAY AWARD?

9    A    YES, IT WAS.

10   Q    AND YOUR MARKET PAY INCREASED BY A THOUSAND DOLLARS?

11   A    THOUSAND, LITTLE BIT OVER A THOUSAND.

12   Q    OKAY.  AND -- OKAY.  NOW RICK, WE HAVE TWO EXHIBITS,

13   EXHIBIT 18 AND EXHIBIT 20 THAT I WANT TO GO OVER WITH YOU,

14   BUT LET ME START BY ASKING YOU THIS.  WHAT IS IT THAT YOU ARE

15   ASKING THE COURT TO DO IN THIS CASE?

16   A    I'M ASKING THIS COURT TO LOOK BACK AT THESE COMPENSATION

17   PANEL HEARINGS AND ENSURE THAT THE GOVERNMENT OFFICIALS

18   COMPLY WITH THE STATUTE PASSED BY CONGRESS AND SEPARATELY

19   DETERMINE MARKET PAY AS REQUIRED BY THE STATUTE, AND THAT IF

20   THAT IS DONE AND ALL OF THE FACTORS ARE CONSIDERED, THAT MY

21   MARKET PAY FOR THESE VARIOUS PERIODS OF TIME WHEN THESE

22   COMPENSATION PANELS WERE HELD, THAT MY MARKET PAY SHOULD BE

23   NO LESS THAN THE MARKET PAY AWARDED TO ONE OF MY COLLEAGUES,

24   ALL OF WHOM WERE YOUNGER, AT A CLOSE POINT IN TIME.

25        IN OTHER WORDS, IF SOMEONE COUPLE MONTHS PREVIOUSLY HAD

1    BEEN AWARDED MARKET PAY OF A $190,000 AND A FEW MONTHS LATER

2    MY MARKET PAY CAME UP FOR REVIEW, MY MARKET PAY SHOULD BE NO

3    LESS, SINCE LOOKING AT THE FACTORS, THAN THAT AWARDED ONE OF

4    MY COLLEAGUES.

5    Q    ALL RIGHT.  SO TAKE A LOOK AT EXHIBIT 18 IF YOU WOULD,

6    PLEASE -- AND THIS IS IN EVIDENCE WITHOUT OBJECTION.  AND

7    TELL US FIRST OFF IS THAT A DOCUMENT THAT YOU YOURSELF

8    CREATED?

9    A    IT IS.

10   Q    OKAY.  AND WHAT DID YOU ATTEMPT TO DO WITH EXHIBIT 18?

11   A    WHAT I ATTEMPTED TO DO WAS GO BACK FOR EACH OF MY

12   COMPENSATION PANEL DOCUMENTS AND SEE WHO -- WHAT -- WHICH OF

13   MY COLLEAGUES HAD THEIR COMPENSATION ADDRESSED AT A SIMILAR

14   TIME BECAUSE I FELT THAT UNDER THE -- CONSIDERING ALL OF THE

15   FACTORS, THAT AGAIN, I SHOULD ALWAYS COME OUT ON TOP BECAUSE

16   VIRTUALLY ALL OF THE FACTORS WERE ESSENTIALLY IDENTICAL OTHER

17   THAN LENGTH OF VA SERVICE WHERE I CLEARLY HAD AN EDGE OVER

18   ALL OF MY COLLEAGUES.

19        AND SO, FOR EXAMPLE, SO MY VERY FIRST PAY PANEL WAS ON

20   MARCH THE 8TH OF 2006, WHICH I GUESS WAS AFTER THE PAY ACT

21   HAD BEEN ENACTED, AND MY MARKET PAY WAS HIGHER THAN DR.

22   MILLER WHO WAS THEN A STAFF ANESTHESIOLOGIST OR DR. PRYOR,

23   AND SO I HAVE NO BEEF WITH THE COMPENSATION PANEL THAT

24   OCCURRED ON THAT DATE.

25   Q    AND THAT'S PARAGRAPH NUMBER ONE OF EXHIBIT 18?

KENNEDY - DIRECT

404

1    A    THAT'S PARAGRAPH NUMBER ONE.

2    Q    ALL RIGHT.

3    A    THEN PARAGRAPH NUMBER TWO I LOOKED AT MY NEXT

4    COMPENSATION PANEL, WHICH WAS ON DECEMBER THE 14TH OF 2007.

5    AND I LOOKED AT THAT COMPENSATION PANEL AND I SAW THAT I WAS

6    AWARDED $156,000 IN MARKET PAY, WHICH I THINK WAS THE AMOUNT

7    THAT I HAD BEEN AWARDED BACK IN '06, BUT DR. PRYOR ON THE

8    EXACT SAME DATE -- WAS PERPLEXING TO ME -- AWARDED 165,000 --

9    OVER $165,000 IN MARKET PAY.

10    Q    LET ME STOP YOU AND ASK YOU A FEW QUESTIONS.

11    A    YES.

12    Q    DR. PRYOR, NUMBER ONE, HAS LESS VA EXPERIENCE THAN YOU

13    DO; CORRECT?

14    A    YES.  I HIRED DR. PRYOR.

15    Q    AND NUMBER TWO, HE'S YOUNGER.

16    A    YES, HE'S YOUNGER.

17    Q    ALL RIGHT.  MOVE TO PARAGRAPH NUMBER THREE.

18    A    PARAGRAPH THREE I LOOKED AT MY NEXT COMPENSATION PANEL

19    DECISION, WHICH WAS ON JANUARY THE 11TH OF 2010, AND I --

20    THERE WAS ANOTHER ANESTHESIOLOGIST, STAFF ANESTHESIOLOGIST,

21    WHO WAS REVIEWED AT THAT TIME, DR. LEDER, WHO IS NO LONGER AT

22    THE VA.  AND ON EXACT SAME DATE WITH THE EXACT SAME PANEL

23    MEMBERS, DR. LEDER WAS AWARDED 179,000, SIGNIFICANTLY MORE

24    THAN I.

25        AND COMPARING MY EXPERIENCE AND ET CETERA WITH DR.

1    LEDER, AGAIN I HAD BASICALLY SIMILAR BACKGROUNDS ON THE OTHER

2    FACTORS EXCEPT I HAD MORE VA EXPERIENCE, AND SO I HAD ASKED

3    THAT ON THAT DATE THAT I RECEIVE NO LESS THAN WHAT DR. LEDER

4    RECEIVED AND -- AS A COMPENSATION PANEL MARKET PAY AWARD.

5    Q    IS HE YOUNGER THAN YOU, DR. LEDER?

6    A    YES.

7    Q    OKAY.  PARAGRAPH FOUR.

8    A    THE NEXT COMPENSATION PANEL DOCUMENT I HAD OBTAINED

9    THROUGH FOIA WAS THE ONE ON MARCH 1ST, 2012, WHICH AGAIN I

10   HAD THE SAME AWARD MARKET PAY.  BUT PRIOR TO THAT DR. CARTER,

11   WHO WAS SIMILAR TO ME IN EXPERIENCE, HE HAD A LITTLE MORE

12   TIME IN ANESTHESIA, BUT HIS VA EXPERIENCE WAS SIGNIFICANTLY

13   LESS THAN MINE.  I DON'T -- HE HAD MAYBE ONE YEAR COMPARED TO

14   WHAT I HAD.  AND SO I FELT THAT I SHOULD BE AWARDED NO LESS

15   THAN WHAT DR. CARTER HAD BEEN AWARDED IN THE PREVIOUS YEAR.

16        AND SO I'M ASKING THE COURT TO REQUEST THAT THE

17   COMPENSATION PANEL AWARD FOR ME FOR 3/1/12 BE CORRECTED FROM

18   167,738 TO 187,013.

19   Q    AND FOR THAT PERIOD SHOWN THERE ON PARAGRAPH FOUR.

20   A    YES.

21   Q    ALL RIGHT.  WHAT ABOUT PARAGRAPH FIVE?  DID YOU DO THE

22   SAME ANALYSIS THERE IN PARAGRAPH FIVE USING INSTEAD THERE DR.

23   ALGHOTHANI WHO WAS REVIEWED AROUND THAT SAME TIME AND WHOSE

24   MARKET PAY AWARD IS SHOWN THERE --

25   A    YES.

1    Q    -- AND AS IS YOURS AND YOU DID THE SAME CALCULATION TO

2    COMPUTE THE DIFFERENCE IN MARKET PAY AND WHAT YOU'RE ASKING

3    THE COURT TO AWARD IN THIS CASE FOR THAT PERIOD.

4    A    I'M ASKING THE COURT TO ASK THE VA TO GO BACK AND

5    CORRECT THESE MARKET PANEL AWARDS FOR EACH PERIOD AND THAT

6    WHATEVER THE RESULTING RESULT OF THAT, THAT I BE -- RECEIVE

7    APPROPRIATE BACK-PAY AND INTEREST AND CORRECTION TO MY

8    PENSION.

9    Q    OKAY.  AND ON THROUGH THE DOCUMENT, WITHOUT GOING

10   THROUGH PARAGRAPH BY PARAGRAPH --

11   A    YES, SIR.

12   Q    -- YOU ATTEMPTED TO DO THE SAME ANALYSIS AND APPLY THAT

13   TO SUBSEQUENT PERIODS OF TIME BASED ON YOUR REVIEWS GOING

14   FORWARD.

15   A    YES.

16   Q    IS THAT A FAIR STATEMENT?

17   A    YES, I DID.

18   Q    AND THE SECOND PAGE OF EXHIBIT 18 IS JUST A SUMMARY.

19   AND YOU ADDED UP THE ADDITIONAL MARKET PAY THAT YOU SAY IS

20   SHOWN BY THIS EXHIBIT THAT TOTALS $163,852.14?

21   A    THAT IS CORRECT.

22   Q    AND THAT IS HOW YOU ARE REASONABLY TRYING TO CALCULATE

23   HOW YOU HAVE BEEN INJURED IN TERMS OF THESE MARKET PAY

24   AWARDS.

25   A    THAT'S CORRECT.

1    Q    OKAY.  NOW DR. KENNEDY, DO -- DOES THE IMPACT THAT YOU

2    HAVE HAD ON YOUR MARKET PAY AWARDS, WHICH RESULTS IN AN

3    IMPACT ON YOUR TOTAL PAY --

4    A    YES.

5    Q    -- HAS THAT ALSO BROUGHT AN IMPACT TO YOUR POTENTIAL OR

6    NOW YOUR ACTUAL PENSION BENEFITS THAT YOU RECEIVE FROM THE VA

7    FOLLOWING YOUR RETIREMENT?

8    A    YES.  IF I HAD RECEIVED APPROPRIATE MARKET PAY FOR THE

9    APPROPRIATE -- FOR THE COMPENSATION PANELS GOING BACK AT

10   LEAST BEYOND THE LAST THREE YEARS, WHICH ARE APPROPRIATE FOR

11   CALCULATING MY PENSION, THEN MY TOTAL SALARY FOR THOSE -- FOR

12   MY HIGH THREE YEARS WOULD OBVIOUSLY BE HIGHER.  AND SINCE MY

13   PENSION IS CALCULATED BASED UPON THE HIGH THREE AVERAGE, MY

14   PENSION WOULD BE HIGHER IF THE MARKET PAY AWARDS HAD BEEN

15   APPROPRIATE AS I HAVE STATED.

16   Q    OKAY.  AND EXHIBIT 20, YOU GOT THAT IN FRONT OF YOU AND

17   THAT'S IN EVIDENCE WITHOUT OBJECTION.  IS THAT YOUR

18   CALCULATIONS THAT YOU DID TO CALCULATE THE IMPACT TO YOUR

19   PENSION BENEFITS THAT RESULT FROM THE DEFICIENT MARKET PAY

20   AWARDS?

21   A    YES.  THERE'S SOME CORRECTIONS ON THIS, BUT I -- THIS

22   IS -- THIS IS WHAT I PREPARED.  IT'S AN ATTEMPT TO

23   APPROXIMATE WHAT I THINK THE IMPACT ON MY PENSION WOULD HAVE

24   BEEN.

25   Q    ALL RIGHT, SIR.  AND YOU DID THAT BASED ON THE

1  INFORMATION THAT YOU RECEIVED FROM THE VA.

2  A    I BASED THIS ON THE FOIA INFORMATION AND -- WHICH WAS

3  PRETTY MUCH CONFIRMED BY THE DISCOVERY MATERIALS THAT WE

4  OBTAINED AFTER THE FILING OF THIS LAWSUIT AND THEN THE

5  VARIOUS PAY PERIODS THAT ARE LISTED ON THE ATTACH -- PAGES

6  ATTACHED TO THE PENSION CALCULATION.  I WENT THROUGH ALL MY

7  PAY STUBS FOR THE LAST 78 PAY PERIODS, WHICH IS THREE YEARS,

8  AND LOOKED AT THE IMPACT PAY PERIOD PER PAY PERIOD SO I COULD

9  GET AS CLOSE AS I POSSIBLY COULD COME UP WITH THE NUMBERS FOR

10 PENSION IMPACT.

11 Q    OKAY.  AND WHAT ARE YOU ASKING THE COURT TO DO WITH

12 RESPECT TO YOUR PENSION?

13 A    I'M ASKING THE COURT TO ORDER THE VETERAN'S

14 ADMINISTRATION TO MAKE APPROPRIATE CORRECTIONS TO THE

15 COMPENSATION PANEL DECISIONS ENSURING THAT I RECEIVE FAIR

16 TREATMENT COMPARED TO MY COLLEAGUES AND THAT THE COMPENSATION

17 PANEL AWARDS TO COLLEAGUES SIMILAR IN POINT OF TIME TO ME,

18 THAT -- COMPARING TO ME -- THAT MY MARKET PAY AWARDS WOULD BE

19 NO LESS THAN THE AWARDS MADE TO THOSE COLLEAGUES WHO ARE

20 YOUNGER AND HAVE LESS VA EXPERIENCE THAN I, AND THAT BASED

21 UPON THOSE CORRECTIONS THAT THE COURT ASK THE VETERAN'S

22 ADMINISTRATION AND OFFICE OF PRACTICE MANAGEMENT, WHOEVER

23 DOES THESE CALCULATIONS, TO-RE CALCULATE WHAT MY INCOME

24 SHOULD HAVE BEEN AFTER THOSE CORRECTIONS AND THAT I WILL BE

25 PAID BACK-PAY AND INTEREST FOR THAT AND THAT THOSE

1    CORRECTIONS TO MY SALARY, THAT THE VA OR OPM MAKE CORRECTIONS

2    TO MY PENSION BENEFIT BASED UPON THOSE COMPENSATION PANEL

3    CORRECTIONS.

4    Q    ALL RIGHT, SIR.  I WANT TO SHOW YOU WHAT WAS MARKED FOR

5    IDENTIFICATION AS DEFENDANT'S EXHIBIT 6.  AND THIS APPEARS TO

6    BE SOME TYPE OF COMPARISON MARKET PAY INFORMATION AND SO

7    FORTH AMONG YOU AND THEN SOME OTHER PHYSICIANS, OTHER LOCALES

8    AND SO FORTH AS MAY BE SHOWN ON EXHIBIT --

9    A    YES.

10   Q    -- NUMBER 5 OF DEFENDANT'S WHICH -- WHICH IS IN

11   EVIDENCE.  LET ME SHOW YOU THOSE DOCUMENTS.  AND YOU HEARD

12   THE TESTIMONY AND YOU HAVE SEEN THOSE EXHIBITS; IS THAT

13   CORRECT?

14   A    YES.

15   Q    AND HOW DO YOU RESPOND TO THAT?

16   A    AS TO DEFENDANT'S EXHIBIT 6 FOR IDENTIFICATION, I CAN'T

17   MAKE A WHOLE LOT OF SENSE OF THIS.  THEY SHOW ME AND MY AGE

18   AND I'M AN ANESTHESIOLOGIST.  DR. EADY IS AN ORTHOPEDIC

19   SURGEON.  HE IS NOT AN ANESTHESIOLOGIST, SO WE DON'T COMPARE.

20   I'M NOT SURE WHO DR. JACKSON OR DR. LEWIS IS.  DR. MACFARLANE

21   IS A UROLOGIST AND DR. PALEPU IS A GENERAL SURGEON.  SO THERE

22   ARE SO MANY -- AND I DON'T KNOW ANYTHING ABOUT THESE PEOPLE'S

23   ACHIEVEMENTS IN THEIR SPECIALTY OR THE LENGTH -- THE NUMBER

24   OF YEARS THAT THEY HAVE BEEN IN THEIR SPECIALTY OR THEIR

25   LENGTH OF TIME AT THE VA.  I JUST DON'T -- I DON'T KNOW

1    ANYTHING, SO I CAN'T MAKE ANY KIND OF JUDGMENT UPON THIS

2    FORM.

3    Q    AND DO YOU HAVE ANY INFORMATION ABOUT THE SERVICE LINES

4    THAT ANY OF THOSE DOCTORS WORK IN AND WHETHER THERE'S BEEN

5    ANY SHOWING OF SOME KIND OF A DISPARATE IMPACT BASED ON AGE?

6    A    I DON'T KNOW ANYTHING ABOUT WHAT IS HAPPENING IN OTHER

7    SERVICE LINES OTHER THAN ANESTHESIA.

8    Q    OKAY.  NOW I WANT TO GO BACK VERY BRIEFLY, BUT I WANT TO

9    GO BACK TO WHAT YOU TESTIFIED TO ABOUT THE LONGEVITY ISSUE

10    AND YOUR PRIOR EXPERIENCE AT THE VA.  AND YOU TESTIFIED ABOUT

11    YOUR FEELING OF UNFAIRNESS WITH RESPECT TO WHAT WAS HAPPENING

12    TO YOU ON THE MARKET PAY SIDE.

13    AND SO, I WANT YOU TO TELL ME WHY YOU BELIEVE YOU SHOULD

14    GET CREDIT FOR ESSENTIALLY YOUR LONGEVITY AT THE VA ON THE

15    MARKET PAY SIDE OF THE EQUATION UNDER THAT FACTOR THAT TALKS

16    ABOUT PRIOR VA EXPERIENCE.

17    *MRS. BAILEY:*  OBJECTION.  SPECULATION.

