IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Richard M. Kennedy, III, | ) Civil Action No: 3:15-cv-01844-MBS |
| Plaintiff, | ) |
| vs. | ) |
| Robert Wilkie, Secretary of Veterans Affairs, | ) |
| Defendant. | ) |

# **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

Plaintiff Richard M. Kennedy, III is a staff anesthesiologist employed at the William Jennings Bryan Dorn Veterans Affairs Medical Center (hereinafter "Dorn") in Columbia, South Carolina. On April 30, 2015, Plaintiff filed this action against Robert A. McDonald in his official capacity as Secretary of the United States Department of Veterans Affairs ("VA"), alleging claims under the Age Discrimination in Employment Act (hereinafter "ADEA"), 29 U.S.C. § 623. David A. Shulkin was substituted for Robert McDonald on July 19, 2017. ECF No. 98. Defendant Robert Wilkie was substituted for David Shulkin on August 1, 2018, pursuant to Federal Rule of Civil Procedure 25(d). ECF No. 135.

Relevant to the within order, Plaintiff alleges that Dorn has engaged in a pattern of age discrimination in determining the market pay for anesthesiologists employed at Dorn. ECF No. 102, Amended Complaint. Plaintiff claims that "although [Dorn's practices and policies are] facially neutral in their treatment of staff anesthesiologists, their impact falls more harshly on older staff anesthesiologists, including [Plaintiff]." Id. at ¶ 39. Plaintiff brings this action under the federal-sector provision of the ADEA, 29 U.S.C. § 633a,

which extends the ADEA to federal employees over the age of forty. The parties appeared before the court for a bench trial on August 1, 2018 and August 2, 2018. The court allowed the parties to submit additional briefing on the issues of Plaintiff's comparative class and Plaintiff's burden of proof. On August 10, 2018, the parties submitted Memorandums in Support of Judgment. ECF Nos. 147, 148. The court has viewed the witnesses and considered their testimony, examined the exhibits and depositions admitted at trial, and thoroughly reviewed the applicable law. The court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201, and makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a) and 57.

## I. FINDINGS OF FACT

### A. *The Department of Veterans Affairs Health Care Personnel Enhancement Act of 2004 (the "Pay Act").*

1. In 2004, Congress recognized that the Veterans Health Administration (VHA) faced severe recruitment and retention difficulties due to inadequate pay for physicians. In response, it passed the Pay Act, Pub. L. 108-445, to address the widening pay gap between VHA physician salaries and those earned in the private and academic sectors. *See* 38 U.S.C. § 7431(a).

2. The Pay Act, in relevant part, establishes two components of physician compensation – base pay and market pay – that together make up physician annual pay. *Id.*

3. Annual pay is the sum of base pay and market pay. Annual pay is the overall pay a physician receives on a yearly basis, excluding incentive pay. Annual pay is the basis for calculating civil service retirement benefits, lump sum annuity payments, life insurance, thrift savings plan contributions, workers compensation, and severance, among other things. Trial Tr. 140:5-6; 17-22; 213:8-13; 354:20-23.

4. Base pay is a scheduled payment system – much like the General Schedule for other federal employees – that is prescribed by statute and based solely upon years of service in the VHA. *See* 38 U.S.C. § 7431(b); Trial Tr. 341:13-18.

5. VHA physicians receive an automatic base pay step increase every two years, through a maximum of 15 steps, as the physician's longevity with the VA increases. *Id.*

6. All first-time VHA physicians, regardless of age, specialty, or years of medical practice, start off at Step 1 on the base pay scale and are moved up the ladder at the rate of one step every two years. 38 U.S.C. § 7431(b).

7. Market pay is the second component of physician pay. The Pay Act specifies that market pay is "intended to reflect the recruitment and retention needs for the specialty or assignment of a particular physician or dentist within a particular health care labor market." 38 U.S.C. § 7431(c)(2).