18    *THE COURT:*  I'M GOING TO SET THE -- MR. IRVIN, CAN

19    YOU REPHRASE YOUR QUESTION?

20    *MR. IRVIN:*  YES, MA'AM.  I CAN.

21    BY MR. IRVIN:

22    Q    DO YOU HAVE A PROBLEM WITH THE FACT THAT YOU ARE NOT

23    RECEIVING CREDIT FOR YOUR PRIOR VA EXPERIENCE IN THE MARKET

24    PAY SIDE?

25    A    ABSOLUTELY.

1    Q    WHAT IS THAT PROBLEM?

2    A    I HAVE REVIEWED THE STATUTE IN WHICH CONGRESS CLEARLY

3    INDICATED THAT IN BOTH BASE PAY AND IN MARKET PAY THAT THE

4    INTENT OF CONGRESS WAS TO REWARD VA PHYSICIANS IN THEIR

5    DETERMINATION OF BASE PAY IN A FORM OF STEP INCREASES AND

6    THAT THEY INTENDED TO REWARD THE ANESTHES -- PHYSICIANS, VA

7    PHYSICIANS, IN THE FORM OF THEIR MARKET PAY BECAUSE CONGRESS

8    LISTED THAT ONE OF THE FACTORS THAT THE COMPENSATION PANELS

9    WERE TO CONSIDER WAS LENGTH OF VHA EXPERIENCE.

10        AND SO, IT'S MY FEELING THAT BOTH MY BASE PAY AND MY

11   MARKET PAY SHOULD BE HIGHER BASED UPON THAT CONGRESSIONAL

12   INTENT.

13   Q    ALL RIGHT.

14        MR. IRVIN:  YOUR HONOR, COULD YOU GIVE ME JUST A

15   MOMENT --

16        THE COURT:  OKAY.

17        MR. IRVIN:  -- AND LET ME COLLECT MY THOUGHTS WITH

18   MRS. FULMER AND SEE IF THERE'S ANYTHING FURTHER THAT WE NEED

19   TO TALK ABOUT?

20   BY MR. IRVIN:

21   Q    DR. KENNEDY, I SHOWED YOU THE TWO DEFENDANT'S EXHIBITS

22   AND I ASKED YOU ABOUT EXHIBIT 6 WHICH IS JUST FOR

23   IDENTIFICATION, BUT I'D LIKE TO ASK YOU ABOUT EXHIBIT

24   NUMBER 5.  WOULD YOU TAKE A MOMENT TO LOOK THAT OVER AND TELL

25   US WHAT YOU--

1              *THE COURT:* IS THAT PLAINTIFF'S OR DEFENDANT'S?

2              *MR. IRVIN:* I BEG YOUR PARDON.  IT'S A DEFENDANT'S

3    EXHIBIT, YOUR HONOR.

4              *THE COURT:* AND WAS NUMBER 6 ADMITTED?

5              *THE CLERK:* JUST FOR ID ONLY.

6              *THE COURT:* JUST FOR ID PURPOSES?  OKAY.

7              *MRS. BAILEY:* YOUR HONOR, WE MOVED THAT INTO

8    EVIDENCE.

9              *THE COURT:* I THOUGHT YOU MOVED IT INTO EVIDENCE.

10             *THE CLERK:* SHE SAID FOR ID ONLY.

11             *THE COURT:* BUT THEN LATER I THOUGHT SHE MOVED IT

12   IN.

13             *THE CLERK:* IT DOESN'T MATTER BECAUSE IT'S NOT A

14   JURY, SO YOU'RE GOING TO--

15             *THE COURT:* I THOUGHT SHE HAD MOVED IT IN.

16             *MRS. BAILEY:* I THOUGHT I DID.  I DID --

17             *THE COURT:* OVER THE PLAINTIFF'S OBJECTION.

18             *MRS. BAILEY:* -- AT THE END OF THE TESTIMONY.

19             *THE COURT:* I WILL LET IT IN.

20             (WHEREUPON, DEFENSE EXHIBIT NO. 6 WAS ADMITTED INTO

21        EVIDENCE.)

22             *THE COURT:* ALL RIGHT.

23   BY MR. IRVIN:

24   Q    NOW DR. KENNEDY, EXHIBIT NUMBER 5 I BELIEVE IS THAT LONG

25   LIST OF --

1    A    YES.

2    Q    -- VARIOUS PEOPLE.  AND WHAT WAS YOUR REACTION TO THAT

3    WHEN YOU SAW THAT EXHIBIT COME INTO EVIDENCE?  HOW IS IT

4    RELEVANT TO THIS INQUIRY?

5    A    WELL, APPARENTLY THE ARGUMENT IS THAT WE NEED TO LOOK AT

6    MORE THAN JUST THE ANESTHESIA DEPARTMENT AND LOOK AT OTHER

7    DEPARTMENTS OR LOOK AT THE MEDICAL STAFF AS A WHOLE.  AND I

8    DON'T SEE HOW THAT CAN BE DONE BECAUSE THERE ARE WAY -- JUST

9    WAY TOO MANY VARIABLES.

10       ANESTHESIA DEPARTMENT IS REALLY SOMEWHAT UNIQUE IN THE

11   UNIFORMITY OF THE PHYSICIANS IN THE ANESTHESIA DEPARTMENT.

12   THEIR DUTIES ARE VIRTUALLY THE SAME, THEIR BACKGROUNDS ARE

13   VERY SAME, SO IT'S POSSIBLE TO COMPARE APPLES TO APPLES IN

14   ANESTHESIA.

15       IT'S NOT POSSIBLE IN THIS -- LOOKING AT THESE OTHER

16   SERVICE LINES.  IF YOU GO TO THE LAST PAGE OF THE EXHIBIT

17   LOOKING AT SURGICAL CARE, DR. BREW [PH] IS LISTED.  HE'S A

18   UROLOGIST.  DR. CHAIPIS IS A GENERAL SURGEON.  DR. CHEUK IS A

19   UROLOGIST.  DR. CHU IS AN ORTHOPEDIC SURGEON.  DR. EADY IS AN

20   ORTHOPEDIC SURGEON.  DR. FICHTNER IS A THORACIC SURGEON.  DR.

21   FRIEDMAN IS A PLASTIC SURGEON.  DR. JACKSON I AM NOT SURE.

22   DR. JORGENSON IS PLASTIC SURGEON.  DR. KERR IS A THORACIC

23   SURGEON.  KOSLOW I DON'T RECALL.  MACFARLANE IS A UROLOGIST.

24   MARKOWITZ IS A OPHTHALMOLOGIST.  MCKEE IS ENT.  NOTTINGHAM IS

25   GENERAL SURGERY.  PALEPU IS GENERAL SURGERY.  WELLS IS ENT.

1        AND ALL OF THESE HAVE -- ARE DIFFERENT SPECIALTIES WITH

2    DIFFERENT MARKETS APPLICABLE.  AND EVEN WITHIN THE SAME

3    SUB-SPECIALTY THERE ARE SIGNIFICANT VARIABLES.  FOR EXAMPLE,

4    I'VE KNOWN THREE ENT DOCTORS QUITE WELL AT THE VA.  ONE OF

5    THEM DIDN'T EVEN -- DIDN'T GO TO THE O-R, HAD NOT BEEN IN THE

6    O-R IN YEARS, ONLY WORKED IN THE CLINIC, DID NOT OBVIOUSLY

7    TAKE CALL BECAUSE HE DIDN'T HAVE O-R PRIVILEGES, HE JUST DID

8    ENT IN THE CLINICS.  ANOTHER OF THE ENT PHYSICIANS DIDN'T

9    HAVE A FULL-TIME CONTRACT WITH THE VA.

10            *MRS. BAILEY:*  OBJECTION, YOUR HONOR, FOR RELEVANCE.

11            *THE COURT:*  SUSTAINED.

12    BY MR. IRVIN:

13    Q    RICK, HAVE YOU HAD, ALONG THE WAY OF YOUR EMPLOYMENT AT

14    THE VA AS YOU'VE DESCRIBED IT, HAVE YOU EVER CONSIDERED GOING

15    TO WORK IN THE PRIVATE SECTOR IN THE PRACTICE OF

16    ANESTHESIOLOGY?

17    A    YES.

18    Q    ALL RIGHT.  AND WHAT DID YOU DO IN THAT RESPECT?

19    A    AFTER I'D BEEN AT THE VA A NUMBER OF YEARS I BASICALLY

20    MADE INFORMAL INQUIRIES AT PEOPLE I KNEW AT THE COLUMBIA

21    GROUPS.  YOU KNOW, JUST SORT OF CAST OUT INQUIRIES BECAUSE

22    MOST OF THESE PEOPLE I KNEW QUITE WELL.  I HAD BEEN ACTIVE IN

23    THE ANESTHESIA DEPARTMENT.  I KNEW THE ANESTHESIOLOGISTS IN

24    COLUMBIA.  AND BASICALLY WAS GETTING OUT THE WORD IF YOU HAVE

25    AN OPENING, I WOULD REALLY BE INTERESTED IN COMING.

1        AND TIME WENT ON AND TIME WENT ON AND I JUST, I NEVER

2    HEARD OF ANYTHING, DIDN'T HEAR ANYTHING BACK, AND I WAS

3    SOMEWHAT PERPLEXED BECAUSE I KNEW I HAD SKILLS, I HAD A LOT

4    OF EXPERIENCE.  AND ULTIMATELY IT WAS CLEAR THAT THE REASON

5    THAT THERE WAS NO INTEREST IN MY SERVICES WAS THAT BEING

6    OLDER --

7            MRS. BAILEY:  OBJECTION.

8    A    -- THEY WERE JUST -- THEY WEREN'T INTERESTED IN HIRING

9    OLDER PEOPLE.

10           MRS. BAILEY:  OBJECTION.

11           THE COURT:  SUSTAINED.  I AM NOT SURE THE RELEVANCE

12   OF THAT TESTIMONY WITH REGARD TO --

13           MR. IRVIN:  THERE WAS--

14           THE COURT:  -- OTHER SERVICES WITH REGARD...

15           MR. IRVIN:  THERE WAS TESTIMONY ABOUT HIRING IN THE

16   PRIVATE SECTOR.  THEY PUT IN EVIDENCE ABOUT HIRING

17   ANESTHESIOLOGISTS OUT IN THE PRIVATE SECTOR, AND THAT'S WHAT

18   DR. KENNEDY WAS RESPONDING TO.

19           THE COURT:  ALL RIGHT.

20           MR. IRVIN:  WHAT HE HAD LEARNED ABOUT THAT AS HE

21   MADE INQUIRY.

22           THE COURT:  OKAY.

23   BY MR. IRVIN:

24   Q    AND THAT'S ALL THE QUESTIONS THAT I HAVE FOR YOU, DR.

25   KENNEDY, AND -- MRS. FULMER IS TELLING ME THAT I'M NOT.  DR.

1    KENNEDY, YOU WILL RECALL THAT TAMARA NICHOLS TESTIFIED THAT

2    TAKING THE MARKET PAY AWARDED TO A RELATIVELY NEW SPECIALIST,

3    A RELATIVELY NEW ANESTHESIOLOGIST, AND THEN AWARDING THE SAME

4    MARKET PAY TO AN OLDER ANESTHESIOLOGIST SUCH AS YOURSELF

5    WOULD CAUSE THAT OLDER ANESTHESIOLOGIST TO GET PAID TOO MUCH.

6    WHY ISN'T SHE RIGHT ABOUT THAT?

7    A    THERE'S NO REQUIREMENT AND I HAVE NEVER SEEN ANY KIND OF

8    REGULATION THAT ALL MEMBERS OF THE ANESTHESIA DEPARTMENT, WHO

9    WERE BASICALLY OTHERWISE EQUAL OTHER THAN LENGTH OF VA

10    SERVICE, ARE EXPECTED TO MAKE THE SAME AMOUNT.

11        MRS. BAILEY: OBJECTION.  NO FOUNDATION FOR HIS

12    INTERPRETATION OF THE VA POLICIES.

13        MR. IRVIN: YOUR HONOR, HE'S WORKED THERE FOR 19

14    YEARS AND HE'S JUST TESTIFIED THAT HE RESEARCHED ALL OF THIS

15    AT LENGTH.  I THINK HE CAN SPEAK FROM HIS OWN KNOWLEDGE.

16        THE COURT: I DON'T THINK HE CAN SPEAK TO THE VA

17    POLICY OR REPRESENTATIVE OF THE VA ON THE POLICY ISSUE.

18    BY MR. IRVIN:

19    Q    CAN YOU NOT HAVE YOUR ANSWER ADDRESS THE POLICIES, BUT

20    IS THERE ANYTHING ELSE THAT YOU WOULD LIKE TO SAY?

21    A    I DIDN'T SEE ANY PROBLEM WITH MY EARNING SIGNIFICANTLY

22    MORE THAN MY COLLEAGUES IN VIEW OF THE FACT THAT I HAD SUCH

23    SIGNIFICANT BUILT-UP SENIORITY WHICH ENTITLED ME TO MORE,

24    PARTICULARLY MORE BASE PAY FROM THE STATUTE AND FROM THE

25    CHARTS SHOWING WHAT THE BASE PAY IS AND WHAT THE STEP

1    INCREASES.

2        I WAS ALLOWED ON STEP NINE WHICH INCREASED MY BASE PAY

3    SOME OVER $25,000 AND I WAS CERTAINLY ENTITLED TO THAT

4    $25,000 MORE THAN MY COLLEAGUES.  I DIDN'T SEE WHY I HAD TO

5    BE PAID THE EXACT SAME AMOUNT VIRTUALLY AS EVERYONE ELSE.

6    Q    OKAY.  NOW DR. KENNEDY, YOU HEARD JUST A LITTLE WHILE

7    AGO WITH MRS. DOTY'S TESTIMONY THAT THERE WAS SOME FIGURE ON

8    ANNUAL SALARY PUT UP OF $427,000 OR SOME SUCH.  YOU'RE NOT

9    ASKING FOR ANYTHING LIKE THAT; ARE YOU?

10   A    OH NO.

11   Q    ALL RIGHT, SIR.  AND IS -- AND TO THE BEST OF YOUR

12   UNDERSTANDING IF THE COURT WERE TO DIRECT THAT YOUR SALARY BE

13   ADJUSTED AS YOU HAVE EXPLAINED IN EXHIBITS 18 AND I GUESS IN

14   20 AS WELL, BUT IF YOUR SALARY WAS ADJUSTED IN ACCORDANCE

15   WITH EXHIBIT NUMBER 18, WOULD YOU GO OVER ANY OF THESE

16   MAXIMUMS THAT ARE SET BY THESE GOVERNMENT TABLES IN TERMS OF

17   YOUR SALARY?

18   A    I'M NOT SURE.  THERE -- THERE ARE REALLY TWO MAXIMUMS

19   THAT HAVE BEEN DISCUSSED HERE, AND I'M GOING TO TRY TO SORT

20   OF SORT THIS OUT.  THERE'S THESE PAY RANGES THAT WE TALKED

21   ABOUT THAT MAY CHANGE FROM YEAR TO YEAR.  AND THESE PAY

22   RANGES AS -- FROM MY UNDERSTANDING IS NOT NECESSARILY A

23   MAXIMUM.  BUT WHAT YOU GET IN -- WHAT I'M FOCUSING ON IS THE

24   EXCEPTIONS THAT THE FACILITY DIRECTOR COULD GIVE VERSUS IN

25   THE VISN DIRECTOR.

1          THROUGHOUT ALL OF THE DOCUMENTS THAT I OBTAINED THROUGH

2     FOIA THERE WERE DOCUMENT AFTER DOCUMENT AFTER DOCUMENT AFTER

3     DOCUMENT WHERE THE ANESTHESIOLOGISTS IN TOTAL SALARIES, MINE,

4     ALL OF MY COLLEAGUES EXCEEDED THE MAXIMUM AT THE FACILITY

5     LEVEL AT DORN.  WITHOUT EXCEPTION THE FACILITY -- THE

6     FACILITY DIRECTOR SENT THOSE SALARIES ON UP TO --

7          *THE COURT:*  CONTINUE.