8. Market pay is added to base pay to arrive at a level of annual pay that is "reasonably comparable" to local private salaries. The amount of market pay to be added to a physician's base pay will depend on how much is needed to bring it "up to a competitive level" of annual pay, with reference to certain statutory factors including – but not limited to – survey data showing private salary ranges for the local market. Trial Tr. 435:16-436:3 (Kennedy); 141: 12-19 (Nichols).

9. The statutory factors to be considered when determining how much market pay to add to an employee's base pay include the following: the level of experience in the specialty; the need for the specialty at the facility; the local health care labor market for the specialty; the physician's board certifications; any prior VHA experience; and any other considerations the Secretary may deem appropriate. 38 U.S.C. § 7431(c)(4).

10. Under §7431(c)(6), a physician's market pay is evaluated not less than every twenty-four

3

months, at which time the amount of market pay may be adjusted.

11. Every two years, the Secretary establishes maximum and minimum rates for annual pay. The annual pay ranges apply nationwide and are intended to enhance VHA flexibility to recruit, develop, and retain the most highly-qualified providers to serve the nation's veterans and maintain a standard for excellence in the VHA healthcare system. Trial Tr. 325:14-18; 137:1-8.

### B. *Application of the Pay Act by Dorn*

12. Deborah Doty, Senior Policy Advisor at the VHA, helps manage and interpret the VHA's physician pay system nationwide, and has written much of the VA Handbook. She serves on the VHA Physician and Dentist Steering Committee that meets every two years to make recommendations to the Secretary to set minimum and maximum rates of annual pay for physicians and dentists. Trial Tr. 286:18-287:14; 288:9-13; 289:18-290:7.

13. The procedure for determining physician pay that is used by the Medical Center is based on the VA Handbook (Pl's Ex. 1) and not on the Pay Act. Trial Tr. 168:18-169: 12. The VA Handbook sets national VA policy. Trial Tr. 286: 22-25; 288; 16-289: 17; 316 10-19.

14. The VHA has an interest in uniformity in pay administration and ensuring that all 152 VHA facilities nationwide are complying with the statute and applying the policy similarly. Trial Tr. 317:12-20.

15. Doty travels nationwide to VHA facilities and gives trainings on application of the Pay Act and the VA Handbook. All VHA facilities use the VA handbook. Trial Tr. 296:8-17; 316:14-19.

16. Doty has met with Dorn Human Resources staff and observed the trial proceedings. She believes that Dorn's setting of physician annual pay under the Pay Act is consistent with

national VHA policy. Trial Tr. 318:6-319:9; 330:15-18.

17. The Pay Act specifies that, when determining the amount of market pay for a particular physician, the Secretary will consult with and consider the recommendation of an appropriate panel or board composed of physicians. These are referred to as "compensation panels." 38 U.S.C. § 7431(c)(5).

18. The purpose of compensation panels is to recommend annual pay for doctors. Trial Tr. 87:19-22 (Miller); 128:11-14 (Nichols); 189:15-17 (Groh); Trial Tr. 209:13-18 (McCallum).

19. The compensation panels make only a recommendation to the approving official for annual pay. They do not have final authority to set or amend physician pay. Trial Tr. 195:20-24.

20. The compensation panel process is concerned with making annual salary reasonably comparable to the labor market. Trial Tr. 178:1-5.

21. The compensation panel process at Dorn is based on the VHA regulatory policy as outlined in the VA Handbook. The compensation panels would make a recommendation on the annual pay for the physicians, which is base plus market. Trial Tr. 178:18-23.

22. Dorn has a medical staff of 209 physicians, dentists, podiatrists, and optometrists. There are approximately 180-90 physicians at Dorn. Trial Tr. 105:19-25.

23. Compensation panels at Dorn are made up of physicians from all specialties within the hospital. The physicians who served on the compensation panels for Plaintiff and his anesthesiologist peers also served on compensation panels for other doctors within Dorn, across all specialties in the hospital. Trial Tr. 190:5-9 (Groh); 213:8-15 (McCallum); 225:2-12 (Al-Assad); 239:18-25 (Downie); 273:25-274:6 (Smith).