8     A    -- WITHOUT EXCEPTION THE FACILITY DIRECTOR FROM THOSE

9     DOCUMENTS SENT THOSE SALARIES ON UP TO THE VISN LEVEL TO ASK

10    THAT THE EXCEPTION BE APPROVED.  AND IN NO SITUATION WAS ANY

11    OF THOSE ANESTHESIA SALARIES, WHICH INVOLVED EVERYBODY IN THE

12    DEPARTMENT, IS -- NO TIME DID THE VISN REFUSE TO ACCEPT THOSE

13    EXCEPTIONS.

14         SO IT WAS MYSELF, IT WAS ALL THE OTHER MEMBERS OF THE

15    DEPARTMENT HAVE THEIR SALARIES THAT EXCEEDED THE FACILITY

16    MAXIMUM APPROVED UP TO THE VISN MAXIMUM, AND AT NO TIME WOULD

17    MY SALARY OR ANY OF MY COLLEAGUES' SALARY EVER HAVE EXCEEDED

18    THE FACILITY, THE VISN, MAXIMUM, SO IT HAD TO GO UP TO THE

19    UNDERSECRETARY.

20    Q    OKAY.  DR. KENNEDY, YOU HAVE SEEN THE TYPED-UP SHEETS

21    THAT WE TALKED A LOT ABOUT WITH THE FACTORS ONE THROUGH SEVEN

22    ON THEM?

23    A    YES, I HAVE.

24    Q    AND IN EVIDENCE WE HAVE THE -- THE SHEETS FOR THE MAY

25    2015 REVIEWS AND THEN WE HAVE THE SHEETS FOR THE

1    NOVEMBER 2016 REVIEWS; IS THAT CORRECT?

2    A    YES.

3    Q    YOU SEEN THOSE AND YOU REVIEWED THOSE.

4    A    I HAVE.

5    Q    ARE THEY IDENTICAL?

6    A    THEY ARE IDENTICAL.  THE ONES THAT WERE PREPARED IN --

7    FOR THE MAY 1, 2015 COMPENSATION PANEL AND THE ONES PREPARED

8    FOR THE NOVEMBER 10, 2016 PANEL ARE THE SAME DOWN TO THE

9    CUT-AND-PASTE MISTAKE OF PUTTING MY NAME ON ALGHOTHANI'S

10   LIST, NARRATIVE LIST OF FACTORS.  AND EVEN THE LENGTH OF VA

11   SERVICE IS LISTED AS THE SAME ON THE TWO NARRATIVES EVEN

12   THOUGH THERE WAS A YEAR -- LIKE A YEAR AND A HALF DIFFERENCE

13   BETWEEN THE TWO COMPENSATION PANELS.

14   Q    THANK YOU, DR. KENNEDY.  ANSWER ANY QUESTIONS

15   MRS. BAILEY MAY HAVE.

16                    CROSS-EXAMINATION

17   BY MRS. BAILEY:

18   Q    WELL DR. KENNEDY, IT'S BEEN A LONG TWO DAYS; HASN'T IT?

19   A    IT HAS.

20   Q    BUT YOU AND I, WE'RE UP HERE AT THE VERY LAST.

21   A    YES.

22   Q    AS I UNDERSTAND FROM YOUR ARGUMENT THAT YOU PRESENTED

23   OVER THE LAST DAY OR YOUR LAWYER HAS PRESENTED, IT'S YOUR

24   POSITION THAT YOUR DISPARATE TREATMENT CLAIM IS LIMITED TO

25   THE COHORT OF FIVE ANESTHESIOLOGISTS AT THE--

1          *THE COURT:*  LET ME STOP YOU.  DISPARATE TREATMENT

2     OR DISPARATE IMPACT?

3          *MRS. BAILEY:*  OH, THANK YOU.

4     BY MRS. BAILEY:

5     Q    IT'S MY UNDERSTANDING THAT YOUR DISPARATE IMPACT CLAIM

6     IS LIMITED TO THE FIVE ANESTHESIOLOGISTS WORKING AT THE DORN

7     VA; IS THAT CORRECT?

8     A    PRECISELY.

9     Q    YOU PERSONALLY HAVE NO INTEREST IN WHAT'S GOING ON WITH

10    THE OTHER OLDER DOCTORS OR THE MORE EXPERIENCED DOCTORS -- TO

11    USE THE HUMAN RESOURCES WORD FOR IT -- AT THE DORN VA.

12    A    I HAVE NO WAY OF LOOKING AT THE VARIABLES OR FACTORS

13    CONCERNING PEOPLE OUTSIDE OF ANESTHESIA.

14    Q    AND YOU'RE NOT INTERESTED IN WHAT HAPPENS WITH THE

15    ANESTHESIOLOGISTS AT ANY OF THE OTHER VA FACILITIES AROUND

16    THE COUNTRY.

17    A    I DON'T KNOW ANYTHING ABOUT THE ANESTHESIA FACILITIES,

18    OTHER PARTS OF THE COUNTRY, SO THERE'S -- THERE'S NO WAY I

19    COULD EXPRESS ANY OPINION ABOUT WHAT'S GOING ON THERE.

20    Q    BECAUSE YOU HAVE LIMITED YOUR CASE, YOUR DISPARATE

21    IMPACT CASE, TO A COHORT OF FIVE.

22    A    I HAVE.

23    Q    I'D LIKE TO TURN YOUR ATTENTION TO YOUR EXHIBIT,

24    PLAINTIFF'S EXHIBIT NUMBER 15 THAT WE WERE ACTUALLY JUST

25    TALKING ABOUT.  AND I SEE FROM HERE, AND I THINK YOU WILL

1    AGREE WITH ME -- IT'S WHAT WE HAVE BEEN TALKING ABOUT -- THAT

2    YOU ARE THE OLDEST OF THE, WHAT, FIVE ANESTHESIOLOGISTS.

3    A    CORRECT.

4    Q    AND IF YOU GO OVER TO THE ANNUAL PAY COLUMN, YOU ALSO

5    HAVE THE HIGHEST PAY OF THE FIVE ANESTHESIOLOGISTS.

6    A    BY A SMALL AMOUNT.

7    Q    BUT IT IS THE HIGHEST PAID.

8    A    IT IS.

9    Q    WHAT'S THE DIFFERENCE BETWEEN YOU AND PRYOR IS, WHAT,

10   $4,000?  YOU AND PENDER, LITTLE BIT MORE, LITTLE BIT LESS

11   THAN THAT?

12   A    YES.  IT'S PRETTY CLEAR THAT THE ANNUAL PAY IS PRETTY

13   CLOSE, AND THAT'S PART -- THAT'S CONSISTENT WITH MY POSITION

14   THAT THE VA HAS BEEN TRYING TO ESSENTIALLY KEEP TOTAL PAY OF

15   ANESTHESIOLOGISTS ESSENTIALLY EQUAL.  AND IN NOVEMBER THEY

16   FINALLY JUST MADE IT QUITE CLEAR IT WAS GOING TO BE EXACTLY

17   EQUAL.

18   Q    WELL, LET ME ASK YOU ABOUT THE SECOND COLUMN WHERE THE

19   LENGTH OF SERVICE IN THE SPECIALTY IN VHA.

20   A    YES.

21   Q    YOU SAY YOU'VE GOT 35.  WHAT DOES THAT 35 REPRESENT?

22   A    THAT'S A COMBINATION OF THE LENGTH OF TIME I HAVE BEEN

23   AN ANESTHESIOLOGIST AND THE LENGTH OF TIME I HAVE BEEN AT THE

24   VA.

25   Q    SO, HOW MANY YEARS HAVE YOU BEEN AN ANESTHESIOLOGIST?

1    A    THREE MORE YEARS THAN I'VE BEEN AT THE VA.

2    Q    SO WHAT IS -- CAN YOU FIGURE THAT OUT FOR ME WITH THESE

3    NUMBERS?

4    A    LET'S SEE.  I DON'T KNOW WHEN THIS CHART WAS PREPARED.

5    I DIDN'T PREPARE IT.  SO LET'S SEE.  AT AGE 63 -- LET ME

6    THINK.  THAT WAS IN -- THAT WAS IN '14.  SO, AT THAT TIME I

7    HAD BEEN AT THE VA FOR 16 YEARS AND I HAD BEEN AN

8    ANESTHESIOLOGIST FOR 19 YEARS.  THAT'S 35.

9    Q    OKAY.  SO THAT'S WHERE THAT NUMBER COMES --

10   A    THAT'S CORRECT.

11   Q    -- IS FROM SOME -- YOU HAVE BEEN AN ANESTHESIOLOGIST 19

12   YEARS.

13   A    YES.

14   Q    AND FOR 16 OF THOSE 19 YEARS YOU HAVE BEEN AN

15   ANESTHESIOLOGIST AT THE VA.

16   A    YES.

17   Q    SO THIS NUMBER YOU'RE -- KIND OF DOUBLE-COUNTS YOUR

18   YEARS AS AN ANESTHESIOLOGIST.

19   A    ABSOLUTELY NOT.

20   Q    OKAY.  SO YOU GOT 19.  WHEN DID YOU FIRST BECOME AN

21   ANESTHESIOLOGIST?

22   A    IN 1995.

23   Q    OKAY.  SO YOU WERE -- AND WHEN DID YOU COME WITH THE VA?

24   A    IN 1998.

25   Q    OKAY.  SO FROM 1995 TO 1998, THAT'S THREE YEARS.

1    A    YES.

2    Q    AND THEN 1998 YOU HAD ONE YEAR OF ANESTHESIOLOGY SERVICE

3    AND ONE YEAR AT THE VA.

4    A    IN 1998 I CAME TO THE VA.  I HAD THREE YEARS OF

5    ANESTHESIA EXPERIENCE AND AT THAT TIME I HAD NO YEARS OF

6    EXPERIENCE AS AN ATTENDING ANESTHESIOLOGIST.  I ONLY HAD

7    EXPERIENCE AS A RESIDENT AND A MEDICAL STUDENT.

8    Q    SO WE ARE TALKING ABOUT THE 16 YEARS WITH THE VA ON THIS

9    CHART?

10   A    YES.

11   Q    IS THAT COUNTING YOUR TERM AS A RESIDENT?

12   A    NO.

13   Q    OKAY.  SO HOW ABOUT THE FOLLOWING YEAR?

14   A    WHAT DO YOU MEAN FOLLOWING YEAR?

15   Q    1999.

16   A    1999 I HAD FOUR YEARS OF ANESTHESIA EXPERIENCE AND ONE

17   YEAR OF VA EXPERIENCE.

18   Q    OKAY.  BUT THAT WAS REALLY -- THAT ONE YEAR OF VA WAS

19   INCORPORATED INTO THE FOUR YEARS OF ANESTHESIOLOGY

20   EXPERIENCE.

21   A    NO.

22   Q    OH.

23   A    I HAD ONE YEAR OF ANESTHESIA -- I HAD FOUR YEARS OF

24   ANESTHESIA EXPERIENCE AND I HAD ONE YEAR OF VA EXPERIENCE.

25   THE SECOND --

KENNEDY - CROSS

424

1    Q    SO THE VA EXPERIENCE--

2    A    -- THEY HAPPENED AT THE SAME TIME ARE IMMATERIAL.

3    Q    WAS THE VA EXPERIENCE IN ANESTHESIOLOGY?

4    A    YES.

5    Q    OKAY.  SO YOU DIDN'T COUNT THAT YEAR AS PART OF YOUR

6    FOUR YEARS OF ANESTHESIOLOGY EXPERIENCE?

7    A    YES, I COUNTED THAT AS PART OF MY FOUR YEARS OF--

8    Q    OKAY.  SO THAT ONE YEAR IS COUNTED TWICE.

9    A    NO.

10   Q    OKAY.  HOW ABOUT LET'S GO TO THE NEXT YEAR WHICH WOULD

11   BE LIKE, WHAT, 2000.

12   A    OKAY.

13   Q    AND THAT -- BY THAT TIME YOU HAD HAD FIVE YEARS TOTAL OF

14   ANESTHESIOLOGY EXPERIENCE?

15   A    YES.

16   Q    AND TWO OF THOSE FIVE YEARS HAD BEEN AT THE VA?

17   A    YES.

18   Q    OKAY.  SO THAT WOULD HAVE BEEN FIVE YEARS TOTAL WITH A

19   SUB-NUMBER OF TWO AT THE VA; IS THAT RIGHT?

20   A    I DON'T ACCEPT YOUR SUB-NUMBER.

21   Q    OKAY.  YOU DON'T -- YOU DON'T COUNT ONE YEAR OF

22   ANESTHESIOLOGY AND ONE YEAR OF ANESTHESIOLOGY AT THE VA IN

23   1995 AS THE SAME CALENDAR YEAR?