24. The compensation panels at Dorn are conducted in the same manner for all doctors

5

at the hospital, irrespective of specialty. Trial Tr. 81:2-8 (Miller); 190:13-16 (Groh); 213:19-22 (McCallum); 225:13-15 (Al-Assad); 240:1-4 (Downie); 279:2-8, 282:6-9 (Smith).

25. The Dorn compensation panels included a technical advisor from human resources whose job was to provide participants relevant information and "support the process." (This advisor was also there to ensure that when the compensation panels were reviewing salary information and making recommendations and discussing the information they were considering they were staying within the rules as set forth in the VA Handbook). Trial Tr. 128:1-4; 148:14-21.

26. The compensation panel form used by Dorn is the same form used across all VHA facilities nationwide. Trial Tr. 301:6-18.

27. Whether memorialized in writing or not, the compensation panel reviews recommendations for physician compensation with reference to the statutory factors. Trial Tr. 176:6-16 (Nichols); 192:2-4 (Groh); 210:8-15 (McCallum); 227:13-15 (Al-Assad); 255:2-5 (Carr); 264:16-19 (Cox).

28. Neither the Pay Act nor the VA Handbook require the compensation panels to lend any particular factor any particular amount of weight. The panels are only required to "consider" these factors. The weight the panels assign any individual factor may vary on a case-by-case basis. Trial Tr. 173:23-24 (Nichols); 193:24-194:6 (Groh); 212:7-14 (McCallum); 279:9-13 (Smith).

29. When considering a physician's experience, the relevant inquiry is "level of experience," not "years" of experience. This allows the VA to consider other factors in a physician's record above and beyond the number of years. Trial Tr. 159:11-23.

30. The compensation panels give the VA flexibility to set physician pay under the Pay

Act with reference to the local labor market. The VA tries to set physician pay at a rate "reasonably comparable" to the local private labor market for that specialty. Trial Tr. 136:8-14.

31. The compensation panels use market information in order to determine local pay in order to hire or obtain physicians. The VHA and Dorn typically use two types of data- AAMC data, which compares physician salaries to those of medical school professor salaries, and HAY data, which varies depending on the contractor. Trial Tr. 138:23-139:19.

32. When the compensation panel is making recommendations on annual salary, it must look at survey data that is also reflective of the annual salary that is paid in the local labor market. Trial Tr. 323:8-15.

33. Because base pay is fixed administratively, and not as part of the compensation panel review process, the only variable component of annual pay subject to the panels' review and recommendation is market pay. Trial Tr. 190:17-191:3 (Groh); 209:19-210:3 (McCallum); 274:20-23 (Smith); 336:20-337:14 (Doty).

34. By recommending annual pay the panels are setting the market pay component of physicians' salaries because when they are reviewing and making a recommendation for annual pay, they are in essence only able to increase market pay as a component of the annual pay. Trial Tr. 191:4-6, 15 (Groh); 342:20-343:4 (Doty).

*C. Plaintiff and His Peers in the Anesthesiology Group Were Similarly Experienced, Similarly Qualified, and Similarly Compensated.*

35. In 2014, Dr. Nael Algothani joined the Dorn anesthesiology practice group, bringing the number of non-supervisory anesthesiologists to five. The other anesthesiologists were Plaintiff, Dr. Pryor, Dr. Pender, and Dr. Nguyen. Dr. Miller was the Chief of the anesthesiology group. Def's Ex. 6; Pl's Ex. 17.

36. At that time, Plaintiff was the oldest non-supervisory physician in the

anesthesiologist practice group. He was sixty- three, followed by Dr. Pryor, sixty; Dr. Pender, fifty-seven; Dr. Nguyen, fifty-two; and Dr. Algothani, forty-nine. *Id.*

37. Plaintiff practiced law for eleven years before entering medical school. Plaintiff graduated from medical school when he was forty years old. At that age, Plaintiff's younger colleague Dr. Nguyen had been an anesthesiologist for ten years. Trial Tr. 365:12; 358:22; 369:6-14; Def's Ex. 6; Pl's Ex. 17.