24   A    YES, IT'S THE SAME CALENDAR YEAR BUT DOESN'T MEAN THAT

25   MY ANESTHESIA EXPERIENCE IS ANY LESS BECAUSE IT WAS THE VA

1    NOR IS MY VA EXPERIENCE ANY LESS BECAUSE I PRACTICED

2    ANESTHESIA DURING THAT TIME.

3    Q    ALL RIGHT.  WELL THAT'S -- I'M A LITTLE BIT AT A LOSS AS

4    TO WHY YOU NEED TO DOUBLE-COUNT IT --

5    A    I AM NOT DOUBLE-COUNTING.

6    Q    -- THESE YEARS.  LET'S JUST FOR FUNSIES ASK YOU HOW MANY

7    YEARS OF VA SERVICE HAVE YOU HAD ACCORDING TO THIS CHART IN

8    DECEMBER 14?

9    A    SIXTEEN.

10   Q    OKAY.  I WISH -- CAN YOU -- I KNOW YOU CAN'T WRITE ON

11   THIS CHART, BUT THAT WOULD BE A 16 FOR THE VA AND YOU HAD AT

12   THE -- SOMEWHAT OVERLAPPING, WHAT, 19 YEARS TOTAL?

13   A    I'M NOT GOING TO ACCEPT YOUR OVERLAPPING ARGUMENT.  I'M

14   SORRY, MRS. BAILEY.  I HAVE -- DURING -- THAT 35 NUMBER

15   REFLECTS 16 YEARS AT THE VA AND 19 YEARS IN ANESTHESIA.

16   Q    AND THE FACT THAT THEY WERE THE SAME YEARS MEANS NOTHING

17   TO YOU?

18   A    ABSOLUTELY NOTHING.

19   Q    AND I GUESS YOU'VE GONE AHEAD AND THROUGH ALL OF THESE

20   DOUBLE-ADDED THE YEARS ANESTHESIOLOGY WITH THE YEARS AT THE

21   VA?

22   A    AGAIN, I'M NOT GOING TO ACCEPT YOUR REPRESENTATION OF

23   DOUBLE-ADDING.  THE SAME APPROACH WAS USED FOR EVERY OTHER

24   ANESTHESIOLOGIST ON THIS CHART WHERE THEIR TIME IN ANESTHESIA

25   AND THEIR TIME AT THE VA WERE ADDED TOGETHER TO COME UP WITH

1    SORT OF A TOTAL TO LOOK AT AS FAR AS COMPARING THEIR MARKET

2    PAY AWARDS.

3    Q    OKAY.  JUST TELL ME, IN DECEMBER OF 2014 HOW MANY YEARS

4    HAD PRYOR HAD AT THE VA?

5    A    I DON'T HAVE HIS RECORDS IN FRONT OF ME, SO I CAN'T TELL

6    YOU.

7    Q    YOU DON'T KNOW THAT?

8    A    BY MEMORY, NO.

9    Q    YOU DON'T REMEMBER--

10   A    I DID -- I DID NOT PREPARE THIS CHART.

11   Q    WELL, IT'S IN EVIDENCE AND YOU HAVE BEEN TESTIFYING

12   ABOUT IT.  BUT YOU DON'T KNOW WHEN PRYOR CAME TO THE VA?

13   A    YES, I KNOW WHEN PRYOR CAME TO THE VA.  HE CAME IN 2005,

14   SO LET'S SEE, AS OF -- I MAY BE ABLE TO COME UP WITH PRYOR'S

15   NUMBERS.  PRYOR HAD SIX MONTHS LESS ANESTHESIA EXPERIENCE

16   THAN I BECAUSE WE WERE IN THE SAME RESIDENCY PROGRAM TOGETHER

17   AND HE FINISHED SIX MONTHS AFTER ME, SO THAT MEANS HE HAS SIX

18   MONTHS LESS ANESTHESIA EXPERIENCE.

19        I HIRED DR. PRYOR AT THE VA IN 2005 AND I HAD BEEN -- I

20   CAME IN 1998, SO THAT MEANS DR. PRYOR HAD SEVEN YEARS OF VA

21   EXPERIENCE.  SO LET'S SEE.  I HAD -- SO DR. PRYOR HAD ABOUT

22   15 OR 16 YEARS OF ANESTHESIA EXPERIENCE.  LET'S USE 16.  AND

23   VA EXPERIENCE WAS '05.  LET'S SEE, WANT TO BACK IN THESE

24   EXHIBITS I -- TO CALCULATE...

25   Q    BUT THE POINT I WAS TRYING TO MAKE IS THAT YOU AND PRYOR

KENNEDY - CROSS

427

1    FINISHED A RESIDENCY AT ABOUT THE SAME TIME?

2    A    WITHIN SIX MONTHS OF EACH OTHER, YES.

3    Q    AND HE CAME TO THE VA ABOUT FIVE YEARS AFTER YOU?

4    A    SEVEN YEARS AFTER ME.

5    Q    AND HIS EXPERIENCE AS A DOCTOR WAS PRETTY CLOSE TO

6    YOURS?

7    A    YES, I WOULD SAY SO.

8    Q    AND RATHER THAN--

9    A    AS A MATTER OF FACT, THAT SEVEN YEARS HE JUST TAUGHT --

10   THAT 28 PLUS SEVEN IS 35, SO THAT GETS...

11   Q    OKAY.  THANK YOU.  AND THEN JUST RATHER THAN GO THROUGH

12   THIS IN ALL THESE, BECAUSE THAT'S JUST OBVIOUSLY GOING TO BE

13   DIFFICULT, I WANT TO LOOK AT THESE FIGURES OF THE ANNUAL PAY

14   THAT IS MARKET PAY.

15   A    OKAY.

16   Q    NOW, ARE YOU TELLING ME THAT YOU DID NOT CALCULATE THESE

17   FIGURES?

18   A    I DID NOT PREPARE THIS CHART.

19   Q    DID YOU CALCULATE THESE FIGURES?

20   A    THESE FIGURES CAME OFF OF DOCUMENTS THROUGH DISCOVERY.

21   I DON'T KNOW ABOUT CALCULATING THE FIGURES.  THE -- THESE

22   NUMBERS CAME FROM DOCUMENTS PRODUCED DURING DISCOVERY.

23   Q    THE PERCENTAGE OF ANNUAL PAY, THAT 57.2 PERCENT, WAS

24   PRODUCED TO YOU DURING DISCOVERY, SIR?

25   A    I DIDN'T CALCULATE THESE PERCENTAGES.  THESE PERCENTAGES

1    WERE PREPARED BY MY COUNSEL.

2    Q    OKAY.

3            MR. IRVIN:  YOUR HONOR, PLEASE.  IF I CAN MAYBE

4    ASSIST.  THIS IS A DOCUMENT, AS THE WITNESS HAS SAID THREE

5    TIMES, HE DIDN'T PREPARE.  MRS. FULMER PREPARED THIS DOCUMENT

6    AND IT WAS SUBMITTED TO THE COURT ON OUR SUMMARY JUDGMENT

7    MOTION.  SO I JUST DON'T KNOW HOW MUCH MORE DR. KENNEDY CAN

8    SAY.  HE DIDN'T DO THE CALCULATIONS.  HE DIDN'T PREPARE THE

9    DOCUMENT.  WE CAN CONTINUE ON WITH THIS IF YOU WANT, BUT...

10           MRS. BAILEY:  NO.

11   BY MRS. BAILEY:

12   Q    BUT DR. KENNEDY, SINCE YOUR COUNSEL PREPARED THIS

13   DOCUMENT, YOU OBVIOUSLY DON'T HAVE ANY QUARREL WITH THE

14   FIGURES?

15   A    I HAVEN'T CHECKED THE FIGURES.  I -- I DON'T HAVE ANY

16   QUARREL WITH THEM.  I DON'T -- LIKE I SAY, I HAVEN'T DONE

17   THESE CALCULATIONS.  I DON'T -- I ASSUME THEY ARE CORRECT,

18   BUT I -- I DON'T KNOW.

19   Q    OKAY.  I'D LIKE FOR YOU TO LOOK AT DEFENDANT'S EXHIBIT

20   NUMBER 6.

21   A    DON'T SEEM TO HAVE IT.

22   Q    CAN YOU LOOK ON THE VIDEO ON THE SCREEN?

23   A    WHAT'S ON MY SCREEN IS THE CHART THAT -- OH, OKAY.  I'M

24   WITH YOU.  I THOUGHT THAT WAS THE PREVIOUS CHART WE WERE

25   TALKING ABOUT.  THIS IS THE CHART WITH DR. EADY ON IT.  OKAY.

1    VERY GOOD.  LOOKING AT IT.

2    Q    AND AGAIN, I GUESS YOU HAVE NOT CHECKED ANY OF THESE

3    FIGURES?

4    A    NO, I HAVE NOT.

5    Q    DO YOU HAVE ANY REASON TO SUSPECT THAT ANY OF THEM ARE

6    NOT CORRECT?

7    A    I DON'T KNOW ANYTHING ABOUT THESE FIGURES.  I HAVE NO

8    REASON TO SUSPECT THEY ARE CORRECT OR INCORRECT.

9    Q    I'D LIKE FOR YOU, IF YOU JUST WOULDN'T MIND, TO TAKE A

10   LOOK AT DEFENDANT'S EXHIBIT NUMBER 5, THE VERY LAST PAGE.

11   THAT WOULD BE RFP6.

12   A    OKAY.

13   Q    GET IT UP THERE.  AND I'D LIKE FOR YOU TO LOOK WHERE IT

14   SAYS -- ON THE LEFT-HAND COLUMN.

15   A    YES.

16   Q    DO YOU HAVE IT UP?

17   A    SAYS SURGICAL CARE.

18   Q    THAT'S RIGHT.

19   A    SPECIALTY CARE, PATIENT SERVICE LINE, AND THEN SURGICAL

20   CARE.

21   Q    AND THEN FROM THE -- AFTER THE TOP THREE, THE REST OF

22   THEM ARE ALL SURGICAL CARE; AREN'T THEY?

23   A    YES.

24   Q    OKAY.  AND I WANT YOU TO LOOK AND SEE IF YOU CAN FIND

25   DR. EADY'S NAME ON THAT CHART.

KENNEDY - CROSS

430

```
 1   A    YES.

 2   Q    AND WHAT IS HIS SALARY?

 3   A    HIS SALARY ON THE LISTING IS 113,285.

 4   Q    AND HIS MARKET PAY.

 5   A    251,136.

 6   Q    AND HIS TOTAL PAY?

 7   A    364,421.

 8   Q    AND WHAT WAS HIS DATE OF BIRTH?

 9   A    ***********, ****, '41.

10   Q    WELL, LET'S SEE IF WE CAN LOOK BACK OUT TO THE

11   GOVERNMENT'S EXHIBIT NUMBER 5.  SEE IF THOSE ARE THE SAME

12   NUMBERS OVER THERE.

13   A    THIS IS -- YOU TALKING ABOUT NUMBER 6, I BELIEVE, NOT...

14   NUMBER FIVE IS WHAT WE WERE JUST DISCUSSING YOU SAID NOW.

15   Q    NUMBER 6.

16   A    NUMBER 6?  OKAY.  I'M LOOKING AT NUMBER 6.

17   Q    WERE ANY OF THOSE THE SAME NUMBERS YOU JUST READ OUT?

18   A    I HAVE TO LOOK AT IT.  LET ME SEE.  OKAY.  IT SAYS BASE

19   PAY HERE AND IT SAYS SALARY HERE, 113,285.  MARKET PAY

20   251,136.  ANNUAL PAY 364,421.  APPEARS TO BE CONSISTENT.

21   Q    OKAY.  RATHER THAN GO THROUGH THAT WITH ALL THE DOCTORS

22   --

23   A    YES.

24   Q    -- I WOULD LIKE FOR YOU TO LOOK FOR YOURSELF AND SEE IF

25   YOU CAN FIND DR. JACKSON UNDERNEATH -- ON THE SURGICAL CARE
```

1    LIST ON EXHIBIT NUMBER 5.

2    A    OKAY.

3    Q    AND JUST TO HELP YOU, HE'S FOUR DOWN FROM DR. EADY.

4    A    DR. JOSEPH JACKSON.  OKAY.

5    Q    AND SEE THAT HE'S IN THE SURGICAL CARE DEPARTMENT?

6    A    IT SAYS SO.

7    Q    AND HIS BIRTH DATE WAS 1945?

8    A    YES.

9    Q    AND THESE OTHER NUMBERS ARE PRETTY MUCH WHAT YOU'RE

10   FAMILIAR WITH?

11   A    I AM NOT FAMILIAR WITH THESE NUMBERS AT ALL.

12   Q    OKAY.  WELL, LET'S GO ON DOWN FIVE MORE LINES TO DR.

13   LEWIS.

14   A    OKAY.

15   Q    AND YOU SEE HERE ON THE -- ON THE CHART, WHICH IS THE

16   DEFENDANT'S EXHIBIT NUMBER 5 --

17   A    YES.

18   Q    -- LEWIS' SALARY WAS 103?

19   A    YES.

20   Q    MARKET PAY ROUGHLY 152?

21   A    YES.

22   Q    TOTAL PAY 255?

23   A    YES.

24   Q    AND HE WAS BORN IN 1944?

25   A    THAT'S ALL TRUE, BUT I DON'T KNOW WHAT -- I DON'T --

1  NEVER SEEN DR. LEWIS, DON'T KNOW WHETHER HE'S -- WORKS IN THE

2  OPERATING ROOM OR JUST IN CLINICS.  I DON'T KNOW ANYTHING

3  ABOUT HIM.  I CAN'T MAKE--

4  Q    WE ARE JUST -- THIS IS A DISPARATE TREATMENT AGE CASE.

5  WE ARE JUST LOOKING AT AGE, MARKET PAY --

6  A    DISPARATE IMPACT.

7  Q    -- AND BASE PAY FOR MY PURPOSES.  AND I'M SURE YOUR

8  LAWYER --

9  A    DISPARATE IMPACT.

10  Q    -- ASK YOU MORE STUFF.  OKAY.  LET'S GO DOWN ONE MORE TO

11  MR -- DR. MACFARLANE.

12  A    YES.

13  Q    HE IS A LITTLE BIT OLDER THAN THE OTHER ONES, LITTLE BIT

14  YOUNGER--

15  A    YOUNGER THAN I.

16  Q    YEAH.  HE'S ONLY BEEN IN THE VA LESS THAN EIGHT YEARS.

17  A    YES.

18  Q    AND AGAIN, HIS BASE PAY, MARKET PAY...

19  A    I DON'T KNOW HOW LONG HE HAS BEEN THERE.  I DON'T KNOW

20  THAT THAT'S ON THIS -- OH, ON THIS CHART.  SORRY.  LET'S SEE.

21  LENGTH OF VHA SERVICE.  MACFARLANE.  LESS THAN OR EQUAL TO

22  EIGHT.  OKAY.

23  Q    AND THEN THE VERY BOTTOM ONE IS PALEPU; RIGHT?

24  A    YES.  UH-HUH.

25  Q    AND AGAIN, HIS SALARY WHICH, YOU KNOW, WE'VE GOT EARLIER

```
1    TESTIMONY THAT THAT IS HIS SCHEDULE PAY BASED ON LONGEVITY IS

2    99,000.

3    A    YES.

4    Q    HIS MARKET PAY 196.

5    A    YES.

6    Q    HIS TOTAL PAY IS 295.

7    A    YES.

8    Q    AND OF COURSE HIS DATE OF BIRTH WAS SEVEN YEARS BEFORE

9    YOU.

10   A    OKAY.

11   Q    THAT'S RIGHT?

12   A    LET'S SEE.  YES.

13   Q    SO THESE ARE FIVE DOCTORS IN THE SURGICAL CARE LINE THAT

14   WERE OLDER THAN YOU WITH A HIGHER PERCENTAGE OF ANNUAL PAY TO

15   MARKET PAY GOING BY THIS CHART.

16   A    IF YOU SAY SO.

17   Q    OKAY.  I'D LIKE FOR YOU AT THIS POINT MOVE ON A

18   DIFFERENT TOPIC.  LET'S LOOK AT EXHIBIT NUMBER 12.

19            THE COURT:  PLAINTIFF OR DEFENDANT?  PLAINTIFF OR

20   DEFENDANT?

21            MRS. BAILEY:  PLAINTIFF'S EXHIBIT NUMBER 12.

22   A    ON THE SCREEN.  ALL RIGHT.

23   Q    NOW, YOU RECOGNIZE THIS DOCUMENT?

24   A    I DO.

25   Q    OKAY.  NOW IN THIS CASE -- LET'S SEE -- WANT YOU TO GO
```

1    TO PAGE 104.  AND YOU SEE, DR. KENNEDY, THAT THIS IS YOUR

2    COMPENSATION PANEL REVIEW --

3    A    YES.

4    Q    -- FROM NOVEMBER 2016.

5    A    YES.

6    Q    AND OF COURSE THAT'S THE -- WHERE IT SAYS, OTHER, THAT

7    WAS A REVIEW WHEN ONE OF THE DOCTORS CAME IN WITH A OFFER OF

8    $300,000 TO LEAVE THE VA.

9    A    THAT'S WHAT THE TESTIMONY WAS.

10   Q    YOU HAVE ANY REASON TO DOUBT THAT?

11   A    NO.

12   Q    OKAY.  NOW LET'S -- SO THE DOCTOR WAS OFFERED 3,000 --

13   $300,000 TO WORK IN THE COLUMBIA AREA.  WOULDN'T THAT BE

14   REPRESENTATIVE OF THE MARKET PAY IN COLUMBIA?

15   A    MY KNOWLEDGE OF THE MARKET PAY IN COLUMBIA IS ABOUT

16   400,000 FROM MY CONTACTS, MY EXTENSIVE CONTACTS WITH

17   ANESTHESIOLOGISTS IN THE COLUMBIA AREA.  THE STARTING PAY FOR

18   SOMEONE WHO IS NOT YET A PARTNER MIGHT BE 400 -- MIGHT BE

19   300, BUT MOST ANESTHESIOLOGISTS IN COLUMBIA ARE MAKING 400

20   PLUS.

21   Q    BUT FOR A DOCTOR LEAVING THE VA, HIS MARKET WORTH IN THE

22   COLUMBIA COMMUNITY IS GOING TO BE $300,000; ISN'T IT?

23   A    I DON'T KNOW.  MAYBE INITIALLY.

24   Q    OKAY.  LET'S JUST SAY INITIALLY.  THAT WOULD BE IT?

25   A    UH-HUH.

1    Q    NOW GO ON TO THE NEXT PAGE IF YOU DON'T MIND, WHICH

2    WOULD BE PAGE 105.  PAGE 105.  AND GO DOWN JUST A LITTLE BIT

3    MORE.  RIGHT THERE.  THE ANNUAL RATE OF PAY.

4    A    YEAH.

5    Q    HE'S GOT -- THIS IS FOR YOU.

6    A    YES.

7    Q    THE BASE PAY WAS 131.  YOU DON'T HAVE ANY QUARREL WITH

8    THAT; DO YOU?

9    A    NO.

10   Q    AND THE MARKET PAY IS 168 ON THIS CHART.  HOW MUCH DO

11   YOU THINK THAT MARKET PAY SHOULD HAVE BEEN?

12   A    IT SHOULD HAVE BEEN NO LESS THAN THE HIGHEST MARKET PAY

13   OF ANY OF THE OTHER PEOPLE WHO WERE REVIEWED ON THAT SAME DAY

14   BY THAT SAME PANEL.

15   Q    WELL, WHAT IS MARKET PAY?

16   A    MARKET PAY IS A SUPPLEMENT CREATED BY CONGRESS TO BRING

17   A VA PHYSICIAN'S PAY UP TO A COMPETITIVE LEVEL.  IT IS NOT AS

18   A SEPARATE ENTITY IN ITSELF WHAT THE SALARY IS.  IT IS

19   DESIGNED AS A SUPPLEMENT.

20       SO THAT WHAT -- THE WAY IT SHOULD BE -- HAPPEN IS THAT

21   WHEN A COMPENSATION PANEL IS REVIEWING A PHYSICIAN, THEY

22   SHOULD -- THEY SHOULD OBVIOUSLY LOOK AT WHAT THE TOTAL

23   COMPENSATION WILL BE AND IT'S NOT INAPPROPRIATE FOR THEM TO

24   LOOK AT THE -- AT THE PHYSICIAN'S BASE PAY, SEE WHAT TYPE OF

25   SUPPLEMENT IT WOULD TAKE TO BRING THEM COMPETITIVE.  AND ONCE

1    THAT SUPPLEMENT HAS BEEN DETERMINED, THAT IS THE SUPPLEMENT

2    THAT IS APPROPRIATE FOR ANYBODY WHO HAS THOSE SIMILAR

3    QUALIFICATIONS.

4    Q    THAT'S EXACTLY WHAT THE VA HAS DONE.

5    A    ABSOLUTELY NOT.

6    Q    ALL RIGHT.

7    A    THE VA HAS DONE--

8    Q    HOLD ON.  LET ME ASK YOU ANOTHER QUESTION.

9    A    OKAY.

10   Q    MRS. WOODS, WOULD YOU GO ON TO THE NEXT PAGE?  ONE MORE

11   OVER.  THIS IS THAT SURVEY DATA FROM THE HAY SURVEY --

12   A    OKAY.

13   Q    -- WHICH SAYS THAT THE RANGE OF MARKET PAY FOR AN

14   ANESTHESIOLOGIST -- WHAT IS THIS?

15   A    WHAT IS THIS?  I CAN'T READ IT VERY WELL.  IT'S...

16   Q    HOW ABOUT THAT?  SHE BROUGHT IT OUT FOR YOU.

17   A    I SEE ANESTHESIOLOGY THREE TIMES WITH THREE DIFFERENT

18   NUMBERS, HIGH LOW, TENTH PERCENTILE, 50TH PERCENTILE.

19   THEY'RE DIFFERENT NUMBERS.  WHAT IS YOUR QUESTION?

20   Q    WHAT WOULD BE THE MARKET PAY OF A ANESTHESIOLOGIST IN

21   COLUMBIA ACCORDING TO THIS PAY DATA, THE ANNUAL SALARY?

22   A    I'M NOT SURE.  IT WOULD -- YOU KNOW, ANESTHESIOLOGIST

23   WITH MORE EXPERIENCE IS GOING TO HAVE -- IS GOING TO GO ON

24   THE SCALE HIGHER THAN AN ANESTHESIOLOGIST RIGHT OUT OF

25   RESIDENCY, SO THERE--

1    Q    OKAY.  SO YOU DON'T UNDERSTAND HOW TO USE THIS TABLE?

2    A    WELL, I CAN'T -- I CAN'T UNDERSTAND THIS TABLE.  I

3    UNDERSTAND THE --

4    Q    LET'S GO ON TO THE NEXT TABLE.

5    A    -- BETTER.

6    Q    LET'S GO TO THE NEXT TABLE.  MAYBE YOU UNDERSTAND THAT

7    BETTER.

8    A    OKAY.

9    Q    DID YOU GO ON TO THE NEXT PAGE?  HOW ABOUT THIS ONE?

10   A    OKAY.

11   Q    YOU KNOW WHERE THE COMMUNITY STANDARD IS ON HERE?

12   A    LET ME SEE HERE.  THE MEDIAN ANESTHESIOLOGY FOR AN

13   ASSOCIATE PROFESSOR IS $351,000.  IN ALL PROBABILITY SOMEONE

14   WITH OVER 15 YEARS EXPERIENCE IN AN ACADEMIC INSTITUTION

15   WOULD LIKELY BE A FULL PROFESSOR AND THAT'S LISTED AT

16   $380,000.