38. In 2014, Dr. Nyugen had the longest experience practicing medicine in the group, having been an anesthesiologist for twenty-two years. He was followed by Plaintiff, with nineteen years' experience; Dr. Pryor, with eighteen years' experience; Dr. Pender, with seventeen years' experience; and Dr. Algothani, with thirteen years' experience. Def's Ex. 6; Pl's Ex. 17.

39. Plaintiff had the longest VHA tenure, having worked at Dorn for sixteen years. He was followed by Dr. Pryor, with nine years' VHA tenure; Dr. Pender, with three years' VHA tenure; Dr. Nguyen, with one year VHA tenure; and Dr. Algothani, who had just started. *Id.*

40. In 2014, the anesthesiologists were similarly paid, with Plaintiff making slightly more in annual pay than his colleagues. *Id.*

41. Doctors who served on compensation panels for the anesthesiologists believed that Plaintiff and his anesthesiologist peers were similarly qualified. Trial Tr. 282:10-13; 265: 9-12.

42. In the private market, there is no guarantee that a doctor with twenty-five years' experience will make more than a doctor with fifteen years' experience. Trial Tr. 195:9-12 (Groh); 215:4-7 (McCallum); 279:22-25 (Smith).

43. Further, there is no guarantee in the private market that an older doctor will be paid more than a younger doctor with the same or similar experience. Trial Tr. 195:13-16 (Groh); 213:8-11 (McCallum); 280:1-4 (Smith).

8

44. Finally, there is no guarantee in the private market that pay will always increase with a physician's age. Trial Tr. 195:17-19 (Groh); 213:12-14 (McCallum); 280:5-7 (Smith).

45. From 2014 to 2016, Plaintiff received approximately $10,000 in raises. Def's Ex. 6; Pl's Ex. 17; Pl's Ex. 12.

46. In 2016, Dr. Nguyen received a job offer from another Columbia hospital with a proposed salary of $300,000. Dr. Nguyen presented this salary to Dr. Miller, informing him that in order to keep him, the VA would need to match the new offer. In order to retain Dr. Nguyen, Dr. Miller sought to match the new offer. Trial Tr. 58:22-59:18; 78:10-14.

47. In the course of modifying Dr. Nguyen's salary, Dr. Miller also conducted an independent compensation review for each anesthesiologist, in order to ensure that their salaries were also in line with Dr. Nguyen's private offer. Though a pay review was not required, and typically occurs only once every two years, Dr. Miller convened a pay review to "see if we could get the pay up to retain the staff we had." *Id*.

48. Plaintiff considered going to work in the private sector but was unsuccessful. He determined there was no interest in him because of his age, even though he was well known in the field. Plaintiff received a "small raise" due to Dr. Nguyen's offer. Trial Tr. 414:18-415:6.

49. Dr. Miller explained that he could not afford to lose Dr. Nguyen, and that "he needed to retain his staff in order to keep the operating rooms functioning at the level they were functioning." Dr. Miller testified that this was a business necessity. Trial Tr. 79:12-16.

> D. *Determination of a Physician's Ratio of Market or Base Pay to His or Her Annual Pay.*

50. The fact that the percentage of annual pay or percentage of market pay goes up for younger doctors is not a product of age but experience at the VA. In order for the VA to offer physicians who have not been with the VA long a competitive salary, the VA has to designate

9

more of the salary as market pay. Trial Tr. 154:2-10 (Nichols).

51. Because base pay and market pay are the only two components of annual pay, which is set at a rate "reasonably comparable" to private pay, the inverse is also true. The relative share of a physician's salary that is made up by market pay is determined solely by that physician's tenure at the VA. It is not based on age. Trial Tr. 154:2-10 (Nichols).

52. If the VA were to guarantee that physicians receive equal amounts of market pay – without reference to their base pay – the result would be disparities in their overall salaries, irrespective of their qualifications or local market survey data. Trial Tr. 333:13-24.

53. Such a decision would inject new inequities into physician pay, hinder recruitment and retention of qualified physicians, and undermine the foundations of the Pay Act. Trial Tr. 79: 5-20 (Miller); 114:4 -115:15 (DeKoning).