17   Q    SO IS THIS YOUR TESTIMONY THAT THIS IS WHAT THE MARKET

18   PAY SHOULD BE IN COLUMBIA?

19   A    THAT'S WHAT -- I MEAN, AS I SAID, MARKET PAY IS A

20   SUPPLEMENT.  THIS IS THE INDICATION OF WHAT THE MARKET IS.

21   I'M NOT GOING TO USE THE TERM MARKET PAY.  THIS IS AN

22   INDICATION OF WHAT THE MARKET IS IN ACADEMIC INSTITUTIONS

23   WHICH THE VA IN MY EXPERIENCE HAS OFTEN RELIED ON.

24   Q    OKAY.  SO LET'S JUST THEN -- MAYBE YOU CAN HELP ME IF I

25   APPROACH THIS A DIFFERENT WAY.  GOING BACK TO -- GOING THREE

1    PAGES BACK NOW -- TO THE CALCULATION OF YOUR MARKET PAY RIGHT

2    HERE ON -- AT THE BOTTOM, LOWER DOWN ON THIS PAGE.

3    A    YES.

4    Q    WHAT DO YOU THINK THE MARKET PAY SHOULD -- FIGURE SHOULD

5    HAVE BEEN IN THAT SLOT?

6    A    I WOULD LIKE TO HAVE THE -- ALL PAY PANEL CHARTS FOR

7    NOVEMBER 10, 2016 TO ANSWER THAT QUESTION.

8         MR. IRVIN:  TAKE A LOOK, SEE IF YOU DON'T HAVE

9    THOSE UP THERE.  IF NOT, WE WILL GET THEM FOR YOU.

10         THE WITNESS:  I HAVE MAY 1, 2015.

11         MR. IRVIN:  AND SAY AGAIN WHAT DATE YOU'RE LOOKING

12    FOR.

13         THE WITNESS:  THE NOVEMBER 10, 2016 COLLECTION OF

14    PAY PANELS.

15         MR. IRVIN:  HERE YOU ARE.  THIS IS EXHIBIT 12, YOUR

16    HONOR.  PLAINTIFF'S EXHIBIT 12.

17         THE WITNESS:  $195,678.

18    BY MRS. BAILEY:

19    Q    OKAY.  AND WHERE DID YOU GET THAT FIGURE FROM?

20    A    IT'S FROM DR. ALGHOTHANI'S AWARD AND DR. NGUYEN'S AWARD,

21    WHICH I BELIEVE WAS EXACTLY THE SAME.

22    Q    OKAY.  NOW WHERE DO THOSE FIGURES COME FROM?

23    A    THOSE FIGURES COME BASED UPON THE TESTIMONY OF VA

24    WITNESSES FROM SUBTRACTING THESE ANESTHESIOLOGISTS' BASE PAY

25    FROM THE TOTAL PAY AWARD TO COME UP WITH THE MARKET PAY.

1    Q    BUT YOU'RE SAYING THAT'S NOT THE RIGHT WAY TO DO IT.  SO

2    GOING BACK TO YOUR WAY, HOW WOULD -- WHAT IS THE RIGHT WAY TO

3    DO THIS?

4    A    OKAY.  THE RIGHT WAY TO DO THIS IS FOR THE PAY PANEL OF

5    A VETERAN'S ADMINISTRATION AND WHAT I -- PARTICULAR SPECIALTY

6    PHYSICIAN COMES IN, TO LOOK AT THE MARKET BASED UPON SURVEYS

7    THAT ARE SUBMITTED.

8    Q    AND THOSE ARE TWO SURVEYS WE JUST LOOKED AT THAT --

9    A    YES.

10    Q    -- YOU DON'T UNDERSTAND.

11    A    WELL, I UNDERSTAND THE ACADEMIC ONE.  I DIDN'T QUITE

12    UNDERSTAND THE OTHER ONE.  I UNDERSTAND THE ACADEMIC ONE

13    QUITE CLEARLY.  AND THE VA TYPICALLY GOES WITH THE ACADEMICS

14    BASED ON MY EXPERIENCE WORKING WITH THE VA.

15        THE PAY PANEL SHOULD LOOK AT WHAT THE COMPENSATION IS IN

16    THE MARKET USING THOSE SURVEYS.  THE PANEL SHOULD LOOK AT

17    WHAT KIND OF BASE PAY THEY'RE CONSIDERING IN THE FIRST

18    PHYSICIAN TO COME BEFORE THEM AND THEN THEY SHOULD COME UP

19    WITH A MARKET PAY SUPPLEMENT WHICH IS WHAT WAS DESIGNED BY

20    CONGRESS IN ORDER TO COME UP WITH A TOTAL COMPENSATION THAT

21    WILL BE COMPETITIVE.

22    Q    OKAY.  SO IN THIS INSTANCE WE HAVE GOT THE SURVEY AND

23    THE NEXT TWO PAGES.  WHAT WOULD HAVE BEEN THE SURVEY PAY?

24    A    I'M SORRY.  I DIDN'T UNDERSTAND YOUR QUESTION.

25    Q    USING YOUR THEORY --

1    A    YES.

2    Q    -- WHICH IS THAT YOU TAKE THE BASE PAY THEN ADD THE

3    SURVEY TO IT OR CONSIDER THE SURVEY WITH IT.

4    A    RIGHT.

5    Q    HOW WOULD YOU -- WHAT WOULD BE THE SURVEY PAY ON THESE

6    NOVEMBER '86 PAY PANELS?

7    A    WELL, THE PAY FOR THE MOST -- THE NEWEST

8    ANESTHESIOLOGIST WOULD LOOK AT -- BECAUSE THESE WERE ALL DONE

9    TOGETHER AND EVERYBODY WAS ALREADY HERE, OKAY?  SO THIS

10   WAS -- THIS WAS A LITTLE DIFFERENT SITUATION.  BUT THE WAY IT

11   SHOULD OPERATE IS THE PAY PANEL SHOULD LOOK AT A GOAL FOR

12   COMPENSATION AND THEN LOOK AT SOMEONE WHO HAS COME BEFORE

13   THEM, SEE WHAT THEIR BASE PAY IS, AND COME UP WITH A MARKET

14   PAY; MARKET PAY SUPPLEMENT.

15       WHEN THE NEXT -- THE KEY IS WHERE THE NEXT PHYSICIAN

16   COMES ALONG, THEY HAVE THE -- THE PANEL HAS ESTABLISHED WHAT

17   THE APPROPRIATE SUPPLEMENT IS FOR A PERSON WITH THAT -- IN

18   THAT SPECIALTY WITH THAT PARTICULAR LEVEL OF EXPERIENCE BASED

19   ON THE VARIOUS FACTORS.

20       SO WHEN SOMEONE COMES WITH A -- WITH A HIGHER BASE PAY,

21   THAT DOESN'T MEAN THEY ARE NOT ENTITLED TO THE SAME

22   SUPPLEMENT AS THEIR COLLEAGUE.  THEY ARE ENTITLED TO THE SAME

23   SUPPLEMENT DETERMINED BY A PREVIOUS PANEL AND ENTITLED TO THE

24   SAME -- TO THEIR BASE PAY AND THEIR RESULTING PAY WILL BE

25   HIGHER; ABSOLUTELY WILL BE HIGHER.

1    Q    I HAVE NEVER HEARD OF THIS MARKET PAY SUPPLEMENT.  WHERE

2    DOES THAT COME FROM?

3    A    THE STATUTE.

4    Q    OKAY.  WHERE IS THAT FIGURE IN ANYTHING THAT'S BEEN PUT

5    INTO EVIDENCE IN THIS COURT?

6    A    I DON'T UNDERSTAND YOUR QUESTION.  THAT FIGURE...

7    Q    WHERE IS MARKET PAY SUPPLEMENT?

8    A    IT IS CLEAR IN--

9    Q    IN ANY OF THE DOCUMENTS IN THIS COURT?

10   A    IT IS CLEAR FROM THE STATUTE THAT THE MARKET PAY IS A

11   COMPONENT OF TOTAL PAY; A COMPONENT.  IT IS NOT THE TOTAL

12   PAY.  SO WHEN THE PANEL DETERMINES MARKET PAY, IT DOES NOT

13   SAY THE HAY SURVEY SHOWS THAT THE NORMAL SALARY OF AN

14   ANESTHESIOLOGIST IS 300,000 AND THEN THE PANEL AWARDS A

15   MARKET PAY OF $300,000.  THEY DON'T DO IT THAT WAY --

16   Q    AND YOU DON'T WANT THEM TO DO IT THAT WAY.

17   A    -- COMPONENT.

18   Q    YOU DON'T WANT THEM TO DO IT THAT WAY.

19   A    NO, I'M NOT ASKING THEM TO AWARD A MARKET PAY NUMBER

20   THAT IS COMPARABLE TO THE MARKET IN THE COMMUNITY.

21   Q    SO JUST LET ME JUST CLARIFY --

22   A    RIGHT.

23   Q    -- THIS MARKET PAY FIGURE THAT'S PART OF THIS EQUATION

24   WE HAVE BEEN USING, BASE PAY PLUS MARKET PAY EQUALS ANNUAL

25   PAY, YOU DO NOT THINK THAT SHOULD BE THE MARKET PAY IN THE

1    COMMUNITY; IS THAT CORRECT?

2    A    THE VA--

3    Q    IS THAT YES OR NO?

4    A    THE VA MARKET PAY IN -- UNDER THE STATUTE IS A

5    COMPONENT.  IT IS NOT THE SAME NUMBER AS THE ACTUAL MARKET

6    SALARY THAT IS SHOWN IN THE COMMUNITY BASED UPON THE SURVEYS.

7    Q    ALL RIGHT.  SO, THIS MARKET PAY SUPPLEMENT IN YOUR

8    READING OF THE VA REGULATIONS OR THE POLICIES, WHERE DOES IT

9    TALK ABOUT A MARKET PAY SUPPLEMENT?

10   A    IT REFERS TO IT AS A COMPONENT.

11   Q    COMPONENT.

12   A    OKAY.  YES.  SAME THING.

13   Q    OKAY.  SO YOU'RE -- IN YOUR VIEW A MARKET PAY COMPONENT

14   MEANS A MARKET PAY AS A SUPPLEMENT TO BASE PAY.

15   A    IT'S CLEARLY A SUPPLEMENT OR COMPONENT.  IT DOESN'T

16   MATTER HOW YOU CHARACTERIZE IT.

17   Q    BUT WHATEVER IT IS, IT'S NOT THE SAME MARKET PAY YOU

18   HAVE OUT IN THE COMMUNITY.

19   A    MARKET PAY IS A SPECIFIC DEFINED TERM UNDER THE STATUTE.

20   THE PAY -- THE TERM MARKET PAY IN THE COMMUNITY DOESN'T

21   REALLY MAKE SENSE.  YOU CAN TALK ABOUT WHAT THE TYPICAL

22   SALARIES ARE FOR A SPECIALIST IN THE COMMUNITY.  MARKET PAY

23   IS A SPECIFIC DEFINED TERM UNDER THE STATUTE.  IT'S NOT A

24   TERM THAT'S USED IN THE PRIVATE SECTOR.

25   Q    WELL, TALK ABOUT ANNUAL SALARY THEN.

1    A    OKAY.

2    Q    IS IT YOUR POSITION THAT THE VA'S MARKET PAY COMPONENT

3    --

4    A    UH-HUH.

5    Q    -- SHOULD HAVE ANY RELATIONSHIP TO THE AVERAGE OR THE

6    ANNUAL SALARY IN THE COMMUNITY?

7    A    WHEN IT'S INITIALLY DETERMINED, THAT ANNUAL SALARY

8    AVERAGE IN THE COMMUNITY IS USED TO DETERMINE IT.  ONCE IT'S

9    DETERMINED, THEN IT SHOULDN'T BE LESS FOR SOMEONE ELSE WHO

10   HAS THE SAME EXPERIENCE AND THE SAME FACTORS APPLY AND WHEN

11   THAT PERSON HAS, LIKE ME, HAS EVEN SIGNIFICANTLY MORE VA, VHA

12   TIME.

13   Q    I UNDERSTAND YOU FEEL THE INJUSTICE.  I'M TRYING TO

14   FIGURE OUT WHAT WOULD BE IN THE SECOND FIGURE, THE MARKET PAY

15   FIGURE, FOR DOCTORS ALGHOTHANI AND NGUYEN BACK IN 2016.

16   A    THEIR MARKET PAY WAS WHAT I SAID; 195 SOMETHING.

17   Q    OKAY.

18   A    THAT WHAT YOU'RE ASKING?

19   Q    YOU KNOW IF THAT'S CORRECT?

20   A    I DON'T KNOW WHETHER IT'S CORRECT OR NOT.

21   Q    YOU CAN'T QUARREL WITH THAT.

22   A    WITH THE -- WITH THE TOTAL GOAL OF 300,000 FOR SOMEONE

23   BRAND NEW?  I DON'T QUARREL WITH THAT.

24   Q    SO THE FIGURES FOR DR. ALGHOTHANI AND NGUYEN,

25   ALGHOTHANI -- HERE'S THE FIRST ONE IN THIS BOOK.  WE DON'T

1    HAVE TO PULL THAT UP.  YOU'RE OKAY WITH THOSE FIGURES; IS

2    THAT RIGHT?

3    A    YES.  I'M OKAY WITH THEM IF I WAS RECEIVING SOMETHING

4    COMPARABLE OR MORE.

5    Q    MAYBE ONE FURTHER.  LOOKING DOWN HERE IN PART C WHERE IT

6    SAYS, ANNUAL RATE OF PAY.

7    A    YES.

8    Q    104.  NOW, THAT'S ALGHOTHANI'S BASE PAY.

9    A    YES.

10    Q    AND THE MARKET PAY IS 195,678.

11    A    YES.

12    Q    YOU'RE OKAY WITH THAT FIGURE?

13    A    I GUESS.  I DON'T HAVE ANY QUARREL WITH IT.

14    Q    OKAY.  AND THE TOTAL ANNUAL PAY OF 300,000, YOU DON'T

15    QUARREL WITH THAT EITHER?

16    A    WELL, DR. ALGHOTHANI, THAT'S APPROPRIATE.

17    Q    NOW, YOU'RE ARGUING THAT THERE SHOULD BE SOME KIND OF A

18    DISCOUNT TO ALGHOTHANI'S PAY THAT WOULD BENEFIT YOU.  NOW,

19    HOW DO YOU COME UP WITH THAT?

20    A    I DON'T UNDERSTAND THE DISCOUNT.

21    Q    OKAY.  ALGHOTHANI'S MARKET PAY IS 195.

22    A    YES.

23    Q    AND YOU'RE SAYING THAT THAT IS TOO MUCH FOR HIM OR IT

24    SHOULD BE DISCOUNTED FOR HIM?

25    A    NO, I'M NOT SAYING THAT.  I -- THAT'S FINE AS LONG AS --

1    AS OTHER PEOPLE WITH -- THAT HAVE THE SAME FACTORS AS DR.

2    ALGHOTHANI ALSO RECEIVE THAT, OR IF THEIR -- IF THEIR FACTORS

3    WEIGH MORE THAN OTHER PEOPLE IN THE SAME PANEL AT THE SAME

4    TIME RECEIVE MORE THAN THAT.

5    Q    OKAY.

6    A    BUT -- BUT--

7    Q    BUT YOU'RE OKAY--

8    A    BUT LET ME FINISH HERE.  THE FACT THAT MY BASE PAY --

9    HIS IS 104,322.  MINE WAS, WHAT, 130 SOMETHING.  I SHOULD NOT

10   BE PENALIZED BECAUSE I HAD SPENT MANY YEARS AT THE VA AND

11   ACCUMULATED MULTIPLE STEP INCREASES AND HAD -- BASICALLY HAVE

12   MY STEP INCREASES DEDUCTED FROM WHAT THE PANEL HAS DETERMINED

13   TO BE AN APPROPRIATE MARKET PAY TO THEN GIVE ME A

14   SIGNIFICANTLY REDUCED MARKET PAY MERELY BECAUSE I HAVE GOT A

15   LOT OF YEARS AT THE VA AND THEY ARE NOT GOING TO LET ME BE

16   COMPENSATED FOR IT.

17   Q    OKAY.  BUT YOU DON'T -- JUST TO REITERATE AND WE CAN

18   PROBABLY MOVE ON, THE -- THE FORMULA WHICH IS BASE PAY PLUS

19   MARKET PAY EQUALS TOTAL PAY, YOU'RE FINE WITH THAT?

20   A    FINE WITH THAT, BUT I'M NOT --