54. As a result, the VA does not concern itself with a particular physician's relative share of market pay to annual pay. The primary concern is whether the physician's salary, his or her annual pay, is "reasonably comparable" to what is paid in the local market and sufficiently competitive to retain that physician at the VA. Trial Tr. 153:8-20.

> E. *The Ratio of Market/Base Pay to Annual Pay is Determined by VHA Tenure, Not Age*.

57. Since 2014, Dorn has hired seven physicians over the age of sixty-five, in various specialties. None of these physicians had prior VA experience. Trial Tr. 108:11-23.

58. These doctors are subject to the same compensation panels as all other doctors at Dorn, including Plaintiff and his anesthesiologist peers. Trial Tr. 161:14-17.

59. These physicians include: Dr. Thomas Malone, age sixty-eight; Dr. Rashid Kahn, age seventy-nine; Dr. Bill Robinson, age sixty-nine; Dr. Irving Williams, age seventy-two; Dr. Carl Huff, age seventy-two; Dr. Beverly Simons, age seventy; and Dr. Victor Seghers, age seventy-

10

four. Because they are new to the VHA but paid at a relatively high annual pay rate because of their experience, all of them have relatively higher market pay-to-annual pay ratios than younger colleagues, including Plaintiff. Trial Tr. 111:5-14; Def's Ex. 5.

60. Still more older Dorn employees have relatively higher market pay-to-annual pay ratios than younger colleagues, including Plaintiff, as illustrated in Defendant's Exhibit 6:

| Doctor | Age in 12/14 | Length of Service (+ VHA) | Base Pay | Market Pay | Annual Pay | % of Annual Pay that is Market Pay |
|---|---|---|---|---|---|---|
| Kennedy | 63 | ≤ 18 | 125,359 | 167,738 | 293,097 | 57.2% |
| Eady | 73 | ≤ 10 | 113,285 | 251,136 | 364,421 | 68.9 % |
| Jackson | 69 | ≤ 8 | 109,953 | 182,013 | 291,966 | 62.3 % |
| Lewis | 70 | ≤ 8 | 103,289 | 152,013 | 255,302 | 59.5 % |
| McFarlane | 61 | ≤ 8 | 103,289 | 211,711 | 315,000 | 67.2 % |
| Palepu | 70 | ≤ 2 | 99,957 | 196,033 | 295,990 | 66.2 % |

61. It is fairly common for the VA to hire physicians over the age of sixty, toward the latter part of their career. Many doctors at that point in their career find VA employment attractive because it allows them to care for patients without having to pay for overhead, manage employees, or handle their own insurance billing. Trial Tr. 160:17-161:7.

62. When the VA hires an older physician who has never previously worked at the VA, it has to pay the physician at a level that is reasonably comparable to private market rates for physicians with similar skills, experience, and credentials. Because all new employees at the VA start as a "step one" on the base pay scale, that means for these older first-time VA employees, the market pay component is a much higher share of their overall salary than Dr. Kennedy's, or most other VA employees. Trial Tr. 342:4-19; *see also* Def.'s Ex. 5, 6.

63. The VA evaluates incoming older doctors, as with all other physicians, based on the quality of their experience and on the type and level of care they can provide the VA's patients.

11

Trial Tr. 161:8-13.

64. In early 2014, Plaintiff was concerned that his salary was "somewhat stagnant." He had been planning for retirement, and had the expectation that by the time he got to his "magic three years" that his overall salary should be around $300,000. Trial Tr. 382:19-24.

65. The "magic three years" are the three highest-earning years during a federal employee's tenure, from which the federal employee retirement system uses to calculate pension. Trial Tr. 383:2-11.

66. Plaintiff was "very interested" in making sure that he "was getting the maximum amount of income possible" so that he could maximize his pension as he planned for his retirement. Trial Tr. 383:4-12.

67. Plaintiff took his concerns to his Chief, Dr. Miller. Trial Tr. 383:12-13.

68. Plaintiff had "been working very, very hard" and "really felt [he] was due" and "hopeful" the pay raise "was going to come through. . . ." Trial Tr. 384:8-11.