21   Q    AND ALSO--

22   A    BUT -- I'M NOT FINE WITH THE VA HAVING COMPENSATION

23   PANELS DETERMINE TOTAL PAY.  THAT CREATES BASICALLY AN ABSURD

24   SITUATION BECAUSE WHEN THE PANEL -- IF THE CONGRESS HAD

25   INTENDED FOR THE COMPENSATION PANELS TO DETERMINE TOTAL PAY,

1    IT WOULD HAVE SAID SO, BUT IT DIDN'T.  IT SET FORTH THESE

2    DIFFERENT COMPONENTS OF PAY.

3         SO, WHEN THE VA CONTRARY TO THE INTENT OF CONGRESS HAVE

4    THE COMPENSATION PANELS DETERMINE TOTAL PAY, IT MAKES THE

5    WHOLE CONCEPT OF BASE PAY AND MARKET PAY BASICALLY AN

6    ABSURDITY BECAUSE YOU HAVE GOT CLERICAL PEOPLE IN THE VA WHO

7    ARE VISUALLY LOOKING AT DOCUMENTS AND -- AFTER AN AWARD OF

8    SAY 300,000, OKAY, NOW WHAT IS THE -- IS THE BASE PAY?  OKAY,

9    WE GOT THE BASE PAY, NOW LET'S SUBTRACT THAT, WE COMING UP

10   WITH THIS MARKET PAY.  WELL THESE --

11   Q    DR. KENNEDY--

12   A    -- THESE ARE MEANINGLESS NUMBERS.

13   Q    ANSWER MY QUESTION, WE MIGHT COULD GO HOME TODAY.

14   A    OKAY.

15   Q    THE SECOND COMPONENT, WHICH IS THE MARKET PAY SUPPLEMENT

16   --

17   A    YES.

18   Q    -- IS ONE THAT YOU FEEL THEY SHOULD BE USING.

19   A    YES.  THAT STATUTE SAYS THAT THEY SHOULD DETERMINE

20   MARKET PAY, THE MARKET PAY COMPONENT, USING THE FACTORS

21   LISTED IN THE STATUTE, YES.

22   Q    OKAY.  AND THAT MARKET PAY COMPONENT MAY VERY WELL NOT

23   BE THE MARKET PAY NUMBER THAT'S IN THE SURVEYS.

24   A    IT'S NEVER GOING TO BE THE MARKET PAY THAT'S IN THE

25   SURVEYS.  IT'S A COMPONENT.  IT'S NEVER GOING TO BE WHAT THE

1    AVERAGE SALARIES ARE IN THE COMMUNITY.

2    Q    OKAY.  THANK YOU.  WE CAN -- LET'S JUST MOVE ON.

3    A    OKAY.

4    Q    WE ARE BEATING A DEAD HORSE HERE.  I WANT YOU TO LOOK

5    DOWN HERE AT EXHIBIT 10 WHICH IS ONE OF THESE THINGS THAT YOU

6    TESTIFIED TO ON DIRECT EXAMINATION.

7    A    OKAY.

8    Q    IT'S -- YOUR LAWYER TOOK YOU THROUGH THESE AND ASKED YOU

9    TO COMPARE THESE FACTORS ON THE DIFFERENT DOCTORS.

10   A    YES.

11   Q    AND GOING BY THIS CHART YOU SAY HERE, PLAINTIFF'S

12   EXHIBIT 10, NUMBER FOUR FOR DR. PRYOR --

13   A    OKAY.

14   Q    -- SAYS HE'S GOT OVER 20 YEARS OF EXPERIENCE.  YOU SEE

15   THAT?

16   A    I SEE THAT.

17   Q    AND THEN THE NEXT PAGE OVER IS DR. PENDER.

18   A    YES.

19   Q    AND HE, TOO, HAS OVER 20 YEARS OF EXPERIENCE.

20   A    OKAY.  IT'S WHAT IT SAYS.

21   Q    GO OVER TO DR. NGUYEN.

22   A    OKAY.

23   Q    HE'S JUST GOT OVER 17 YEARS EXPERIENCE.

24   A    THAT'S PROBABLY NOT CORRECT THAT DR. NGUYEN HAS LESS

25   BECAUSE DR. NGUYEN, I BELIEVE -- I'M PRETTY SURE IF YOU'RE

1   LOOKING AT YEARS OF EXPERIENCE, HE HAS PROBABLY SLIGHTLY MORE

2   YEARS OF EXPERIENCE THAN ANYONE. I KNOW HE HAD THREE YEARS

3   MORE EXPERIENCE THAN ME AND HE'S PROBABLY GOT NUMBER -- A

4   GOOD MANY NUMBER OF YEARS MORE EXPERIENCE THAN DR.

5   ALGHOTHANI.

6   Q    SO YOU'RE SAYING DR. NGUYEN IS THE MOST EXPERIENCED OF

7   THE GROUP?

8   A    HE HAS BEEN AN ANESTHESIOLOGIST FOR THE MOST NUMBER OF

9   YEARS.

10  Q    AND IT SAYS -- WHERE IT SAYS OVER 17, THAT MIGHT BE AN

11  UNDERSTATEMENT?

12  A    I DON'T KNOW. I REALLY -- I HAVE THE CV SOMEWHERE. I

13  HAVE REVIEWED THESE AND HAVE PUT SOME OF THESE YEARS ON MY

14  CHART. BUT IT APPEARS THAT DR. MILLER OR WHOEVER PREPARED

15  THIS NARRATIVE HAS MADE SOME ERRORS ON THESE.

16  Q    OKAY. AND YOU IN FACT, WHERE IT SAYS YOU HAVE OVER 17

17  YEARS EXPERIENCE, YOUR EXPERIENCE AS AN ANESTHESIOLOGIST

18  MIGHT HAVE BEEN -- WAS PROBABLY AROUND 19?

19  A    LET'S SEE. FIND MINE. OKAY. OVER 20 YEARS OF

20  EXPERIENCE IN ANESTHESIOLOGIST -- THIS WOULD HAVE BEEN -- IS

21  THIS THE...

22  Q    IT'S KENNEDY VA UNDERSCORE 263.

23  A    IS THIS THE ONE FROM THE 5-1-15 COMPENSATION PANEL OR

24  THE ONE FROM THE 11-10-16 COMPENSATION PANEL? I DON'T KNOW.

25  Q    OKAY. WELL, SUPPOSE IT WAS THE 15 ONE.

1    A    OKAY.  IF THE 15--

2    Q    WHAT WAS YOUR YEARS--

3    A    MY YEARS OF VA EXPERIENCE WOULD HAVE BEEN 17 AND MY

4    YEARS OF ANESTHESIA EXPERIENCE WOULD HAVE BEEN 20 AT -- MAKE

5    IT -- IN MAY OF 2015.

6    Q    OKAY.  SO THE POINT IS ALL OF Y'ALL HAD BETWEEN 17 AND

7    20, AND THEN DR. NGUYEN HAD EVEN MORE THAN ANYBODY ON THIS --

8    A    I DON'T --

9    Q    -- ON THIS PAGE HERE--

10   A    -- EXACT NUMBERS, BUT WE HAD COMPARABLE NUMBER OF YEARS

11   OF EXPERIENCE.

12   Q    OKAY.  AND AS I UNDERSTAND IT FROM YOUR PRIOR TESTIMONY,

13   YOU'VE PERSONALLY NEVER BEEN OFFERED A JOB OUTSIDE OF THE VA?

14   A    NO, I HAVE NOT.

15   Q    HAVE YOU EVER ACTIVELY APPLIED FOR A JOB?

16   A    APPLIED, NO.

17   Q    SO YOU DON'T KNOW PERSONALLY WHAT YOUR VALUE IS TO A

18   ANESTHESIOLOGY PRACTICE IN COLUMBIA.

19   A    THEY DON'T SEEM TO VALUE OLDER PEOPLE BASED UPON MY

20   EXPERIENCE.  THEY HAVE -- THEY PLACE MORE VALUE ON SOMEONE

21   WHO COMES IN AS A -- SOMEONE OFF -- BEFORE A PARTNERSHIP

22   TRACK AND WHO IS GOING TO BE WITH THEIR GROUP FOR A LONG

23   PERIOD OF TIME.

24   Q    YEP.  WANT TO ASK YOU ABOUT -- THIS IS ANOTHER THING YOU

25   SPOKE -- YOU DISCUSSED WITH YOUR LAWYER.  IT'S PLAINTIFF'S

1    EXHIBIT NUMBER 5 AND IT'S THE NAEL ALGHOTHANI BOARD PAPERS.

2    IF YOU COULD TURN TO KENNEDY PAGE TWO.

3    A    OKAY.

4    Q    NOW, JUST TO REFRESH ME, THIS IS THE BOARD THAT YOU

5    PRESENTED WHEN YOU WERE ACTING CHIEF OF THE ANESTHESIOLOGY

6    GROUP?

7    A    YES.

8    Q    AND THIS WAS IN MAY 22, 2014.

9    A    YES.

10    Q    AND YOU HAD SOME CONCERN THAT THE BOARD WAS CURSORY IN

11    ITS CONSIDERATION OF DR. ALGHOTHANI?

12    A    YES.

13    Q    AND LOOK AT THE -- I WAS LOOKING AT THIS COVER

14    MEMORANDUM, FIRST PAGE KENNEDY NUMBER TWO.  THAT'S ACTUALLY

15    YOUR SIGNATURE AT THE BOTTOM; ISN'T IT?

16    A    IT IS.  I DID NOT DRAFT THIS LETTER.  IT WAS DRAFTED BY

17    SOMEONE IN THE ADMINISTRATION FOR MY SIGNATURE.

18    Q    OKAY.  NUMBER ONE IT SAYS, I RECOMMEND THAT NAEL

19    ALGHOTHANI RECEIVE AN EXCEPTION TO THE PAY CAP AND THAT HE

20    GET 288.

21    A    YES.

22    Q    THAT'S WHAT YOU RECOMMENDED.

23    A    YES, I RECOMMENDED -- I WAS RECOMMENDING -- I HAD

24    RECOMMENDED THAT AS I HAVE TESTIFIED AT THE COMPENSATION

25    PANEL.  I RECOMMENDED THAT HE RECEIVE THAT IN TOTAL

1    COMPENSATION AND, AS I HAVE ALSO TESTIFIED PREVIOUSLY, IT WAS

2    ROUTINE FOR US TO GO BEYOND THE FACILITY TO GET APPROVAL

3    BECAUSE THE FACILITY PAY CAP WAS 275, AND ALGHOTHANI WAS

4    BEING AWARDED 288, SO IT HAD TO GO UP TO THE VISN TO BE --

5    FOR AN EXCEPTION TO BE APPROVED.

6    Q    THEN NUMBER TWO IN YOUR LETTER IT TALKS ABOUT THE MARKET

7    PAY AND THE AREA.  DO YOU SEE THAT?

8    A    YES.

9    Q    OF 331 FOR AN ASSOCIATE PROFESSOR, THAT HAY BEING 329.

10   YOU SEE THAT?

11   A    YES.

12   Q    AND THAT'S INFORMATION THAT YOU PROVIDED TO THE BOARD;

13   IS THAT RIGHT?

14   A    I JUST TOOK DOCUMENTS THAT WERE GIVEN TO ME AND

15   PRESENTED THEM.

16   Q    YOU JUST SIGNED IT BECAUSE THEY GAVE IT TO YOU.  YOU

17   NEVER EVEN LOOKED AT IT; IS THAT RIGHT?

18   A    I DIDN'T HAVE ANY AUTHORITY TO CHANGE ANYTHING.

19   Q    AND YOU DIDN'T WANT TO CHANGE ANYTHING.

20   A    I HAD NO REASON.  I HAD -- I HAD NOT SURVEYED AND

21   STUDIED THE PAY STATUTE AT THE TIME THIS WAS PREPARED.  I WAS

22   GOING THROUGH THE MOTIONS AS I HAD BEEN REQUESTED TO DO.

23   Q    OKAY.  AND YOU NOTICED THAT YOU, YOURSELF, IN THIS

24   LETTER THAT YOU SIGNED SAID THAT ALGHOTHANI HAD OVER 10 YEARS

25   OF EXPERIENCE IN ANESTHESIA, AND YOU GO THROUGH WHAT HIS

1    CERTIFICATIONS ARE.

2    A    YES.

3    Q    THEN NUMBER FOUR IS THE NEED BECAUSE THE SPACE HAD BEEN

4    VACANT SINCE JANUARY.

5    A    WE NEEDED DR. ALGHOTHANI, NO QUESTION.

6    Q    AND THEN YOU WERE THE ONE WHO PRESENTED THIS INFORMATION

7    TO THE BOARD; YOU PERSONALLY.

8    A    THIS INFORMATION WE'RE TALKING ABOUT, JUST TO BE CLEAR,

9    WAS PRESENTED TO VISN.  I DID PRESENT INFORMATION TO THE

10   BOARD THAT HAD BEEN PREPARED BY EITHER DR. MILLER OR HIS

11   ADMINISTRATIVE ASSISTANT.  I TOOK THE INFORMATION -- THE

12   PAPERWORK THEY GAVE ME AND I PRESENTED IT TO THE BOARD.

13   Q    OKAY.  AND YOU DIDN'T REALLY LOOK AT IT AND YOU DIDN'T

14   CARE WHAT IT WAS.  YOU JUST PRESENTED IT JUST--

15   A    I WANTED DR. ALGHOTHANI TO BE HIRED.  I WANTED THEM TO

16   APPROVE HIS SALARY SO THAT HE WOULD BE.

17   Q    OKAY.

18   A    YES.

19   Q    GOING ON TO THE NEXT PAGE, WHICH WILL BE KENNEDY

20   UNDERSCORE FIVE.

21   A    PLAINTIFF'S EXHIBIT 5?

22   Q    YES, SIR.

23   A    OKAY.  AND BOTTOM?  ALL RIGHT.

24   Q    NOW, YOU PRESENTED THIS PAPERWORK TO THE BOARD; RIGHT?

25   A    THIS DOCUMENT I'M HOLDING IN MY HAND IS THE PANEL

1    DECISIONS.  NOT SOMETHING I PRESENTED.

2    Q    YOU PRESENTED THE INFORMATION TO THE BOARD?

3    A    I'M SURE I DID.

4    Q    YOU ANSWERED ANY QUESTIONS THEY HAD?

5    A    THERE WERE NO QUESTIONS.

6    Q    THE PANEL MEMBERS SIGNED THIS?

7    A    YES, THEY DID.

8    Q    DID THEY SIGN IT IN YOUR PRESENCE?

9    A    I'M SURE THEY DID.  YES, I WAS THERE.

10   Q    DO YOU HAVE ANY REASON TO THINK THAT THEY -- THEY WERE

11   UNAWARE OF WHAT THEY WERE SIGNING OF THE -- OF THEIR ANNUAL

12   RATE OF PAY?

13   A    IT WAS CLEAR TO ME THAT THEY--

14   Q    MY QUESTION WAS, DO YOU HAVE ANY REASON TO THINK THAT

15   THEY DID NOT KNOW WHAT THE ANNUAL RATE OF PAY WAS THAT THEY

16   WERE AGREEING TO?

17   A    SPECULATING ON WHAT THEY KNEW?  I DON'T KNOW WHAT THEY

18   KNEW OTHER THAN WHAT I COULD SAY THAT I OBSERVED.  I'LL BE

19   HAPPY TO TELL YOU WHAT I OBSERVED.

20   Q    AND JUST REAL QUICKLY GOING ON TO PLAINTIFF'S EXHIBIT

21   NUMBER 18.  THIS IS SOMETHING THAT YOU DREW UP YOURSELF?

22   A    YES, IT IS.

23   Q    NO ECONOMIST OR OTHER EXPERT HAS LOOKED AT IT?

24   A    NO.

25   Q    DID YOU EVER ASK ANYBODY AT OPM TO SEE IF THESE FIGURES

KENNEDY - CROSS

454

1    WERE CORRECT?

2    A    I WOULDN'T HAVE ANY IDEA HOW TO DO THAT.

3    Q    OKAY.  WANT TO ASK YOU ABOUT NUMBER THREE.

4    A    YES.

5    Q    NOW, YOU TALK ABOUT DR. LEDER.

6    A    YES.

7    Q    WHAT WAS HIS AGE?

8    A    I HAVE IT PROBABLY IN MY FILES SOMEWHERE, BUT I DON'T

9    RECALL IT RIGHT OFF-HAND.  I KNOW HE WAS YOUNGER THAN I.

10   Q    AND WHAT WAS HIS YEARS OF PRACTICE?

11   A    I DON'T RECALL SPECIFICALLY.  IT WAS CLOSE PROBABLY