69. Plaintiff came to learn that "there was a clear inverse correlation between age of anesthesiologists and market pay awards." Trial Tr. 393:9-13.

70. Plaintiff contacted an EEO officer, who told him that since his pay was the highest in the department, that he "didn't have any legitimate complaint." Trial Tr. 395:18-23.

71. Plaintiff came to believe he was being "penalized" for his time at the VHA. Trial Tr. 398:19.

72. At trial, Plaintiff described his grievance with the VHA:

The beef that I have is that I didn't receive the recognition financially for the years of service that I would have received had it been done properly and I had been financially awarded, that I had received market pay commensurate with my comparison to my colleagues and that my total pay was more than them because of my longevity at the VA. In other words, that my base pay cumulative step increases

would be on top of that.

Trial Tr. 401:14-21.

73. Plaintiff believes the market pay component of his salary "should be no less than the market pay awarded to one of my colleagues, all of whom are younger." Trial Tr. 402:22-24.

74. Plaintiff is concerned he is "not receiving credit for [his] prior VA experience in the market pay side." Trial Tr. 410:22-25.

75. Plaintiff has never applied for or been offered a job outside the VHA since he started there, but believes private employers "don't seem to value older people." Trial Tr. 449:12-23.

76. Plaintiff acknowledges he is the highest-paid anesthesiologist, by a small amount, at the VHA. Trial Tr. 421:4-8.

77. Plaintiff "didn't see any problem with [his] earning significantly more than [his] colleagues in view of the fact that [he] had such significantly built-up seniority which entitled [him] to more." Trial Tr. 416:21-23.

78. Plaintiff further explained:

I should not be penalized because I had spent many years at the VA and accumulated multiple step increases and had – basically have my step increases deducted from what the panel has determined to be an appropriate market pay to then give me a significantly reduced market pay merely because I have got a lot of years at the VA and they are not going to let me be compensated for it.

Trial Tr. 445:9-16.

## B. **CONCLUSIONS OF LAW**

### A. *Plaintiff Has Failed to Establish a Prima Facie Case of Disparate Impact Age Discrimination.*

1. A prima facie case of disparate impact requires the identification of a specific employment practice that, while facially neutral, nonetheless had a disproportionate adverse effect

13

on a protected class of individuals, and a demonstration of causation through "statistical evidence of a kind and degree sufficient to show that the practice in question …. caused" individuals to suffer the offending adverse impact "because of their membership in a protected group." *Kennedy v. McDonald*, 2017 WL 1162978, at *3–4 (D.S.C. Mar. 29, 2017) (quoting *Anderson v. Duncan*, 20 F. Supp. 3d 42, 54 (D.D.C. 2013)) (ECF No. 81).

2. A plaintiff "must allege a tangible adverse employment action as a result of the alleged discrimination." *Kennedy v. McDonald*, 2017 WL 1162978, at *3–4 (D.S.C. Mar. 29, 2017) (quoting *Axel v. Apfel*, 171 F. Supp. 2d 522, 526 (D. Md. 2000)) (ECF No. 81) (emphasis added).

3. Plaintiff has been unable to demonstrate a tangible adverse employment action for himself or any other ADEA-eligible VHA physicians. Plaintiff was the highest-paid nonsupervisory doctor in his practice area, received consistent pay raises over time, was paid more than at least one colleague who had more experience as an anesthesiologist, and was relatively close in age and overall medical experience to his peers, all of whom were ADEA-eligible.

4. The evidence established at trial makes clear that the adverse impact that Plaintiff alleges – the relative share of his market pay-to-annual pay – is "a result of" his VHA service, not age discrimination.

5. In a disparate impact age discrimination case, the plaintiff is obligated to not only put forth statistical evidence of discriminatory impact, but the "[s]tatistical disparities must be sufficiently substantial that they raise …. an inference of causation." *Kennedy v. McDonald*, 2017 WL 1162978, at *3–4 (D.S.C. Mar. 29, 2017) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988)) (ECF No. 81) (internal citations omitted).