12   AROUND SIMILAR TO ME.  I DON'T RECALL SPECIFICALLY.

13   Q    HOW ABOUT DR. CARTER?  WHAT WAS HIS AGE?

14   A    I KNOW DR. CARTER WAS -- WAS YOUNGER THAN I AND I THINK

15   HE HAD MORE YEARS OF EXPERIENCE AS A PRACTICING

16   ANESTHESIOLOGIST THAN I.

17   Q    OKAY.

18   A    BUT OUR OTHERWISE COMPETENCE IN ANESTHESIA ABILITIES

19   WERE VERY, VERY COMPARABLE.

20   Q    AND THEN I WANT TO ASK YOU ABOUT THIS -- YOU SAID

21   THERE -- THE VA SHOULD REWARD LONGEVITY.

22   A    I SAID--

23   Q    WHERE -- WHERE IN THE POLICY, IN THE STATUTES, OR

24   ANYTHING ABOUT THE -- ABOUT THE VETERAN ADMINISTRATION DOES

25   IT SAY THAT THEY REWARD LONGEVITY?

1    A    OKAY.  THERE IN THE PAY ACT OF 2006, THEY CREATE THREE

2    COMPONENTS OF PAY; BASE PAY, MARKET PAY, AND PERFORMANCE PAY.

3    AS WE KNOW, PERFORMANCE PAY IS NOT AT ISSUE IN THIS

4    LITIGATION--

5    Q    IT DOESN'T SAY THERE THAT THEY REWARD LONGEVITY?

6    A    I'M TRYING TO ANSWER YOUR QUESTION.

7    Q    OKAY.  SO YOU'RE JUST GOING BACK TO THE FACT THAT THAT'S

8    THE FORMULA FOR CALCULATING IT?

9    A    NO, NOT TALKING ABOUT THE FORMULA.  YOU ASKED ME ABOUT

10   WHAT -- WHY DO I THINK CONGRESS INTENDED TO REWARD --

11   Q    NO--

12   A    -- LONGEVITY OR WHY THE VA INTENDS TO--

13   Q    THAT'S NOT--

14        THE COURT:  THAT WASN'T THE QUESTION.  THE QUESTION

15   WAS WHERE IN THE STATUTE DOES IT SAY THE VA SHOULD REWARD

16   LONGEVITY.

17        THE WITNESS:  OKAY.

18        THE COURT:  SO, IF YOU CAN POINT TO SOMETHING IN

19   THE STATUTE THAT SAYS THAT, THAT WOULD ANSWER THE QUESTION.

20        THE WITNESS:  OKAY.  I CAN.

21   BY MRS. BAILEY:

22   Q    OKAY.  GOOD.

23   A    THE SECTION ON BASE PAY HAS CHARTS ATTACHED TO IT WHERE

24   VA PHYSICIANS ARE GIVEN STEP INCREASES, SIGNIFICANT STEP

25   INCREASES, EVERY TWO YEARS THEY ARE THERE.  STEP INCREASES

1    ARE REWARDS FOR LONGEVITY -- LONGEVITY.  IN THE MARKET PAY

2    PROVISION OF THE STATUTE PASSED BY CONGRESS THEY LIST FACTORS

3    TO BE -- THAT SHOULD BE CONSIDERED.  ONE OF THOSE FACTORS IS

4    LENGTH OF VHA SERVICE.

5        SO, THE BASE PAY PART OF THE STATUTE REWARDS LONGEVITY

6    IN THE WAY IT PROVIDES STEP INCREASES.  IN THE MARKET PAY

7    PROVISIONS OF THE STATUTE IT DIRECTS THE COMPENSATION PANEL

8    TO GIVE CONSIDERATION IN AWARD OF MARKET -- OF THE MARKET PAY

9    COMPONENT TO V -- YEARS OF VHA SERVICE.

10   Q    IS THAT ALL YOU GOT TO BASE YOUR REWARD, LONGEVITY ON?

11   A    THAT'S -- THAT'S MY COMMENT ON THE -- YOU ASKED ME ABOUT

12   WHAT DOES THE -- HOW DOES THE STATUTE SHOW THAT IT REWARDS

13   LONGEVITY AND I HAVE ANSWERED THAT.

14   Q    ONE MINUTE WHILE I CONSULT.

15           MRS. BAILEY:  NO FURTHER QUESTIONS, YOUR HONOR.

16           MR. IRVIN:  WE HAVE NOTHING FURTHER, YOUR HONOR.

17           THE COURT:  ALL RIGHT.  I JUST WANT TO MAKE CLEAR,

18   SURE THAT EVERYONE IN THE -- THAT YOU HAVE COMPARED YOURSELF

19   TO IN THE DEPARTMENT IS OVER 40 YEARS OLD; CORRECT?

20           THE WITNESS:  YES.

21           THE COURT:  OKAY.  I DON'T HAVE ANYTHING ELSE.

22   THANK YOU.  YOU CAN STEP DOWN.

23       (WITNESS LEFT THE STAND.)

24           THE COURT:  ALL RIGHT.  DO YOU WANT TO HAVE ANY

25   OTHER WITNESSES?

1              MR. IRVIN:  YOUR HONOR, THAT'S ALL THE WITNESSES

2     FOR THE PLAINTIFF.  I THINK WE HAD 13 OF THEM.

3              THE COURT:  ALL RIGHT.  THANK YOU.  ANY WITNESSES,

4     ADDITIONAL WITNESSES, FOR THE GOVERNMENT?  I KNOW THAT YOU

5     WERE ASKED TO EXAMINE THE WITNESSES AS IF THEY WERE YOUR

6     DIRECT EXAMINATION.

7              MRS. BAILEY:  NO ADDITIONAL WITNESSES, YOUR HONOR.

8              THE COURT:  ANY ADDITIONAL ARGUMENT THAT THE

9     PARTIES WANT TO MAKE?  SHORT AND BRIEF.

10              MR. IRVIN:  SHORT AND VERY BRIEF, YOUR HONOR.  I

11     SAID AT THE BEGINNING THAT THE CASE INVOLVES THE

12     ANESTHESIOLOGISTS AT DORN.

13              COURT REPORTER:  CAN YOU GET TO A MICROPHONE?

14              MR. IRVIN:  OH, I BEG YOUR PARDON.

15              COURT REPORTER:  THANK YOU.

16              MR. IRVIN:  YOUR HONOR, I SAID THAT THE CASE IS

17     ABOUT ANESTHESIOLOGISTS AT DORN VA MEDICAL CENTER AND THE

18     AMOUNTS OF MARKET PAY THOSE ANESTHESIOLOGISTS RECEIVE.  THE

19     CASE IS NOT ABOUT UROLOGISTS IN OREGON OR IN DIFFERENT

20     FACILITIES ACROSS THE COUNTRY IN DIFFERENT SPECIALTIES.

21          WE FOCUSED, AS YOUR HONOR HAS CLEARLY POINTED OUT, ON

22     THOSE STAFF ANESTHESIOLOGISTS AT THE DORN VA MEDICAL CENTER.

23     AND WE BELIEVE, YOUR HONOR, THAT THE METHODOLOGY THAT IS

24     APPLIED AND WHICH ALL -- VIRTUALLY EVERY WITNESS THAT

25     PARTICIPATED IN THESE PANELS TESTIFIED -- THE METHODOLOGY

1    THAT IS APPLIED AND APPARENT -- AND NOT APPARENT -- AND

2    APPROVED BUT RIGHT ON UP THE CHAIN IN THE VA IS SIMPLY THAT

3    MARKET PAY, RATHER THAN BEING SEPARATELY DETERMINED AS

4    REQUIRED BY THE STATUTE, IS PURELY AN ARITHMETIC CALCULATION.

5         THE VA DECIDES WHAT IT WANTS THE TOTAL SALARY TO BE FOR

6    SOMEONE AND THEY PRESENT THAT TO THIS PANEL AND THE PANEL

7    ADOPTS THAT AND THEN HR TAKES THE TOTAL NUMBER AND GOES TO

8    THE LONGEVITY PAY TABLE AND DETERMINES THE BASE PAY BASED ON

9    THE TABLE AND THEN SIMPLY SUBTRACTS FROM THE TOTAL PAY THE

10   ANNUAL PAY NUMBER THAT IS APPROVED BY THE PANEL, THE BASE

11   PAY, AND THAT IS HOW THEY DETERMINE MARKET PAY.

12        AND THE FACTORS THAT ARE IN THE STATUTE AND THEN

13   SIMILARLY IN THE VA HANDBOOK, THERE'S CERTAINLY EVIDENCE IN

14   THE RECORD THAT AT LEAST BEGINNING IN 2015 THEY AT LEAST HAD

15   TYPED-UP SHEETS THAT HAD THAT INFORMATION ON IT.  BUT WHAT IS

16   ABSOLUTELY CLEAR IS THAT BOTH THE STATUTE AND THE HANDBOOK

17   SAY THAT THOSE FACTORS ARE TO BE TAKEN -- THE STATUTE SAYS

18   SHALL TAKE INTO ACCOUNT THOSE, THOSE FACTORS IN DETERMINING

19   MARKET PAY, AND THAT IS THE VIOLATION OF THE STATUTE; THAT

20   THEY ARE NOT TAKING THOSE FACTORS INTO DETERMINATION IN

21   ARRIVING AT AN AWARD OF MARKET PAY.

22        AND WHAT DR. KENNEDY FOUND AND WHAT WE HAVE PRESENTED --

23   AND I DON'T THINK IT'S CONTESTED -- IS THAT THERE IS AN

24   INVERSE CORRELATION BETWEEN AGE AND AWARD OF MARKET PAY AMONG

25   THIS GROUP THAT WE FOCUS ON HERE.  AND WITH REGARD, YOUR

1  HONOR, TO ANY BUSINESS NECESSITY, ALL THEY NEEDED TO DO WAS

2  APPLY THE STATUTE AS IT IS WRITTEN.

3  AND IF YOU LOOK AT THE CALCULATIONS THAT DR. KENNEDY HAS

4  MADE, WHICH THE EVIDENCE WILL SUPPORT, THAT EVEN WITH HIS

5  CALCULATIONS AND INCREASING HIS MARKET PAY AWARD, WHICH HAS

6  THE IMPACT OF INCREASING HIS TOTAL SALARY, HE'S GOING TO BE

7  WITHIN THE RANGE OF WHAT IS TYPICALLY -- HAS BEEN APPROVED IN

8  THE ANESTHESIOLOGY DEPARTMENT BY WAY OF EXCEPTIONS REQUESTED

9  AND APPROVED JUST LIKE DR. KENNEDY DID FOR DR. ALGHOTHANI AT

10  THE VISN LEVEL.

11  AND SO THERE'S NOT GOING TO BE A CRISIS HERE AND NO ONE,

12  CERTAINLY DR. KENNEDY, IS NOT ASKING ANYBODY TO ADJUST HIS

13  SALARY AT $427,000 OR SOMETHING LIKE THAT BUT SIMPLY TO PUT

14  HIM IN LINE BASED ON THE STATUTORY FACTORS.  AND IT IS

15  UNDISPUTED IN THIS CASE THAT THE ONLY FACTOR THAT REALLY

16  MATTERS IN THIS CASE IS THE PRIOR VA EXPERIENCE -- AND

17  UNDENIABLY DR. KENNEDY HAS THE HIGHEST AMOUNT OF EXPERIENCE

18  THAN ANY OF THE STAFF ANESTHESIOLOGISTS.

19  AND SO ALL WE'RE SAYING IS THAT BECAUSE OF THAT, WITH

20  EVERYTHING ELSE BASICALLY BEING EQUAL, HE SHOULD RECEIVE AT

21  LEAST AS MUCH AS THE HIGHEST MARKET PAY AWARD FOR THE STAFF

22  ANESTHESIOLOGISTS AS WAS GIVEN BY A PANEL FOR ANY PAY PERIOD

23  AND WE BELIEVE THAT YOUR HONOR HAS THE AUTHORITY UNDER THE

24  APPLICABLE STATUTES TO DIRECT THE GOVERNMENT TO RECALCULATE

25  DR. KENNEDY'S SALARY BY INCREASING HIS MARKET PAY.  AND IN

460

1    DOING SO, THEY WILL ALSO HAVE RECALCULATED SUCH THAT HIS

2    PENSION BENEFITS WOULD LIKE -- LIKEWISE INCREASE IN

3    ACCORDANCE WITH HIS INCREASED SALARY.

4         AND SO, YOUR HONOR, IT SEEMS TO ME THAT THE HEART OF THE

5    CASE IS SIMPLY THAT YOU HAVE A STATUTE, AND THEY MIGHT NOT

6    LIKE IT, BUT THEY GOT TO GO BY IT, AND IT SAYS WHAT IT SAYS

7    AND THAT IS WHAT FOLKS LIKE DR. KENNEDY RELY ON IS THAT THE

8    GOVERNMENT WILL ABIDE BY THE STATUTES THAT CONTROL ITS

9    ABILITY TO AWARD SALARIES.

10        AND SO, I BELIEVE, YOUR HONOR, THAT THE REAL DISPUTE

11   HERE IS THAT THE GOVERNMENT SAYS THAT IT DOES NOT WANT TO

12   GIVE DR. KENNEDY CREDIT FOR HIS LONGEVITY AT THE VA BECAUSE

13   HE'S ALREADY GETTING IT THROUGH THE BASE PAY.  AND

14   UNFORTUNATELY, YOUR HONOR, THAT WOULD MEAN THAT WE WOULD HAVE

15   TO TAKE OUT OUR PEN AND STRIKE THROUGH WHAT CONGRESS HAS PUT

16   IN THE STATUTE WHERE THEY CLEARLY SAY THAT THE DETERMINATION

17   OF MARKET PAY SHALL TAKE INTO ACCOUNT THE PRIOR EXPERIENCE OF

18   THE PHYSICIAN.  SHALL TAKE INTO ACCOUNT.  THEY MUST GIVE IT

19   WEIGHT.

20        AND WHAT THEY ARE SAYING IS, ALREADY GIVEN HIM THAT IN

21   BASE PAY.  AND WHAT WE ARE SAYING IS HE IS ENTITLED TO THAT

22   BASE PAY THAT HE RECEIVES AND THOSE LONGEVITY STEPS ALONG THE

23   WAY, HE'S ENTITLED AND EARNED THAT BASE PAY AND AT THE SAME

24   TIME HE IS ENTITLED UNDER THE STATUTE TO HAVE THAT LONGEVITY

25   FACTORED IN AND TAKEN INTO ACCOUNT ALSO IN HIS DETERMINATION

1    IN MARKET PAY.  AND IN THIS CASE THAT FACTOR IS THE ONLY REAL

2    DIFFERENCE.

3         ALL THE WITNESSES, THE VA WITNESSES SAID OTHERWISE,

4    THEY'RE QUALIFIED.  AND SO THAT'S -- THAT'S AT THE HEART OF

5    THE CASE AND THEY CAN'T IGNORE THAT.

6         *THE COURT:*  MR. IRVIN, THIS IS A DISPARATE IMPACT

7    CASE.

8         *MR. IRVIN:*  YES, MA'AM.

9         *THE COURT:*  AND FOR ARGUMENT PURPOSES, JUST FOR THE

10   SAKE OF THE ARGUMENT, EVEN IF THE VA VIOLATED THE STATUTE,

11   HOW HAVE YOU PROVED THAT THAT VIOLATION, IF IN FACT IT WAS,

12   HAS A DISPARATE IMPACT ON THE OTHER DOCTORS THAT ARE SUBJECT

13   TO THE SAME POLICY?

14        *MR. IRVIN:*  THANK YOU, YOUR HONOR.  BECAUSE RIGHT

15   DOWN THE LINE, THE DOCTORS IN THE ANESTHESIOLOGY GROUP,

16   AGE -- AND THEIR AGES ARE SUBJECTED TO THE DISPARATE IMPACT

17   HERE WHICH IS THE YOUNGER GUYS, YOU'RE ALL MEN, RECEIVE

18   HIGHER MARKET PAYS AND RIGHT ON UP THE CHAIN.

19        *THE COURT:*  BUT ALL OF THE INDIVIDUALS THAT HAVE

20   BEEN COMPARED TO DR. KENNEDY ARE ALL IN THE PROTECTED GROUP

21   AND THEY ARE ALL OVER 40 YEARS OLD.  SO...

22        *MR. IRVIN:*  YES, MA'AM.