6. Because the ultimate question in a disparate impact case is whether the challenged

policy has a discriminatory effect within the population it affects, the alleged disparate impact must therefore be demonstrated by statistical evidence based on "the total group to which the policy was applied." *Edwards v. Johnston Cty. Health Dep't*, 885 F.2d 1215, 1223 (4th Cir. 1989) (quoting *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 987 (4th Cir. 1984)).

7. The evidence and testimony admitted at trial is undisputed that Dorn calculated pay for Plaintiff and his anesthesiologist colleagues in the same manner it did for nearly two hundred other physicians – and indeed, in the same manner as all other VHA physicians nationwide – the relevant comparator population in this case should be all physicians compensated under the Pay Act, 38 U.S.C. § 7431, as applied by VHA subject to the VA Handbook. Pl's Ex. 1.

8. Plaintiff's proposed sample of four anesthesiologists is too small a population to be statistically significant or have any probative value, and greatly increases the likelihood that conclusions drawn from its subjects will be based on chance. *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir. 1994).

9. Because Plaintiff has failed to establish an adverse employment action, and because Plaintiff has failed to otherwise put forth any competent evidence of disparate impact age discrimination, the court enters judgment for Defendant.

### B. *Defendant Has Established a Business Necessity Defense*.

10. If Plaintiff established a prima facie case, "the burden shifts to the defendant to 'demonstrate that the challenged practice is job related for the position in question and consistent with business necessity….'" *Kennedy v. Shulkin*, No. 3:15-cv-1844 (D.S.C. July 30, 2018) (ECF No. 133) (quoting *Figueroa v. Tillerson*, 289 F. Supp. 3d 212, 220 (D.D.C. 2018)).

11. With a business necessity defense, "the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer. *See,*

*e.g., Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996-997 (1988).

12. At trial, the evidence makes clear that the VHA is required by law and by business necessity to set annual pay for its doctors that is both "reasonably comparable" to private salaries and internally fair and consistent. If the VA were to adopt Plaintiff's view, it would have to assess market pay at a rate that would raise annual pay rates above what the VHA determines to be "reasonably comparable" ranges. It would also inject new disparities into the VA pay system by prioritizing VA tenure over other market-based factors.

13. Accordingly, even if Plaintiff were able to establish a prima facie case of disparate impact age discrimination , there is sufficient evidence to conclude that Defendant has established that the VHA sets pay for doctors in the manner it does as a matter of business necessity.

14. Finally, Plaintiff has failed to identify an alternative practice which would have complied with the statutory and regulatory guidelines. "If a defendant successfully puts forward a business necessity defense, then the plaintiff must persuade the trier of fact that alternative practices would have achieved the same business ends without 'a similarly undesirable effect' on the protected class of individuals." *Anderson v. Duncan*, 20 F. Supp. 3d 42, 55 (D.D.C. 2013) (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989)). "Despite shifting the burden of production, the burden of persuasion remains with the plaintiff." *Anderson*, 20 F. Supp. 3d at 55.

15. The court finds that Plaintiff's sole evidence at trial for an alternative employment practice was to avoid the alleged disparate impact on older staff anesthesiologists by increasing the market pay component. The court finds that it cannot consider only one component of the three component pay system (base, market, and annual pay) created by the Pay Act. *See* 38 U.S.C. § 7431. If Plaintiff's suggestion were implemented and only the market pay component

was increased, older staff anesthesiologist's annual salary would be substantially higher in the government than in the private sector. The court believes that this proposed alternative is not economically feasible for the VA. Therefore, the court concludes that Plaintiff fails to meet his burden of demonstrating the existence of an economically feasible alternative practice for staff anesthesiologist compensation under the Pay Act. The court finds that in absence of any other alternatives, Plaintiff fails to rebut Defendant's business necessity defense.

### III.  CONCLUSION

For the reasons set forth above, the court finds that Plaintiff has failed to make a prima facie case of age discrimination under a disparate impact theory, and that even if a prima facie case is made, Defendant has presented a valid business necessity defense. The court grants judgment in favor of Defendant. The Clerk of Court shall enter judgment pursuant to Fed. R. Civ. P. 58.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

September 28, 2018