23        *THE COURT:*  WHAT CASE LAW DO YOU HAVE TO SUPPORT

24   YOUR POSITION THAT IT MAKES -- THAT THEY WOULD BE APPROPRIATE

25   TO COMPARE IN THIS CASE?

 1           *MR. IRVIN:*  AND YOUR HONOR, I AM GOING TO TURN MY

 2    MICROPHONE OVER TO MRS. FULMER, MAYBE IN JUST A METAPHORIC

 3    SENSE, BUT WE WOULD LIKE THE OPPORTUNITY TO PROVIDE YOU WITH

 4    SOME AUTHORITY ON THAT, AND IT MAY BE THAT WE HAVE SOME, BUT

 5    THAT IS THE POOL.  IT IS WHAT IT IS.  THEY ARE ALL OVER 40.

 6           *THE COURT:*  I UNDERSTAND THAT AND I UNDERSTAND THE

 7    CONCERN ABOUT, BUT I HAVE TO GO BY WHAT THE LAW IS HERE.  AND

 8    HIS COMPARATORS ARE ALL IN THE PROTECTED GROUP.

 9           *MR. IRVIN:*  I UNDERSTAND.

10           *THE COURT:*  AND SO I NEED SOME CASE LAW TO SUPPORT

11    YOUR POSITION.

12           *MR. IRVIN:*  YES, MA'AM.

13           *THE COURT:*  OKAY.

14           *MR. IRVIN:*  THANK YOU.

15           *MRS. BAILEY:*  YOUR HONOR, I WAS GOING TO SHOW A

16    35-MINUTE POWERPOINT, BUT IN LIGHT OF THE LATENESS OF THE

17    DAY, MR. ANDREWS SAID HE CAN SUM IT UP.

18           *THE COURT:*  OKAY.

19           *MRS. BAILEY:*  AND I THOUGHT, GREAT IDEA.

20           *MR. ANDREWS:*  YOUR HONOR, I WILL ONLY BE 32, 33

21    MINUTES AT MINIMUM.  THAT'S A JOKE.

22         YOUR HONOR, I WILL BE AS BRIEF AS I CAN.  FRANKLY I

23    BELIEVE THAT THE EVIDENCE HAS SHOWN THAT ALL OF THE ISSUES I

24    IDENTIFIED IN MY OPENING AND MY POWERPOINT IS INCLUDED IN

25    YOUR TRIAL BRIEF HAVE COME TO BEAR.  WE HAVE SEEN THE

1    EVIDENCE DEMONSTRATE EXACTLY WHAT WE THOUGHT IT WOULD.

2         AND I WANT TO DRAW THE COURT'S ATTENTION TO ONE THING.

3    IN FACT, YOU JUST MENTIONED IT.  THE PLAINTIFF AND IN FACT

4    MR. IRVIN HAVE BOTH TOLD US WHAT THIS CASE IS ABOUT.  THIS

5    CASE IS ABOUT THE PLAINTIFF'S GRIEVANCE THAT THEY HAVE NOT

6    GIVEN HIM ENOUGH PAY FOR HIS TENURE AT THE VA.

7         AND I UNDERSTAND THE GRIEVANCE.  IT MAY BE EVEN A

8    LEGITIMATE GRIEVANCE.  BUT WE ARE NOT LITIGATING A VIOLATION

9    OF THE PAY ACT.  WE ARE LITIGATING A VIOLATION OF THE ADEA,

10   AND THERE NEEDS TO BE A SHOWING OF DISCRIMINATION TO A

11   PROTECTED CLASS.

12        SO, I'LL DRAW YOUR ATTENTION TO A COUPLE OF THINGS I

13   POINTED OUT IN THE BEGINNING OF THE TRIAL.  THE FIRST IS THAT

14   THE EVIDENCE STILL DOES NOT DEMONSTRATE THAT DR. KENNEDY WAS

15   OWED MORE THAN HIS PEERS.  IN FACT, I THINK THAT'S BEEN

16   CONCEDED THAT THEY'RE ALL FAIRLY SIMILARLY QUALIFIED.

17        I THINK IT'S ALSO BEEN DR. KENNEDY'S TESTIMONY THAT HIS

18   IDEA OF FAIRNESS WOULD BE THAT IN THIS CHART HE WOULD BE PAID

19   ABOUT $25,000 MORE THAN HIS PEERS.  AND I WOULD ASK THE COURT

20   TO LOOK AT THE EVIDENCE TO ASK WHY THAT WOULD BE TRUE THAT HE

21   WOULD BE ENTITLED TO THAT AND WHETHER THAT'S FAIR.

22        ADDITIONALLY, WHAT THAT $25,000 WOULD BE BASED ON.  IN

23   PLAINTIFF'S CONSTRUCTION IT WOULD BE BASED ENTIRELY UPON ONE

24   OF THE SEVEN FACTORS WHICH IS LENGTH OF SERVICE IN THE VA.

25        NOW, HE HAS SAID THAT THE COMPENSATION PANEL MEMBERS DO

1    NOT CONSIDER THIS FACT.  THE TESTIMONY ABSOLUTELY REFUTES

2    THAT.  EVERY MEMBER OF THE COMPENSATION PANEL WHO GOT UP HERE

3    AND TESTIFIED CONFIRMED THAT THEY CONSIDERED ALL FACTORS.

4    THEY ALSO SAID THAT THERE WAS NOT ANY ASSIGNED WEIGHT

5    REQUIRED OF THEM TO GRANT ANY ONE OF THOSE FACTORS.  THEY

6    SAID THEY CONSIDERED HIS TIME IN THE VA.  I THINK THE DISPUTE

7    HERE IS HOW MUCH MONEY THEY WERE TO REWARD IT.

8         SO, I THINK THE EVIDENCE IS CLEAR THAT THAT'S REALLY THE

9    FOUNDATION OF THIS DISPUTE IN THE PLAINTIFF'S CASE;

10   DISCRIMINATION FOR -- AGAINST VA TENURE, WHICH DID NOT OCCUR

11   HERE.  BUT EVEN IF IT DID, THAT'S NOT ACTIONABLE.  AGE

12   DISCRIMINATION IS.

13        GO FORWARD A SLIDE.  NOW, WE ARE NOT GOING TO DISPUTE

14   THE LANGUAGE IN THE STATUTE IS NOT A MODEL OF CLARITY.  WHEN

15   I CAME TO THIS CASE, IT'S -- I THINK IT'S A NATURAL REACTION

16   TO HAVE SOME CONFUSION OVER THE TERMS MARKET PAY AND ANNUAL

17   PAY AND BASE PAY, AND WE HAVE TALKED ABOUT THOSE TERMS AT

18   INFINITUM THROUGHOUT THIS TRIAL.  BUT THE POINT IS, AND I

19   THINK THAT ALL OF THE PARTIES AGREE, THAT THE VA WAS DOING

20   THE BEST JOB THAT IT COULD TO DESIGN REGULATIONS AND ENFORCE

21   THOSE REGULATIONS.

22        THE PLAINTIFF HIMSELF HAS TESTIFIED THAT MARKET PAY IS

23   DESIGNED TO BE ADDED ON TOP OF BASE PAY TO GET TO A

24   RELATIVELY COMPETITIVE LEVEL OF ANNUAL PAY.  THIS

25   DISAGREEMENT WITH COUNSEL DURING THE EXAMINATION WAS NOT

```
 1    ABOUT THAT QUESTION.  INSTEAD IT WAS ABOUT WHAT EXACTLY THE

 2    LEVEL OF MARKET PAY IT WAS OWED.

 3         AND SO YOUR HONOR, I WOULD LOOK AT THE TESTIMONY -- WE

 4    DON'T HAVE THE TRANSCRIPTS YET AVAILABLE TO US.  THE CHART WE

 5    ARE LOOKING AT HERE AGAIN IS THE AGES, AND WE SEE THE YEARS

 6    OF ANESTHESIOLOGY EXPERIENCE WHICH ARE FAIRLY COMPARABLE.

 7    CAN WE GO FORWARD ONE MORE?  LET'S GO FORWARD TO THOSE FINAL

 8    CHARTS.

 9         YOUR HONOR, WE HAVE DISCUSSED THROUGH THE COURSE OF THE

10    TESTIMONY WHAT THE APPROPRIATE COHORT GROUP IS.  WE WOULD BE

11    HAPPY TO SUBMIT ADDITIONAL BRIEFING ON THIS QUESTION.

12    OBVIOUSLY WE HAVE MADE OUR POINT THAT WE BELIEVE THAT THE

13    COHORT OF FIVE IS INSUFFICIENT AS A MATTER OF LAW AND AS A

14    MATTER OF FACT BECAUSE THE WITNESSES WHO TESTIFIED IN THIS

15    TRIAL TESTIFIED THAT AT THE DORN MEDICAL CENTER THERE'S

16    REALLY NO DIFFERENCE IN THE CALCULATION OF PAY AND THE

17    ENFORCEMENT OF THE PAY ACT AMONG ALL DOCTORS.

18         SO EVEN IF WE DON'T SEEK OUT A SAMPLE SIZE, REQUIRE A

19    SAMPLE SIZE AMONG DOCTORS NATION-WIDE -- EVEN THOUGH THE

20    TESTIMONY SUPPORTS THAT THE PAY ACT IS ENFORCED THE SAME WAY

21    NATION-WIDE AS WELL ON THE SAME FORMS -- AT LEAST WITHIN DORN

22    VA WE KNOW THAT IT'S BEING ENFORCED THE SAME WAY BY THE SAME

23    DOCTORS, THE SAME PANELISTS ACROSS PRACTICE GROUPS.

24         AND THE REASON WHY WE ARE NOT SEEING THAT EVIDENCE -- GO

25    TO THE NEXT SLIDE, PLEASE -- IS BECAUSE THE MINUTE WE DO, THE
```

1    THEORY FALLS APART. WE DON'T HAVE ANY DOCTORS OLDER THAN

2    KENNEDY IN HIS PROPOSED COHORT. WE ALSO DON'T HAVE ANYBODY

3    THERE WITH -- ANYBODY WHO IS OLDER THAN HIM WITH LESS VA

4    EXPERIENCE. AND SO HERE WE HAVE BROUGHT OUT EVIDENCE OF

5    COMPARATORS, WE HAVE PLAINTIFF'S EXHIBIT 5, PLAINTIFF'S

6    EXHIBIT 6 THAT SHOW THAT OLDER DOCTORS WHO ARE COMING INTO

7    THE VA SYSTEM ARE NOT BEING DISCRIMINATED AGAINST.

8         THE EFFECT THAT PLAINTIFF'S IDENTIFIED IS NOT COMING TO

9    BEAR ON THEIR PAY. AND IF IT'S NOT COMING TO BEAR ON THEIR

10   PAY, ON 73-YEAR-OLDS, ON 70-YEAR-OLDS, ON 69-YEAR-OLDS, THEN

11   HOW IS THIS A CASE OF AGE DISCRIMINATION, DISPARATE IMPACT

12   DISCRIMINATION AGAINST THE CLASS?

13        I THINK WE HAVE SEEN THROUGH THE COURSE OF THIS CASE

14   IT'S CLEAR THAT THE PLAINTIFF FEELS PERSONALLY VERY

15   AGGRIEVED, BUT THIS IS NO LONGER A DISPARATE TREATMENT CASE.

16   THERE NEEDS TO BE A SHOWING OF HARM TO AN ENTIRE CLASS.

17   THERE ALSO NEEDS TO BE A SHOWING OF A CORREL -- OF NOT JUST A

18   CORRELATION BUT A CAUSAL RELATIONSHIP BETWEEN THAT HARM AND

19   AGE. AND AS WE'VE DEMONSTRATED, THE CAUSAL RELATIONSHIP IS

20   YEARS OF SERVICE IN THE VA. GO FORWARD ONE MORE SLIDE. AND

21   AGAIN, THAT'S WHAT STANDS OUT TO DISTINGUISH PLAINTIFF FROM

22   HIS PEERS IN THE ANESTHESIOLOGY GROUP.

23        IT'S NOT AGE. IT'S NOT REALLY COMPARATIVE YEARS OF

24   ANESTHESIOLOGY EXPERIENCE, WHICH ARE PRETTY CLOSE. THE

25   BIGGEST DIFFERENCE BETWEEN EACH ONE OF THEM AND THE ONLY

1    FACTOR THAT AFFECTED THEIR BASE PAY AS IT RELATED TO THEIR

2    MARKET PAY PROPORTIONS IS THE YEARS OF SERVICE IN THE VA.

3         SO YOUR HONOR, WITH THAT WE BELIEVE THIS IS JUST NOT A

4    MERITORIOUS CASE OF AGE DISCRIMINATION.  AND WE'D BE HAPPY IF

5    YOUR HONOR SO WISHES TO PROVIDE FURTHER BRIEFING ON ANY

6    PARTICULAR ISSUES YOU WOULD PROPOSE.  THANK YOU.

7         THE COURT:  ALL RIGHT.  THANK YOU.  ALL RIGHT.  MR.

8    IRVIN?

9         MR. IRVIN:  YOUR HONOR, JUST TO REMIND THE COURT

10   THAT ON THE ISSUE THAT I -- WE ARE GOING TO SUBMIT

11   AUTHORITY -- NEVER PLED, IT'S NOT BEEN AN ISSUE IN THE CASE,

12   BUT WE -- WE UNDERSTAND THE COURT'S CONCERN AND WE WILL BRIEF

13   IT FOR YOU.

14        THE COURT:  I'M NOT -- WHAT WAS NEVER PLED?

15        MR. IRVIN:  THE COHORT ISSUE AND THE FACT THAT

16   THOSE THAT ARE IN THE COHORT ARE ALL OF THE--

17        THE COURT:  BUT IT IS A DISPARATE IMPACT CASE, AND

18   CERTAIN FACTORS THAT YOU HAVE TO SHOW IN A DISPARATE IMPACT

19   CASE AND THE CASE LAW IS VERY CLEAR AS TO HOW DO YOU -- HOW

20   YOU GO ABOUT PROVING AGE DISCRIMINATION IN A DISPARATE IMPACT

21   CASE.  AND THERE IS CASE LAW ON WHO THE COMPARATORS ARE AND

22   WHAT THE SIZE OF THE CLASS HAS TO BE.  SO, I -- IF YOU WANT

23   TO BRIEF THAT, THAT WILL BE FINE.

24        MR. IRVIN:  YES, MA'AM.  THANK YOU.  I -- ALL I

25   CONTINUE TO SAY WAS THAT JUST NEVER HAD RAISED THAT AS A

1    DEFENSE IN THIS CASE THAT WE -- THAT THAT LAW APPLIED.

2        *MR. ANDREWS:* IT'S -- YOUR HONOR--

3        *THE COURT:* IT'S REALLY NOT A DEFENSE.  IT'S

4    BASICALLY WHAT THE LAW IS AND -- IN THE CASE.

5        *MR. ANDREWS:* THANK YOU, YOUR HONOR.  I WAS GOING

6    TO SAY IT'S THEIR BURDEN ACTUALLY TO DEMONSTRATE THAT.  IT'S

7    NOT A DEFENSE WE NEED TO ASSERT.

8        *THE COURT:* ALL RIGHT.  SO, WHEN DO YOU THINK YOU

9    COULD SUBMIT THAT ADDITIONAL BRIEFING?

10       *MR. IRVIN:* BY -- YOUR HONOR, BY THE END OF NEXT

11   WEEK.  TOMORROW IS FRIDAY.  GET YOU SOMETHING NEXT WEEK ON

12   IT.

13       *THE COURT:* OKAY.

14       *MR. IRVIN:* THANK YOU.

15       *THE COURT:* AND GOVERNMENT?

16       *MR. ANDREWS:* DOES YOUR HONOR PREFER SIMULTANEOUS

17   BRIEFING OR...

18       *THE COURT:* I MEAN, YEAH, BECAUSE...

19       *MR. ANDREWS:* WE'D LIKE THE OPPORTUNITY TO RESPOND

20   IF WE COULD -- OR SIMULTANEOUSLY?

21       *THE COURT:* SIMULTANEOUSLY.

22       *MR. ANDREWS:* WE CAN DO THAT.  NEXT FRIDAY THEN?

23       *THE COURT:* YES.

24       *MR. ANDREWS:* YES, MA'AM.

25       *THE COURT:* THANK YOU.  ALL RIGHT.  ANYTHING ELSE?

1          *MR. IRVIN:*  NOTHING ELSE FROM US, YOUR HONOR.

2          *THE COURT:*  THANK YOU VERY MUCH.  APPRECIATE IT.

3      (HEARING CONCLUDED.)

4                        * * *

5      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

6  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8      S/KATHLEEN RICHARDSON

9      _____          AUGUST 28, 2018

10     KATHLEEN RICHARDSON, RMR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25